

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:26-cv-00038-DAB-JEP

HEATHER AMMEL,

                         Plaintiff,

  v.

KYRSTEN SINEMA,

                         Defendant.

## DECLARATION OF KYRSTEN SINEMA

      I, KYRSTEN SINEMA, declare and state as follows:

      1.      I am over the age of eighteen and am competent to make this declaration. I have personal knowledge of all facts described below.

      2.      I reside in Arizona. I have never resided in North Carolina, own no property in North Carolina, do not conduct business in North Carolina, and have no contractual relationships with North Carolina business entities or residents.

      3.      I represented the State of Arizona in the U.S. House of Representatives from 2013 to 2019 and in the U.S. Senate from 2019 until 2025. During my time as a Senator, I had approximately 70 people working for me and/or my campaign who worked out of several different offices and/or remotely. I traveled frequently by airplane, in most cases more than twice per week. It was very difficult for me to keep up with my own schedule and whereabouts and, with the one exception of an aide who traveled with me, I was unable to and did not attempt to keep track of whereabouts of the other members of my staff or consultants at any given time.

      4.      Due to numerous threats made against me as a Senator, in 2021, my Senate campaign and political action committee ("PAC") engaged a security company to provide

security details at my public events. The first company engaged was Toa Group, LLC ("Toa Group"), which typically dispatched at least three security guards to attend my public events. Toa Group is based in Phoenix, Arizona and has no connection to North Carolina.

5. As of October 2023, due to leadership changes at Toa Group, my campaign engaged Kinsaker Security Group, LLC ("Kinsaker") to provide security details at my public events. Again, Kinsaker typically dispatched at least three security guards to attend my public events. Kinsaker is based in Phoenix, Arizona and has no connection to North Carolina.

6. The security details dispatched to my events by Toa Group and Kinsaker included at least the following three positions:

   a. "Body," meaning the person who stood by or walked near me at all times I was in public;

   b. "Driver," meaning the person who stayed with or in the vehicle used to transport me to ensure swift departure in case of emergency;

   c. "Advance," meaning the person who came to each public event in advance to ensure it was safe prior to my arrival. Upon my arrival, the advance person would depart, often to the next public event on my schedule. I was never alone with the advance member of my security detail.

7. As a Senator, I was trained to communicate using the Signal Messenger LLC ("Signal") messaging app for communications related to my public service or governmental activities. Encrypted Signal messages disappear shortly after they are sent to the recipient and cannot thereafter be retrieved on the device of either the sender or the recipient; they also cannot be retrieved by Signal or phone service providers. I routinely used the Signal messaging app

2

during the time period I was a Senator, including to communicate with all security guards dispatched to my events by Toa Group and Kinsaker.

8. During the entire time Toa Group and Kinsaker provided security for me, I entered the State of North Carolina one time, a campaign-related event in Charlotte on February 6, 2023. I flew into Charlotte with a staffer, arriving at 2:00 pm. I was accompanied by a staffer and two additional security members to an office building in Charlotte, then went straight back to the airport at the conclusion of the event. The staffer and I departed from the Charlotte airport at 6:00 pm. I was in North Carolina for approximately four hours. I did not return to North Carolina thereafter until May 2025.

9. I became aware of Matthew Ammel in 2022 after he began providing security services to me and my campaign through Toa Group and later Kinsaker. Initially, I did not know where he resided, but at some point in the fall of 2023 received his telephone number in order to maintain contact with him related to his role on security details for me—as I did with all members of my security details. I became aware at that point that the area code of Mr. Ammel's telephone number was "913," which I knew to be a Kansas area code.

10. Mr. Ammel was on numerous security details for me from 2022 through 2024, initially for Toa Group, as of October 2023 for Kinsaker, and as of June 2024, also as a paid employee of the Senate; most of his security detail work for me occurred in the Western United States, Texas, New York, Chicago, and Washington, DC. At some point I learned he was working simultaneously for Ridgeline Defense, LLC ("Ridgeline"), a firearms training facility in New Hampshire, and for Staccato 2011, LLC ("Staccato"), a firearms manufacturer based in Texas. Between his work for Ridgeline and Staccato, I was aware he traveled very frequently throughout the country and needed to coordinate his travel for me and my campaign with his

3

travel for Ridgeline and Staccato.  I was unaware of Mr. Ammel's physical whereabouts on a day-to-day basis—due to my hectic work schedule and his extensive travels—other than the occasions he was part of a security detail assigned for my protection and was either en route to my location, physically present in my location, or departing my location.

11. I did not learn that Mr. Ammel resided in North Carolina, and lived there with his wife and children, until approximately December 2023.  He introduced me to his wife that month in Las Vegas, Nevada, following a U2 concert I acquired tickets for them to attend.  Though I knew from that point forward that Mr. Ammel resided in North Carolina, I also knew that he was traveling outside of North Carolina for Ridgeline, Staccato, and/or me and my campaign the vast majority of each month.  I never had personal knowledge of him being physically present in North Carolina at any time I initiated or had communications with Mr. Ammel prior to November 2024.

12. Between the commencement of his security detail work for me and my campaign in 2022 and October 2024, Mr. Ammel and I engaged in communications through three means: (1) telephone; (2) email; and (3) Signal messages.  We did not engage in any communications via SMS (text) messages during that time period.  The only phone I ever used to communicate with him was my personal cellphone.

13. I have carefully reviewed the records of my cellphone and email communications with Mr. Ammel and used those records to ascertain where I was and where he was when such communications occurred.  I can produce those records upon request, but am not attaching them hereto because they are voluminous and are private records that would require some form of protection both from the public court file and from further dissemination.

4

14. Based upon my review of those records, none of my telephone or email communications with Mr. Ammel between early 2023 and November 1, 2024 occurred while he was physically present in North Carolina. Stated another way, Mr. Ammel was physically outside the State of North Carolina at the time I directed 100% of my telephone and email communications to him during such time period. Furthermore, virtually all such telephone and email communications I directed to him during such time related solely to the security services he provided to me and my campaign.

15. Below I detail all of my telephone and email communications with Mr. Ammel during the relevant time period, and I address the Signal messages Plaintiff alleges in her Complaint I sent to Mr. Ammel at times she alleges I knew he was physically located in North Carolina.

16. On September 23, 2023, at 11:47 am, I called Mr. Ammel from Sonoma County, CA to let him know that I and my two friends were ready to depart our hotel for a local winery. Mr. Ammel was providing security that weekend while I cycled with a friend and his wife. Mr. Ammel was in Sonoma County, CA at the time of the call. The call lasted 1 minute.

17. On September 24, 2023, at 7:28 pm, I called Mr. Ammel from Sonoma County, CA to let him know that my two friends and I were ready to depart to dinner. Mr. Ammel was in Sonoma County, CA at the time of the call. The call lasted 1 minute.

18. On October 26, 2023, at 8:00 am, I forwarded an email to Mr. Ammel. It was the registration confirmation of the Canyonlands Ultra marathon taking place in St. George, UT. The email contained no other communication. My research has confirmed that Mr. Ammel was in St. George, UT when I sent this email.

19.     I have no recollection of any Signal messages I sent to Mr. Ammel in January 2024, as is alleged in paragraph 27 of Plaintiff's Complaint.  If I did send him Signal messages in that month:  (1) for the reasons described above, at the time, I had no knowledge as to where Mr. Ammel was physically located; and (2) any such communications would have related solely to the security services he was providing to me and my campaign, and were not of a romantic or intimate nature.  To the extent Plaintiff alleges that such messages "exceeded the bounds of a normal working relationship and were of romantic and lascivious natures," that allegation is false.

20.     In paragraph 28 of her Complaint, Plaintiff alleges that I sent Mr. Ammel messages that included a picture of me "wrapped in a towel" and that I offered to help him work through his mental health challenges and suggested for him to bring MDMA drugs on a work trip so I could "guide him through a psychedelic experience."  First, I never sent Mr. Ammel any messages that included a picture of me wrapped in a towel and have no recollection of any message of the type Plaintiff alleges.  Second, whatever messages and/or photo I sent to Mr. Ammel that pertain in any way to Plaintiff's allegations in paragraph 28 of her Complaint were (1) not of a romantic or intimate nature and (2) for the reasons described above, at the time, I had no knowledge as to where Mr. Ammel was physically located.

21.     On March 2, 2024, at 2:41 pm, I called Mr. Ammel from Phoenix, AZ to let him know that my staff and I were ready to depart to the Innings Festival.  Mr. Ammel was one of three security personnel assigned to me that afternoon, and was in Phoenix, AZ at the time of the call.  The call lasted 1 minute.

22.     Plaintiff alleges in paragraph 29 of her Complaint that I messaged Mr. Ammel during the State of the Union address, which occurred on March 7, 2024.  As is apparent from

paragraph 29, (1) such communication was not of a romantic or intimate nature; and (2) for the reasons described above, at the time, I had no knowledge as to where Mr. Ammel was physically located.

23. Plaintiff alleges in paragraph 30 of her Complaint that Mr. Ammel messaged me while at a baseball game during a work trip for Staccato in Pennsylvania that he was going to start a "fuck the troops" chant and that I responded I would "fuck the hot ones." As is apparent from paragraph 30, this communication (1) was not of a romantic or intimate nature and (2) occurred while Mr. Ammel was in Pennsylvania.

24. Plaintiff alleges in paragraph 31 of her Complaint that Mr. Ammel and I messaged each other about having sex missionary style with the lights on and that I stated "Boring!" Though I don't have a specific recollection of such message, it would have occurred at the same time as those referenced in paragraph 30 of Plaintiff's Complaint and related to the same subject matter—about American troops, not about me and Mr. Ammel. This communication (1) was not of a romantic or intimate nature and (2) occurred while Mr. Ammel was in Pennsylvania.

25. On April 6, 2024, at 5:41 pm, I called Mr. Ammel from Washington, DC to coordinate walking me and my friends to dinner. Mr. Ammel was in Washington, DC at the time of the call. The call lasted 2 minutes.

26. On April 7, 2024, at 6:50, 6:51 and 6:53 am, I called Mr. Ammel from Washington, DC three times as my friends and I were navigating our way to our destination. Mr. Ammel was in Washington, DC at the time of the call. Each call lasted 1 minute.

27. On May 25, 2024, at 2:32 pm, I called Mr. Ammel from Sonoma, CA to let him know that my flight had arrived and my friends and I would walk out of the airport terminal soon. Mr. Ammel was in Sonoma, CA at the time of the call. The call lasted 1 minute.

7

Case 1:26-cv-00038-DAB-JEP    Document 14-1    Filed 03/12/26    Page 7 of 14

28. At the end of May 2024, my relationship with Mr. Ammel became romantic and intimate. On May 27, 2024, while Mr. Ammel was on a security detail for me Sonoma, CA, we were physically intimate for the first time. Thereafter, we were physically intimate in mid-June in New York City, NY, in mid-July in Washington, DC, in late-August in Aspen, CO, in late-September in Washington, DC, and in early-October in Phoenix, AZ.

29. On June 21, 2024, at 1:40 pm, I called Mr. Ammel from Los Angeles, CA to let him know that a staffer and I had completed our run to the beach and to locate him and my other friend, who was with him. Mr. Ammel was in Los Angeles, CA at the time of the call. The first call did not go through, so I called again. Each call lasted 1 minute.

30. On June 22, 2023, at 7:09 pm, I forwarded an email to Mr. Ammel. It was the receipt for his hotel room, which he needed to submit to his superiors for reimbursement. The email contained no other communication. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time I sent this email.

31. Plaintiff alleges in paragraph 40 of her Complaint that I sent Mr. Ammel a message in June 2024 expressing that I kept waking up during my sleep and reaching over for his arms to hold me. I can confirm that on or about June 22, 2024, I sent four Signal messages to Mr. Ammel. I was in Scottsdale, AZ when I sent those messages. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time I sent those messages. Those messages were as follows:

    a. "I hope your day was ok";

    b. "Thinking of you";

    c. "I am with you"; and

    d. "I keep waking up during my sleep and reaching over for your arms to hold me."

8

32. I was able to reconstruct the foregoing Signal messages from a screenshot Plaintiff made of them—presumably from Mr. Ammel's phone—and thereafter texted to herself. Plaintiff produced her entire text stream with Mr. Ammel in their domestic litigation and the screenshot containing these Signal messages appears on page 79 of the text stream. The messages before and after that screenshot confirm that Mr. Ammel was with his family, including Plaintiff, in Leavenworth, KS when these Signal messages were sent.

33. On June 24, 2024, at 3:02 pm, I forwarded an email to Mr. Ammel. It was the receipt for his hotel room, which he needed to submit to his superiors for reimbursement. The email contained no other communication. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time he received the email.

34. On July 4, 2024 at 2:31 pm, I called Mr. Ammel from Tokyo, Japan. I had just climbed Mount Fuji with a staffer and called Mr. Ammel to discuss an upcoming Grand Canyon hike with a group of hikers. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time of the call. The call lasted 19 minutes.

35. On July 11, 2024, at 9:42 pm, I called Mr. Ammel from Idaho to further discuss the Grand Canyon hike. Mr. Ammel called me back at 9:46 pm and we talked for 23 minutes. My research has confirmed that Mr. Ammel was in Washington, DC at the time of the call.

36. On July 20, 2024, at 8:14 am, I called Mr. Ammel from Phoenix, AZ to coordinate my departure at the airport. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

37. On August 8, 2024, at 12:19 pm, I forwarded an email to Mr. Ammel. It was the receipt for his hotel room, which he needed to submit to his superiors for reimbursement. The

9

email contained no other communication. My research has confirmed that Mr. Ammel was in New York City, NY when I sent this email.

38. On September 3, 2024, at 9:04 pm, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a dinner I was having with a friend. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

39. On September 4, 2024, at 2:47 pm, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a meeting. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

40. On September 7, 2024, at 1:12 pm, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a meeting. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

41. On September 19, 2024, at 2:46 pm, I called Mr. Ammel from New York City, NY, to coordinate my departure from a hotel I was staying at with friends. Mr. Ammel was in New York City, NY at the time of the call. The call lasted 1 minute.

42. Mr. Ammel was on security details for me in Arizona all but two nights from October 1, 2024 until October 11, 2024. That included the three-day trip to the Grand Canyon from October 7-9.

43. On October 1, at 5:40 pm, I started a staff call on my conference line while I was in Phoenix, AZ. At 5:42 pm, I called Mr. Ammel to merge him into the staff conference line for the staff meeting, as he had not dialed into the call. Mr. Ammel was in Phoenix, AZ at the time of the call. The meeting lasted 30 minutes; Mr. Ammel was merged through my line for 28 minutes.

44. On October 7, at 11:33 am, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a meeting. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 2 minutes.

45. On October 8, 2024, at 3:06 pm, I called Mr. Ammel from the Grand Canyon. Mr. Ammel was at the Grand Canyon at the time of the call. The call did not go through, and is listed in my phone records as lasting 1 minute.

46. On October 8, 2024, at 10:22 pm, I called Mr. Ammel from the Grand Canyon to coordinate leaving the restaurant and returning the group of hikers to our cabins. Mr. Ammel was at the Grand Canyon at the time of the call. The call lasted 2 minutes.

47. Mr. Ammel returned with me and our group of hikers to Phoenix, AZ on October 10, 2024. He left Phoenix the following day.

48. I traveled from Phoenix to Montana on October 10—while Mr. Ammel was still in Phoenix—and then left Montana on October 11 to travel to Paris, a trip that lasted from October 12-16. I then flew from Paris to Salt Lake City, UT, arriving on October 17. I was in Utah until the evening of October 18 and boarded a flight bound for Miami, FL just before midnight on October 18. I met Mr. Ammel, his wife, and children in Miami on October 19. They had come to Miami as my guests to see the Taylor Swift concert that evening. I was together with Mr. Ammel and his family October 19 and 20 before flying back to Phoenix on October 21.

49. In paragraph 44 of her Complaint, Plaintiff alleges that Mr. Ammel was in Moore County, NC in October 2024 when I messaged him, "I miss you. Putting my hand on your heart. I'll see you soon." She further alleges that she responded to my message by stating, "Are you having an affair with my husband? You took a married man away from his family." The Complaint does not allege the specific timing of this message exchange.

50. I recall sending Mr. Ammel a Signal message similar to the one described in foregoing paragraph—and also remember receiving Plaintiff's response about taking "a married man away from his family." The earliest that message exchange occurred would have been at the end of my trip to Paris—on or about October 16—which is why I closed my message to Mr. Ammel, "See you soon." Because I had acquired the Taylor Swift tickets for Mr. Ammel and his family, I knew they would be in Miami on or about October 19—three days following the end of my Paris trip. It is also possible that I sent that Signal message even closer to the time we would all be together in Miami, which would have been while I was in Utah on October 17 or 18. Thus, my very best memory is that I sent the Signal message described in the foregoing paragraph somewhere between October 16 and October 18, 2024.

51. At the time I sent the message to Mr. Ammel described in the foregoing paragraph, due to my extensive travels—which included both Paris and Utah—and my knowledge that Mr. Ammel traveled for work frequently and was rarely in North Carolina, I did not know where he was physically located. Specifically, I did not know he was with in North Carolina when that message was sent—and/or that he was in the proximity of Plaintiff—until I received her responsive message. In any event, at the time I sent that message, it was very clear to me that Mr. Ammel's marriage with Plaintiff was over and that he had found a new apartment he planned to move into imminently.

52. On October 22, 2024, at 4:40 pm, I called Mr. Ammel from Las Vegas, NV to find him as we were leaving the conference center. Mr. Ammel was in Las Vegas at the time of the call. Mr. Ammel did not answer the call; it is listed on my phone records as 1 minute. I called again at 4:41 pm and Mr. Ammel answered as he was walking towards the rest of the group inside the conference center. The call lasted 2 minutes.

53. Mr. Ammel was physically with me from October 26 until November 1, 2024, first in Phoenix, AZ and then in the Middle East.

54. I did not, as Plaintiff alleges in paragraph 53 of her Complaint, solicit Mr. Ammel "by using telephonic and internet communications of lascivious natures" while "Plaintiff and Mr. Ammel were domiciled and present in North Carolina[.]"

55. It is untrue, as Plaintiff alleges in paragraph 55 of her Complaint, that "[m]any of the communications" referenced in her Complaint "occurred while Mr. Ammel was in the marital residence in Moore County, North Carolina with Plaintiff and the Children."

56. It is untrue, as Plaintiff alleges in paragraph 56 of her Complaint, that I "had actual knowledge that Mr. Ammel was physically located and present in North Carolina with Plaintiff and the Children at the time [I] sent the messages to Mr. Ammel and the messages were received by Mr. Ammel."

57. It is untrue, as Plaintiff alleges in paragraph 57 of her Complaint, that I had "repeated telephone calls and repeatedly sent messages to Mr. Ammel knowing he was located in North Carolina with Plaintiff and the Children."

58. It is untrue, as Plaintiff alleges in paragraph 58 of her Complaint, that I "could have and should have known that through eliciting communication—texts and phone calls—with Mr. Ammel, [I] was establishing a connection with the State of North Carolina."

59. The opposite of Plaintiff's allegations is true. I had no knowledge at the time I initiated any communications with Mr. Ammel that he was located in North Carolina at the time. Indeed, my research has confirmed that Mr. Ammel was located outside of North Carolina when virtually all of the communications addressed in this declaration occurred.

60. I declare under the penalty of perjury and the laws of the United States that the foregoing is true and accurate.

This the 7th day of March, 2026.

*KYRSTEN SINEMA*

14