UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:26-cv-00038-DAB-JEP

HEATHER AMMEL,

                                    Plaintiff,

         v.

KYRSTEN SINEMA,

                                    Defendant.

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Defendant Kyrsten Sinema hereby submits this memorandum of law in support of her motion to dismiss for lack of personal jurisdiction.

## INTRODUCTION

Jurisdiction over Defendant does not exist because she did not purposefully direct any conduct giving rise to Plaintiff's claim for alienation of affection into North Carolina. Defendant admits that she and Plaintiff's husband, Matthew Ammel, began a romantic relationship in May 2024, about five months prior to his separation from Plaintiff. Yet, as her declaration establishes, that relationship occurred exclusively outside of North Carolina.

Plaintiff grounds her assertion of jurisdiction on romantic telephone calls and electronic messages she alleges Defendant initiated with Mr. Ammel while he was in North Carolina. The evidence, however, refutes her allegations. During the relevant time period, Mr. Ammel was traveling outside of North Carolina for at least three different jobs all but a few days each month. Defendant documents each telephone call and email communication she had with him—none of which occurred while he was in North Carolina.

Though Plaintiff points to a handful of arguably romantic Signal messages Defendant sent to Mr. Ammel prior to October 2024, Mr. Ammel was not in North Carolina when Defendant transmitted any of them. The only arguably romantic message Defendant transmitted to Mr. Ammel while he was in North Carolina was sent in mid-October 2024, after Mr. Ammel had found a new place to live in response to Plaintiff's clear directive that he move out of the marital residence. That one communication—when the marriage was already over—did not give rise to Plaintiff's cause of action for alienation of affection and, therefore, cannot establish personal jurisdiction over Defendant.

Because Defendant's conduct related to her romantic relationship with Mr. Ammel does not connect her to North Carolina in a meaningful way, jurisdiction over her in this action does not comport with due process.

## QUESTION PRESENTED

I.    **Does the exercise of jurisdiction over Defendant comport with due process?**

## STATEMENT OF THE CASE

Plaintiff filed this action in Moore County Superior Court on September 30, 2025. DE 1-2. Defendant removed the case to this Court on January 13, 2026. DE 1. Via text orders, Defendant was granted an extension of time to file responsive pleadings until March 12, 2026.

## STATEMENT OF FACTS

### A. *Defendant and Mr. Ammel's Professional Relationship*

Defendant represented the State of Arizona in the U.S. House of Representatives from 2013 until 2019 and in the U.S. Senate from 2019 until 2025. Sinema Decl. ¶ 3. She has never resided in North Carolina, does not own property here, conducts no business here, and has no contractual relationships here. *Id.* ¶ 2. During the relevant time period—prior to Plaintiff's separation from

2

Mr. Ammel—Defendant was in North Carolina on only one occasion, for a campaign-related event in Charlotte. *Id.* ¶ 8.

Due to threats against her, Defendant's Senate campaign and political action committee retained security companies—first Toa Group, LLC ("Toa Group") and later Kinsaker Security Group, LLC ("Kinsaker")—to provide security details at her public events. *Id.* ¶¶ 4-5. She routinely used encrypted messages on the Signal Messenger platform to communicate about her governmental activities, including to members of her security details. *Id.* ¶ 7. By design, Signal messages disappear shortly after they are sent. *Id.*

After retiring from the U.S. Army in 2022, Mr. Ammel began working as a security guard for Toa Group and later for Kinsaker. Ammel Decl. ¶¶ 3-4, 6. Defendant became aware of Mr. Ammel through his work on her security details. Sinema Decl. ¶ 9. Mr. Ammel was also working as a firearms instructor for Ridgeline Defense, LLC ("Ridgeline") and Staccato 2011, LLC ("Staccato"). Ammel Decl. ¶ 4. His work required extensive travels across the country and he was only in North Carolina a few days per month. *Id.*

In June 2024, Mr. Ammel was hired by the U.S. Senate as a W2 employee to provide security services on governmental trips, both across the country and throughout the world. Ammel Decl. ¶ 8. At that point, he stopped working for Ridgeline and Staccato but continued his work for Kinsaker. *Id.* His travels outside of North Carolina were even more extensive in 2024 than they had been in 2022 or 2023 and kept him away from the state during most of the year. *Id.*

Initially, Defendant did not know that Mr. Ammel resided in North Carolina. Sinema Decl. ¶ 9. She became aware of his telephone number in the fall of 2023 and noted his Kansas area code. *Id.* She first learned that he lived in North Carolina with his wife and children in or around December 2023. *Id.* ¶ 11. Defendant knew Mr. Ammel traveled outside of North Carolina for

3

Ridgeline, Staccato, and/or her or her campaign the vast majority of each month, *id.*, and was unaware of his physical whereabouts on a day-to-day basis. *Id.* ¶ 10. She never had personal knowledge of Mr. Ammel being physically present in North Carolina at any time she initiated or had communications with him prior to November 2024. *Id.* ¶ 11.

### B. *Defendant and Mr. Ammel's Romantic Relationship*

At the end of May 2024, Defendant's relationship with Mr. Ammel became romantic and intimate. *Id.* ¶ 28. They were physically intimate for the first time on May 27 in Sonoma, California. *Id.* Thereafter, they were physically intimate in mid-June in New York City, mid-July in Washington, DC, late-August in Aspen, Colorado, late-September in Washington, DC, and early-October in Phoenix, Arizona. *Id.*

### C. *End of Plaintiff's and Mr. Ammel's Marriage in October 2024*

On Thursday, October 3, 2024, while he was returning to North Carolina from a work trip, Plaintiff texted Mr. Ammel and instructed him to get a hotel or apartment "by Sunday." Ammel Decl. ¶ 12. Mr. Ammel stayed at the marital residence until then, sleeping downstairs in the spare bedroom. *Id.* ¶ 13. That Sunday, Plaintiff texted him: "I know you've got a busy week ahead but if you have a few spare minutes this puts it really well. About how do to a structured separation." *Id.* ¶ 14.

Mr. Ammel was gone for a work trip the entire following week. *Id.* ¶ 15. On Friday, October 11, Plaintiff texted him, "Please make sure you have a hotel room arranged from Saturday to Friday…. I highly suggest you use this week to find an apartment and therapist…. When we tell the kids on Saturday, I will not take the fall for your choices…. You have repeatedly told me you want a divorce. I won't allow you to continue to hurt me or the kids." *Id.*

As Plaintiff requested, Mr. Ammel began making arrangements to live separate and apart from her. *Id.* ¶ 16. He visited the Tylers Ridge at Sand Hills apartment community ("Tylers Ridge") on Monday, October 14 and toured an apartment. *Id.* He told Plaintiff later that day he would be moving out as soon as his new apartment at Tylers Ridge was ready. *Id.* He and Plaintiff went to her therapist together on October 17 and discussed their impending separation. *Id.* ¶ 19.

Plaintiff, Mr. Ammel, and their three children traveled to Miami on October 19 to see a Taylor Swift concert as Defendant's guest. *Id.* ¶ 20; Sinema Decl. ¶ 48. Plaintiff and Mr. Ammel divided their children and stayed in separate hotel rooms. Ammel Decl. ¶ 20. Mr. Ammel left Miami on October 21 for a work trip in Phoenix and Las Vegas and returned to North Carolina on October 23. *Id.* ¶ 21. He slept in the spare bedroom the next two nights. *Id.* He submitted his lease application to Tylers Ridge on October 24. *Id.* ¶ 22.

Plaintiff and Mr. Ammel flew to Nashville the morning of October 25 to attend a performance by a country artist. *Id.* ¶¶ 24-26. Though they were in the midst of a separation, they discussed in advance of the trip that seeing the concert in Nashville would be a nice way of saying "goodbye" to their marriage and all the years they had together. *Id.* ¶ 25. Mr. Ammel slept on the couch of their hotel room. *Id.* ¶ 26. The next morning, October 26, Mr. Ammel flew to Phoenix for a work trip and Plaintiff returned to North Carolina; they never spent another evening together. *Id.* Following his seven-day work trip, Mr. Ammel moved into his new apartment at Tylers Ridge on November 1. *Id.* ¶ 29.

### D.  *Plaintiff's Allegations as to Personal Jurisdiction*

Plaintiff's primary allegations as to the existence of personal jurisdiction over Defendant are set forth in paragraphs 56 to 58 of her Complaint:

5

56.     Defendant had actual knowledge Mr. Ammel was physically located and present in North Carolina with Plaintiff and the Children at the time Defendant sent the messages to Mr. Ammel and the messages were received by Mr. Ammel.

57.     Defendant repeated telephone calls and repeatedly sent messages to Mr. Ammel knowing he was located in North Carolina with Plaintiff and the Children.

58.     Defendant could and should have known that through eliciting communication—texts and phone calls—with Mr. Ammel, she was establishing a connection with the State of North Carolina.

DE 1-2, p. 10.

### E.  Defendant's Evidence

Defendant has proffered both her and Mr. Ammel's declarations to refute the foregoing allegations.  As those declarations demonstrate, Defendant and Mr. Ammel communicated in three different ways:  (1) telephone; (2) email; and (3) Signal messages.  Sinema Decl. ¶ 12.  They did not engage in SMS (text) communications and Defendant only used her personal cellphone to communicate with Mr. Ammel.  *Id.*  Defendant recounts each and every telephone and email communication between her and Mr. Ammel during the relevant time period.  After carefully reviewing all pertinent records, she confirmed that 100% of those communications occurred while Mr. Ammel was physically located outside of North Carolina.  *Id.* ¶ 14.

Plaintiff's Complaint refers to several Signal messages Defendant allegedly transmitted to Mr. Ammel.  In paragraph 27, she alleges that Defendant was frequently messaging Mr. Ammel in January 2024 while he was home in North Carolina and contends "[t]he messages exceeded the bounds of a normal working relationship and were of romantic and lascivious natures."  DE 1-2, p. 5.  Yet any such messages occurred four months before Defendant and Mr. Ammel began a romantic relationship and therefore had no romantic content.  Sinema Decl. ¶¶ 19, 28. Furthermore, Defendant had no knowledge as to where Mr. Ammel was physically located at the time any such messages were sent.  *Id.* ¶ 19.

6

Plaintiff alleges in paragraph 28 that Defendant sent Mr. Ammel pictures of herself "wrapped in a towel" and offered to help him through his mental health challenges. DE 1-2, p. 5. Defendant avers that she never sent Mr. Ammel any messages that included a picture of her wrapped in a towel and that any messages of the sort alleged by Plaintiff were sent at a time she had no knowledge as to where he was located and were not of a romantic or intimate nature. Sinema Decl. ¶ 20.

Plaintiff alleges in paragraph 29 that Defendant messaged Mr. Ammel during the State of the Union Address, which occurred on March 7, 2024. DE 1-2, p. 6. She does not allege that such message was romantic or intimate and, in any event, Defendant did not know where Mr. Ammel was located at the time. Sinema Decl. ¶ 22.

Plaintiff alleges in paragraph 30 that while Mr. Ammel was at a baseball game in Pennsylvania he messaged Defendant that he was going to start a "f**k the troops" chant and that Defendant responded she would "f**k the hot ones." DE 1-2, p. 6. She alleges in paragraph 31 that they messaged one another about the concept of having sex missionary style with the lights on. *Id.* Yet each of the messages alleged in paragraphs 30-31 occurred while Mr. Ammel was in Pennsylvania, not North Carolina. Sinema Decl. ¶¶ 23-24.

Plaintiff alleges in paragraph 40 that she discovered messages between Defendant and Mr. Ammel in which Defendant expressed that "she keeps waking up during her sleep and reaching over for his arms to hold her." DE 1-2, p. 7. She took a screenshot of that message and sent it to herself from Mr. Ammel's phone. Sinema Decl. ¶ 32. At the time, Plaintiff and Mr. Ammel were on a family vacation in Kansas rather than at home in North Carolina. *Id.* ¶¶ 31-32; Ammel Decl. ¶ 9.

7

Plaintiff alleges in paragraph 44 that Mr. Ammel was at the marital residence with her in October 2024 when Defendant messaged him, "I miss you. Putting my hand on your heart. I'll see you soon." DE 1-2, pp. 7-8. Defendant recalls sending such a message either from Paris on October 16 or from Utah on October 17 or 18. Sinema Decl. ¶ 50. It was only upon receiving a response to that message—from Plaintiff herself—that Defendant had any idea Mr. Ammel was in North Carolina at the time. *Id.* ¶ 51. In any event, Defendant was aware when she sent the message that Mr. Ammel had already found a new apartment and planned to move out of the marital residence imminently. *Id.*

### F. Plaintiff's Sworn Testimony

In August 2025, Plaintiff's deposition was taken in the domestic case she filed against Mr. Ammel. Her testimony confirmed how little Mr. Ammel was in North Carolina in the months preceding the parties' formal separation. She testified that Mr. Ammel's "schedule keeps him away the majority of the month. Prior to the separation, he chose to be away for ninety percent of the month[.]" H. Ammel Dep. p. 56. When asked if Mr. Ammel had been living at the marital residence prior to November 1, 2024, Plaintiff responded, "Technically…. He was not home often." *Id.* p. 106. Asked if he was *ever* home between May and November 2024, her answer was, "Yes. He was home sometimes." *Id.*

## ARGUMENT

### I. The exercise of jurisdiction over Defendant does not comport with due process.

When the defendant lodges a challenge to the district court's jurisdiction under Rule 12(b)(2), the question raised "is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *see also Pathfinder Software, LLC v. Core Cashless,*

8

*LLC*, 127 F. Supp.3d 531, 537 (M.D.N.C. 2015). Ordinarily, the Court should follow a procedure that allows it to dispose of a Rule 12(b)(2) motion as a preliminary matter, applying the preponderance of the evidence standard. *Grayson v. Anderson*, 816 F.3d 262, 267 (4h Cir. 2016); *see also SEC v. Receiver for Rex Ventures Grp., LLC*, 730 F. App'x 133, 136 (4th Cir. 2018). In resolving a personal jurisdiction challenge, the Court may consider materials outside the pleadings, including "the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint." *Grayson*, 816 F.3d at 268.

If the Court analyzes the motion "on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a *prima facie* showing of a sufficient jurisdictional basis[.]" *Combs*, 886 F.2d at 676. Yet the allegations of the complaint are taken as true only to the extent they are not controverted by evidence from the defendant. *Vision Motor Cars, Inc. v. Valor Motor Co.*, 981 F. Supp. 2d 464, 468 (M.D.N.C. 2013). "Once a defendant presents evidence indicating that the requisite minimum contacts do not exist, the plaintiff must come forward with affidavits or other evidence in support of its position." *Id.* The plaintiff must base her claim for personal jurisdiction on specific facts set forth in the record. *Id.*

For personal jurisdiction over a nonresident defendant to exist, jurisdiction must be consistent with the forum state's long-arm statute and with due process. *Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004). In North Carolina, these dual jurisdictional requirements "collapse into a single inquiry as to whether the defendant has such 'minimal contacts' with the forum state that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001) (citations omitted). Consequently, whether jurisdiction over Defendant exists boils

9

down to a single question: whether she established minimum contacts with North Carolina such that her being subject to suit does not offend traditional notions of fair play and substantial justice.

A. **Minimum contacts necessary to satisfy due process exist only where a defendant's intentional actions connect her to the forum—not the plaintiff or third persons—in a substantial and meaningful way.**

Plaintiff asserts that sufficient minimum contacts exist to establish specific jurisdiction over Defendant. DE 1-2, pp. 9-10. To support this assertion, Plaintiff must show that Defendant "purposely established" minimum contacts in North Carolina such that she "should reasonably anticipate being haled into court" here. *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (citations omitted). Stated another way, Plaintiff must establish that Defendant "purposely directed" her activities at North Carolina and that her cause of action for alienation of affection "arise[s] out of or relate[s] to" those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Furthermore, specific jurisdiction exists only where the contacts related to the cause of action create a "substantial connection" with the forum state. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997). Minimum contacts exist only "where the defendant 'deliberately' has engaged in ***significant activities*** within a State[.]" *Burger King*, 471 U.S. at 475-76 (emphasis added and citation omitted).

In *Calder v. Jones*, 465 U.S. 783 (1984), actress Shirley Jones filed a libel action in California against a *National Enquirer* reporter and editor, both of whom worked at the publication's Florida headquarters; they had made phone calls to sources in California for the information contained in the allegedly defamatory article. *Id.* at 785-86. The Supreme Court found the requisite minimum contacts in California because: (1) the article was about a California resident; (2) the story was drawn from California sources: (3) the brunt of the harm suffered by the plaintiff was in California; and (4) California was "the focal point both of the story and of the

10

harm suffered." *Id.* at 788-89. Jurisdiction, the Court held, was proper in California based on the "effects" of the defendants' Florida conduct in California. *Id.* at 789; *see also Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 280 (4th Cir. 2009) (specific jurisdiction under *Calder* "effects test" requires showing that (1) defendant committed intentional tort; (2) plaintiff felt brunt of harm in forum; and (3) defendant "expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.")

The Supreme Court significantly narrowed the scope of the *Calder* effects test in *Walden v. Fiore*, 571 U.S. 277 (2014). In that case, a deputized DEA agent seized nearly $100,000 from two travelers at the Atlanta airport who were traveling home to Las Vegas. The agent forwarded a probable cause affidavit to a federal prosecutor in Georgia. The travelers contended the affidavit was false and the DEA ultimately agreed and returned their money. *Id.* at 280–81. The travelers then filed suit against the agent in Nevada contending that he had violated their constitutional rights. *Id.* at 281. Though the Nevada court dismissed the action for lack of personal jurisdiction, a divided panel of the Ninth Circuit reversed, concluding that, under the *Calder* effects test, the agent "expressly aimed" his submission of the allegedly false affidavit at Nevada by knowing it would affect persons residing there. *Id.* at 282.

The Supreme Court unanimously reversed. Writing for the Court, Justice Thomas noted that the case involved the exercise of "specific jurisdiction," which "focuses on the relationship among the defendant, the forum, and the litigation." *Id.* at 283–284 (citations omitted). "For a State to exercise jurisdiction consistent with due process, the defendant's ***suit-related conduct*** must create a ***substantial connection*** with the forum State." *Id.* at 284 (emphasis added). Two issues framed that analysis:

"First, the relationship must arise out of contacts that the "defendant *himself*" creates with the forum State." *Id.* (emphasis in original and citation omitted). "Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Id.* "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be decisive in determining whether the defendant's due process rights are violated." *Id.* at 285 (citation omitted).

"Second, our 'minimum contacts' analysis looks to the defendant's contacts ***with the forum State itself***, not the defendant's contacts ***with persons who reside there***." *Id.* (emphasis added). Justice Thomas noted that the Court had in the past "upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their State and into another[.]" *Id.* (citation omitted). "And although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Id.* (citation omitted).

The plaintiff cannot be "the only link between the defendant and the forum," and "a defendant's relationship ***with a plaintiff or a third party***, standing alone, is an insufficient basis for jurisdiction." *Id.* at 285–286 (emphasis added). Justice Thomas underscored that "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation ***with the State***, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting ***with other persons*** affiliated with the State." *Id.* at 286 (emphasis added and citation omitted). That is particularly true in intentional tort cases, he added. *Id.* "A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on ***intentional conduct*** by the defendant that creates the necessary contacts ***with the forum***." *Id.* (emphasis added).

12

Applying these principles to the facts, the Court concluded that the Georgia agent lacked the necessary contacts with Nevada "that are a prerequisite to the exercise of jurisdiction over him." *Id.* at 288. No part of his course of conduct occurred in Nevada. *Id.* He conducted his search and seizure in Georgia, drafted the affidavit there, and submitted it to a federal prosecutor there. *Id.* He "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada. In short, when viewed through the proper lens—whether the ***defendant's*** actions connect him to the ***forum***—[the agent] formed no jurisdictionally relevant contacts with Nevada." *Id.* at 289 (emphasis in original).

The Ninth Circuit's analysis went astray, Justice Thomas reasoned, "by shifting the analytical focus from [the agent's] contacts with the forum to his contacts with [the travelers]. Rather than assessing [the agent's] own contacts with Nevada, the Court of Appeals looked to [the agent's] knowledge of [the travelers'] 'strong forum connections'" and the fact that they "suffered foreseeable harm in Nevada." *Id.* (citations omitted). Yet the agent's "actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at [the travelers] whom he knew had Nevada connections. Such reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis." *Id.* (citation omitted). "[M]ere injury to a forum resident is not a sufficient connection to the forum.… The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct ***connects him to the forum in a meaningful way.***" *Id.* at 290 (emphasis added).

> **B.  Defendant's suit-related conduct did not create a substantial connection with North Carolina or connect her with the forum in a meaningful way.**

The Fourth Circuit has developed a three-pronged inquiry to analyze whether specific jurisdiction over a nonresident defendant exists: (1) to what extent the defendant purposely availed

13

herself of the privileges of conducting activities in North Carolina; (2) whether the plaintiff's claim arose out of those North Carolina-related activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable. *Nolan*, 259 F.3d at 216. The plaintiff must prevail on each prong for jurisdiction to exist. *Perdue Foods*, 814 F.3d at 189. "The analysis must focus on the nature, quality, and quantity of the contacts, as well as their relation to the forum state." *Consulting Eng'rs Corp.*, 561 F.3d at 279 n.5. "This analysis is not 'mechanical,' and a court must weigh 'the totality of the facts before' it." *MarieOliver LLC v. Zwanzig*, No. 1:25-CV-227-DAB, 2026 WL 370859, at *4 (M.D.N.C. Feb. 10, 2026).

Here, Plaintiff prevails on neither the first nor second prong. Consequently, jurisdiction over Defendant does not exist.[1]

> ### 1. Defendant did not purposely avail herself of the privileges of conducting activities in North Carolina because her limited contacts with this State were random and fortuitous, rather than intentional and substantial.

As the Statement of Facts and Plaintiff's own sworn testimony make clear, *see supra* p. 8, Mr. Ammel was rarely in North Carolina. Though Defendant had periodic Signal communications with him, due to his extensive travels, she never knew where he was when she communicated with him. Sinema Decl. ¶ 11. Indeed, her declaration documents her contacts with him in Texas, New York, Illinois, Washington, DC, Nevada, California, Utah, Arizona, Pennsylvania, Colorado, Kansas, Florida, and the Middle East. *Id.* ¶¶ 10-11, 16-18, 21, 23-48, 52-53. Thus, to the extent Defendant also communicated with Mr. Ammel while he happened to be in North Carolina, any such contacts were random and fortuitous, not deliberate or intentional.

---

[1] Because Plaintiff fails to satisfy either the first or second prong of the required inquiry, a detailed analysis of the third prong is unnecessary. *See Consulting Eng'rs*, 561 F.3d at 282 n.12.

As *Walden* teaches, the Court may not rely on a defendant's random, fortuitous, or attenuated contacts with the forum state or base its determination on the mere fact that the person she was communicating with was a forum resident. *Walden*, 571 U.S. at 285-86. Rather, for specific jurisdiction to exist, the defendant's "suit-related conduct must create a **substantial connection** with the forum State." *Id.* at 284 (emphasis added). The defendant must have **deliberately**—not by mere fortuity—engaged in **significant activities** in the forum state. *Burger King*, 471 U.S. at 475–76; *Walden*, 571 U.S. at 286 (exercise of jurisdiction must be based on **intentional conduct** by the defendant creating the necessary contacts with the forum). The defendant's conduct must connect her to the forum—not a forum resident—"in a meaningful way." *Walden*, 571 U.S. at 290. Because the evidence establishes none of that happened in this case, Plaintiff has failed to satisfy the first prong of the test for specific jurisdiction.

The *Calder* effects test—as limited by *Walden*—does not help Plaintiff overcome this deficiency. For that test even to apply, Plaintiff would need to establish that Defendant "expressly aimed [her] tortious conduct at the forum"—rather than at Plaintiff or Mr. Ammel. *Consulting Eng'rs*, 561 F.3d at 280; *Walden*, 571 U.S. at 285 (analysis looks to "defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there."). Moreover, North Carolina can hardly be considered the "focal point of the [alleged] tortious activity," *Consulting Eng'rs*, 561 F.3d at 280, when the intimate conduct between Defendant and Mr. Ammel occurred in California, New York, Washington, DC, Colorado, and Arizona—not in North Carolina.

Plaintiff may contend that the Signal message Defendant sent Mr. Ammel from Paris or Utah, while he was apparently in North Carolina—about putting her hand on his heart, DE 1-2, pp. 7-8—is by itself sufficient to confer jurisdiction over Defendant. Yet that isolated 13-word message is not nearly enough to establish the constitutionally required "purposeful availment."

15

It is true that even a single act can support jurisdiction "so long as it creates a '**substantial connection**' with the forum." *Burger King*, 471 U.S. at 475 n.18 (emphasis added). "But whether one act or many, it is the '*quality* and *nature*' of the defendant's connections with the forum that justify personal jurisdiction, 'not merely the number of contacts between the defendant and the forum state.'" *Khashoggi v. NSO Group Technologies Ltd.*, 138 F.4th 152, 161 (4th Cir. 2025) (emphasis in original and citations omitted). Further, the court must weigh "the totality of the facts before it" in analyzing jurisdiction. *MarieOliver LLC*, 2026 WL 370859, at *4.

Defendant's evidence establishes that: (1) she did not know she was making a connection with North Carolina when she sent her Signal message to Mr. Ammel from Paris or Utah in mid-October 2024; (2) all of her physical, intimate contact with Mr. Ammel occurred outside of North Carolina; (3) all other communications about her romantic relationship with Mr. Ammel occurred outside of North Carolina; and (4) the mid-October 2024 message was sent *after* Plaintiff twice instructed Mr. Ammel to move out of the marital residence and, pursuant to that instruction, Mr. Ammel had found an apartment to move into. The totality of facts make amply clear that Defendant's "suit-related conduct" did not "create a substantial connection with the forum state" or connect her conduct to North Carolina "in a meaningful way." *Walden*, 571 U.S. at 284, 290.

What qualifies as a "substantial connection" capable of conferring jurisdiction over nonresident defendants in alienation of affection cases is well illustrated by a slew of North Carolina cases—all of which involved significantly more, and higher quality, in-state contacts than an isolated 13-word electronic message. *See, e.g., Trivette v. Risher*, No. 7:07-cv-16-D, 2008 WL 516747, at *1 (E.D.N.C. Feb. 25, 2008) (telephone calls and emails); *Ponder v. Been,* 380 N.C. 570, 869 S.E.2d 193 (2022) (per curiam, adopting dissent in *Ponder v. Been,* 275 N.C. App. 626, 853 S.E.2d 302 (2020)) (telephone calls, emails, and text messages); *Brown v. Ellis,* 363 N.C. 360,

16

361, 363-64, 678 S.E.2d 222, 224 (2009) (telephone calls and emails); *Cooper v. Shealy*, 140 N.C. App. 729, 734, 537 S.E.2d 854, 857 (2000) (telephone calls and emails).

The thread running through the foregoing cases is a ***pattern*** of communications by the nonresident defendant with the plaintiff's spouse in North Carolina—such that the defendant could reasonably anticipate being haled into a North Carolina court. These cases stand in stark contrast to the factual record here—where the only pattern of communications between Defendant and Mr. Ammel occurred while he was outside of North Carolina.

Though it did not involve alienation of affection, *Renfinity, Inc. v. Jones*, No. 3:20-CV-00422-KDB, 2022 WL 332782 (W.D.N.C. Feb. 3, 2022) is also instructive. The plaintiff, a company centered in North Carolina, engaged the Texas defendant to develop certain software products. *Id.* at *3. The plaintiff alleged that the defendant accepted $500,000 in payments, falsely communicated that he was making progress, and then delivered into North Carolina two prototypes that were actually owned by another company. *Id.* The plaintiff asserted a host of claims, including for fraud. *Id.* The defendant moved to dismiss for lack of jurisdiction. *Id.*

In its analysis, the district court relied heavily on *Vishay Intertech., Inc. v. Delta Int'l Corp.*, 696 F.2d 1062 (4th Cir. 1982) and *Felland v. Clifton*, 682 F.3d 665 (7th Cir. 2012). The contacts between the California defendant and North Carolina in *Vishay* were three letters and five telephone calls "that formed at least part of the basis of the plaintiff's claims for slander, unfair trade practices, tortious interference with contract and abuse of process." *Id.* at *4. In *Felland*, the nonresident defendant's contacts with Wisconsin were numerous emails and regular mail communications and six telephone calls assuring the plaintiffs all was well with a real estate transaction in Mexico—that turned out to be nonexistent. *Id.* at *5. The Fourth and Seventh

17

Circuits, respectively, concluded that these facts were sufficient to confer jurisdiction over the nonresident tortfeasors. *Id.* at *4-5.

Turning to the facts before it in *Renfinity*, the district court concluded that the plaintiff's claims "fit the relevant circumstances of *Vishay* and *Felland*." *Id.* at *5. The crux of the plaintiff's claim was the defendant's fraud, which was carried out through the delivery of fraudulent prototypes and his communications with the plaintiff's officers via text messages, emails, and phone calls. Such "deliberate conduct and communications directed into North Carolina in furtherance of an alleged fraud" was sufficient to confer jurisdiction. *Id.* The district court noted that its decision was bolstered by the "three year long series of alleged fraudulent conduct directed into North Carolina." *Id.* at *6 n.4.

In stark contrast to the jurisdictional facts in *Renfinity*, Plaintiff here can point to only one isolated 13-word communication into North Carolina that, as is discussed below, is not actionable for alienation of affection in and of itself. Unlike in *Renfinity, Vishay*, and *Felland*, (1) the communication at issue here was a one-off contact in North Carolina, not part of a larger pattern; and (2) Defendant did not know at the time she sent it that Mr. Ammel was in North Carolina.

For all of these reasons, Plaintiff cannot satisfy the first prong of the test for specific jurisdiction.

### 2. *Plaintiff's alienation of affection claim did not arise out of Defendant's North Carolina-related activities.*

The second prong of the Fourth Circuit's inquiry "requires that the defendant's contacts with the forum state form the basis of the suit." *Consulting Eng'rs*, 561 F.3d at 278-79. To analyze whether Defendant's contacts with North Carolina form the basis of Plaintiff's claim for alienation of affection, the Court must focus on the elements of such a claim. The plaintiff must prove "(1) that the spouses were happily married and a genuine love and affection existed between them;

18

(2) the love and affection was alienated and destroyed; and (3) the defendant caused the destruction of that marital love and affection." *Malecek v. Williams*, 255 N.C. App. 300, 302, 804 S.E.2d 592, 595 (2017) (citation omitted). Only conduct occurring prior to the parties' physical separation can give rise to such a claim. N.C. Gen. Stat. § 52-13. Thus, for purposes of the jurisdictional analysis, Plaintiff must establish that Defendant's conduct **in North Carolina**, prior to the separation, "caused the destruction" of "marital love and affection." *Malecek*, 255 N.C. App. at 302, 804 S.E.2d at 595.

Plaintiff cannot establish the required link. Most of the North Carolina contacts she alleges occurred long before Defendant and Mr. Ammel began a romantic relationship in late May 2024.[2] Defendant's evidence establishes that her "suit-related conduct"—her romantic advances toward Mr. Ammel—was "substantially connected" to California, New York, Washington, DC, Colorado, and Arizona, where she and Mr. Ammel were physically intimate, and Kansas and Pennsylvania, where Mr. Ammel was located when Defendant transmitted romantic or sexualized Signal messages to him. Sinema Decl. ¶¶ 23-24, 28, 31-32. In stark contrast, Plaintiff points to no evidence of Defendant making romantic or sexualized advances toward Mr. Ammel while he was in North Carolina through at least October 15, 2024.

Again, that leaves Plaintiff with the stray 13-word Signal message Defendant sent Mr. Ammel on October 16, 17, or 18 from Paris or Utah. On this prong of the test, the question is whether that message—standing by itself—can serve as the basis of a claim for alienation of affection. Put another way, can Plaintiff make a colorable claim that Defendant's 13-word message caused the destruction of marital love and affection?

---

[2] That is particularly true for the Signal messages Plaintiff alleges occurred in January 2024 which she contends "were of romantic and lascivious natures." DE 1-2, p. 5; *see* Sinema Decl. ¶¶ 19, 28.

Significantly, by the time that message was sent: (1) Plaintiff had instructed Mr. Ammel on two separate occasions to move out of the marital residence; (2) Mr. Ammel had toured Tylers Ridge and decided to move into its apartment community; and (3) he had told Plaintiff he would be moving out as soon as his apartment was ready. *See supra* pp. 4-5. When he and Plaintiff traveled to Miami to take their children to the Taylor Swift concert, they stayed in separate hotel rooms; he then flew off to Phoenix and slept in the spare bedroom of the house upon his return from his work trip. *See supra* p. 5.

Though Plaintiff alleges she and Mr. Ammel went on an anniversary trip to Nashville on October 25—at his request—the facts do not bear that out. Indeed, that very day was the last full day of their marriage. *See id.*

In view of these facts, no jury could find that Defendant's 13-word Signal message Mr. Ammel received on October 16, 17, or 18 had any bearing on the destruction of marital love and affection. Plaintiff's own words on October 3 and 11, and Mr. Ammel's actions immediately thereafter, leave no room for argument that the marriage still had a heartbeat at the moment he received Defendant's message. Consequently, Plaintiff cannot satisfy the second prong of the jurisdictional test.

## **CONCLUSION**

For all of the foregoing reasons, Defendant respectfully requests that this Court dismiss this action for lack of personal jurisdiction.

Respectfully submitted the 12th day of March, 2026.

POYNER SPRUILL LLP

By:   <u>/s/ Steven B. Epstein</u>
Steven B. Epstein
N.C. State Bar No. 17396
sepstein@poynerspruill.com
301 Fayetteville Street, Suite 1900
P.O. Box 1801 (27602-1801)
Raleigh, NC 27601
Telephone: (919) 783-2846
Facsimile: (919) 783-1075

*Attorney for Defendant Kyrsten Sinema*

## **CERTIFICATE OF WORD COUNT**

I certify that the foregoing memorandum complies with the word limitation set forth in Local Civil Rule 7.3(d)(1) as reported by the undersigned's word-processing software, which reports a word count of 6,241 words, not including the case caption, signature block, or required certificates.

This the 12th day of March 2026.

/s/ Steven B. Epstein
Steven B. Epstein

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

> Thomas M. Van Camp
> Mary Catherine Coltrane
> Van Camp, Meacham & Newman, PLLC
> Post Office Box 1389
> Pinehurst, NC  28370
> thomasv@vancamplaw.com
> marycatherine@vancamplaw.com

This the 12th day of March 2026.

> /s/ Steven B. Epstein
> Steven B. Epstein