**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
CIVIL ACTION NO. 1:26-cv-00038

|  |  |  |
|---|---|---|
| **HEATHER AMMEL,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **PLAINTIFF'S MEMORANDUM OF LAW** |
| | **)** | **IN OPPOSITION TO DEFENDANT'S** |
| **KYRSTEN SINEMA,** | **)** | **MOTION TO DISMISS FOR LACK OF** |
| | **)** | **PERSONAL JURISDICTION** |
| **Defendant.** | **)** | |
| | **)** | |

Plaintiff Heather Ammel hereby submits this memorandum of law in opposition to Defendant Kyrsten Sinema's Motion to Dismiss for lack of personal jurisdiction.

## INTRODUCTION

The fundamental question before this Court is whether Defendant's contacts with North Carolina are sufficient to support this Court's exercise of personal jurisdiction.

"When a court's personal jurisdiction is properly challenged by motion under Federal Rule of Civil Procedure 12(b)(2), the jurisdictional question thereby raised is one for the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Mylan Lab., Inc. v. Akzo*, *N.V.,* 2 F.3d 56, 59–60 (4th Cir. 1993) (citation omitted). When, as is the case here, "the district court decides a pretrial personal jurisdiction motion without an evidentiary hearing, the plaintiff need only prove a prima facie case of personal jurisdiction." *Id.* (citation omitted). This Court must resolve all factual disputes and draw all reasonable inferences in Plaintiff's favor. *Id.* (citation omitted).

1

Plaintiff married her husband, Matthew Ammel ("Mr. Ammel"), on 23 October 2010 ("the Marriage"). {Dkt. 2 p 2}. Plaintiff and Mr. Ammel separated on 1 November 2024 ("the Separation"). *Id.* During the Marriage, Plaintiff and Mr. Ammel had three children: C.A., born 4 October 2011; I.A., born 3 January 2013; and J.A., born 29 September 2015 ("the Children"). *Id.*

Mr. Ammel was a member of the United States Army, and Plaintiff was the primary homemaker, who supported Mr. Ammel's military career, caring for the Children and household. *Id.* Plaintiff and Mr. Ammel moved to Moore County, North Carolina in 2014, and they resided there together as a family until the date of Separation. *Id.*

In 2022, Mr. Ammel officially retired from the Army and began working for Defendant as her security detail in April 2022. {Dkt. 2 p 3}. At that time, Defendant was serving as a United States Senator for the State of Arizona. {Dkt. 2 p 4}. Defendant, whether through her security group, or individually, would arrange and pay for Mr. Ammel's travel expenses and would fly Mr. Ammel out of Raleigh-Durham International Airport to whatever event Defendant needed Mr. Ammel to attend. {Pl. Decl. ¶ 12}.

In the fall of 2023, Defendant's head of security resigned from her position. {Dkt. 2 p 4}. Prior to leaving, Defendant's head of security expressed to Mr. Ammel she had concerns Defendant was having sexual relations with other security members. *Id.* She encouraged Mr. Ammel to leave with her, but Mr. Ammel decided to stay due to the financial security of the job. *Id.*

In addition to accompanying Defendant to various work events, Mr. Ammel accompanied Defendant on several trips and went with her alone to Napa Valley, California in the fall of 2023. *Id.* Upon returning home from Napa Valley, Mr. Ammel appeared uncomfortable and informed

Plaintiff that if anyone had seen them together on the trip, it would have appeared as if they were on a romantic getaway. *Id.*

In December 2023, Defendant requested Mr. Ammel serve as her security for the U2 concert at the Sphere in Las Vegas, Nevada. {Dkt. 2 pp 4-5}. Mr. Ammel asked Plaintiff to accompany him on the trip and presented it to her as a "gift." {Dkt. 2 p 5}. Mr. Ammel expressed that the trip would be a great opportunity for Plaintiff to meet Defendant and would help establish boundaries. *Id.* Mr. Ammel introduced Plaintiff to Defendant as his wife. When Defendant greeted Plaintiff in Las Vegas, Defendant told her, "I feel like I already know you because I've heard all about you from [Mr. Ammel]." {Pl. Decl. ¶ 12}.

Beginning in January 2024, while Plaintiff, Mr. Ammel, and the Children were residing in Moore County, North Carolina, Plaintiff discovered Defendant frequently messaging Mr. Ammel on Signal, the messaging app. {Dkt. 2 p 5}. Defendant knew Mr. Ammel was residing in North Carolina at the time she sent the messages, and Mr. Ammel received the messages while residing at the marital residence in Moore County, North Carolina. *Id.* The messages exceeded the bounds of a normal working relationship and were of romantic and lascivious natures. *Id.*

Specifically, in January 2024, Plaintiff witnessed Defendant send Mr. Ammel a message about helping him with his mental health, and Mr. Ammel agreed. {Dkt. 2 p 5; Pl. Decl. ¶ 14(a)}. In or around early spring 2024, Plaintiff witnessed Defendant send Mr. Ammel a picture of Defendant wrapped in a towel. *Id.* Although Defendant denies sending such a message, Plaintiff has alleged she was standing in her kitchen when she read Defendant's message. {Def. Decl. ¶ 20; Pl. Decl. ¶ 14(b)(i)}. Defendant was wrapped in a white towel, and the picture showed her bare upper back with cupping bruises. *Id.* Mr. Ammel responded to the picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman

who doesn't." *Id.*

In early spring 2024, and while Mr. Ammel was physically present in North Carolina and at the marital residence, Plaintiff discovered the following messages: Mr. Ammel messaged Defendant stating he was intimidated by Defendant, and Defendant responded to the message asking why because she only wants to be intimidating to her opponents, not to people she likes; Defendant suggested Mr. Ammel bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience; Defendant messaged Mr. Ammel during the State of the Union address, and when Mr. Ammel asked why she wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote. {Dkt. 2 pp 5-6; Pl. Decl. ¶ 14(b)}.

Around that same time, Mr. Ammel traveled to Pennsylvania for a separate work trip, but during his free time, he attended a baseball game and messaged Defendant during the game stating he was going to start a "fuck the troops" chant. {Dkt. 2 p 6}. Defendant responded stating she would "fuck the hot ones." *Id.* At some point during their message exchange, and when Mr. Ammel had returned to North Carolina, Plaintiff discovered Defendant and Mr. Ammel message about having sexual intercourse missionary style with the lights on. {Dkt. 2 p 6; Pl. Decl. ¶ 14(b)(v)}.

Mr. Ammel continued to travel with Defendant, and as time went on, Defendant became closer and more comfortable with Mr. Ammel. {Dkt. 2 p 6}. In May 2024, Defendant started purchasing gifts for Mr. Ammel and paid for him to receive psychedelic treatment. {Dkt. 2 p 6}.

In June 2024, Defendant offered Mr. Ammel a salary position and placed him on her senate staff as a Defense and National Security Fellow. {Dkt. 2 p 7}. Mr. Ammel then worked as Defendant's personal security guard as well as her senate staff member. *Id.* Around that same

4

time, Plaintiff discovered more messages between Defendant and Mr. Ammel. *Id.* While Plaintiff and Mr. Ammel were vacationing in Kansas, Defendant messaged Mr. Ammel saying she keeps waking up during her sleep and reaching over for his arms to hold her. *Id.* After discovering this message, Plaintiff confronted Mr. Ammel. *Id.*

In the following months, Mr. Ammel struggled to admit to Plaintiff he was having an affair with Defendant but was vocal he was leaving Plaintiff and that they were divorcing. *Id.* Mr. Ammel continued to work for Defendant as her security guard and senate staff member, traveling to various states and cities within the United States and internationally. *Id.*

On 3 October 2024, after Mr. Ammel had been with Defendant on a work trip 1-2 October, Mr. Ammel returned home to Moore County, North Carolina, for his daughter's birthday. {Dkt. 2 pp 7-8; Pl. Decl. ¶ 14(c)}. While Mr. Ammel was physically present in North Carolina, and at the marital residence, Defendant messaged Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." *Id.* Plaintiff responded to the message stating, "are you having an affair with my husband? You took a married man away from his family." *Id.*

Although Plaintiff acknowledges Plaintiff and Mr. Ammel's Marriage relationship became rocky due to Defendant's interference, Plaintiff and Mr. Ammel were still physically intimate and emotionally connected. {Pl. Decl. ¶ 27-31}.

Specifically, at the end of October, Mr. Ammel insisted he and Plaintiff go on an anniversary trip to Nashville, Tennessee. {Dkt. 2 p 8; Pl. Decl. ¶ 27}. Although Mr. Ammel denies his interest in the anniversary trip, Mr. Ammel admits through a text-message incorporated in his own declaration that he was "catch[ing] the red eye home to be there for [their] anny." {Ammel Decl. p 10}. On their anniversary trip, Plaintiff and Mr. Ammel held hands on the plane, were physically intimate, and attended a concert together. {Pl. Decl. ¶ 27-28}.

5

After the anniversary trip concluded, Plaintiff returned home to Moore County, North Carolina, and Mr. Ammel went on a work trip with Defendant to Saudi Arabia. {Dkt. 2 p 8; Pl. Decl. ¶ 28}. Plaintiff and Mr. Ammel parted ways at the airport, but Mr. Ammel messaged Plaintiff stating he loved her and missed her. *Id.*

Shortly after Mr. Ammel returned home to Moore County, North Carolina from Saudi Arabia, on 1 November 2024, Plaintiff and Mr. Ammel separated. {Dkt. 2 p 8}.

## **ARGUMENT**

Plaintiff's Complaint should not be dismissed for lack of personal jurisdiction. Despite Defendant's contention the exercise of jurisdiction over Defendant does not comport with due process, Defendant's contacts with North Carolina are sufficient to support this Court's exercise of personal jurisdiction.

### I.   THE EXERCISE OF JURISDICTION OVER DEFENDANT COMPORTS WITH DUE PROCESS

For this Court "to validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied. First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and, second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements." *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001) (citation omitted). "With regard to the first requirement, [this Court] must accept as binding the interpretation of [North Carolina's] long-arm statute rendered by [North Carolina] Court[s]." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citation modified).

North Carolina's long-arm statute authorizes the exercise of personal jurisdiction over a nonresident defendant:

6

> in any action claiming injury to person or property within [North Carolina] arising out of an act . . . outside [North Carolina] by the defendant, provided in addition that at or about the time of the injury . . . [s]olicitation or services activities were carried on within [North Carolina] by or on behalf of the defendant[.]

N.C. Gen. Stat. §1-75.4(4)(a).

Indeed, our North Carolina long-arm statute "requires only that the action 'claim' injury to person or property within this state in order to establish personal jurisdiction." *Cooper v. Shealy*, 140 N.C. App. 729, 732, 537 S.E.2d 854, 856 (2000) (citation omitted). "The statute does not require there to be evidence of proof of such injury." *Id.*

It is well established under North Carolina law that (1) actions for alienation of affection constitute "injury to person or property" and (2) telephone contacts are sufficient "solicitations" under section 1-75.4(4)(a). *See Cooper* at 733–734, 537 S.E.2d at 857 (holding alienation of affection a type of "injury" as contemplated by section 1-75.4, and "telephone contacts (including telephone calls and telephone transmitted e-mail) [] 'solicitations' within the meaning of [section] 1-75.4(4)"). *See also Fox v. Gibson*, 176 N.C. App. 554, 559, 626 S.E.2d 841, 844 (2006) (holding section 1-75.4 conferred personal jurisdiction where the alienation of affection action arose directly out of the defendant's activities—telephone conversations, email messages, and sexual intercourse—within and to the state of North Carolina); *Little v. Clay*, 299 N.C. App. 148, 915 S.E.2d 303 (2025) (holding section 1-75.4 authorized personal jurisdiction where the plaintiff sufficiently alleged "his injury occurred within this State and was allegedly caused by [the] [d]efendant's solicitation of [the] [p]laintiff's wife's love and affection by telephoning [the] [p]laintiff's home in North Carolina." (citation omitted)).

Furthermore, "North Carolina's longarm statute is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." *Nolan*, 259 F.3d at 215 (4th Cir. 2001). Thus, the statutory inquiry merges into a single constitutional inquiry:

"whether the defendant has such 'minimal contacts' with [North Carolina] such that 'maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The defendant's conduct and connection with the forum state must demonstrate he "purposefully avails" himself "of the privilege of conducting activities within the forum state[,]" *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), "such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

The due process inquiry "can be undertaken in two different approaches—by finding specific jurisdiction . . . or by finding general jurisdiction." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 709 (4th Cir. 2002) (citation omitted). A court may exercise general jurisdiction when the defendant's contacts with the forum state are so "'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Year Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 316). In contrast, and as is the case here, a court may exercise specific jurisdiction when the defendant has single or isolated contacts with the forum state, when those contacts relate to the plaintiff's cause of action. *Helicopteros Nacionales De Colombia v. Hall*, 466 U.S. 408, 414 (1984).

### A. This Court May Exercise Specific Jurisdiction Over Defendant

To determine whether specific jurisdiction exists, this Court must examine "(1) the extent to which the defendant 'purposefully availed' itself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *ALS Scan,* 293 F.3d at 712 (citation omitted). "The inquiry whether a forum state may assert specific

8

jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (citation omitted).

In analyzing specific jurisdiction, the Fourth Circuit, in addition to our North Carolina district courts, have held singular contacts sufficient, even when the defendant is not physically present in the forum state, if those contacts relate to the cause of action. *Carefirst*, 334 F.3d at 397 ("Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." (citation omitted); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 942–46 (4th Cir. 1994) (In order to satisfy the due process requirements of specific personal jurisdiction, the activities of the defendant need not involve her physical presence in the state but must still be "purposefully directed toward the forum state"); *Occidental Fire & Casualty Co. v. Continental Illinois Nat'l Bank & Trust Co.*, 689 F. Supp. 564, 568 (E.D.N.C. 1988) ("It is well settled that even one isolated contact may give rise to jurisdiction if that contact is related to the cause of action and is sufficiently purposeful in its aim at the forum state." (citing *First American First, Inc. v. National Asso. of Bank Women*, 802 F.2d 1511, 1516 (4th Cir. 1986) ("Indeed, where authorized by state law, a single contact by a nonresident defendant may, if sufficiently 'purposeful' in its aim at, and sufficiently egregious in its impact upon, a forum state's legitimate interests, support a constitutional exercise of specific jurisdiction in respect of a claim arising from that very contact." (citation omitted)))).

Thus, precedent teaches us that "whether one act or many, it is the 'quality and nature' of the defendant's connections with the forum that justify personal jurisdiction, not merely the number of contacts between the defendant and the forum state." *Khashoggi v. NSO Grp. Techs. Ltd.,* 138 F.4th 152, 161 (4th Cir. 2025) (citation omitted). If the defendant's contacts with the

state are purposeful and intentional, and the injury arises out of those contacts, the exercise of specific jurisdiction is proper. *Id.*

### 1. Quality and Nature of Defendant's Contacts

In *Cooper v. Shealy*, the North Carolina Court of Appeals addressed the same question before this Court with a nearly mirror-image fact pattern to the present case. *Cooper*, 140 N.C. App. at 731–32, 537 S.E.2d at 855–56. There, the plaintiff brought an alienation of affection action against a nonresident defendant and alleged within her complaint the defendant "telephoned her husband in North Carolina in order to solicit his affections and entice him to leave his family." *Id.* at 734, 537 S.E.2d at 857. Additionally, the plaintiff alleged, while living in North Carolina, she "suffered injury, the destruction of her husband's love and affection, as the direct result of the defendant's wrongful conduct." *Id.* After the Court determined section 1-75.4 authorized personal jurisdiction, because "the plaintiff's injury allegedly occurred within North Carolina and was allegedly caused by [the] defendant's solicitation of [the] plaintiff's husband's love and affection by telephoning [the] plaintiff's home in North Carolina[,]" the Court addressed due process. *Id.*

The Court recognized it had no transcript of the hearing and the plaintiff's complaint did not allege the number of contacts the defendant had with the plaintiff's husband in North Carolina. *Id.* However, the Court, in relying on federal precedent[1] that only minimum contacts are required, held "[t]he quantity of [the] defendant's contacts with North Carolina may not have been extensive. However, we have already determined the contacts were sufficient for purposes of [section] 1-75.4, especially considering that the alleged injury under the claim ([destruction of the marriage]) was suffered by [the] plaintiff allegedly within this state." *Id.* at 735, 537 S.E.2d at 858 (citation

---

[1] *See Brown v. Flowers Industries, Inc.*, 688 F.2d 328 (5th Cir. 1982) (holding defamatory telephone call from Indiana to forum state, Mississippi, was sufficient to confer personal jurisdiction).

modified).  Thus, because there was "a direct relationship between the contacts and the plaintiff's injuries[,]" the Court determined personal jurisdiction was proper over the nonresident defendant. *Id.*

Here, similar to *Cooper*, Plaintiff alleged within her verified Complaint and supporting declaration Defendant telephoned and messaged her husband in North Carolina in order to solicit his affections, and that Plaintiff, while living in North Carolina, "suffered injury, the destruction of her husband's love and affection, as the direct result of the defendant's wrongful conduct." *Id.* at 734, 537 S.E.2d at 857. {Dkt. 2 pp 9-13}.  Although Defendant may have not been physically present in North Carolina, Defendant's contacts with North Carolina—telephone calls, text messages, Signal messages, email communications, etc.—gave rise to Plaintiff's cause of action. *Id.*  Additionally, and even more compelling than the facts in *Cooper*, Plaintiff identifies the amount and content of the messages between Defendant and Mr. Ammel. {Dkt. 2 pp 5-13; Pl. Decl. ¶ 14}.  Specifically, of the messages Plaintiff references in her verified Complaint, Plaintiff asserts the following communications occurred while Mr. Ammel was physically present in North Carolina, prior to the date of Separation:

> 28.  Plaintiff discovered messages which included a picture of Defendant wrapped in a towel; Defendant offered to help Mr. Ammel work through his mental health challenges and Mr. Ammel agreed; Mr. Ammel stated to Defendant he was intimidated by her and Defendant asked why because she only wants to be intimidating to her opponents, not to people she likes; Defendant suggested for Mr. Ammel to bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience.
>
> 29.  Defendant messaged Mr. Ammel during the State of the Union Address, and when Mr. Ammel asked why she wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote.
>
> 31.  Defendant and Mr. Ammel messaged about having sex missionary style with the lights on, and Defendant stated "Boring!"

11

44. In October 2024, soon after Mr. Ammel returned home to Moore County, North Carolina, after being away with Defendant on another work trip, Defendant messaged Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." Plaintiff responded to the message stating, "are you having an affair with my husband? You took a married man away from his family."

*Id.*

Although Defendant, in her declaration, denies sending such messages or claims she did not know where Mr. Ammel was physically located when she sent the messages, Plaintiff clearly alleges she read the messages and witnessed Mr. Ammel receive the messages while he was physically present in North Carolina. {Pl. Decl. ¶ 14}.

To further support Plaintiff's position, Defendant admits to having an affair with Mr. Ammel in May 2024. {Def. Decl. ¶ 28}. Although Plaintiff denies the affair occurred as late as May 2024, even if this Court were to accept Defendant's declaration as true, and ignore Plaintiff's contrary evidence, it is not reasonable to believe that from May 2024 to November 2024, the date of Separation between Plaintiff and Mr. Ammel, Defendant never communicated with Mr. Ammel while he was in North Carolina or that "she never had personal knowledge of Mr. Ammel being physically present in North Carolina at any time she initiated or had communications with Mr. Ammel prior to November 2024." {Def. Decl. ¶ 11}.

Furthermore, Plaintiff, in her Complaint and declaration, explains that shortly after the Separation, Defendant traveled to North Carolina to help Mr. Ammel retrieve his belongings from the marital residence and helped him move into his rental property in Moore County, North Carolina. {Dkt. 2 p 12; Pl. Decl. ¶ 36}. Additionally, Defendant sat out in the parking lot during Plaintiff and Mr. Ammel's domestic mediation at Plaintiff's counsel's office located in Pinehurst, North Carolina. {Dkt. 2 p 11; Pl. Decl. ¶ 34}. *See Rodriguez v. Lemus*, 257 N.C. App. 493, 498, 810 S.E.2d 1, 5 (2018) ("evidence of post-separation conduct may be used to corroborate evidence

12

of pre-separation conduct and can support claims for alienation of affection and criminal conversation, so long as the evidence of pre-separation conduct is sufficient to give rise to more than mere conjecture.").

Here, the evidence shows Defendant frequently traveled to North Carolina to see Defendant while he was still residing in North Carolina after the Separation, and that she was aware of Mr. Ammel's whereabouts. {Dkt. 2 pp 11-12; Pl. Decl. ¶¶ 34-36}. Accordingly, Defendant's post-separation conduct supports Defendant had knowledge of Mr. Ammel's whereabouts prior to the date of Separation; especially considering Defendant admits her romantic relationship with Mr. Ammel began in May 2024.

Additionally, Defendant acknowledges in October 2024, soon after Mr. Ammel returned home to Moore County, North Carolina, after being away with Defendant on another work trip, that Defendant messaged Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." {Def. Decl. ¶ 50}. Plaintiff responded to the message stating, "are you having an affair with my husband? You took a married man away from his family." {Dkt. 2 pp 7-8 ; Pl. Decl. ¶ 14(c)}. Thus, through Defendant's own declaration, Defendant admits she sent this message to Mr. Ammel prior to Plaintiff and Mr. Ammel's Separation. Although Defendant contends Plaintiff's and Mr. Ammel's Marriage was over at this point, Plaintiff has provided contrary evidence showing otherwise.

Specifically, Plaintiff, in her declaration, explains that at the end of October, Plaintiff and Mr. Ammel went on an anniversary trip to Nashville, Tennessee. {Pl. Decl. ¶ 27-28}. Plaintiff acknowledges she and Mr. Ammel were physically intimate on this trip, including engaging in sexual intercourse, and were still very much emotionally connected. *Id.* To further support Plaintiff's contention, Plaintiff incorporated text messages to her declaration showing the nature

13

of Plaintiff and Mr. Ammel's relationship during, and at the conclusion of their anniversary trip. *Id.* Mr. Ammel told Plaintiff he loved and missed her. *Id.* It is not reasonable to believe if Plaintiff and Mr. Ammel were still saying I love you to each other, and were still physically intimate, that their Marriage was over.

Furthermore, even after the date of Separation, Mr. Ammel continued to frequent the marital residence, and Plaintiff and Mr. Ammel continued to see each other on occasion, including Plaintiff hosting Mr. Ammel's family for Thanksgiving in 2024. {Pl. Decl. ¶¶ 29-31}. Additionally, Plaintiff and Mr. Ammel, along with their Children, spent Christmas together as a family in Kansas. *Id.*

Thus, the evidence supports, Plaintiff and Mr. Ammel's relationship was not over at the time Defendant sent the October message. {Pl. Decl. ¶¶ 27-31}. By Defendant's own admission of sending the message, she admits to minimum contacts with North Carolina. Additionally, based on the quality and nature of the communication, even if that was the only message Defendant sent to Mr. Ammel while he was physically present in North Carolina, the October message is sufficient in and of itself, as it is clear from the plain language of the message, the nature of Defendant's conduct and that Plaintiff suffered injury as a result of Defendant's conduct. *Khashoggi,* 138 F.4th at 161. {Dkt. 2 pp 7-8 ; Pl. Decl. ¶ 14(c)}.

### 2. Plaintiff Suffered Injury in North Carolina

In addition to Defendant's contacts with North Carolina, Plaintiff suffered injury, alienation of affection, in North Carolina.

In *Calder v. Jones*, our United States Supreme Court held a court may exercise specific jurisdiction over a nonresident defendant when the defendant has intentionally directed tortious conduct toward the forum state, knowing that the conduct would cause harm to a forum resident.

14

*Calder*, 465 U.S. 783, 789–90 (1984) (holding specific jurisdiction properly exercised where nonresident defendants wrote, edited, and published an allegedly defamatory article "that they knew would have a potentially devastating impact upon [the plaintiff]. And they knew that the brunt of that injury would be felt by [the plaintiff] in the State in which she lives and works").

Since our Supreme Court's decision in *Calder*, the Fourth Circuit has employed the same principle. *See Blue Ridge Bank v. Veribanc, Inc.,* 755 F.2d 371, 374–75 (4th Cir. 1985) (holding specific jurisdiction properly exercised over a nonresident defendant in a defamation action where the defendant directed conduct at the forum state and "the brunt of [the plaintiff's] alleged injuries to occurred in the forum state"); *First American First*, 802 F.2d at 1517 (holding specific jurisdiction properly exercised over a nonresident defendant where the defendant "knew or should have known that its allegedly defamatory letters would inflict the greatest injury upon [the plaintiff] in the state in which he resided and conducted his business."). The Court in *First American First* went on to explain that although not all the letters were directed at the plaintiffs' actions in Virginia, "there can be no doubt that the primary and most devastating effects of the letters would be felt in Virginia where [the plaintiff] lives and his business is principally located." *Id.* (citation modified).

Here, similar to *First American First*, Defendant knew or should have known her conduct would inflict the greatest injury upon Plaintiff in the state in which Plaintiff, Mr. Ammel, and their Children resided. *Id.* Although Defendant contends in her declaration she "did not learn Mr. Ammel resided in North Carolina, and lived there with his wife and [C]hildren, until approximately December 2023[,]" Defendant admits to having an affair with Mr. Ammel in May 2024, approximately six months before Plaintiff and Mr. Ammel separated. {Def. Decl. ¶ 28}. Furthermore, Plaintiff alleges in her verified Complaint and supporting declaration, that Defendant

15

sent messages to Mr. Ammel while he was physically present in North Carolina and at the marital residence. {Dkt. 2 pp 5-13; Pl. Decl. ¶ 14}. The messages exceeded the bounds of a normal working relationship and were of romantic and lascivious natures. *Id.* Although Defendant denies sending such messages, Plaintiff witnessed Mr. Ammel receive the messages, and Plaintiff responded to the October 2024 message. *Id.*

Furthermore, even though Defendant admits, and therefore it is not disputed, that extra-marital conduct occurred in various other states, "there can be no doubt that the primary and most devastating effects of [her conduct] would be felt in [North Carolina] where [Plaintiff and Mr. Ammel] live[d]" with their family. *First American First,* 802 F.2d at 1517 (citation modified). Thus, the evidence clearly supports Plaintiff suffered injury in North Carolina as a result of Defendant's conduct.

Although we recognize the state where Plaintiff feels the injury is not dispositive, it is certainly "plainly relevant to the inquiry." *See ESAB Grp., Inc. v. Centricut, Inc.,* 126 F.3d 617, 626 (4th Cir. 1997) ("Although the place that the plaintiff feels the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld."); *Grant v. Shields*, No. 5:02-CV-641-BO(3), 2002 U.S. Dist. LEXIS 25677, at *9–12 (E.D.N.C. Nov. 22, 2002) (dismissing the plaintiff's claim for alienation of affection for lack of personal jurisdiction where "[t]he only connection between the [p]laintiff's claim and the state of North Carolina is the fact that [the] [p]laintiff's injuries were allegedly suffered within North Carolina because [the] [p]laintiff resides there. . . [the] [p]laintiff has not alleged a single contact between [the] [d]efendant and anyone or anything in North Carolina").

Here, unlike the facts in *ESAB Group* and *Grant*, Plaintiff sufficiently alleged both—contacts and injury. {Dkt. 2 pp 5-13; Pl. Decl. ¶ 14}. As discussed above, Defendant made sufficient contacts with North Carolina, and Plaintiff suffered injury as a result of those contacts. *Id.* The evidence clearly supports Defendant knew or had reason to know her conduct directed at the state of North Carolina, would cause injury to Plaintiff—ultimately, the destruction of Plaintiff's Marriage. *Id.*

**B. Other Considerations Support this Court's Exercise of Personal Jurisdiction**

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, [the defendant's] contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (*quoting Int'l Shoe*, 326 U.S., at 320). Our Supreme Court has held courts may consider the following factors to determine whether to exercise personal jurisdiction over a defendant with minimum contacts in the forum state:

> 1) burden on the defendant; 2) the forum State's interest in adjudicating the dispute; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and 5) the shared interest of the several States in furthering fundamental substantive social policies.

*Id.* at 477 (*quoting World-Wide Volkswagen,* 444 U.S. at 292 (citation modified)).

While no single factor is dispositive, Defendant's contacts, considering many of the foregoing factors, support the exercise of jurisdiction.

**1. The Forum State's Interest in Adjudicating the Dispute**

Relevant here, and albeit the most recognizable factor, is North Carolina's interest in adjudicating the dispute. *See Fish v. Stetina*, 297 N.C. App. 733, 750, 913 S.E.2d 236, 248 (2025)

17

(recognizing North Carolina as one of the few states that adjudicates alienation of affection claims); *Bassiri v. Pilling*, 287 N.C. App. 538, 546, 884 S.E.2d 165, 171 (2023) (explaining that if the defendant's conduct spans multiple states and North Carolina is the only state involved that recognizes the tort of alienation of affection "the sufficiency of the claim . . . [is] dependent upon whether the alleged injury occurred in North Carolina").

North Carolina courts have repeatedly demonstrated the importance of protecting marriage. In *Malecek v. Williams*, the North Carolina Court of Appeals rejected a defendant's facial challenge to North Carolina's common law torts of alienation of affection and criminal conversation. *Malecek*, 255 N.C. App. 300, 301, 804 S.E.2d 592, 594 (2017). There, the defendant, alleged these common law torts violate an individual's "First and Fourteenth Amendment rights to engage in intimate sexual activity, speech, and expression with other consenting adults." *Id.*

In a detailed opinion, the Court of Appeals, in rejecting the defendant's argument, outlined the purpose of alienation of affection, and North Carolina's interest in preserving the sanctity of marriage and protecting marriage from deliberate interference. *Id.* Specifically, the Court made the following observations: "Marriage is, after all, perhaps, the most important institution in human history. 'The centrality of marriage to the human condition makes it unsurprising that the institution has existed for millennia and across civilizations.'" *Id.* at 304, 804 S.E.2d at 596 (quoting *Obergefell v. Hodges*, 576 U.S. 644, 657 (2015)).

"Its dynamic allows two people to find a life that could not be found alone, for a marriage becomes greater than just the two persons. Rising for the most basic human needs, marriage is essential to our most profound hopes and aspirations." *Id.* (citation omitted). The Court went on to state, "[i]mportantly, marriage is a commitment. Among the most essential vows in the marriage

18

is the promise of fidelity.  In most marriages, this means a promise of monogamy: an agreement to share romantic intimacy and sexual relations only with one spouse."  *Id.*  While the Court recognized that not every marriage may carry such commitment, "for those that do, society expects married couples to honor it."  If such commitment is broken, "injury results—personal injury to the still-faithful spouse, but also societal injury, because a broken marriage can mean the loss of all the benefits that a healthy marriage brings to society."  *Id.* (citation omitted).

"Simply put, [North Carolina] has a legitimate interest (indeed, a substantial interest) in protecting the institution of marriage, ensuring that married couples honor their vows, and deterring conduct that would cause injury to one of the spouses."  *Id.* (citation modified).  After applying the "robust rational basis standard," the Court determined the defendant could not show how alienation of affection and criminal conversation overshadow the State's reasons for enacting them[,]" and as a result, held actions for alienation of affection and criminal conversation do not violate the Fourteenth Amendment.  *Id.* at 305, 804 S.E.2d at 597.

Furthermore, the Court, in its assessment of alienation of affection impacting free speech stated "[i]n most applications of these torts, the State is not concerned with the content of the intimate speech or expression that occurs in an extra-marital relationship.  Instead, the State seeks to deter and remedy the harmful effects that result from acts that cause people to break their marriage vows[.]".  *Id.* at 306, 804 S.E.2d at 597.

Thus, this further supports Plaintiff's position that this Court cannot ignore the injury component of the due process analysis.  In addition to Defendant's contacts with North Carolina, it is also relevant, and a great concern of our State, that Plaintiff suffered injury in North Carolina as a result of Defendant's intentional conduct.  *Id.*

19

## 2. The Burden on Defendant

Defendant has frequently traveled to North Carolina on multiple occasions in the last two years, including assisting Mr. Ammel retrieve his belongings from the marital residence, and most recently assisting Mr. Ammel with his criminal charges and involuntary commitment. {Dkt. 2 pp 11-12; Pl. Decl. ¶¶ 33-39}. Defendant also traveled to North Carolina for Plaintiff and Mr. Ammel's domestic mediation and sat out in the parking lot of Plaintiff's counsel's office. *Id.* Thus, the evidence supports Defendant has no difficulty traveling to North Carolina when it suits her purpose, and therefore it would not be a burden for Defendant to be "haled into court" in North Carolina. Plaintiff and Mr. Ammel have lived in North Carolina and have raised their family in the North Carolina for approximately twelve (12) years. {Dkt. 2 p 2}. Defendant destroyed their Marriage, and the convenience of Plaintiff should be paramount over any burden on Defendant.

## 3. Plaintiff's Interest in Obtaining Convenient and Effective Relief

Plaintiff is a single mother raising her three minor Children in Moore County, North Carolina. {Pl. Decl. ¶ 33-39}. Additionally, due to recent events involving Mr. Ammel, she has been awarded sole custody of the Children. *Id.* Furthermore, witnesses to Defendant's conduct, including Matthew Ammel's former friends and associates, reside in North Carolina. {Dkt. 2 p 11}. While there are some witnesses outside of North Carolina, North Carolina is clearly the location of Plaintiff's injury. Moreover, Plaintiff cannot obtain "effective relief" anywhere except North Carolina, as North Carolina is one of the few states that recognizes the tort of alienation of affection and Arizona does not. *See Fish*, 297 N.C. App. at 750, 913 S.E.2d at 248.

In sum, the evidence clearly establishes Defendant, on multiple occasions, initiated contact with Mr. Ammel for purposes of soliciting his affection. {Dkt. 2 pp 5-13; Pl. Decl. ¶ 14}. Defendant's contacts were intentional and made with full knowledge that Mr. Ammel was married

20

to Plaintiff.  Considering Defendant's contacts in light of these factors, the exercise of jurisdiction over Defendant is proper.

## **CONCLUSION**

For all the foregoing reasons, this Court should deny Defendant's Motion as it is proper for this Court to exercise jurisdiction over Defendant.

This, the 17th day of April 2026.

<div style="margin-left:40%">

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*


By:    */s/ Thomas M. Van Camp*
Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile:  (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

</div>

<div align="center">**CERTIFICATE OF WORD COUNT LIMIT**</div>

I certify that this **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** complies with the page limit set forth in Local Civil Rule 7.3(d) and does not exceed the maximum allotted word count of 6,250 words.

This, the 17th day of April 2026.

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

By:    */s/ Thomas M. Van Camp*
Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile:  (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

<div align="center">22</div>

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that the undersigned has this date served the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** upon the persons listed below via email addressed as follows:

Steven B. Epstein, Esq.
*Attorney for Defendant Kyrsten Sinema*
301 Fayetteville Street
Suite 1900
Post Office Box 1801 (27602-1801)
Raleigh, North Carolina 27601
Telephone: (919) 783-2846
Facsimile:  (919) 783-1075
sepstein@poynerspruill.com

This, the 17th day of April 2026.

VAN CAMP, MEACHAM & NEWMAN, PLLC
*Attorneys for Plaintiff*

By:  */s/ Thomas M. Van Camp*
Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile:  (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

23