**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**Case No. 1:26-CV-00038-DAB-JEP**

| | |
|---|---|
| **HEATHER AMMEL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **DECLARATION OF** |
| **KYRSTEN SINEMA,** ) | **HEATHER AMMEL** |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

The Affiant, in addition to her verified Complaint, being first duly sworn, deposes and states as follows:

1. My name is Heather Ammel, and I am the Plaintiff in this action.

2. Unless otherwise stated, I have personal knowledge of the facts and information contained herein.

3. I am a citizen and resident of Moore County, North Carolina, and I have resided in Moore County since 2014.

4. I married my now former husband, Matthew Ammel (hereinafter "Mr. Ammel"), on 23 October 2010 (hereinafter, "the Marriage").

5. During our Marriage, Mr. Ammel and I had had three children: C.A., born 4 October 2011; I.A., born 3 January 2013; and J.A., born 29 September 2015 (hereinafter "the Children").

6. Mr. Ammel and I, along with our Children, resided together as a family in Moore County, North Carolina from 2014 until Mr. Ammel and I separated on 1 November 2024

1

(hereinafter, "the Separation").

7. Prior to Defendant's malicious interference, Mr. Ammel and I had a good and loving marriage and genuine love and affection existed between us.

8. Mr. Ammel started working for Defendant in April 2022 as her security detail.

9. Defendant incorrectly asserts in paragraph 2 of her declaration she "do[es] not conduct business in North Carolina, and ha[s] no contractual relationships with North Carolina business entities or residents." Mr. Ammel has worked for Defendant since 2022, whether that was through Defendant's security organizations or senate staff.

10. Defendant incorrectly asserts in paragraphs 4 & 5 of her declaration that her security organizations, Toa Group, LLC, and later Kinsaker Security Group, LLC, have no connection to North Carolina. The security organizations hired Mr. Ammel, a North Carolina resident, to work for Defendant, and then Defendant herself offered Mr. Ammel a salary position and placed him on her senate staff as a Defense and National Security Fellow.

11. Defendant incorrectly asserts in paragraph 9 of her declaration she did not know where Mr. Ammel resided until the fall of 2023, at which point she received his telephone number to maintain contact with him, and discovered he had a Kansas area code. Defendant has known Mr. Ammel resided in North Carolina since he began working for her. Defendant values Mr. Ammel's military experience and knows Mr. Ammel was a member of the 3rd Special Forces Group, a military group permanently stationed and headquartered in Fort Bragg, North Carolina. Additionally, in the fall of 2023, Mr. Ammel went with Defendant alone to Napa Valley, California. It was on this trip where Defendant really got to know Mr. Ammel. When Mr. Ammel returned home from Napa Valley, he appeared

2

uncomfortable and informed me that if anyone had seen them together on the trip, it would have appeared as if they were on a romantic getaway.

12. Defendant incorrectly asserts in paragraph 11 of her declaration she "did not learn Mr. Ammel resided in North Carolina, and lived there with his wife and [C]hildren, until approximately December 2023." To begin, Mr. Ammel began working for Defendant in April 2022. Defendant, whether through her security group, or individually, would arrange and pay for Mr. Ammel's travel and would fly Mr. Ammel out of Raleigh-Durham International Airport. While it is true Defendant met me for the first time in December 2023 in Las Vegas, Nevada, at the U2 concert, she knew about me well before then. When Defendant greeted me in Las Vegas, she told me "I feel like I already know you, because I've heard so much about you from Matt." On the same trip, Defendant also made a comment about my curly hair and said, "well that's because you live in the humid south." She also commented on Mr. Ammel's military experience, specifically his special forces background.

13. Defendant incorrectly asserts in paragraph 11 of her declaration she "never had personal knowledge of Mr. Ammel being physically present in North Carolina at any time [she] initiated or had communications with Mr. Ammel prior to November 2024." When Mr. Ammel was not with Defendant traveling to various locations, both within and outside of the United States, Defendant knew, or at the very least, had reason to know Defendant returned home to his family in Moore County, North Carolina.

14. Of the messages I reference in my verified Complaint, I personally witnessed Defendant send Mr. Ammel the following messages while he was physically present in North Carolina, prior to the date of Separation:

3

a. In January 2024, I witnessed Defendant send Mr. Ammel a message about helping him with his mental health.

b. In or around early spring 2024, I witnessed Defendant send Mr. Ammel the following messages:

    i. A picture of Defendant wrapped in a towel. Mr. Ammel was physically present in North Carolina and at our marital residence when Defendant sent a photo of herself wrapped in a towel. I was standing in our kitchen when I read the message. Defendant was wrapped in a white towel, and the picture showed her bare upper back with cupping bruises. Mr. Ammel responded to the picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman who doesn't."

    ii. Mr. Ammel messaged Defendant stating he was intimidated by Defendant while Mr. Ammel was physically present in North Carolina. Defendant responded to the message asking why because she only wants to be intimidating to her opponents, not to people she likes. Mr. Ammel received Defendant's message while he was at our marital residence. I read the message standing in our kitchen.

    iii. Defendant messaged Mr. Ammel suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience while Mr. Ammel was physically present in North Carolina. Mr. Ammel received Defendant's message while he was at our marital residence, packing and preparing to go on another trip with Defendant.

4

iv. Defendant messaged Mr. Ammel during the State of the Union address while Mr. Ammel was physically present in North Carolina and at our marital residence. While Defendant and Mr. Ammel were messaging during the State of the Union, Mr. Ammel and I were sitting on the couch in our living room. I personally witnessed the live message exchange. When Mr. Ammel asked why Defendant wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote.

v. Defendant and Mr. Ammel messaged about having sex missionary style with the lights on while Mr. Ammel was physically present in North Carolina. I read the message standing in my kitchen.

c. In or around 3 October 2024, I witnessed Defendant message Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." I responded to the message stating, "are you having an affair with my husband? You took a married man away from his family." Mr. Ammel was physically present in North Carolina and at the marital residence when Defendant sent the message. At this point, I took Mr. Ammel's phone and responded to the message. Defendant knew or had reason to know Mr. Ammel was in North Carolina when she sent Mr. Ammel the message, because Mr. Ammel was with Defendant in Phoenix, Arizona 1-2 October 2024, and purposefully flew home on 3 October 2024, for our daughter's birthday. Mr. Ammel was only home for two days, before flying back to Phoenix to be with Defendant on 5 October 2024. See attached as **Exhibit A.**

5

15. Defendant incorrectly asserts in paragraph 12 of her declaration that between 2022 and October 2024, Defendant and Mr. Ammel did not engage in any communications via SMS (text) messages during that time period, and that the only phone she ever used to communicate with him was her personal cell phone. I have attached a text exchange between Defendant and Mr. Ammel from Mr. Ammel's work phone from June, July, and August 2024 for reference. In the June message exchange, Defendant sent Mr. Ammel a ticket titled Noah Kahan: We'll All Be Here Forever Tour. In the July message exchange, Defendant shared her location with Mr. Ammel. In the August message exchange, Defendant sent Mr. Ammel a code and a separate message stating, "I cannot sleep, I am miserable, and I want at least one of my pens back. You have them both. Pls give me one back now." See attached as **Exhibit B.**

16. Defendant incorrectly asserts in paragraph 13 of her declaration she has carefully reviewed the records of her cellphone and email communications with Mr. Ammel and used those records to ascertain where she was and where he was when such communications occurred. In addition to my own evidence showing otherwise, Defendant and Mr. Ammel primarily communicated through Signal, the messaging app. Defendant, through her own admission, in paragraph 7 admits "[e]ncrypted Signal messages disappear shortly after they are sent to the recipient and cannot thereafter be retrieved on the device of either the sender or the recipient; they also cannot be retrieved by Signal or phone service providers." Signal does not reveal the location of the person or the content of their messages.

17. Defendant incorrectly asserts in paragraph 14 of her declaration that none of her "telephone or email communications with Mr. Ammel between early 2023 and 1 November 2024 occurred while [Mr. Ammel] was physically present in North Carolina" and that "Mr.

6

Ammel was physically outside the State of North Carolina at the time [she] directed 100% of [her] telephone and email communications to him during such time period." I have named every message I witnessed Defendant send to Mr. Ammel while he was physically present in North Carolina and at the marital residence. I have also attached the message I sent to Defendant confronting her about the affair to this declaration. See **Exhibit A** attached.

18. Defendant incorrectly asserts in paragraph 19 of her declaration she has no recollection of any Signal messages she sent to Mr. Ammel in January 2024, or if she did send him a Signal message in that month, she had no knowledge as to where Mr. Ammel was physically located. Specifically, in the month of January, I personally witnessed Defendant send Mr. Ammel a message about helping him with his mental health.

19. Defendant offering to help Mr. Ammel with his mental health, is what I believe to be, one of the many ways Defendant lured Mr. Ammel away from me and our family. Mr. Ammel, when he began working for Defendant, was already suffering from PTSD, TBI, and substance abuse. Defendant knew he was in a vulnerable place and took advantage of that. Defendant paid for Mr. Ammel to participate in psychedelic drug treatment in an effort to "help" him with his mental health. Instead, Mr. Ammel's mental health has progressively gotten worse, and he has completely forgotten who he is and has left our family.

20. Defendant incorrectly asserts in paragraph 20 of her declaration she did not send Mr. Ammel any messages that included a picture of her wrapped in a towel and she "has no recollection of any message of the type Plaintiff alleges." Although Defendant denies remembering this event, I read the message standing in the kitchen of our marital residence. Defendant was wrapped in a white towel, and the picture showed her bare upper back with

7

cupping bruises. Mr. Ammel responded to the picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman who doesn't." Although Defendant contends this message was not of a romantic or intimate nature, I was deeply offended by the message.

21. In paragraph 20 of Defendant's declaration, Defendant does not deny she sent Mr. Ammel a message suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience. I read the message at our marital residence. Defendant sent Mr. Ammel the message as he was preparing to go on another work trip. Defendant sent this message in the early spring of 2024, and by Defendant's own admission in paragraph 11, she already knew where Mr. Ammel lived at that point. Although Defendant contends this message was not of a romantic or intimate nature, I was deeply offended by the message.

22. In paragraph 22 of Defendant's declaration, Defendant does not deny she sent Mr. Ammel messages during the State of the Union address. Although Defendant asserts she had no knowledge as to where Mr. Ammel was physically located when she sent the message, I read the message at our marital residence. Defendant sent this message in the early spring of 2024, and by Defendant's own admission in paragraph 11, she already knew where Mr. Ammel lived at that point. Although Defendant contends this message was not of a romantic or intimate nature, I was deeply offended by the message.

23. Defendant incorrectly asserts in paragraph 24 of her declaration she does not recall messaging Mr. Ammel about having sexual intercourse missionary style with the lights on and that she stated "Boring!" Although Defendant denies remembering the message and contends it was not of a romantic or intimate nature, I read the message standing in the

8

kitchen of our marital residence and was deeply offended by it.

24. Defendant acknowledges in paragraph 28 of her declaration that at the end of May 2024, her relationship with Mr. Ammel became romantic and intimate. Although Defendant correctly speaks to the nature of Defendant and Mr. Ammel's relationship at that time, based on the communications and events that occurred prior to May 2024, I deny the affair occurred as late as May 2024.

25. In paragraph 49 of Defendant's declaration, Defendant does not deny she messaged Defendant while he was physically present in North Carolina stating, "I miss you. Putting my hand on your heart. I'll see you soon." I responded to the message stating, "are you having an affair with my husband? You took a married man away from his family."

26. Although Defendant disputes the timeline for this particular message, I am certain Defendant sent the message in or around 3 October 2024. Mr. Ammel was physically present in North Carolina and at the marital residence when Defendant sent the message. I took Mr. Ammel's phone and responded to the message. See **Exhibit A** attached. Additionally, Defendant knew or had reason to know Mr. Ammel was in North Carolina when she sent Mr. Ammel the message, because Mr. Ammel was with Defendant in Phoenix, Arizona 1-2 October 2024, and purposefully flew home on 3 October 2024, for our daughter's birthday. Mr. Ammel was only home for two days, before flying back to Phoenix to be with Defendant on 5 October 2024.

27. In paragraph 51 of her declaration, Defendant contends that at the time she sent the October message, "it was very clear to [her] that Mr. Ammel's [M]arriage with Plaintiff was over." Despite Defendant's contention, our relationship was not over. Mr. Ammel and I went on an Anniversary trip 25-26 October 2024. We held hands on the plane, were

9

physically intimate on the trip, including engaging in sexual intercourse, and were still very much emotionally connected. Mr. Ammel and I attended a concert together, and throughout the three-and-a-half-hour concert, Mr. Ammel held me and hugged me. I have attached pictures that we took together on the trip as well as our text exchange immediately after the trip. Mr. Ammel told me he loved me and missed me. See attached as **Exhibit C.**

28. After the anniversary trip concluded, I returned home to Moore County, North Carolina, and Mr. Ammel went on a work trip with Defendant to Saudi Arabia. Mr. Ammel and I parted ways at the airport, but Mr. Ammel messaged me stating he loved and missed me. See **Exhibit C** attached.

29. Shortly after Mr. Ammel returned home to Moore County, North Carolina from Saudi Arabia, on 1 November 2024, we separated. However, Defendant did not completely move out of the marital residence until the middle of November.

30. Mr. Ammel traveled to Washington, DC to move furniture from Defendant's apartment into his new apartment in Moore County, North Carolina.

31. After Mr. Ammel and I separated, Mr. Ammel continued to frequent the martial residence and would physically touch me in a romantic way each time he stopped by. Mr. Ammel's brother's family stayed with me and the Children for Thanksgiving 2024, and Mr. Ammel came over for Thanksgiving Day. Additionally, we all traveled to Kansas together for Christmas 2024, and Mr. Ammel and I slept in the same bed on Christmas Eve. After spending Christmas in Kansas, we went skiing together as a family.

32. After the ski trip in December 2024, Mr. Ammel and I officially parted ways.

33. After the Separation, Defendant started making her presence known in North Carolina and

10

would frequently travel to North Carolina to visit Mr. Ammel.

34. On 18 August 2025, Defendant drove to our custody and equitable distribution mediation at Van Camp, Meacham & Newman, PLLC in Pinehurst, North Carolina. Defendant sat outside in the parking lot and waited for Mr. Ammel.

35. On the weekend of 12 September 2025, Defendant and Mr. Ammel took our minor child, J.A., to a concert in Kentucky. On Sunday, 14 September, Defendant and Mr. Ammel drove J.A. back through the night to Moore County, North Carolina. Defendant and Mr. Ammel dropped J.A. off at school at 9:00 a.m. Monday morning.

36. On 16 September 2025, Defendant accompanied Mr. Ammel to the marital residence to pick up the remainder of his belongings. Defendant sat outside in the cul-de-sac immediately adjacent to our marital residence.

37. On 19 November 2025, Mr. Ammel's property manager filed a 50C Complaint for No-Contact Order against him. Mr. Ammel was involuntarily committed to the hospital, and on 20 November 2025, Mr. Ammel was arrested for assaulting the physician assistant at the hospital. Defendant traveled to Moore County, North Carolina to bond Mr. Ammel out of jail and moved him out of his rental property to her house in Arizona.

38. On 24 November 2025, I was awarded emergency custody of all three of the Children.

39. The Children have been in my custody ever since. We continue to reside at the marital residence in Moore County, North Carolina.

I declare under penalty of perjury that the foregoing statements are true, correct, and compete, to the best of my knowledge and belief.

**FURTHER THE DECLARANT SAYETH NAUGHT.**

**[Signature page to follow]**

11

This, the 17 day of April 2026.

Heather Ammel
Heather Ammel

12

<u>**CERTIFICATE OF SERVICE**</u>

THIS IS TO CERTIFY that the undersigned has this date served the foregoing **DECLARATION OF HEATHER AMMEL** upon the persons listed below via email addressed as follows:

Steven B. Epstein, Esq.
*Attorney for Defendant Kyrsten Sinema*
301 Fayetteville Street
Suite 1900
Post Office Box 1801 (27602-1801)
Raleigh, North Carolina 27601
Telephone: (919) 783-2846
Facsimile:  (919) 783-1075
sepstein@poynerspruill.com

This, the 17th day of April 2026.

VAN CAMP, MEACHAM & NEWMAN, PLLC
*Attorneys for Plaintiff*

By:     */s/ Thomas M. Van Camp*
Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile:  (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

13