IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 1-:26-cv-00038

| | | |
|---|---|---|
| HEATHER AMMEL, | ) | V I D E O T A P E D |
| Plaintiff, | ) | D E P O S I T I O N |
| vs. | ) | O F |
| KYRSTEN SINEMA, | ) | H E A T H E R |
| Defendant. | ) | A M M E L |

------------------------------

A P P E A R A N C E S:

For the Plaintiff: Mr. Thomas M. Van Camp
Van Camp, Meacham & Newman, PLLC
P.O. Box 1389
Pinehurst, North Carolina 28370

For the Defendant: Mr. Steven B. Epstein
Ms. Abby Jenkins
Poyner & Spruill
P.O. Box 1801
Raleigh, North Carolina 27601

Videographer: Mr. Corey Parker

In Attendance: Ms. Kyrsten Sinema

In Raleigh, N.C.
July 31, 2026

Reported by:
Lisa S. Marion, CER

E X A M I N A T I O N  I N D E X


| Examination | By Whom | Page No. |
|---|---|---|
| Direct | Mr. Epstein | 6 |
| Cross | Mr. Van Camp | 157 |

E X H I B I T   I N D E X

| Exhibit No. | Description | Page Marked |
| --- | --- | --- |
| Defendant's 1 | Deposition of Heather Lynne Ammel | 15 |
| Defendant's 2 | Plaintiff's Responses to Defendant's First Set of Interrogatories, First Request for Production of Documents, and First Request for Admissions | 28 |
| Defendant's 3 | Messages | 57 |
| Defendant's 4 | Text Messages | 99 |

S T I P U L A T I O N S

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record:

(1) That the videotaped deposition of HEATHER AMMEL may be taken on July 31, 2026, beginning at 12:52 P.M., in the OFFICES OF POYNER SPRUILL, LLP, located at 301 Fayetteville Street, Suite 1900, Raleigh, North Carolina 27601, before Lisa S. Marion, CER, a Notary Public.

(2) That the deposition shall be taken and used as permitted by the applicable Federal Rules of Civil Procedure.

(3) That any objections of any party hereto as to notice of the taking of said deposition or as to the time or place thereof, or as to the competency of the person before whom the same shall be taken, are deemed to have been met.

(4) Objections to questions and motions to strike answers need not be made during the taking of this deposition, but may be made for the first time during the progress of the trial of this case, or at any pretrial hearing held before any judge of competent jurisdiction for the purpose of ruling thereon, or at any other hearing of said case at which said deposition might be used, except that an objection as to the form of a question must be made at the time such question is asked, or objection is waived as to the form of the question.

(5) That the witness waives the right to read and sign the deposition prior to filing.

(6) That the sealed original transcript of this deposition shall be mailed first-class postage or hand-delivered.

(7) That the witness was identified by a government-issued photo ID.

* * * * *

THE VIDEOGRAPHER: Good afternoon. We're now on the record. Today's date is Friday, July 31st, 2026. The time is approximately 12:52 p.m. Eastern. This is the case of Heather Ammel versus Kyrsten Sinema. The deponent is Heather Ammel.

Counsel, please introduce yourselves, after which our court reporter will swear in our witness.

MR. VAN CAMP: Tom Van Camp for the plaintiff.

MR. EPSTEIN: Steven Epstein for the defendant.

MS. JENKINS: Abby Jenkins for the defendant.

Whereupon,

HEATHER AMMEL,
having been first duly sworn,
was examined and testified
as follows:

DIRECT EXAMINATION BY MR. EPSTEIN:

Q Good afternoon.
A Good afternoon.
Q Go ahead and state your full name for the record, please.
A Heather Lynne Ammel.
Q What is your residential address?
A 18 Cayman Court, Whispering Pines, North Carolina.
Q Ms. Ammel, as I think you know, my name is Steve Epstein. I represent Kyrsten Sinema in a lawsuit that you originally filed against her in Moore County and that is now pending in federal court in Winston-Salem. I'm here today to ask you questions related to a motion to dismiss that we filed back in March.
Before we begin, I want to set a few ground rules very similar to the ground rules that your own lawyer did -- that your own lawyer set with Ms. Sinema. You've been sworn to tell the truth and have a legal obligation to do so. You must answer all of my questions unless you're instructed not to by your attorney. Do you understand that?
A Yes.
Q If you don't understand a question I ask, please ask me to rephrase it, and I will. I don't want

you to answer a question that you don't understand. All right?

A Okay.

Q If you answer my question, however, I'm going to assume that you understood it. Is that fair?

A Fair.

Q If you need to correct an answer that you supplied at an earlier point in the deposition, you just need to let me know that at any point in time, and I will give you an opportunity to correct your answer. Okay?

A Okay.

Q If you need to take a break at any time, let me know that, and we will take a break. You will just need to answer any pending question unless instructed not to before we take a break. Okay?

A Okay.

Q For the benefit of the court reporter -- and you've seen how this works now -- it's critical that only one of us speaks at a time. Therefore, I'll let you -- or at least try to let you finish each answer before I start my next question, and by the same token, please try to allow me to finish my question before you begin to answer. Okay?

A Okay.

Q Please answer each question verbally and with words rather than shaking your head or saying "uh-huh" or "uh-uh" because those are difficult to transcribe in the transcript. Okay?
A Okay.
Q This is not a race. You may take your time -- as much time as you need to answer my questions. The same thing is true when you're examining exhibits. If you need to take time to examine the exhibits, take all the time that you need. Okay?
A Okay.
Q Do you have any questions for me before we begin?
A I do not.
Q Have you taken any medications, any type of drugs, or alcohol within the last 48 hours?
A I have not.
Q Do you know of any reason why you cannot supply complete, truthful, and accurate answers to the questions that I'll be asking you?
A No.
Q Did you attend the deposition of your ex-husband, Matthew Ammel, on July 28, 2026?
A I did.
Q Where were you located?
A In my lawyer's office.

Q Okay. So you were in the conference room that both Mr. Van Camp and Ms. Coltrane were in at the time of the deposition?
A Correct.
Q What is your date of birth?
A May 13th, 1987.
Q Have you ever been charged with a crime?
A I have not.
Q Where did you grow up?
A Mostly in Leavenworth, Kansas.
Q So you're not originally from North Carolina?
A I am not.
Q Do you have relatives who still live in Kansas?
A I do.
Q How often do you travel to Kansas to see those relatives?
A Typically once a year.
Q Typically in the summer?
A Correct.
Q When did you move to North Carolina?
A January of 2010.
Q And for what purpose did you move to North Carolina?
A Matt at the time was stationed at Fort Bragg, North Carolina, and so we agreed that I would move to

North Carolina so that we could have a relationship.
Q And you were in Kansas at the time you moved?
A Correct.
Q And have you lived in North Carolina since 2010?
A I have.
Q Tell me about your education.
A I went to the University of Kansas and I have a bachelor in journalism and a bachelor in English. And then recently, I went to Sandhills Community College where I obtained an associate's in fine arts and visual arts.
Q Tell me about your work history.
A I worked when I first moved to North Carolina at Fayetteville State University in their writing center. And that's the extent of it because I had kids and ended up being a stay-at-home mom.
Q And how long was that work experience at Fayetteville State?
A Around January 2010 to July -- or I'm sorry. Yes. January 2010 -- no. That's not right. I'm sorry. I'm getting dates mixed up.
Q I'm actually not looking for dates.
A Yeah.
Q Just a rough approximation of how long that work

experience was.
A About maybe six to eight months.
Q Okay. When did you and Mr. Ammel begin a dating relationship?
A I think it was in early 2008.
Q Okay. Where were you living at the time?
A In Lawrence, Kansas.
Q Where was he living at the time?
A He was deployed, and so he was coming home from deployments, and then I think he was stationed out of Fort Bragg at that time.
Q And when you say Lawrence, Kansas, were you still attending college at the time?
A Yes.
Q When did you get married?
A October 23rd, 2010.
Q Were you still in college at the time, or had you graduated by then?
A I had graduated.
Q Okay. And is that -- you got married before you moved to North Carolina or after?
A After.
Q When did Matthew Ammel retire from the military?
A I think it was August of 2022. I think it was 2022.

Q What did he do for work at that point?
A When he retired --
Q Yes.
A -- outside of Special Forces?
Q Yes.
A He was working for -- I think he had started working for Ridgeline by then. I'm not sure if he was working for Staccato yet. And he was also part of a tree removal company with his friend.
Q Did he also work for a company called Consolidated Analysis Centers in Africa?
A Yes.
Q And that was --
A Briefly. Very briefly.
Q And that was in 2022?
A I think so.
Q And when he was working for that company, that involved a lot of travel, correct?
A No.
Q It did not?
A It did not.
Q Ridgeline Defense is located in New Hampshire. Is that right, to your knowledge?
A Yes.
Q His work for Ridgeline Defense involved a lot of

travel, didn't it?
A Not really.
Q No? Most of --
A I would not say extensive, considering he was in Special Forces and gone considerably more.
Q Okay. And so just to be clear, I'm not asking you to compare the amount of travel he did at any point in time. When I say "a lot of travel," I mean is he gone multiple days a month to -- that's my definition of a lot of travel. He's gone multiple days a month. Under that definition of a lot of travel, for Ridgeline Defense out of New Hampshire, did he have a lot of travel?
A I'd say so.
Q He worked for Staccato 2011 out of Texas, correct?
A Correct.
Q And by my definition, at least, that work involved a lot of travel, didn't it?
A No.
Q No. He worked for TOA Group as a security contractor, right?
A Correct.
Q That work involved a lot of travel, by my definition, didn't it?
MR. VAN CAMP: Objection. What is your

definition?

MR. EPSTEIN: I've already given it. I said multiple days per month.

A I would say that's not correct.

Q And then he went from working for TOA Group to working for Kinsaker Security Group as a security contractor. Is that right?

A Yes.

Q That work involved a lot of travel, didn't it?

A That did.

Q Okay. And he also worked as a member of the staff of Ms. Sinema's Senate office as of June of 2024, correct?

A Correct.

Q That work involved a lot of travel, correct?

A I don't know. Those lines were blurred.

Q Okay. Well, your husband, Matthew Ammel, traveled so much that you provided sworn testimony in your domestic case against him that he was gone 90 percent of the time in the months leading up to that -- to your separation, correct?

A Can you repeat that?

Q Yes. Your husband, Matthew Ammel, traveled so much that you provided sworn testimony in your domestic case against him that he was gone 90 percent of the

time in the months leading up to the separation, correct?
A How many months leading up to the separation?
(DEFENDANT'S DEPOSITION EXHIBIT NO. 1 MARKED FOR IDENTIFICATION)
Q I'm showing you what has been marked as Exhibit No. 1 to your deposition. Just to confirm, you've seen this before. This is the transcript of your deposition from the case that you filed against Mr. Ammel in Moore County, correct?
A Correct.
Q And you have seen the transcript before, right?
A Yes.
Q Go to Page 56, Line 7. Did you testify "He hasn't demonstrated that he is a capable co-parent"?
A Correct.
Q And you were sworn to tell the truth when you were providing this testimony, correct?
A Correct.
Q Mr. Tanner was the one asking you questions. Is that right?
A Correct.
Q He then said, "How is that" on Line 8, right?
A Uh-huh.
Q Go ahead and read into the record here what you

said starting on Line 9.

A "Well, for one, his schedule keeps him away the majority of the month. Prior to separation, he chose to be away for 90 percent of the month, and now he only has an issue with custody now that he's restricted."

Q There were days during 2024 that you, Mr. Ammel's wife, didn't know where he was, correct?

A Could you clarify?

Q Sure. I'll ask it a different way. Did you always know where he was any given day at any given time?

A I tended to know his location.

Q Okay. Well, in fact, you shared location, right?

A Correct.

Q So you were able to track him on your phone, weren't you?

A Correct, up until maybe midsummer of 2024.

Q And what happened in midsummer of 2024?

A He turned off his location, so I could not track him anymore.

Q Did he tell you he was doing that?

A No.

Q You just noticed that he was no longer sharing his location with you?

A Correct.

Q Did you have a discussion with him about that?
A Yes.
Q Tell me about that discussion.
A I believe it was primarily over text and confronting him about why he would stop sharing his location, what would -- why. And I don't think he had -- I don't quite remember what he said. And I think he may have briefly turned it back on and then turned it off again.
Q You're not aware of any evidence that Kyrsten Sinema was able to track his location like you were, are you?
A I'm not aware.
Q Would you agree that Matthew Ammel had used the Signal messaging platform as a means of communication throughout his military career?
A No.
Q What is your understanding about when he started using the Signal messaging platform?
A I don't recall a specific time frame when he began using Signal.
Q When did you first become aware of Signal as a messaging platform?
A I would be speculating. I don't know.
Q I'm looking for an estimate. Give me an estimate

in time. You can say it was before 2022, after 2022, before he retired from the military, after he retired from the military.

A It was after 2020. And that's a pure guess.

Q So -- and that's a good marker because we all think about COVID. So somewhere in the COVID time frame, you knew that he was using Signal as a messaging platform?

A I would not agree with that.

Q Okay. Somewhere before he retired from the military, you knew he was using Signal as a messaging platform?

A I don't know if I'd agree with that either.

Q Did you know he was using the Signal messaging platform before he performed any security services that involved Kyrsten Sinema?

A He may have.

Q Did you understand that United States senators communicated via the Signal platform?

A No.

Q You became aware at some point that Mr. Ammel communicated with Kyrsten Sinema through the Signal platform, correct?

A Correct.

Q How did you become aware of that?

A I think it was when he was picked up for a security job in California. It may have been a Napa job. And it might have been the first time he had her personal phone number and he was included in a group Signal message thread. I'm not sure specifically.

Q So from that point forward, you were aware that, to the extent that he and Ms. Sinema communicated, at least some of those communications would be via Signal?

A Correct.

Q And you certainly were aware that Mr. Ammel made arrangements through Ms. Sinema for you and your -- for you to travel to Las Vegas to see that U2 concert?

A Could you repeat that?

Q Sure. You knew that Mr. Ammel made arrangements through Ms. Sinema for you to travel to Las Vegas to go to the Sphere and be part of that U2 event, correct?

A It was my understanding that he received permission to bring me on that trip.

Q And going back to Signal, when Mr. Ammel and Ms. Sinema were communicating via Signal, you knew that because of the way Signal works, those messages

would not, in fact, remain past a certain point in time?

A I disagree with that.

Q Okay. Tell me what you knew.

A My understanding was it did not auto-delete after eight hours, in that it was the user's choice to go in and put a time in.

Q When --

A In fact, I've seen messages between Matt -- I mean, scrolling, you can just scroll and scroll and scroll, and they weren't auto-deleting.

Q Okay. In other chains of communication with other people besides Ms. Sinema? Is that what you're referring to?

A Yes.

Q But at some point you knew that his messages back and forth with Ms. Sinema on Signal did auto-delete, correct?

A I don't know that.

Q You just randomly decided to take a screenshot one day of a Signal communication?

A They either auto-deleted or he was deleting them.

Q Okay. You knew they wouldn't last on his phone. Is that fair to say?

A It wasn't always like that.

Q I'm talking about the messages between Ms. Sinema and --
A Correct.
Q -- Mr. Ammel.
A Correct.
Q Please let me finish my question. It's okay. You were aware that their communications did not remain as a fixture on his phone like the communications he was having with other people?
A I don't know that it was always like that.
Q But at some point you understood that?
A At some point it may have changed to become that.
Q And to ensure that you had access to communications that you found, you took screenshots of them and sent them to yourself, correct?
A Not all.
Q Well, the ones that you were able to, that's how you secured them from going away, right?
MR. VAN CAMP: Strike -- I mean objection.
A Which messages?
Q For instance, the ones that were sent while he was in Leavenworth, Kansas.
A Those were screenshots.
Q Why did you decide to take a screenshot?
A Because that was the confirmation that they were

having an affair.

Q So you knew as of then that they were having an affair?

A Clearly.

Q Okay. So to be clear, you did not have access to Mr. Ammel's Signal account, the account itself, did you?

A No.

Q You didn't know his password? You didn't know how to get into his account or anything like that, right?

A Correct.

Q You didn't hack into that account to see what was there?

A I did not.

Q You didn't have a computer forensic expert try to determine what was in his Signal account --

A No.

Q -- correct?

The only way you could ever know what Signal messages Mr. Ammel sent or received was if you saw them with your own two eyes on his cell phone, correct?

A Correct.

Q And between January 1st of 2024 -- my date range is

going to be a little bit different than your attorney's. Between January 1st of 2024 and November 1st of 2024, how often were you in possession of Mr. Ammel's cell phone?
A Describe "in possession."
Q Like you had the phone; Mr. Ammel did not have the phone.
A I could not give you an estimate.
Q Well, tell me what would occasion you being in possession of his phone to his exclusion.
A Could you reword that?
Q Yeah. What -- under what circumstances would you wind up with his phone and him not have his phone?
A If he may have left it on the counter.
Q How often did that happen that he left it on the counter and he was nowhere around it?
A I mean, he would often leave his phone on the counter.
Q Well, of the times that he left it on the counter, first of all, would you be able to access material on his phone if you wanted to?
A Yes.
Q And how were you able to do that?
A I had his passcode.
Q Did he know that you had his passcode?

A Yes.
Q Did he consent to you going on his cell phone and seeing what was there?
A He knew I was.
Q Throughout your entire marriage -- strike that.
Until the time that you separated, he knew that you were using his password to go onto his cell phone?
A Correct.
Q Between November 1st, 2024 and -- I'm sorry. Strike that.
Between January 1st, 2024 and November 1st, 2024, how often did Mr. Ammel show you his cell phone in order for you to see the Signal messages that were on his cell phone?
A Possibly once.
Q Okay. And what was that message?
A I think it was the State of the Union messages.
Q From Ms. -- between him and Ms. Sinema?
A Correct.
Q Okay. You're not aware as you sit there right now of any other occasion where Mr. Ammel showed you a Signal message between him and Ms. Sinema on his cell phone?
A I don't recall Matt showing me specifically.

Q Other than that one instance that you just described?

A Correct. And with the State of the Union, that may have been him verbally reading the messages next to me, as well.

Q Okay. So let me ask you this question. Other than the screenshot of the Signal messages from June of 2024 that you witnessed in Leavenworth, Kansas and the photograph of Signal messages from October 3rd, 2024 that you took with your phone, did you ever see any Signal messages between Mr. Ammel and Ms. Sinema with your own two eyes?

A Yes.

Q On how many occasions would you say that occurred?

A Probably a dozen, at least.

Q And how would you be able to see those messages?

A Because I had access to his phone.

Q So you would be able to go into his phone without him being aware of it and see if he had recently gotten a Signal message?

A Correct.

Q And you would only be able to do that if he had gotten that Signal message within the eight hours of when you were looking, correct?

A That's if that eight-hour default is correct. And

I don't know that it is.

Q All right. I'm going to change topics. You possess no evidence, do you, that Matthew Ammel and Kyrsten Sinema had any romantic, intimate, or sexual encounters in North Carolina prior to November 1st, 2024, correct?

A Can you restate that, please, or say it again?

Q Sure. You have -- you possess no evidence that Matthew Ammel and Kyrsten Sinema had any romantic, intimate, or sexual encounters in North Carolina prior to November 1st, 2024, correct?

A Correct.

Q And you haven't produced any such evidence to us, right?

A Correct.

Q You possess no evidence that Ms. Sinema was ever physically present in the State of North Carolina between February 2023 and November 1st, 2024, correct?

A I do not have evidence.

Q And you haven't produced any to us, correct?

A Correct.

Q You have no way to dispute that the in-person romantic or sexual relationship between Ms. Sinema and Mr. Ammel prior to November 1st, 2024 occurred

exclusively outside the State of North Carolina, do you?

A Could you repeat that?

Q Sure.

A Slowly.

Q Okay.

A Very slowly.

Q You cannot dispute with evidence that the romantic and sexual relationship between Ms. Sinema and Mr. Ammel -- physical relationship in person -- occurred exclusively outside the State of North Carolina before November 1st, 2024, correct?

A Correct.

Q You are aware that both Ms. Sinema and Mr. Ammel have provided evidence or testimony about sexual encounters they had in California, New York, Washington, DC, Colorado, and Arizona between May 2024 and October 2024, correct?

A Correct.

Q Is it your belief that they had -- with everything that you've now seen in this case, as you sit there right now, is it still your belief they had additional sexual encounters besides what I just described?

A Potentially.

Q Is it your belief as you sit there right now that they had a sexual encounter in North Carolina?
A No.
Q Okay. And, again, I'm going to use the date restriction of November 1st, 2024. I am not going to ask you, I don't believe, a single question about the relationship between my client and your ex-husband post-November 1st, 2024. So if you're confused on any question, that is my standard admonition that I am not focused on any timeline after November 1st, 2024.
A Okay.
Q So you think maybe they had sex in California as early as 2023. Is that right?
A Potentially.
Q You think they potentially had sex in Colorado as early as 2023, right?
A I don't know.
Q You mentioned both of those in your discovery responses. Do you recall that?
A Could we look?

(DEFENDANT'S DEPOSITION EXHIBIT NO. 2 MARKED FOR IDENTIFICATION)

Q Sure. I'll go ahead -- and you're going to get this soon enough. I'm showing what is being marked

as Exhibit 2 to your deposition. So if you go to Page 7, your second bullet point talked about Mr. Ammel accompanying Defendant on several trips and went with her alone to Napa Valley, California in the fall of 1990 -- I'm sorry -- the fall of 2023. Do you see that?

A Yes.

Q And that's an instance where you think possibly they had sex, right?

A Possibly.

Q And then the next bullet point, you said, "In or around August/September 2023, Mr. Ammel went on a security detail trip to Colorado where Defendant participated in a bike race," right?

A Correct.

Q And then you talk about talked about after the race, Defendant, Mr. Ammel, and other team members went to a waterfall in their swimsuits, drank champagne, and took photos, right?

A Correct.

Q And you saw those photos, right?

A I did.

Q And that led you to believe that perhaps Mr. Ammel and Ms. Sinema had sex on that occasion?

A I never said that.

Q Okay. Would you agree that Mr. Ammel and Ms. Sinema, from what you now know, had a coast-to-coast romantic and sexual relationship?
A Yes.
Q And that coast-to-coast romantic and sexual relationship, to the best of your knowledge, did not include North Carolina, correct?
A To the best of my knowledge.
Q Okay. I want to talk about -- you can put that to the side. We'll get back to it.
Different topic. Did Mr. Ammel have a laptop computer in 2024?
A Yes. It was jointly owned. We both used it.
Q Okay. Did he primarily use it?
A I would say we both used it.
Q Okay. When it was purchased, who was originally the user of that laptop computer?
A I think him.
Q And did he leave that laptop computer home when he went on business trips?
A I think so.
Q Did you go on to that computer when he was on business trips?
A Yes.
Q And did you have a password that both of you knew?

A Yes.
Q What was that password?
A Specifically?
Q Do you recall it?
A Maybe a variation of it. I don't know it exactly anymore. I've changed it.
Q Okay. What was it before you changed it, as best you can recall?
A It might have been his name with a capital M, an @8036 at the end, and maybe an exclamation.
Q But he was aware that you knew that password?
A Yes.
Q Okay. Did you actually keep that laptop computer following separation and divorce?
A Yes.
Q Did you scour that laptop computer for evidence about his sexual relationship with Kyrsten Sinema?
A I wouldn't use the word "scour."
Q What would you use?
A I looked. I reviewed it.
Q Were you specifically reviewing it with the intention of finding what you could about their relationship?
A Yes.
Q You did everything you knew to do to find evidence

on that computer about their relationship, correct?
A Yes.
Q Did you have a computer forensics expert search that computer for evidence about their relationship?
A No.
Q After all the work that you did going through his computer -- going through the computer, you came up with zero evidence indicating that Mr. Ammel and Ms. Sinema had any romantic or intimate encounters in North Carolina, correct?
A In North Carolina, correct.
Q After all the work you did with his laptop computer, you came up with zero evidence indicating that Ms. Sinema communicated with Mr. Ammel while he was present in the State of North Carolina, correct?
A Could you repeat that?
Q Yes. After all the work you did looking for information about their relationship on that laptop computer, you came up with zero evidence indicating that Ms. Sinema communicated with Mr. Ammel while he was present in the State of North Carolina? And I'm just talking about what was on the laptop computer.

A That's correct for the laptop, I think.
Q Yeah. Okay. So going back to Exhibit No. 2, can you confirm that Exhibit No. 2 is a complete and accurate copy of your discovery responses that you verified under oath on June 17th, 2026? And that verification page is the last page. And you can flip through it --
A Yes.
Q -- to make sure there is nothing missing or nothing has been slipped in there.
A Yes.
Q Okay. Go to Page 6, please, which includes Interrogatory No. 2. Okay. I'm going to read you what Interrogatory No. 2 says, and I'll first ask you when I'm done if I read it accurately. Interrogatory 2 said, "Identify all journals, logs, diaries, calendars, notes, screenshots, photographs, video and/or audio recordings, and/or any other records revealing contacts or communications between Defendant and Matthew Joseph Ammel." Did I read that correctly?
A Correct.
Q After some objections, the response given says, quote, "To the extent Plaintiff has possession of said documents, Plaintiff produces all screenshots

and photographs of Defendant and Mr. Ammel's communications," correct?
A Correct.
Q So to start out, Ms. Ammel, we didn't just ask you for screenshots and photos that revealed contacts or communications between Ms. Sinema and Mr. Ammel. We asked you to identify all journals, logs, diaries, calendars, notes, screenshots, photographs, video and/or audio recordings, and/or any other records revealing such contacts. You're aware of that, right?
A Right.
Q Can you confirm that you produced no journals?
A I did not produce a journal or journals.
Q Can you confirm that you produced no logs?
A I did not produce logs.
Q Can you confirm you produced no diaries?
A No diaries.
Q Can you confirm you produced no calendars?
A Technically correct.
Q Can you confirm you produced no notes?
A Correct.
Q Can you confirm you produced no video or audio recordings?
A Correct.

Q And you do understand you are under an obligation to produce all of those things if they reveal contacts or communications between Ms. Sinema and Mr. Ammel?

A Correct.

Q Did you ever at any point in time possess journals, logs, diaries, calendars, notes, or video or audio recordings revealing contacts or communications between Ms. Sinema and Mr. Ammel?

A No.

Q No?

A Can you repeat the question?

Q Did you ever at any point in time -- and, again, if I'm going too fast, just let me know. I am not trying to confuse you. I'm not trying to make you go faster than you want. This is your deposition. You are in control. If something makes you uncomfortable, you let me know that, and I will work my best to make you more comfortable. Okay?

A Uh-huh.

Q You understand -- I'm sorry. Strike that.

Did you ever -- ever at any point in time possess, have possession of, journals, logs, diaries, calendars, notes, or video or audio recordings revealing contacts or communications

between Ms. Sinema and Mr. Ammel?
A Did I have them in my possession?
Q Yes.
A No.
Q And that, to me, suggests you never created any such things. Would that be true, as well?
A Created --
Q Created notes or logs or diaries.
MR. VAN CAMP: Object to the extent that that may implicate work product, which is things that your law office or my office asked you to create in connection with the case.
THE WITNESS: Okay.
Q Right. So what I'm focused on is before you went to a lawyer. Before you went to a lawyer, did you create any type of memorialization of any communications between Ms. Sinema and Mr. Ammel? Did you memorialize -- other than screenshots and photos, did you with your own hands do anything to memorialize contacts or communications between your husband and Ms. Sinema?
A Do you mean such as print them?
Q No. I mean like making a note, "This is what it said, this is the date it occurred," anything like that.

A Could you provide a specific example?
Q We'll be going through examples. But I'll give you the one that your --
A I would --
Q I'll give you the one that your attorney referenced of Ms. Sinema supposedly wearing a towel in a photo sent to your husband, right?
A Correct.
Q So in this line of questioning, what I want to know is what did you do, if anything, to memorialize that such a photo was sent?
A For that specific one, I did not memorialize it. I'm not sure I'm quite understanding.
Q Okay. Let me -- let me do it this way, then.
A Does this include writing it down in a personal journal?
Q Yes.
A Yes, I did do that.
Q You wrote down that a contact or photo was sent from Ms. Sinema to your husband?
A Not on the specific date it happened.
MR. VAN CAMP: Again, I'll just reiterate my objection. If this is part of the case and requests and things you provided to your lawyer as far as remembering these things, you are not to

answer. But if you did it on your own before you hired us --

A This was all before I hired or went to a lawyer. So no. My answer is no.

Q Okay. So let me just make sure we've got -- we can --

A Yes.

Q -- put a fine point on this.

A Okay.

Q Prior to preparing documentation for your attorneys, you had never done anything by way of a journal, log, diary, calendar, or notes to memorialize any contacts between your husband and Ms. Sinema, true?

A Will you repeat it one more time --

Q Sure.

A -- very slowly?

Q Prior to preparing materials for your attorneys in this case --

A Yes.

Q -- you had never done anything to memorialize any contacts between Ms. Sinema and your husband in the form of a journal, a log, a diary, a calendar, notes, or anything like that?

A Correct.

Q The only way you memorialized those contacts before doing something for your attorneys was through a screenshot or a series of screenshots and a photograph, correct?

A Correct.

Q And at the time you prepared something for your attorneys, aside from that screenshot and that photograph, the only thing you had to go on to recall contacts or communications between Ms. Sinema and your husband -- the only thing you had was your memory, correct?

MR. VAN CAMP: Other than the photos? Was that the beginning of the question?

MR. EPSTEIN: Yeah.

MR. VAN CAMP: Yeah.

A Other than the photos and the -- the screenshots and the photo, yes, I believe that is it.

Q And another way of asking the same question -- I'm going to have you go to Page 16. I'm sorry. Pages 6 through 16. There are bullet points that start at the bottom of Page 6 where you're running through a timeline of sorts, where you say in April 2022 and then you start bulleting out different things. See all those bullets that go on for 10-plus pages?

A Yes.
Q The only thing that you had to go on to prepare all of that information at the first time you prepared it, whether it was going to your attorney, whether it was for yourself, or whomever -- the only thing that you had to go on other than one set of screenshots and one photograph -- the only thing that you had to go on was your memory?
A Correct.
Q And that's for everything we see here in Pages 6 through 16, correct? You're relying on your memory?
A I journaled a lot.
Q Because we just looked at Exhibit 2 -- I'm sorry. We just looked at Interrogatory No. 2. And No. 2 refers expressly to journals, and you did not produce a journal, as you've confirmed. I need to know why you didn't produce a journal to us in this case when we asked you for journals that related to or revealed contacts or communications between your husband and Ms. Sinema.
A Because it didn't memorialize. It was therapeutic.
Q Ms. Sinema -- Ms. Sinema -- sorry.
Ms. Ammel, is there any reference in the journal that you are talking about or the journals

that you're talking about to contacts or communications between your husband and Ms. Sinema?

MR. VAN CAMP: That are not part of something you did in preparation for your domestic case or this case at the request --

A No.

MR. VAN CAMP: -- of an attorney.

Q So what were you journaling that was therapeutic?

A My emotions about finding out about the affair. It was my way to work through it.

Q In response to Interrogatory No. 2, did you review that journal to determine whether there is any reference, however small, to any communication between Ms. Sinema and your husband?

MR. VAN CAMP: That wouldn't be protected by the work product doctrine, meaning that we didn't ask you to do in preparation for one of the two cases.

A My answer is no.

Q So you never said anything like -- in your journal, "I just learned that Kyrsten Sinema communicated with my husband"?

MR. VAN CAMP: Objection. We --

MR. EPSTEIN: Well, let me do it this way.

MR. VAN CAMP: Let me just -- okay. 'Cause

--

MR. EPSTEIN: I'm not trying to --

MR. VAN CAMP: You're asking to find out what's in her journal and what she's saying when it was requested by an attorney for her to prepare it. If it was before that, I'm -- fair game.

Q Let me -- prior to the time lawyers were ever involved in your life, did you keep a journal?

A Yes.

Q Did that journal have anything to do with lawyers?

A No.

Q Were you keeping that journal in 2023?

A I do think I had it dated back to 2023.

Q Were you keeping that journal in 2024?

A Yes.

Q And that was personal to you? Had nothing to do with lawyers, correct?

A Correct.

Q And there was stuff going on in your marriage that you were unhappy about, correct?

A Correct.

Q And you journaled it, didn't you?

A Yes.

Q In response to Interrogatory No. 2, Ms. Ammel, did you review that journal to determine if there was

responsive information?

MR. VAN CAMP: And "that journal" means the journal before you hired an attorney.

A No.

Q It didn't dawn on you that you had a legal obligation to do that?

A Could you rephrase that?

Q You were required by law to respond to this interrogatory. You understand that?

A Correct.

Q You were required by law to provide the information available to you in responding to this interrogatory. You understand that?

A Correct.

Q Your journal was available to you when you responded to this interrogatory, correct?

A Correct.

Q Your journal contained information about the affair that you believed Mr. Ammel was having with Ms. Sinema, correct?

A It contained my feelings about the affair.

Q It may have also included things about the communications between Ms. Sinema and Mr. Ammel. That's possible, isn't it?

A It's possible, but I'd have to review them.

Q And you didn't, did you?
A No. I did re-read my journals.
Q Ma'am, you testified not less than five minutes ago that in response to Interrogatory No. 2, you did not review your journal to determine if there was any information that responded to what we were asking for. Isn't that right?
A I don't know. I'm getting confused now.
Q You want a break?
A That would be great.
MR. EPSTEIN: Okay. I'll come back to that question after the break. Let's take --
THE WITNESS: Okay.
MR. EPSTEIN: -- five minutes.
THE VIDEOGRAPHER: Off the record at 1:38 p.m.
(SIX-MINUTE RECESS)
THE VIDEOGRAPHER: On the record at 1:44 p.m.
Q Ms. Ammel, we've been talking about a journal that you kept possibly as early as 2023, including 2024, correct?
A Correct.
Q Describe that journal. What does it look like? Does it have more than one volume? How did you put

information into it?
A I have been keeping a journal, I think, beginning in 2022 sparsely. I didn't -- so I think I have three -- two and a half filled-in journals.
Q Is that a notebook? Is it --
A They're journals. They're like a diary type of --
Q What color are they?
A One has flowers, one has butterflies, one is black.
Q Okay. And you would write by hand in those journals?
A Correct.
Q And would you date your entries?
A Yes.
Q And you were doing that through the entire timeline of events that we're here talking about today, correct?
A I think I started heavily in the spring of '24.
Q And a lot of what is written in there is the subject of the lawsuit between you and Ms. Sinema, correct?
A No. I wouldn't say that's correct.
Q A lot of what is written in there is about your feelings about what's happening in your marriage to Mr. Ammel, correct?
A The ending of my marriage.

Q Okay. Go to Page 16. You were asked to "Identify all communications between you and Matthew Joseph Ammel related to the subject of your marriage ending or the plan" -- it should say "or desire of either of you to physically separate, including, but not limited to, verbal communications, correspondence, e-mails, text messages, voicemails, and encrypted messages," right? Were you asked that?

A Correct.

Q Your diary is going to refer to communications that you and Mr. Ammel had about the subject of your marriage ending, correct?

MR. VAN CAMP: Objection.

A I would argue that it says, "Identify all communications between you and Matthew." That's not -- my journals are not a communication between me and Matthew.

Q Would your journal have referenced communications between you and Matthew about the subject of your marriage ending?

MR. VAN CAMP: Object. You're asking -- you're asking for --

A No. I don't think so.

MR. VAN CAMP: -- communications -- let me

finish. You're asking for communications. The journal is not a communication, as Ms. Ammel has stated. And for the record, Interrogatory 2 and Request for Production of Document No. 1 are very limited in the request only as to the communications between -- revealing contacts or communications between the defendant and Matthew Ammel, nothing more as far as a log or a diary.

Q Ms. Ammel, the three diaries or journals that you're talking about, the flowers, the butterflies, the black one, somewhere in there there is information about the end of your marriage and discussions you had with Matthew Ammel about them. Somewhere in there -- strike that.

Would you agree with that?

A Could you repeat that?

Q Somewhere in those three journals is information related to communications you had with your husband about your marriage ending, correct?

A Most likely. I would have to review it.

Q And somewhere in there we would find a reference to what you learned about contacts or communications between your husband and the defendant, correct?

A Most likely.

Q And for that reason, you should have identified

those three journals in response to the interrogatories we just looked at. Would you agree with that, ma'am?

MR. VAN CAMP: Objection.

A I did not know that I needed to do that.

Q And go ahead and take a look at Request for Production of Document No. 1, which is on Page 28.

A Of the -- okay.

Q Were you asked to produce to us all documents, including electronically stored information, identified in response to the foregoing interrogatories?

A Correct.

Q And you never identified the three journals that you've just described: The flowered one, the butterfly one, and the black one, correct?

MR. VAN CAMP: Objection. You can answer.

A I don't consider them communications.

Q That's not my question, ma'am. You did not identify those journals anywhere in the 30-plus pages of responses that you provided to us, correct?

A Correct.

Q And you didn't produce them to us, correct?

A Correct.

Q Do you have any idea why that is upsetting to us?

MR. VAN CAMP: Objection. You can answer.

A I don't. I don't know why that would upset you.

Q You don't think you should play by the same rules as Ms. Sinema?

MR. VAN CAMP: Objection.

Q Do you?

A I am playing by the same rules.

Q By not revealing information that responded to what we asked you?

A There was nothing else revealing. I've already produced everything I had. So if any -- if I've referenced any -- any evidence I have given you, it's just a duplicate of me hashing out my feelings in my journal.

Q Do you understand that we have a right to see that and not trust you on that?

MR. VAN CAMP: Objection. Again, the interrogatory and the request for production of documents is limited to logs and journals revealing contacts or communications between the defendant, Ms. Sinema, and Matthew Ammel, nothing more.

MR. EPSTEIN: Okay.

MR. VAN CAMP: So --

MR. EPSTEIN: Mr. --

MR. VAN CAMP: And to the extent that there are journals that reveal contacts or communications between them, we will produce those. But you're acting like you get her entire journal.

MR. EPSTEIN: We absolutely do.

MR. VAN CAMP: No, you don't. You get -- you get what you asked for.

MR. EPSTEIN: Okay.

MR. VAN CAMP: So you should worry about your questions.

MR. EPSTEIN: We wouldn't have filed a motion to compel if you provided less than a document that was identified in interrogatory responses. And at this point, number one, we are asking for the production of all three journals. We would like that by Monday.

MR. VAN CAMP: You're not going to get them. You're going to get --

MR. EPSTEIN: Okay.

MR. VAN CAMP: If they reveal contacts and communications between the defendant and Matthew Ammel, you're going to get that, 'cause that's what you asked for.

MR. EPSTEIN: Then we will be filing a motion to compel.

MR. VAN CAMP: Okay. Fine.

MR. EPSTEIN: And number two --

MR. VAN CAMP: Let it rip, Steve. Just keep asking --

MR. EPSTEIN: Number two --

MR. VAN CAMP: -- your questions.

MR. EPSTEIN: -- we are keeping this deposition open --

MR. VAN CAMP: That's fine.

MR. EPSTEIN: -- And we'll ask the judge to allow us --

MR. VAN CAMP: I think that's fair.

MR. EPSTEIN: -- to continue.

MR. VAN CAMP: I think -- I think that's fair. I think to the extent that you need to ask questions about any portions of the journal that are subject to your very narrow question that haven't been produced and we produce them, absolutely I will make Ms. Ammel available for you to ask questions about those journals immediately, and I will consent to an extension of discovery to include a day that we can get together next week to do that. And I will get you her journals by tomorrow, to the extent they were requested and they're relevant and not objectionable. So we

don't need to beat this dead horse anymore. Okay?

Q Ms. Ammel, were you the one who was preparing the bullet points that are listed out in -- from Pages 6 through 16? Was that you or was that not you that prepared those bullet points?

A I provided this information to my counsel.

Q Did you provide it in bullet form? Were these bullets provided to your counsel?

A I don't recall how I -- I may have. I broke it down somehow.

Q Okay. What were you looking at in order to prepare the information that is listed in bullet on Pages 6 through 16?

A I might have referenced my complaint.

Q And your testimony is you didn't look at your journal at all as you were preparing this information that is in the interrogatory responses?

MR. VAN CAMP: I don't think that was her testimony. Objection.

A I do not recall if I looked at my journal for this.

Q And going back to Interrogatory No. 2 -- I'm sorry -- Interrogatory No. 3 on Page 16 where you were asked to "Identify all communications between you and Matthew Joseph Ammel related to the subject of your marriage ending, including, but not limited

to, verbal communications," right?
A Verbal.
Q Yeah.
A How could I provide verbal communications?
Q Well, what you did was you said, "See the documents we produced," right? "Subject to and without waiving said objections, see Plaintiff's documents attached," right?
A We are on Page 16?
Q Page 16, Interrogatory 3. Your response was "Subject to and without waiving said objections, see Plaintiff's documents attached," right?
A Correct.
Q And a document you could have attached that included reference to verbal communications between you and your husband about your marriage ending would have been your diary, right?
A Those are not verbal communications.
Q You don't think you referred to verbal communications in your diary?
A I'd have to review it.
Q We asked you to identify those verbal communications, and instead of doing that, you said, "See my documents," right?
A Could you repeat that?

Q We asked you to identify those verbal communications between you and your husband about the subject of your marriage ending.
A Could you be more specific?
Q You were asked to "Identify all communications between you and Matthew Joseph Ammel related to the subject of your marriage ending or the plan or desire of either of you to physically separate," were you not?
A Correct.
Q You had verbal communications about those -- that subject, correct?
A About our marriage ending?
Q Yes.
A Yes, we've had verbal communication about that.
Q And what --
A How am I supposed to provide you verbal communication?
Q Did you memorialize those communications, at least to some degree?
A I don't know.
Q Because you didn't look, did you?
A I mean, my journals are to just get out my feelings. I don't typically re-read them.
Q Even when you're commanded by law to provide

information in response to a lawful request?

A I don't recall.

MR. EPSTEIN: We renew the request. We will be filing a motion to compel. It will be filed on Monday.

MR. VAN CAMP: Just ask questions.

MR. EPSTEIN: This is --

MR. VAN CAMP: I don't need your speeches. I don't need your speeches. You know, you don't -- I'm not going to do verbal objections or grandstand like you're doing. You do what you need to.

MR. EPSTEIN: I'm not grandstanding.

MR. VAN CAMP: I just want --

MR. EPSTEIN: I am -- I'm flabbergasted that we're in this situation.

MR. VAN CAMP: You knew that there was no verbal communications identified when these were sent, and you didn't file a motion to compel. So now you're going to file a motion to compel when you're taking a deposition about something that you knew about -- I don't know. When was this sent? A month ago? Go ahead. I'm not --

MR. EPSTEIN: Mr. Van Camp --

MR. VAN CAMP: I mean --

MR. EPSTEIN: -- we didn't know that your

client had documents that were responsive because she didn't --

MR. VAN CAMP: Okay.

MR. EPSTEIN: -- reveal them.

MR. VAN CAMP: Are you talking about documents or identifying verbal communications? Like, "identify" means state what you recall. A request for production of documents means --

MR. EPSTEIN: She has a diary telling her what to recall, and she didn't even look at her diary.

MR. VAN CAMP: She has a diary where -- you're telling her what's in it. I mean, it's just --

MR. EPSTEIN: She told me what was in it, and --

MR. VAN CAMP: So if she writes about a kid breaking a leg, you want that, too? I mean, you know, your requests are very limited and --

MR. EPSTEIN: Okay.

MR. VAN CAMP: -- as to --

MR. EPSTEIN: Well, we will --

MR. VAN CAMP: So just file what you want to file. I would just -- you know, this deposition is going to end with you and start with you asking

questions of her and her giving the best answer she can, so let's just proceed along those lines, and then you file whatever you need to file, and we will, too, so --

MR. EPSTEIN: We will certainly do so.

(DEFENDANT'S DEPOSITION EXHIBIT NO. 3
MARKED FOR IDENTIFICATION)

Q I'm going to hand you now what is being marked as Exhibit No. 3 to your deposition. And you might recognize this because it was also marked in your ex-husband's deposition as Plaintiff's Exhibit No. 9.

MR. VAN CAMP: Is this Exhibit 1, by the way? The --

MR. EPSTEIN: That's 1.

MR. VAN CAMP: It's 1?

Q Take some time to look through that, please. Have you had a chance to review?

A I have.

Q I'm going to represent you, Ms. Ammel, that the only screenshots or photographs your attorney provided to us that contained contacts or communications between Ms. Sinema and Mr. Ammel are those that appear in Exhibit 3, which is four pages long. So let me ask you, are you aware of any

other document in the world that captures a contact or communication between Ms. Sinema and Mr. Ammel prior to November 1st, 2024?
A No.
Q Let's look through these four pages. Would you agree that what appears on the first page are Signal communications between Ms. Sinema and Mr. Ammel?
A Correct.
Q You actually saw this message on Mr. Ammel's phone, correct?
A Correct.
MR. VAN CAMP: Which one? Page 1?
MR. EPSTEIN: Page 1.
Q How did that occur that you saw that message?
A We were at my parents' house and he was in bed next to me. And he had come home severely intoxicated, and I had some suspicions that something was going on, so I got on his phone and saw the -- these messages.
Q And then you created a screenshot?
A Correct.
Q You texted yourself that screenshot?
A Correct.
Q And that's why we have it here in front of us as

Exhibit 3, correct?
A Correct.
Q And you were physically present in Leavenworth, Kansas at the time, correct?
A Correct.
Q Those messages that we're looking at on the first page were sent to Mr. Ammel on either June 22nd or June 23rd, 2024, correct?
A Correct.
Q And that was shortly after he came back from a work trip to provide security to Ms. Sinema, correct?
A Correct.
Q And he came back to Leavenworth, Kansas because your family was on vacation there, correct?
A Correct.
Q Read out loud what Ms. Sinema wrote in blue.
A Which page?
Q The first page.
A In blue?
MR. VAN CAMP: Object. Object to the form. You can answer.
Q The first page of Exhibit No. 3.
A Could you repeat?
Q Yes. Can you read out loud what Ms. Sinema wrote in -- I'm sorry. Yeah. Not in blue. I misspoke.

Read out loud the communications from Ms. Sinema to your husband.

A "I hope your day was okay. Thinking of you. I am with you. I keep waking up during my sleep and reaching over for your arms to hold me."

Q Kind of suspicious, would you agree?

A Yes.

Q Doesn't sound like it had anything to do with providing security for her, right?

A Correct.

Q And as you've already testified, this was the point that you realized that your husband was having an affair with Ms. Sinema, correct?

A Confirmed, yes.

Q Yes. You pretty much suspected it even before then?

A Correct.

Q Go to the second page, please. That same message stream on Signal continues onto Page 2, right?

A Correct.

Q And the first new item that we haven't already seen in italics says, quote, "You deleted this message," right?

A Right.

Q And that was you actually who deleted the message,

right?

A Correct.

Q And Ms. Sinema responded on Signal, "What did you write and delete? I am here," correct?

A Correct.

Q And it was your hand or hands on Mr. Ammel's phone when those messages came through, correct?

A Correct.

Q So you realized that Ms. Sinema was communicating in real time to the phone that was in your hand?

A Correct.

Q You did not respond?

A I did. That's the deleted message.

Q Okay. And what was in that deleted message?

A I said, "Are you having an affair with my husband?" And then I chose to delete it.

Q How quickly did you delete it after you sent it?

A Quickly. Quickly enough that she didn't see it.

Q How do you know she didn't see it?

A Because it verifies when someone has seen it.

Q Okay. So in order to fully complete what we're looking at in Exhibit 3 in these first few pages, we would need to plop back into this exchange what you wrote, which was "Are you having an affair with my husband?"

A Correct.
Q And is that all you wrote?
A Yes.
Q And she didn't respond to that?
A No, because I had deleted it.
Q And it's clear from the context here that she didn't know what you had sent. Would you agree?
A I agree. And then there were more messages after that that I do not have screenshots of.
Q Explain what you mean by that.
A She continued to send other messages.
Q Do you have any idea what they say?
A I think it was more fluffy stuff about "My hand is on your heart" type of stuff.
Q Was the phone in your hand when they were coming through?
A Yes.
Q And you just for some reason decided not to take a screenshot of those?
A Yes. I was in complete panic mode, having a complete meltdown at 2:00 a.m. in utter shock.
Q Go to Page 3, please. Rather than a screenshot, that looks like a photo of a laptop screen. Would I be right about that?
A This might be an iPad.

Q Your iPad?

A Matt had a work iPad.

Q Okay. Do you know as you sit here right now what device this is?

A I think it's Matt's work iPad.

Q Okay. How did you have access to what was on his work iPad?

A That's a question for him.

Q Did you have to use a password to access it?

A I think so.

Q How did you know the password?

A He provided it.

Q Did you document or record somewhere when you took this photo, Page 3 of Exhibit 3?

A Document how so?

Q Writing it down.

A I don't recall writing this down.

Q As you sit there right now, do you know when you took this photo?

A I want to say this is around September 2024.

Q If I told you that the metadata embedded in that photo indicates it was created the afternoon of October 3rd, 2024, would that sound about right?

A When I took the photo?

Q When this photo was created. Yes, ma'am.

A October 3rd of 2024?
Q Yes, ma'am.
A I guess that could be correct. I don't recall.
Q That was a significant day, was it not?
A Oh, yes.
Q Okay. That was another day that you were quite unhappy, correct?
A Correct.
Q And it might have been a day that you were going through Mr. Ammel's work iPad because you were unhappy?
A Excuse me. We're speaking of October 3rd, not October 4th, correct?
Q Correct.
A Okay. October 4th, I was very unhappy.
Q Okay. But you weren't unhappy on October 3rd for the same reason because you hadn't seen those communications on October 3rd?
A I had not seen those communications. Well, at what time did that photo -- was the metadata on that?
Q October 3rd at about -- what did I say? The afternoon of October 3rd.
A Yeah. I didn't see the October 3rd message until October 4th.
Q And the last item, the last bubble at the bottom of

that screen says, "Today, 12:38 a.m." Do you see that?

A Yes.

Q And if today was October 3rd at 12:38 your time, what time would that message have been sent Pacific time?

A Nine -- or I guess 9:38 p.m.

Q And where was Mr. Ammel at 9:38 p.m. on October 2nd, Pacific time?

A He was in -- I'm sorry. Could you repeat that?

Q Yes. Where was Mr. Ammel at 9:38 p.m. Pacific time on October 2nd?

A I think he was in Phoenix.

Q It's your not -- it's not your contention in this case that the message "I cannot sleep. I am miserable. And I went" -- "I want at least one of my pens back. You have them both. Please give me one back now" -- it's not your contention that Mr. Ammel was in North Carolina when that message was sent. Would you agree?

A I agree.

Q But when you saw that message, you considered it to be further confirmation of the relationship between your husband and Ms. Sinema, correct?

A Correct.

Q Go to the fourth page of Exhibit 9. That appears to be a photo of Matthew Ammel's cell phone with Signal messages from Kyrsten Sinema displayed. Would you agree with that?
A I agree.
Q Is that your hand holding the phone?
A It is.
Q And what is in your other hand as you're holding that phone?
A My phone.
Q And you took a photo with your phone, correct?
A Correct.
Q And you've provided us the photo from your phone in this last page, Page 4, correct?
A Yes.
Q And you took that photo at about eight o'clock in the morning on October 4th, correct?
A Correct.
Q And that's approximately when you sent the blue message at the very bottom of that screen to Ms. Sinema?
A Correct.
Q And that one you didn't delete, correct?
A Correct.
Q But it's -- from what you're telling me today, it's

the exact same message that you did transmit to her through Signal on or about June 22nd, 2024 before you deleted it?

A Correct.

Q Same words?

A I believe so.

Q Yeah. The messages from Ms. Sinema to Mr. Ammel, as we see here on the fourth page, were received on his phone at about 10:00 p.m. the evening of October 3rd your time, correct?

A Correct.

Q How and when did you first see those messages?

A I saw those messages on the morning of October 4th around 8:00 a.m. when I opened the phone -- when I opened Signal.

Q And what led you to open your husband's phone the morning of October the 4th?

A I was extremely suspicious at this point that they were having a full-blown affair, and he briefly left his phone on the counter, and I took the opportunity to look. And my suspicions were confirmed.

Q Ms. Ammel, this fourth page of Exhibit 3, which we're looking at right now, is the only documentation or physical evidence you possess of a

communication between Ms. Sinema and Mr. Ammel that was received by Mr. Ammel in the State of North Carolina, true?
A Could you repeat the question?
Q Sure. This fourth page of Exhibit 3 that we're looking at right now is the only documentation or physical evidence you possess of a communication between Ms. Sinema and Mr. Ammel that he received in the State of North Carolina, correct?
A Correct.
Q Go to -- back to Exhibit No. 2. I think we're done with Exhibit No. 3. And go to Page 31.
MR. VAN CAMP: Which exhibit is this? 2?
MR. EPSTEIN: 2.
MR. VAN CAMP: Exhibit 2?
Q And in response to Request for Admission No. 2, you, in fact, admitted that, quote, "You possess no physical evidence of any communications of a romantic nature between Defendant and Matthew Joseph Mr. Ammel prior to October 2024 that occurred while he was physically present in the State of North Carolina," correct?
A Correct.
Q And you've also admitted in response to Request for Admission No. 3 that, quote, "You possess no

physical evidence revealing that Defendant was aware of the physical location of Matthew Joseph Ammel at the time of the communications between them that you describe in your April 17th, 2026 declaration in this matter," correct?

A Correct.

Q And that includes the Page 4 of Exhibit 3 that we just looked at? You possess no physical evidence that Kyrsten Sinema was aware that Mr. Ammel was in North Carolina when she sent those messages on October 3rd, 2024, correct?

A I would be speculating if I tried to guess what she thought.

Q And you're aware her sworn testimony is that she did not, correct?

A Correct.

Q Is it your testimony she's lying about that, or you just don't know?

A Could you repeat?

Q Is it your testimony she is lying that she didn't know he was in North Carolina when those messages were sent, or you just don't know?

A I think she's lying.

Q But you have nothing other than your own feelings and suspicions to base that on, correct?

A No. She knew where he lived and she knew where he was -- he was returning home.
Q On what basis do you say she knew where he was returning home?
A Where else would he go? And she knew that it was our daughter's 13th birthday.
Q And on what basis do you say that?
A I'm sure Matt informed her.
Q You're sure or you're speculating, ma'am?
A I'm speculating.
Q Okay. Thank you. Ms. Ammel, your discovery responses, your declaration, indeed your verified complaint reference numerous communications you say occurred between Ms. Sinema and Mr. Ammel apart from the ones we just looked at in Exhibit 3, right?
A Correct.
Q Just to make it clear for the record, you have no physical evidence of any of them, correct?
MR. VAN CAMP: Just -- can you just -- and "physical evidence" meaning the picture, things of that nature?
MR. EPSTEIN: Correct.
MR. VAN CAMP: Okay.
Q Any tangible things that we could put our fingers

on. You have no physical evidence of any of those other messages apart from what we've looked at in --
A Correct.
Q -- Exhibit 3?
Nobody else in the world saw those messages with their own two eyes who can testify as to what they said other than you, correct? Besides Mr. Ammel. Putting him to the side.
A I think that's correct.
Q And we don't know whether a journal entry says anything about any of those messages, because you didn't look to find out, correct?
A Correct.
Q And would you also agree that there is no physical evidence, tangible things that we can touch, establishing where Mr. Ammel was when any such message that wasn't included in Exhibit 3 was received on his phone?
A Correct.
Q And for these items that we're about to go through, you're relying totally and completely on your memory of events that happened as long as two to three years ago, correct?
MR. VAN CAMP: Other than Exhibit 3?

MR. EPSTEIN: Yeah.
A Correct.
Q Okay. And the vast majority of these messages, as we'll go through, that you describe in your discovery responses, by your own admission, were sent to Mr. Ammel when he was not in the State of North Carolina, correct?
A Could you repeat that?
Q Sure. The vast majority of the messages that are in your bullets on those 10 to 11 pages in your discovery responses, by your own admission, were sent to him when he was outside the State of North Carolina, correct?
A I would need to review them.
Q Okay. And we're going to do that.
A Okay.
Q And I'm going to tell you -- and you can correct me if I'm wrong as we go through. But by my count, having very carefully reviewed your discovery responses, there are eight such messages that in your discovery responses you say were sent to Mr. Ammel by Ms. Sinema while he was in the State of North Carolina: One about his mental health, one that included a photo of Ms. Sinema in a towel, one that started with Mr. Ammel messaging Ms. Sinema

about him being intimidated by her, one about guiding Mr. Ammel through a psychedelic experience, one that recommended that Mr. Ammel watch a Netflix documentary about MDMA, one about the State of the Union address by President Biden, one about having sex missionary style with the lights on, and one about her being on the way to see Depeche Mode in Europe. And you can -- as we go through your responses, you can tell me if you see anything else that you believe was sent to Mr. Ammel while he was in North Carolina. But those are eight messages that you believe were sent to Mr. Ammel while he was physically present in North Carolina, correct?

A Correct.

Q Okay. We're going to drill down on them all. Go to Page 8 of Exhibit 2. I'm going to start with the fourth bullet point on that page. That starts in January 2024. That one says that you witnessed Defendant send Mr. Ammel a message about helping him with his mental health and Mr. Ammel agreed. Do you see that?

A Yes.

Q You actually didn't witness Defendant do anything, fair to say, right?

A No.

Q That's not right?
A Well, I was not in her presence.
Q So you couldn't witness her do anything, correct?
A That's fair.
Q Okay. What were the exact words of this message? You don't quote anything here. What were the exact words?
A I don't recall the exact words.
Q How could you possibly have a recall of the specificity you supply here in this interrogatory response if you have no photo, no screenshot, or other written confirmation of this message?
A I have an incredible memory.
Q Of stuff that happened two years before?
A Yes.
Q Okay.
A This was my life.
Q Okay. Explain the circumstances of how you came to see that specific message on your husband's phone.
A I was in my kitchen, and I accessed his phone, and opened up the Signal app, and read the message between Kyrsten and Matt.
Q Where was Mr. Ammel?
A In the house somewhere.
Q So you did that without his knowledge?

A I don't know if he knew or not.
Q How long did you observe that message?
A A few minutes.
Q Like 180 seconds, maybe?
A I could not recall a specific time.
Q So you're guessing when you say a few minutes?
A Long enough to read it and close the phone.
Q Did you do anything at all to memorialize what you saw on his phone?
A I would have to review my journals.
Q So it's possible your journal contradicts what is in this --
A I would disagree.
Q -- interrogatory response?
A No. What I've put here is the truth.
Q Your journal would have reflected it more closely in time to when it happened. Wouldn't you agree with that?
A If I wrote about it then.
Q But whatever is in your journal would be more accurate than what you're testifying to today. Would you agree with that?
A That's speculation.
Q How did you know that message came from Ms. Sinema?
A Because it said "KS" at the top.

Q How do you know that message was sent by Ms. Sinema when Mr. Ammel was within North Carolina's borders?

A Because he was home most of that month. And based on the auto delete of eight hours, it was within that time frame he was home.

Q You don't even know what day it was, do you?

A Not specifically. No.

Q Then how can we possibly know it was within eight hours of when the message was sent that you saw it?

A Well, you've said that they auto-delete within eight hours, and he was home most of the month.

Q But you don't know if he was home six or seven hours before you looked at that message, do you?

A I guess we'll never know because we don't know specifically what date it happened.

Q So in which case, there is no way to really know that Mr. Ammel was in the State of North Carolina when that message was sent, correct?

A I would disagree.

Q What is your way to know? Tell me.

A What is your way to know?

Q Okay. I get to ask the questions. What is your way that you know that that message that you don't know what day it was was sent while he was in North Carolina?

A I could not say for 100 percent certainty that he was in North Carolina, but most likely he was because he spent most of the month in North Carolina. Or he spent most of January in North Carolina.

Q But it's also possible that he was traveling and got back to North Carolina a few hours before you looked at that message, and that message had been sent before he arrived in North Carolina, isn't it?

A I doubt it.

Q There is no way for us to know, is there?

A I suppose not.

Q Did his receipt of that message cause any discussion between you and him?

A I think we did have a discussion about it.

Q What was the nature of that discussion?

A Something along the lines of "Why would she be asking you to help you with your mental health?"

Q Okay. And do you recall what Mr. Ammel said?

A Not specifically.

Q Any further discussion beyond that?

A Not that I can recall.

Q And as you sit there right now, just to confirm, you have no idea whether you memorialized anything about that communication in your journal?

A I don't know if I memorialized that in my journal. I'd have to review it.

Q The second bullet point in the questions I'm going to be asking you is at the bottom of Page 8, which is "In or around early spring 2024, I witnessed Defendant send Mr. Ammel the following messages while he was physically present in North Carolina." And the first one is "A picture of Defendant wrapped in a towel. The picture showed her bare upper back with cupping bruises." Okay? And then she responded to your husband's message saying, "Show me the woman who doesn't," correct?

A Correct.

Q Describe every detail of the photo you say Ms. Sinema sent to Mr. Ammel.

A It was a photo of her back. It was as if the photo was taken of her back. And it was a white towel wrapped around her, and her upper back was exposed with cupping bruises.

Q I assume that means her face was not visible in the photo, correct?

A Correct. But you could tell it was her hair.

Q Okay. So you identify this photo by her hair?

A No. I identify it by it was sent from her account.

Q Okay.

A And it was clearly a photo of her. And based on the text messages that occurred regarding that photo would mean it was a photo of her.
Q We're never going to see this -- that photo in this litigation, are we?
A No.
Q What parts of her body do you say were wrapped in a towel?
A From chest down.
Q What parts of her body were visible, do you say, in this photo?
A Her upper back and her arms and part of her lower back that was -- well, not -- the towel was concealing her chest down.
Q So what skin of her body was visible in this photo?
A Her upper back and her shoulder area and her upper arms.
Q Okay. So it was a closeup of the top portion of her back, from what you're describing?
A Yes.
Q Okay. Not so close that you couldn't see her hair?
A Excuse me?
Q You could see her hair, as well, from what you're describing?
A Yes.

Q There was no mirror in the photo showing any part of the front of her, correct?

A I don't recall.

Q And the only words that you say she wrote to Mr. Ammel were "Show me a woman who doesn't." Is that right?

A Yes. I think there might have also been something about she and So-and-So were laughing about it -- about the bruising. But I don't recall.

Q And this happened two-plus years ago, correct?

A Yes.

Q And you have a memory of her words today?

A Yes.

Q And did nothing to memorialize those words, correct?

A I'd have to review my journal.

Q How long did you observe that message while you had Mr. Ammel's phone in your hands?

A I don't recall.

Q And is that one where you grabbed his phone off the kitchen counter, like the first message we talked about?

A I believe I was in the kitchen and his phone was on the counter again.

Q And he was nowhere around you?

A I don't know where he was. He was somewhere on the property.
Q You don't know what day that message was delivered?
A Not specifically.
Q You don't know where that day fit on Mr. Ammel's travel schedule, correct?
A Not specifically. No.
Q You don't know where within the eight-hour timeline that message was delivered before it was deleted, do you?
A I do not.
Q For all you know, that message was delivered before Mr. Ammel arrived in North Carolina, correct?
A I don't believe so.
Q But you have no way of knowing, do you?
A He was home. He was in the house.
Q When you looked at the message, right?
A Yes.
Q You didn't see the message come through, did you?
A No.
Q And you have no idea where within the eight-hour time frame of the auto-delete when that message came in?
A That's true.
Q Okay. Did his receipt of that message cause any

discussion between the two of you?
A I think so, but I don't remember exactly what we discussed.
Q Tell me what you do remember.
A I don't remember.
Q And you have no way to tell the Court, to tell me, to tell anybody how you could know that Ms. Sinema knew that Mr. Ammel was located in North Carolina when she sent that message?
A Correct.
Q And the same was true for the last message about the helping with mental health? You have no way to tell us how Ms. Sinema could have known he was in North Carolina when she sent that message?
A Correct.
Q Okay. Let's go to Page 9. We're now on the third message of the eight we're going to be talking about. That bullet says, "Mr. Ammel messaged Defendant stating he was intimidated by Defendant while Mr. Ammel was physically present in North Carolina. Defendant responded to the message asking why, because she only wants to be intimidating to her opponents, not to people she likes." Okay. What were the exact words of Ms. Sinema's message?

A I don't know the exact words.
Q Okay. And you don't have a photo, a screenshot, or other written confirmation of what was said, do you?
A No.
Q All you have is a two-plus-year-old memory of what was said, correct?
A Correct.
Q Explain the circumstances of how you came to see that message on your husband's phone.
A Again, I think I was in the kitchen, and picked up his phone and looked.
Q And he wasn't around?
A Yes, he was around.
Q I mean around you physically as you were looking at the message.
A I don't recall. He may have been, though.
Q So he watched you look at that message on his phone?
MR. VAN CAMP: Objection.
A He was -- I think he was around in the marital home.
Q Okay. But your testimony is the phone was in your hands when you looked at the message?
A Yes.

Q Okay. How long did you observe that message?
A Long enough to read it.
Q Did you do anything at all to memorialize what you saw on your husband's phone?
A I would have to review my journal on that one.
Q Do you now see why your journal was important for us to have a chance to look at?
A Maybe.
Q How did you know that message was sent by Ms. Sinema?
A Because it had "KS" at the top.
Q Okay. How do you know that message wasn't sent somewhere in the eight-hour cycle when Mr. Ammel was not in North Carolina?
A I guess we'll never know.
Q But it's true you didn't see that message come in while the phone was in your hands, correct?
A That would be correct, I think.
Q And you don't know what day it was delivered, correct?
A Not specifically. No.
Q Did his receipt of that message cause any discussion between you and him?
A Yes.
Q Tell me everything you recall about that.

A I asked him why he would tell her he's intimidated by her, and he told me he has always been intimidated by confident -- I think it was either confident older women or confident powerful women.
Q Any discussion beyond that about this message?
A I don't think so.
Q What is your basis for contending that Ms. Sinema knew Mr. Ammel was located in North Carolina when she sent this Signal message to him?
A I would be speculating.
Q Okay. Let's go to the fourth message, which is at the bottom of that page. You wrote, "Defendant messaged Mr. Ammel suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience while Mr. Ammel was physically present in North Carolina," right?
A Right.
Q You don't have exact words from that message, correct?
A She referenced the two MDMA capsules that he had brought home, and she wanted him to bring them on his next trip so that she could sit with him while he took MDMA. And he said that, essentially, he didn't think that that would be a great idea to do that with his boss. And she said she -- she

something along the lines of, "Oh, I wasn't going to do it with you; I was just going to sit with you."

Q Okay. And you have no photo, screenshot, or other written confirmation of the back and forth between them in this message, correct?

A No screenshots.

Q And you believe that two-plus years later, you're accurately recalling that message?

A I am.

Q Explain the circumstances of how you came to see that message on your husband's phone.

A I think same as all the prior scenarios where I accessed his phone.

Q In the kitchen? The phone was in your hands?

A Yes.

Q Just like the other ones, you don't know where within the eight-hour cycle that message was delivered, do you?

A Correct.

Q So for all you know, Mr. Ammel could have been outside of North Carolina when the message was delivered and inside of North Carolina when you were looking at the message, correct?

A I don't know where he was.

Q Okay. Because you don't know what date this was, right?
A I do not know the exact date for this.
Q Did his receipt of that message cause any discussion between the two of you?
A I think so.
Q What do you remember about that?
A I think I referenced the message like, "Why would you do that," and he also agreed that he didn't think that was a good idea either and he wasn't going to.
Q Anything beyond that?
A Not that I can recall.
Q And you have no basis to contend that Ms. Sinema knew that Mr. Ammel was located in North Carolina, if, in fact, that was even true when she sent this message, correct?
A Correct.
Q Okay. Let's go to the next one, which is the top of Page 10. You wrote, "Defendant" -- second line of that first bullet point, "Defendant sent a Signal message to Mr. Ammel telling him to watch the Netflix documentary 'How to Change Your Mind,' which has an episode about MDMA," correct?
A Correct.

Q Can you tell us what the exact words of that message were?
A I don't know the exact words, but something along the lines of Kyrsten talking about how there was this episode on Netflix about MDMA and that he should watch it.
Q And you have no photo, screenshot, or other written confirmation of what was said?
A Correct.
Q Unless there is something in your diary, correct?
A I'd have to review it.
Q Okay. And that's two and a half years before you prepared these interrogatory responses, correct? March of 2024 to June -- two years and three months before you prepared these responses?
A Correct.
Q Explain the circumstances of how you came to see that message on your husband's phone.
A I accessed his phone in the kitchen.
Q With your own two hands?
A With my own two hands.
Q No idea where within the eight-hour cycle you were looking at those -- that message?
A Correct. I did not stare at a timer.
Q Okay. And for all you knew, Mr. Ammel could have

been outside the borders of the State of North Carolina at the time that actually hit his phone, correct?

A I don't know. I'd be speculating.

Q Okay. Well, you'd equally be speculating, as you did here, to say he was in North Carolina when he received it --

MR. VAN CAMP: Objection.

Q -- right? You said --

MR. VAN CAMP: When he received it or when it was sent?

Q You said in your discovery responses he was in North Carolina.

A I believe that he was in North Carolina when he received all of these messages referenced.

Q But for every single one of them, since you don't know what day it was and you don't know what his travel itinerary was, he could have been outside of North Carolina and you could have been looking at the message some eight hours later, correct?

A Correct.

Q Does -- did his receipt of that message cause any discussion between you and him?

A I don't recall having a discussion about that particular message.

Q And you have no basis, as with the others, to contend that Ms. Sinema knew Mr. Ammel was located in North Carolina, if, in fact, he was, when she sent this message, correct?

A Correct.

Q Okay. Let's go to the sixth one, which is the March 7th, 2024. You have a date because the State of the Union address is well documented to have occurred on that date, correct?

A Correct.

Q Okay. And you said that "Defendant messaged Mr. Ammel and they had a discussion about why she wasn't there, and she stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote," correct?

A Correct.

Q Are those her exact words, or you're not able to tell us what her exact words were?

A Those are her exact words.

Q And you're saying that even though you have no photo, screenshot, or other written confirmation of what she said, correct?

A Correct.

Q That's all based upon your memory, right?

A Correct.

Q Explain the circumstances of how you came to see that message on your husband's phone.
A Matt was reading them out loud in real time.
Q Okay. So you didn't see them; you just heard his description?
A I think I did read that, too.
Q So he showed them to you?
A I don't remember if he showed them to me or I looked later.
Q And as to whether you did anything to memorialize what you saw on that day, it all depends upon whether it's in your journal, correct?
A Correct. I don't remember memorializing that.
Q And whether Mr. -- that one you're saying he received while he was sitting on the couch?
A He did.
Q Okay. So that one, unlike all the others, you can state with confidence he received while he was in North Carolina?
MR. VAN CAMP: Objection to the form. You can answer.
A Yes.
Q Okay. And to be clear, that is the only message that we have discussed so far that is not memorialized in Exhibit 3 that you can confidently

say your husband was in North Carolina when he received the message, correct?

MR. VAN CAMP: Object to the form.

A I feel pretty confident he was in town when he received these messages.

Q It's the only one where you know he was, correct?

MR. VAN CAMP: So far.

A That's speculating.

Q Yeah. That's the point.

Did any -- did any discussion occur other than what you discussed on the couch about what was actually said in the message?

A I don't recall if we had a discussion about it.

Q And, like the others, you have no way of knowing if Ms. Sinema knew he was in North Carolina at the time that message was sent, correct?

A Correct.

Q All right. Let's go to the seventh one, which is the second -- third bullet point, I guess, on this page, where you say, "I discovered Defendant and Mr. Ammel message about having sex missionary style with the lights on while Mr. Ammel was physically present in North Carolina. I read the message standing in my kitchen."

A Correct.

Q What were the exact words of that message?
A Something along the lines of like it was like a joke, like it's like having sex with the lights on missionary style, and then Kyrsten said, "Boring," exclamation mark.
Q Who said, "Having sex missionary style with the lights on"? Mr. Ammel or Ms. Sinema, as best you recall?
A I think that was Mr. Ammel.
Q Okay. So the only word that Ms. Sinema contributed to that conversation was "boring." Is that right?
A As far as I can recall.
Q And you're recalling it from two-plus years ago, correct?
A Correct.
Q And you have no photo, screenshot, or other written confirmation of what was said, right?
A Correct.
Q Explain the circumstances of how you came to see that on your husband's phone.
A I -- that, I think, was in the kitchen, and I opened his phone.
Q And he wasn't there?
A I think he was in the house. Yes.
Q Okay. And you have no idea of where within the

eight-hour cycle of the auto-delete you were looking at that message, correct?
A Correct.
Q And you have no idea where Mr. Ammel was at any point in that eight-hour cycle other than when you were reading the message, correct?
A Correct.
Q Because you don't know what day it was, right?
A That is correct.
Q Did his receipt of that message cause any discussion between you and him?
A I don't recall having a discussion about that one.
Q Okay. And you have no way to say whether Ms. Sinema knew that Mr. Ammel was located in North Carolina, if that's even true, when she sent that message to him -- the message "Boring"?
A Correct.
Q Okay. The eighth and final message is on the top of Page 11. It's the second bullet point where you say, "In or around spring of 2024, Defendant traveled to Europe. While Defendant was in Italy, she messaged Mr. Ammel, who at the time was physically present in North Carolina and at our marital residence, that she was on her way to see Depeche Mode. She included a mushroom emoji in the

message." Okay. You have no photo, no screenshot, or other written confirmation of this message, correct?

A Correct.

Q This is all based upon your memory?

A Correct.

Q And whether you memorialized it or not, only your journal would know, right?

A Yes. I don't know.

Q How did you come into possession of that message?

A I was in the kitchen, and opened his phone, and saw it on Signal.

Q Okay. How long did you observe that message?

A Long enough to read it.

Q Okay. And, again, you have no way of knowing where within the eight-hour cycle you were looking at that message, correct, before it auto-deleted?

A Correct.

Q And you don't know what day it was, correct?

A Correct.

Q So you have no idea whether Mr. Ammel was physically present in North Carolina when that message was sent or if he was traveling, right?

A Correct.

Q Did the receipt of that message cause any

discussion between you and him?
A I think the only thing that might have been referenced was he told me that she was supposed to see Depeche Mode, and she slept -- she overslept and missed it, and then was overseas and seeing Depeche Mode overseas.
Q Okay. Before we move on, are there any other messages that you believe or you're going to testify about in court your husband received while present in the State of North Carolina from Ms. Sinema that we haven't talked about today?
A Not that I can recall right now.
Q Okay. All eight of the messages I've been asking you about pre-dated Memorial Day 2024, correct?
A Could you repeat that?
Q Sure. All eight of the messages I've been asking you about pre-dated Memorial Day 2024, correct?
A I believe so.
Q And both Ms. Sinema and Mr. Ammel have testified that their romantic sexual affair began on Memorial Day 2024 in California, correct?
MR. VAN CAMP: Objection.
A (No verbal response.)
Q And if that is accurate, the eight messages we've just been through had nothing to do with their

romantic sexual affair, did it -- did they?

MR. VAN CAMP: Objection.

A I would disagree.

Q So this -- these were the seeds of the affair. That's your testimony?

MR. VAN CAMP: Objection. You can answer.

A I would say that's an accurate way to put it.

MR. EPSTEIN: Probably a good place to take a break.

THE VIDEOGRAPHER: Off the record at 2:48 p.m.

(FOURTEEN-MINUTE RECESS)

THE VIDEOGRAPHER: On the record at 3:02 p.m.

Q Ms. Ammel, as of October 2nd, 2024, before Ms. Sinema sent the Signal messages to your husband on October 3rd, is it your testimony that you still had a loving relationship with Mr. Ammel?

A Yes.

Q Is it your testimony that Ms. Sinema's Signal messages with your husband on October 3rd, 2024 altered the path of your relationship with him?

A Yes.

Q Is it your testimony that had it not been for those October 3rd messages, you and Mr. Ammel would have

remained together as a married couple?
A Yes.
Q Do you believe that's consistent with the evidence in this case?
A Prior to the October messages, I was still in denial about the affair, and I thought it could be saved if it was only an emotional affair.
Q Okay. I thought you told us earlier that you confirmed the existence of the affair on or about June 22nd, 2024.
A Emotional or physical, I didn't know.
Q So you as of October 3rd, 2024, if I hear you right, were operating under some belief that your husband hadn't had sex with Ms. Sinema?
A Yes.
Q You and Mr. Ammel regularly communicated with one another by SMS text messages, correct?
A Correct.
Q You had to do that a lot because he was gone for work so much of the time, correct?
A For the -- for 2024, yes.
Q Okay. And remember, my timeline is January 1st to --
A June --
Q -- November 1st -- October 2024. That's the

timeline I'm looking at. So for that timeline, you were texting a lot because he was gone for work so much, right?
A Correct.
Q Okay. And you produced -- those text messages you produced in this case, correct?
A Correct.
Q Hundreds and hundreds of pages of them, right?
A I believe so.
(DEFENDANT'S DEPOSITION EXHIBIT NO. 4 MARKED FOR IDENTIFICATION)
Q Okay. I'm going to show you what I've marked as Exhibit 4 to your deposition, which I'll represent to you are excerpts from those hundreds and hundreds of pages. And the page number -- the page numbers are at the bottom. There is both the page number from the PDF itself, and then on the right corner is the page number from the document production by your attorney. Do you see that?
A Yes.
Q I'm going to be referring to the page number at the bottom center.
A Okay.
Q Okay? All right. So we pick up on June 22nd, 2024, which was a significant day in your marriage

to your husband, correct?
A Correct.
Q And you had been in Kansas visiting family for about 10 days as of then, correct?
A That sounds right.
Q Mr. Ammel had left you and the kids there to provide security services for Ms. Sinema in several states, right?
A I think so.
Q You picked him up from the airport in Kansas City in the early morning hours of June 22nd. Does that sound about right?
A It may have been the 21st. I don't recall specifically.
Q But right about that time -- and we're going to look at these text messages -- he went out to a bar with the best man from your wedding, correct?
A He went out the following day.
Q Okay.
A I picked him up on one night, and then the next night, he went out.
Q Okay. So he may have come home on the 21st, and then the 22nd, when he started sending you text messages, that was the night he was at the bar with his best man?

A Correct.
Q Okay. And, in fact, there were quite a lot of texts that went back and forth between you and him that night, correct?
A Correct.
Q And this is, according to the text messages here -- I'm looking at 12:34 a.m. and after. It's the wee hours of the morning of actually June 23rd, correct?
A Correct.
Q All right. So I'm going to pick up at 12:34 in the morning. You asked him where he was, right?
A Right.
Q And then you said, "What the fuck, Matt"?
A Right.
Q Because he wasn't responding, right?
A He wasn't returning home when he said he would return home.
Q And what he said was, "I want a fucking divorce," right?
A Correct.
Q And you said that you were leaving for your grandfather's funeral. "What is wrong with you?" And how did he respond?
A "I hate you."

Q You said, "Wow." And on the next page, at 12:41, you told him to answer your call because you were trying to call him, correct?
A Correct.
Q And he said no, right?
A Right.
Q He didn't answer your call?
A I think he answered at some point during the night, but I don't remember when.
Q Okay. You said to him, "Where are you going," and he said, "Home." By "home," do you know what he meant?
A He might have meant his parents' home.
Q Okay.
MR. VAN CAMP: And I'm just going to -- just for the record, I'm not going to do a speaking objection, but I object on the grounds that -- and I have not instructed her not to answer. She can answer your questions. But these -- this line of questioning has nothing to do with jurisdiction, which is what we're restricted to in the Court's order. But you can answer the question.
Q You said, "So what do" -- "What do I do about traveling tomorrow? We are traveling tomorrow. What am I supposed to do?" Correct?

A Uh-huh. Yes.

Q Because you were heading to Oregon, right?

A Right.

Q And he was going with you to Oregon, or so you thought, right?

A Right.

Q He said, "I'll be just fine," right?

A Uh-huh. Yes.

Q You said, "What about your family? Stop being selfish," right?

A Yes.

Q You asked him to "Act like an adult, Matt," right?

A Right.

Q What he said in response at 12:45 a.m. was "I am. I don't want to be married to you anymore. My best man confirmed I shouldn't be with a woman who hits me," correct?

A Correct.

Q Who is his best -- who was the best man at your wedding?

A Scott Schultz.

Q And that's who he was out with at the time he was sending these text messages, correct?

A Correct.

Q You said, "I don't hate you. You're drunk." And

he responded, "Everyone that has ever met you hates you," correct?

A Correct.

Q And you were trying to call him and you were trying to demand that he answer your call, if you look at the next several messages. Would you agree with that?

A Yes.

Q And he said at the top of Page 73, "Stop calling me." What did he say after that?

A "We are getting divorced."

Q Okay. And then he said at 12:58, "A normal wife would have been happy that I'm seeing my best friend, but you hate me. You're the fucking worst," right?

A That's what he said.

Q And at the bottom of the page, he repeated, "I hate you," correct?

A Yes.

Q At 12:59 the next morning, Page 74, you said, "We are leaving in a few hours for my grandfather's funeral. How could you treat your wife like this?" And he answered you at 1:01, "Because you've treated me like shit forever. A normal wife who actually cares about her husband would have been

happy for me tonight." That's what he said, correct?

A Correct.

Q And you're asking again at 1:01, "Are you coming with us or not?" He said, "I don't care. I hate you. I don't want to be married to you anymore," correct?

A Correct.

Q Okay. And then you continue to go back and forth about whether he's coming or not on the trip, right?

A Right.

Q And he mentions at the bottom of Page 74, "You punched me in the head three times. I hate you," right?

A That's what he said.

Q He called you "a fucking immature child" at 1:03, correct?

A Correct.

Q Told you he hated you again at 1:04, correct?

A Correct.

Q Told you another time at 1:04 that he hated you, right?

A Correct.

Q And then he told you at 1:05 that you should fly

with the kids without him, correct? "You should fly with the kids."

A He did not say without him.

Q Okay. But that's the way you took it, correct?

A I don't know what he meant.

Q Okay. At 1:06, you said, "You know the kids will be devastated, but you're selfish." And he responded, "That's not true. They know their mom hates their dad. You can pretend moral superiority all you want." I read that accurately, correct?

A Yes.

Q And you produce these to us. These are true and accurate records from your text communications with your husband, correct?

A Correct.

Q All right. You then said at 1:08, "I'm not going to let you treat me this way anymore. I will drive to Oregon by myself with the kids," right?

A Right.

Q And he said, "I was going to get you to Oregon and have a good summer vacation and then end it," right?

A Right.

Q And you understood that to mean end the marriage, right?

A Correct.

Q Okay. Next page, 77, at 1:09, you called him cruel and evil, correct?

A Correct.

Q At 1:09, he told you once again that he hated you, right?

A Yes.

Q And also at 1:09, he said, "You're the worst person I've ever met," right?

A Correct.

Q He said, "Look at your family. You're them." To which you said, "That's evil. You are evil," right?

A Correct.

Q And what was the next thing you said? Read it out loud, please.

A "Did you fuck Kyrsten?"

Q And you meant did you have sexual intercourse with Kyrsten Sinema, correct?

A That's another term for "fuck."

Q Yeah. And he denied that, and he said, "I just fucking hate you," right?

A Right.

Q But Kyrsten Sinema is affecting your marriage in real time on June 23rd, '24 before you discovered

her Signal message to him in Leavenworth, Kansas, correct?

A You're asking me if she was having an effect on our marriage prior to the Signal message on June 24th -- 23rd?

Q Whatever day it was. Yeah. It's clear from these messages, right?

A She was having an effect on our marriage. Yes.

Q Okay. Go to the top of Page 78. You told him you didn't believe his denial of having sexual intercourse with Kyrsten Sinema, correct?

A Correct.

Q Okay. Go to Page 79. That's at 2:16 that morning, so about an hour after the last text messages we were looking at. Would you agree with that?

A Yes.

Q That's when you discovered the Signal message on his phone that we looked at earlier in Exhibit 3, correct?

A Correct.

Q And what we see at the top of Page 79 is you texting -- the reason it's gray is because it's coming from Matt's phone. You're texting that to yourself so you have it for posterity, correct?

A So I have it. Yes.

Q Right. So that it's not going to go away, it's not going to disappear, it's not going to auto-delete, right?

A That would make sense.

Q Yes. And then you told him exactly what you thought about what was going on, correct?

A Yes.

Q This is more than --

A This was the following day.

Q This is more than three months before the October 3rd, 2024 Signal message we talked about a moment ago, correct? More than three months before?

A Yes.

Q You said, "I need to say this over text. She's insidious." By "she," you mean Kyrsten Sinema?

A Correct.

Q "Yes, she might care about you and want to help you, but it's to her own gain. This is a woman who is willing to break up a family. Why do you want to align yourself with someone who doesn't respect your marriage and family? She's a homewrecker. She knows you're vulnerable, and she is taking advantage of that. And I get" -- "And I get why you feel comforted by her, but underlying that is more darkness. She has you in her web now. I'm

telling you if our marriage ends and you continue this emotional affair, if not physical at this point, the girls will never forgive you. That is not a threat either. It's just what will happen. And I don't want to see them damaged in that way. Please do not throw away our family that I love so much for someone as selfish as she is. I love you more than anything. I don't ever want to lose you. I'm going to do everything in power to fix my shit so we can have a happy marriage. I need to know that you are willing, too."

So let me pause there for a second. The notion of the marriage ending is literally something on your mind June 24th, 2024 because of what you believe is at least an emotional, if not sexual, affair between your husband and Kyrsten Sinema, correct?

A That would be a fear when you find out your spouse is having an affair that your marriage will then end because of it.

Q Okay. Three-plus months before the October 3rd message, correct?

A Correct.

Q Okay. And, in fact, if you look at the next page, Page 100, you are sending your husband on July 10th

a document about separating and what that might look like?
A A structured separation.
Q Separation nonetheless?
A With the intent to reconcile, which is important.
Q Okay. But the notion of separating isn't just coming from your husband as of July 10th, 2024; it's coming from you, as well?
A He was giving me no choice.
Q Okay. And that is just a little less than three months before the October 3rd messages, correct?
A Correct.
Q So Page 102, you said, "I really need" -- this is July 11th. You said, "I really need to talk to you." He said, "I can't for a few hours." And then at 10:15 that morning, you said, "The writing is on the wall with you and Kyrsten having an affair."
A I'm sorry. Which page are we on?
Q 102 at the bottom.
A Okay. Can we redo that?
Q Yes, we can. You at the top of the page at 10:11 said, "I really need to talk to you." Mr. Ammel said, "I can't for a few hours." And at 10:15, you said, "The writing is on the wall with you and

Kyrsten having an affair." And by that, you meant "It's clear to me that you're having an affair," correct?

A Correct.

Q Okay. "I feel like you're trying to keep me at bay until your shit is lined up for you to leave and be with her." Those were your feelings. You weren't making them up. You weren't lying. You were saying what your feelings really were, right?

A Correct.

Q "I also think you're trying to keep me calm so I don't expose anything and ruin whatever opportunity is next for you. Just be honest with me. I deserve that." That's what you wrote, right?

A Right.

Q And you said, "I can" -- next, "I can tell you're already with her by how disgusted you are by me. Please just tell me the truth. You need to respond to me before I take drastic steps to protect myself and the kids," right?

A Correct.

Q And, again, this is nearly three months before that October 3rd Signal message, right?

A Yes. I'm not sure what you're implying.

Q Just asking for the time.

What did you mean by "drastic steps"?

A Well, at that time, Matt was very hot and cold and in and out and wishy-washy, and he had gaslit me into believing that there was no physical affair going on when I confronted him about the June text messages about why would she say that she is waking up and reaching for your arms to hold her, and he said, "I don't know. She says she has dreams about me all the time and it weirds me out." So he is actively gaslighting me over a period of time to believe that there, A, is no affair, and it's certainly not physical. You can imagine the kind of abuse and manipulation and gaslighting that would do to someone.

Q But my question was -- and if you need a break, let me know and we'll take one. My question was what did you mean by "drastic steps"?

A (No verbal response.)

(Whereupon, the Witness exits the deposition.)

THE VIDEOGRAPHER: Going off?

MR. VAN CAMP: Let's just go off for now. Yeah.

MR. EPSTEIN: Yeah. You don't have to stay on.

(THREE-MINUTE RECESS)

THE VIDEOGRAPHER: On the record at 3:24 p.m.

Q Before we took a break, Ms. Ammel, I had asked you about the last text message that you sent on the bottom of Page 102 where you said, "You need to respond to me before I take drastic steps to protect myself and the kids." My question is what did you mean, if you can recall what you meant, by "drastic steps"?

A I don't recall.

Q Top of Page 103 at 10:47 that same day in the morning, you said, "If none of that is true, then you need to do everything in your power to prove that to me." The "that" was about whether he was having an affair with Kyrsten Sinema, correct?

A Right, because he was lying to me.

Q Right. In fact, you said, "You're already checked out," right?

A Yes.

Q And by :checked out," you meant checked out of the marriage with you, right?

A He was actively checking out of the marriage at that point.

Q Okay. Go to Page 105. There is a handwritten note at the top of Page 105 that is July 11th at 12:14

p.m. You texted him a screenshot of that handwritten note, correct?

A I texted him a photo of that handwritten note.

Q Okay. And that is his handwriting, correct?

A Correct.

Q And I'm going to try and read it, but correct -- well, why don't you just go ahead and read it? 'Cause you can probably read that writing better than I can.

A "I need to keep my fucking shit together until Tuesday. Do I fully trust her? Is the pot making it smell fishy or does it smell fishy?"

Q Okay. Why did you send that to your husband?

A Because he had journaled that while he was home and left it out, and that was -- to me, that implied that he was contemplating whether he trusted Kyrsten and whatever she was proposing to him.

Q Okay. And the message that you sent about the same time as you sent that photo was "You left this where the kids could find it. And to hold it together long enough to get back to her? Hold it together so I don't find out the truth." And the truth that you're referring to is that he's having an affair with Kyrsten Sinema, correct?

A And, in my mind, actively contemplating leaving me.

Q Okay. And he said, "Please don't read my things. That's not at all what I was talking about." And you're trying to find out from him what he meant because you said, "You left it out. I hope the kids don't see it. Or is it" -- "Or is it do you fully trust Kyrsten," right?

A Right.

Q You aren't sure what he meant as -- in terms of trusting and who, right?

A It's vague.

Q Okay. And then you said, "You realize every sign points to you having an affair," right?

A Right.

Q You mention the handwriting is on the wall. Every sign points to him having an affair, right?

A Right.

Q At the same time as this was happening, you went to see your therapist, who told you she was certain he was having an affair, correct?

A I don't remember the exact date, but it was, I think, in July.

Q Right. In July, your therapist, who you were seeing to discuss what's going on in your marriage, told you, "I'm certain your husband is having an affair with this woman"?

A That's what she told me.
Q And that's no different than what you're saying to your own husband in these text messages, correct? That you're --
A Yes.
Q -- building certainty that he's having an affair?
A I'm reaching that conclusion.
Q Yes. Okay. As you told us earlier, the Signal message that was sent to him while he was in Leavenworth, to you, confirmed the existence of an affair, right?
A No, because I was still in denial. I do believe there definitely -- yes. Yes. He was having an affair. That message confirmed to me that he was having an affair. I didn't know if it was physical or emotional yet.
Q Okay. Page 106, you said to him at 12:24, "Why would you need to hold it together until Tuesday?" You're referring to his note, correct? Or his journal entry.
A Correct.
Q And he is not responding to you. By two hours later, you said, "I would appreciate a response." And then you asked him, "Are you willing to go to couples therapy or is it too late," right?

A Right.
Q And then you told him you're on the verge of a full-blown panic attack, right?
A Right.
Q And all this time, he is not responding to you at all, right?
A Right.
Q And you're asking him, "Why won't you respond? Why are you treating me this way," right?
A (No verbal response.)
Q And you asked him, "How can you crush our children this way?" Because, in your mind, the marriage is coming to an end, right? That's what you meant when you said, "How can you crush our children this way," right?
A Yes.
Q Okay. You want to take a break?
A No.
Q Okay. We'll fight on. On Page 107, you said at 5:03 a.m., "I'm physically getting sick. I'm begging you to reach out to me. I feel completely alone and abandoned. I feel like I'm dying inside. Matt, please say something. I'm your wife."
A Correct.
Q And he responded to that by saying, "Heather, you

need to stop this," right?

A Correct.

Q And he said, "I'll be home soon." And the reason he wasn't home is because he was traveling for work, right?

A And having an affair.

Q Both at the same time, right?

A Right.

Q Okay. Page 108, at 8:07, you asked him, "Did you read that thing about a healing separation?" He said, "I will on the plane today." That's the document you sent him earlier that we looked at, right?

A I don't know if that's the exact document or not. Maybe.

Q Okay. Because your idea is we'll separate and then maybe reconcile after we separate?

A That was my goal.

Q And it was looking like his goal was just to end the marriage?

A I don't know because he was one foot in and one foot out and misleading me.

Q Gaslighting you, as you said?

A Gaslighting me and manipulating me.

Q Top of Page 109, you said, "I bet you had a great"

-- this is July 12th. "I bet you had a great couple of days celebrating her birthday," right?
A Right.
Q And by "her," you meant Kyrsten Sinema?
A Yes.
Q Two texts later, you said, "Okay. Here's the deal. If you aren't going to provide full honesty and transparency, do not come back here," right?
A Right.
Q That is the first time you intimated to him, "Do not come back to this home," right?
A That doesn't mean I meant it.
Q I'm not asking you what it meant. I'm asking you that is the first time you intimated to him that he should not come back to the marital home, correct?
A I believe so.
Q That was July 12th, 2024, right?
A Yes, if that was the first time. I don't know. It looks -- it appears so.
Q Okay. He told you from -- was he in Arizona at the time, to the best of your knowledge?
A He may have been in DC. Or what day?
Q July 12th, 2024.
A He may have been in DC. I don't know.
Q He was somewhere doing security services for

Kyrsten Sinema, correct?
A Correct. I think so.
Q And he told you his flight might get canceled, right?
A Yes.
Q And at 2:03 in the afternoon, you said, "I don't want you staying there," right?
A Correct.
Q And the reason you said that on the top of Page 110 is because you didn't trust him with Kyrsten Sinema, correct?
A Correct.
Q He told you "She's in Idaho," right?
A That's what he said.
Q At 2:06 p.m., you said, "You need to quit, Matt. Don't lose your family. It might seem golden right now, but it won't last." When you said, "It might seem golden right now," you meant his relationship with Kyrsten Sinema, correct?
A Or the life that came with leaving me for her.
Q Okay. And then you asked him again at 2:40 to please read the document. "I would appreciate it if you would read that document about a healing separation," right?
A Right.

Q Your hope was that you would separate and come back together again after separating, right?
A Right.
Q He responded to your messages at 5:20 that afternoon saying, "If you try to get physical with me tonight, I am going to call the police," correct?
A Correct.
Q And you texted him, "Start acting like a man. Don't come here if you've been drinking. I will not tolerate you here if you appear even slightly like you've been drinking or you're high. I will call the police," right?
A Right.
Q So you're both threatening to call the police on each other?
A Yes.
Q Talking about separation and leaving each other, correct? Whether it's temporarily or permanently, that's what you're talking about?
A Uh-huh.
Q 6:36, you sent him the healing separation again, right?
A Which day?
Q Page 111, right after the message I just said about

calling the police.

A Yes.

Q Because, to you, that's your best hope -- is a healing separation, right?

A Yes.

Q Okay. And then you also sent him a website from the Marriage Restoration Project on Page 113, correct?

A Correct.

Q Go to Page 250. We're now in the month of September. Okay? So we're about now 30 days exactly -- I'm sorry -- 29 days exactly before the October 3rd message.

MR. VAN CAMP: Objection.

Q On September the 2nd, you said, "Did you stay with her in DC the other night," right?

A Right.

Q "Why would it be a big deal," you said, "if you don't stay at her place? That's absurd as a married man. You're spinning lies. You told me she invited you to dinner at her house, implying that she knew you were staying at a hotel." Okay. So you're very focused on September 2nd about where he is in relation to Kyrsten Sinema while he is on a work trip, right?

A Right.
Q You said you would like answers, right?
A Right.
Q And he's not -- he's not responding to any of this, is he?
A No.
Q And you asked, "Why are you so concerned about her feelings? You should only care about your wife's." He was providing no evidence that he did, correct?
MR. VAN CAMP: Objection.
A Could you --
MR. VAN CAMP: In this text, or this group of texts, or ever?
Q He said, "Why are you so" -- you said, "Why are you so concerned about her feelings? You should only care about your wife's," correct?
A Correct.
Q And he wasn't providing any evidence that he did care about your feelings, was he?
A I wouldn't agree with that.
Q Okay. You said you want answers, and again he is not responding, he's not giving you answers, right?
A Right.
Q You said, "No one cares about her enough for you to look at your phone for a minute to respond to your

wife." You're angry that he's not responding to you, right?

A Right.

Q "Please answer me so I can go to sleep" is what you said at 8:34, right?

A Right.

Q And then you send him a long text that says, "While your children are growing up, playing baseball, becoming teenage girls, cheering, and playing band at football games, enjoying one of their last Halloweens, you're accompanying another woman who is not your wife or your children's mother to concerts and dinners. You can get an epidural in Pinehurst. You can get a job in North Carolina. Your kids want their dad around. Clara is catching on, Matt. I will not share you with another woman. She has you under her thumb. It's selfish. She knows you're going to bite when she dangles a job in front of you. It's a red flag if you're afraid of rocking the boat with her. You need to get out of this mess. It will not get better. The only way this is going to get better for you, for us, for our family, is to let this job go in December. It's not worth losing what really counts at the end of the day, your family." Did I read all that

correctly?

A Correct.

Q He was giving you no evidence at all as of the time you wrote this that he was choosing you and your children over Kyrsten Sinema, correct?

MR. VAN CAMP: Objection.

A Could you rephrase that?

Q Sure. What you're saying here is "You're choosing her over me. I won't share you with her," right?

A But you asked if there was any evidence to suggest that he was not choosing me.

Q He wasn't giving you any evidence as of these text messages that he was choosing you over an affair with Kyrsten Sinema?

A Through the text messages.

Q And, in fact, he didn't respond to any of those text messages on September 2nd, did he?

A I don't believe so.

Q Go to Page 266. We're now at September the 7th, and I'm looking at 4:14. Picking up on what we were just talking about, you told him, "You are choosing her over me and your family," right?

A Right.

Q And you told him that "You lied to me again. You explicitly said you were going up to hike alone,

then you lied to me just now saying you went hiking alone." You knew he had gone hiking with Kyrsten Sinema, correct?
A That's what I found out.
Q Right. And you understand throughout all this time he's been lying to you all this time, right? Gaslighting, lying?
A While it was actively happening, it's very difficult to see through the muck. But now that it's over, I can see clear as day the gaslighting and the lying. I was in denial. My husband was having an affair.
Q Okay. Go to Page 267. At -- same day at 4:34 p.m., you asked him, "Did you stay with her in DC?" And then you said, "I'm calling her. Do not ignore me, Matt. Answer the phone. I know you have ten minutes before that flight boards." And he finally responded, right?
A Right.
Q And what he said was "Heather, please stop this. You are driving the final nails in the coffin," correct?
A Correct.
Q And you understood that to mean the coffin that would be the death of your marriage, right?

A Correct, because he was caught.
Q Right. You told him, "You are cheating on me," right?
A Where?
Q The very next text that you sent after he said, "You're driving the final nails in the coffin."
A Right.
Q You're not in denial at this point, ma'am, are you?
A Actually, yes, a little bit. I didn't want to believe it.
Q He said he wasn't going to answer, and if you didn't stop, he was not coming home, right?
A Right.
Q And you said, "Then don't come home. Continue to devastate your children by spending time" -- I'm not sure what you meant by that. But you said, "Don't come home," correct? "Then don't come home."
A Right.
Q And then you next said at the top of Page 268, "Don't know how inappropriate this is. If you're choosing that, then tell me now. I want a fucking answer. Are you choosing that or me?" And his response was, "I'm going to make the world a beautiful place for my children. It's just going

to hurt for a little bit. But one day, they will understand," correct?

A Yeah, whatever that meant.

Q Well, it didn't mean he was choosing you, did it?

MR. VAN CAMP: Objection.

A Apparently not.

Q And then you said, "Even if you aren't sleeping with her, you have an inappropriate emotional relationship with her. They will not" -- in other words, the children -- "will not understand. They're already sad," right?

A Yes.

Q And you said, "Answer, please. It will be much faster." And he told you he was turning off his phone if you call again. So you're also calling him during this time, correct?

A Correct.

Q And he is not answering, is he?

A No, because he was caught.

Q And then you threaten to call Kyrsten Sinema for the second time, correct? Bottom of Page 268.

THE WITNESS: Could I pause to get a tissue --

MR. EPSTEIN: We should --

THE WITNESS: -- or a napkin?

MR. EPSTEIN: We should have some tissues. Hold on. I think I know where a box of tissues is. Let's take -- we can stay on the record. I'll be right back. I was wrong, but I had a bunch of napkins.

THE WITNESS: Thank you.

MR. EPSTEIN: You're welcome.

Q Okay. So at the bottom of 268, you threatened to call Kyrsten Sinema again, correct?

A Yes.

Q And on the top of 269, you let him know that you had her phone number, right?

A Yes.

Q And he called your bluff and said, "Then call her," right?

A Right.

Q You said, "I can't hide this from the kids anymore. Did you stay at her place in DC?" And he said, "Then tell them." And then he said, "No," as to your question about staying at her place, right?

A Right.

Q Then you asked him if he stayed at her place in Phoenix, and he said no. You asked him if he had sex with her. He said no. And, ma'am, at this point, did you really believe his denials?

A I was in denial. Yes.

Q Go to Page 271. You said at the top, still on September 7th -- we've been on the same day for a while -- "She wants to fuck you, end of story," to which your husband replied, "I'm tired of being made to feel" -- "made to feel simple by you," right?

A What page are we on?

Q 271.

A Okay.

Q She said she wants to -- you said, "She wants to fuck you, end of story," and he said, "I'm tired of being made to feel simple by you," correct?

A Correct.

Q And you asked, "Are you seriously leaving me? I want an answer." And he gave you an answer, correct?

A Yes.

Q And his answer was "Yes," right?

A Yes.

Q And then he said, "Please do not do anything rash. Everything is going to be okay." And then you told him, "Fuck you. I was always loyal to you. I never did anything wrong. Enjoy your lesbian 50-year-old vegan girlfriend. As soon as she uses

you up, she will discard you." And then you said, "I am doing something rash. You treated me like garbage. You better answer now. B." What does the "B" mean?

A It's just when I try to make a period, I accidentally hit "B" all the time.

Q Okay.

A I'm not calling him a bitch, which he would deserve.

Q Okay. And you said at the top of Page 272, "I seriously will do something if you don't fucking answer." And he said, "You better stop calling me," right?

A B.

Q Right. But the reason he said, "You better stop calling me" is in addition to what we're seeing on the text, you're calling him constantly throughout all of this?

A Correct.

Q And he's not picking up?

A He picked up maybe once or twice.

Q Okay. And then you continued to threaten to call her and told him that you were -- that he was driving you to the brink, right?

A Correct.

Q And you again said, "Then call her," right?
A Right.
Q And you said, "If you fucking leave me, I will expose you," right? So you're thinking he's going to leave you and that you have something to hold over his head so he doesn't, right?
A No. That was not the intent of that message.
Q You told him you were having a breakdown, correct?
A Correct.
Q Because you realized your marriage was in the process of ending, right?
A No.
Q No? You thought it was hunky-dory?
A I didn't think it was hunky-dory, but that didn't mean the marriage was going to end.
Q It actually did a few weeks later, right?
MR. VAN CAMP: Objection.
A It did not.
MR. VAN CAMP: Complete --
Q It did not?
MR. VAN CAMP: -- mischaracterization of evidence by both sides.
Q Go to Page 276. Still on the same day, September the 7th, you said, "We can have a conversation later, but I would like a short answer before you

fly." He said, "Yes. I'm certainly in the wrong, but I do stand by my decision." Do you see that?

A Correct.

Q And you understood that to mean "I want out of this marriage," right?

A I understood that to mean he knew he was wrong by choosing her.

Q But despite that, he wanted to separate from you, correct?

A I don't know because he was giving me mixed signals even after that.

Q Okay. And then you kept on asking him and asking him, "Are you done with me? Is it your decision to leave me? Please answer before you take off." He said he didn't want to do that on the phone, right?

A Right.

Q And you asked him on the next page, 277, "Is it possible to get on track?" And he said, "I think us both pretending isn't making this easier on you or me or the kids." And you understood him to mean pretending that the marriage could last, did you not?

A Correct.

Q Okay. And you asked, "Can we take divorce off the table" at 5:38. He didn't say no. He said, "Let's

not do it over the phone," right?
A Right.
Q Next page, 278, still the same day, 5:50, you said, "Can you please give me reassurance? This isn't an ultimatum. This is me asking if we can please keep our marriage." You said, "The greatest gift we can give our kids is to have a healthy, loving marriage. Let's give that to each other and to our children. That's the greatest legacy." Didn't respond to any of that, did he?
A It doesn't appear so.
Q Go to Page 336. We're now at September 30th. And you sent a message to him at 7:50, "Cooper just told me he wishes you were home. I think you need to do some serious soul searching, really evaluate the decisions you're making. The consequences are going to be devastating." You mean the consequences of the marriage ending, correct?
A No. The consequences of the affair and what that was doing to our family. And because of the affair, if we were to divorce, those consequences would be devastating to our family, and they have been.
Q He was in Phoenix at the time?
A I don't know where he was.

Q He wasn't there, was he? That's why Cooper --
A Correct.
Q Yeah. And he -- when that trip was ending at 12:46 p.m. your time on the 3rd of October, the same day that those Signal messages were sent, long before those Signal messages were sent -- would you agree with that, that 12:46 your time October 3rd was long before the Signal messages of that day were sent?
A 12:46?
Q Yes. 12:46 p.m.
A I'm not seeing -- oh, okay. No. I was seeing 12:12 p.m. You're speaking to --
Q In the sequence of events, 12:46 p.m., "Do I need to get a hotel tonight," that was before Ms. Sinema sent any Signal messages to Mr. Ammel, correct?
A Correct, because he was with her.
Q Yeah. She wouldn't have needed to send him Signal messages, 'cause they were together, right?
A Which -- right.
Q Okay.
A So she was sending Signal messages when she wasn't with him.
Q Right. So he asked --
A (Inaudible) North Carolina.

Q He asked, "Do I need to get a hotel tonight," right?

A Yes.

Q And the reason was because separation was literally imminent at that point, right?

A No.

Q It wasn't?

A We -- anything could have happened.

Q That's not what you told him in your response to his question, is it?

A I haven't read the response yet.

Q Okay. Let's read it together. At 1:28, again, long before Ms. Sinema's messages were sent, right?

A I would not say long before. Same day. That's not long --

Q Same day.

A That's not long before. He's already traveling home --

Q Okay. It's --

A -- at this point.

Q -- hours before? Many hours before?

A Not many.

Q Okay.

A Be realistic.

Q Okay, ma'am. You said, "At this point, all I care

about is protecting my children and preventing as much as possible any more emotional harm you're inflicting on them because of your selfish decisions. You are being manipulative asking about the hotel when you know damn well that you told the kids you would be home today and they're expecting to see you. You've requested to separate many times." That's a true statement, ma'am, correct?
A Yes.
Q "It's your decision to leave. That being said, only because it's my daughter's 13th birthday tomorrow and in no way do I want to associate this with her birthday, you can stay at the house until Sunday when you leave for your next trip, but thereafter, you need to get a hotel or apartment. Don't ask me again. That's my answer." Correct?
A That is what I wrote.
Q Yeah. He wouldn't need to go to an apartment if you were going to continue your marriage, right?
A That's not true.
Q And, in fact, this was sent eight and a half hours before Ms. Sinema's Signal messages?
A That's not that long.
Q Okay. But you don't dispute that? Hers were sent about 10:00 p.m. --

A Around 10:00.
Q -- at night.
A Correct.
Q Yeah. Go to Page 343. On October the 6th at 7:15, you wrote, "I know you've got a busy week ahead, but if you have a few spare minutes, this puts it really well about how to do a structured separation."
A I don't think I'm on the same page.
Q Page 343.
A Okay.
Q That top bubble.
A Oh, yes. Okay.
Q You were trying to send him something again about a structured separation, correct?
A Correct. Because I was trying to save the marriage.
Q Right. And you told him the therapist could see you Thursday the 17th at 2:00, correct?
A Because he agreed to do couples therapy and find a couples therapist to work on the marriage because it was not over yet.
Q Okay. And that was Chad Brown?
A That is my therapist now. Yes. And we saw Chad Brown for that appointment.

Q And that was the first time you saw Chad Brown, correct?
A Correct.
Q On the 17th at two o'clock, just as you say there?
A I assume so. I don't know if that's when it actually ended up happening.
Q And just so this doesn't become an exhibit that may be seen by others, can you confirm now by looking at Mr. Brown's records that, in fact, that therapy appointment did occur then?
MR. VAN CAMP: Can I see a copy of it?
MR. EPSTEIN: Yeah. I'm sorry.
A I don't know if this was the couples one. We also saw him individually twice.
Q Okay.
A And it's not clear on here.
Q Okay. I'm going to read it to you.
MR. VAN CAMP: Is this an exhibit?
MR. EPSTEIN: I'm not going to make it an exhibit just for privacy purposes.
Q "Therapist" --
A Oh, met with --
Q -- "met with client and husband."
A Okay.
Q Do you see that?

A Yes.
Q Would you agree that you actually did -- despite denying this in the request for admissions, you met with Chad Brown and your husband on October 17th, 2024?
MR. VAN CAMP: Objection.
A I don't remember. Why did I --
Q I don't know.
A Why did we deny?
MR. VAN CAMP: I don't think it was denied. And I think we gave them all these records, which speak for themselves, but --
MR. EPSTEIN: The records speak for themselves.
Q You agree that you saw Mr. Brown with your husband on October 17, correct?
A That's what the record says. I don't know. I don't -- I don't have it like --
Q Let's take a look at Exhibit 2, which are your discovery responses.
MR. VAN CAMP: I'm just -- I'm just going to object to the characterization. This note that you're referring to, Mr. Epstein, says he met with her, but it doesn't -- I mean met with the husband, but it doesn't say that this note is in reference

to that meeting. It just says that there --

Q You --

MR. VAN CAMP: -- was a meeting. I think there might have been a second one.

Q Okay. You were the client, correct?

A Yes.

Q 'Cause it says, "Heather Ammel" -- "Heather A., client name." And Mr. Brown wrote in his notes, "Therapist met with client and husband." And what you're talking about is the text messages between Senator Sinema January 2024 and beyond the scope of a business relationship and the other text messages from January to June before client attempted to reconcile with husband in marriage therapy, correct?

A Correct. But I don't know if that date is accurate. But it must be, I guess.

Q Okay. And go to Page -- Exhibit 2, Page 32, which is Request for Admission No. 4. You see Request for Admission No. 4?

A Yes.

Q Which asked, "On or about October 17, 2024, you and Matthew Joseph Ammel attended a therapy session with your therapist, Mr. Chad Brown, during which the topic of your impending separation was

discussed." You denied, and what you said was -- after an objection -- or two objections, you said, "Subject to and without waiving said objections, Plaintiff and Mr. Ammel attended a joint therapy session with Mr. Brown on October 24th, 2024 and the topic of separation was discussed." We now know from Mr. Brown's records, which I don't think you had at the time you wrote that, that occurred on the 17th, correct?

A Correct. I don't -- I don't know the date.

Q Okay.

A My lawyer put that in there.

Q You would accept Mr. Brown's records of when that therapy session was?

A Yes.

Q Okay. Go back to the last page of Exhibit 4. At the very top, which is the 10th of October 2024 -- so this is a week after the Signal messages were sent. Are you with me?

A Yes.

Q Mr. Ammel is in Arizona and with Ms. Sinema doing work at that time that you're sending this message, correct?

A Correct.

Q You said, "It doesn't really look like you're

working very hard. You could sit around at her house, but not contact your kids until I said something." And then you said, "Don't ever call them from her house again," right?

A Right.

Q And then before he came home to North Carolina, you told him at 7:43 in the morning on October 11th, "Please make sure to have a hotel arranged from Saturday to Friday. I will be in class Wednesday and Thursday this week. That is your opportunity to come finish the office project. When I am home, you can't be. You can come to pick up the kids for school. There are games Monday and Wednesday this week where you can meet us. I highly suggest you use this week to find an apartment and therapist. You need help, Matt. You are destroying every relationship you have with your poor choices. When we tell the kids on Saturday, I will not take the fall for your choices. These are consequences for the choices you've made, and you haven't made choices that protect your marriage or your family." Did I read that correctly?

A That was read correctly.

Q And you and he had made the decision that you were going to tell your kids that Saturday that you were

ending the marriage?

A No. That's not what we told them at all, actually.

Q Ma'am, let's listen carefully to my question. My question is based upon this text message and what happened before the text message, not what happened after.

A So what is your question again?

Q You wrote, "When we tell the kids on Saturday." This was not Saturday. I will tell you what day this was by looking at a calendar. This was Friday. Okay? This was the day before the Saturday. You said, "When we tell the kids on Saturday, I will not take the fall for your choices." What you were going to tell the kids, based upon what you wrote there, was that you were separating, correct?

A Temporarily.

Q Okay. Understood. But that was the decision that you and he made as of October the 11th -- was to tell your kids on October 12th that you were separating?

A We didn't make a decision. He didn't respond. And I don't even know that we told them that day --

Q But that was --

A -- referenced.

Q That was the intention? That's why you wrote this, correct?

A The intention was to tell them that Dad was moving out for six months in hopes of reconciling, and that is what we told them.

Q So you told the kids you were going to separate for six months?

A That is what we ended up saying to them, yes, with the hope of reconciling.

Q And that's what you told them on October 12th, 2024?

A I don't know that we did it on October 12th because the Miami trip was coming up and we didn't want to ruin it for them, so we may have waited. I don't remember the exact day that we told them. I'd have to see if I can find that date.

Q But the decision had been made to tell them as of October 12th, 2024?

A I don't know because we were kind of wishy-washy up to the day of telling them.

Q On October 19th, you, Mr. Ammel, and the children -- yeah. I am done with that. You can put it aside.

On October 19th, you, Mr. Ammel, and the children traveled to Miami for a Taylor Swift

concert, one that was arranged by Ms. Sinema, correct?

A I think she arranged it. I'm not sure.

Q You and Mr. Ammel stayed in separate hotel rooms in Miami, correct?

A Yes.

Q You divided the children between you?

A Yes. But that wasn't my choice.

Q You interacted with Kyrsten Sinema in Miami and thanked her for what she was doing for your family, knowing full well she had been having an affair with your husband, correct?

A What?

Q No?

A Thanked her?

Q You didn't thank her for the generosity of arranging the trip for you and getting you down to see the Taylor Swift concert?

A Oh, no.

Q No? What did you say to her when you saw her?

A Nothing.

Q You said nothing to her?

A Pretty much. I think there was a hello.

Q Okay.

A So what -- could you please -- what -- please show

me where you are referring to I thanked her.
Q I'm just asking the questions, ma'am.
A You weren't asking. You were inferring that I did that. You were speculating.
Q Okay. After the concert, Mr. Ammel left Miami to travel with Ms. Sinema to Las Vegas while you flew home to North Carolina, correct?
A Could you repeat that, please?
Q After the concert, Mr. Ammel left Miami to travel with Sinema to Las Vegas while you flew home to North Carolina, correct?
A I think he went to Las Vegas. Yes.
Q He went to the western part of the country; you flew back east, right?
A Correct.
Q And when you flew back, you knew that you were days away from starting what you thought was going to be a six-month separation, correct?
A Potentially. I was still fighting it till the very -- till the very final moment about separating.
Q But you knew he already had an apartment lined up at Tyler's Ridge, correct?
A He hadn't gotten the keys, and he hadn't put a deposit down, and I had to remind him.
Q Okay. You went to Nashville with Mr. Ammel on the

25th of October to see the Sturgill Simpson concert knowing full well you were in the process of starting that separation, correct?
A While simultaneously begging him not to leave.
Q But the plan was he was going to leave? That wasn't a surprise to you?
A That was planned, but it didn't happen yet.
Q So you thought something about that trip to Nashville would potentially change his mind?
A It was an anniversary trip. Yes.
Q You believed it was an anniversary trip?
A And so did he. In fact, I have text messages referencing him talking about booking -- coming home for our anniversary trip and "Can I take you to Sturgill in a different place?" He is lying.
Q That trip had been booked on September 23rd, correct?
A I don't remember.
Q If that's what the text messages show --
A Is that what the text messages show? Then yes.
Q Okay. That was well before your directives to him on October 3rd and October 11th to move out of the marital residence, correct? That's when that --
A We planned our anniversary trip prior to October 3rd.

Q Okay. And you knew full well when you boarded your flight back to North Carolina and he boarded his flight to Arizona the morning of the 26th that he would be moving into his apartment at Tyler's Ridge when he returned, correct?
A I wouldn't say that's necessarily correct.
Q You didn't know that?
A I was in denial and hoping that -- he hadn't picked up his keys. He hadn't put down a deposit.
Q You didn't know that he put down a deposit that very morning?
A He had not.
Q Ma'am, you didn't know that he put down a deposit that --
A No. What morning did he put the deposit down?
Q That morning.
A He didn't tell me.
Q Did you not read his declaration and see the e-mail correspondence with Tyler's Ridge?
MR. VAN CAMP: Objection. You can answer.
A I read his declaration.
Q Okay. And there was e-mail correspondence with Tyler's Ridge on the 26th showing his deposit.
A So then that lines up with the date that we left Nashville.

Q Correct.
A Okay. I didn't realize it corresponded that -- like that. I don't think he informed me that he had put down the deposit --
Q Okay.
A -- on the apartment.
Q The Nashville trip, ma'am, did not in any way change the plans to separate, did it?
A No. We ended up separating. But it was still an anniversary trip --
Q That --
A -- for our marriage.
Q With both of you knowing that the separation was following on the other end of it?
A But it also implies hope.
Q And when Mr. Ammel returned to North Carolina on November the 1st, he, in fact, moved into his apartment at Tyler's Ridge, correct?
A He did not move in then.
Q He didn't?
A He did not move in until mid-November. And he stayed in the marital home after he came home from Saudi Arabia.
Q Where did he sleep the night of November the 1st?
A In the marital home.

Q I'm just about done with my questions, and I'm going to take a break before I tell you I'm actually done, but before I finish, I need to ask this one. Are you aware of any evidence of Ms. Sinema purposefully contacting Mr. Ammel prior to November 1st, 2024 while he was physically present in North Carolina apart from what you've testified to today?

MR. VAN CAMP: Objection. You can -- you can answer. I'm objecting to the form of the question and the use of the word "purposefully," whether it was a purposeful text versus purposefully knowing where he was. It's confusing.

Q I want to make sure that there is not something else I'm going to learn about at a hearing that you haven't told me about today.

A Repeat the question --

Q Sure.

A -- very slowly.

Q Are you aware of any evidence of Ms. Sinema purposefully contacting your husband prior to November 1st, 2024 while he was physically present in North Carolina apart from what you've testified to today?

A I don't believe so.

Q Another way of asking the same question for clarity, have you told me everything you know about what you believe to be Ms. Sinema's purposeful contacts with Mr. Ammel prior to November 1st, 2024 while he was physically present in North Carolina?
A I believe so.
MR. EPSTEIN: Okay. Let's take a break. I think I might be done.
THE VIDEOGRAPHER: Off the record at 4:08 p.m.
(EIGHT-MINUTE RECESS)
THE VIDEOGRAPHER: On the record at 4:16 p.m.
MR. EPSTEIN: Okay. So, Ms. Ammel, for today, those are all of my questions. We are keeping your deposition open until we receive your journals.
I'm going to ask on the record to hopefully save me from having to write a letter this afternoon, Mr. Van Camp, can we receive all three of those journals: The flower-covered journal, the butterfly-covered journal, and the black journal -- obviously copies, we don't need the originals -- in full by close of business Monday?
MR. VAN CAMP: You're not going to receive

them in full, Steve. Obviously you're going to receive responses that you requested. But if there are issues in the journal about situations unrelated to Ms. Sinema or unrelated to what you asked for, you're not getting them.

MR. EPSTEIN: Okay.

MR. VAN CAMP: Okay? Because -- but --

MR. EPSTEIN: That's fine.

MR. VAN CAMP: I will -- I will meet with -- and if you want to state on the record you think you're entitled to her entire journal with all of her other personal thoughts totally unrelated to this case -- is that what you're saying?

MR. EPSTEIN: Letting you decide what's related and what's not related is the problem. That's the big problem we have.

MR. VAN CAMP: Well --

MR. EPSTEIN: We -- I will tell you --

MR. VAN CAMP: There's two -- there's two sides to this case. One is lying and one isn't. So I think, you know, for you to imply that I wouldn't do my job is really not appropriate. I've done my job. She's done her job. We owe you parts of a journal that you requested. No question about it. I'm going to meet with Ms. Ammel tomorrow at

nine o'clock. I'm going to get you those journal entries, my hope is, on Saturday so that you can review them. And I will make her available early next week, with the Court's permission, to ask her questions about any of those journal entries. But I'm not going to give you wholesale a journal when you haven't requested a journal related to every other thing that she talks about. Whether you trust me or not, I don't -- that doesn't bother me.

MR. EPSTEIN: This has nothing to do with trust. So here's what we will agree to without having to write a letter, without having to file a motion. We will agree that those three journals, to the extent that they discuss Mr. Ammel in any way, shape, or form -- any such entry is produced to us with the full verbiage that relates to Mr. Ammel.

MR. VAN CAMP: I will -- I will respond to your Interrogatory No. 2, I believe it is --

MR. EPSTEIN: Okay. Then we will --

MR. VAN CAMP: -- in full -- in full -- in full with everything that you've requested and any request for admission -- I mean -- excuse me -- request for production of documents in full that is not protected by the attorney-client privilege or

the work product doctrine, which Ms. Ammel has testified she has some of that, in full and hopefully by tomorrow, at the latest, Sunday. Like I said --

MR. EPSTEIN: Okay.

MR. VAN CAMP: -- I'm going to meet with her Saturday. I'm going to have our firm go through the entire journal with her to make sure that we capture everything. She's not going to show us what she has and we give it to you. We're going to go through it and make an independent inquiry.

MR. EPSTEIN: Okay. And I -- based upon that representation, I will wait until receiving that before communicating with you further about what next steps will be, including highly likely that we'll need to continue -- probably not for very long -- her deposition.

MR. VAN CAMP: I think that's fair. I'm not -- if you don't have something you should have -- and you should be able to ask questions of her about it. And so we could do it by Zoom. I can come back up here. It's no big deal.

MR. EPSTEIN: Okay. I will take you at your word and --

MR. VAN CAMP: I appreciate that.

MR. EPSTEIN: -- we will wait to see that.
And with that, for now, those are all of our questions for today.

CROSS-EXAMINATION BY MR. VAN CAMP:

Q Okay. Ms. Ammel, I've got a few questions. Mr. Epstein has showed you some June 2024 e-mails back and forth between you and Matt Ammel where he is out with his friend at a bar somewhere?
A Yes.
Q Okay. And does -- to your knowledge, was Mr. Ammel drinking that night?
A He was.
Q And was it sort of his modus operandi to kind of go after you or attack you about the marriage when you would question him about Ms. Sinema when he had been drinking or high?
A Yes.
Q And is it fair to say that there are many other text messages during the summer and the fall of 2024 where he is telling you that he loves you?
A Yes.
Q And that you're telling him you -- you're telling him you love him?
A Correct.
Q And that you miss him?

A Right.

Q And, in fact, there are "I love you" messages after the legal date of separation and your divorce on November 1st, 2024, correct?

A Correct.

Q And is that what creates this hope you talk about?

A Yes. I mean, he -- even as late as January of 2025, he was hugging me and telling me he loves me in our kitchen.

Q Do you feel that -- just based on your knowledge of your ex-husband, that he was conflicted or struggling with his relationship with Ms. Sinema and his marriage to you?

A I think he was highly conflicted. And I think that he was in an extremely vulnerable place in that time of his life when he was transitioning out of the military, and he didn't know what to do, and so -- could you repeat the question? I lost my train of thought.

Q I think you answered it. Do you -- do you feel that Ms. Sinema here cares at all about you or your family or what she did to you and your family?

A Not at all.

Q And do you have concerns about your ex-husband as the father of your children's mental health now?

A Very much so.

Q And do you feel like Ms. Sinema made any effort, based on what you -- your discussions with your ex-husband, about letting Matt go so he could return to you and his family?

A No. If anything, I think she just continued to hook him and hook him and hook him. And, you know, he was even saying he was going to leave as late as January 2025. He would move out then because, you know, that's when his pay would increase and he could afford two households. But I just -- I think she was dangling money in front of him and he couldn't say no.

Matt is an established liar and manipulator, and I think he was actively manipulating both of us.

And -- but she met me, she met my kids, and she still had an affair with my husband, and she completely dismantled my family. My children don't have a father now, and he's alive.

Q And would you say that the arguments that Mr. Epstein raised with you that were expressed in these text messages were the result of his relationship with Ms. Sinema while he was married to you?

A Could you repeat that?
Q Would you say that these arguments you had and saying all these --
A Yeah.
Q -- hateful things to each other was a direct result of Ms. Sinema and your ex-husband, Matt Ammel, having an affair while he was married to you?
A Absolutely.
Q And was there any discussions about divorce -- serious discussions other than typical marital arguments -- prior to him going to work for Ms. Sinema?
A No.
Q And has it been hard for you to sit here?
A Yes.
Q I mean, you're sitting here with a lawyer that's asking you a bunch of questions and the person that you view destroyed your family. Are you emotional about that?
A I'm sorry. Yes.
Q Do you think that if Ms. Sinema had backed off or not started something or participated in something, as she said, that you would still be married to Matt?
A Yes.

Q And, in fact, in October when you went on your hopeful anniversary trip, you slept in the same bed with Matt, correct?
A Correct.
Q You had intimacy, correct?
A Correct.
Q And you earlier mentioned that he lies a lot. And now that you understand he was lying to you about the affair all this time and trying to make you feel like you were crazy for thinking about it, does that -- does that make you angry?
A I think the anger has passed and it's just sadness.
Q And your daughters, how are they doing?
A They don't even have a relationship with him anymore.

MR. VAN CAMP: That's all I have.

MR. EPSTEIN: Okay. Subject to what we said earlier, I think we're done for today.

THE VIDEOGRAPHER: Off the record at 4:26 p.m.

THE COURT REPORTER: And Mr. Epstein, would you like the same copy order for this one?

MR. EPSTEIN: Yes, please.

THE COURT REPORTER: And expedited, as well?

MR. EPSTEIN: Yeah. So we had previous

arranged for next Wednesday.

THE COURT REPORTER: Okay. Perfect. And Mr. Van Camp, would you like the same copy order, too?

MR. VAN CAMP: Sure. Yeah.

THE COURT REPORTER: And do you need this expedited?

MR. VAN CAMP: Yes, ma'am.

THE COURT REPORTER: Sounds good. Thank you so much. We're going off the record.

(Whereupon, the deposition was concluded at 4:27 P.M.)

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

I, Lisa S. Marion, CER, a Notary Public in and for the State of North Carolina, duly commissioned and authorized to administer oaths and to take and certify depositions, do hereby certify that on July 31, 2026, HEATHER AMMEL, being by me duly sworn to tell the truth, thereupon testified as above set forth as found in the preceding 162 pages, her examination being reported by me verbatim and then reduced to typewritten form under my direct supervision; that the foregoing is a true and correct transcript of said proceedings to the best of my ability and understanding; that I am not related to any of the parties to this action; that I am not interested in the outcome of this case; that I am not of counsel nor in the employ of any of the parties to this action, and that signature of the witness was waived.

IN WITNESS WHEREOF, I have hereto set my hand, this the 3rd day of August, 2026.

Lisa S. Marion

______________________

Notary Public

Certificate No. 200630000110

DEFENDANT'S DEPOSITION EXHIBIT
PENGAD 800-631-6989
1
Ammel

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
MOORE COUNTY, NORTH CAROLINA
25CV000606-620

HEATHER LYNNE AMMEL,
Plaintiff;

vs.

MATTHEW JOSEPH AMMEL,
Defendant.

# DEPOSITION OF HEATHER LYNNE AMMEL

At Pinehurst, North Carolina
August 13, 2025
At 12:03 P.M. to 3:33 P.M.
Reported by: Cynthia J. Dotson

COBB COURT REPORTING
6331 NC 27E
COATS, NORTH CAROLINA 27521

ORIGINAL 919 894-7249

A P P E A R A N C E S

FOR THE PLAINTIFF: Ms. Whitney S.P. Foushee
Van Camp, Meacham & Newman
P.O. Box 1389
Pinehurst, NC 28370

FOR THE DEFENDANT: Mr. Brent Tanner
Parker Bryan Britt
Tanner & Jenkins
133 Fayetteville St.
Suite 500
Raleigh, NC 27602

ALSO PRESENT: Mr. Matthew Ammel

I N D E X

| | Page |
|---|---|
| Direct Examination by Mr. Tanner . . . . . . . . . . . | 5 |
| Certificate of Notary Public/Reporter. . . . . . . . | 139 |

S T I P U L A T I O N S

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record:

(1) That the deposition of Heather Lynne Ammel may be taken on August 13, 2025, at the offices of Van Camp, Meacham & Newman, 2 Regional Circle, Pinehurst, North Carolina, before Cynthia J. Dotson, Notary Public/Reporter.

(2) That this examination shall be taken for the purpose of discovery, or for use as evidence in the above-entitled action, or for both purposes.

(3) That this deposition is deemed opened and all formalities and requirements with respect to opening the same, expressly including notice of the opening of this deposition, are hereby waived, and this deposition shall have the same effect as if all formalities in respect to opening the same had been complied with in detail.

(4) The North Carolina Rules of Civil Procedure shall control the taking of said deposition and the use thereof in court.

(5) Objections to questions and motions to strike answers need not be made during the taking of this deposition, but may be made for the first time during the progress of the trial of this case, or any pretrial hearing held before any superior court judge or magistrate for the purpose of ruling thereon, or at any other hearing of said

case at which said deposition might be used, except that an objection as to the form of a question must be made at the time such question is asked or objection is waived as to the form of the question.

(6) That the witness hereby waives the right to read and sign this deposition.

(7) That the sealed original transcript of this deposition shall be mailed first-class postage or hand delivered to the party taking the deposition for preservation and delivery to the court, if and when necessary.

---

WHEREUPON,

Heather Lynne Ammel,

Having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. TANNER:

Q All right. If you could just identify yourself.
**A Heather Ammel.**
Q Okay. And you're a party in the action?
**A Yes.**
Q Okay. And that action's against your husband, Matthew?
**A Yes.**
Q Okay. Ever had a deposition before?
**A No.**
Q And you understand today that you're tasked with telling the truth?
**A Yes.**
Q And do you understand what telling the truth is?
**A Yes.**
Q So the example I always use is if I were to say that the sky is red currently, would that be true or not true?
**A Not true.**
Q Okay. You understand that you have to be of a sound mind to testify today, so --

A Yes, sir.
Q And are you under any kind of alcohol or substances that would impair your ability to understand --
A No.
Q -- the questions?
A No.
Q Or that would impair you from telling the truth?
A No.
Q At any point if I ask you a question and you need some clarification, you understand that you can ask me to clarify it?
A Yes.
Q Okay. And if you need a break or to speak with your attorney, you can request that as well?
A Yes.
Q Is there any other reason today you believe that you will not be able to provide answers truthfully?
A No.
Q Okay. Outside of your attorney, who have you talked to about today's deposition?
A My parents and my sister and my friend.
Q Who's your friend?
A Carmen.
Q What's her last name?
A Harris.

Q Harris. Okay. She live locally?
**A Not -- no.**
Q Where does she live?
**A She lives in Washington, North Carolina.**
Q Okay. That's near the coast?
**A Yes.**
Q Okay. And when's the last time, we'll start with your parents, that you talked to them about the deposition?
**A Last night. My dad's in town and I talked to him.**
Q Is he residing with you currently?
**A He's visiting.**
Q But he's in the household where you're at?
**A Yes.**
Q Okay. How long has he been here?
**A He arrived Sunday.**
Q And when is he expected to go back to his other home?
**A I think end of the week. Actually I'm not sure. He's traveling around.**
Q Okay. Is he here because you have the deposition or for some other reason?
**A No, we got a new kitten that he delivered.**
Q Okay. And in your conversations with your dad, we'll start with him, what did you guys talk about as it relates to the deposition?
**A Just what happened yesterday.**

Q What did you say about what happened yesterday?
A **I don't recall.**
Q Don't recall any of it? What do you think happened yesterday?
A **I think Matt gave a deposition.**
Q Okay. How would you describe it?
A **Long-winded.**
Q Okay. Anything else?
A **Informative.**
Q How so?
A **I learned things I guess I didn't know prior to the deposition.**
Q Huh. What did you learn yesterday that you didn't know prior to?
A **Who his boss is.**
Q Okay. Do you recall his boss's name?
A **Michelle something.**
Q Okay. Anything else that you learned for the first time yesterday in the deposition?
A **That he's employed by ASU.**
Q Okay. Anything else?
A **That he claims his relationship with Kyrsten began in January.**
Q Okay. Anything else you learned?
A **That he did not buy a truck. Work apparently bought**

**it.**

Q Okay. And were you concerned that he bought the truck and not his work?

**A Yes.**

Q Did that make you mad?

**A No.**

Q Then what was your concern that he bought a truck?

**A Because he's currently not paying any support.**

Q Is there anything else about him driving the truck that concerns you, or having that truck?

**A It's suspicious that his pay was reduced.**

Q Okay. Anything else in regards to that truck, how it made you feel?

**A Didn't really make me feel any way.**

Q Other than concern, correct?

**A Concerns.**

Q Okay. Any other concerns regarding the truck?

**A No.**

Q Okay. Going back to the more general question, was there anything else you learned yesterday at the deposition for the first time?

**A I can't recall.**

Q Okay. So based on right now, it was less than twenty-four hours ago. That's all you can recall as far as things you learned for the first time?

A I think so.
Q Okay. Any other observations or thoughts you had in regards to Mr. Ammel's deposition yesterday or today?
A **He seems unwell.**
Q Why do you think he seems unwell?
A **He's clearly mentally unwell.**
Q Why do you say that?
A **His manic behavior.**
Q Why would you say it's manic?
A **You heard the laugh.**
Q What else?
A **He's rambling. He's rambling and going on long, incoherent tangents.**
Q Anything else?
A **He's just clearly unwell.**
Q Any other reason based on what you observed to make you think that, outside of tangents and laughter?
A **Strictly regarding the deposition?**
Q Yeah.
A **Strictly regarding the deposition, I just think that he has unusual behavior.**
Q What would be unusual?
A **Inappropriate and weird jokes about the word "cunt."**
Q Okay.
A **The Muslim, Islam thing. That was pretty weird and**

**unusual.**
Q Okay. Anything else?
**A His disrespect for my attorney.**
Q Okay. Anything else?
**A Hmm. I don't know. There's so much. That's all that I can recall, though.**
Q Okay. You said you also talked to your mom. When's the last time you talked to your mom about either the deposition or the case as a whole?
**A Last night.**
Q What did you guys talk about?
**A I just gave her a brief synopsis of what happened.**
Q Okay. Did she offer any insight or advice based on what you told her?
**A She reminded me that while she was visiting, he told me he wanted a divorce, because he's been very adamant that it was all my idea.**
Q So whose idea was it to divorce and separate?
**A Matt's.**
Q Why do you say that?
**A Because he told me repeatedly he wanted a divorce.**
Q And you say repeatedly. When was that?
**A Well, when I discovered the affair in the summer of '24, he really kicked off with the divorce talk.**
Q You say you discovered the affair. What did you

discover?
A Text messages.
Q And what were those text messages?
A Text messages between Matt and Kyrsten.
Q Do you recall what they said?
A Yes.
Q What did they say?
A She said something along the lines of she was thinking of him, she hoped he had a good day. And he replied with "I really miss you."
Q Okay.
A And then the following day she messaged him in the middle of the night and said she kept waking up and reaching for his arms around her.
Q And did that make you mad?
A Rightfully.
Q Are you still angry about that?
A I wouldn't say anger.
Q How would you describe it?
A Disappointment.
Q So anger to disappointment. Any other feelings you have about that?
A Betrayed.
Q Okay. Any other feelings?
A Abandoned.

Q Okay. But not angry?
A **I don't think anger's the right word.**
Q How did you come about seeing these messages between him and Kyrsten?
A **He had provided me his passcode for his phone.**
Q When did he provide the passcode to his phone?
A **At some point. I don't recall.**
Q Did you tell him you were going to go on his phone to look at the messages?
A **No, because he was passed out drunk. And then when he did wake up, he got up and he went and peed on my bedroom wall. He was too intoxicated.**
Q Okay. So the answer is, you didn't ask him before you went on his phone to look at the messages?
A **No, but he had already given me permission with -- by providing his passcode.**
Q So using that, if he provided you his passcode, that meant that you could go unfettered and look through any kind of messages on his phone?
A **Just as he had access to my phone.**
Q Okay.
A **As a married couple.**
Q Okay. And did you ever record any conversations between him and Kyrsten?
A **No.**

Q Did you ever overhear any conversations between him and Kyrsten while y'all lived together?
**A I think so.**
Q How?
**A Work calls.**
Q Okay. And are these calls that he would take in your presence or was he --
**A In the -- in the home.**
Q Okay. And you never put any kind of tracking device or any kind of surveillance device on his phone?
**A No.**
Q What about a computer?
**A No.**
Q What about his automobile, car?
**A No.**
Q Did you ever hire a private investigator to have him followed?
**A I didn't need to.**
Q So the answer is no?
**A The answer is no.**
Q Okay. Have you ever hired anybody to do surveillance on him in Arizona?
**A No.**
Q Do the children have phones, cell phones?
**A Our daughters do.**

Q Okay. And do they take those phones with them when they visit with Mr. Ammel?

**A I believe at least one of them does.**

Q Okay. And do you have any applications on their phone that would track them like Life360 or Find My Phone or any of that?

**A No.**

Q And you've never used any program or application like that to track the children while they were with Mr. Ammel?

**A One of my daughters might share her location with me.**

Q Okay.

**A For safety.**

Q Have you checked their location before while they've been with Mr. Ammel?

**A Yes, but the phone's so old, it doesn't update anyway.**

Q Okay. When was the last time you checked their location when they were with Mr. Ammel?

**A I think when they were traveling with him in Idaho.**

Q Do you recall when that was?

**A July.**

Q And why would you want to use this tracking program, if you will, or you know, the surveillance, whatever you want to call it, on the children's phone to track them when they were in Idaho with Mr. Ammel?

A Just curious.
Q Did that curiosity come about after the landing at the Colorado airport?
A It did not.
Q Was it before?
A I think so.
Q Okay. Well, do you routinely talk to the children when they're with Mr. Ammel?
A I talk to Isla.
Q Okay. Do you do that via telephone, text?
A She texts me a lot.
Q Okay. And do you guys use any kind of text apps like Signal, WhatsApp?
A Uh-uh.
Q Just straight texts?
A Yes.
Q And do you have an iPhone?
A Yes.
Q And does she have an iPhone?
A Yes.
Q So the messages the two of you would be sending would be iMessage?
A Yes.
Q In blue?
A Correct.

Q Okay. Do you store or keep your messages between you and the children?
**A How so?**
Q Are they on your phone?
**A Yes.**
Q Do you delete them?
**A No.**
Q Okay. So if I were to ask you today if you had possession of those text messages between you and the children, you could produce them?
**A Yes.**
Q Okay. Do you text with your son at all?
**A A little bit.**
Q Little bit?
**A He's not as communicative as the girls, or the middle.**
Q Now, yesterday during Mr. Ammel's deposition, you were texting somebody. Who were you texting?
**A I don't recall.**
Q You don't recall? Do you have your phone with you?
**A Yes.**
Q Could you look and see who you were texting?
**A I could.**
Q Would that help refresh your memory on who you were texting?
**A I'm sure it would.**

Q Okay. Then is there any reason today you couldn't look at your phone and determine who you were texting if we took a break?
**A I could look.**
Q Okay. All right. We'll circle back to that. So you talked to, I think you said, sister?
**A When?**
Q About the deposition. You talked to your sister, is that what you said?
**A I did not.**
Q Okay. So mom, dad, we talked about the friend in Washington. Who else did you talk to?
**A That's it.**
Q Okay. So mom, dad, your friend?
**A Correct.**
Q Okay. What did you talk to your friend about?
**A What happened in the deposition.**
Q Anything different from what you described with either your dad or your mom?
**A No.**
Q No? Did she offer any advice to you about the deposition or your case?
**A Not really, no.**
Q No? Has she ever been through a divorce or separation?

A No.
Q No? Okay. If this case goes to a trial, do you know what witnesses you would plan on calling for we'll say custody?
A I haven't thought about it.
Q If you had to have it today, who would you call?
A Could you explain?
Q Say we leave here, we're going to go see Judge Bibey to have a custody trial.
A Uh-huh.
Q Which witnesses today, if you had to pick, would you select to be witnesses for that trial?
A Carmen.
Q Okay.
A Possibly another friend.
Q Who's --
A Jessica -- Jessica Alcorn.
Q Where's Jessica live?
A Southern Pines.
Q How do you know Jessica?
A I met her through Matt. He went through the Q course or something with her husband a long time ago.
Q How often do you encounter Jessica?
A Describe encounter.
Q Well, we'll start basics. When's the last time you

saw Jessica?
A Saturday night.
Q In what setting?
A Dinner.
Q Okay. Were the kids with you?
A They were with Matt.
Q So it was just you and her?
A No, we had other people with us.
Q Other people. Okay. And how often does she come around whenever the children are with you?
A Maybe half the time.
Q Half the time?
A Or not even.
Q Is it more of a weekend get-together?
A With the children?
Q Uh-huh.
A Sure. I mean, our oldest kids are old enough to meet together on their own. They take bike rides and whatnot together.
Q Do you guys live in the same neighborhood?
A We live in the same area, not the same neighborhood exactly.
Q Okay. And if I were to say monthly, how often does the children for Jessica and your children interact?
A Weekly maybe.

Q Okay. And what's the ages and genders of Jessica's children?
**A She has two boys. One is fifteen and one is twelve.**
Q Okay. And do you let them go bike by themselves, wherever?
**A Not wherever.**
Q Well, where do the kids bike?
**A Down to a lake that's nearby.**
Q Do you know what that -- do you know the name of the lake?
**A No. It's like mostly a neighborhood pond.**
Q Okay. And when the kids go and do this biking, how long are they usually gone?
**A Couple hours.**
Q Couple hours? Okay. And is that all three children?
**A Not typically.**
Q So who goes with the fifteen and twelve-year-old boy?
**A Usually my oldest, Clara.**
Q Okay. And she's thirteen, right?
**A Uh-huh.**
Q Okay. So you got Carmen, Jessica. Any other witnesses you would call?
**A Oh, if I would choose?**
Q Uh-huh.
**A I don't know at this time.**

Q So today you wouldn't know right now? Would you call any of his family members as witnesses?
**A Potentially.**
Q Okay. Let's explore potentially. Who would you potentially consider calling?
**A His brother Jordan.**
Q Okay. Anybody else?
**A No, probably not.**
Q Okay. And what would be the purpose in calling his brother Jordan?
**A So he could discuss Matt's violent behavior.**
Q What do you believe Jordan would say as it relates to Matt's behavior?
**A That Matt broke his ribs and collarbone.**
Q Is that based on what Jordan told you?
**A Yes.**
Q What else did Jordan tell you?
**A About what?**
Q About Matt.
**A He told me about the incident that happened between him and Matt on New Year's Eve.**
Q And did he reach out to you?
**A Yes.**
Q Okay. And did he describe what his mental state was on the day of that?

A **Whose?**
Q Jordan's. His own.
A **No.**
Q Did he provide any description on how he perceived Matthew to be during that alleged incident?
A **Yes.**
Q What did he say?
A **He said Matt was stoned. He speculated that he might be on opiates because his pupils were pinpoints. Basically Matt was very intoxicated.**
Q And what level of training, if you know, would Jordan have to make a description based on pupils and opioid and all that?
A **I have no idea.**
Q No idea. And while you guys were together as a couple, did Matt and Jordan have any kind of relationship?
A **Yeah.**
Q How would you describe that relationship?
A **Sporadic.**
Q Sporadic? Did you guys go visit Jordan a lot?
A **I wouldn't say a lot.**
Q Did Jordan ever come visit or interact with you as a family?
A **No.**

Q No. And is he in Leavenworth, Kansas?
A **That's correct.**
Q And that's the location that both of you guys are from originally, right?
A **Uh-huh.**
Q Okay. All right. So we got Jordan. Any other family members you've talked to of Matthew's during the pendency of the separation and divorce?
A **Can you repeat that?**
Q Any other family members of Matthew that you have talked to while you guys have been separating and divorcing?
A **I've talked to his mother.**
Q Okay.
A **And my sister-in-law.**
Q Okay. As to his mother, when's the last time you talked to her?
A **Probably when we were home over the summer.**
Q Summer of '25?
A **This summer.**
Q Okay. What did you guys talk about?
A **Not much. She said she hasn't seen him.**
Q Okay. Anything else that was said?
A **She hasn't seen him and she doesn't talk to him.**
Q Okay. Did they ever have a relationship during the

course of your marriage?
A Yes.
Q How was it?
A I don't think Matt has a good relationship with most of his family.
Q So would you say that relationship was also sporadic?
A Yeah.
Q Yeah. I mean, did you guys often go to visit his family in Leavenworth for holidays and stuff like that or no?
A Most summers I took the kids back home, and since both of our families lived there, they spent equal time at each grandparent's house.
Q Okay. All right. And then you mentioned sister-in-law. Who's that?
A His brother Josh, Josh's wife.
Q Okay. And is Josh the brother in Idaho?
A Uh-huh.
Q Okay. When is the last time you talked to her?
A When I saw her in Kansas in -- it's June or July. I don't remember.
Q Of this year?
A Uh-huh.
Q Okay. Did you talk to her about your current case you've got with Matthew?

A **Yes.**
Q What did y'all talk about?
A **That we're separated, we're divorcing. He's in a relationship with Kyrsten. I think we briefly touched on the Jordan incident. That's about it.**
Q Okay. Did she offer any advice to you?
A **No.**
Q No. Did she say he had talked to Matthew?
A **No. They said they had not talked to him.**
Q Okay. And do you know whether or not that conversation happened before or after he took a trip to Idaho?
A **It was before.**
Q Before. Is that it as far as his family members you've talked to about your divorce and separation, the case you've got?
A **I believe so.**
Q Okay. During the course of the marriage, so from wedding bells to -- well, first let me ask you, what date do you think you guys separated?
A **November 1st, 2024.**
Q Okay. So from date of marriage to that day, were you ever involved in any kind of sexual experience, sexual act or sexual encounter with anybody other than Matthew?

A No.
Q Since that date, have you been romantically involved with anybody?
A Romantically, no.
Q Are you dating anybody?
A No.
Q Have you gone out on dates with any individuals?
A No.
Q Is there anybody that's asked to go out on a date with you since you've separated?
A No.
Q Okay. Do you have any social media sites?
A Yes.
Q What do you have?
A Instagram and Facebook.
Q Okay. And how would you describe your use of those?
A Facebook, minimal. Instagram, daily.
Q Okay. And what do you post on Instagram typically?
A I don't post that much.
Q Have you ever put anything on either social media page about -- since you've been separated, anything about Matt?
A Could you elaborate?
Q Sure. Since you've been separated, we'll say November 1st of '24, have you posted anything on your Instagram

page that's said anything pertaining to him?
**A Naming him?**
Q Uh-huh.
**A I have not named him.**
Q Okay. Have you ever described your case or how you feel about it on social media since you've been separated?
**A The case, no.**
Q Okay. Have you ever described the breakdown of your marriage on Instagram since you've been separated?
**A No.**
Q Have you ever described your frustration or your disappointment or your anger on social media --
**A No.**
Q -- since you've been separated?
Okay. Have you ever posted anything on your social media pages that would have any inferences that it relates to your relationship with him?
**A Depends on who's reading it.**
Q Okay. So what would be an example of one that could make that inference?
**A Maybe my friends who know I was married to him.**
Q What would that be?
**A What do you mean, what would that be?**
Q Example. What would be something your friends would

understand was pertaining to him?
A **Well, it would be all assumptions.**
Q Okay. Well, make the assumption for me. What would be something that would make people infer or assume that it's pertaining to Matthew?
A **I really can't give a specific example.**
Q But there are examples there that could make that inference?
A **Depends on how they interpreted it.**
Q Well, have you ever expressed your feelings about your separation and the end of your marriage on social media since you've been separated?
A **I'm going to say no.**
Q Okay. Have you ever said anything on your social media page as it relates to the children, as it relates to custody?
A **No.**
Q No? Okay. Have no other social media?
A **Instagram and Facebook.**
Q No X?
A **Twitter?**
Q Twitter, as they used to call it.
A **No.**
Q No SnapChat, no TikTok?
A **No.**

Q All right. Transition a little bit. As of the date of separation, what bank accounts, checking, savings, money market, all that, did you have possession, custody or control of?

**A We had a joint checking and a joint savings account.**

Q Who was that with?

**A USAA.**

Q Joint checking, joint savings. Did you have any other accounts?

**A Not until I think April of this year, I opened my own checking and savings after Matt withdrew fourteen thousand dollars.**

Q Okay. Is that also with USAA?

**A Yes.**

Q Any other financial institutions that you've had any kind of financial account with?

**A No.**

Q Okay. Do you still use your individual checking and savings?

**A Yes, but it's severely depleted because he has not paid support.**

Q So the answer is you use it?

**A I use it.**

Q Okay. Do you recall how much money was in the joint accounts at the date of separation?

**A** **No.**
Q Do you have any pensions or retirement plans?
**A** **He does. I don't personally.**
Q So at the date of separation, you didn't have any 401-K's or IRA's or any of that?
**A** **No.**
Q Okay. Do you have at the date of separation any stocks, either ownerships or stock options, that you're aware of?
**A** **Do not.**
Q Okay. Have you inherited any money from any family members in -- say since January of '24?
**A** **Have not.**
Q Okay. As of the date of separation, did you have any investment accounts like brokerage accounts, mutual funds, those types of things?
**A** **Uh-uh.**
Q No? Did you have any, we'll say any time during 2024?
**A** **No.**
Q Okay. Do you use any kind of cryptocurrency?
**A** **No.**
Q Never owned cryptocurrency?
**A** **No.**
Q And you understand what cryptocurrency is, like different types, Bitcoin, that kind of stuff?

A I don't have any of that.
Q Okay. Do you use any kind of payment apps?
A Like Apple Pay?
Q Yeah.
A Yeah, but it's my credit card is tied to it.
Q Okay. So you've got Apple Pay. And how long have you had Apple Pay?
A I don't recall.
Q Would you say you had it at the date of separation?
A I don't recall.
Q Okay. You use Venmo?
A I do.
Q How long have you had Venmo?
A Probably a few years.
Q Okay. What about PayPal?
A Yeah, I do have a PayPal.
Q Do you use that one?
A Not frequently. Sometimes.
Q Okay. Have you had that one for a few years?
A Yeah.
Q Do you have a Zelle account?
A Maybe. It's probably tied into USAA.
Q Okay. You ever use CashApp?
A I don't think so.
Q Any other payment apps of that sort that you have used

or possessed since January 1st of 2024?

A **No.**

Q Okay. Your Venmo and your PayPal, those apps, what are those usually used for?

A **PayPal is when I'm lazy and I don't want to get my credit card. I might purchase something online. And then Venmo is primarily to pay my therapist.**

Q Okay. Come back to that. All right. Any life insurance policies you have, we'll say from January 1st of '24 to the present?

A **No.**

Q Okay. Any annuities?

A **No.**

Q Okay. Real property. So real estate that either you've owned individually or you guys have owned together.

What real property do you guys have or have had since January 1st of 2024?

A **The 18 Cayman Court marital home.**

Q And that's the only one?

A **Uh-huh.**

Q And as of the date of separation, how much do you think that property was worth?

A **How much is it currently worth?**

Q Do you know what it was worth when you separated?

**A No.**
Q What do you think it's worth now?
**A Six hundred thousand.**
Q And you base that on --
**A Zillow.**
Q Zillow? Okay. So you think Zillow's a reliable --
**A I don't.**
Q Okay. So what do you think is a reliable method to value it?
**A Probably a realtor.**
Q Realtor? You ever had any comparative market analysis done?
**A I have not.**
Q Have you spoke to a realtor about the value?
**A I have not.**
Q Okay. Do you know how much is on the mortgage as far as the principal balance?
**A About two hundred thousand.**
Q About two hundred. So originally -- you would say currently there's about four hundred thousand dollars of we'll call it equity in the house?
**A Could be.**
Q Could be? Okay. And what is your plan for the house as far as equitable distribution?
**A I plan to stay in that house.**

Q Okay. And if you stay in the house, what will you do about the current loan that's on the house?

**A I'll pay it.**

Q Okay. Have you sought out possibilities of assuming or refinancing the debt on it?

**A I have not.**

Q Okay. If the court were to require that to occur, could you do it?

**A Require what?**

Q A refinance or a loan assumption of the current debt on the house.

**A Could you elaborate?**

Q Do you think you would qualify or be able to get a refinance or a loan assumption on the current mortgage into your name solely?

**A Into my name solely?**

Q Uh-huh.

**A I have no idea.**

Q If you couldn't do that, what would be your option?

**A My dad will assume the loan.**

Q Your dad will assume the loan? Okay. And he's told you he's willing to do that?

**A He has told me we'll figure it out.**

Q Okay. And for that property, if you get it, looking just at that property, is it safe to say that of the

four hundred thousand dollars in equity, that two hundred thousand dollars of that if you split equally would go to Mr. Ammel?
**A I don't think it should be split equally.**
Q Why?
**A I just don't.**
Q Is there a reason why?
**A Probably.**
Q Let's explore it. Tell me all the reasons you think it shouldn't be.
**A Because when I do have to go sell it, we have such a shit show in our side yard with the septic, he's very well aware that it's going to take thousands of dollars to repair that.**
**So if I have to sell the home, I need it to be an unequal distribution in my favor so that I can pay for the expensive repairs that will be -- need to be done to the home.**
Q And it's on a septic system, and I assume is it well water?
**A It's not well water.**
Q So city water?
**A Yeah.**
Q Okay. And do you know how much the septic would be to fix it?

A Thousands, I'm sure.
Q You're sure. How are you sure?
A My neighbor had a similar issue and she paid upward of twenty thousand.
Q Okay. Have you got any estimates?
A I have not gotten an estimate on that yet.
Q So what's the issue with the septic system for that house?
A The side yard is flooding. The leach field is damaged.
Q Okay. Is there a leak in the actual septic unit or is it just --
A I haven't had it evaluated.
Q Okay. So you're not quite sure what the reason is for the leach field leaking so that there's, you know, the build-up on the surface?
A No. It's likely because he drove a trailer over it with equipment on it and ruined it.
Q So it's his fault?
A Yeah, I would say so.
Q Okay. But you don't know for sure, though, right?
A I don't know for certain what?
Q You don't know for certain what's caused whatever damage is in there?
A I do not, 'cause I haven't had it evaluated yet.

Q Think that would be a good idea to have it evaluated to see in fact what is wrong with it?
A **I will when I have the money. My dad's had to front me money.**
Q There's nobody that won't do a free evaluation?
A **I haven't had the time yet. I've had to take care of other issues he left me with.**
Q What other issues did he leave you with?
A **My parents had to pay over three thousand dollars to remove construction and debris piles that were left around the perimeter of the yard after we received a notice from the village.**
Q When was that?
A **This summer.**
Q What kind of debris was it?
A **He had cut down large trees, branches, and accumulated large piles. There was construction-like debris and trash also along the perimeter of the yard that he had left, and they hauled it all away.**
Q Okay. Is that something you couldn't haul away?
A **No.**
Q Why's that?
A **It required two dump -- dump trucks essentially and whatever -- I don't know what the equipment's called, but no, it would -- it was not possible.**

Q Who did you hire to do this removal?
A **Chris something or other. I don't remember his business name. My dad hired him for me.**
Q Did your dad pay for it?
A **He did.**
Q Okay. Does your dad pay a lot of your expenses?
A **Not until now. Not until Matt stepped out.**
Q What do you mean, stepped out?
A **Abandoned the family and stopped paying any support.**
Q Okay. So was your dad contributing to your household before then?
A **He was not.**
Q Okay. So when did your dad start giving you money?
A **For paying for things?**
Q Sure.
A **I think around May.**
Q Okay. So around May he started paying for things. What has he paid for?
A **Matt left me with a large house project inside involving trim, trim work that was incomplete for nearly a year. So my dad paid for all those materials to complete the project and he completed it himself. That was hundreds of dollars.**
Q Uh-huh.
A **He paid for gutters for my back porch.**

Q Uh-huh.
**A He paid for repairing my back deck, which he did himself. He paid for the supplies.**
Q Uh-huh.
**A He's bought me a special attachment for my pressure washer so I can maintain the home. He has bought us groceries. He's spent three thousand dollars of his own money to clear debris that Matt left.**
Q Uh-huh.
**A And now he is having to -- he's going to have to start transferring cash into my account so I can pay our bills, because Matt is not paying support.**
Q Okay. So how much cash do you anticipate he is going to be putting into your account?
**A However much it costs to pay my bills.**
Q Okay. What's your dad do for a living?
**A He's a retired Army officer.**
Q Okay. And he gets a retirement --
**A Yes.**
Q -- pension? Does he get VA?
**A I think. I don't know.**
Q Think so? Okay. Has he ever complained about giving you that money?
**A No, he's very kind and generous.**
Q All right. So is that something you foresee that he

would continue doing?
**A He would never let me and the kids go on our ass like he did.**
Q And when you mean go on your ass, tell me about that.
**A Not be able to pay the bills.**
Q Okay. Any other things about the house that you think would have an influence or impact on the value of the property, outside the unknown septic and the debris that had to be removed?
**A Potentially the back porch that Matt built.**
Q Is that the one that your dad worked on?
**A Correct.**
Q Okay. Did your dad not fix it, whatever these issues are?
**A Well, he put the gutters in, which helps with the rot.**
Q Okay.
**A And then he -- we can't afford to replace the deck right now, so he resealed it and replaced the ones that were rotting the most.**
Q How old is the deck?
**A Nine years old or something.**
Q Okay. Is it wood?
**A Uh-huh.**
Q Does wood typically rot after a period of time?
**A It does.**

Q Is that part of home maintenance?
**A Correct. That's why I need support.**
Q If you're not in that house, where would you be?
**A Good question.**
Q Have you ever thought about it?
**A Not much.**
Q Would you stay in the area if you were not living in that house?
**A If I could afford to do so.**
Q Have you ever thought about relocating to another spot?
**A Not seriously.**
Q Well, not in a serious way, but have you contemplated relocating somewhere else since you've been separated?
**A When?**
Q After separation.
**A Like I get up and move right now?**
Q Sure.
**A I can't.**
Q Okay. If you could, would you move somewhere else?
**A I would prefer not to.**
Q Okay. Ever considered moving to -- back to Kansas?
**A Only if I lose the house and I can't afford to live here.**
Q Okay. Ever considered moving to Arizona?

A No.
Q Okay. Don't want to move to Scottsdale?
**A So I could be neighbors with his mistress? That makes sense.**
Q Okay.
**A It's beautiful, though.**
Q It is nice there. All right. Cars you have. What do you got?
**A Between us, marital?**
Q Marital cars.
**A We have a 2011 Forerunner and I have a 2023 Sequoia.**
Q Okay. And the Forerunner, who drives that?
**A Matt does.**
Q To your knowledge, do you know what it was valued at at separation?
**A The Forerunner?**
Q Yeah.
**A The value of the Forerunner?**
Q Yeah, do you know?
**A I don't.**
Q And was there a debt on that? Was it paid?
**A Paid.**
Q The car you have, what do you think it's worth?
**A I don't know.**
Q Have you looked to see?

A I may have Googled it for the financial stuff.
Q This is one you've had issues with, correct?
A I have had issues.
Q And would you like to maybe sell that and get rid of it?
A I haven't decided.
Q So what issues have you had with it?
A Some kind of hybrid battery issue. I don't know.
Q And it's a 2023?
A Correct.
Q Is the battery covered under any kind of warranty?
A It was.
Q How many miles are on it?
A Like seventy, I think.
Q Okay. Have you gone to a Toyota dealer to figure out whether it's something that needs to be fully replaced?
A I have had it towed twice, and if it happens again, they will open up a case on the vehicle and bring Toyota people down to figure out what the hell's going on with it. And it could be a recall eventually.
Q Okay. And what issues happen with this Sequoia?
A It will not drive.
Q So what's that look like? It just won't switch on or dies at a stop sign?

**A No. Like I can't put it into gear and drive.**
Q Okay. And it's been that same issue twice?
**A Yes.**
Q Okay. And have you talked to the folks at the Toyota dealership about them taking it back and you getting something different?
**A I have not.**
Q Okay. And what is the monthly payment on that automobile?
**A I think twelve eighty.**
Q What term is it financed?
**A Five or six.**
Q Five or six. How much was it when you purchased it?
**A I don't recall.**
Q Okay. And is there a particular reason you selected a Sequoia?
**A Because I like Toyotas and they are typically reliable, and we needed a larger vehicle, and we needed a second vehicle because we were sharing the Forerunner, and that was not practical.**
Q Okay. Do you think there's another type of vehicle that might be better both in maintenance and cost effective?
**A I have no idea. Maybe.**
Q Have you explored that at all?

**A No.**
Q Okay. All right. Is there any other property that you can think of that's marital that we haven't talked about? Talked about the cars, the house, the bank accounts and the retirement. Is there anything else?
**A Not that I'm aware of.**
Q Okay. So as it relates to equitable distribution, what do you think should be the division of the marital assets?
**A I'll take the Sequoia, he'll take the Forerunner, I'll take the house.**
**He can have the -- his IRA or whatever. And there's no money in the accounts, joint checking account anyway, so nothing to split there.**
Q Okay. Do you know what's in his IRA's or TSP or any of that stuff?
**A I don't have access.**
Q Don't have access. Okay. If those were not as much as say the equity of the house, would you still contend that you should just get the house, equity and all?
**A I would find a way --**
THE WITNESS: Can I ask you something?
MS. FOUSHEE: Sure.
(EIGHT-MINUTE RECESS)

Q All right. Where were we? Okay. So I think I asked you about the division of assets and you said you get the house, he keeps whatever he's got in his --

(DISCUSSION OFF RECORD)

Q Back on the record. Division of assets. Just to kind of circle back to that.

First of all, did you guys have any credit cards as of the date of separation? You guys run any credit cards?

**A Yes.**

Q What did you have?

**A I have my own credit card.**

Q What do you have? Who's it with?

**A It's with USAA.**

Q Okay. Is that the only credit card you have?

**A Yeah.**

Q Okay. And is it something where you pay it off at the end of each month?

**A Typically.**

Q Typically? Okay. And do you recall if you had a balance as of the date of separation?

**A I don't recall that.**

Q Don't recall. Okay. Any other debts you can think of that you had that were marital?

**A The Sequoia.**

Q Sequoia, mortgage and credit card?

**A Uh-huh.**

Q Okay. All right. And based on all that, again just as a summation, what's your proposal on how the assets should be equitably divided?

**A He gets the Forerunner, I get the Sequoia. He gets the IRA. And an unequal distribution of the house.**

Q Okay. And what factors do you believe exist that warrant you getting an unequal division?

**A Well, he has steady income. He was the provider. I've always been the stay at home mom.**

Q Uh-huh.

**A So it makes the most sense that I remain in the house, and if we have to sell, under those circumstances, I think it should be an unequal distribution, so I can be able to afford the home repairs. And also that would be my way of being able to take care of the children.**

Q Okay. Anything else?

**A I don't know. I don't think so.**

Q Okay. All right. Okay. And you said earlier that if need be, your dad would help you to do a loan assumption and refinance the house in order to keep it?

**A I don't -- he has not said that he would specifically**

**do that, but he has said that he would help me figure out -- he would -- we would come up with some kind of solution that keeps me and the kids afloat.**

Q Okay. And you heard earlier Mr. Ammel say that your parents' relationship was not the greatest. Would you agree with that?

**A That's true.**

Q How so?

**A They are not divorced. They are separated. They have a very amicable divorce technically.**

**He -- my mom chose to move out a few years ago, and they have -- they basically live separated but have -- are cordial. He makes sure that she is taken care of.**

Q Okay. And during -- well, when you lived with them, was their relationship good, bad?

**A Normal.**

Q Normal? Did they have fights?

**A Probably.**

Q Okay. Do you interact with your mom as much as your dad?

**A Probably a little more with my mom.**

Q In person, over telephone?

**A They live in Kansas.**

Q Okay. So mostly telephone?

A Uh-huh.

Q Okay. Does your mom give you any kind of financial money, help?

A She -- when she visits, she will pay for groceries and gas.

Q Outside that, she give you any other monies, funds?

A Give?

Q Uh-huh.

A Like deposit money into my account?

Q In any way, shape or form, gives it to you, buys things for you.

A Other than gas and groceries, but again, that's tied to my dad's finances.

Q Okay. Are there any other third parties that give you money or buy things for you?

A No.

Q So nobody else has given you money since you've been separated?

A Uh-uh.

Q Okay. Any of your friends?

A Uh-uh.

Q Okay. I'm going to use August of '25 as a good example. How much do you think your dad has given you in August?

A This month?

Q Uh-huh.
**A Not much this month. Like what do you mean, given me?**
Q How much money has he deposited into your accounts?
**A Well, he just linked his account to my personal checking account and he did a test run and sent me seventy-five.**
Q Seventy-five what?
**A Dollars.**
Q Okay. Has he sent you any other monies other than the seventy-five dollars?
**A Not that I'm aware of.**
Q Has he written you a check?
**A No.**
Q Has he paid any of your bills?
**A No.**
Q Okay. So how have you paid the mortgage?
**A With money I had in my personal accounts. I've had to transfer money to the joint accounts to make sure, but I'm almost out. I'll be able to make one more car payment and then I'm out.**
Q Okay. How would you describe your marriage to Mr. Ammel?
**A Currently?**
Q No, we'll say historically. Wedding bells to when you separated. How would you describe your marriage?

A We had a fairly normal marriage. We had our ups and downs like all couples. We had certain struggles that we dealt with.
I was always loyal and faithful and tried to support him the best that I could under the circumstances.
And then the last few years have just been challenging with his transition out of the Army.
Q So during your marriage, was he deployed a lot?
A Yes.
Q Okay. And then he retired, I think he said '22?
A Yeah.
Q So once he retired out of the service, was there a transition in your marriage?
A A transition in our marriage?
Q Yeah.
A How so?
Q Was it better, worse, the same? How would you describe it? He's home now. He's no longer in the service.
A He's not home. He's choosing to be away.
Q So after he's retired, he's choosing to be away?
A Yes.
Q How so?
A Taking jobs that keep him away.

Q You heard him yesterday talk about trying to get jobs in Raleigh Fire Department and I think Pinehurst police. I mean, did you support that?
A I did.
Q And you heard him say that you didn't support that, 'cause he didn't make enough?
A That's incorrect.
Q So how would you describe it?
A He couldn't pass a drug test. So he chose not to go those routes.
What he told me, he tried to go to the Raleigh Fire Department. He wanted to do that because they're allowed to do things outside of like -- local fire departments are more restricted. I guess the Raleigh Fire Department has a different program where they can scale buildings and whatnot. I don't know. Other things. He wanted to do that kind of stuff.
And I didn't prefer that he went to the Raleigh Fire Department because he -- it was a nine-month program, which he would be required -- I didn't know how we could afford maybe an apartment up there so he could go through the program. We couldn't have afforded an apartment.
Q Uh-huh.
A Otherwise he would have been commuting back and forth.

Logistically it didn't make sense.
Q Okay.
A And he went so far as to do the PT test or something, and then I encouraged him to go to the program at Sandhills Community College for the fire department.
I encouraged him multiple times to go to the fire departments in town because that would have been ideal, because he would have been home.
Q Okay. So if he'd have gotten a job at a local fire department, or maybe a police force, you'd have been okay with that?
A Absolutely.
Q Okay. Would you still be okay with that?
A Yes.
Q Okay. Do you know what the typical salaries are for those types of jobs?
A I think there's a range.
Q What do you think the range is?
A I think it depends. It's -- I think -- I looked it up recently because I have explored an option of joining the police department. I think they start at forties potentially.
Q Okay. Which police departments would you be looking to join?
A Well, I would -- if I do that route, which I don't

know that I would, it would be the sheriff's department.
Q Okay. And have you looked into BLET?
A Yes.
Q Okay. What have you found out about that?
A There's a program over here at Sandhills, and I think it's like a nine-month program or something, all day.
Q Okay.
A So logistically again as a stay at home mother, that would be very challenging without support.
Q Okay. And when you say support, if you had someone who could financially support you?
A It would be very challenging in every aspect. It would be challenging financially. It would be challenging not -- it would be challenging logistically because I don't have a coparent who is in town often enough to help. I've had to shoulder the burden of caregiving.
Q So in that situation, you had someone who was here, say he was here, you know, most of the month --
A Uh-huh.
Q I mean, would you have any issue with him having the kids so that you could go get that training?
A Potentially.
Q What do you mean, potentially?

A Well, now the state of our relationship and marriage, things have changed. So in the past, when we were married and then living in the same household, it was a different story. It's not the same anymore.

Q So once you separated, he's not able to have that kind of care and control and time with the kids?

A He hasn't demonstrated that he is a capable coparent.

Q How's that?

A Well, for one, his schedule keeps him away the majority of the month. Prior to separation, he chose to be away for ninety percent of the month, and now he only has an issue with the custody now that he's restricted.

Q What do you mean, restricted?

A His time with them is now limited, I should say.

Q Would you have an issue if your time was restricted with the kids?

A Yes, but I am a capable mother.

Q And you don't think he's a capable father?

A I question if he is.

Q Why?

A He's mentally unwell.

Q You think he's mentally unwell. What else?

A His daily drug use.

Q If things he were taking were pursuant to

prescriptions, would you have any issue?
A Well, he's an addict, so he abuses prescriptions, and he has in the past. He said so yesterday in his deposition.
Q That was 2016, correct?
A I mean, his -- he still was stealing pills after that. He was snorting Adderall at work.
Q When do you think that happened?
A Probably up till 2020.
Q And during the time frame that happened, you stayed married to him, didn't you?
A Yes.
Q What other issues do you think he has as a parent that give you some concern?
A I think sometimes his judgement -- I think he can be reckless.
Q How so?
A An example I can think of off the top of my head is a year or two ago, he had our oldest daughter drive his Forerunner down a fifty-five-mile-per-hour road. That's pretty reckless.
Q When was that?
A Could have killed the children. I'm sorry?
Q When was that?
A About a year or two ago.

Q And were you present when that happened?
**A I was not, but my daughter told me about it.**
Q And did you --
**A And I confronted him about it.**
Q And what did he say about it?
**A He wrote it off. Well, he joked about it. "At least now they can -- I know they could drive me if something happened."**
Q Okay. Was that while you were living together?
**A Yes.**
Q And after that happened, did the kids continue to go with Mr. Ammel places?
**A Yes, but I said if he ever did that again, I would call the police.**
Q Okay. Did it ever happen again?
**A Not that I'm aware.**
Q The kids talk to you about their times with Mr. Ammel, don't they?
**A Do the kids speak to me about their time?**
Q Yeah.
**A I guess so, yeah.**
Q Okay. We'll come back to that. They got a whole litany of those.
But getting back to you and this BLET thing, so you need someone who can help with care of the kids

and some other help. Is there anything else that's stopping you from doing that training?

A Stopping me.

Q Yeah.

A I think it's a personal choice if I decide to do that.

Q Okay. Have you done any kind of efforts to find a job?

A To alleviate the financial strain, I just actually finished a two-year degree over here at Sandhills so I could use his GI bill in order to bring in some extra income to help us.

Q Okay.

A So it's unfair that he says that I have not helped financially. That allowed me to help financially while being able to take care of the kids, because that is my priority. I have always been the primary caregiver and I plan to continue to be the primary caregiver.

Q Okay. So that's a nice way of not answering. Let's go back to it. So what efforts have you taken to get a job?

A I have not applied for a job.

Q Do you have any intentions to apply for a job?

A I have intentions to probably get my master's so I could get a job to pay my bills.

Q And you would get a master's in what?
A **Potentially psychology. I haven't decided. I'm thinking about a few different things that I want to do.**
Q What few things are you thinking about doing?
A **Therapy. The sheriff's department's on the bottom of my list because of the risk and the environment. And I also very much enjoy art, but I haven't fleshed out that idea yet.**
Q Get a job in art?
A **Maybe.**
Q Have you looked into the realities of getting a degree and it turning into an actual job?
A **I mean, I just got an associate's in fine arts.**
Q Okay. So how many credits do you need to get a bachelor's degree?
A **I have no idea.**
Q Have you researched any online schools to get a degree?
A **I think I have looked at maybe an art history degree online.**
Q Where would you work with an art history degree?
A **That's the golden question.**
Q Is there a museum around here that you could work at?
A **Exactly. There's not.**

Q So do you think that's a wise investment?
**A Maybe if I teach.**
Q Where you going to teach?
**A Sandhills.**
Q Have you looked into that possibility of teaching there?
**A I have not looked into it because I do not have a master's.**
Q Okay. So until you procure this master's in one of these various degree areas --
**A Correct.**
Q Have you sought any kind of job that may just be entry level?
**A No, because that's not practical.**
Q How's it not practical?
**A Because I am the primary caregiver of my children.**
Q Well, they go to Moore County schools, right?
**A Correct.**
Q So during the school day, what's to keep you from working some hours somewhere?
**A Because I'm the primary caregiver and there are other things. I hate how moms get such a bad rap. Why do people not appreciate mothers?**
Q You don't feel appreciated as a mother?
**A Not by Matt.**

Q You said they.

A **Because -- because he --**

Q I don't think he identifies as they, so who's they?

A **Oh, he's part of the alphabet group now, I think.**

Q What's the alphabet group?

A **The LGBTQ plus, I don't know. I don't know what else they've tacked on since then, Matt.**

Q Why do you say that?

A **Why do I say what? 'Cause he's -- 'cause he's dating a bisexual woman, so I guess he's familiar with LGBTQ.**

Q Okay.

A **He has more knowledge than I do.**

Q Oh, okay. So he is part of that 'cause he's dating someone that's bisexual?

A **I'm sorry? I blanked out.**

Q I'll come back. So he is now part of that group or whatever because he's dating someone that you say is bisexual?

A **That's -- you would have to ask him that.**

Q I'm asking you that.

A **Oh, I don't know if he's part of that group or not.**

Q You said he was, now you don't know?

A **I don't know. You're right. I shouldn't have said that.**

Q Okay. You can start to see why when I asked you

earlier if you've got some anger about your dealings with Matt, do you think perhaps you still do?
A No.
Q No? Okay. So where do you think that answer came in from then?
A I don't know. Just came in.
Q Just came in. Just popped in your head?
A Correct.
Q Oh, okay. All right. So we've got that going on. So you said they give moms a bad rap.
A I'm just talking in general. I feel like some people -- actually his girlfriend in an article said that stay at home moms are leeches off their spouses.
Q Okay. What else?
A What else what?
Q Well, if he were to get hit by a bus today --
A Correct.
Q Wouldn't you be expected to go get a job? What would be your plan?
A Yeah, I'd have to figure it out. Haven't thought that far.
Q You'd have to figure it out?
A Correct.
Q That's correct? Is there a reason you can't figure it out now?

A I've been dealing with the divorce and taking care of the kids and that is why I have not figured it out now.
Q Okay. So how do other parents who take care of kids, how are they able to have a job?
A Well, they're probably spending a lot in child care expenses.
Q So you have a child, one is thirteen, twelve and nine, correct?
A Correct.
Q So what kind of child care expenses are you going to incur when they're in school?
A I don't know. If I have a nine to five, I'm going to have to figure out what they're going to do after they get released from school.
Q Aren't there after school programs?
A No, not at the middle school.
Q Okay. Have you looked into any kind of programs to see what's available?
A No, I haven't had to.
Q What if Matt was available to get the kids after school?
A I mean, if a judge decides he gets fifty-fifty custody, then if he's available, then that -- he would be able to do that on his time.

Q But to help you out, if you're working a job, he says, "Look, I'll go pick up the kids after school and keep them until, you know, you get off work" to coparent, would that be an issue?

**A And is Matt going to be working?**

Q I don't know. That's --

**A When I'm at work?**

Q I'm just asking if you're working, if he was available.

**A I hope he's not available. I hope he's working.**

Q So is your expectation he's working all the time?

**A Is his expectation that I'm working all the time and taking care of the kids?**

Q Much like Whitney asked him, I'm asking the questions. I just need a response from you. I'm not answering questions.

**A Okay. Go ahead and ask your question again.**

Q All right. I'll ask it again.

If he's available to care for the kids after school if you're working, any issue with that? Assuming he's off?

**A If it's on his custody time, that is fine.**

Q Okay. But if it's not his custody time, no way, no shape, should he have that interaction with the kids? You would rather they be somewhere else?

A I haven't thought about it.
Q Well, we're here now. Let's think about it.
A No, that's something that would require some thought. That's my answer.
Q That's your answer, so you need to ponder it more, huh?
A Yes.
Q Do you have an issue, if he's available, having more time with the kids?
A Do I have an issue if he has more time with the kids?
Q Yeah.
A I would prefer that the custody schedule remains the same.
Q So the answer to that question is yes, you don't want him to have more time with the children?
A Not currently.
Q Have you always felt that way since you've been separated?
A No.
Q And what is your reservation of Kyrsten interacting with the children?
A Well, she causes extreme distress emotionally for my daughters.
Q How so?
A They do not want to be around her.

Q And do they tell you this?
**A Yes.**
Q What do they say?
**A They say that if she's around, they will not be around.**
Q Okay. When's the last time they've told you that?
**A I don't recall.**
Q Okay. And when they told you that, did they explain why they are saying that?
**A Essentially that she's the reason their dad left.**
Q Okay. And did you talk to the children about Kyrsten when you separated?
**A No.**
Q Okay. Did you tell Mr. Ammel that you were going to talk to the kids about her if he didn't first?
**A No.**
Q Okay. So how did they find out about Kyrsten, that relationship?
**A He told the girls.**
Q So your -- your statement is that he was the first person to have that conversation with them?
**A Correct.**
Q Okay. What about your son?
**A What about him?**
Q Does he have any opinion about it?

A About what?
Q Him and Kyrsten being together.
A I don't know that he has an opinion.
Q Does he talk to you about anything related to his time with Mr. Ammel?
A Not really.
Q Not really?
A Bike-related stuff.
Q When the kids return to you after they've had time with Mr. Ammel, do you ask them about what happened while they were with their dad?
A No, they just tell me.
Q Just tell you? They just come in and start describing everything?
A Typically.
Q And they recently took some trips, I think Idaho and maybe to the beach?
A Uh-huh.
Q And that went fine?
A Besides the hiccup in Idaho or on the plane ride home from Idaho.
Q And you'll admit that your daughter had a band camp --
A Correct.
Q -- and she was really wanting to go to that, correct?
A Correct.

Q So do you think it's appropriate to figure out ways to perhaps accommodate that if it's important to the child?
**A Absolutely.**
Q To the best of your ability?
**A Correct.**
Q And you understand that weather delays for planes, you can't control?
**A Correct. I was actually in Denver at that time.**
Q You were?
**A Yes.**
Q Why were you in Denver?
**A Visiting family.**
Q Okay. And did you and Mr. Ammel have a conversation about the logistics to figure out?
**A No, I tried to call him and he ignored my calls.**
Q What do you mean, he ignored your calls?
**A He wouldn't answer the phone.**
Q Okay. Did you talk to the kids when you were there?
**A When I was where?**
Q In Denver.
**A Yes.**
Q Okay. What was that conversation?
**A Was my daughter panicking that Kyrsten was about to pick them up from the airport in I think Grand**

Junction, Colorado.
Q Okay.
A Which is a violation of the court order. She's not to be in their presence. So he was willing to actively violate it and so was Kyrsten.
Q That didn't happen, though, did it?
A No, but it was planned to the point of causing my daughter a panic attack. And the man sitting next to her was asking her if she was okay.
Q Would it surprise you that Mr. Ammel did not witness any panic attack that you described?
A Well, I mean, that would not surprise me. He's not very observant.
Q Is that yet another concern you have about Mr. Ammel as a parent, you don't think he's observant enough?
A He says that he struggles with his memory.
Q Okay. He does. You mean, so people who struggle with short term memory causes them not to be observant?
A I don't know. I don't struggle with that.
Q Does that mean they're not a good parent?
A I didn't say that.
Q Well, how would you describe Mr. Ammel as a parent?
A Not very engaged, especially with the girls.
Q Okay. Anything else?
A Absent.

Q Anything else?
A **I think that he is sometimes reckless with them.**
Q Okay. How so, outside of the driving? We talked about that.
A **There was another driving incident.**
Q When was that?
A **This summer. He put my son in -- on the floor of the passenger seat to drive him, and when my son expressed that he could be killed, he didn't care and he basically told him that if he got pulled over, a cop wouldn't see him down there.**
**That's dangerous. He could have killed my son rather than putting him in a seat with a seat belt.**
Q And is this something you observed?
A **My daughter told me about it. And she also sent me a photo of Matt on work calls while he's driving with the children in the car.**
Q Huh. So do the children typically send you pictures and video of Matt when they're with him?
A **My middle child does on her own free will.**
Q What does she send you?
A **She's sent me that photo of him Zoom calling while driving.**
Q What else?
A **That's all I can recall.**

Q Okay. So middle child sent one picture one time of him allegedly on a Zoom call. Okay. Any other pictures or videos they've sent of their time with dad to you?

**A Not that I'm aware.**

Q Okay. All right. So you said absent, maybe not observant. What else?

**A What are we describing again?**

Q Him as a parent.

**A Checked out.**

Q Checked out. Well, if he's wanting more time with the kids, do you think that supports him being checked out?

**A He only wants more time with the kids now that it has been limited. He didn't want it when -- before he moved out. He chose to be away from the kids to be with his girlfriend.**

Q But if he's saying he can be available for the kids half the time, and actually does it, doesn't that mean that he's all of a sudden not absent, that he's there?

**A But he's absent up until potentially maybe being available. That doesn't make sense.**

Q I agree, it doesn't make sense. If he's saying "I am ready, willing and able to be available to have these children as a parent for half the time" and does it,

wouldn't that alleviate the concern you have about him being absent?

A **No, because his pattern is to be absent, and he doesn't follow through. So we can't say if. If this, if that. I don't know. Can't predict the future.**

**I don't know what he might do. I don't know if he might one day not be absent. I mean, if he's choosing to move to Arizona, I think that speaks for itself.**

Q If he doesn't move to Arizona, he's here, wouldn't you like the help?

A **No, I've been fine on my own.**

Q So even though you complain that he's absent --

A **For the children's sake.**

Q For the children's sake.

A **I feel bad for them. I'm fine but I feel bad for the children.**

Q Are you fine?

A **I am fine.**

Q You said you were in therapy. Who's your therapist?

A **Correct. Chad Brown.**

Q Chad Brown. How long you been seeing Chad?

A **November or October of '24.**

Q Okay. Was that around separation?

A **Correct. We initially approached him for couples**

**therapy.**
Q So now he just does individual counseling?
A **Correct. He wouldn't take us on as a couple.**
Q Okay. And how often do you see Mr. Brown?
A **I was seeing him weekly for some months and then I went to I think every other week. And now, just recently, I switched to once a month.**
Q That's because now you're fine, right?
A **I'm doing much better thanks to his help.**
Q Okay. Well, good. So have you ever been diagnosed with any kind of mental illnesses?
A **I have not.**
Q You ever been screened for one? Had any kind of evaluation, psychological exams, anything like that?
A **No.**
Q Do you think you have any kind of mental illness?
A **I do not.**
Q Do you have any physical impairments, physical issues that would --
A **No.**
Q -- hinder you day to day?
A **Uh-uh.**
Q Any ailments that would hinder your ability to work?
A **I do not.**
Q Okay. During the course of your marriage with Mr.

Ammel, do you remember approximately how much you guys were making during the course of your marriage?
A **The whole course of our marriage? I have no idea.**
Q Yeah, maybe --
A **I mean --**
Q Let's say --
A **Whatever an enlisted salary was, I'm sure.**
Q Do you remember what his last rank was before he retired?
A **E-7.**
Q E-7. He had about seventeen and a half years?
A **Correct.**
Q Okay. And so you have that as his pay, and then he gets out, and what was the job or jobs he was doing leading up to your separation?
A **He briefly had a business with his friend for tree removal. And then --**
Q Do you remember the name of that business?
A **Tree Fellers. I named it.**
Q Tree Fellas?
A **Tree Fellers.**
Q Fellers.
A **Very clever, isn't it? I named it.**
Q Yeah.
A **I think I should get paid for that.**

**He worked for Ridgeline, which is a training company up in New Hampshire. He worked for Staccato till he got fired. And then he worked for CACI and he went over to Tunisia for like two weeks and he quit on his own free will.**

Q You ever been to Tunisia?

**A Me?**

Q Yeah.

**A No.**

Q Would you want to go to Tunisia?

**A I think it would be very interesting to see.**

Q Why is that?

**A I'm a fan of art history, so I think it would be very interesting to see the sights there.**

Q And what was his job when he was in Tunisia?

**A Training their forces.**

Q Okay. Maybe a different side of Tunisia than art history?

**A I'm sorry?**

Q Perhaps a different experience what he was doing versus seeing an art history component of Tunisia, correct?

**A I don't understand the question.**

Q I mean, is training soldiers the same as visiting historical sites?

A **No.**
Q Yeah. And during the course of your marriage when he was a E-7 with seventeen and a half years, building up to that, you guys were able to live off that salary, weren't you?
A **Not well.**
Q Not well?
A **No.**
Q But did you live off of it?
A **Barely.**
Q Barely. But you did?
A **That was before inflation.**
Q Before inflation. Well, you got cost of living adjustments every year, right?
A **Barely.**
Q Barely. Well, okay. Barely making it. Okay. Well, did you guys run a bunch of debt loads and credit cards and all that during the course of your marriage?
A **Matt did at the end.**
Q What did he have at the end?
A **In debt?**
Q Uh-huh.
A **He consistently kept over twelve thousand dollars in debt on his credit card.**
Q Okay. How do you know that?

A **Because it was a joint account.**
Q Okay. And -- huh. You don't recall what he was making as an E-7 with seventeen years? Do you remember?
A **Could have been like seven and a half, something like that, a month.**
Q Seventy-five hundred bucks?
A **A month maybe.**
Q Okay.
A **I don't recall.**
Q And did you manage the household budget?
A **I handled everything in the household. He basically made a paycheck.**
Q Okay. So he made a paycheck and you were the one that was --
A **Well --**
Q -- scrapping by?
A **He put us in a bind by racking up his credit card.**
Q Okay. That you say was twelve thousand dollars?
A **Consistently.**
Q Consistently. Okay. And did you ever have a conversation with him about "Hey, let's don't have this credit card"?
A **All the time.**
Q Okay. How did that conversation go?

A He just continued to rack -- I don't know how the conversation went, but his pattern was to continually hold a balance on his credit card, and it was financially distressful.

Q Okay. So seventy-five hundred dollars is what you think he was making, you know, at the end, if you will, of his military career. Do you recall what he was making in these other odd jobs?

A I think with Ridgeline he was making like five hundred a day or something.

Q Okay.

A The pay wasn't -- they didn't pay in a timely manner, which put -- was distressing because at that time he was -- I think when he retired from the military, his CRSC wasn't coming through.

Q Uh-huh.

A And so we were basically living off of his disability.

Q Yeah.

A And I don't know, that was like twenty-five hundred dollars a month.

Q Okay.

A And on top of that, he's racking up the credit card, so we were financially strapped.

And he also brought a loaded gun through RDU and that cost us five thousand dollars and pretty much

**wiped our savings out.**
Q Okay.
A **And that's when we didn't have any money really. And --**
Q As he transitioned making seventy-five hundred dollars a month as an E-7 to now trying to figure out, you know, transitioning to a civilian world and trying to secure what disabilities he could get, correct?
A **What's the question?**
Q I mean, he was transitioning from the military world to civilian world, correct?
A **Correct.**
Q And do you think that was an easy transition?
A **What do you mean by easy?**
Q Just that. I mean, do you think it was easy for him to transition from being in the service to also being into the civilian world that most people know?
A **I never said I thought it was easy.**
Q Okay. Do you think it was difficult for him?
A **Yes.**
Q And how did you support him in that difficulty?
A **In what ways?**
Q In all the ways you can think of.
A **I would job search for him.**
Q Okay.

A He wanted me to write his resume for him, which I said "I can't write your resume. I don't know your resume. But I will gladly edit it for you," which I did.
Q Uh-huh.
A I went to school for two years to bring in -- VH is what you get with the GI Bill.
Q Uh-huh.
A So I did that to help alleviate.
I continued to run the household so he could -- for his jobs he was traveling, so I was home with the kids, taking care of the house and taking care of the kids so that he had the flexibility and ability to leave and go work to bring in income.
Q Okay. Anything else?
A Not that I can think of.
Q Okay. So just so I'm clear, as far as you looking for a job, you haven't seriously explored that option any?
A I have researched but I have not seriously.
Q Do you have a time frame in which you'll approach it with a serious manner?
A Maybe when the stress of the divorce is gone.
Q What stress is your divorce?
A Is that a rhetorical question?
Q No, there's a question mark at the end. What's the stress that's caused you from getting a job?

A Oh, getting a job or the divorce? I think I misheard you.

Q Well, you said that you're not taking it serious about getting a job because of the stress of the divorce, so --

A My job is to take care of the kids.

Q Okay. So taking care of the kids means that you could not be serious about getting a job?

A That's not what I said.

Q Then what do you think you were saying?

A I think I said I would think about getting a job when the divorce is behind me and I can focus on it.

Q Okay. So do people who are getting a divorce have jobs?

A I don't know. I'm not other people.

Q Well, I mean, let's see. So going through divorce and you're taking care of kids, so that's going to prevent you from securing some kind of actual employment? Is that your position?

A Taking care of the kids is going to prevent me from getting a job, is that what you asked?

Q Yeah.

A Taking care of the kids is my job.

Q Okay. That's the only job you think you should have is taking care of the kids?

A I didn't say that.
Q Okay. Then what are you saying?
A I'm saying that when the divorce is behind me and I don't have to focus on the stress of getting through that, while also caregiving for the children most of the time, I will -- I am considering going back to school to get my master's so I can pursue a career where I can be financially independent when --
Q I'm not talking about the long-term career. I'm just talking basic job, twelve fifty an hour.
A It doesn't -- it doesn't make -- why would I do that? It doesn't make sense, 'cause I'm already --
Q A lot of people do it.
A That would add more stress to my daily life to have to figure out logistics. I'm assuming -- I can't ask you a question, but I'm assuming you don't take care of children full-time.
Q What is your daily routine that you have that just hinders you so much that you can't go get a job like the rest of the world?
A I take care of the kids and the household every day.
Q So what's your daily routine look like that's so stressful?
A I don't have a set daily routine because it's not like a nine to five job. It could be anything.

Q Okay. Let's say the kids are in school. What are you doing while they're in school?
A **Grocery shopping, cleaning, paying bills, yard work, doing dishes, laundry. I don't know if I'm repeating myself now. Whatever comes with taking care of a household, which is a full-time job.**
Q Okay.
A **And children. Children are a full-time responsibility.**
Q So --
A **I take the kids to school. I pick them up from school. I take them to their activities, which is challenging to get kids from multiple locations, and I take my child to therapy.**
**I go to therapy. I go to the gym because I have to take care of myself.**
Q So have you researched how other parents who take care of kids and maybe are single parents who are not living with someone else, how they do it?
A **No, because I don't care.**
Q You don't care?
A **I don't care how other people do it. I'm not other people.**
Q Okay. So you're not willing to explore a pathway to being able to take care of the kids and also have some

level of employment?
A I wonder if that expectation would be put on Matt that he would have to take care of the kids and maintain full-time employment.
Q What if it was?
A It won't be, because I am the primary caregiver.
Q That's not my question.
A I don't remember your question.
Q My question is if that expectation was put on Matt, what would be wrong with that? If he had the kids --
A The children would not prefer that. And he is not capable of being a full-time parent.
Q Let's assume that you felt differently and he was in your mind --
A I would --
Q What would be the issue of him caring for the kids and also having a job?
A The kids would not prefer that.
Q Same answer. Okay. We'll save that one for a later day.
So are you saying right now that given the fact that you are caring for your kids, you will not be able to secure a job?
A I didn't say that. That's not what I said.
Q Okay. So just so I'm clear, taking care of the kids

and the stress of the divorce is keeping you from getting a job?
**A I also take care of the household.**
Q Okay. You do household chores. Okay. The kids don't help you with that?
**A They do.**
Q Okay. And those three things. What else is keeping you from getting some kind of employment?
**A I've had employment in the past.**
Q What have you had in the past?
**A I've edited books.**
Q Can you do that remote?
**A If I could find one, sure.**
Q Have you looked for one?
**A Not recently.**
Q Okay. What other employment have you had?
**A Well, other than that, nothing.**
Q Okay. So let's see. Chores, kids, divorce stress is why you can't go out and find a job. Anything else?
**A I mean, I think that kids are a pretty big priority and obligation.**
Q So that's it?
**A That's all I can think of right now.**
Q Okay. If the court were to require you to have an expectation -- they expected you -- let's say Judge

Bibey, we mentioned Judge Bibey. He had some expectation that you're going to have to go out and get a job, or as some say around here, strike a lick, what would you think about that?

A **If he required that of me, I would do that.**

Q Could you do that if he required it?

A **Could I?**

Q Yeah.

A **I could try to figure it out.**

Q Okay. And have you tried to figure it out thus far?

A **Figure what out?**

Q How to make it work to get a job.

A **I have not done that yet.**

Q Okay. Do you think you have an obligation to also contribute to yourself and to the children financially?

A **Well, during our marriage, that wasn't the status quo.**

Q Status quo is you guys lived off seventy-five hundred dollars a month?

A **That's not true.**

Q How so?

A **Because he brought in other income.**

Q When he was E-7?

A **Yes.**

Q What other income was he bringing in then?

A His tree work. He was -- while he was transitioning out of the Army, he was working for other companies that we just talked about.
Q But before his transition period, was he doing that or was this as he was getting out into the civilian world?
A He was still in the Army at this time.
Q Okay. Was that something he did right at the time of retirement?
A He was not retired yet.
Q Yeah, I understand that, but was it like in 2022 he was starting this?
A 2020.
Q 2020. Okay. Was that during COVID?
A Correct.
Q Okay. But during that period of time, did he have a series of deployments that would take him away to various places?
A Deployments?
Q Deployments or TDY's.
A No. He was at -- he finished his career at SFARTAETC, which was like a three-year gig.
Q So he was essentially nine to five, is that what you're saying, his last few years?
A No, it was not that kind of schedule.

Q Then what was his schedule?
**A While he was at SFARTAETC?**
Q Yeah.
**A It was like he would come home at two or three in the morning.**
Q Okay.
**A So again, I was taking care of the children while he was working extensive hours.**
Q On base?
**A Correct.**
Q Yeah. Exactly. All right. Okay. Have you taken any trips since you've been separated?
**A Yeah.**
Q Where have you gone?
**A I went to Florida with my kids and my mom and sister.**
Q When was that?
**A July, end of July.**
Q Of this year?
**A Correct.**
Q Where did you stay?
**A I don't know. Some hotel outside of Orlando or in Orlando.**
Q Did you book it or somebody else book it?
**A No, my parents paid for the trip.**
Q Okay. Was it like a week long?

A I think five days.
Q Five days. Okay. Any other trips you've taken?
A I went to Denver.
Q What was that for?
A To see my family.
Q How long was that?
A I went two different times for about two to three days each time.
Q Okay. Do you recall when that was?
A Once mid June, once late June, beginning of July.
Q Of this year, correct?
A Correct.
Q Okay. And that was just personal, nothing --
A Correct.
Q Okay. Did the kids go with you on those trips?
A They did not. They were with Matt both those weekends.
Q And do you recall Matt asking you for some more time in the summer?
A Yes, he did.
Q And you weren't agreeable to that, correct?
A Correct.
Q Is there any particular reason outside of that's what the order said?
A Yes, for the same reasons that the order was instated.

Q Do you think he's a monster?
**A I never said he was a monster.**
Q Do you think he was going to abscond with the kids?
**A Abscond? Is that what you said?**
Q Uh-huh.
**A A-b-s --**
Q Yes.
**A -- c-o-n-d?**
Q Take the kids and go overseas. How about that?
**A If I thought he would go --**
Q Yeah.
**A -- take the kids? If he -- I don't know what Matt's capable of.**
Q Well, did you have a concern he was going to kidnap the kids or --
**A I mean --**
Q -- take them away?
**A I had some concerns when he was talking about suicide.**
Q How does suicide equate to taking the kids overseas?
**A Overseas?**
Q Overseas, yeah, like --
**A I never said that he would take them overseas.**
Q Okay. You never stated that you thought he was going to kidnap the kids or otherwise take them away from you?

A **Not that I recall.**
Q Okay. You took a trip to California with the kids, didn't you?
A **Me?**
Q Yeah.
A **With Matt? To California?**
Q Yeah. Have you taken a long trip with the kids since you've been separated?
A **To California?**
Q Yeah.
A **No.**
Q Did you go to any other state, Kansas, for instance?
A **I went to Kansas.**
Q Okay. How long were you in Kansas?
A **With the kids?**
Q Uh-huh.
A **I think like two weeks maybe.**
Q Okay. And did you leave the kids with your parents and then come back?
A **Briefly.**
Q How long was that? What's briefly?
A **Two days.**
Q Two days. You weren't gone nine days?
A **No.**
Q Okay. Well, where did you go when you left the kids?

**A Oklahoma.**

Q What was in Oklahoma?

**A A friend.**

Q Who's the friend?

**A A friend from my past.**

Q What's the name of the friend?

**A Do I have to say? His name is -- I would really prefer not to.**

MS. FOUSHEE: Why don't we take a little break? She'll come back and --

MR. TANNER: Great.

(EIGHTEEN-MINUTE RECESS)

**A Way earlier in the conversation, I did speak to his brother Jordan again.**

Q Okay. When was that?

**A Last night.**

Q Okay.

**A Through text message.**

Q Through text --

**A So I forgot about that.**

Q Okay. And did you have a chance to figure out who you were texting during yesterday's deposition?

**A Oh, no, I did not look.**

Q Okay. Do you recall?

**A I do not recall.**

Q Okay. So tell me, my question was, this trip to Oklahoma --

**A Uh-huh.**

Q Tell me about that.

**A I went to visit a friend.**

Q Who is the friend?

**A Nathan Grant.**

Q Nathan Grant. Okay. Tell me about Nathan Grant.

**A He's just a friend.**

Q From middle school?

**A Middle school.**

Q Okay. And how did you and Nathan reconnect?

**A Instagram and then text message.**

Q Okay. So when did you make the plan to go see Nathan in Oklahoma?

**A June.**

Q Was this before you went out there or during?

**A Before I went out where?**

Q To Kansas.

**A I think I was in Kansas when we made the plan.**

Q Okay. And it was for two days?

**A Yeah.**

Q And did you stay with him?

**A I did stay with him.**

Q Okay. And is he married?

A He's not.
Q He's not. Okay. And when you left, did the kids know that you were going to see Nathan?
A They did not know who I was going to see.
Q What did you tell them?
A That I was going to visit a friend.
Q Did they inquire who the friend was?
A They did.
Q They did?
A Uh-huh.
Q What did you tell them?
A I said an old friend from junior high school.
Q Okay. And was this visit with Nathan romantic in nature?
A I wouldn't call it romantic.
Q What would you call it?
A We just had fun.
Q What did y'all do that was fun?
A Went to a concert.
Q What concert?
A Called Muscadine Bloodline.
Q Okay. What else?
A The second day he took me to see my childhood home. My dad was stationed at Fort Sill, Oklahoma.
Q Uh-huh.

A **And so I wanted to go see it, so he took me down there to see that.**
Q Okay. Did y'all stay in separate rooms?
A **We did not.**
Q You did not? Okay. All right. Hold on. All right. So you did that and then you came back after the two-day stint, the concert and the other fun?
A **Uh-huh.**
Q And did the kids ask you about your time away?
A **I don't recall.**
Q This was during the block of time that you had summer vacation with the kids, right?
A **It was during my custody time.**
Q During your custody time. During the summer, right?
A **Correct.**
Q Okay. Do you think you could have maybe had that meeting with Mr. Grant when you didn't have the kids?
A **No.**
Q No? And have you talked to Mr. Grant since then?
A **Yeah.**
Q How often?
A **Not often.**
Q Not often?
A **Uh-uh.**
Q Wasn't that fun?

A **I'm sorry?**
Q I said it wasn't that fun?
A **It was actually a lot of fun.**
Q Okay. Do you plan on going back?
A **If the opportunity arises, I guess maybe one day. But there are no plans.**
Q Okay. Has he got any plans to come see you?
A **There are no plans for him to come see me.**
Q Okay. And what does Mr. Grant do for a living?
A **He's a lineman.**
Q Lineman. Okay. And just so we're clear for the record, lineman is an electrical pole worker?
A **Correct.**
Q Does like -- okay. Do you know what he makes?
A **I do not.**
Q Don't know. Okay. Did you guys date in middle school or just --
A **We did not.**
Q Did not. Okay. And did he reach out to you or did you reach out to him?
A **I reached out to him.**
Q And what was the purpose of reaching out to him?
A **To say hi. Hadn't talked to him in a long time.**
Q Okay. Have you reached out to anybody else like that?
A **No.**

Q Just him?
**A Just him.**
Q Okay. And was that because you had some interest in maybe forming some kind of relationship with him?
**A No.**
Q So just random, I think I'm going to connect with this guy?
**A Yeah. He was my best friend in middle school or junior high, whatever you want to call it.**
Q Okay.
**A And I just hadn't talked to him in a long time.**
Q Okay. All right. Would you like it to become more serious?
**A No.**
Q No? Does he know that?
**A We didn't discuss it.**
Q Didn't discuss it. Okay. So like to perhaps see him in the future but nothing serious is what you're saying?
**A Yeah, he's a friend. Very good friend.**
Q Okay. And then you got back, the kids didn't inquire, you didn't say anything to them about Nathan Grant specifically?
**A Not that I recall.**
Q Okay. Did you guys post anything on Facebook or

social media, Instagram, being out together?
A I posted a picture of us at the concert.
Q And do your kids have social media?
A They do not.
Q Do not. Do they have access to Instagram?
A No.
Q You sure?
A I'm sure.
Q Do you screen their phones for it?
A I don't, but I trust my kids.
Q Okay.
A Unless you know something I don't know. And I will screen their phone tonight and make sure they don't, because they will not have social media.
Q Okay. All right.
A If they have social media and he's aware, then that would be reflected on him as well.
Q I'm not saying anything about him. I'm just saying whether or not they saw your outing.
A My outing?
Q Your outing with this friend.
A Oh. They don't have social media.
Q All right. Trust but verify. All right. What health care providers do you currently see?
A I have a PCN in Carthage.

Q Who's that?

A **Leslie Purvis I think is her last name.**

Q And she's at the place over there I think beside the Chinese restaurant, right?

A **Correct.**

Q Okay. So that's your primary care physician?

A **Uh-huh.**

Q And do you have any other specialists you see?

A **I see Dr. Richberg for gynecology.**

Q Okay. Just routine care for that?

A **Correct.**

Q Okay. Anybody else?

A **I recently had an abnormal lab where I've had to see a gastro doctor, but that's a yearly checkup thing.**

Q Okay. All right. Absent or with the exception of the therapist, Chad Brown, any other mental health care professionals that you see, psychiatrist or anybody like that?

A **No.**

Q Okay. Are you on any kind of prescriptions?

A **Metformin.**

Q Okay. Is that for diabetes or is that for --

A **I'm not diabetic, no.**

Q Okay. Any other medication?

A **No other medications.**

Q Okay. How long you been on Metformin?
**A I think 2020. I think 2020 is when I went on it. I can't remember.**
Q Okay. And is that for a particular diagnosis or --
**A My gynecologist prescribed it to me.**
Q Okay. Did they explain to you why?
**A Uh-huh.**
Q What's the Metformin for?
**A It helps with hormone regulation.**
Q Okay. And how old are you?
**A I'm thirty-eight.**
Q So is there an issue with your hormones, either biologically or because of your age, to put you on the Metformin, that you're aware of?
**A I've had symptoms that require it.**
Q What symptoms have you had?
**A PCOS symptoms.**
Q Explain the acronym.
**A Polycystic ovarian syndrome.**
Q Okay.
**A It's a broad term.**
Q Okay. All right. Absent the Metformin, any other prescriptions?
**A Uh-uh.**
Q Okay. All right. Have you ever been on a

prescription during the course of the marriage, and not an antibiotic but like something related to an ongoing health concern?

A **No.**

Q No. Okay. Tell me one good thing you would say about Mr. Ammel.

A **He's a good craftsman.**

Q He's a good craftsman. Okay.

A **That's a compliment.**

Q Okay.

A **It's artistic and wonderful.**

Q Okay. Anything else?

A **It's hard to say after an abusive marriage.**

Q Well, you heard him talk about you assaulting him. Would you agree that happened?

A **I would agree that it's a reactive abuse situation.**

Q A reactive abuse situation.

A **Uh-huh.**

Q Explain that for me.

A **Reactive abuse situations happen in domestic violence situations where the victim has been abused for so long that they act out of character in isolated events.**

Q Sound like a good cover. So what domestic violence did you undergo during the course of your marriage?

A Extreme verbal and emotional abuse as well as he would often break furniture, punch walls, rage, scream. Those are the big ones I can think of right now.
Q And you heard him talk about you bloodied his nose. Remember that?
A I did not bloody his nose.
Q You didn't hit him with a phone?
A I did not hit him with a phone.
Q Did you hit him with something?
A I did not hit him with something.
Q Have you ever hit him with your fist?
A I have not.
Q Have you ever struck him?
A Yes.
Q How?
A When he locked me out of the house -- let me back up. That night he was in an explosive rage in front of the children and punching doors. I asked him to leave because he was violent and I was worried.
So he left temporarily and he came back. He went into the garage to gather some things. I think he was trying to camp or something somewhere. I'm not sure.
Q Uh-huh.
A And as we were in the garage, he was charging toward me like he was going to strike me.

Q Uh-huh.
A **And I was worried. I was legitimately worried that night that he was going to hit me. He was in such a rage.**
**And he bypassed me, went through the garage door, and he locked me -- he locked the garage door so I couldn't enter the house. And the children were upstairs and I was fearful based on the state he was in.**
**And so I banged on the door. And he unlocked the door. And I followed him into the kitchen. And he crouched down and I just kind of was like "What the fuck is wrong with you?"**
Q What's this? You're doing hand gestures, so were you like tapping him on the back of the head?
A **No, I didn't touch his head.**
Q So what did you touch?
A **He was like this, so I just -- I made contact with his arms, I think, and maybe his back.**
Q And when you say you made contact, what was that contact?
A **My hand made contact.**
Q Okay. And I know we're not doing a video recording of this, but when you say it was contact, was it an aggressive contact or was it a slight tap? What was

it?
A I wouldn't call it aggressive.
Q What would you call it? Were you angry?
A Yeah, I was angry. He locked me out of the house.
Q But then he let you back in, according to your story. And the first thing you do when he's curled up is put your hands on him?
A I don't think you understand domestic abuse situations.
Q I don't think you understood the question. He curls up and he lets you back in the house and the first thing you do is you put your hands on him. Yes or no? I know people don't like to answer questions, but a simple yes or no.
A Yes.
Q You think that was appropriate?
A I do not.
Q Okay. Was that the only time that you had put your hands on him in that manner?
A Correct.
Q So there were no other times in which you were physical with him in that way?
A No. It was an isolated incident.
Q When did that happen?
A May of 2024.

Q And this is right before approaching the eventual separation?
**A Six months before.**
Q Okay. And you say November 1st. Was that when someone vacated the residence?
**A Matt vacated the residence.**
Q And was he living there prior to then?
**A Technically.**
Q What do you mean, technically?
**A He was not home often.**
Q Okay. Was he home ever between May '24 and November of '24?
**A Yes. He was home sometimes.**
Q Sometimes. Okay. And at that point in time, were you done with the marriage?
**A No.**
Q During this May incident?
**A No.**
Q No. So you were -- despite that you were still wanting to stick it out?
**A I was trying to work on my marriage.**
Q Okay. And just so I'm clear, neither one of you ever filed any domestic violence actions against the other, did you?
**A We did not.**

Q Did you ever seek while he was in the service any kind of military protective order?
**A I did not.**
Q Okay. How would you say you foster the relationship between Mr. Ammel and the children?
**A I make sure that they see him when it's his custody time.**
Q Okay. So you followed that. That's good. What else?
**A I encourage my daughters to have a positive relationship with him.**
Q Do you ever talk negative about Mr. Ammel in front of the kids?
**A I do not.**
Q Have you ever said anything bad about Mr. Ammel, you know, while talking to others and the kids were around?
**A Not that I'm aware.**
Q Okay. What do you -- are there any negative things about your parenting?
**A I'm sure there -- we all have our flaws.**
Q And what would you think your flaws would be as a parent?
**A I don't really know. I think I'm just a normal mom.**
Q So you don't know?
**A I don't know.**

Q Okay. Is there anything you do as a parent you wish you could do better?
**A Coach them through stressful times.**
Q Okay. Have you ever done any kind of illegal substances?
**A Yes.**
Q What was that?
**A I have done marijuana, MDMA, psilocybin and DMT.**
Q Okay. And those are some of the things that your attorney was asking Mr. Ammel about, correct?
**A Correct.**
Q Okay. Does your father drink alcohol?
**A He does.**
Q How many drinks does he drink that you're aware of?
**A I don't know. I don't track it.**
Q Okay. Have you known him historically to drink -- bless you -- alcohol?
**A Yes.**
Q Okay. And since he's been staying with you this past week, has he consumed alcohol?
**A Yes.**
Q What's he drink?
**A Like whiskey and soda.**
Q Bless you. Whiskey with soda?
**A Yeah.**

Q Like Crown Royal or bourbon or what?

**A I don't know what he drinks. I just know it's brown.**

Q Okay. And how many drinks do you think he's had while you've --

**A I have no idea.**

Q Okay. Has he drank every day?

**A I don't know.**

Q Don't know. Okay. And you -- again, I think just to clarify, you would agree that there's been periods in his time where he has been -- he's had an alcohol issue, your father?

**A No.**

Q You don't think so?

**A No.**

Q And what's an alcohol issue look like to you?

**A Intoxicated.**

Q Okay. Have you ever seen him intoxicated?

**A No.**

Q No. Have you ever known him to be intoxicated, your father?

**A No.**

Q Has he ever told you he's been intoxicated?

**A No.**

Q Okay. When's the last time you've seen your father smoke marijuana?

A **I've never seen my father smoke marijuana.**
Q Okay. But you know he does smoke marijuana?
A **I am aware that he does.**
Q Okay.
A **I don't know --**
Q Did he tell you that?
A **Yes.**
Q Okay. When did he tell you that?
A **A few summers ago maybe.**
Q Okay. And you have left your kids alone with him --
A **Not alone.**
Q Who was with them?
A **My sister.**
Q Your sister.
A **Or my mom.**
Q Okay. And have there been times where he has been around the kids and you were not around?
A **I'm not aware.**
Q Well, was he visiting the kids in Kansas when you went to Oklahoma?
A **He was spending quality time with them, yes.**
Q While you were not around?
A **Because he was spending quality time with his grandchildren, just as the kids were spending quality time with his parents at their house in the same time**

**period.**

Q I'm not asking about quality time. You went to Oklahoma. The kids are there spending time with your father and --

A **Quality time.**

Q But you're not there, right?

A **Correct.**

Q Correct. Save that one. Were your parents or your family members in Kansas talking about Mr. Ammel in front of the kids?

A **I don't think so.**

Q You never heard any of that?

A **I did not.**

Q Okay. Is there anybody else in your family that has a alcohol or substance abuse issue?

A **No.**

Q Is there any of your family members you know other than your father that smokes marijuana?

A **No.**

Q Uses any other drugs?

A **No.**

Q Okay. Do you recall the incident that was described yesterday about your parents using I think it was cocaine in Lake Tahoe? You remember that?

A **Yeah. I don't know what he's talking about.**

Q You've never heard that?
**A Never heard that.**
Q Okay. Have you ever removed Mr. Ammel as a parent on any kind of forms?
**A Removed him?**
Q Yeah.
**A No.**
Q So on the school forms, for instance, is he listed as a parent?
**A Yeah.**
Q And you've never done anything to prevent him from interacting with the school or being listed?
**A Correct.**
Q What about any medical forms?
**A He should be on there.**
Q Okay. As far as school portals and the like, have you ever done anything to keep Mr. Ammel from having information sent out by the schools?
**A I have not.**
Q And what apps do the kids use for school as far as teacher communication?
**A Dojo. I think that's primarily it.**
Q Okay. Have you ever listed any other third party on the school forms as far as care providers or people who can authorize pick-up?

A No, just emergency contact.
Q Who's your emergency contact?
A My neighbor and my friend.
Q Do you think your children have any concerns about alcohol or drug use for Mr. Ammel?
A They do.
Q Why?
A The most recent example they gave, my daughters suspected that maybe he was under the influence when he picked them up from school in I think May.
Q Uh-huh. Is this the middle daughter? Middle child or --
A The oldest actually brought it to my attention.
Q Okay. And if they bring these things to your attention, do you reach out to Matt and say "Matt, listen, the kids are telling me X, Y and Z concern," and have a conversation?
A That wouldn't be productive.
Q So the answer is you don't?
A I've tried in the past. Not now because it's never been effective.
Q So you think children express a concern about what they think they're observing, and instead of trying to address it with the other parent or have a conversation, you think the better approach is just to

put it to the side?

A **Didn't put it to the side.**

Q Is that the catalyst for your motion you filed?

A **I'm sorry?**

Q Your emergency ex parte custody motion?

A **This wasn't the same. This was not the same time period.**

Q Okay. So what did you do to address what the children say they observed about Mr. Ammel? What did you do?

A **I told them if they ever think that he or anybody is under the influence, that they are not to get in the vehicle and ride with them.**

Q Okay. What else did you do?

A **I think I made Whitney aware probably in an email.**

Q Wouldn't you agree that you and Mr. Ammel probably should have some ability to communicate and have a conversation?

A **I would --**

Q Okay.

A **-- like that to happen.**

Q What steps do you think you could take to make that happen?

A **I do try to communicate with him. He ignores my phone calls and text messages.**

Q Okay. Have you guys thought about using any kind of

other applications like Family Wizard to --
A We haven't spoken about that, but I have thought about that.
Q Okay. If he were to agree to that, would you have any opposition?
A I would not.
Q Okay. How would you describe Matt's relationship with his son, the son you guys have? How would you describe that?
A I think my son likes Matt and he enjoys doing things with him. He's also young and doesn't understand what's happening.
He doesn't understand his father's manipulation. He doesn't understand -- he just doesn't understand what's going on.
Q He doesn't understand. Is that because of what reason?
A Because I don't want to have the conversation with him about why -- I don't want to repeat the words about the suicide stuff that Matt said to my son about why Matt -- the emergency order was issued.
Q Uh-huh.
A I think he's too young for -- it's already traumatizing enough that his dad told him that he tried to kill himself.

Q Well, has your son brought it up to you on a repeated basis?
A **No. Not on a repeated basis.**
Q And do you think that Matt manipulates the children?
A **I think that he has a transactional relationship with the children.**
Q A transactional relationship. What do you mean by that?
A **Let me buy you a thousand-dollar bike and maybe you'll come hang out with me. Let me buy you a electric guitar and amp and maybe you'll come hang out with me. Let me buy you a trampoline and maybe you'll come hang out with me. But I won't pay your mom any support to help take care of you.**
Q So you think that's a form of manipulation that --
A **Yes.**
Q To buy kids things?
A **Yes.**
Q Any other reason you think he's manipulating the kids?
A **When he tells the kids that I have an evil lawyer, that I -- he tells the kids that I need to go get a job.**
**He's talking -- he's trying to paint me in a bad way and it's affecting my relationship with my son. So in that way I do feel that it's manipulative.**

Q Okay. You learned these things because your son's telling you this, or is it the daughters telling you this?

**A I already forgot what I said.**

Q Horrible lawyer. No offense. And that the --

**A Oh, yes, my daughter, I think, told me.**

Q Yeah. So your son's not telling you this, the daughters are coming back and reporting this is what dad's supposedly saying to them?

**A I trust my kids.**

Q And if he's saying these things, again have you reached out to Matt to go, "Dude" --

**A Yes.**

Q "Don't say these things"?

**A Yeah.**

Q How did you do that?

**A Like "I suggest you stop saying X, Y and Z in front of the children."**

Q How did you communicate that?

**A Text message.**

Q Okay. Was there a response back?

**A No.**

Q When did you send that text?

**A I don't remember.**

Q Do you still have it?

A Probably. I'm sure I do.
Q You think you guys would benefit from a parenting coordinator?
A I do not.
Q You don't think so?
A No.
Q Why?
A Because we don't have the same objectives.
Q Would you say that your current custody situation is high conflict?
A No.
Q Okay. Why is that?
A The custody order is black and white. It's pretty easy to follow. There's no conflict in that.
Q Okay. But you're good, you got no issues with that?
A No issues?
Q Yeah.
A I don't know what that means.
Q Means what it means.
A I think he's mentally unwell.
Q Okay. Do you distrust him?
A Yes.
Q Okay. Do you think between one or both of you, there's some potential anger issues?
A I mean, I'm not an angry person. I have -- it's --

well, anger is a natural emotion just like all other emotions, so --
Q So is that a natural emotion that --
A I think you can have a flow of emotions about things.
Q So is anger a natural emotion that sometimes you have towards Matt?
A Yeah.
Q Okay.
A Especially when my daughters come home crying.
Q Didn't -- you said I think in one of your discovery responses, they came home crying 'cause he wouldn't buy them clothing?
A Correct.
Q And how did you address that situation when they came home complaining about he wouldn't buy clothing?
A My mom was staying at my house and they -- she took them out to -- I don't know if she got them clothing or what, but it was something simple.
My daughter needed clothes for band camp and when she tried to address it with Matt, he made her feel bad about it, and so it put Clara into tears, and so she and her sister decided on their own to leave the house and go to my house for a breather.
Q Okay. And did you have a conversation with Matt about that?

A I did not, I don't think.
Q Okay. Are the kids in therapy?
A My son is.
Q Who's he in therapy with?
A Her name is Cindy Garrett.
Q She local?
A Local down 211, Raeford, like border.
Q Okay. Like on the Moore County, Hoke County line?
A Uh-huh.
Q How's that going?
A It's early stages. Yeah.
Q And is that a therapist that you and Mr. Ammel talked about getting him in?
A I took the initiative.
Q Did you have any conversation with Matt beforehand, say "Hey, we need to do some therapy, I'm going to pick this person"?
A I don't recall.
Q Do you think you should have had a conversation with Matt before you did that?
A I don't think it's necessary. I make decisions all the time without him.
Q So your position is if something needs to be done like that, you're just going to go ahead and do it, he should have no involvement?

A Maybe under different situations.
Q I'm talking about -- I'm not talking about different. I'm talking about your situation.
A Today? I mean, if he has a say in it, he can say something, but that's who the therapist is and that's who he's seeing.
Q That's because that's what you're going to do?
A He didn't take the initiative to find him a therapist. And I had to find him a therapist because he told my son that he had thought about killing himself.
Q And you didn't think it was important to have a conversation with the parent, 'cause you guys have joint custody, legal custody? Do you know?
A Do we have joint --
Q Legal custody.
A I guess technically? No.
Q Okay. Did you make that decision before or after the entry of the order?
A It was during the emergency ex parte.
Q Okay. So the therapist was put in place before you had the order which you're currently operating under?
A She was put into place in the same time period as a result of the trauma Matt inflicted on my son.
Q It's Matthew's fault, everything's Matthew's fault. So when did you first tell him that "Hey, our son is

in therapy"?

A **I don't recall.**

Q Did you ever tell him?

A **I think so.**

Q Okay. And do you recall what he said about it, if anything?

A **No.**

Q And you don't think it's important to have a conversation with the other parent about signing a child up for some kind of therapy or counseling?

I mean, what if he went and signed up one of your other children for therapy and didn't tell you? Would that be cool?

A **Sure, if it's a good therapist.**

Q Okay. So your position is when it comes to decision making, parent wants to do something, go for it?

A **Not necessarily. I would love to see him take the initiative and do something like that.**

Q Okay. Is that something you'd be willing to sign up for and agree to if he took the initiative?

A **I don't know how that works.**

Q Well, I mean --

A **Sign up -- sign up for taking the initiative?**

Q Yeah, if he's going to take the initiative in a decision such as counseling or any other medical stuff

--

A That would be great. I really hope -- that would be fantastic.

Q Your goal is that he steps up to coparent with you in decisions --

A No, that's not what I mean.

Q You don't want to --

A If he found a therapist for his custody time for the children --

Q Uh-huh.

A Then that is on his custody time and he can do that.

Q Okay. But you're not saying that in your perfect world, you know, he would have more time and more decision making with that time with the kids?

A I don't think he should have more time.

Q Under any circumstances?

A He's not demonstrated that he should have more time.

Q What are the bellwethers, the requirements for him to demonstrate that in your mind?

A He needs to be off of drugs, first of all.

Q Okay.

A He's a danger to the children. I can't trust that he won't drive them when he's high.

Q Uh-huh.

A He tried to drive our family when we were high in Flag

-- or I think we were in Sedona or something then.
Q You said we. Were you high too?
A No. No. We took a family vacation to Arizona over Christmas.
Q Okay.
A After separation. And he was high the entire time, vaping weed. I watched him vape weed and try to attempt to get into the vehicle to drive me and the children. And I prevented him from doing so.
And then while we were in the hotel, I went to the hotel bathroom where he was hanging out and smoking weed in the hotel bathroom with the children right on the other side of the door.
Q Uh-huh.
A And that turned into a big fight. You can't smoke weed with the children right next to us.
Q Okay.
A You cannot drive the children when you are high.
Q Okay.
A It is a problem. He has a problem. A substance abuse problem that he cannot get under control.
Q And you determined that based on --
A My firsthand experience with him.
Q And you haven't lived with him since, using your date of separation, November '24?

A Correct.
Q So you haven't had any personal knowledge or observations of what he's like beyond that?
A I did in December and January of '24 and '25 on a family vacation.
Q After separation?
A After separation.
Q What was this family trip you guys took after you separated?
A We went home for Christmas to Kansas and then we flew from Kansas to Phoenix and we went to Flagstaff for a ski trip as a family.
Q Okay. Anything after that?
A Not that I recall at this moment.
Q If you guys are at any events for the kids, do you interact?
A No.
Q No. What's that look like? Are you on one side of the stage and he's on the other side, or wherever the event is, the bleachers?
A Sure.
Q Okay. You think that's the way it should be?
A In this situation, yes.
Q Is that -- is that how you want it to be?
A I'm fine with it.

Q Do you think that's good for the kids?
**A Yes.**
Q You don't think having a situation where two parents who should coparent have a relationship where it's -- you can coexist together for the benefit of the kids?
**A The alternative is they see their parents fighting. I think that's much worse than peacefully being apart.**
Q And do you think he's the one that picks all the fights in those situations or do you think you have a part to play?
**A I don't know. That's a very -- I don't know how to answer that.**
Q Do you think you have a part to play in the relationship issues you have or the coparenting relationship issues you have with Mr. Ammel?
**A No.**
Q So it's all because of him?
**A Yes.**
Q Okay. So you're doing it perfect?
**A I didn't say I'm perfect.**
Q I didn't say you were perfect, but when it comes to coparenting and fostering that relationship with Mr. Ammel, you're doing nothing wrong?
**A No relationship's perfect. No coparenting relationship is perfect.**

Q Okay. And just so I'm clear, you have a strong level of distrust, it sounds like, of Mr. Ammel?

**A Yes.**

Q Okay. His motion on the access to your -- his records, have you ever tried to access his USAA account?

**A His personal?**

Q After date of separation? Uh-huh.

**A No, I don't have access to his personal account.**

Q Have you ever used any credit cards that are tied to his personal USAA accounts?

**A I don't have access to his personal USAA accounts.**

Q Okay. Do you guys still have any joint accounts?

**A Yes.**

Q And who uses those?

**A All the bills come out of those accounts.**

Q Okay. Have you ever tried to get access to his Military Connect government log-in?

**A I have not.**

Q Have you ever reset any of his emails attempting to get access to those?

**A I have not.**

Q Okay. Have you ever tried to get access to his -- any of his online account information, be it personal, business or health-related?

**A I have not.**
Q Okay. Has he received mail at the house you're living in?
**A Yes.**
Q And have you delivered mail to him opened that had his name on it?
**A Opened?**
Q Opened.
**A Maybe a couple pieces.**
Q Did you open it?
**A Yes.**
Q Was there a reason you would open mail that's addressed to him after you separated?
**A Because I was worried about marital funds.**
Q Did you talk to him about doing that before you did it?
**A I don't recall.**
Q You heard his testimony yesterday. He was surprised by receiving mail packages in his name that were opened?
**A I'm sorry?**
Q I said you heard his deposition yesterday. He was surprised by the fact that he was getting mail addressed to him that had been opened by you?
**A I don't know if he was surprised.**

Q Do you know whether or not that legally you can do that?
**A Well, we're a married couple.**
Q Married couple who are separated?
**A And he was sending his personal mail to the marital home.**
Q And so that gives you authority to open it?
**A I didn't open most of it. He lied when he said I've opened hundreds of pieces of mail. That's -- I haven't even given him hundreds of pieces of mail.**
Q So what did you open?
**A I don't recall.**
Q You're worried about hiding assets, so bank statements maybe?
**A Yeah.**
Q Any records from the VA?
**A I don't recall that.**
Q Any records from any health care provider?
**A I don't recall that.**
Q Okay. Do you recall the last time you gave him mail that you had opened?
**A No, I haven't opened any of his mail in -- probably since right after separation.**
Q Have you asked anybody to access his online information on your behalf?

A No.
Q What are your monthly expenses you have?
A I have like eight thousand dollars total with the financial affidavit. Do you have access to that?
Q I don't. So walk me through.
A I have the mortgage. I have the Sequoia payment, electric, water, internet, phone, insurance. All the usual things.
Q What do you spend a month on electricity?
A Probably two twenty-five.
Q What do you spend on water?
A I've seen it as high as seventy-five recently.
Q Okay. What about clothing?
A We buy clothing when needed.
Q Okay.
A I don't know.
Q Don't know. Any recreation, entertainment, activities? Do you know what you spend on that?
A I don't know what we spend on that.
Q Don't know. Okay. How much is your car payment?
A Twelve eighty.
Q You think that's pretty high?
A Yes, I do.
Q Have you thought about getting a car that has a lower car payment?

A I've thought about it.
Q You think that would be a good idea?
A Maybe. I don't know yet.
Q What groceries -- what do you think you spend on groceries?
A A lot.
Q Where do you shop?
A Harris Teeter and Fresh Market primarily.
Q Have you thought about maybe exploring other locations for grocery shopping?
A There's no need.
Q Why is there no need?
A Groceries are expensive everywhere, especially for kids.
Q Okay. What steps do you think you could take to pare down some of your expenses?
A There really are none.
Q There's nothing you can do?
A No, everything I need is critical.
Q Everything you need's critical.
A Well, let me backtrack that.
Q Uh-huh.
A I guess we don't need Netflix or Amazon Prime.
Q Okay.
A That's not critical.

Q Okay.
**A But what would be critical is a house, a car, electric, water.**
Q Okay.
**A Food.**
Q Okay.
**A Clothing.**
Q What do you spend on clothing for yourself?
**A I don't know. Not much.**
Q Not much? Okay. Is a lot of the expenses you have related to the kids?
**A Probably so.**
Q Okay.
**A And bills.**
Q Are there any expenses for yourself that you can think of that are high?
**A No.**
Q No. Would you call yourself low maintenance?
**A Pretty much.**
Q How often do you get your hair cut?
**A Every few months maybe.**
Q Every few months. Is that -- do you get it locally?
**A Uh-huh.**
Q Where do you go for that?
**A Bamboo.**

Q Bamboo? Is that Southern Pines?
A **Uh-huh.**
Q Okay. Do you do nails or any of that mess?
A **No.**
Q No. Okay. Any other expenses you can think of? We got, I assume, the mortgage. And I assume your mortgage is escrowed so the taxes and insurance is part of that?
A **Uh-huh.**
Q Okay. You got the automobile?
A **Uh-huh.**
Q At twelve hundred bucks. Whatever groceries would be. Some clothing. Personal care, randomly. Any activities you pay for yourself?
A **Activities?**
Q Yeah.
A **Like the gym?**
Q Yeah.
A **I have a gym membership.**
Q Where is that at?
A **FirstHealth.**
Q How much does that run you?
A **Like sixty bucks.**
Q Is that for you and the kids?
A **No.**

Q Just you?
**A Me.**
Q Okay.
**A Prescribed by my therapist basically.**
Q Prescribed by your therapist.
**A Take care of myself.**
Q Okay. How often do you go there?
**A Not enough.**
Q That's what everybody says. It's never enough. Probably true. Very important, though.
All right. Any educational expenses for yourself?
**A Not currently.**
Q Not currently. Okay.
**A Well, actually maybe soon.**
Q What will be soon?
**A Like next week. This week.**
Q Oh, what's going to be this week?
**A I'm going to go enroll in the Sandhills ceramics class, so that will be an expense for me.**
Q And what is educational? You going to get a job doing ceramics?
**A Potentially, one day. That would be cool. I'd love to have a kiln and a wheel in my garage.**
Q Okay. You ever done it before?

A Uh-huh. Love it.
Q Go work up at Seagrove?
A I've been up to Seagrove.
Q Yeah. Make good money doing that.
All right. Let's see here. Any other expenses you can think of that would say be over ten dollars a month?
A Miscellaneous. I don't know.
Q Ah, narrow it down. What's miscellaneous?
A A coffee.
Q Okay.
A That's it. That's all I can think of.
Q That's all you can think of? So absent what you just talked about, the only other expense you can think of over ten bucks might be a coffee?
A Wait, what are we saying? Are we talking about bills?
Q Yeah, bills, expenses, things you pay each month.
A Yeah. I mean, I -- it's all listed on the financial affidavit if you want to look at that. I don't know.
Q Okay.
A It's all there. There's a lot of stuff.
Q Okay. And you're saying you spend eight thousand dollars a month?
A Uh-huh. Groceries are expensive.

Q Are they?
A **Car payment's expensive. Mortgage is expensive. Electric's expensive. All adds up and then there's gymnastics and there's extracurriculars and it all just adds up.**
Q Is it safe to say that a lot of the expenses you have probably associated with the children? I mean, the gymnastics is for the children, correct, at least a child?
A **Yeah. I mean, I don't know if -- what do you mean, the majority of expenses go to the children? We are a family. All the money is to keep the family household running.**
Q I mean just that.
A **And the children running.**
Q I mean gymnastics, that's for the children?
A **Correct.**
Q Correct? Any other things that are specifically just for the kids?
A **One of them does jiu jitsu. She also does band. Cooper does some sports. They need spending money here and there for things that they go do with their friends.**
Q Uh-huh.
A **I don't know. I don't really guess I understand what**

we're getting at.

Q I'm just asking about your eight thousand dollars a month.

A **Yes. It's all in the financial affidavit and I -- eight thousand dollars.**

Q Do you think there's any room to diminish that level of expenses that you're saying exist?

A **I could diminish the expenses by not paying for Netflix and Amazon Prime.**

Q So that's the only thing you think you could cut?

A **Off the top of my head, yes. That's all I've got for you on that.**

THE WITNESS: Can I grab a snack?

MS. FOUSHEE: Yeah. Want to take a few-minute break?

MR. TANNER: Sure.

(TWENTY-THREE-MINUTE RECESS)

Q I just got a few more questions and then I'll be ready to roll. What religion are you?

A **I'm not religious.**

Q Not religious. So doesn't have any importance to you?

A **I'm spiritual.**

Q Okay. And what do you mean by spiritual?

A **I believe in God but I'm not religious.**

Q Okay. Do you go to any kind of religious gatherings

or no?

**A No.**

Q Okay. Ever been Islamic?

**A Can't say that I have.**

Q Okay. What about Nathan Grant? Do you know what religion he is?

**A I think he's Christian.**

Q He's never been Islamic, right?

**A No, I don't think so.**

Q Okay.

MR. TANNER: All right. That's all I got. Thank you.

(THEREUPON THE WITNESS WAS DISMISSED.)

State of North Carolina
Wake County

C E R T I F I C A T E

I, Cynthia J. Dotson, Notary Public/Reporter, do hereby certify that Heather Lynne Ammel was duly sworn by me prior to the taking of the foregoing deposition: And that said deposition was taken by me and that the foregoing 138 pages constitute a true and accurate transcript of the testimony of the witness.

I do further certify that I am not of counsel for or in the employment of either of the parties to this action, nor am I interested in the results of this action.

In witness whereof, I have hereunto subscribed my name this 27th day of August, 2025.

______________________________

Cynthia J. Dotson

Certificate No. 19972120061

DEFENDANT'S DEPOSITION EXHIBIT
2
Ammel
PENGAD 800-631-6989

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
CIVIL ACTION NO. 1:26-cv-00038

| | | |
|---|---|---|
| **HEATHER AMMEL,** | ) | |
| **Plaintiff,** | ) | **PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES, FIRST REQUEST FOR PRODUCTION OF DOCUMENTS, AND FIRST REQUEST FOR ADMISSIONS** |
| **v.** | ) | |
| **KYRSTEN SINEMA,** | ) | |
| **Defendant.** | ) | |

NOW COMES Plaintiff, Heather Ammel ("Plaintiff"), and pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure and the Court Order entered May 7, 2026 [Dkt. 20], hereby responds to Defendant's First Set of Interrogatories, First Request for Production of Documents, and First Request for Admissions as follows:

## GENERAL RESPONSES

Plaintiff reserves the right to rely on any facts, documents or other evidence which may develop or come to Plaintiff's attention after serving these responses. The responses set forth below are based upon information presently known to Plaintiff and are made without prejudice to Plaintiff's rights to assert additional objections or supplemental responses should Plaintiff discover additional information or grounds for objections. Plaintiff reserves her right to supplement or amend these responses at any time prior to trial subject to any discovery order entered in this case.

By responding to Defendant's First Set of Interrogatories, First Request for Production of Documents, and First Request for Admissions, Plaintiff neither waives nor intends to waive any

objection regarding the use of any such information, and expressly reserves all objections regarding the competency, privilege, relevance, materiality, probative value, and admissibility of any documents produced and contents thereof, the right to object on any and all proper grounds at any time to other discovery procedures involving or relating to the subject matter of any information provided by Plaintiff, the right to challenge the competency, privilege, relevance, materiality, and admissibility of or to object on any grounds to the use of these responses in any subject proceeding or trial of this or any other action, and all objections to vagueness and ambiguity.

The inadvertent providing of information that is properly protected from disclosure by the attorney-client, work-product doctrine, or any other privilege shall not be construed as a waiver of such privilege. Nothing herein shall be construed as an admission of Plaintiff with respect to the admissibility or relevance of any information and/or documents provided at any time responsive to Defendant's First Set of Interrogatories, First Request for Production of Documents, and First Request for Admissions.

## GENERAL OBJECTIONS

1. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents insofar as it requests information and/or documents regarding the use of the terms "all," "any," and/or "each," when used with respect to persons, facts, circumstances, or documents, as such terms are overly broad, unduly burdensome, vague, and/or ambiguous.

2. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents to the extent they are overly broad, unduly burdensome, vague and/or ambiguous.

3. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents to the extent they seek information and/or documents that are not relevant or reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents to the extent they seek information and/or documentation protected from disclosure by the attorney-client privilege, the work-product doctrine, the privilege of self-evaluation, or any other legally cognizable privilege.

5. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents to the extent they seek information and/or documents not in the possession, custody, or control of Plaintiff.

6. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents to the extent they seek information and/or documents relating to confidential information, statutorily protected information, trade secrets, confidential business records, reserve information, information regarding reinsurance, proprietary information, confidential underwriting information, or other protected information.

7. Plaintiff reserves the right to claim any disclosure of confidential or privileged information was unintentional and inadvertent, to seek retrieval of such information or documents as necessary, and to preclude Defendant's use of such information or documents in any matter.

8. Plaintiff reserves her rights to challenge the competency, relevance, materiality, and admissibility of the information or responses set forth below in any subsequent proceeding or the trial of this or any other action, and to object on any ground to the use of these responses in

any subsequent proceeding or the trial of this or any other action.

## INTERROGATORIES

1. Identify any and all dates when Matthew Joseph Ammel was physically present at your home in Moore County, for any part of the day or night, from November 1, 2023 to October 31, 2024.

ANSWER: **Plaintiff objects to Interrogatory # 1 on the grounds that it is overly broad and unduly burdensome. Subject to and without waiving said objections, Plaintiff responds upon information and belief and gives approximate dates as follows:**

- **November 12-30, 2023;**
- **December 3-13, 2023;**
- **December 17-26, 2023;**
- **December 29, 2023, through January 26, 2024;**
- **February 1-4, 2024;**
- **February 6-18, 2024;**
- **February 22-23, 2024;**
- **February 25, 2024, through March 1, 2024;**
- **March 6-14, 2024;**
- **March 15-17;**
- **March 20 through April 6, 2024;**
- **March 28-31, 2024 (family vacation to Outer Banks, North Carolina);**
- **April 11-16, 2024;**

- **April 19-29, 2024;**
- **April 19-21, 2024 (family vacation to Charleston, South Carolina);**
- **May 3, 2024;**
- **May 7-14, 2024;**
- **May 17-21, 2024;**
- **May 28 through June 11, 2024;**
- **June 12, 2024, through July 6, 2024 (we were traveling outside of North Carolina)**
- **July 6-10, 2024;**
- **July 12-14, 2024;**
- **July 23-25, 2024;**
- **July 25-28, 2024 (family vacation in Bryson City, North Carolina);**
- **July 28-29, 2024;**
- **July 31, 2024, through August 4, 2024;**
- **August 8-16, 2024;**
- **August 18-29, 2024;**
- **September 7-13, 2024;**
- **September 14-18, 2024;**
- **September 25-30, 2024;**
- **October 3-5, 2024 (possibly October 3-7);**
- **October 11-19, 2024;**
- **October 23-26, 2024;**
- **November 1-5, 2024; and**

- **November 8-9, 2024.**

2. Identify all journals, logs, diaries, calendars, notes, screenshots, photographs, video and/or audio recordings, and/or any other records revealing contacts or communications between Defendant and Matthew Joseph Ammel.

ANSWER: **Plaintiff objects to Interrogatory # 2 on the grounds that it is vague, overly broad, unduly burdensome, not limited in time, and to the extent it seeks information protected by the work product doctrine. Plaintiff further objects to this interrogatory as this information is equally available to Defendant. Subject to and without waiving said objections, *see* Plaintiff's documents attached. To the extent Plaintiff has possession of said documents, Plaintiff produces all screenshots and photographs of Defendant and Mr. Ammel's communications. Plaintiff asserts that Defendant and Mr. Ammel primarily communicated over Signal, an encrypted messaging app, which enables users to delete messages after a certain period, and the messages are no longer retrievable. To the extent Plaintiff is prohibited from retrieving said messages, Plaintiff produces all screenshots and photographs in her possession and responds as follows:**

- **In April 2022, Defendant's head of security hired Mr. Ammel to work as a security detail for Defendant.**
- **At that time, Defendant was serving as a United States Senator for the State of Arizona.**
- **In April 2022, Mr. Ammel began working for Defendant.**

- **In the fall of 2023, Defendant's head of security resigned from her position. Prior to leaving, Defendant's head of security expressed to Mr. Ammel she had concerns Defendant was having sexual relations with other security members. She encouraged Mr. Ammel to leave with her, but Mr. Ammel decided to stay due to the financial security of the job.**
- **In addition to accompanying Defendant to various work events, Mr. Ammel accompanied Defendant on several trips and went with her alone to Napa Valley, California in the fall of 2023. Upon returning home from Napa Valley, Mr. Ammel appeared uncomfortable and informed me that if anyone had seen them together on the trip, it would have appeared as if they were on a romantic getaway.**
- **In or around August/September 2023, Mr. Ammel went on a security detail trip to Colorado where Defendant participated in a bike race. After the race, Defendant, Mr. Ammel, and other team members went to a waterfall in their swimsuits, drank champagne, and took photos. Mr. Ammel shared some of these photos with me. When he returned from the trip, he felt paranoid about the photos and deleted them, because he felt the photos were unprofessional and might tie him to a scandal if word got out that Defendant was allegedly sleeping with other security members.**
- **On our anniversary on October 23, 2023, Mr. Ammel came to me and said that for my anniversary gift, he wanted to take me to Las Vegas, Nevada in December 2023 to see U2 at the Sphere. It was technically a work trip that he was inviting me on, but he received permission from Defendant to do so. When he told me about the trip, he said it would be a great opportunity for me to meet Defendant and would help**

establish boundaries, because he was feeling uncomfortable with Defendant's behavior towards him.

- In December 2023, while we were in Las Vegas, Nevada, I met Defendant's best friends, Penny Croissant and Stevanie Bahnerth. They told me Defendant "preferred" Mr. Ammel for her security and that because of his size, he was intimidating, like a refrigerator sitting at the table.
- In or around late December 2023, while Mr. Ammel and I were on vacation in Vermont with our children, I personally witnessed Defendant and Mr. Ammel exchange messages over Signal, the messaging app. The messages were outside the scope of a normal working relationship. Mr. Ammel sent Defendant a photo of the Vermont landscape at night, and Defendant replied, "Hauntingly beautiful."
- Beginning in January 2024, I noticed Defendant frequently messaging Mr. Ammel on Signal, the messaging app.
- In January 2024, and while Mr. Ammel was physically present in North Carolina, I witnessed Defendant send Mr. Ammel a message about helping him with his mental health, and Mr. Ammel agreed.
- In or around early spring 2024, I witnessed Defendant send Mr. Ammel the following messages while Mr. Ammel was physically present in North Carolina:
    - A picture of Defendant wrapped in a towel. Mr. Ammel was physically present in North Carolina and at our marital residence when Defendant sent a photo of herself wrapped in a towel. I was standing in our kitchen when I read the message. Defendant was wrapped in a white towel, and the picture showed her bare upper back with cupping bruises. Mr. Ammel responded to the

**picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman who doesn't."**

- **Mr. Ammel messaged Defendant stating he was intimidated by Defendant while Mr. Ammel was physically present in North Carolina. Defendant responded to the message asking why because she only wants to be intimidating to her opponents, not to people she likes. Mr. Ammel received Defendant's message while he was at our marital residence. I read the message standing in our kitchen. Mr. Ammel replied that he has always been intimidated by powerful, confident women. I also saw a message from Mr. Ammel to Defendant on Signal where he complimented the way she looks in a dress. I remember this being a source of tension between us in April of 2024 when we took a family trip to Charleston, South Carolina, and I confronted Mr. Ammel about why would he compliment another woman's appearance?**
- **Defendant messaged Mr. Ammel suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience while Mr. Ammel was physically present in North Carolina. Mr. Ammel received Defendant's message while he was at our marital residence, packing and preparing to go on another trip with Defendant. Mr. Ammel responded by saying he was not sure that it would be a good idea to do MDMA with his attractive boss, that he was not sure what might happen. Defendant then said she was not going to do MDMA with him and that Mr. Ammel would take it while she sat with him. Mr. Ammel ended up not bringing the MDMA on the work trip.**

        - Around this same time, and while Mr. Ammel was physically present in North Carolina and at our marital residence, Defendant sent a Signal message to Mr. Ammel telling him to watch the Netflix documentary "How to Change Your Mind," which has an episode about MDMA.
    - On 7 March 2024, Defendant messaged Mr. Ammel during the State of the Union address while Mr. Ammel was physically present in North Carolina and at our marital residence. While Defendant and Mr. Ammel were messaging during the State of the Union, Mr. Ammel and I were sitting on the couch in our living room. I personally witnessed the live message exchange. When Mr. Ammel asked why Defendant wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote.
    - I discovered Defendant and Mr. Ammel message about having sex missionary style with the lights on while Mr. Ammel was physically present in North Carolina. I read the message standing in my kitchen.
- In or around early spring 2024, I remember addressing the Singal messages with Mr. Ammel because I felt that it was crossing boundaries and inappropriate. When I confronted Mr. Ammel about it, he became defensive and went into our garage to sit in his sauna. I was complaining to him, and he told me to leave him alone in the sauna while he figured out what to say to Defendant to get out of the situation.
- In March 2024, Mr. Ammel accompanied Defendant on a work trip to Phoenix, Arizona, where he attended the Extra Innings Festival as security detail with Defendant and her friends. Mr. Ammel told me Defendant kept grabbing his hand

**and touching him during the show, it made him uncomfortable, and he did not know how to get out of the situation without offending her.**

- **Shortly thereafter, Defendant and Mr. Ammel flew to San Francisco, California for Defendant's work trip. During this trip, Defendant invited Mr. Ammel to her hotel room, and they stayed together for hours. Mr. Ammel told me that when he arrived at her room, he allegedly told her that he was uncomfortable and loved his wife. He also said it seemed like Defendant was trying to normalize infidelity.**
- **In or around spring 2024, Defendant traveled to Europe. While Defendant was in Italy, she messaged Mr. Ammel, who at the time was physically present in North Carolina and at our marital residence, that she was on her way to see Depeche Mode. Defendant included a mushroom emoji in the message, suggesting to Mr. Ammel that she was going to use mushrooms while watching the concert. Mr. Ammel shared with me that he would sometimes provide Defendant with mushrooms when they attended concerts while he was working as her security detail. Mr. Ammel told me Defendant preferred him on her security detail for concerts because she could let her guard down and have fun. Mr. Ammel was willing to blur lines and use drugs with her or provide them to her.**
- **On April 8, 2024, Mr. Ammel was in Pennsylvania on a work trip with Staccato. During his free time, Mr. Ammel attended a baseball game by himself, but messaged Defendant during the game stating he was going to start a "fuck the troops" chant. Defendant responded stating she would "fuck the hot ones."**
- **On April 18, 2024, Mr. Ammel was in Maryland on a work trip with Staccato. At the time, Mr. Ammel was sharing his location with me, and I watched him as he drove**

from Maryland into Washington, D.C. to go to Defendant's apartment. I called him to ask what he was doing. Mr. Ammel initially lied and said he was going back to his hotel room and that I would not hear from him for the rest of the night because he was exhausted and going to bed. I confronted him, saying I could see that his location was moving toward Defendant's apartment. Mr. Ammel finally relented and admitted that he was going to Defendant's apartment. Mr. Ammel did not care that I told him not to go. Mr. Ammel stayed at Defendant's apartment until after 11:00 p.m. When Mr. Ammel returned home to Moore County, North Carolina, I read the Signal messages between Defendant and Mr. Ammel the evening he went to her apartment. Mr. Ammel told Defendant he had been wandering around Annapolis, and Defendant proceeded to invite him over to her apartment.

- In May 2024, Defendant started purchasing gifts for Mr. Ammel and paid for him to receive psychedelic treatment. Defendant paid for Mr. Ammel's psychedelic treatment appointment in Nashville, Tennessee, and then flew him to Napa Valley, California, for him to provide Defendant's security at a concert. After the concert, Defendant, Defendant's friends, and Mr. Ammel stayed in a private Airbnb together.
- At the beginning of May 2024, Defendant purchased a theragun for Mr. Ammel. At some point, I saw a message where Mr. Ammel was going over to Defendant's apartment to visit her, and she suggested for him to bring the theragun so that she could "work on his back."
- Around May or June 2024, Mr. Ammel stopped wearing his wedding ring. Mr. Ammel stated it was best for "public optics" so it wouldn't look like Defendant was

putting her hands on a married man when they were out at concerts and various other public events.

- In June 2024, Defendant requested Mr. Ammel travel to New York City to be her security and guest for a wedding. From New York City, Defendant and Mr. Ammel flew to Defendant's house in Scottsdale, Arizona where they stayed together alone.
- That same month, Defendant offered Mr. Ammel a salary position and placed him on her senate staff as a Defense and National Security Fellow. Mr. Ammel then worked as Defendant's personal security guard as well as her senate staff member.
- Around that same time, I discovered more messages between Defendant and Mr. Ammel. Specifically, in or around June 22-23, 2024, while our family was vacationing in Kansas, Defendant messaged Mr. Ammel expressing that she keeps waking up during her sleep and reaching over for his arms to hold her. After I read this message, I confronted Mr. Ammel.
- In the following months, Mr. Ammel struggled to admit he was having an affair with Defendant but was vocal that he was leaving me and that we were divorcing.
- In July 2024, Mr. Ammel took our minor child, C.A., to Washington, D.C. for a work trip. Mr. Ammel and C.A. attended the Green Day concert with Defendant, and Defendant provided C.A. a tour of the United States Capitol.
- In or around 3 October 2024, soon after Mr. Ammel returned home to Moore County, North Carolina, after being away with Defendant on another work trip, Defendant messaged Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." I responded to the message stating, "are you having an affair with my husband? You took a married man away from his family."

**• That same month, Mr. Ammel went as Defendant's guest to the Taylor Swift concert in Miami, Florida. Months prior to the concert, Mr. Ammel arranged for the Children and I to also attend. I attended to the concert out of concern for the Children. After the concert was over, the Children and I flew home to Moore County, North Carolina. Mr. Ammel stayed behind to travel with Defendant to Las Vegas, Nevada for work.**

**• After returning home from Las Vegas, Nevada, Mr. Ammel insisted he and I go together on an anniversary trip to Nashville, Tennessee. Mr. Ammel and I went on an anniversary trip October 25-26, 2024. We held hands on the plane, were physically intimate on the trip, including engaging in sexual intercourse, and were still very much emotionally connected. Mr. Ammel and I attended a concert together, and throughout the three-and-a-half-hour concert, Mr. Ammel held me and hugged me. I have attached pictures that we took together on the trip as well as our text exchange immediately after the trip. Mr. Ammel told me he loved me and missed me.**

**• After our anniversary trip concluded, I returned home to Moore County, North Carolina, and Mr. Ammel went on a work trip with Defendant to Saudi Arabia.**

**• Shortly after Mr. Ammel returned home to Moore County, North Carolina from Saudi Arabia, on 1 November 2024, Mr. Ammel informed me that he wished to separate, and he initiated the separation process. However, Defendant did not completely move out of the marital residence until the middle of November.**

**• Mr. Ammel traveled to Washington, DC to move furniture from Defendant's apartment into his new apartment in Moore County, North Carolina.**

- **After Mr. Ammel and I separated, Mr. Ammel continued to frequent the martial residence and would physically touch me in a romantic way each time he stopped by. Mr. Ammel's brother's family stayed with me and the Children for Thanksgiving 2024, and Mr. Ammel came over for Thanksgiving Day. Additionally, we all traveled to Kansas together for Christmas 2024, and Mr. Ammel and I slept in the same bed on Christmas Eve. After spending Christmas in Kansas, we went skiing together as a family.**
- **After the ski trip in December 2024, Mr. Ammel and I officially parted ways.**
- **After the Separation, Defendant started making her presence physically known in North Carolina and would frequently travel to North Carolina to visit Mr. Ammel.**
- **On 18 August 2025, Defendant drove to our custody and equitable distribution mediation at Van Camp, Meacham & Newman, PLLC in Pinehurst, North Carolina. Defendant sat outside in the parking lot and waited for Mr. Ammel.**
- **On the weekend of 12 September 2025, Defendant and Mr. Ammel took our minor child, J.A., to a concert in Kentucky. On Sunday, 14 September, Defendant and Mr. Ammel drove J.A. back through the night to Moore County, North Carolina. Defendant and Mr. Ammel dropped J.A. off at school at 9:00 a.m. Monday morning.**
- **On 16 September 2025, Defendant accompanied Mr. Ammel to the marital residence to pick up the remainder of his belongings. Defendant sat outside in the cul-de-sac immediately adjacent to our marital residence.**
- **On 19 November 2025, Mr. Ammel's property manager filed a 50C Complaint for No-Contact Order against him. Mr. Ammel was involuntarily committed to the hospital, and on 20 November 2025, Mr. Ammel was arrested for assaulting the**

**physician assistant at the hospital. Defendant traveled to Moore County, North Carolina to bond Mr. Ammel out of jail and moved him out of his rental property to her house in Arizona.**

3. Identify all communications between you and Matthew Joseph Ammel related to the subject of your marriage ending or the plan of desire of either of you to physically separate, including but not limited to verbal communications, correspondence, emails, text (SMS) messages, voicemails, and encrypted messages.

ANSWER: **Plaintiff objects to Interrogatory # 3 on the grounds that it is vague, overly broad, unduly burdensome, not limited in time, and to the extent it seeks information protected by the work product doctrine. Subject to and without waiving said objections, *see* Plaintiff's documents attached.**

4. Identify all persons you made aware of contacts or communications between Defendant and Matthew Joseph Ammel prior to November 1, 2024 and what you informed them about such contacts or communications.

ANSWER: **Plaintiff objects to Interrogatory # 4 on the grounds that it is vague, overly broad, unduly burdensome, and to the extent it seeks information protected by the work product doctrine. Subject to and without waiving said objections, Plaintiff responds as follows:**

1. **Sharon Melanson, mother: Aware of the Signal messages on June 22-23, 2024, and October 3, 2024, between Defendant and Mr. Ammel. By sharing these screenshots with my mom, I was altering her to the fact that Mr. Ammel and Defendant were**

having an affair.

2. Karmen Harris, friend: Aware of the Signal messages on June 22-23, 2024, and October 3, 2024, between Defendant and Mr. Ammel. I first shared the June 2024 screenshot with Karmen in July 2024, because I was seeking advice and her opinion about whether she thought Mr. Ammel and Defendant were having an affair. I told Karmen about the October 2024 message from Defendant to Mr. Ammel that confirmed they were having an affair.

3. Chris Harris, friend: Aware of the Signal messages on June 22-23, 2024. I made Chris aware of this message in July 2024, because I was seeking advice and his opinion about whether he thought the Signal messages implied Mr. Ammel and Defendant were having an affair.

4. Mike DeVault, Mr. Ammel's former friend and business partner: I made Mike aware that I suspected that Mr. Ammel and Defendant were having an affair. I shared the screenshot of the June 22-23, 2024, Signal messages between Defendant and Mr. Ammel around July 2024.

5. Chad Brown, current therapist: In October 2024, I contacted Chad to schedule couple's therapy after discovering the October 3, 2024, Signal message from Defendant to Mr.Ammel. I informed Chad about the various other Signal messages as well.

6. Jessica Alcorn, friend: I informed Jessica about the June 22-23, 2024, signal messages in July 2024, because I was seeking her advice and opinion on whether she thought Mr. Ammel was having an affair with Defendant. I sent Jessica the October 3, 2024, Signal screenshot from Defendant to Mr. Ammel, expressing that I was struggling and I would speak to her in person about the situation.

7. Eli VonCannon, friend: In July 2024, I shared with Eli the June 22-23, 2024, Signal messages. I was crying on his couch and asking his opinion on whether he thought the messages implied if Mr. Ammel and Defendant were having an affair.

8. Jodi McCain, former therapist: In July 2024, I had my first therapy session after discovering the June 22-23, 2024, Signal messages. I informed her about the Signal messages during that therapy session, and I was crying on her couch the entire time. I was in denial about the affair, but she was certain that Mr. Ammel and Defendant were having an affair.

9. Elise Williams, friend: During a birthday dinner for Jessica Alcorn in July 2024, I had a breakdown about Mr. Ammel and Defendant. During this breakdown, I told Elise about the June 22-23, 2024 Signal messages.

10. Laura Ammel, former sister-in-law: In October 2024, I made Laura aware that Mr. Ammel and Defendant were having an

**affair while her husband, Josh Ammel, was on a trip to Arizona with Mr. Ammel and Defendant.**

5. Identify and describe all evidence, including but not limited to documents (including ESI) you contend exists that supports your contention that the romantic relationship between Defendant and Matthew Joseph Ammel began prior to May 2024.

ANSWER: **Plaintiff objects to Interrogatory # 5 on the grounds that it is vague, overly broad, unduly burdensome, and to the extent it seeks information protected by the work product doctrine. Subject to and without waiving said objections, *see* Plaintiff's documents attached and Plaintiff responds as follows:**

- **In April 2022, Defendant's head of security hired Mr. Ammel to work as a security detail for Defendant.**
- **At that time, Defendant was serving as a United States Senator for the State of Arizona.**
- **In April 2022, Mr. Ammel began working for Defendant.**
- **In the fall of 2023, Defendant's head of security resigned from her position. Prior to leaving, Defendant's head of security expressed to Mr. Ammel she had concerns Defendant was having sexual relations with other security members. She encouraged Mr. Ammel to leave with her, but Mr. Ammel decided to stay due to the financial security of the job.**
- **In addition to accompanying Defendant to various work events, Mr. Ammel accompanied Defendant on several trips and went with her alone to Napa Valley, California in the fall of 2023. Upon returning home from Napa Valley, Mr. Ammel**

**appeared uncomfortable and informed me that if anyone had seen them together on the trip, it would have appeared as if they were on a romantic getaway.**

- **In or around August/September 2023, Mr. Ammel went on a security detail trip to Colorado where Defendant participated in a bike race. After the race, Defendant, Mr. Ammel, and other team members went to a waterfall in their swimsuits, drank champagne, and took photos. Mr. Ammel shared some of these photos with me. When he returned from the trip, he felt paranoid about the photos and deleted them, because he felt the photos were unprofessional and might tie him to a scandal if word got out that Defendant was allegedly sleeping with other security members.**
- **On our anniversary on October 23, 2023, Mr. Ammel came to me and said that for my anniversary gift, he wanted to take me to Las Vegas, Nevada in December 2023 to see U2 at the Sphere. It was technically a work trip that he was inviting me on, but he received permission from Defendant to do so. When he told me about the trip, he said it would be a great opportunity for me to meet Defendant and would help establish boundaries, because he was feeling uncomfortable with Defendant's behavior towards him.**
- **In December 2023, while we were in Las Vegas, Nevada, I met Defendant's best friends, Penny Croissant and Stevanie Bahnerth. They told me Defendant "preferred" Mr. Ammel for her security and that because of his size, he was intimidating, like a refrigerator sitting at the table.**
- **In or around late December 2023, while Mr. Ammel and I were on vacation in Vermont with our children, I personally witnessed Defendant and Mr. Ammel exchange messages over Signal, the messaging app. The messages were outside the**

scope of a normal working relationship. Mr. Ammel sent Defendant a photo of the Vermont landscape at night, and Defendant replied, "Hauntingly beautiful."

- Beginning in January 2024, I noticed Defendant frequently messaging Mr. Ammel on Signal, the messaging app.
- In January 2024, and while Mr. Ammel was physically present in North Carolina, I witnessed Defendant send Mr. Ammel a message about helping him with his mental health, and Mr. Ammel agreed.
- In or around early spring 2024, I witnessed Defendant send Mr. Ammel the following messages while Mr. Ammel was physically present in North Carolina:
  - A picture of Defendant wrapped in a towel. Mr. Ammel was physically present in North Carolina and at our marital residence when Defendant sent a photo of herself wrapped in a towel. I was standing in our kitchen when I read the message. Defendant was wrapped in a white towel, and the picture showed her bare upper back with cupping bruises. Mr. Ammel responded to the picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman who doesn't."
  - Mr. Ammel messaged Defendant stating he was intimidated by Defendant while Mr. Ammel was physically present in North Carolina. Defendant responded to the message asking why because she only wants to be intimidating to her opponents, not to people she likes. Mr. Ammel received Defendant's message while he was at our marital residence. I read the message standing in our kitchen. Mr. Ammel replied that he has always been intimidated by powerful, confident women. I also saw a message from Mr.

**Ammel to Defendant on Signal where he complimented the way she looks in a dress. I remember this being a source of tension between us in April of 2024 when we took a family trip to Charleston, South Carolina, and I confronted Mr. Ammel about why would he compliment another woman's appearance?**

- **Defendant messaged Mr. Ammel suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience while Mr. Ammel was physically present in North Carolina. Mr. Ammel received Defendant's message while he was at our marital residence, packing and preparing to go on another trip with Defendant. Mr. Ammel responded by saying he was not sure that it would be a good idea to do MDMA with his attractive boss, that he was not sure what might happen. Defendant then said she was not going to do MDMA with him and that Mr. Ammel would take it while she sat with him. Mr. Ammel ended up not bringing the MDMA on the work trip.**
  - **Around this same time, and while Mr. Ammel was physically present in North Carolina and at our marital residence, Defendant sent a Signal message to Mr. Ammel telling him to watch the Netflix documentary "How to Change Your Mind," which has an episode about MDMA.**
- **On 7 March 2024, Defendant messaged Mr. Ammel during the State of the Union address while Mr. Ammel was physically present in North Carolina and at our marital residence. While Defendant and Mr. Ammel were messaging during the State of the Union, Mr. Ammel and I were sitting on the couch in our living room. I personally witnessed the live message exchange. When Mr.**

**Ammel asked why Defendant wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote.**

- **I discovered Defendant and Mr. Ammel message about having sex missionary style with the lights on while Mr. Ammel was physically present in North Carolina. I read the message standing in my kitchen.**

- **In or around early spring 2024, I remember addressing the Singal messages with Mr. Ammel because I felt that it was crossing boundaries and inappropriate. When I confronted Mr. Ammel about it, he became defensive and went into our garage to sit in his sauna. I was complaining to him, and he told me to leave him alone in the sauna while he figured out what to say to Defendant to get out of the situation.**
- **In March 2024, Mr. Ammel accompanied Defendant on a work trip to Phoenix, Arizona, where he attended the Extra Innings Festival as security detail with Defendant and her friends. Mr. Ammel told me Defendant kept grabbing his hand and touching him during the show, it made him uncomfortable, and he did not know how to get out of the situation without offending her.**
- **Shortly thereafter, Defendant and Mr. Ammel flew to San Francisco, California for Defendant's work trip. During this trip, Defendant invited Mr. Ammel to her hotel room, and they stayed together for hours. Mr. Ammel told me that when he arrived at her room, he allegedly told her that he was uncomfortable and loved his wife. He also said it seemed like Defendant was trying to normalize infidelity.**
- **In or around spring 2024, Defendant traveled to Europe. While Defendant was in Italy, she messaged Mr. Ammel, who at the time was physically present in North**

Carolina and at our marital residence, that she was on her way to see Depeche Mode. Defendant included a mushroom emoji in the message, suggesting to Mr. Ammel that she was going to use mushrooms while watching the concert. Mr. Ammel shared with me that he would sometimes provide Defendant with mushrooms when they attended concerts while he was working as her security detail. Mr. Ammel told me Defendant preferred him on her security detail for concerts because she could let her guard down and have fun. Mr. Ammel was willing to blur lines and use drugs with her or provide them to her.

- On April 8, 2024, Mr. Ammel was in Pennsylvania on a work trip with Staccato. During his free time, Mr. Ammel attended a baseball game by himself, but messaged Defendant during the game stating he was going to start a "fuck the troops" chant. Defendant responded stating she would "fuck the hot ones."
- On April 18, 2024, Mr. Ammel was in Maryland on a work trip with Staccato. At the time, Mr. Ammel was sharing his location with me, and I watched him as he drove from Maryland into Washington, D.C. to go to Defendant's apartment. I called him to ask what he was doing. Mr. Ammel initially lied and said he was going back to his hotel room and that I would not hear from him for the rest of the night because he was exhausted and going to bed. I confronted him, saying I could see that his location was moving toward Defendant's apartment. Mr. Ammel finally relented and admitted that he was going to Defendant's apartment. Mr. Ammel did not care that I told him not to go. Mr. Ammel stayed at Defendant's apartment until after 11:00 p.m. When Mr. Ammel returned home to Moore County, North Carolina, I read the Signal messages between Defendant and Mr. Ammel the evening he went to her

**apartment. Mr. Ammel told Defendant he had been wandering around Annapolis, and Defendant proceeded to invite him over to her apartment.**

- **In May 2024, Defendant started purchasing gifts for Mr. Ammel and paid for him to receive psychedelic treatment. Defendant paid for Mr. Ammel's psychedelic treatment appointment in Nashville, Tennessee, and then flew him to Napa Valley, California, for him to provide Defendant's security at a concert. After the concert, Defendant, Defendant's friends, and Mr. Ammel stayed in a private Airbnb together.**
- **At the beginning of May 2024, Defendant purchased a theragun for Mr. Ammel. At some point, I saw a message where Mr. Ammel was going over to Defendant's apartment to visit her, and she suggested for him to bring the theragun so that she could "work on his back."**
- **Around May or June 2024, Mr. Ammel stopped wearing his wedding ring. Mr. Ammel stated it was best for "public optics" so it wouldn't look like Defendant was putting her hands on a married man when they were out at concerts and various other public events.**
- **In June 2024, Defendant requested Mr. Ammel travel to New York City to be her security and guest for a wedding. From New York City, Defendant and Mr. Ammel flew to Defendant's house in Scottsdale, Arizona where they stayed together alone.**
- **That same month, Defendant offered Mr. Ammel a salary position and placed him on her senate staff as a Defense and National Security Fellow. Mr. Ammel then worked as Defendant's personal security guard as well as her senate staff member.**
- **Around that same time, I discovered more messages between Defendant and Mr. Ammel. Specifically, in or around June 22-23, 2024, while our family was vacationing**

in Kansas, Defendant messaged Mr. Ammel expressing that she keeps waking up during her sleep and reaching over for his arms to hold her. After I read this message, I confronted Mr. Ammel.

- In the following months, Mr. Ammel struggled to admit he was having an affair with Defendant but was vocal that he was leaving me and that we were divorcing.
- In July 2024, Mr. Ammel took our minor child, C.A., to Washington, D.C. for a work trip. Mr. Ammel and C.A. attended the Green Day concert with Defendant, and Defendant provided C.A. a tour of the United States Capitol.
- In or around 3 October 2024, soon after Mr. Ammel returned home to Moore County, North Carolina, after being away with Defendant on another work trip, Defendant messaged Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." I responded to the message stating, "are you having an affair with my husband? You took a married man away from his family."
- That same month, Mr. Ammel went as Defendant's guest to the Taylor Swift concert in Miami, Florida. Months prior to the concert, Mr. Ammel arranged for the Children and I to also attend. I attended to the concert out of concern for the Children. After the concert was over, the Children and I flew home to Moore County, North Carolina. Mr. Ammel stayed behind to travel with Defendant to Las Vegas, Nevada for work.
- After returning home from Las Vegas, Nevada, Mr. Ammel insisted he and I go together on an anniversary trip to Nashville, Tennessee. Mr. Ammel and I went on an anniversary trip October 25-26, 2024. We held hands on the plane, were physically intimate on the trip, including engaging in sexual intercourse, and were still very

**much emotionally connected. Mr. Ammel and I attended a concert together, and throughout the three-and-a-half-hour concert, Mr. Ammel held me and hugged me. I have attached pictures that we took together on the trip as well as our text exchange immediately after the trip. Mr. Ammel told me he loved me and missed me.**

- **After our anniversary trip concluded, I returned home to Moore County, North Carolina, and Mr. Ammel went on a work trip with Defendant to Saudi Arabia.**
- **Shortly after Mr. Ammel returned home to Moore County, North Carolina from Saudi Arabia, on 1 November 2024, Mr. Ammel informed me that he wished to separate, and he initiated the separation process. However, Defendant did not completely move out of the marital residence until the middle of November.**
- **Mr. Ammel traveled to Washington, DC to move furniture from Defendant's apartment into his new apartment in Moore County, North Carolina.**
- **After Mr. Ammel and I separated, Mr. Ammel continued to frequent the martial residence and would physically touch me in a romantic way each time he stopped by. Mr. Ammel's brother's family stayed with me and the Children for Thanksgiving 2024, and Mr. Ammel came over for Thanksgiving Day. Additionally, we all traveled to Kansas together for Christmas 2024, and Mr. Ammel and I slept in the same bed on Christmas Eve. After spending Christmas in Kansas, we went skiing together as a family.**
- **After the ski trip in December 2024, Mr. Ammel and I officially parted ways.**
- **After the Separation, Defendant started making her presence physically known in North Carolina and would frequently travel to North Carolina to visit Mr. Ammel.**

- **On 18 August 2025, Defendant drove to our custody and equitable distribution mediation at Van Camp, Meacham & Newman, PLLC in Pinehurst, North Carolina. Defendant sat outside in the parking lot and waited for Mr. Ammel.**
- **On the weekend of 12 September 2025, Defendant and Mr. Ammel took our minor child, J.A., to a concert in Kentucky. On Sunday, 14 September, Defendant and Mr. Ammel drove J.A. back through the night to Moore County, North Carolina. Defendant and Mr. Ammel dropped J.A. off at school at 9:00 a.m. Monday morning.**
- **On 16 September 2025, Defendant accompanied Mr. Ammel to the marital residence to pick up the remainder of his belongings. Defendant sat outside in the cul-de-sac immediately adjacent to our marital residence.**
- **On 19 November 2025, Mr. Ammel's property manager filed a 50C Complaint for No-Contact Order against him. Mr. Ammel was involuntarily committed to the hospital, and on 20 November 2025, Mr. Ammel was arrested for assaulting the physician assistant at the hospital. Defendant traveled to Moore County, North Carolina to bond Mr. Ammel out of jail and moved him out of his rental property to her house in Arizona.**

REQUESTS FOR PRODUCTION OF DOCUMENTS

1. All documents (including ESI) identified in response to the foregoing interrogatories.

**RESPONSE: Plaintiff objects to Request # 1 on the grounds that it is vague, overly broad, unduly burdensome, and to the extent it seeks information protected by the work product doctrine. Subject to and without waiving said objections, to the extent Plaintiff has possession of the**

**requested documents they are attached.**

2. All documents (including ESI) in your possession, custody, or control—including those contained on the laptop formerly belonging to Matthew Joseph Ammel—evidencing written communications (via SMS/text, email, or any other means) between Defendant and Mr. Ammel or between Mr. Ammel and third parties regarding Defendant and/or his impending separation from you.

**RESPONSE: Plaintiff objects to Request # 2 on the grounds that it is vague, overly broad, unduly burdensome, not limited in time, and to the extent it seeks information protected by the work product doctrine. Plaintiff further objects to this request as this information is equally available to Defendant. Subject to and without waiving said objections, to the extent Plaintiff has possession of the requested documents they are attached.**

3. All notes and records of your therapy sessions with Chad Brown, LMFT, LCAS that refer to: (1) your marriage to Matthew Joseph Ammel; (2) the possibility of separation between you and Matthew Joseph Ammel; and/or (3) Defendant.

**RESPONSE: Plaintiff objects to Request # 3 on the grounds that it is vague, overly broad, unduly burdensome, contains confidential information, and is not likely to lead to the discovery of admissible evidence. Plaintiff further objects on the grounds that the documents requested are protected by the psychotherapist-patient privilege and the work-product doctrine. Subject to and without waiving said objections, to the extent Plaintiff has possession of the requested documents they**

**are attached.**

4. All photos/screenshots in native format (with metadata intact revealing, at a minimum, the date and time such photo/screenshot was taken) evidencing any communications you claimed to have witnessed between Defendant and Matthew Joseph Ammel, including but not limited to the photo/screenshot attached as Exhibit A to your April 17, 2026 declaration in this matter.

**RESPONSE: Plaintiff objects to Request # 4 on the grounds that it is vague, overly broad, and unduly burdensome, not limited in time, and to the extent it seeks information protected by the work product doctrine. Plaintiff further objects to this request as this information is equally available to Defendant. Subject to and without waiving said objections, to the extent Plaintiff has possession of the requested documents they are attached.**

5. All communications between you and Matthew Joseph Ammel related to the subject of your marriage ending or the plan of desire of either of you to physically separate, including but not limited to correspondence, emails, text (SMS) messages, audio or video recordings, voicemails, and encrypted messages.

**RESPONSE: Plaintiff objects to Request # 5 on the grounds that it is vague, overly broad, unduly burdensome, not limited in time, and to the extent it seeks information protected by the work product doctrine. Subject to and without waiving said objections, to the extent Plaintiff has possession of the requested documents they are attached.**

## REQUESTS FOR ADMISSIONS

Plaintiff is requested to admit the following:

1. You possess no physical evidence establishing that Defendant's messages as revealed in Exhibit A to your April 17, 2026 declaration in this matter were sent to Matthew Joseph Ammel's cellphone on or about October 3, 2024.

Admit ☐ Deny ☒

**RESPONSE: Plaintiff has produced a photograph of the October 3, 2024, Signal message where Defendant messaged Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." Plaintiff responded to the message stating, "are you having an affair with my husband? You took a married man away from his family." The date on the photograph shows Plaintiff took the photo and responded to the Signal message on October 4th, 2024, at 8:00am, and Defendant sent the message the night before.**

2. You possess no physical evidence of any communications of a romantic nature between Defendant and Matthew Joseph Ammel prior to October 2024 that occurred while he was physically present in the State of North Carolina.

Admit ☒ Deny ☐

**RESPONSE: While Plaintiff does not possess any physical evidence of messages Defendant sent to Mr. Ammel while he was physically present in North Carolina prior to October 3rd, 2024, Plaintiff personally witnessed all the messages described herein and set forth in her verified complaint and declaration.**

3. You possess no physical evidence revealing that Defendant was aware of the physical location of Matthew Joseph Ammel at the time of any of the communications between them that you describe in your April 17, 2026 declaration in this matter.

Admit ☒ Deny ☐

**RESPONSE: Plaintiff objects to this Request as it requires Plaintiff to speculate as to Defendant's knowledge. However, Plaintiff asserts that based on the information described herein and set forth in her verified complaint and declaration, Defendant knew or should have known where Mr. Ammel was located at the time Defendant sent Mr. Ammel the messages described herein and set forth in Plaintiff's verified complaint and declaration.**

4. On or about October 17, 2024, you and Matthew Joseph Ammel attended a therapy session with your therapist, Mr. Chad Brown, during which the topic of your impending separation was discussed.

Admit ☐ Deny ☒

**RESPONSE: Plaintiff objects to this Request as it seeks confidential information and is not likely to lead to the discovery of admissible evidence. Plaintiff further objects on the grounds that the information requested is protected by the psychotherapist-patient privilege. Subject to and without waiving said objections, Plaintiff and Mr. Ammel attended a joint therapy session with Mr. Brown on October 24th, 2024, and the topic of separation was discussed.**

5. You were aware that Matthew Joseph Ammel had toured an apartment into which he planned to move prior to the trip you and Mr. Ammel took to Nashville, Tennessee on or about October 25, 2024.

Admit ☒ Deny ☐

**RESPONSE: Plaintiff objects to this Request as to relevance, as it is irrelevant whether Mr. Ammel toured an apartment prior to their anniversary trip on October 25-26th,**

**2024. Plaintiff asserts that Plaintiff and Mr. Ammel's anniversary trip and the events that occurred between them on the anniversary trip is sufficient in and of itself to demonstrate that their marriage was not over prior to their anniversary trip.**

This, the 17 day of June 2026.

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

By: Mary Catherine Coltrane

Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

# CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that the undersigned has this date served the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES, AND FIRST REQUEST FOR PRODUCTION OF DOCUMENTS, FIRST REQUEST FOR ADMISSIONS, TO PLAINTIFF** upon the persons listed below via e-mail addressed as follows:

Steven B. Epstein, Esq.
*Attorney for Defendant Kyrsten Sinema*
301 Fayetteville Street
Suite 1900
P.O. Box 1801 (27602-1801)
Raleigh, North Carolina 27601
Telephone: (919) 783-2846
Facsimile: (919) 783-1075
sepstein@poynerspruill.com

This, the 17 day of June 2026.

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

By: Mary Catherine Coltrane
Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

**STATE OF NORTH CAROLINA )**
**)** **VERIFICATION**
**COUNTY OF MOORE )**

I, **HEATHER AMMEL**, after first being duly sworn, depose and say:

I have reviewed the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES**. That the information contained therein is true and correct. With regard to any information stated therein upon information and belief, I believe it to be true as well.

This, the 17 day of June 2026.

Heather Ammel
**HEATHER AMMEL**

On this 17 day of June 2026, before me Audrey Villatoro a notary public, personally appeared **HEATHER AMMEL**, proved on the basis of satisfactory evidence to be the person whose name is subscribed to this Verification, and acknowledged she executed the same.

Witness my hand and official seal.

A. Villatoro
*Notary signature*

My Commission Expires: 04/11/2028

AUDREY VILLATORO
MY COMMISSION EXPIRES
(Seal)
NOTARY PUBLIC
04/11/2028
LEE COUNTY, NC

PENGAD 800-631-6989
DEFENDANT'S DEPOSITION EXHIBIT
3
Ammel



02:41

KS
8h

Yesterday

I hope your day was ok 20:54

Thinking of you 20:54

I really miss you. 22 38

I am with you 22:59

Today

I keep waking up during my sleep and reaching over for your arms to hold me. 01 18

*You deleted this message.*
19m

New Messages

What did you write and delete 1m

I am here 1m


KS >
Thu, Jun 20 at 12:02 PM
Noah Kahan: We'll All Be Here Forever Tour
verified-ticket.com
8/19/24
Thu, Jul 18 at 1:32 PM
KS's location expired
7/22/24
KS started sharing location with you.
Mon, Jul 29 at 6:13 PM
KS's location expired
Tue, Aug 6 at 9:31 AM
1787 enter
Today 12:38 AM
I cannot sleep, I am miserable, and I want at least one of my pens back. You have them both. Pls give me one back now.
iMessage



08:00
LTE
K S
8h
K S
+1 602-904-9665
Member of R2R, Bottlerock,
and 3 additional groups
Yesterday
I miss you 21:57
Putting my hand on your heart 21:58
I'll see you soon 21:58
Today
Are you having an affair with my husband
Now
Message

6/22/24, 10:54 PM
iPhone (87) (19132403852)

I won't. I set it for later

6/22/24, 10:55 PM
iPhone (87) (19132403852)

It's not safe for us to do a road trip on not enough sleep

6/22/24, 11:06 PM
iPhone (87) (19132403852)

When will you be back? We have to leave early

6/23/24, 12:34 AM
iPhone (87) (19132403852)

Where are you?????

6/23/24, 12:36 AM
iPhone (87) (19132403852)

What the fuck matt

6/23/24, 12:38 AM
Matthew Ammel (matthew.ammel@hotmail.com)

I want a fucking divorce

6/23/24, 12:38 AM
iPhone (87) (19132403852)

We are leaving for my grandfathers funeral. What is wrong with you!

6/23/24, 12:38 AM
Matthew Ammel (matthew.ammel@hotmail.com)

I hate you

6/23/24, 12:38 AM
iPhone (87) (19132403852)

Wow

6/23/24, 12:40 AM
iPhone (87) (19132403852)
Message was edited 6/23/24, 12:40 AM

Where is my moms car

PENGAD 800-631-6989 DEFENDANT'S DEPOSITION EXHIBIT 4 Ammel

6/23/24, 12:41 AM
iPhone (87) (19132403852)

Answer my call

6/23/24, 12:41 AM
Matthew Ammel (matthew.ammel@hotmail.com)
Message is a reply to thread: "Where is my moms car"

At my moms house

6/23/24, 12:41 AM
iPhone (87) (19132403852)

Answer my call

6/23/24, 12:41 AM
Matthew Ammel (matthew.ammel@hotmail.com)

No

6/23/24, 12:42 AM
iPhone (87) (19132403852)

Where are you going

6/23/24, 12:42 AM
Matthew Ammel (matthew.ammel@hotmail.com)

Home

6/23/24, 12:42 AM
iPhone (87) (19132403852)

So what so I do about traveling tomorrow

6/23/24, 12:43 AM
iPhone (87) (19132403852)

We are traveling tomorrow. What am I supposed to do

6/23/24, 12:43 AM
Matthew Ammel (matthew.ammel@hotmail.com)

I'll be just fine

6/23/24, 12:43 AM
iPhone (87) (19132403852)

What about your FAMILY

6/23/24, 12:43 AM
iPhone (87) (19132403852)

stop being selfish

**6/23/24, 12:44 AM**
iPhone (87) (19132403852)

Act like an adult matt.

**6/23/24, 12:45 AM**
Matthew Ammel (matthew.ammel@hotmail.com)

I am. I don't want to be married to you anymore. My best man confirmed I shouldn't be with a woman who hits me.

**6/23/24, 12:45 AM**
iPhone (87) (19132403852)

I don't hate you. You're drunk.

**6/23/24, 12:46 AM**
Matthew Ammel (matthew.ammel@hotmail.com)

Everyone that's ever met you hates you

**6/23/24, 12:46 AM**
iPhone (87) (19132403852)

We are traveling in a few hours. What can I expect of you

**6/23/24, 12:46 AM**
iPhone (87) (19132403852)

How can you treat me like this

**6/23/24, 12:46 AM**
iPhone (87) (19132403852)

I'm driving out to get you now

**6/23/24, 12:49 AM**
iPhone (87) (19132403852)

ANSWER MY CALL

**6/23/24, 12:50 AM**
iPhone (87) (19132403852)

We are leaving for a funeral in a few hours matt. What are you doing

**6/23/24, 12:53 AM**
iPhone (87) (19132403852)

Answer me

6/23/24, 12:54 AM (Viewed 6/23/24, 12:56 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Stop calling me. We are getting divorced

6/23/24, 12:56 AM
iPhone (87) (19132403852)

I feel sick

6/23/24, 12:57 AM
iPhone (87) (19132403852)

You said you weren't going to drink anymore

6/23/24, 12:58 AM
iPhone (87) (19132403852)

Are you traveling with us?

6/23/24, 12:58 AM
Matthew Ammel (matthew.ammel@hotmail.com)

A normal wife would've been happy that I'm seeing my best friend. But you hate me

6/23/24, 12:58 AM
Matthew Ammel (matthew.ammel@hotmail.com)

You're the fucking worst

6/23/24, 12:58 AM
iPhone (87) (19132403852)

Of course I am

6/23/24, 12:59 AM
Matthew Ammel (matthew.ammel@hotmail.com)

You are

6/23/24, 12:59 AM
iPhone (87) (19132403852)

I'm happy you saw him. How could you treat me so horribly

6/23/24, 12:59 AM
Matthew Ammel (matthew.ammel@hotmail.com)

I hate you

6/23/24, 12:59 AM
iPhone (87) (19132403852)

We are leaving in a few hours for my grandfathers funeral. How could you treat your wife like this

6/23/24, 1:00 AM
iPhone (87) (19132403852)

Are you coming with us to Colorado?

6/23/24, 1:01 AM
Matthew Ammel (matthew.ammel@hotmail.com)

Because you've treated me like shit forever. A normal wife who actually cares about her husband would've been happy for me tonight

6/23/24, 1:01 AM
iPhone (87) (19132403852)

I am happy for you! We also have to drive twelve hours today! And the next couple days

6/23/24, 1:01 AM
iPhone (87) (19132403852)

Are you coming with us or not

6/23/24, 1:01 AM
Matthew Ammel (matthew.ammel@hotmail.com)

I don't care. I hate you. I don't want to be married to you anymore

6/23/24, 1:02 AM
iPhone (87) (19132403852)

Are you coming with us this morning or not?

6/23/24, 1:02 AM
Matthew Ammel (matthew.ammel@hotmail.com)

Not if you're going to continue treating me like shit

6/23/24, 1:02 AM
Matthew Ammel (matthew.ammel@hotmail.com)

You punched me in the head 3 times. I hate you

6/23/24, 1:03 AM
iPhone (87) (19132403852)

I don't. You're treating me like shit. And I won't take the blame.

6/23/24, 1:03 AM
iPhone (87) (19132403852)

I didn't.

6/23/24, 1:03 AM
iPhone (87) (19132403852)

Are you coming or not matt

6/23/24, 1:03 AM
Matthew Ammel (matthew.ammel@hotmail.com)

That's because you're a fucking immature child

6/23/24, 1:03 AM
iPhone (87) (19132403852)

I'm not taking the blame.

6/23/24, 1:04 AM
iPhone (87) (19132403852)

You're wrong here and you know it

6/23/24, 1:04 AM
Matthew Ammel (matthew.ammel@hotmail.com)

I hate you

6/23/24, 1:04 AM
iPhone (87) (19132403852)

Will you be in the car with us in a few hours or not

6/23/24, 1:04 AM
iPhone (87) (19132403852)

My sister is taking my dad to the airport at 5 am in my mom's car.

6/23/24, 1:04 AM
Matthew Ammel (matthew.ammel@hotmail.com)

I don't know I hate you

6/23/24, 1:04 AM
iPhone (87) (19132403852)

You're acting like a child.

6/23/24, 1:05 AM
Matthew Ammel (matthew.ammel@hotmail.com)

You should fly with the kids

6/23/24, 1:05 AM
iPhone (87) (19132403852)

I'm going to bed now. And I'm driving with the kids in a few hours.

6/23/24, 1:05 AM
Matthew Ammel (matthew.ammel@hotmail.com)

Ok

6/23/24, 1:05 AM
iPhone (87) (19132403852)

Thanks for being a good husband and dad.

6/23/24, 1:06 AM
iPhone (87) (19132403852)

You know the kids will be devastated but you're selfish.

6/23/24, 1:07 AM
Matthew Ammel (matthew.ammel@hotmail.com)

That's not true. They know their mom hates their dad. You can pretend moral superiority all you want

6/23/24, 1:08 AM
iPhone (87) (19132403852)

Im not going to let you treat me this way anymore.

6/23/24, 1:08 AM
iPhone (87) (19132403852)

I will drive to Oregon by myself with the kids

6/23/24, 1:09 AM
Matthew Ammel (matthew.ammel@hotmail.com)

I was going to get you to Oregon and have a good summer vacation and then end it

6/23/24, 1:09 AM
iPhone (87) (19132403852)

I need my moms car in the drive way

6/23/24, 1:09 AM
iPhone (87) (19132403852)

I bet. Because you're cruel and evil.

6/23/24, 1:09 AM
iPhone (87) (19132403852)

There's something wrong with your brain.

6/23/24, 1:09 AM
Matthew Ammel (matthew.ammel@hotmail.com)

No I hate you

6/23/24, 1:09 AM
iPhone (87) (19132403852)

Thanks for fucking me last night.

6/23/24, 1:09 AM
Matthew Ammel (matthew.ammel@hotmail.com)

You're the worst person I've ever met

6/23/24, 1:09 AM
iPhone (87) (19132403852)

Thanks for telling me you love me.

6/23/24, 1:09 AM
Matthew Ammel (matthew.ammel@hotmail.com)

Look at your family. You're them

6/23/24, 1:10 AM
iPhone (87) (19132403852)

That's evil. You are evil.

6/23/24, 1:10 AM
iPhone (87) (19132403852)

Did you fuck Kyrsten

6/23/24, 1:10 AM
Matthew Ammel (matthew.ammel@hotmail.com)

No. I just fucking hate you

6/23/24, 1:10 AM
iPhone (87) (19132403852)

You can say that all you want but I don't believe you.

6/23/24, 1:11 AM
iPhone (87) (19132403852)

Are you bringing my mom's car here?

6/23/24, 1:11 AM
Matthew Ammel (matthew.ammel@hotmail.com)

No I have for a long time

6/23/24, 1:11 AM
iPhone (87) (19132403852)

Are you bring my moms car back

6/23/24, 1:11 AM (Viewed 6/23/24, 1:12 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Of course

6/23/24, 1:12 AM
iPhone (87) (19132403852)

When can I expect you

6/23/24, 1:13 AM
iPhone (87) (19132403852)

When will the car be here or do I need to come get it

6/23/24, 1:14 AM
iPhone (87) (19132403852)

I am devastated. My heart is shattered.

6/23/24, 1:16 AM
iPhone (87) (19132403852)

Are you coming back to my house

6/23/24, 1:21 AM
iPhone (87) (19132403852)

Do I need to come get the car

6/23/24, 2:16 AM (Viewed 6/23/24, 2:17 AM)

Matthew Ammel (matthew.ammel@hotmail.com)




6/24/24, 9:33 AM

iPhone (87) (19132403852)

I need to say this over text. She's insidious. Yes, she might care about you and want to help you, but it's to her own gain. This is a woman who is willing to break up a family. Why do you want to align yourself with someone who doesn't respect your marriage and family? She's a home wrecker. She knows you're vulnerable, and has taken advantage of that. And I get why you feel comforted by her. But underlying that is more darkness. She has you in her web now. I'm telling you if our marriage ends, and you continue this emotional affair (if not physical at this point) the girls will never forgive you. That is not a threat either. It's just what will happen. And I don't want to see them damaged in that way. Please do not throw away our family that I love SO much for someone as selfish as she is. I love you more than anything. I don't ever want to lose you. I'm going to do everything in power to fix my shit so we can have a happy marriage. I need to know that you are willing too.

**7/10/24, 7:48 PM**
iPhone (87) (19132403852)

Is it ok if I send you a link to read in private when you have time? I think it's a good strategy for us to try out

**7/10/24, 8:32 PM (Viewed 7/10/24, 8:35 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah of course

**7/10/24, 8:36 PM**
iPhone (87) (19132403852)



Denver Psychotherapy and Consultation Services, LLC | Noeticus Counseling Center and Training Institute

**THE HEALING SEPARATION:**
**AN ALTERNATIVE TO DIVORCE OR ENDING**
*Adapted from Rebuilding: When Your Relationship Ends (2nd ed.)*
by Bruce Fisher, PhD

A Healing Separation is a structured time apart which can help a couple heal a relationship that isn't working. It can also help revitalize and renew a relationship that is working. The Healing Separation is designed to transform the basis of a love relationship – moving it from neediness to health. A successful Healing Separation requires that both partners be committed to personal growth, and to creating healthy relationships with themselves and each other. Such a framework will allow them to carve out a new and more fulfilling relationship than they've known in the past.

When a relationship is in trouble, the couple has essentially three choices:

1. Continue as is
2. End the relationship
3. Carve out a new relationship

If a relationship is already crumbling, not many couples want to continue it as is. That leaves choices two and three. Chances are they hadn't thought much about the third choice – it probably seemed impossible. What's more, they don't know how to go about it. So their choice, almost by default, is to end the relationship.

There is another alternative: partners can work out a new relationship with themselves and with each other. The Healing Separation offers a process within which to do just that.

*What is a Healing Separation?*

The Healing Separation, like a "trial separation," involves living apart for a while, with the decision as to whether or not to end the relationship put off until some future time. Unlike unplanned and unstructured separations, however, the Healing Separation is a working separation, in which you and your partner *dedicate* yourselves to investing in your own personal growth. Can you create a better relationship with yourself that will allow different and healthier relationships with others? Sometimes your work during a Healing Separation may be on "the old relationship," and sometimes it may be on "the old you." The Healing Separation is a creative way to strengthen both partners and build a new relationship without dissolving the partnership.

A relationship between two people is analogous to a bridge. Each partner forms one end and provides half the support for the bridge. The connection between the two – the bridge – is the relationship itself. A Healing Separation gives the partners time to concentrate on themselves, on their own supportive end structures, rather than on the relationship, or the bridge. It can be a

131 West 10th Avenue • Denver CO 80204-4013 • Phone 303-399-9988 • Fax 303-399-9977
*Denver Psychotherapy and Consultation Services, LLC* • info@dpsconline.com or www.dpsconline.com
*Noeticus Counseling Center and Training Institute* • info@noeticus.org or www.noeticus.org

**7/10/24, 8:36 PM**
iPhone (87) (19132403852)



Denver Psychotherapy and Consultation Services, LLC | Noeticus Counseling Center and Training Institute

THE HEALING SEPARATION:
AN ALTERNATIVE TO DIVORCE OR ENDING
Adapted from Rebuilding: When Your Relationship Ends (2nd ed.)
by Bruce Fisher, PhD

A Healing Separation is a structured time apart which can help a couple heal a relationship that isn't working. It can also help revitalize and renew a relationship that is working. The Healing Separation is designed to transform the basis of a love relationship – moving it from neediness to health. A successful Healing Separation requires that both partners be committed to personal growth, and to creating healthy relationships with themselves and each other. Such a framework will allow them to carve out a new and more fulfilling relationship than they've known in the past.

When a relationship is in trouble, the couple has essentially three choices:

1. Continue as is
2. End the relationship
3. Carve out a new relationship

If a relationship is already crumbling, not many couples want to continue it as is. That leaves choices two and three. Chances are they hadn't thought much about the third choice – it probably seemed impossible. What's more, they don't know how to go about it. So their choice, almost by default, is to end the relationship.

There is another alternative: partners can work out a new relationship with themselves and with each other. The Healing Separation offers a process within which to do just that.

What is a Healing Separation?

The Healing Separation, like a "trial separation," involves living apart for a while, with the decision as to whether or not to end the relationship put off until some future time. Unlike unplanned and unstructured separations, however, the Healing Separation is a working separation, in which you and your partner dedicate yourselves to investing in your own personal growth. Can you create a better relationship with yourself that will allow different and healthier relationships with others? Sometimes your work during a Healing Separation may be on "the old relationship," and sometimes it may be on "the old you." The Healing Separation is a creative way to strengthen both partners and build a new relationship without dissolving the partnership.

A relationship between two people is analogous to a bridge. Each partner forms one end and provides half the support for the bridge. The connection between the two – the bridge – is the relationship itself. A Healing Separation gives the partners time to concentrate on themselves, on their own supportive end structures, rather than on the relationship, or the bridge. It can be a

131 West 10th Avenue • Denver CO 80204-4013 • Phone 303-399-9988 • Fax 303-399-9977
Denver Psychotherapy and Consultation Services, LLC • info@dpsconline.com or www.dpsconline.com
Noeticus Counseling Center and Training Institute • info@noeticus.org or www.noeticus.org

**7/10/24, 8:36 PM**
iPhone (87) (19132403852)




https://equivocality.com/files/healing-separation.pdf
(Sent with URL)

**7/10/24, 8:36 PM**
iPhone (87) (19132403852)
Message was edited 7/10/24, 8:36 PM

I think that this is exactly what both of us want and need.

**7/10/24, 9:06 PM**
iPhone (87) (19132403852)

We have the cutest kids on the planet. Cooper melts my heart.

**7/10/24, 9:06 PM**
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah he's a sweet boy

**7/11/24, 6:10 AM**
iPhone (87) (19132403852)

I miss you.

**7/11/24, 8:00 AM**
iPhone (87) (19132403852)

Good luck today. I know you'll crush it. I love you!

**7/11/24, 10:09 AM (Viewed 7/11/24, 10:11 AM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Thanks baby. I love you too.

**7/11/24, 10:09 AM (Viewed 7/11/24, 10:11 AM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Are you okay with the girls babysitting my buddy across the streets 9 mo old?

7/11/24, 10:11 AM
iPhone (87) (19132403852)

I really need to talk to you

7/11/24, 10:12 AM (Viewed 7/11/24, 10:14 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

I can't for a few hours

7/11/24, 10:14 AM
iPhone (87) (19132403852)

I need transparency. I just came from therapy and I'm going back on Saturday.

7/11/24, 10:15 AM
iPhone (87) (19132403852)

The writing is on the wall with you and Kyrsten having an affair. I feel like you're trying to keep me at bay until your shit is lined up for you to leave and be with her. I also think you're trying to keep me calm so I don't expose anything and ruin whatever opportunity is next for you. Just be honest with me. I deserve that.

7/11/24, 10:18 AM
iPhone (87) (19132403852)

I can tell you're already with her by how disgusted you are by me.

7/11/24, 10:19 AM
iPhone (87) (19132403852)

Please. Just tell me the truth.

7/11/24, 10:22 AM
iPhone (87) (19132403852)

You need to respond to me before I take drastic steps to protect myself and the kids.

7/11/24, 10:45 AM (Viewed 7/11/24, 10:46 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

None of that is true. I can't talk about this right now.

7/11/24, 10:47 AM
iPhone (87) (19132403852)

If none of that is true then you need to do everything in your power to prove that to me. But you won't. Because you're already checked out.

7/11/24, 10:54 AM
iPhone (87) (19132403852)

Are you willing to go to therapy with me Saturday

7/11/24, 11:03 AM (Viewed 7/11/24, 11:05 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Of course

7/11/24, 11:04 AM (Viewed 7/11/24, 11:05 AM)
Matthew Ammel (matthew.ammel@hotmail.com)




Are you good with this? The girls said they are.



AMMEL 1st POD 00104/457

7/11/24, 11:06 AM
iPhone (87) (19132403852)

9 months is young….they don't know how to change diapers. I guess I could help. Is it temporary?

7/11/24, 11:07 AM (Viewed 7/11/24, 11:12 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

They're smart girls. They just need to be shown how to do it.

7/11/24, 11:07 AM (Viewed 7/11/24, 11:12 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah their nanny took a different job and only gave them a weeks notice.

7/11/24, 11:07 AM (Viewed 7/11/24, 11:12 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

I didn't know how to change a diaper either

7/11/24, 11:07 AM (Viewed 7/11/24, 11:12 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

This will be good for them.

7/11/24, 11:13 AM
iPhone (87) (19132403852)

When does it start? I will need to be available to show them

7/11/24, 11:25 AM (Viewed 7/11/24, 11:48 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Monday

7/11/24, 12:14 PM
iPhone (87) (19132403852)




7/11/24, 12:15 PM
iPhone (87) (19132403852)

You left this where the kids could find it. Need to hold it together long enough to get back to her? Hold it together so I don't find out the truth.

7/11/24, 12:15 PM (Viewed 7/11/24, 12:16 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Please don't read my things. That's not at all what I was talking about.

7/11/24, 12:16 PM
iPhone (87) (19132403852)

You left it out.

7/11/24, 12:16 PM
iPhone (87) (19132403852)

I hope the kids didn't see it n

7/11/24, 12:16 PM
iPhone (87) (19132403852)

Or is it do you fully trust Kyrsten?

7/11/24, 12:17 PM
iPhone (87) (19132403852)

You realize every sign points to you having an affair right

7/11/24, 12:24 PM
iPhone (87) (19132403852)

Why would you need to hold it together until Tuesday?

7/11/24, 2:35 PM
iPhone (87) (19132403852)

I would appreciate a response

7/11/24, 2:42 PM
iPhone (87) (19132403852)

Are you willing to go to couples therapy or is too late

7/11/24, 5:25 PM
iPhone (87) (19132403852)

I'm on the verge of a full blown panic attack matt.

7/11/24, 6:39 PM
iPhone (87) (19132403852)

Why won't you respond to me

7/11/24, 7:07 PM
iPhone (87) (19132403852)

Why are you treating me this way?

7/11/24, 7:09 PM
iPhone (87) (19132403852)

How can you crush our children this way

7/11/24, 7:36 PM
iPhone (87) (19132403852)



Something in the orange huh

**7/11/24, 7:47 PM**
iPhone (87) (19132403852)



**7/11/24, 10:03 PM**
iPhone (87) (19132403852)

Please answer matt

**7/11/24, 10:03 PM**
iPhone (87) (19132403852)

Please let me know you care.

**7/12/24, 5:03 AM**
iPhone (87) (19132403852)

I'm physically getting sick. I'm begging you to reach out to me. I feel completely alone and abandoned. I feel like I'm dying inside. Matt, please. Say something. I'm your wife.

**7/12/24, 7:46 AM (Viewed 7/12/24, 7:59 AM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Heather you need to stop this

**7/12/24, 7:46 AM (Viewed 7/12/24, 7:59 AM)**
Matthew Ammel (matthew.ammel@hotmail.com)

I'll be home soon

**7/12/24, 7:59 AM**
iPhone (87) (19132403852)

Will you still go with me tomorrow morning to therapy

7/12/24, 7:59 AM

Matthew Ammel (matthew.ammel@hotmail.com)

Yes

7/12/24, 8:00 AM

iPhone (87) (19132403852)

Are you still in love with me

7/12/24, 8:03 AM (Viewed 7/12/24, 8:07 AM)

Matthew Ammel (matthew.ammel@hotmail.com)

Of course. I have and will always love you

7/12/24, 8:07 AM

iPhone (87) (19132403852)

Did you read that thing about a healing separation

7/12/24, 8:09 AM

Matthew Ammel (matthew.ammel@hotmail.com)

I will on the plane today

7/12/24, 10:31 AM

iPhone (87) (19132403852)

Are you working today

7/12/24, 10:48 AM

iPhone (87) (19132403852)

Can you please pick up

7/12/24, 10:49 AM

iPhone (87) (19132403852)

I need to talk to you

7/12/24, 11:00 AM

iPhone (87) (19132403852)

You should be doing everything you can to show to me that me and your kids are more important

7/12/24, 11:00 AM

iPhone (87) (19132403852)

Otherwise it's abandonment

7/12/24, 11:01 AM
iPhone (87) (19132403852)

I bet you had a great couple days celebrating her birthday.

7/12/24, 11:05 AM
iPhone (87) (19132403852)

No job is worth your family

7/12/24, 11:08 AM
iPhone (87) (19132403852)

Ok here's the deal. If you aren't going to provide full honesty and transparency do not come back here. I can't take anymore lies. If you can be fully honest then come back home.

7/12/24, 11:20 AM
iPhone (87) (19132403852)

Is that agreeable with you?

7/12/24, 2:03 PM
Matthew Ammel (matthew.ammel@hotmail.com)

The flight might get canceled

7/12/24, 2:03 PM
iPhone (87) (19132403852)

Is it rain?

7/12/24, 2:03 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

7/12/24, 2:03 PM
iPhone (87) (19132403852)

You can drive

7/12/24, 2:03 PM
iPhone (87) (19132403852)

I don't want you staying there

7/12/24, 2:04 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Because I'll drink too much by myself?

7/12/24, 2:04 PM
iPhone (87) (19132403852)

No because I don't trust you w her

7/12/24, 2:05 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Well she has been in Idaho since 3 pm yesterday

7/12/24, 2:05 PM
iPhone (87) (19132403852)

Well you'll be reunited soon enough

7/12/24, 2:06 PM
iPhone (87) (19132403852)

You need to quit matt. Don't lose your family.

7/12/24, 2:06 PM
iPhone (87) (19132403852)

It might seem golden right now, but it won't last.

7/12/24, 2:09 PM
iPhone (87) (19132403852)

Look matt. Something isn't right. Your friends are worried about you. I will help you but you need to be level headed about this

7/12/24, 2:15 PM
iPhone (87) (19132403852)

Did you take off?

7/12/24, 2:40 PM
iPhone (87) (19132403852)

I would appreciate if you read that document about a healing separation. That way we can have a mature conversation about our next step

7/12/24, 4:03 PM
iPhone (87) (19132403852)

https://open.spotify.com/track/6ZtqlEsh4lq0YUVft1YIJq?si=09VQlhJ6TsmG6RpmpjPKDQ&preview=none
(Sent with URL)

**7/12/24, 5:20 PM (Viewed 7/12/24, 5:22 PM)**

Matthew Ammel (matthew.ammel@hotmail.com)

If you try and get physical with me tonight I am going to call the police.

**7/12/24, 5:26 PM**

iPhone (87) (19132403852)

Start acting like a man.

**7/12/24, 5:26 PM**

iPhone (87) (19132403852)

Don't come here if you've been drinking

**7/12/24, 5:33 PM**

iPhone (87) (19132403852)

I will not tolerate you being here if you appear even slightly like you've been drinking or you're high. I WILL call the police

**7/12/24, 6:36 PM**

iPhone (87) (19132403852)



Denver Psychotherapy and Consultation Services, LLC | Nueticus Counseling Center and Training Institute

THE HEALING SEPARATION:
AN ALTERNATIVE TO DIVORCE OR ENDING

by Bruce Fisher, PhD

1. Continue as is
2. End the relationship
3. Carve out a new relationship

*What is a Healing Separation?*

**7/12/24, 6:36 PM**
iPhone (87) (19132403852)


Denver Psychotherapy and Consultation Services, LLC
Noeticus Counseling Center and Training Institute

THE HEALING SEPARATION:
AN ALTERNATIVE TO DIVORCE OR ENDING

by Bruce Fisher, PhD

1. Continue as is
2. End the relationship
3. Carve out a new relationship

*What is a Healing Separation?*

**7/12/24, 6:36 PM**
iPhone (87) (19132403852)




https://equivocality.com/files/healing-separation.pdf
(Sent with URL)

**7/13/24, 5:46 PM**
iPhone (87) (19132403852)



**7/13/24, 5:46 PM**
iPhone (87) (19132403852)



**7/13/24, 5:46 PM**
iPhone (87) (19132403852)

THE MARRIAGE
RESTORATION PROJECT
Keeping Couples Together And Happy

https://themarriagerestorationproject.com/how-my-therapist-destroyed-my-marriage/
(Sent with URL)

9/2/24, 7:48 PM (Viewed 9/2/24, 7:53 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Because I haven't told kyrsten that I'm not staying there. I don't want Courtney to.

9/2/24, 7:54 PM
iPhone (87) (melansonh@yahoo.com)

Did you stay with her in dc the other night

9/2/24, 7:56 PM
iPhone (87) (melansonh@yahoo.com)

Why would it be a big deal if you don't stay at her place? That's absurd as a married man.

9/2/24, 7:57 PM
iPhone (87) (melansonh@yahoo.com)

You're spinning lies. You told me she invited you to dinner at her house.

9/2/24, 7:57 PM
iPhone (87) (melansonh@yahoo.com)

Implying that she knew you were staying at a hotel n

9/2/24, 7:59 PM
iPhone (87) (melansonh@yahoo.com)

I would like answers

9/2/24, 8:01 PM
iPhone (87) (melansonh@yahoo.com)

Why are you so concerned about her feelings? You should only care about your wife's!!!

9/2/24, 8:18 PM
iPhone (87) (melansonh@yahoo.com)

I want answers. No one cares about her enough for you to look at your phone for a minute to respond to your WIFE

9/2/24, 8:34 PM
iPhone (87) (melansonh@yahoo.com)

Please answer me so I can go to sleep.

9/2/24, 9:47 PM
iPhone (87) (melansonh@yahoo.com)

While your children are growing up, playing baseball, becoming teenage girls, cheering and playing band at

football games, enjoying one of their last halloweens, you're accompanying another woman, who is not your wife or your children's mother, to concerts and dinners. You can get an epidural in Pinehurst. You can get a job in North Carolina. Your kids want their dad around. Clara is catching on, Matt. I will not share you with another woman. She has you under her thumb. It's selfish. She knows you're going to bite when she dangles a job in front of you. It's a red flag if you're afraid of rocking the boat with her. You need to get out of this mess. It will not get better. The only way this is going to get better for you, for us, for our family, is to let this job go in December. It is not worth losing what really counts at the end of the day, your family.

**9/3/24, 7:50 AM**
iPhone (87) (melansonh@yahoo.com)



**9/3/24, 8:21 AM**
iPhone (87) (melansonh@yahoo.com)

Give me a call before you get busy

**9/3/24, 10:40 AM**
iPhone (87) (melansonh@yahoo.com)

Are you giving me the silent treatment bc I feel like that's unfair? I'm just asking for a minute to chat and I'll let you go on with your day please

**9/3/24, 11:43 AM (Viewed 9/3/24, 11:44 AM)**
Matthew Ammel (matthew.ammel@hotmail.com)

No I've just been busy. I'll call when I get to the hotel

9/7/24, 4:05 PM

Matthew Ammel (matthew.ammel@hotmail.com)



9/7/24, 4:06 PM

iPhone (87) (melansonh@yahoo.com)

Thanks boo! Looks gorgeous

9/7/24, 4:13 PM

iPhone (87) (melansonh@yahoo.com)

Matt this is not ok. Please call me when you get through security. You still have three hrs before you fly

9/7/24, 4:14 PM

iPhone (87) (melansonh@yahoo.com)

You are choosing her over me and your family. You have to stop this please. I am begging you.

9/7/24, 4:15 PM

iPhone (87) (melansonh@yahoo.com)

You lied to me again. You explicitly said you were going up to hike alone. Then you lied to me just now saying you went hiking alone.

9/7/24, 4:22 PM

iPhone (87) (melansonh@yahoo.com)

You don't understand how devastating this is. This is cheating, matt.

**9/7/24, 4:27 PM**
iPhone (87) (melansonh@yahoo.com)

I literally daydream about seeing you and you're with her.

**9/7/24, 4:31 PM (Read 9/7/24, 4:32 PM)**
iPhone (87) (melansonh@yahoo.com)
Message was deleted 9/7/24, 4:32 PM

**9/7/24, 4:33 PM (Delivered 9/7/24, 4:34 PM)**
iPhone (87) (melansonh@yahoo.com)

Did you stay with her in DC

**9/7/24, 4:34 PM**
iPhone (87) (melansonh@yahoo.com)

I'm calling her.

**9/7/24, 4:46 PM**
iPhone (87) (melansonh@yahoo.com)

Do not ignore me matt

**9/7/24, 4:47 PM**
iPhone (87) (melansonh@yahoo.com)

Answer the phone. I know you have 10 mins before that flight boards

**9/7/24, 4:48 PM**
Matthew Ammel (matthew.ammel@hotmail.com)

Heather please stop this. You are driving the final nails in the coffin.

**9/7/24, 4:48 PM**
iPhone (87) (melansonh@yahoo.com)

You are by cheating on me!!!!

**9/7/24, 4:49 PM**
Matthew Ammel (matthew.ammel@hotmail.com)

I'm not going to answer. If you don't stop I'm going to not come home.

**9/7/24, 4:49 PM**
iPhone (87) (melansonh@yahoo.com)

Then don't come home!! Continue to devastate your children by spend time with them

9/7/24, 4:50 PM
iPhone (87) (melansonh@yahoo.com)

Don't know how inappropriate this is?!

9/7/24, 4:50 PM
iPhone (87) (melansonh@yahoo.com)

If you're choosing that then tell me now

9/7/24, 4:50 PM
iPhone (87) (melansonh@yahoo.com)

I want a fucking answer

9/7/24, 4:50 PM
iPhone (87) (melansonh@yahoo.com)

Are you choosing that or me

9/7/24, 4:51 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I'm going to make the world a beautiful place for my children. It's just going to hurt for a little bit. But one day they will understand.

9/7/24, 4:51 PM
iPhone (87) (melansonh@yahoo.com)

Even if you aren't sleeping with her, you have an inappropriate emotional relationship with her

9/7/24, 4:52 PM
iPhone (87) (melansonh@yahoo.com)

They will not. They are already sad.

9/7/24, 4:52 PM
iPhone (87) (melansonh@yahoo.com)

Answer please. It will be much faster

9/7/24, 4:52 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I'm going to turn off my phone if you call again

9/7/24, 4:52 PM
iPhone (87) (melansonh@yahoo.com)

Ok do you want me to call her then

9/7/24, 4:52 PM
iPhone (87) (melansonh@yahoo.com)

I have her number.

9/7/24, 4:53 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Then call her.

9/7/24, 4:53 PM
iPhone (87) (melansonh@yahoo.com)

I can't hide this from the kids anymore

9/7/24, 4:53 PM
iPhone (87) (melansonh@yahoo.com)

Did you stay at her place in dc

9/7/24, 4:53 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Then tell them

9/7/24, 4:53 PM
Matthew Ammel (matthew.ammel@hotmail.com)

No

9/7/24, 4:53 PM
iPhone (87) (melansonh@yahoo.com)

Did you stay at her place in phoenix

9/7/24, 4:53 PM
Matthew Ammel (matthew.ammel@hotmail.com)

No

9/7/24, 4:53 PM
iPhone (87) (melansonh@yahoo.com)

Have you had sez with her

9/7/24, 4:53 PM
iPhone (87) (melansonh@yahoo.com)

Sex

9/7/24, 4:53 PM
Matthew Ammel (matthew.ammel@hotmail.com)

No

9/7/24, 4:53 PM
iPhone (87) (melansonh@yahoo.com)

Have you done a psychedelic therapy session with her

9/7/24, 4:54 PM
Matthew Ammel (matthew.ammel@hotmail.com)

No she doesn't do that

9/7/24, 4:54 PM
iPhone (87) (melansonh@yahoo.com)

She does it for her friends

9/7/24, 4:54 PM
iPhone (87) (melansonh@yahoo.com)

Do you consider what you're doing with her an affair?

9/7/24, 4:55 PM
Matthew Ammel (matthew.ammel@hotmail.com)

No. But I do know it's inappropriate. I understand why you're upset.

9/7/24, 4:55 PM
iPhone (87) (melansonh@yahoo.com)

Are you willing to stop?

9/7/24, 4:55 PM
iPhone (87) (melansonh@yahoo.com)

Bc she is trying to be with you

9/7/24, 4:56 PM
iPhone (87) (melansonh@yahoo.com)

She is not a good person. If she were she wouldn't go after a married man with kids! She's a fucking cunt.

9/7/24, 4:56 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Maybe. But it's because she values me for my mind

9/7/24, 4:56 PM
iPhone (87) (melansonh@yahoo.com)

Fuck you.

9/7/24, 4:56 PM
iPhone (87) (melansonh@yahoo.com)

She wants to fuck you. End of story

9/7/24, 4:56 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I'm tired of being made to feel simple by you

9/7/24, 4:56 PM
iPhone (87) (melansonh@yahoo.com)

Are you seriously leaving me? I want an answer

9/7/24, 4:56 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Yes

9/7/24, 4:56 PM
iPhone (87) (melansonh@yahoo.com)

Ok.

9/7/24, 4:57 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Please do not do anything rash. Everything is going to be okay.

9/7/24, 4:57 PM
iPhone (87) (melansonh@yahoo.com)

Fuck you. I was always loyal to you. I never did anything wrong. Enjoy your lesbian 50 year old vegan girlfriend. As soon as she uses you up she will discard you.

9/7/24, 4:57 PM
iPhone (87) (melansonh@yahoo.com)

I am doing something rash.

9/7/24, 4:57 PM
iPhone (87) (melansonh@yahoo.com)

You treated me like garbage.

9/7/24, 4:58 PM
iPhone (87) (melansonh@yahoo.com)

You better answer now b

9/7/24, 4:58 PM
iPhone (87) (melansonh@yahoo.com)

I seriously will do something if you don't fucking answer!

9/7/24, 4:58 PM
Matthew Ammel (matthew.ammel@hotmail.com)

You better stop calling me b

9/7/24, 4:58 PM
iPhone (87) (melansonh@yahoo.com)

Fuck you!!!!!!!

9/7/24, 4:59 PM
iPhone (87) (melansonh@yahoo.com)

I'm calling her

9/7/24, 5:00 PM
iPhone (87) (melansonh@yahoo.com)

If you don't answer I will get ppl involved

9/7/24, 5:00 PM
iPhone (87) (melansonh@yahoo.com)

You are literally driving me to the brink

9/7/24, 5:00 PM
iPhone (87) (melansonh@yahoo.com)

I'm calling her b

9/7/24, 5:01 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Then call her b

9/7/24, 5:01 PM
iPhone (87) (melansonh@yahoo.com)

If you fucking leave me I will expose you

9/7/24, 5:01 PM
iPhone (87) (melansonh@yahoo.com)

Please matt call me

9/7/24, 5:01 PM
iPhone (87) (melansonh@yahoo.com)

I'm having a breakdown

9/7/24, 5:01 PM

Matthew Ammel (matthew.ammel@hotmail.com)

Expose me for trying to get psychedelic assisted therapy available for all suffering veterans

9/7/24, 5:02 PM

iPhone (87) (melansonh@yahoo.com)

I'm spinning bad

9/7/24, 5:02 PM

iPhone (87) (melansonh@yahoo.com)

Please the kids

9/7/24, 5:02 PM

iPhone (87) (melansonh@yahoo.com)

Are beee here

9/7/24, 5:02 PM

iPhone (87) (melansonh@yahoo.com)

Please two mins

9/7/24, 5:02 PM

Matthew Ammel (matthew.ammel@hotmail.com)

Go for a walk

9/7/24, 5:02 PM

iPhone (87) (melansonh@yahoo.com)

Please reassure me

9/7/24, 5:02 PM

iPhone (87) (melansonh@yahoo.com)

Before you get on that flight

9/7/24, 5:02 PM

iPhone (87) (melansonh@yahoo.com)

I can't do this for four hrs please

9/7/24, 5:03 PM

iPhone (87) (melansonh@yahoo.com)

Please answer I have the kids I need to function

9/7/24, 5:03 PM
iPhone (87) (melansonh@yahoo.com)

Til they go to bed

9/7/24, 5:03 PM
iPhone (87) (melansonh@yahoo.com)

Please just answer

9/7/24, 5:03 PM
iPhone (87) (melansonh@yahoo.com)

Please

9/7/24, 5:03 PM
iPhone (87) (melansonh@yahoo.com)

I'm having a breakdown please answer

9/7/24, 5:03 PM
iPhone (87) (melansonh@yahoo.com)

Please I'm your wife

9/7/24, 5:03 PM
iPhone (87) (melansonh@yahoo.com)

I love you. Please

9/7/24, 5:04 PM
iPhone (87) (melansonh@yahoo.com)

Matt I begging you

9/7/24, 5:04 PM
iPhone (87) (melansonh@yahoo.com)

Two kind

9/7/24, 5:04 PM
iPhone (87) (melansonh@yahoo.com)

Mins

9/7/24, 5:04 PM
iPhone (87) (melansonh@yahoo.com)

Please matt

9/7/24, 5:04 PM
iPhone (87) (melansonh@yahoo.com)

Are you going to leave me

9/7/24, 5:05 PM
iPhone (87) (melansonh@yahoo.com)

Please don't leave me. You're the love of my life.

9/7/24, 5:07 PM
iPhone (87) (melansonh@yahoo.com)

Are you leaving?

9/7/24, 5:11 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I would rather have this conversation in person. As long as you can keep it together.

9/7/24, 5:11 PM
iPhone (87) (melansonh@yahoo.com)

Fine. But we are not splitting.

9/7/24, 5:11 PM
iPhone (87) (melansonh@yahoo.com)

Ok?

9/7/24, 5:12 PM
iPhone (87) (melansonh@yahoo.com)

We are going to make this work. Ok?

9/7/24, 5:13 PM
iPhone (87) (melansonh@yahoo.com)

The Mendy session changed everything for me. And it made me want to have a loving happy relationship w you. Can we please work for that? I don't want divorce on the table again

9/7/24, 5:15 PM
iPhone (87) (melansonh@yahoo.com)

?

9/7/24, 5:15 PM
iPhone (87) (melansonh@yahoo.com)

My feelings are valid and you do need to take accountability in this

9/7/24, 5:16 PM
iPhone (87) (melansonh@yahoo.com)

Please give me answer

9/7/24, 5:18 PM
iPhone (87) (melansonh@yahoo.com)

We can have a conversation later but I would like a short answer before you fly

9/7/24, 5:22 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Yes I am certainly in the wrong. But I do stand by my decision

9/7/24, 5:23 PM
iPhone (87) (melansonh@yahoo.com)

What's your decision? To leave? I don't want that. I want my marriage to you. It's sacred b

9/7/24, 5:24 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Sacred enough that you made me feel like I couldn't do anything b

9/7/24, 5:24 PM
iPhone (87) (melansonh@yahoo.com)

So are you done with me?

9/7/24, 5:25 PM
iPhone (87) (melansonh@yahoo.com)

Is your decision to leave me?

9/7/24, 5:28 PM
iPhone (87) (melansonh@yahoo.com)

Please answer before you take off

9/7/24, 5:31 PM
iPhone (87) (melansonh@yahoo.com)

?

9/7/24, 5:32 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I don't want to have this conversation on the phone

9/7/24, 5:33 PM
iPhone (87) (melansonh@yahoo.com)

We don't have to have a conversation. But I would like some reassurance bc we were in a really great spot prior to this trip and I don't want to lose that

9/7/24, 5:33 PM
iPhone (87) (melansonh@yahoo.com)

Is it possible to get back on track?

9/7/24, 5:35 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I think us both pretending isn't making this easier on you or me or the kids

9/7/24, 5:35 PM
iPhone (87) (melansonh@yahoo.com)

I'm not matt. Please can we agree to get back on track?

9/7/24, 5:35 PM
iPhone (87) (melansonh@yahoo.com)

Unless you really want out, then that is your choice to make. It's not what I want n

9/7/24, 5:36 PM
iPhone (87) (melansonh@yahoo.com)

Please don't beat around the bush. Can we get back on track bc it was good after Mendy. We were connecting

9/7/24, 5:38 PM
iPhone (87) (melansonh@yahoo.com)

Can we take divorce off the table?

9/7/24, 5:39 PM
iPhone (87) (melansonh@yahoo.com)

?

9/7/24, 5:45 PM
iPhone (87) (melansonh@yahoo.com)

I'm suffering so bad please respond if you haven't left

9/7/24, 5:47 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Let's not do this over the phone

9/7/24, 5:47 PM
iPhone (87) (melansonh@yahoo.com)

Ok but can you please tell me you want to be with me

9/7/24, 5:49 PM
iPhone (87) (melansonh@yahoo.com)

Is that a no? Bc I believe in your heart you love me and don't want to loose me

9/7/24, 5:50 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I'll always love you

9/7/24, 5:50 PM
iPhone (87) (melansonh@yahoo.com)

We built a life together.

9/7/24, 5:50 PM
iPhone (87) (melansonh@yahoo.com)

Please let's keep our family together. Or marriage whole. We can do that if we're both willing.

9/7/24, 5:50 PM
iPhone (87) (melansonh@yahoo.com)

Can you please give me reassurance

9/7/24, 5:51 PM
iPhone (87) (melansonh@yahoo.com)

This isn't an ultimatum. This is me asking if we can please keep our marriage?

9/7/24, 5:52 PM
iPhone (87) (melansonh@yahoo.com)

The greatest gift we can give our kids is to have a healthy loving marriage. Let's give that to each other and to our children. That's the greatest legacy.

9/8/24, 2:43 PM
iPhone (87) (melansonh@yahoo.com)

Can you come to our room? I don't want the kids to see me

9/9/24, 12:52 PM (Viewed 9/9/24, 12:56 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Am I getting girls or bubs?

9/9/24, 12:56 PM
iPhone (87) (melansonh@yahoo.com)

Can we get bubs and then get the girls together

9/30/24, 1:28 PM (Viewed 9/30/24, 1:32 PM)

Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

9/30/24, 5:44 PM (Delivered 9/30/24, 7:50 PM)

iPhone (87) (melansonh@yahoo.com)

Cooper just told me he wishes you were home. I think you need to do some serious soul searching. Really evaluate the decisions you're making. The consequences are going to be devastating.

10/3/24, 12:12 PM (Viewed 10/3/24, 12:46 PM)

Matthew Ammel (matthew.ammel@hotmail.com)

Do I need to get a hotel tonight?

10/3/24, 1:28 PM

iPhone (87) (melansonh@yahoo.com)

At this point all I care about is protecting my children and preventing as much as possible any more emotional harm you're inflicting on them because of your selfish decisions. You are being manipulative asking about the hotel when you know damn well you told the kids you would be home today and they're expecting to see you. You've requested to separate many times. It is your decision to leave. That being said, ONLY BECAUSE it's my daughter's 13th birthday tomorrow, and in no way do I want her to associate this with her birthday, you can stay at the house until Sunday when you leave for your next trip. But thereafter, you need to get a hotel or apartment. Don't ask me again. That's my answer.

10/5/24, 4:01 PM (Viewed 10/5/24, 4:02 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Do you have the address?

10/5/24, 4:13 PM
iPhone (87) (melansonh@yahoo.com)

Got her?

10/5/24, 4:13 PM (Viewed 10/5/24, 4:21 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

10/5/24, 10:16 PM
iPhone (87) (melansonh@yahoo.com)

I'm on my way back

10/5/24, 10:25 PM (Viewed 10/5/24, 10:51 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Ok. Be safe. What's your eta?

10/5/24, 10:51 PM
iPhone (87) (melansonh@yahoo.com)

1245

10/6/24, 10:55 AM
iPhone (87) (melansonh@yahoo.com)

Coming

10/6/24, 10:55 AM (Viewed 10/6/24, 11:05 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

They still haven't messaged

10/6/24, 7:11 PM
iPhone (87) (melansonh@yahoo.com)

What's your new email?

10/6/24, 7:14 PM
iPhone (87) (melansonh@yahoo.com)

https://avenuescounselingcenter.org/sometimes-fighting-marriage-means-separating/
(Sent with URL)

10/6/24, 7:15 PM
iPhone (87) (melansonh@yahoo.com)

I know you've got a busy week ahead but if you have a few spare minutes this puts it really well. About how to do a structured separation. I love you and I hope you have a good week.

10/7/24, 10:09 AM
iPhone (87) (melansonh@yahoo.com)

The therapist can see us Thursday the 17th at 2

10/7/24, 10:40 AM (Viewed 10/7/24, 10:44 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Loved "I know you've got a busy week ahead but if you hav…"

10/7/24, 10:40 AM (Viewed 10/7/24, 10:44 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Liked "The therapist can see us Thursday the 17th at 2"

10/7/24, 12:31 PM
iPhone (87) (melansonh@yahoo.com)

I got our taxes situated if you get a second to call I can run you through it

10/7/24, 1:26 PM (Viewed 10/7/24, 1:52 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

I have to do this clearance thing. I will call before we leave.

10/7/24, 1:52 PM
iPhone (87) (melansonh@yahoo.com)

Liked "I have to do this clearance thing. I will call bef…"

10/7/24, 3:07 PM
iPhone (87) (melansonh@yahoo.com)

Are you finished with the clearance

**10/10/24, 10:08 AM (Delivered 10/10/24, 10:09 AM)**
iPhone (87) (melansonh@yahoo.com)



**10/10/24, 11:46 AM (Viewed 10/10/24, 11:53 AM)**
Matthew Ammel (matthew.ammel@hotmail.com)

**10/10/24, 5:50 PM**
iPhone (87) (melansonh@yahoo.com)

Why do you give us breadcrumbs 😒 your family is here without you and we rarely hear from you.

**10/10/24, 5:52 PM (Viewed 10/10/24, 5:53 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Heather I've been really busy with Josh here and everything going on. And the hike kicked my fucking ass. I'm sorry. I can talk today

**10/10/24, 6:42 PM (Viewed 10/10/24, 6:56 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Can you guys talk?

**10/10/24, 6:58 PM**
iPhone (87) (melansonh@yahoo.com)

You should call them.....

10/10/24, 7:05 PM
iPhone (87) (melansonh@yahoo.com)

It doesn't really look like you're working very hard. You could sit around at HER house but not contact your kids until I said something.

10/10/24, 7:05 PM
iPhone (87) (melansonh@yahoo.com)

Don't ever call them from her house again.

10/10/24, 8:50 PM (Viewed 10/10/24, 8:52 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

What year was Regina?

10/10/24, 8:52 PM
iPhone (87) (melansonh@yahoo.com)

2016

10/10/24, 9:02 PM (Viewed 10/11/24, 5:10 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Thanks

10/11/24, 7:43 AM
iPhone (87) (melansonh@yahoo.com)

Please make sure to have a hotel arranged from Saturday to Friday. I will be in class Wednesday and Thursday this week. That is your opportunity to come finish the office project. When I am home, you can't be. You can come to pick up the kids for school. There are games Monday and Wednesday this week where you can meet us. I highly suggest you use this week to find an apartment and therapist. You need help, Matt. You are destroying every relationship you have with your poor choices. When we tell the kids on Saturday, I will not take the fall for your choices. These are consequences for the choices you've made, and you haven't made choices that protect your marriage or your family.

10/11/24, 7:45 AM
iPhone (87) (melansonh@yahoo.com)

You have repeatedly told me you want a divorce. I won't allow you to continue to hurt me or the kids.

10/11/24, 1:38 PM
iPhone (87) (melansonh@yahoo.com)

Is there hope