IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 1-:26-cv-00038

| | | |
|---|---|---|
| HEATHER AMMEL, Plaintiff, | ) | V I D E O T A P E D |
| vs. | ) | D E P O S I T I O N O F |
| KYRSTEN SINEMA, Defendant. | ) | K Y R S T E N S I N E M A |

------------------------------

A P P E A R A N C E S:

For the Plaintiff: Mr. Thomas M. Van Camp
Van Camp, Meacham & Newman, PLLC
P.O. Box 1389
Pinehurst, North Carolina 28370

For the Defendant: Mr. Steven B. Epstein
Ms. Abby Jenkins
Poyner & Spruill
P.O. Box 1801
Raleigh, North Carolina 27601

Videographer: Mr. Corey Parker

In Attendance: Ms. Heather Ammel

In Raleigh, N.C.
July 31, 2026

Reported by:
Lisa S. Marion, CER

E X A M I N A T I O N   I N D E X


| Examination | By Whom | Page No. |
|---|---|---|
| Direct | Mr. Van Camp | 7 |
| Cross | Mr. Epstein | 123 |
| Redirect | Mr. Van Camp | 126 |

E X H I B I T   I N D E X


| Exhibit No. | Description | Page Marked |
| --- | --- | --- |
| Plaintiff's 1 | Verified Complaint | 6 |
| Plaintiff's 2 | Declaration of Heather Ammel | 6 |
| Plaintiff's 3 | Declaration of Kyrsten Sinema | 6 |
| Plaintiff's 4 | Declaration of Matthew Joseph Ammel | 6 |
| Plaintiff's 5 | Deposition of Matthew Joseph Ammel | 6 |
| Plaintiff's 6 | Notice of Deposition of Matthew Ammel | 6 |
| Plaintiff's 7 | Messages | 6 |
| Plaintiff's 8 | Flight Information | 6 |
| Plaintiff's 9 | Messages | 6 |
| Plaintiff's 10 | Telephone Records | 6 |
| Plaintiff's 11 | Plaintiff's Responses to Defendant's First Set of Interrogatories, First Request for Production of Documents, and First Request For Admissions | 6 |

E X H I B I T   I N D E X


| Exhibit No. | Description | Page Marked |
|---|---|---|
| Plaintiff's 12 | Defendant's Responses to Plaintiff's First Request For Admissions, First Set of Interrogatories, and First Requests for Production of Documents | 6 |
| Plaintiff's 13 | Photograph | 6 |
| Plaintiff's 14 | Photograph | 6 |
| Plaintiff's 15 | Message | 6 |
| Plaintiff's 16 | Photograph | 6 |
| Plaintiff's 17 | Photograph | 6 |
| Plaintiff's 18 | Telephone Bill | 6 |
| Plaintiff's 19 | Telephone Bill | 6 |
| Plaintiff's 20 | 11-1-2024 E-mail | 6 |

S T I P U L A T I O N S

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record:

(1) That the videotaped deposition of KYRSTEN SINEMA may be taken on July 31, 2026, beginning at 9:02 A.M., in the OFFICES OF POYNER SPRUILL, LLP, located at 301 Fayetteville Street, Suite 1900, Raleigh, North Carolina 27601, before Lisa S. Marion, CER, a Notary Public.

(2) That the deposition shall be taken and used as permitted by the applicable Federal Rules of Civil Procedure.

(3) That any objections of any party hereto as to notice of the taking of said deposition or as to the time or place thereof, or as to the competency of the person before whom the same shall be taken, are deemed to have been met.

(4) Objections to questions and motions to strike answers need not be made during the taking of this deposition, but may be made for the first time during the progress of the trial of this case, or at any pretrial hearing held before any judge of competent jurisdiction for the purpose of ruling thereon, or at any other hearing of said case at which said deposition might be used, except that an objection as to the form of a question must be made at the time such question is asked, or objection is waived as to the form of the question.

(5) That the witness waives the right to read and sign the deposition prior to filing.

(6) That the sealed original transcript of this deposition shall be mailed first-class postage or hand-delivered.

(7) That the witness was identified by a government-issued photo ID.

* * * * *

(PLAINTIFF'S DEPOSITION EXHIBITS NO. 1 - 20
MARKED FOR IDENTIFICATION PRIOR TO TESTIMONY)

THE VIDEOGRAPHER: Good morning. We're now on the record. Today's date is Friday, July 31st, 2026. The time is approximately 9:02 a.m. Eastern. This is the case of Heather Ammel versus Kyrsten Sinema. The deponent is Kyrsten Sinema.

Counsel, please introduce yourselves, after which our court reporter will swear in our witness.

MR. VAN CAMP: Tom Van Camp for the plaintiff.

MR. EPSTEIN: Steven Epstein for the defendant.

MS. JENKINS: Abby Jenkins for the defendant.

Whereupon,

KYRSTEN SINEMA,
having been first duly sworn,
was examined and testified
as follows:

DIRECT EXAMINATION BY MR. VAN CAMP:

Q Ms. Sinema, my name is Tom Van Camp. I'm here to ask you some questions. I'm going to try and limit them to the jurisdictional issues. There is some overlap.

But my first question is have you ever had your deposition taken before?

A No.

Q Okay. Let me go through some of the rules. I'm sure Steve has kind of walked you through some of them. But I'm going to be asking you questions, and you're going to be providing answers. Okay? During the course of our dialogue, it's important that you only answer questions that you understand. There may be a time where you need some clarification, you need some information from me to make sure you understand the question. Feel free to ask me to clarify my question. Okay?

A Okay.

Q Okay. My second point is although we're being videoed, it's important that your answers be audible, "yes," "no," and you're free to explain, as opposed to "uh-huhs," "uh-uhs," or shakes of the head, just so that the court reporter can also have a clear transcript. Okay?

A Okay.
Q Okay. And then as I'm asking you questions, you may comprehend where I'm going quickly and want to answer it before I'm finished, or I may understand your answer and move on before you're done. It's important that we don't talk over one another. Okay?
A Okay.
Q So I'll do my best to make sure you're done with your answer, and you can do your best to make sure I'm done with my question. Okay?
A Okay.
Q All right. All right. And if you want to take a break at any time to discuss with your lawyer privilege or work product, feel free to just sort of raise your hand, and complicit with the Rules of Civil Procedure, we can accommodate you. Okay?
A Okay.
Q Okay. Let me start with your background. Where do you live currently?
A I live in Cave Creek, Arizona.
Q Okay. What is your address?
A My address is 5515 East Dale Lane, Cave Creek, Arizona 85331.
Q And who do you live there with, if anyone?

A I live alone.
Q Okay. And how long have you lived at that address?
A August 1st of 2025.
Q Okay. And where did you live prior to that, prior to August 1st of 2025?
A I lived in Scottsdale, Arizona.
Q Okay. Can you give me that address, please?
A 6533 East Grandview Drive, Scottsdale, Arizona.
Q I'll find out the ZIP myself. That's all right.
And did you live there with anyone else?
A I lived alone.
Q Okay. And how long did you live at that Scottsdale, Arizona address?
A About two years.
Q Okay. And prior to that address, where did you reside? And let me strike that.
So that will take you to around the summer of 2023. So prior to the summer of 2023, where were you residing?
A I lived in Phoenix.
Q Okay. And what was the address there?
A I can't remember the name of the street.
Q Okay. How long did you live at that address?
A Around ten years.
Q And did you live there with anyone?

A Yes.
Q Who did you live there with?
A My partner.
Q And who was that?
A Lindsay Buckman.
Q Are you currently married?
A No.
Q Engaged?
A No.
Q Are you still seeing romantically Matthew Ammel?
A I'm sorry. Can you repeat that?
Q Are you still seeing Matthew Ammel in a romantic or intimate way?
A Yes.
Q Okay. Did that ever -- I understand in your declaration, you state that it started around late May of 2024. Has there ever been a break where -- between that date and today where you weren't seeing or romantic with Mr. Ammel?
A No.
Q Okay. And would he be, during that time period, your -- the only individual that you were romantic with?
A Yes.
Q Okay. And when I say "romantic," I don't mean

intercourse, necessarily, but kissing, hugging, holding hands, you know, in a way that's beyond friendship. Do you understand? Is that your understanding, sort of, of "romantic"?

A Yes.

Q Okay. All right. So -- and did you have any residences in Washington, DC when you served as a congresswoman or a -- or a senator?

A Yes.

Q Okay. So let's talk about those first. I think you were a congresswoman first. Where did you live? Or where did you have a residence in either DC or maybe Virginia during that time period?

A Could you say that again?

Q Where did you live or where did you have a place to reside -- I know it wasn't your residence. You're from Arizona. But where were you staying in the DC area when you served as a congresswoman for the United States Congress?

A An apartment in Washington, DC.

Q Okay. And what is the address, if you recall?

A I do not recall.

Q And then how about your six years as a senator? How -- where did you stay? Same apartment?

A I moved apartments in April 2023.

Q And do you know the address of the apartment you moved into in April of 2023?
A Yes.
Q Okay. Do you currently have -- still maintain that apartment?
A No.
Q Okay. What is the address there?
A 71 East Potomac Avenue Southeast.
Q Okay. And for how long did you maintain that apartment after 2023?
A I believe on or around October 31st, 2024.
Q And when you moved out of the apartment in DC, where did you move your furniture, belongings to? What location?
A Scottsdale, Arizona.
Q Did any of the -- did any of the furniture or personal belongings get moved to the State of North Carolina?
A Yes.
Q And where did they go in North Carolina?
A I don't know.
Q Who moved them to North Carolina?
A Can you say that again?
Q Who moved them to North Carolina?
A Matthew.

Q Matthew Ammel?
A Yes.
Q Okay. And is he now using that furniture or personal belongings in his place of residence in North Carolina, or has he moved that material, furniture, personal property back out west somewhere?
A I don't know.
Q So do you know if Matthew Ammel has currently a residence in the State of North Carolina?
A I do not believe so.
Q When he would come to the State of North Carolina let's say after November 1st of 2024, do you know where he would stay?
A His apartment.
Q Family members -- do you have any children?
A No.
Q Have you ever been married?
A Yes.
Q Okay. And to who were you married?
A Blake Dain.
Q Okay. And during what years were you married to Mr. Dain?
A I believe 1995 to 1997.
Q Are your parents still living, including

stepparents?
A Some.
Q Okay. Can you -- is your mom still living?
A Yes.
Q And where does she live?
A Utah.
Q And your stepdad, is he still living?
A No.
Q Okay. And your biological father, is he still living?
A Yes.
Q Where does he live?
A I don't know.
Q Have any of those three individuals, mom, dad, or biological stepdad ever lived in North Carolina, to your knowledge?
A No.
Q Okay. All right. If you would, walk me through, Ms. Sinema, your educational background. I know you went to law school and undergrad and all that. Just rather than me ask you individual questions, just tell me a little bit about your educational background.
A I have a bachelor's degree in social work from Brigham Young University, 1995; a master's degree

in social work from Arizona State University, 1999; a J.D. from Arizona State University, 2004; Ph.D. from Arizona State University, 2012 --

Q Okay. And what --

A -- I believe; and an MBA from Arizona State University, 2018.

Q Are you currently in school anywhere?

A Excuse me?

Q Are you currently in school anywhere? Any college, any university?

A Could you be more specific?

Q Well, are you currently receiving any educational courses?

A No.

Q Okay. So the -- and you went to law school at Arizona State. Did you practice law?

A Yes.

Q Okay. And for how long?

A I can't remember the exact amount of time.

Q What type -- can you give me a range that you feel comfortable with?

A I practiced criminal defense law and civil forfeiture law for a short period of time after passing the Bar and before going to Congress.

Q Okay. And what law firm did you work for where you

were doing the criminal defense and the forfeiture work?

A I worked for an individual attorney.

Q And what was his or her name?

A Martin Liberman.

Q Now let's talk about your public service. You first were a congresswoman from the State of Arizona, correct?

A No.

Q Okay. Explain, then, what other employment-wise -- you got out of law school. Did you have any employment prior to graduating from law school?

A Yes.

Q Okay. Tell me about that.

A I was a social worker.

Q Where?

A I was a social worker for the Washington Elementary School District, and I was a therapist for children with Valle Del Sol.

Q I'm sorry. With what?

A Valle Del Sol.

Q And what is Valle Del Sol?

A An organization that provides mental health services to indigent and low-income families.

Q Is that in the State of Arizona?

A Yes.
Q Okay. All right. And any other employment prior to graduating from law school?
A Yes.
Q Could you explain?
A I was a contractor for a number of nonprofits.
Q In the same field of social work or in another field?
A Social work.
Q Okay. All right. And any other employment other than being a contractor for some nonprofit entities and being a social worker prior to your graduation from law school?
A I was a law clerk for Martin Liberman.
Q Okay. All right. In what year? Was that during law school?
A During law school.
Q Okay. Is he still practicing, Martin Liberman?
A I don't know.
Q All right. So any other employment other than law clerk, social worker, and contract worker?
A I was an adjunct professor in the School of Social Work at Arizona State University.
Q What years did you do that?
A 2003 forward.

Q Are you still an adjunct professor --
A No.
Q -- at Arizona State?
When did that -- did that end when you went to Congress, or when you went to law school, or when?
A I was promoted to a distinguished professor of practice in the School of Social Work.
Q And when was that?
A January of 2025.
Q So currently, what is your employment?
A I'm a distinguished professor of practice in the School of Social Work at Arizona State University. I am an attorney at Hogan Lovells Cadwalader in Washington, DC.
Q Could you repeat that? Is it Pogue?
A Hogan --
Q Hogan.
A -- Lovells Cadwalader.
Q How long have you worked for them?
A Since March 31st, 2025.
Q Okay. Are you employed in any other way other than as a distinguished professor at Arizona State University and as an attorney for the Hogan Law Firm?

A Yes.
Q Please tell me about that.
A I am the CEO and president of the Arizona Business Roundtable, and I own my own consulting company.
Q What is the name of your consulting company?
A GSDAZ.
Q And where is that located? And I mean your own company that you're a CEO of.
A Arizona.
Q Okay. How many employees?
A One.
Q Is that you?
A No.
Q Who would be the one employee?
A Daniel Winkler.
Q Okay. And what does Daniel do for GSDAZ?
A Chief of staff.
Q Okay. And what does GSDAZ do?
A It's a consulting company.
Q What type of consulting does it do?
A It helps businesses interact with government.
Q And how long has GSDAZ been in business?
A January 3rd, 2025.
Q And it has only one employee, Daniel Winkler?
A Yes.

Q Does it have any contract employees?
A Yes.
Q And who might that be?
A Michelle Davidson.
Q Okay. Any others?
A No.
Q Does Matthew Ammel work at all for GSDAZ?
A No.
Q Does Matthew Ammel provide any services for the Hogan Law Firm?
A No.
Q To your knowledge, what is Matthew Ammel's employment situation as we speak today? In other words, who does he work for and what does he do?
A He does regenerative grazing on a National Guard military base in California called Camp SLO, San Luis Obispo.
Q Okay. And how long has he done that, to your knowledge?
A I'm not sure.
Q And where does he live?
A In California.
Q Is there a -- you said -- is the name of the road where you currently live Cave Creek?
A No.

Q Okay. What is the name of the road that you --
A Dale Lane.
Q Okay. It's in Cave Creek?
A Yes.
Q Okay. Is there a Cave Creek, to your knowledge, or a Cave Creek Ranch in California?
A I don't know.
Q Okay. We took Mr. Ammel's deposition on Tuesday. He was at your house --
A Yes.
Q -- in Arizona?
A Yes.
Q How did he get from California to Arizona? Do you know? I mean, did he fly? Did he drive?
A He drove.
Q Okay. And is he still in Arizona, or is he back in California, to your knowledge?
A I don't know.
Q Okay. Well, was he at your house when you left to fly here to North Carolina?
A Yes.
Q Okay. Do you know when he plans on departing back to California?
A No.
Q Okay. How frequently is he at your residence in

Cave Creek?
A Probably once a month.
Q Okay. And for how many days, on average?
A Two to three.
Q And how often are you in California at his location or anywhere in California where you're seeing him?
A About once a month.
Q Same, two to three days?
A Two to three days or less.
Q Okay. Were you on any committees when you served in Congress?
A Yes.
Q What committees were you on?
A Can you be more specific?
Q I mean, I'm not in Congress, so I don't know what committees there are other than the ones I watch on TV. So help me understand kind of -- you get assigned to committees when you become a member of Congress, correct?
A Correct.
Q Okay. What committees were you assigned to when you first started as a congresswoman?
A The House Financial Services Committee.
Q And as your -- how long were you in Congress?
A Six years in the House.

Q Six years. And while in the House in that six years, did you have any other committees that you served on other than the financial committee?
A I served on several subcommittees for the House Financial Services Committee. I'm unable to recall their names.
Q Okay. And then once you got to the Senate, were you assigned a committee?
A Yes.
Q And what was that committee or committees?
A The House -- sorry. The Senate Homeland Security and Government Affairs Committee, the Senate Commerce Committee, the Senate Veterans Affairs Committee, the Senate Banking Committee, The Senate Committee on Aging.
Q Any committees related to health?
A Later, I served on the Senate Committee on Appropriations.
Q And how does that relate to health care, if at all?
A The Appropriations Committee is responsible for the disbursement of all funds from the federal government.
Q Did you serve on -- my understanding is you were in North Carolina in 2023 in Charlotte for a meeting with Tom -- Senator Tom Tillis. Is that correct?

A Yes.
Q Okay. And it's my understanding from your declaration that the next time you were in the state -- you were physically in the State of North Carolina would have been in May of 2025. Is that correct?
A Yes.
Q Okay. You went to Saudi Arabia with Mr. Ammel and others at the end of October 2024, correct?
A Yes.
Q And you all stayed in a suite. Who stayed in that hotel suite other than you?
A We did not stay in a hotel suite.
Q Okay. Where did you stay?
A In my own hotel room.
Q Okay. So you didn't have a suite with a center room and rooms adjoining it?
A No.
Q Okay. And where did Mr. Ammel stay?
A In his hotel room.
Q And who else went?
A Daniel Winkler.
Q Okay. And was he your chief of staff at the time?
A No.
Q What was his title?

A I don't remember.
Q Okay. Was it just the three of you?
A Yes.
Q And at any time during that trip, were you and Mr. Ammel romantic in any way? And I'll say romantic meaning not just intercourse, but kissing, hugging in a way that you don't hug your sister or your mother, so to speak.
A No.
Q And you flew home, I believe, on November 1st of 2024? At least that's what the itinerary says.
A Could you be more specific?
Q Did you fly home from Qatar and land in Washington at or around 9:20 a.m. on November 1st?
A I don't recall the time. We did land at Dulles --
Q Okay.
A -- on November 1st.
Q Okay. And, according to the itinerary, you were scheduled to fly two, three hours later to New York, JFK. Do you recall that?
A Yes.
Q Did you get on a plane and go to JFK?
A Yes.
Q You did not come to the State of North Carolina on November 1st?

A No.
Q Tell me the phone numbers that you used from April 22nd through, let's just say, December 1st of 2024.
A 602-904-9665.
Q What other phone numbers did you use?
A None.
Q None. So that -- for all business, whether you're talking to other senators, staff, friends, family, security, you used that same number?
A Yes.
Q Okay. Did you ever use another number, to your knowledge?
MR. EPSTEIN: Do you mean ever?
Q Ever, like, in the time frame that I provided. Did you ever use another number during, let's just say, April of 2022 to December 1st, 2024?
A Not to my recollection.
Q And what were your methods or modes of communication with individuals? And I'm not talking about just security. Senators, senator staff, other senators. You know, would it be text, e-mail, calls, Signal? Just kind of walk me through the types of modes of communication you used.
A In person, telephone, text, Signal, Slack.

Q What is Slack?
A Slack is a workplace communication tool within staffs.
Q So would you use your phone to communicate with your staff, the 904-9665 number you just referenced?
A Yes.
Q Okay. So -- but it would be on -- is Stack -- or Slack, rather, an app --
A Yes.
Q -- like Signal?
A Not like Signal.
Q Can you retrieve former messages from -- that you sent through Slack?
A No.
Q So how is Slack and Signal different, to your knowledge?
A Slack is generally used as a workplace communication tool. Staff have their own groups where they communicate with each other. There are some channels where they communicate with a principal or a supervisor.
Q But it's work-related?
A Yes.
Q And Signal, you get the app and you can send

anybody a Signal message, correct?
A My understanding is they also have to have the Signal app.
Q Yes. The recipient in your call or the one sending you a text or a call back. Is that correct?
A I believe so.
Q Tell me, what is your understanding of how Signal messages are stored or kept. And, again, I'm going to talk about from April 2022 through December 1st, 2024.
A I don't know how.
Q Okay. Well, you understand in your declaration, you state that they are unretrievable -- Signal messages. How did you learn that?
A I don't recall specifically. But when I began using Signal, the tech person showed me how to do it.
Q And what did the -- when was that first?
A I don't recall.
Q Prior to 2022?
A Yes.
Q And what did -- you don't recall what the tech person showed you about how it works?
A I don't recall specifically. I knew that you could only Signal others who were also on Signal.

Q Did the tech person tell you that your messages will automatically delete after a period of time?
A I don't recall someone telling me that specifically.
Q How did you come to know that?
A It was the default.
Q On the app?
A Yes.
Q Well, how did you know there was a default on the app that would delete your messages after -- at some period of time after they were sent?
A I don't recall.
Q If you got a Signal message and you know it was going to be deleted within eight hours, 24 hours, whatever that time frame is, and you wanted to keep the Signal message, an important picture of a family member, something like that, how would you do that?
A I did not do that.
Q How did you decide whether you communicated with individuals -- any individuals through Signal, e-mail, or regular text? How would you pick which mode to use?
MR. EPSTEIN: And just to be clear, you're talking in the same time frame as you were --

MR. VAN CAMP: Yes.

MR. EPSTEIN: -- describing?

MR. VAN CAMP: All my questions are that time frame.

A Different work streams used different methods.

Q And that's what I'm asking. How did you decide? Like, for security, was it Signal? For congressmen, is there some law or rule that says it has to be public and you have to be able to disclose it, so that's a regular text versus e-mails? I mean, is there -- are there certain groups of people that you purposefully chose one way or another to communicate in a certain way?

A I didn't choose.

Q Well, you had your phone and you text -- you've texted people and you've Signaled people. How did you decide which way when you were initiating communication to go with it?

A There was a process for different work streams.

Q What was the process for your security detail?

A Signal.

Q Was it always Signal?

A Yes.

Q What was your process for communicating with other senators?

A It depended.
Q What did it depend on?
A The other senator.
Q If they had Signal or not, or if you liked them or you didn't like them, or if they were Republican or Democrat? What was the distinction?
A Their preference.
Q Okay. Their preference. Okay. So it's your testimony you had one phone number, and that was the 602-904 -- what -- 9665?
A Yes.
Q Is that still your number?
A No.
Q Okay. And you would communicate, my understanding, with your security detail only through Signal, and that would include all individuals, including Matthew Ammel, correct?
A Not only.
Q Okay. Can you explain that?
A When we were moving between locations, it was phone call -- usually a one or two-minute phone call.
Q Meaning, "Pick me up, I'm going here," that kind of thing?
A Yes.
Q And so you would call security -- your security

detail if they were on duty and they're outside in the car or they're in the restaurant or wherever to come get you 'cause it's time to go?

A Yes.

Q Okay. So you would talk to your security through Signal and through phone calls, correct?

A Yes.

Q Okay. And would that be the same for Mr. Ammel, how you would communicate with him?

A Yes.

Q Did you ever communicate with him through Slack?

A No.

Q And did you ever e-mail him?

A Yes.

Q Okay. And do you have those e-mails? My understanding, you referenced in your declaration that you had information, e-mails that you -- that, if requested, you would provide subject to a protective order, which we don't have yet, I guess. But do you have those e-mails in your possession?

A Yes.

Q E-mails between you and Mr. Ammel?

A Yes.

Q Okay. And --

MR. EPSTEIN: Let's go off the record for a

quick second.

MR. VAN CAMP: Okay.

THE VIDEOGRAPHER: Off the record at 9:36 a.m.

(DISCUSSION OFF RECORD)

THE VIDEOGRAPHER: On record at 9:37 a.m.

Q In the time frame that I've been addressing with you, Ms. Sinema, the April 2022 through December 1st, 2024, did you ever loan your phone out to anyone?

A Can you define "loan"?

Q Well, provide your phone to another individual to use.

A Yes.

Q And who were those people?

A A number of my staff commonly had my phone.

Q And who would be on your staff that would have your phone?

A Dan Winkler, Hannah Hurley, Pablo -- I think Sierra-Carmona, Courtney Sauder, Ethan Sanders, Michelle Davidson. Possibly others whose names I'm not recalling at the moment.

Q Did Matthew Ammel ever use your phone, to your knowledge?

A I don't know.

Q These individuals that you just mentioned that would use your phone, would that be generally in your presence? Like, "I don't have my phone. Can I borrow yours? I need to send a message." Or would it be outside your presence?
A Outside my presence.
Q Okay. Any of those individuals ever frequent North Carolina, to your knowledge?
A No.
Q And you've kind of -- have you -- well, strike that.
Have you used any burner phones in the time frame that I referred to, April 2022 to December 1, 2024?
A No.
Q So it's always been that phone that's the 904-9665 phone, correct --
A Yes.
Q -- when you used the phone?
And there are occasions when your staff may need to use your phone and you let them use it, correct?
A No.
Q Explain that. I thought that they used your phone -- the staff members, the folks you just mentioned

had perhaps used your phone.
A Yes.
Q Okay. And under what circumstances would they need to use your phone?
A I would often give my phone to a staffer while I was doing my job --
Q Okay.
A -- and they would utilize the phone to do work.
Q Was your phone, to your knowledge, ever physically in the State of North Carolina after you left in 2023 after your meeting with Senator Tillis and May 2025 when you were back in North Carolina?
A No.
Q All right. The e-mails that we talked about earlier to Matthew Ammel, would all -- would those all be related to travel, or would there be other e-mails that were more of a personal nature?
A Three e-mails were related to travel, one was related to a race.
Q What type of race? Running race? Bike race?
A A running race.
Q Car -- okay. And where was that race?
A Moab, Utah.
Q Okay. Do you know when that was?
A I believe October 2023.

Q Okay. Now, you've testified that as of -- I guess it was Memorial Day 2024, you claim that's when your relationship with Mr. Ammel became romantic. Is that correct?

MR. EPSTEIN: Objection to form.

A On Memorial Day 2024.

Q Yes. And if I didn't say that, I meant to say that. What did I say? Did I say another date?

A (No verbal response.)

Q Okay. And how do you define "romantic"?

A Can you be more specific?

Q Well, that's your word in your declaration. "Romantic and intimate." So you're talking about that was the first time you had intercourse with Matthew Ammel was --

A Yes.

Q -- late May of 2024?

A Yes.

Q Prior to that date, had you and Mr. Ammel ever kissed on the lips?

A No.

Q Had you ever held or touched each other in a way that you would consider to be romantic in nature?

A No.

Q Had you ever flirted with him prior to May -- I

think it's the 27th of 2024?

A No.

Q Had you ever expressed to him that you had an interest in him prior to May of 2024?

A No.

Q And tell me how -- you were in Napa at the time?

A Yes.

Q Last time I was there, the place caught on fire the day I got there and I had to leave. I don't know when it was.

So tell me about how the romance started. I don't mean -- I'm not here to do a tabloid. I just want to know kind of who initiated it, and kind of who was there, and that type of thing, and where you were staying. If you could just sort of provide me some background.

A We were staying at an Airbnb in Napa, California. We were outside. Matt kissed me. We went inside and had sex.

Q And it's your testimony that's the first time that you had sex?

A Yes.

Q And the first time that you ever kissed was when he kissed you, correct?

A Yes.

Q Okay. And you -- who was with you on that trip to Napa?
A Another member of the security team and my two friends from Arizona.
Q And who was the other member of the security team?
A Zach.
Q What is Zach's last name?
A I think Garner.
Q Where is Zach Garner from? Do you know?
A I don't.
Q Were any other members -- any members of your security team other than Matt Ammel during the time frame I've addressed residing in the State of North Carolina, to your knowledge?
A I don't know.
Q My understanding is you -- your first security detail was through TOA, and then Kinster [sic], and then the Senate. Is that -- is that correct?
A No.
Q Okay. Tell me -- in your declaration, you talk about needing security, there were threats on you. When did you first start having a security detail?
A October 2022.
Q Okay. And --
A Excuse me. October 2021.

Q Okay. So then your first meeting with Mr. Ammel would have been in April of 2022?
A April 2022.
Q Okay. And who was he working for at the time?
A He was a contractor with TOA Group.
Q Okay. And did you have to -- or members of your staff have to review his background and approve him as a security member, or does your staff just hire a company and they send who they send?
A TOA Group was responsible for their security members.
Q You didn't have to approve any of them?
A No.
Q Okay. And where is TOA out of? The TOA Group. Like, where is their main place of business?
A I can't recall.
Q And you -- the head of the TOA Group, did he change employers and go work for Kinster [sic]? Is that why you went with another group for security? Or did you just change to a more local entity?
A The owner of TOA Group was a woman.
Q Okay.
A She ceased operations.
Q Okay. So TOA just shut down?
A I believe so.

Q Okay. And so then you hired Kinster [sic]. Were you involved in Kinster [sic] hiring Mr. Ammel to continue on as your security personnel?
A No.
Q And did everybody sort of -- individual security folks stay the same, just working for a different entity, working for Kinster [sic]?
A I'm not sure I understand.
Q When TOA went out of business and these individuals that were on your security detail worked for TOA, did all of them just go over and work for Kinster [sic] and business as usual?
A Some.
Q And one of those was Mr. Ammel?
A Yes.
Q Okay. And your testimony is you had nothing to do with Kinster [sic] hiring Mr. Ammel?
A Correct.
Q Okay. And --
MR. EPSTEIN: And for the record, it's just a small thing. It's Kinsaker. It's not Kinster.
MR. VAN CAMP: Kinsaker?
MR. EPSTEIN: Yes.
Q Okay. All right. You know what I was talking about, right, when I asked you about Kinster and

it's not -- it's Kinsaker? You understood that's the company that you used for security, correct?
A I didn't use them.
Q Okay. Who did?
A The Sinema for Arizona Campaign and the United States Senate.
Q Okay. And who pays your security detail during the time frame I've referenced, April 2022 through December 1, 2024?
A The Sinema for Arizona Campaign and the United States Senate.
Q And how was that broken down? Percentages or --
A I don't know.
Q Okay. At some point did Mr. Ammel begin working directly for the Senate in a security capacity? I think it was June of 2024.
A Yes.
Q Okay. And how did that happen?
A I don't know.
Q So you didn't have anything to do with that either?
A I was not responsible for hiring or any paperwork.
Q I'm not asking about paperwork. Were you involved at all in his leaving the security company, Kinsaker, and going to work directly for the Senate on behalf of you?

A Can you repeat that?
Q Did you have anything to do with Mr. Ammel's transfer of employment in June of 2024? In other words, did you call anybody, did you e-mail anybody, text anybody saying, "I now want this gentleman, Mr. Ammel, to be on my -- you know, my security detail through the Senate versus the company Kinsaker"?
A I don't recall specifically.
Q What were -- let's go back to your methods of communication. You said text and Signal. Those are two different things. Is that correct?
A Excuse me?
Q Text and Signal are two different ways to communicate. Is that correct?
A Yes.
Q One is an app, and one you just SMS -- you text on your phone, correct?
A (No verbal response.)
Q But you still use Signal -- you -- excuse me.
You still use your phone to Signal someone. You just go to the app and do it, correct?
A They are two different apps. Yes.
Q And the e-mails that we just talked about, is that the extent of your knowledge of you e-mailing Mr.

Ammel?

A Yes.

Q May 27th-ish, 2024, it's your position that Mr. Ammel initiated a kiss with you, which ended up resulting in having sex. Whose room at the VRBO did you -- did you have sex in? Yours or his?

MR. EPSTEIN: Objection. Objection to form.

A Matt's.

Q And did you have two separate rooms?

A Yes.

Q Okay. And what was the -- can you identify that VRBO, where it was, or what its number is, or what it's called? These houses have names sometimes.

A No.

Q Have you ever stayed in it before or after that May Memorial Day date?

A No.

MR. EPSTEIN: I'm sorry. I need to take a very quick break.

MR. VAN CAMP: Sure.

MR. EPSTEIN: Thank you.

THE VIDEOGRAPHER: Off the record at 9:51 a.m.

(FIVE-MINUTE RECESS)

THE VIDEOGRAPHER: On the record at 9:56

a.m.

Q Ms. Ammel, when you landed in DC, Dulles after your trip --

MR. EPSTEIN: You said, "Ms. Ammel."

Q I'm sorry. Ms. Sinema, when you -- when you landed in Dulles on November 1st in the morning -- itinerary says 9:20. Do you have any information or knowledge to believe that that flight was late or early?

A I don't recall.

Q Okay. Did you give your phone to Mr. Ammel to take to North Carolina, the nine -- the 904-9665 number?

A No.

Q And in connection with your declaration, you outlined all of the phone calls that you made to Mr. Ammel, and where you were, and where you believe he was, whether it be in North Carolina or outside of North Carolina, correct?

A Correct.

Q So how did you determine where you were when you either sent a Signal message or a -- or a call or a text or whatever it was?

A I reviewed my phone records and my daily rundown e-mails that still existed, and recollection of trips and travel throughout my -- the relevant time

period.

Q Your phone records show an origin for the call, i.e., where you were, and then it shows the call that you -- the number you called, correct?

A I'm sorry?

Q Your phone records show the origin of your call; in other words, where you were when the call was made or the text was made, and then where -- or the number where the other individual was. Not necessarily where they were, but what their phone number was, correct?

A Correct.

Q Okay. So you looked at the origin -- or origination to determine where you were, correct?

A Partly.

Q Okay. And then partly schedules and other documents?

A I reviewed Matthew's travel records, my daily rundown e-mails -- those that still exist -- I checked my American Airlines app, my Marriott Bonvoy account.

Q Anything else?

A Not that I can recall at the moment.

Q And based on those documents, you were able to determine where you were when you made contact with

Mr. Ammel -- physically where you were?

A Yes.

Q And what is your understanding of the date that Mrs. and Mr. Ammel separated?

A Their court documents say either October 31st or November 1st, 2024.

Q The document says that, or based on your recollection, it was one of those days?

A The court documents.

Q Okay. So you believe there is a court document that says that there was a separation date of either October 31st or November 1st?

A Both exist.

Q Okay. The one that was signed by Mr. Ammel, what date does that have?

A Can you be more specific?

Q The one that was actually signed by the Court and Mr. Ammel, the official order, what date does that have? October 31st, 2024 or November 1st, 2024?

A I'm not sure.

Q Okay. And in looking at -- if we would turn -- let me -- let me give you this, Ms. Sinema, which is sort of a notebook of exhibits.

MR. VAN CAMP: And you have the ones that we used. I told -- I think we're using --

MR. EPSTEIN: I don't have them with me right at the moment, so I'll have to go --

MR. VAN CAMP: I'm going to refer to her declaration. So that is Exhibit 3, I believe, to start. So you may want to run and get that.

MR. EPSTEIN: We'll take a break.

MR. VAN CAMP: Yeah.

THE VIDEOGRAPHER: Off record at 10:01 a.m.

(FOUR-MINUTE RECESS)

THE VIDEOGRAPHER: On the record at 10:05 a.m.

Q Ms. Sinema, if you would look at Exhibit 3, which is your declaration that you filed in this case, and you go to Page 5, I just kind of want to understand the method of the -- Paragraph 16, you state that on September 23rd, 2023 at 11:47, you called Mr. Ammel. Do you see that?

A Yes.

Q And if you look at Exhibit 10, what I would -- the very first page. And these are Mr. Ammel's phone records. He received a call from Healdsburg, California from your number at exactly 11:47 on that day, correct?

A Correct.

Q And so where it says, "Origination" at the top

there, where it says, "Healdsburg, California," that is in Napa Valley, correct? I mean, that's a wine region in Napa, correct?

A In Sonoma County.

Q Sonoma. Was it Sonoma? Okay.

And then -- so is that kind of how you figured out where you were by looking at his phone records where it says exactly when you called, or did you also look at your records, as well?

A At this time, I looked at my phone records and my daily rundown --

Q Okay.

A -- to determine where I was and where he was.

Q So -- and you provided all those documents to your lawyer to give to us where you've looked at where he was and where you were?

A Yes.

Q Okay. And then on page -- on Page 5, No. 17, you talk about a September 24th, 2023 phone call at 7:28 p.m. And if you look at that 7:28, September 24th, the 602-904-996 [sic] number called him from -- again, from California, correct?

A Correct.

Q Okay. So -- and so that's consistent with what you're saying in your declaration as to --

A Yes.

Q -- as to the origin of the call and the call -- and who you called?

And then if you look at Page 6, 21 -- Paragraph 21, it has a March date, March 2nd. If you look at Sinema 997, which is on the bottom right corner of each page of the production within Exhibit 10, you'll see on March 2nd, about halfway down the page -- a little less than halfway down the page, at 2:41, you called Mr. Ammel from Phoenix, correct?

A Correct.

Q Okay. So if you look at the last page of Exhibit 10, it references the October to November 2024 time frame. If you -- if you look at the November 1 time frame at 4:02, the 602-904-9665 number called Mr. Ammel and talked to him for 48 minutes, and the origin of that call was Southern Pines, North Carolina. Now, can you explain to me how, if you weren't in Southern Pines, the origin of the call on this document says you were in Southern Pines?

MR. EPSTEIN: Objection to form.

Q Can you explain that to me?

A I cannot.

Q So you don't know -- are you saying you weren't in

Southern Pines on November 1st?
A I was not.
Q Okay. Does -- do you -- do you understand that this phone record shows that your phone was?
MR. EPSTEIN: Objection to form.
A I don't understand that.
Q You don't understand how that -- where were you on November 1st at 4:02 p.m.?
A New York City.
Q And what hotel were you staying in?
A The Edition.
Q And you didn't drive to Southern Pines with Mr. Ammel after landing in DC --
A No.
Q -- on November 1st?
A No.
Q And do you know what you were speaking to him about for 48 minutes on November 1st?
A No.
Q Can you explain this phone record at all as to --
A No.
Q -- as to why it shows you in Southern Pines, North Carolina if you weren't there?
A No.
Q Okay. When you came to North Carolina in May of

2025, where did you stay? Hotel? His apartment?
A Matt's rented house.
Q Okay. So have you ever stayed at a hotel in Southern Pines, North Carolina?
A No.
Q Have you ever stayed in Moore -- at a hotel in Moore County, North Carolina?
A No.
Q If you go back to Exhibit 3, your declaration -- let me go back.
And you're absolutely positive you didn't give Mr. Ammel your phone to take with him to North Carolina after you landed in -- at Dulles Airport?
A Not to my recollection.
Q And would you have any reason to give him your phone?
A No.
Q Okay. And where is -- what is the address of his house in Southern Pines or Whispering Pines, North Carolina? You said you stayed at his house in May of 2025. Where is that?
A I don't recall.
Q You don't recall the address. Do you recall what town it was in within Moore County?
A Carthage.

Q Was -- and you recall it was a house, not a -- not an apartment at Tyler's Ridge, correct?
A Can you be more specific?
Q A house versus apartment. Are you familiar with those two --
A Yes.
Q Okay. You stayed -- in May of 2025, you said you stayed at his house. Was that an apartment or is that a house?
A House.
Q Okay. And you don't know the address. Do you know the town where --
A Carthage.
Q Okay. And cupping -- have you ever had cupping done?
A Yes.
Q Okay. And on what occasions have you had cupping done?
A Many.
Q Okay. And what is -- I've heard about it, and I've seen the little suction marks on people. What is it -- what is it designed to do?
A Relieve fascia in the muscles and bone under the skin.
Q Okay. And who performs your cupping procedures?

And, again, I'm going to talk about the same time frame, April 2022 through December 1, 2024.

A Two individuals.

Q Okay. And who are they?

A Shauna and Kristin.

Q Shauna who and Kristin who?

A I don't know.

Q Who do they work for? What do they -- do they work for an entity that you go to, and those are the two -- much like you go get your hair done and, you know, you have a person that does it, but they might work for a company, is there a company that Shauna or Kristin work for?

A I don't think so.

Q Okay. Well, where is Shauna located?

A In Arizona.

Q And when you go to get cupping, do you go to -- I assume she's a female. Do you go to her house, or do you go to a place of business, or does she come to your house?

A She comes to my house.

Q Okay. And you've seen the declaration of Ms. Ammel where she observed a Signal message from you to Mr. Ammel showing you in a towel with cupping. Do you recall that?

A I don't recall it.
Q Okay. You don't recall ever sending Mr. Ammel a Signal message with you in a towel?
A I do not.
Q You're saying you don't recall that particular event, or are you saying that it didn't happen?
A I don't recall.
Q Okay. And if you sent Mr. Ammel messages -- Signal messages with you in less -- less than fully clothed, would that have been, to your knowledge, before or after May of 2024 -- late May of 2024 -- Memorial Day of 2024?
A Can you be more specific?
Q If you had sent messages to Mr. Ammel in which depicted you in a towel, would -- through Signal, would -- or some similar type of message where you're not fully clothed, would that have been, to your knowledge, before or after Memorial Day 2024?
MR. EPSTEIN: Objection to form.
A I don't recall ever doing that.
Q So you're not admitting it, you're not denying it; you just don't recall?
A I don't recall.
Q Okay. Did you ever send through Signal to Mr. Ammel any pictures of you at any time between when

he started working in April of 2022 and December 1st, 2024?

A I don't recall.

Q All right. The cupping that you -- that you are getting at your home, does that continue today?

A Yes.

Q Okay. How often -- I'm going to say this wrong -- but do you get cupped? I mean --

A It depends.

Q Okay. What does it depend on?

A The sporting activity I am training for or engaged in.

Q Okay. At what point did you start this procedure, the cupping procedure?

A I don't recall.

Q Was it prior to April of 2022?

A Yes.

Q Okay. And has it been fairly regular since April of 2022, depending on what you're training for?

A Yes.

Q Okay. Do you recall a point in time in the summer of 2024 where Mr. -- sometime around the summer of 2024 where Mr. Ammel confronted you about being too flirty with him?

A No.

Q Okay. Has Mr. Ammel ever confronted you about being too flirty with him?
A No.
Q Have you ever confronted or discussed with Mr. Ammel that he was too flirty with you?
A No.
Q Okay. And it's your testimony that prior to Memorial Day of 2024, there was absolutely nothing between the two of you as far as romance or intimacy?
A Correct.
Q Okay. And you never expressed any interest in him prior to May of 2024 to him?
A Correct.
Q Okay. Do you know why he felt like he, as your professional bodyguard, could just kiss you on Memorial Day of 2024? In other words, how did that -- what was the lead-up to that? Or was it just a sudden kiss, and unexpected, and one thing led to another?
A He kissed me.
Q Yeah. And in the hours prior to that, where were you?
A Can you be more specific?
Q I mean, were you at dinner? Were you at a wine

tasting? Where were you? At the VRBO? In your room?
A Outside.
Q One of those you just sort of kick back, drink wine, and hang out by a fire or something like that outside, or conducting business outside, or riding a hot air balloon outside? What were you doing outside?
A In the back yard of the Airbnb.
Q Okay. Who else was there?
A Zach, the other security member, and my two friends from Arizona.
Q And what are their names?
A Penny and Grant.
Q Penny who and Grant who?
A Croissant.
Q Spelled like the bread or --
A Like the pastry.
Q Okay. And did they observe Mr. Ammel kiss you?
A No.
Q Where were they at the time, to your knowledge? And I'm talking about Penny and Grant, not Zach.
A Inside the Airbnb.
Q And where was Grant? I'm sorry. Where was Zach?
A Inside the Airbnb.

Q And what time did this occur?
A I don't have an exact recollection. 1:00, 2:00 a.m.
Q Okay. So were they in bed at the time, to your knowledge?
A I don't know.
Q Okay. And what time did you leave Mr. Ammel's room at the -- at the B&B to go back to your room on Memorial Day or the day after?
A I don't recall.
Q Okay. And then, according to your declaration, you had intimacy with Mr. Ammel next in mid-June and then mid-July, correct?
A Yes.
Q Okay. Mid-June, was that the one in New York or -- New York City, I think you said?
A Yes.
Q Okay. Where in New York City?
A The Edition Hotel.
Q Okay. And where is the Addition [sic] Hotel? Is it Addition, like A-D-D, or is it --
A E.
Q E. So Edition. Okay.
A Edition.
Q Okay. Where is that located? Is it in Manhattan?

A Midtown Manhattan.

Q Okay. And that's where you said you were staying the night of November 1st when you -- after you landed in -- of 2024 after you landed at Dulles Airport?

A Yes.

Q Okay. And how -- who else was with you and Mr. Ammel at the Edition Hotel in mid-June?

A Ashley Kennedy and Shawn [phonetic] Kennedy.

Q And who are they?

A Ashley was my finance consultant, and Shawn is her husband.

Q Okay. And what brought you to New York?

A A wedding and work.

Q Whose wedding?

A Alex Katz and Jessica Dean.

Q Okay. And how do you know them?

A Alex works for Blackstone, and Jessica is an anchor on CNN. I met them through my time in the Senate.

Q Okay. And whose -- did you have a separate hotel room and Mr. Ammel have a separate hotel room?

A Yes.

Q Okay. And where were you intimate? Whose hotel room?

A In mine.

Q And then in mid-July -- December -- excuse me.
Mid-July in Washington, DC, do you recall that?
A Yes.
Q And where were you staying when you were there in DC in mid-July?
A My apartment.
Q And how did -- how did that come about -- that encounter with Mr. Ammel? Was he there as your driver? You know --
A We had taken a redeye flight from, I think, Los Angeles to one of the DC airports and went to my apartment in the morning before work.
Q And what was work? Was there a vote or something?
A I can't recall.
Q Okay. And so that encounter occurred in the morning --
A Yes.
Q -- sometime in mid-July?
All right. And then Aspen, Colorado, late August. Where were you? Were you on a run or some other -- a concert? What was it that brought you to Aspen, Colorado?
A A fundraising trip.
Q Okay. And who came along with you other than Mr.

Ammel?

A I can't recall all of the names of the security team who were there. Melissa.

Q Do you have a last name for Melissa?

A I do not.

Q Okay. Anyone else that you can recall?

A I can't remember which --

Q And then according to your declaration, in late September, you had sex with Mr. Ammel in Washington, DC, correct?

A I don't think so.

Q Okay. If you look at Exhibit 3, Paragraph 28, which is on Page 8 at the top, you go through when you were physically intimate. And we talked about mid-June in New York, we talked about mid-July in Washington, and late August in Aspen. And then late September in DC, do you see that?

A I do.

Q Okay. Do you know -- what were the circumstances surrounding that intimate encounter?

A I can't recall.

Q Okay. And then the last one is early October in Phoenix. Do you know -- can you help me with a date on that as far as before Mr. Ammel went home for his daughter's birthday or after, meaning

before October 3rd or after October 6th when he returned?

A I believe October 2nd.

Q Okay. And where -- you were in Phoenix. Was it at your -- at your house or --

A Yes.

Q -- at the time?

And who else was at your house?

A I don't recall.

Q Okay. And how did Mr. Ammel get to go to your -- I mean, how did he know to come to your house? Like did you text him, e-mail him, Signal him?

A I don't recall.

Q Okay. But you were not in a -- in a public setting at that point? You were at home?

A I believe so.

Q And when you were in your apartment in DC, you were not at a public function, like a wedding or a fundraiser, but rather at your apartment in DC, correct?

A Yes.

Q Okay. All right.

MR. EPSTEIN: I'm sorry. I need to take another break.

MR. VAN CAMP: All right.

MR. EPSTEIN: Off record.

THE VIDEOGRAPHER: Off the record at 10:26 a.m.

(THREE-MINUTE RECESS)

THE VIDEOGRAPHER: On the record at 10:29 a.m.

Q So, Ms. Sinema, we've gone through what you claim to be the times that you had intimacy with -- a romantic intimacy with Mr. Ammel. Are there any other times that you can think of?

A No.

Q And it's your testimony that while in -- while in Saudi Arabia, you were -- or in the Middle East, I'll say, you were not romantic in any way with Mr. Ammel?

A That is my recollection.

Q Okay. So you don't admit or deny; you just can't recall?

A Can't recall.

Q Okay. The -- you have produced documents in this area. Some of them are Mr. Ammel's travel records, itinerary, phone records. How did you get those documents? How did they come into your possession?

A He gave me access to his e-mail to find documents.

Q Okay. How about his phone records?

A He requested them from the relevant company and gave them to me.

Q And where did he give them to you? Where was he, where were you when you received his phone records?

A He gave me access to his e-mail.

Q I'm talking about phone records. Did somebody e-mail him his phone records?

A Yes.

Q And then he forwarded them to you?

A No.

Q How did you get access to them?

A He requested them from the company. They gave them to him via e-mail. He gave me access to his e-mail.

Q And did you review his phone records in preparation for Exhibit 3, your declaration?

A No.

Q Did you notice when you reviewed your phone records and you reviewed his phone records that they indicated that your phone was in Southern Pines, North Carolina on the late afternoon of November 1st, 2024? Did you notice that?

A I did --

MR. EPSTEIN: Objection to -- objection to form.

A I did not review November 1st.
Q Okay. And why not?
A Their separation occurred on October 31st or November 1st.
Q At what time of day on October 31st or November 1st?
A I do not know.
Q Did you have any discussions with Mr. Ammel as your security guard in the Middle East in late October of 2024 leading up to November 1st of 2024 about his marriage to Heather Ammel?
A I don't recall.
Q Has he ever told you prior to November 1st, 2024 that he wanted to divorce his wife?
A Yes.
Q And tell me about when he first raised that issue with you and under what circumstances.
A My recollection is January of 2024.
Q Okay. So what happened in January of 2024?
A Can you be more specific?
Q What happened in January of 2024 that would lead you to believe that that was the date that Mr. Ammel indicated to you he wanted to divorce his wife?
A He told me that Heather had hit him and threw a

phone at his face.
Q Did he say he wanted to divorce her at that time, or just that there were some marital issues?
A My recollection is he said, "I got to get a divorce."
Q Okay. And did he tell you that the basis for the discord between Mr. and Mrs. Ammel was you? Did he ever tell you that?
A No.
Q Did he ever tell you prior to May of 2024 -- May 27th, 2024 -- did he ever tell you that his wife, Heather Ammel, suspected that he was having a relationship -- an improper romantic relationship with you?
THE VIDEOGRAPHER: Sorry. We got to go off record.
(ONE-MINUTE RECESS)
THE VIDEOGRAPHER: On the record at 10:35 a.m.
Q Ms. Sinema, prior to May 27th, 2024, did Mr. Ammel ever tell you that his wife Heather suspected that you and Mr. Ammel were having a romantic relationship?
A No.
Q And prior to November 1st, 2024, did he ever tell

you that Ms. Ammel suspected that you and Mr. Ammel -- Matt Ammel were having a romantic relationship?

A No.

Q So, to your knowledge as you sit here today, you thought he was just getting a divorce, and moving on, and that your -- that Ms. Ammel had no concerns about his relationship with you?

MR. EPSTEIN: Objection to form.

A Can you be more specific?

Q Well, "concerns" meaning romantic -- that the two of you had a romantic relationship. You testified that up to November 1st, he had never told you that -- of 2024 that Heather Ammel suspected that you and Mr. Ammel, her husband, were having a romantic relation [sic], correct?

A Can you repeat the question?

Q Prior to November 1st, 2024, you testified that prior to that date, Mr. Ammel had not told you that Heather Ammel suspected that you and Mr. Ammel -- Matt Ammel were having a romantic relationship, correct?

A Correct.

Q When was the first time, if it ever happened, that Mr. Ammel -- Matt Ammel disclosed to you that the arguments that the -- that the -- that he and his

wife, Heather Ammel, were having were related to his relationship with you?

MR. EPSTEIN: Objection to form.

Q If it ever happened was part of my question.

A That conversation never occurred.

Q Up through today?

A That's a different question.

Q Yeah. So that's my next question. Up through today? Same question, but up through today?

A Can you repeat the question?

Q Yes. Has -- up through today, has Mr. Ammel ever expressed to you that prior to November 1st of 2024, Heather Ammel suspected that you and Mr. Ammel were having a romantic affair?

A I learned that later.

Q When?

A I believe I learned it when I reviewed their text history from their domestic case.

Q And what is it about -- oh, where Heather is saying things about you and his relationship with you?

A Yes.

Q Okay. And do you know when that was?

A I can't recall exactly when I reviewed that text history.

Q Would it have been in 2025?

A It's possible.
Q Would it have been as early as 2024, to your knowledge?
A No.
Q Okay. All right. So my understanding from reading your declaration is that you became aware that Matthew Ammel was married and had three children and was living in the State of North Carolina sometime in December of 2023, correct?
A Correct.
Q And the events -- the intimate romantic events between you and Mr. Ammel that you say began on May 27th, 2024 all occurred while Mr. Ammel's home residence was in North Carolina and he was living there with his wife and three children, correct?
MR. EPSTEIN: Objection to form.
A I don't know that.
Q So he's never told you where he lives in North Carolina -- or where he did live, at least, prior to November 1st, 2024?
A No.
Q You didn't know that they had a marital home until November -- sometime in November of 2024 in which he resided, Heather resided, and their three children resided?

A Can you be more specific?
Q Did he ever tell you at any time that prior to November of 2024, he resided at his home with his wife and three children?
A Yes.
Q Okay. When was that?
A Can you be more specific?
Q No. When did he tell you that, that that's where he resided when he was in North Carolina?
A I believe it was the winter of 2023.
Q Okay. And the times that you were romantic with him, you were aware that he was married and his home residence was in North Carolina, correct?
A Yes.
Q And that was mid-June, mid-July, I think August, September, and October, correct, according to your declaration?
A Yes.
Q Okay. And you indicated that in January of 2024, he said that his wife had thrown a phone at him. Was that a cell phone or an old-fashioned phone that old people like me are used to seeing?
A I don't know.
Q And did he tell you why she threw the phone at him?
A No.

Q Do you know whether or not it was because of messages that she found on his phone that you had sent him?

A I do not know.

Q All right. The -- is it fair to say that, at least according to your declaration, you didn't know where Matt was -- Matt Ammel was a lot of the time? If he wasn't with you, he could be working for Ridgeline or -- what's it -- Staccato, correct?

A Correct.

Q Okay. And that he traveled quite a bit for those two companies. Was that --

A Yes.

Q -- your understanding?

Okay. How did you come to know that he was working at Ridgeline?

A He often wore a Ridgeline hoodie.

Q And you asked him what it was -- where the hoodie came from? Or how did that lead you to believe that was a company that he worked for?

A The security guys would all talk about their gigs.

Q Okay. And do you know when he started and stopped working for Ridgeline?

A I do not.

Q Do you know when he started and stopped working for

Staccato?

A I do not.

Q Do you know if in the dates between November 27th, 2024 and December 1st, 2024, he was still working for either of those entities?

A Can you repeat that?

Q Between May 2024 and December 1st, 2024, are you aware of whether or not he was working for one of those two entities, meaning Ridgeline or Staccato?

A I do not know.

Q Did he ever talk to you about his family, his children in particular?

A No.

Q So --

MR. EPSTEIN: And I just want to make sure the "ever" has clarity. Do you mean ever to this day or ever in the time frame that you gave earlier to that?

MR. VAN CAMP: To this day.

A Yes.

Q Okay. Prior to November 1st, had he ever talked to you about his children?

MR. EPSTEIN: You mean November 1st, 2024?

MR. VAN CAMP: Yes, sir.

A Once. Yes.

Q Tell me about that. When was it and what was the discussion about?
A Matt asked if he could bring Clara, their oldest daughter, to Washington, DC to experience, you know, the Capitol, et cetera. I said "Yes, of course."
Q Do you know when that was?
A I believe the end of July 2024.
Q Okay. And when he went home -- well, strike that.
What -- when he would travel from being with the security detail for you to come home, who would make his flight arrangements?
A I don't know.
Q And you only have his flight arrangements because he gave you access to his e-mail?
A Correct.
Q Okay. When he flew home on October 3rd of 2024, I think it was his daughter's birthday. Were you aware that he was doing that --
A No.
Q -- at the time?
A No.
Q Okay. But you were aware where he lived and where his children and his wife were, correct?
MR. EPSTEIN: On that day? Is that your

question?

MR. VAN CAMP: On that day. On that day.

A No.

Q Why -- what happened that you -- that you wouldn't know -- you knew before, but you didn't know on October 3rd of 2024 where his wife and children were residing and where his home was?

A I did not know.

Q But -- so he might have moved? Is that, I mean --

A I don't know.

Q Okay. You had information that the last place he lived was in Moore County, North Carolina, correct, as of October 3rd, 2024, but you don't know whether he moved?

MR. EPSTEIN: Objection to form.

A I do not know.

Q Did he ever tell you he moved out of that home residence prior to October 3rd, 2024?

A No.

Q Did you have any reason to believe he was living somewhere else other than where you knew he was living with his wife and children since December of 2023 in or on October 3rd, 2024?

MR. EPSTEIN: Objection to form.

A Could you repeat that?

Q Did you have any reason to believe he and his wife and children had moved to a different location when you Signal messaged him on the night of October 3rd, 2024?

A I did not know.

Q Okay. So you didn't know where he was, but you had -- do you have any information that would lead you to believe he wasn't where he was living back in December or whenever it was of 2023 that you first learned about his residence?

A I had no information.

Q Okay. And when he applied for a job with the Senate or Kinster [sic] --

MR. EPSTEIN: Kinsaker.

Q -- Kinsaker or TOA, is it my understanding that you didn't see his application on where he lived?

A I did not.

Q But you guys were at a -- you and Matt and Ms. Ammel and -- were at -- among others, were at a concert -- A U2 concert in -- is it 2023 in Las Vegas? Is that where you learned that he had a wife and where he lived?

A I believe so.

Q Okay. All right. June of 2024, there was a message sent -- it is Exhibit 9 in your book --

where you say, "I hope your day was okay. Thinking of you." And he says, "I really miss you." And you say, "I am with you. I keep waking up during my sleep and reaching over for your arms to hold me." Do you see that?

A I do.

Q Did you send him that message?

A I did.

Q And was that in June of 2024?

A I do not recall.

Q Do you recall if it was before that or after that date, June -- let's just say June 1st, 2024?

A I don't recall.

Q Okay. And where was Mr. Ammel when you sent that message, to your knowledge?

A I do not know.

Q And --

A I did not know.

Q Okay. But you know now that he was in Kansas, right?

A Now I know he was in Kansas.

Q And then if you turn to the last -- second-to-last page of Exhibit 9, there is a -- is that your -- is that your e-mail to him on August -- or text, rather, to him on August 6th of 2024?

A I don't know.

Q Do you know where you were on that date when you sent this text message to Mr. Ammel?

MR. EPSTEIN: Objection to form.

A Can you be more specific?

Q Where you were physically when you sent this text message.

MR. EPSTEIN: You're implying something in your question that may or may not be true, so that's why --

MR. VAN CAMP: Well, she can explain it. That's -- yeah -- no problem.

A Could you -- could you ask that again?

Q Did you send a message to Mr. Ammel sometime on August 6th at 9:30 a.m. saying, "I cannot sleep" -- or excuse me -- 12:38 a.m. saying, "I cannot sleep. I'm miserable. And I want at least one of my pens back. You have them both. Please give me one of them back now." Is that your message to him?

A It appears so.

Q Okay. And that's, like, in the middle of the night, at least for people like me that are in their 60s, right? 12:38 a.m., correct?

A That's what this says.

Q And do you know what year that was? August 6th of

what year?

MR. EPSTEIN: Objection to form.

Q Does it say not above that Tuesday, August 6th at 9:31 a.m., you wrote, "1787 enter"? Did you -- did you text that to Mr. Ammel?

A I don't think so.

Q Okay. And why don't you think so?

A I don't recall sending it.

Q And so you're not admitting or denying; you're just saying you don't recall?

A Don't recall.

Q All right. And then you do admit sending a Signal message to Mr. Ammel about 9:30, 10:00 on October 3rd of 2024, correct? The one that is the last page of Exhibit 9.

A Can you repeat the question?

Q Do you recall sending this text message, which is the last page of Exhibit 9, to Mr. Ammel on October 3rd, 2024 where you state, "I miss you. Putting my hands on your heart. I'll see you soon."

MR. EPSTEIN: I want to make sure I understand the question. Are you saying that does she recall this message, or does she recall that she sent it on October 3rd?

Q Do you recall sending this message on October 3rd?

A I do not recall sending it on October 3rd.
Q When do you recall sending it?
A I do not know.
Q Okay. And then Mrs. Ammel apparently got Matt Ammel, her husband's, phone and said, "Are you having an affair with my husband?" Do you recall getting that e-mail?
A I do.
Q Okay. Do you know when you received that e-mail?
A Signal.
Q But when? What day?
A I do not recall.
Q I'm sorry. Text message or Signal message. You don't recall.
Okay. And did you ever respond to the question that Heather Ammel posed saying, "Are you having an affair with my husband?"
A No.
Q Why not?
A I did not want to respond.
Q Did you contact Matt Ammel at some point after receiving that message from Heather Ammel to inform her [sic] that his wife had got ahold of his phone and saw your message --
A No.

Q -- your Signal message?
You didn't speak to Mr. Ammel at all about that up till November 1st, let's say, 2024?
A No.
Q So you received this message, "Are you having an affair with my husband," from Heather Ammel sometime in October of 2024, and didn't raise that Signal message that you received with Matt Ammel at or prior to November 1st of --
A Correct.
Q -- 2024?
Didn't say, "Hey, your wife just sent me a message; I think she might be on to us" or something like that? I don't know.
A No.
Q Okay. And when you say you don't recall when you sent -- well, let me strike that.
Are you -- are you denying that you sent this message to Matt Ammel at 21:57, 21:58 on October 3rd, 2024?
A No.
Q And are you denying that you received a response that was stating, "Are you having an affair with my husband?"
A No.

Q You just don't know when in October of 2024 you sent the message or received what is in blue here on the last page of 9?
A I did not know.
Q Okay. And have you done any research to try to determine what day you would have sent that message at what time?
A Yes.
Q And what did that research reveal?
A I spent a lot of time thinking about when this could have occurred in October. I reviewed my daily rundown e-mails that still exist, I searched my recollection, and I believed it was in the middle of October.
Q Is that still your belief?
A It is not.
Q What is your belief today?
A Today, I have evidence that it occurred on October 3rd and October 4th.
Q Of --
A Of 2024.
Q And what is your evidence?
A The metadata from this screenshot.
Q And would you consider that message, which is the last page of Exhibit 9, to be romantic in nature?

A No.

Q And if you look at -- and if you look at the last page of Exhibit 9, "Putting my hand on your heart. I'll see you soon. I miss you." Is that the type of message that you sent to other security guards or other members of your security detail?

A I can't recall.

Q You understand, Ms. Sinema, don't you, that a wife reading this might get concerned about who is sending her husband that kind of message referring to putting his -- her hand on his heart? Can you see that?

A Yes.

MR. VAN CAMP: Let's take a break.

THE VIDEOGRAPHER: Off the record at 10:55 a.m.

(THIRTEEN-MINUTE RECESS)

THE VIDEOGRAPHER: On the record at 11:07 a.m.

Q Ms. Sinema, it's my understanding from your prior testimony that Mr. Ammel in January of 2024 said, "I've got to get a divorce" or some words to that effect to you. Is that correct?

A That is my recollection.

Q Do you know where you were when he said that to

you?
A I'm not sure exactly, but I think Park City, Utah.
Q And what were the circumstances? Were you there for a concert, for a fundraiser, for an event?
A Fundraising trip.
Q Okay. And why would you be fundraising, you said, in Utah if you were an Arizona senator? I mean, you get funds, I guess, from other -- from donors from other states, obviously. Is that -- or were you at somebody else's fundraiser?
A I held fundraisers all over the country.
Q Okay.
A And outside of the country.
Q Did you ever hold one in North Carolina?
A Yes.
Q Where did you hold a fundraiser in North Carolina?
A In Charlotte with Senator Tillis.
Q And that was the 2023 trip you referenced?
A February of 2023, if I recall.
Q And was that the only fundraiser you've ever done in North Carolina --
A Yes.
Q -- as a senator?
A Yes.
Q And you had discussions with Mr. Ammel about him

saying, "I got to get a divorce" in January of 2024, but then really didn't discuss his marriage or the status of his marriage from that time forward through November 1st of 2024. Is that correct?
A It wasn't a discussion. He just told me that.
Q Okay. But there were no other discussions about his marriage or his family -- well, his marriage to you between January of 2024 and November 1st, 2024, correct?
A Correct.
Q Okay. And so you wouldn't be able to give any type of opinion or testimony regarding what the status of that marriage was as of October 3rd of 2024, correct?
MR. EPSTEIN: Objection. Do you mean now or then?
MR. VAN CAMP: Then. October 3rd, 2024.
MR. EPSTEIN: Thank you.
A At the time, no.
Q And what you found out about Mr. Ammel and his situation -- marital situation with Heather all occurred -- other than the January discussion about divorce -- or statement -- occurred after November 1st, 2024?

A Could you repeat that?

Q Any discussion you had with Matt Ammel about the status of his marriage, the quality of his marriage would -- other than the statement "I've got to get a divorce" in January of 2024 to you, any discussion would have been after November 1st, 2024. Is that correct?

A I believe so.

Q Okay. All right. What documents or information did you look at to come to the conclusion in your declaration that the Signal message you sent to Matt Ammel in October of 2024 was mid-October as opposed to October 3rd?

A I had no recollection of when that exchange occurred, so I reviewed my daily rundown e-mails which still existed -- those that still existed -- I reviewed Matt's flight e-mails, I reviewed my phone records to determine where I was on specific dates, I reviewed my Marriott Bonvoy account for hotel dates.

Q Is the Edition hotel in Midtown Manhattan -- is that a Marriott?

A Yes.

Q Okay. Did you ever review a document that would suggest that you were in New York on the evening of

November 1st of 2024?

A Yes.

Q Okay. And do you have that with you? I know it's -- I guess November 1st was a cutoff for you as far as looking at documents. But have you ever looked at any document that would indicate that -- not that you had a reservation, but that you were actually there?

A I know that I was there.

Q Okay. If you look at Exhibit 3, one more example of this -- that's your declaration. In Paragraph 36, it states that "On July 20th, 2024 at 8:14 a.m., I called Mr. Ammel from Phoenix, Arizona." Do you see that?

A Yes.

Q Okay. And if you look at Exhibit 10 with the phone records on Page -- if you look at Page 1064 at the bottom right, Ms. Sinema, it states that -- this is Mr. Ammel's number -- that he received a call from your number at 12:40 -- excuse me -- at 8:14 from Cave Creek, Arizona on July 20th. Do you see that?

A I do.

Q How far away is Cave Creek from Phoenix?

A About 20 minutes.

Q And is that your number, 602-904-9665?

A Yes.
Q And where did you get the information to support Paragraph 36 of your declaration, which is the July 21st, 2024 phone call to Mr. Ammel?
A July 20.
Q Excuse me. July 20, 2024.
A I believe I gathered from flight reservations or records or the daily rundown.
Q It says you called Mr. Ammel. Did you look at your phone records?
A Yes.
Q Have you looked at -- well, these are his, Exhibit 10. I don't think we've received some of yours yet. But is that consistent with your recollection that at 8:14 on July 20th, 2024, you called Mr. Ammel and spoke with him for -- this says two minutes?
A Could you repeat that question?
Q Is the reference on paragraph -- excuse me -- Page 1064 at the bottom a phone call that Mr. Ammel received on July 20th, 2024 at approximately 8:14 from Cave Creek, Arizona consistent with your representation on Paragraph 36 of Exhibit 3, your declaration, that you called him at exactly that date and time, and you were in Arizona, and he was

in Arizona at the time?
A I believe we were both in Arizona at the time.
Q And that you made that phone call while he was in Arizona and you were in Arizona?
A I believe so.
Q Okay. Did -- let me -- let's just kind of go through your declaration here, Ms. Sinema.
Well, let me ask you this. This number appeared a lot on your phone records. It's a 704 number. I think it's Senator Tillis's number. But did you have a fair amount of communication with Senator Tillis during the time frame of April 2022 through November 1, 2024?
A Significant.
Q Yeah. Yeah.
A Yes.
Q Were you guys -- did you two serve on the same committees or -- in the Senate at the time, during that time frame?
A I don't remember.
Q Okay. What was the purpose of your communications with him -- Senator Tillis?
A Senator Tillis and I negotiated major pieces of legislation together over the time of our overlapping service in the Senate.

Q And the number 704-775-3200, that's his number, correct?
A I don't know.
Q Okay. All right. Now, if you look at your declaration, did you -- if you would go to Page 2, please. And define for me on the first sentence of that page what -- how you define "public events." What would be public events?
MR. EPSTEIN: Where are you specifically?
MR. VAN CAMP: Top page -- top of Page 2.
MR. EPSTEIN: Okay.
MR. VAN CAMP: Just want her to define -- when she says that the security group would be assigned to attend the public events, what -- how do you define "public event"?
A Any time I was outside of my home was a public event.
Q All right. And on Paragraph 5 of your declaration, you stated that in October of 2023, due to leadership changes at TOA, you engaged Kinsaker to be your security group. Was it a leadership change, or did TOA Group just cease to exist at that time?
A I don't know for sure.
Q And with respect to Paragraph 6, you talk about

three different types of security details: Body, driver, and advanced. Do you see that?
A Yes.
Q Okay. Which one was Matt Ammel?
A Can you be more specific?
Q Was he a bodyguard, a driver, or was he on the advanced team when he worked for you in the Senate -- or worked with you in the Senate? He wasn't your employee, I understand. Which one was he? Was he -- was he body, driver, or advanced?
A All security members rotated between these positions.
Q Okay. And then if you look at Paragraph 7, it talks about that "As a senator, I was trained to communicate using Signal Messenger, LLC," it says. Signal -- who trained you? Was it the -- you mentioned earlier you had some training at some point. Who trained you as a senator?
A The technology person in the -- in the Senate.
Q But did all senators use Signal, to your knowledge? At least the ones that you communicated with?
A I don't know.
Q And then you state at the bottom there that Signal messages cannot be retrieved by Signal or phone service providers. What was the basis for that

statement? Like, how did you know that that was the case?

A I researched this before putting together my declaration.

Q And how did you research it?

A I Googled it.

Q And what did the Google research say? Or as my friend says, the Google. What does -- what did it say to you?

A The Google said that Signal does not keep or retrieve messages that have -- that are no longer there.

Q And do you know what your particular phone between April of 2022 and December 1st, 2024 -- what it was set out as far as a setting that it would delete messages after they were sent or received?

A Could you repeat that?

Q Do you know what setting your Signal app was on to delete messages? I understand it's a time thing. You can do 24 hours, eight hours, 12 hours. Do you know what your phone -- your personal phone was set on through Signal between August -- excuse me -- April 2022 and December 1st, 2024?

A I believe eight hours.

Q Okay. And did you ever discuss with Mr. Ammel the

fact that you were communicating with him through Signal and that the messages were disappearing after eight hours?

A No.

Q Did he ever discuss with you that that's how Signal works, and that any messages you sent to him, unless somebody can capture it at the moment, are going to be forever deleted? Did he ever have that discussion with you?

A No.

Q Okay. And on Paragraph 8 on Page 3 of your declaration, in the middle, it talks about a trip to Charlotte and you were accompanied by a staffer and two additional security members. Do you see that?

A Yes.

Q Do you know who the two additional security members were?

A I can't recall.

Q How did you know there were two when you did your declaration?

A When doing a public event, such as an event with another United States senator, there were always three security staff and one non-security staff.

Q Do you know who the staff -- I'm sorry. Go ahead.

A I said always. I believe it was always.
Q The -- in Paragraph 8, you referenced a staffer. Do you know who the staffer was that accompanied you to Charlotte?
A It was probably Dan Winkler. It could have been Ashley Kennedy.
Q Okay. And do you know -- I think your testimony was that Matt -- in the declaration that Matt Ammel was not one of the security guards? I may have that wrong.
A He was.
Q He was. So he was in Charlotte as one of the security guards in 2023 when you flew in for a fundraiser with Tom -- Senator Tom Tillis?
A Yes.
Q But you don't know who the other one was?
A There were two others.
Q Okay.
A I can't recall.
Q All right. So I understand Paragraph 8 of your declaration, it says that you entered the State of North Carolina for one time, a campaign-related event in Charlotte on February 6, 2023. You flew into Charlotte with a staffer arising [sic] at 2:00 p.m. "I was accompanied by a staffer and two

additional security members to an office in Charlotte." One of those security members was Matthew Ammel, but you do not recall who the other one was. Is that correct?
A I apologize. The two additional would refer to two additional from Matt. Three total.
Q Oh, okay. Well, I didn't see that you had him in here. So it was Matt and two additional security guards?
A Yes. That was my mistake.
Q And did those security guards meet you in Charlotte, or were they -- did they come from another location, to your knowledge?
A I have no idea.
Q Okay. And if you look at Paragraph 11, it states that you did not learn that Mr. Ammel resided in North Carolina and lived there with his children until approximately December of 2023. Is that correct?
A That is my recollection.
Q Okay. And as we discussed, just to confirm, since that date, December of 2023, you're not aware of that -- his status changing about where his wife and children lived and where he resided, correct?
A I had no awareness.

Q Okay. He didn't tell you they moved to Maryland or Idaho or wherever?
A He did not.
Q Okay. And how did you learn that he and his wife and family lived in North Carolina?
A I don't recall.
Q And in Paragraph 13, you indicate that you have carefully reviewed the records of your cell phone and e-mail communications with Mr. Ammel, and those records can be produced, quote, "Upon request." Have you produced all of the records you're referring to in Paragraph 13 to your attorney?
A I have.
Q And, to your knowledge, has your attorney provided all of those records to my office?
A Yes.
Q Okay. Okay. Now, Paragraph 4 states, based upon your review of those records --
MR. EPSTEIN: 14. 14.
Q Excuse me. 14, Page 5. "Based upon my review of those records, none of my" -- "of my telephone or e-mail communications with Mr. Ammel between early 2023 and November 1st, 2024 occurred while he was physically present in the United States." When you say --

MR. EPSTEIN: It said -- it said in North Carolina.

MR. EPSTEIN: In North Carolina, rather.

Q When you say define telephone calls -- or I mean you talk about telephone, are you referring to Signal, as well, in the first sentence of Paragraph 14, or are you referring to phone calls, like verbal discussion?

A I utilize Signal as a messaging app.

Q So when you are saying, "None of my telephone or e-mail communications," you're referring to just in person -- well, not in person, but talking verbally over the phone?

A Telephone.

Q Okay.

A Correct.

Q And as we kind of discussed, you admit that you had a -- you sent a message -- a Signal message to Mr. Ammel on October 3rd, 2024 in the evening. Would that not be included in what you're referencing in Paragraph 14 about telephone or e-mail?

A Can you repeat that?

Q I'm just trying to get an idea. You say "telephone." Well, you can use your telephone to do Signal, you can use your telephone to do texts,

you can e-mail, you -- so, I mean -- so is telephone -- I just want to confirm. When you say "telephone" in Paragraph 14, you are not referring to Signal messages, correct?
A Correct.
Q Okay. Okay. Tell me about the trip to -- or the concert -- the U2 concert in Las Vegas in December of 2023 when you met Heather Ammel for the first time. How did -- how did Matt Ammel and his wife Heather appear to get along to you, based on your observations?
A I was on the ground for very little time, so I did not have an opportunity for much observation.
Q What you did observe, did you see anything that led you to believe they were going to get a divorce anytime soon?
A I saw them arguing on the balcony.
Q Okay. Do you know what they were arguing about?
A No.
Q And other than that, did you observe anything that would give you any information about the health of their marriage, so to speak?
A No.
Q And then you ended up seeing Heather again in Miami in mid-October of 2024 at a Taylor Swift concert?

A Yes.
Q How would you describe the interaction between Matthew Ammel and Heather Ammel at that time?
A Normal.
Q And did you get any indication -- of course this was after she sent that text message -- or Signal message saying, "Are you sleeping with my husband," correct?
A Correct.
Q So it kind of had to be an awkward situation. Did she confront you or talk to you about why you didn't answer her Signal message?
A No.
Q Okay. No discussions whatsoever with her other than pleasantries about the concert and their children? Or I guess some of their children were there.
A Pleasantries.
Q Yeah. And kind of nothing was spoken about her concerns about your involvement in her marriage?
A No.
Q Okay. I know you say you cannot recall this message that Heather says she saw in, I think, the spring of 2024 with you and a towel. But putting that aside, would you agree with me that a boss

sending a security detail member a picture of her in a towel would be inappropriate?
A No.
Q Okay. And why not? I mean --
A I'm an endurance athlete. So a photograph of me with cupping marks is about sports.
Q I'm talking about the towel part of it.
A I have no recollection of that.
Q But would you -- I understand you can't recall it. That was part of my question. But you would agree that kind of message to a married man would be inappropriate?
A No.
Q Can you see how a wife might view it as such if her husband was getting a picture on his phone of his boss in a towel?
MR. EPSTEIN: Objection to form.
A I don't know.
Q And you never had any discussions with Mr. Ammel about -- prior to November 1st of 2024 about the status of his marriage?
A Can you repeat the question?
Q You never had any -- well, let me -- let me strike that. Other than the discussion -- not even a discussion, but the comment he made about getting a

divorce back in January of 2024, you have no recollection of any discussions with Mr. Ammel from January of 2024 prior to or up to November 1st, 2024 about the status of his marriage to Heather Ammel?

A Not that I can recall.

Q Okay. Paragraph 26 of your declaration, you talk about "Navigating our way to our destination with some friends." What was your destination on April 7th, 2024? All of them -- all the other ones kind of said where you were going, and this one didn't, so I --

A The Cherry Blossom 10-Mile Run.

Q Okay. Okay. And if you look at Paragraph 28, is it fair to say you cannot recall any other times that you were intimate with Mr. Ammel, meaning having sex with him, other than those referenced in Paragraph 28?

MR. EPSTEIN: Using your date parameters, correct?

MR. VAN CAMP: Yes.

A Correct.

Q You didn't know Matt Ammel prior to April 2022, correct?

A Correct.

Q Okay. Paragraph 32 -- and you may have gone through this, but indulge me. "Since I was able to reconstruct the foregoing Signal messages from a screenshot made by the plaintiff presumably of Mr. Ammel's phone" -- how did you -- and I think -- I think that's the photograph of the June 24th text message, rather. How were you able to reconstruct, other than what you've described so far, meaning looking at where you were, your itinerary, your phone records, Matt's phone records, that kind of thing? Was there any -- is there any other things that you looked at to reconstruct the screenshot referenced in Paragraph 32 of your complaint?
A I reviewed the text history between Ms. and Mr. Ammel that was provided in the domestic litigation.
Q When did you review that? Sometime in 2025, I think you said?
A It's possible.
Q Yeah.
A I reviewed it here to prepare this declaration.
Q All right. Anything else?
A Yes. Mr. Ammel's e-mails concerning flights and my own daily rundown e-mails which still exist -- those that still exist.
Q All right. And on Paragraph 42, you reference that

Mr. Ammel was on security details for you in Arizona all but two nights from October 1st, 2024 until October 11th, 2024. Can you tell me what two nights he was not on your security detail?

A Could you remind me the paragraph you're mentioning?

Q Paragraph 42 on Page 10.

A 42. Could you repeat the question?

Q In 42, it talks about all but two nights. I'm asking you what two nights he was not on your security detail.

A I believe October 3rd, 4th. Actually, also October 5th. It should say three nights, I believe.

Q And where was he on those three nights, October 3rd --

MR. EPSTEIN: Is your question about what she knew then or what she knows now?

Q To your knowledge, where was he on October 3rd, 4th, and 5th prior to December 1st, 2024?

A I had no knowledge of his location.

Q No actual knowledge? He didn't tell you where he was going, that his daughter --

A No.

Q -- had a birthday, that he was heading home, nothing like that?

A No.
Q Okay. How often would you speak with Mr. Ammel --
A Can you --
Q -- between April 2022 and December 1st, 2024?
MR. EPSTEIN: And by "speak," do you mean audible or do you mean --
MR. VAN CAMP: Communicate.
MR. EPSTEIN: Okay. Thank you.
MR. VAN CAMP: We'll do that.
A It depended.
Q What did it depend on?
A Proximity, work schedule, activities planned.
Q On average, how often did you communicate with Mr. Ammel between April 2022 and December 1st, 2024?
A When Matt was working a trip, we would have short phone communications when he was the lead about pickup, departure, logistics. Other times when he was playing a different role, there was little to zero communication.
Q So you were -- you were, according to your testimony, starting May 27th-ish, 2024, in an intimate relationship with him having sex, but you didn't have any communications through Signal unless he was actually working for you? Is that your testimony?

A No.
Q Okay. So tell me about the personal communications with Mr. Ammel that you had after May 24 -- 27th, 2024 up to December 1st, 2024. How often would those occur? "I miss you, I love you, I'm holding out, you know, my hand to you, my hand is on your heart," those types of messages.
A Very rare.
Q Okay. Did you have any -- obviously there was a physical relationship. Was there an emotional relationship with Mr. Ammel prior to December 1st, 2024 between the two of you?
A Can you be more specific?
Q Yeah. Did you care about him? Did you want to talk to him? Did you miss him? As opposed to having sex with him.
A I cared about Matt.
Q Were you ever worried about Matt's psyche, mental health prior to December 1st, 2024?
A Yes.
Q Tell me about that.
A Matt and several other of the members of the security team suffered from traumatic brain injury and post-traumatic stress disorder.
Q And how did that manifest itself when they were

working for you, if at all?
A They would speak of it.
Q You ever look at his medical records or -- Matt's medical records prior to December 1st, 2024?
A No.
Q You -- were you aware in late October before the two of you and others went to Saudi Arabia that Mr. Ammel and Mrs. Ammel went on a trip to Nashville, Tennessee? Were you aware of that at the time?
A I was not aware that they went to Nashville, Tennessee.
Q When did you first become aware that they went to Nashville, Tennessee?
A I don't recall.
Q Do you remember what year it was?
A I think I learned that they went to Nashville in the context of this litigation.
Q Did you discuss with Mr. Ammel -- Matt Ammel the fact that he didn't reveal that to you prior to the context of this litigation? Did you have a discussion about that after you found out?
A No.
Q But at the time, October 25th, 6th, 7th [sic], somewhere there, of 2024, you weren't aware that they had gone to Nashville -- Mr. and Mrs. Ammel --

correct, and gone to see a concert? You weren't aware at that time that they did that?

A I was aware of a concert.

Q Okay. Well, did you just think that Matt went by himself? Or what did you think at the time?

A I knew that Matt and Ms. Ammel went to a concert.

Q Okay. When did you know they went to a concert?

A Before the concert.

Q And are you talking about the Nashville concert?

A I'm not familiar with the Nashville part.

Q Okay. So you didn't know where they were going to a concert; you just knew they were going to a concert sometime before -- shortly -- very shortly before you went to Saudi Arabia and Matt went to Saudi Arabia with others?

A Yes.

Q Okay. And what did you know about that trip other than there was a concert? Or is that the extent of it?

A Sturgill Simpson.

Q Okay. And how did you know that he was going to a concert with his wife to see Sturgill Simpson?

A I had plans to see Sturgill Simpson in Washington, DC in mid to late November with a large group of individuals, and Matt told me that he and Ms. Ammel

were also going to see Sturgill.
Q They didn't tell you where or when?
A I didn't ask.
Q Okay. And have you read Ms. Heather Ammel's declaration in this case?
A I have.
Q Did you see that one of the exhibits -- I think it's Exhibit C to her deposition -- I mean to her declaration -- is some e-mail exchanges between she and Matt after that concert of Sturgill Simpson where they're telling each other they love each other?
A I'd like to review.
Q Sure. It's Exhibit 2. Exhibit 2 and then Exhibit C to Exhibit 2, I believe. There's one, two, three, four -- last page of that exhibit. Ms. Ammel states, "I love you. Text me when you arrive." Then he states back to her, "I love you, too." And there's a picture of them hugging in the hotel room they shared in Nashville. Do you see that?
A I do.
Q Okay. Did you -- did you know about this text exchange prior to this litigation?
A I did not.

Q Okay. All right. And then if you look at Exhibit 12, Ms. Sinema, these are your discovery responses. Looking at the second page, No. 3, would you now, based on the information that you have learned since, as you've testified, admit unequivocally the third admission at the top of Page 2?

MR. EPSTEIN: Objection to form. I'm confused by your question.

MR. VAN CAMP: Would she now admit -- she says it's therefore denied 'cause she can't admit or deny it. It's therefore denied. Would she now unequivocally admit it, based upon the metadata she referred to earlier?

A Yes.

Q Okay. In the interrogatories, there is a reference to a protective order, which has not been signed yet. But nonetheless, you've produced everything that was requested, correct?

A Yes.

Q Okay. And then if you look at the answer to Interrogatory No. 2, is that an accurate representation of all locations by date and location where you and Mr. Ammel were physically present, whether it's work or not -- non-work-related, between 1 of April 2022 and

November 1, 2024?
A Of all that I can recall and was able to identify through records.
Q And in between these dates, when he's not -- Mr. Ammel is not with you, you don't -- it's your testimony you don't know where he is?
A Correct.
Q Okay. And Mr. Ammel -- you said he was at your house in Arizona when you flew here. Have you communicated with him at all since you got to North Carolina?
A Yes.
Q And how did you communicate with him? Signal or some other form?
A He FaceTimed me last night.
Q And tell me about that FaceTime event. What was said by you and him? How long did it last?
A It lasted a few minutes. He had some hip pain.
Q Did he talk to you at all about your deposition?
A No.
Q Did you talk to him at all about your deposition?
A No.
Q Turn to Exhibit 13, Ms. Sinema. Who are the individuals in that picture other than you and Matt, and where are you, if you can recall?

A The person on the left is Daniel Winkler. Next to him is Austin Kennedy, and then me and Matt.
Q And where are you?
A I have no idea.
Q Do you know when this photograph was taken?
A I do not.
Q Looking at Exhibit 14, who is in that photograph and where was it taken? That might be an easier "Where was it taken?"
A That's -- on the left is Matthew, next is his brother Josh, then me, my friend Kristin, and her husband, and my friend Matt. We are either at the north or the south rim of the Grand Canyon.
Q So Matt is on the left, and then his brother is the next individual, and then you're in the middle?
A Uh-huh.
Q And then the next one is --
A Yes.
Q -- who?
A Kristin.
Q And the -- and then the gentleman at the end?
A Matt.
Q Okay. And Matt and Kristin are married?
A They are.
Q And what are their last names?

A Kristin's last name is Meyer [phonetic].
Q And what is Matt's last name?
A Wright.
Q But they're married, yes?
A They are.
Q Okay. All right. Okay. Plaintiff's Exhibit 15 is a set of messages June 17th. It looks like at 11:02, there is a message, "My other phone is in the room. Text here if you need me." Is that a message from you or to you?
A It appears that is a message to me.
Q From who?
A I think Matt.
Q Okay. And how many phones did Matt have other than the one that you primarily used to communicate with him, to your knowledge? He references -- or whoever is writing this references another phone.
A I don't know.
Q Okay. All right. Plaintiff's Exhibit 16 looks like the same group of individuals and one is added. Who is on the far right next to you, if you know?
A The far right in the white hat is Dan Winkler.
Q Okay. And then that's you, and then there's Matt, Kristin, Josh, and then another Matt, right?

A Correct.
Q Okay. All right. If you look at Exhibit 18 -- excuse me -- Exhibit 19, it has a list of numbers in your -- in your name. I recognize the lower one, 602-904-9665, but I don't -- the other two numbers in your name on your ATT -- AT&T bill, do you know who -- are those also phones that belong to you?
A I believe these are numbers attached to an Apple watch and an iPad, I believe. I could be wrong.
Q Okay. All right. And then when you went to New York after your trip to Saudi Arabia -- you claim you went to New York. Who was with you on the flight from Washington, DC to New York?
A Dan Winkler.
Q Okay. And where did -- where did Dan go when he got to New York when you guys landed?
A Into Manhattan.
Q And did he stay where you stayed at the Edition?
A I can't recall.
Q Okay. And why did you go to New York? What was the purpose of that visit?
A To both run the New York Marathon and to do campaign events.
Q All right. And when was the -- when were the

campaign events in New York, that you recall, in November of 2024?
A The day after the marathon.
Q And when was the marathon in New York?
A Shortly after I landed.
Q When you say "shortly," like minutes or days?
A Likely one day.
Q Okay. Did you train when you were in Saudi Arabia for the marathon?
A I did.
Q Okay. And didn't you train with Matt?
A No.
Q If Matt had testified under oath that you and he had no sex until January of 2025, would that be true or false?
A Can you repeat that question?
Q If Matt had testified under oath that you and he had not had sex until January of 2025, would that be true or false?
A False.
Q And if Matt testified in his deposition that you did not share a bed with Matt until January 2025, would that be true or false?
A False.
Q Okay. Are you -- are you aware if Matt has ever

lied to you in the past? Caught him in a lie? He said something that wasn't true and you found out that it wasn't true? Has that ever happened?
A I can't recall.
Q Have you ever discussed with him the fact that you felt that he had misrepresented at some point in time his relationship with his wife Heather to you?
A I did not.
Q That's never happened where you've confronted him on that?
A No.
Q Okay. To your knowledge, did you make a phone call to Sanford, North Carolina sometime in November of 2024 about -- to a moving company about helping with Matt's move to an apartment?
A I have no recollection of that.
Q What did -- what did Matt retrieve from your apartment and bring down to North Carolina? What belongings? What furniture? What things?
A A comforter, a set of sheets, some kitchen items, a blender, an air fryer, a runner rug, some towels, I think a set of sheets.
Q Any furniture? Chairs? Couches? Tables? Lamps?
A A coffee table.
Q Anything else furniture-wise?

A Not for me.

Q And how was -- how were those items transported to North Carolina?

A My recollection is that Matt rented a U-Haul or something like that and moved items himself in the U-Haul.

Q But how were the items from Washington, DC brought to North Carolina? Are you saying that the items you just referred to required a U-Haul?

A I didn't move them.

Q Were you there when he gathered the items and -- or someone did and put them in a U-Haul truck to take to North Carolina?

A I was not there.

Q And do you know what date that was?

A I do not.

Q And when you left -- it looks like Qatar to arrive in Dulles, was Matthew Ammel on that plane with you?

A Can you repeat that question?

Q Was Matthew Ammel on that plane with you?

A Which one?

Q The one from Qatar to DC to Dulles.

A Doha to Dulles, yes.

Q Okay. Yeah. And how did he get from Dulles to

North Carolina?
A He flew.
Q And where did he fly to from Dulles?
A I don't know.
Q And when was the next time after he flew to North Carolina on November 1st did you see him?
A I do not recall.
Q Okay. So I'm going to walk through this, and just you tell me if I'm right or wrong here. So April 22nd, Matt Ammel begins to work for TOA, which is providing you with security, and he's working on your security detail, correct?
A Correct.
Q And he continues to work on your security detail until you leave the Senate? You don't run for re-election?
A Correct.
Q And, according to your testimony, in late May of 2024, the -- you and Mr. Ammel have sex for the first time in California, correct?
A Correct.
Q And you have a sexual relationship from that point forward until today's deposition, correct?
A Correct.
Q Okay. And during the summer of 2024 leading into

the fall -- early October of 2024, you had intimate physical sexual relations with Mr. Ammel, correct?
A Correct.
Q And at the time that you had those relationships, he was married to Heather Ammel, correct?
A Yes.
Q And you knew he was married to Heather Ammel, correct?
A Yes.
Q And other than a comment in January of 2024, you had no information or knowledge as to whether they had a healthy relationship or unhealthy relationship -- Mr. and Mrs. Ammel -- correct?
A Can you repeat that?
Q Other than the statement he made to you in January of 2024 about "I got to get a divorce," you have no information about where -- excuse me -- about the status of their -- of their marriage, whether it was good or bad or divorce was imminent?
A Well, I and others watched them argue on the balcony in December of 2023.
Q You don't know what the argument was about?
A No.
Q So -- but my question was January of 2024. Other than that, let's just say between January 2024 and

November -- or December 1st -- November 1st, rather, 2024, you had no information about the quality of their marriage, correct, whether it was good, whether it was bad, whether it was subject to divorce?

A Correct.

Q And on October 3rd, 2024 while Mr. and Mrs. Ammel were still married, you sent a Signal message to Mr. Ammel while in North Carolina, correct? While he was in North Carolina.

A Yes.

Q But at the time, you didn't actually know where he was, correct?

A Correct.

Q But you knew that the last place you knew he and his family lived was the State of North Carolina, correct?

A Could you repeat that?

Q You knew that the last place that you were aware of where he and his family lived, including he and his wife, would be the State of North Carolina, correct? You knew that at the time of the October 3rd, 2024 Signal message to Mr. Ammel, correct?

A I did not know where he was.

Q But at the time that you sent the message, you knew

that the last place you had known him to be living with his wife was North Carolina, correct?
A Yes.
Q And then when you crafted your declaration, you did not have the metadata to determine exactly when the October 3rd, 2024 Signal message you sent to Mr. Ammel was sent, correct, but you estimated it was mid-October?
A I estimated it was mid-October.
Q And whenever it was sent, and in light of the circumstances of Mr. Ammel at that time being a married man, you did not feel that what -- the message you were sending to him was inappropriate in any way, correct?
A I did not.
Q Okay. And you did -- if you sent a message, although you can't recall, of yourself in a towel, that's part of your athletic routine, so to speak, and you don't believe that's inappropriate, correct?
A Could you repeat that?
Q A boss sending their security detail -- a member of their security detail a picture of them in a towel with nothing else on, you don't believe in and of itself that's inappropriate?

MR. EPSTEIN: Objection to form.
Q Am I correct with that?
A I don't know that that photo is what you've described.
Q Yes. But if it happened, you don't believe that that still would be inappropriate, correct?
A I don't believe there is a photo of me wearing nothing but a towel.
Q Okay. Did you ever have any discussions with Heather Ammel in Las Vegas -- December [sic] of Las Vegas about the fact that you regularly get cupping?
A I don't recall.
Q Have you ever had a discussion with Heather Ammel about you getting cupping prior to December 1st, 2024?
A I don't recall.
MR. VAN CAMP: All right. Let's take a little break. Five minutes.
THE VIDEOGRAPHER: Off the record at 12:06 p.m.
(LUNCH RECESS)
THE VIDEOGRAPHER: On record at 12:39 p.m.
Q Ms. Sinema, did you ever read Mr. Ammel's deposition testimony in his domestic case with

Heather Ammel?

A I have reviewed it.

Q And have you reviewed it in its entirety?

A No.

Q Are you aware that in that deposition, Mr. Ammel stated that you had always expressed an interest in him and that you were flirty with him from the time he met you?

A I have reviewed that.

Q Okay. And is that accurate?

A It is not.

Q Okay. Do you know why he would have said that under oath?

A I don't know.

Q Do you know why that would have been his perception of your behavior?

A I don't know.

Q And did you and Mr. Ammel ever discuss the fact that there was a cause of action in North Carolina for alienation of affection while you were engaging in a romantic relationship while he was married?

A No.

Q When was the first time you were aware that there is a tort that is recognized in the State of North Carolina for alienation of affection?

A I don't recall.
Q Was it before this lawsuit or after? Before the lawsuit was filed? I think it was September of -- that was when it went to federal court. I don't know when it was filed.
A Oh, before.
Q And how did you come to find out about the tort of alienation of affection? I don't want you to disclose anything you talked to with any lawyer, not just Mr. Epstein. But I know you had one prior, Mr. Armstrong.
A There are a handful of states in the country in which this tort exists. I became familiar with it at some point in my life.
Q Okay. And were you -- did you know that one of those states was North Carolina?
A I don't recall.
Q And were you at all concerned prior to November 1st of 2024 that you might be sued for alienation of affection based on your and Mr. Ammel's relationship?
A No.
MR. VAN CAMP: That's all I have.
MR. EPSTEIN: Okay. I have what I think is just going to be a handful of questions.

CROSS-EXAMINATION BY MR. EPSTEIN:

Q Ms. Sinema, you were asked about a phone call listed in Mr. Ammel's Verizon phone records that is listed at November 1st, 2024, which the record shows lasted 48 minutes. Do you recall being asked about that?

A Yes.

Q Mr. Van Camp asked if you were aware of any reason why your phone would have been in Southern Pines, North Carolina at 4:02 p.m. on November 1st, 2024 when the record shows that call was began. Do you recall that?

A Yes.

Q Have you reviewed voluminous phone records in this case?

A Yes.

Q Do you have a sense of how the phone records work in terms of what they're showing?

A I do.

Q Okay. Look at Exhibit 10, please, in the notebook. I'm going to ask you to go to what I believe is the last page, which is Page 1108. Do you see a 48-minute phone call that started at 4:02 with your phone number listed November 1st?

A I do.

Q Do you know what this record is indicating about the origination -- do you know what this record is indicating when -- under the column "Origination" when it says, "Southern Pines"?
A I believe I do.
Q What do you believe it says?
A I believe the origination line refers to where the phone of the account is physically located at the time of the call.
Q Does that line have anything to do, as you understand it, with where your phone was located at the time that call connected?
A My understanding is that it is not related to where my phone was located at the time of the call.
Q Okay. You can put that to the side.
The second question -- or the second topic that I want to talk to you about related to a question that Mr. Van Camp asked just before we took a break for lunch. He asked you a question along the lines of whether you had or didn't have information about the quality of Mr. Ammel's marriage apart from what he told you in January 2024 and apart from what you observed on the hotel balcony in Las Vegas in December 2023. Do you remember him asking about that?

A I do.
Q And do you remember you agreeing that you had no other information besides those two pieces of data?
A I do.
Q Upon further reflection, is that, in fact, accurate?
A It is not.
Q Can you explain what is accurate about what you knew about the quality of their marriage and how you knew it prior to November 1st, 2024?
A Yes. A number of my friends attended that U2 concert weekend. I was delayed in arriving for the series of events because I was working in DC. So Mr. and Mrs. Ammel and my friends spent significant time together both the day before the U2 event and the day of the U2 event and at the suite after the U2 event, and during the course of those two days, Ms. Ammel had -- and Mr. Ammel had discussions with my friends, both together and separate, about the -- about their marriage.
Q What information did you learn and when did you learn it?
MR. VAN CAMP: Objection, hearsay. But you can answer certainly.
A Shortly after that trip, my friends -- those same

friends and I were together in Sedona, Arizona and -- over a New Year's holiday, and it was at that time that they told me about their interactions with Ms. Ammel and Mr. Ammel during that trip.

Q And what did they tell you related to the question Mr. Van Camp asked about the quality of the marriage?

MR. VAN CAMP: Objection.

A That Mrs. Ammel had complained significantly about Matt. They -- some of them witnessed the argument on the balcony, heard the arguments between them, and had separate conversations with Ms. Ammel specifically in which she had numerous complaints about the unhappiness of her marriage.

Q And did she, as you understood it from your friends, mention anything about whether the marriage would continue or discontinue?

MR. VAN CAMP: Objection.

A It is my recollection that they unanimously said, you know, they are getting divorced and she wants a divorce.

MR. EPSTEIN: Okay. Those are all my questions.

REDIRECT EXAMINATION BY MR. VAN CAMP:

Q What prompted your further recollection as

referenced in Mr. Epstein's --

MR. EPSTEIN: Objection. Instruct you not to answer.

MR. VAN CAMP: Can I finish the question?

MR. EPSTEIN: You can.

MR. VAN CAMP: Okay.

MR. EPSTEIN: It's going to be the same instruction.

MR. VAN CAMP: Thank you.

Q What prompted -- or what was your personal further recollection, or was it your lawyer's further recollection?

MR. EPSTEIN: Objection. Instruct you not to answer.

Q So did you come up with the idea that the origin of the call was -- on the phone records, Exhibit 10, was where Mr. Ammel's phone was?

A Could you repeat that?

Q Did you come up with that recollection in and of -- by yourself that the origin as referenced in Exhibit 10 of the calls was where Mr. Ammel was, and not where you were?

A At the time you asked me the questions, I believe that that's what I was trying to answer, but perhaps did not do so completely.

MR. VAN CAMP: Okay. That's all I have. Thank you.

MR. EPSTEIN: Okay. We're done.

THE VIDEOGRAPHER: Off the record at 12:48 p.m. This includes the deposition of Kyrsten Sinema.

THE COURT REPORTER: And just before we wrap up on the written transcript, Mr. Van Camp, would you like the same copy order as you wanted before?

MR. VAN CAMP: Yeah. Just expedited, please.

THE COURT REPORTER: And you need this by the 5th?

MR. VAN CAMP: As soon as you can get it to me. Thank you.

THE COURT REPORTER: And, Mr. Epstein, would you like the same, as well?

MR. EPSTEIN: The same -- the same as we've ordered. Yes.

THE COURT REPORTER: Okay. And you need this expedited by the 5th, as well?

MR. EPSTEIN: Yes.

THE COURT REPORTER: Sounds good. Thank you so much. We're going off the record.

(Whereupon, the deposition was concluded at 12:49 P.M.)

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

I, Lisa S. Marion, CER, a Notary Public in and for the State of North Carolina, duly commissioned and authorized to administer oaths and to take and certify depositions, do hereby certify that on July 31, 2026, KYRSTEN SINEMA, being by me duly sworn to tell the truth, thereupon testified as above set forth as found in the preceding 128 pages, her examination being reported by me verbatim and then reduced to typewritten form under my direct supervision; that the foregoing is a true and correct transcript of said proceedings to the best of my ability and understanding; that I am not related to any of the parties to this action; that I am not interested in the outcome of this case; that I am not of counsel nor in the employ of any of the parties to this action, and that signature of the witness was waived.

IN WITNESS WHEREOF, I have hereto set my hand, this the 3rd day of August, 2026.

Lisa S. Marion

______________________

Notary Public

Certificate No. 200630000110

PLAINTIFF'S EXHIBIT 1 Sinema

STATE OF NORTH CAROLINA

COUNTY OF MOORE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.

25CV001930-620

HEATHER AMMEL,

Plaintiff,

v.

KYRSTEN SINEMA,

Defendant.

**VERIFIED COMPLAINT**
**(Jury Trial Demanded)**

**COMES NOW** Plaintiff, Heather Ammel, by and through her undersigned counsel, and complaining of Defendant, Kyrsten Sinema, hereby alleges and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is a citizen and resident of Moore County, North Carolina and has been for more than six months preceding the filing of this action.

2. Defendant is a citizen and resident of Cave Creek, Arizona.

3. The Superior Court of Moore County has both personal and subject-matter jurisdiction over the parties and the claims set forth in this Complaint.

4. Venue is proper in Moore County, North Carolina pursuant to N.C. Gen. Stat. § 1-82.

## PREDICATE FACTS

5. Plaintiff hereby realleges and incorporates by reference paragraphs 1-4 of this Complaint as if fully set forth herein.



Electronically Filed Date: 9/30/2025 9:56 AM Moore Superior Court County Clerk of Superior Court

6. Plaintiff married her husband, Matthew Ammel (hereinafter "Mr. Ammel"), on 23 October 2010 (hereinafter, "the Marriage"). Plaintiff and Mr. Ammel separated on 1 November 2024 (hereinafter, "the Separation").

7. During the Marriage, Plaintiff and Mr. Ammel had three children: C.A., born 4 October 2011; I.A., born 3 January 2013; and J.A., born 29 September 2015 (hereinafter "the Children").

8. Mr. Ammel was a member of the United States Army. Prior to moving to Moore County in 2014, Plaintiff and Mr. Ammel lived in Raeford, North Carolina. Over the course of four years, Mr. Ammel deployed on four separate occasions to Afghanistan and to the Middle East. During this period, Plaintiff and Mr. Ammel had their two children, C.A. and I.A..

9. From 2014 until 2024, the Ammel family resided together in Moore County, North Carolina.

10. On 29 September 2015, while residing together in Moore County, Plaintiff and Mr. Ammel had their third child, J.A.

11. Throughout the Marriage, Plaintiff was a dutiful spouse and mother and provided a comfortable and loving home and environment for Mr. Ammel. Plaintiff supported Mr. Ammel's career, caring for the Children and household as Mr. Ammel had a demanding schedule with the Army between deployments and military trainings when he was stateside.

12. Specifically, throughout the Marriage, Plaintiff was the primary homemaker, taking care of all basic needs of the Children, including but not limited to: (a) waking, dressing, grooming, feeding, and preparing the Children for daily activities; (b) waking up at night to care for the Children's nighttime needs; (c) preparing breakfast, lunch, and dinner for both Mr. Ammel and the Children on a daily basis; (d) transporting the Children to and from school, activities, and social

functions; (e) facilitating and participating in after-school activities, weekend activities, and social engagements for the Children; (f) facilitating, hosting, and participating in social engagements for Mr. Ammel; (g) cleaning the household on a daily basis; (h) doing laundry for both Mr. Ammel and the Children on a daily basis; (i) completing basic repairs and maintenance in the household; (j) caring for the Children and Mr. Ammel when they were ill; (k) facilitating family routines, traditions, and activities; and (l) caring for family pets.

13. Plaintiff and Mr. Ammel had an active, generous, and fulfilling sexual relationship and remained emotionally and physically intimate throughout the Marriage.

14. Prior to Defendant's intentional and malicious interference, Plaintiff and Mr. Ammel had a good and loving marriage, and genuine love and affection existed between them.

15. Due to the stress and responsibilities associated with his job in the military, Mr. Ammel suffers from substance abuse, post-traumatic stress disorder, and traumatic brain injuries (TBI). Plaintiff ensured Mr. Ammel received proper treatment and care, including taking him to substance-abuse appointments and facilitating his enrollment in various treatment programs.

16. In 2020, Mr. Ammel separated from the Army. Shortly thereafter, Mr. Ammel and his friend, Mike DeVault, started a tree removal company based in Tennessee. Plaintiff and Mr. Ammel made plans to move to Nashville, Tennessee, but in 2021, Mr. Ammel stopped taking his prescription medications, began to rely heavily on marijuana, and was emotionally unstable. As a result, Plaintiff and Mr. Ammel decided to stay in North Carolina for the time being.

17. In 2022, Mr. Ammel officially retired from the Army. Plaintiff and Mr. Ammel initially experienced difficulty obtaining Mr. Ammel's retirement pay and went through an extensive process to secure his retirement.

18. Plaintiff maintained the household while Mr. Ammel searched for stable employment and focused on improving his mental and physical health.

19. In 2022, Mr. Ammel secured employment in a few different jobs. Ridgeline Defense hired Mr. Ammel as a shooting, driving, and breaching instructor. Consolidated Analysis Centers, Inc. ("CACI") hired Mr. Ammel as a maritime operations instructor in Tunisia. Staccato, a nationally recognized firearm company, hired Mr. Ammel to train law enforcement on how to use their pistols.

20. That same year, in 2022, Defendant's head of security hired Mr. Ammel to work as a security detail for Defendant.

21. At that time, Defendant was serving as a United States Senator for the State of Arizona.

22. In April 2022, Mr. Ammel began working for Defendant.

23. In the fall of 2023, Defendant's head of security resigned from her position. Prior to leaving, Defendant's head of security expressed to Mr. Ammel she had concerns Defendant was having sexual relations with other security members. She encouraged Mr. Ammel to leave with her, but Mr. Ammel decided to stay due to the financial security of the job.

24. In addition to accompanying Defendant to various work events, Mr. Ammel accompanied Defendant on several trips and went with her alone to Napa Valley, California in the fall of 2023. Upon returning home from Napa Valley, Mr. Ammel appeared uncomfortable and informed Plaintiff that if anyone had seen them together on the trip, it would have appeared as if they were on a romantic getaway.

25. In December of 2023, Defendant requested Mr. Ammel serve as her security for the U2 concert at the Sphere in Las Vegas, Nevada. Mr. Ammel asked Plaintiff to accompany him on

the trip and presented it to her as a "gift." Mr. Ammel expressed that the trip would be a great opportunity for Plaintiff to meet Defendant and would help establish boundaries. Mr. Ammel introduced Plaintiff to Defendant as his wife. Plaintiff met Defendant, Defendant's friends, and several others on the trip, including American diplomat and Executive Director of the World Food Programme, Cindy McCain. After the concert was over, the group went to McCain's suite. Defendant offered Plaintiff a glass of Dom Perignon and stated to Plaintiff "Did you ever think you would be drinking Dom Perignon in Cindy McCain's Suite?"

26. In or around 2023, Defendant traveled to Charlotte, North Carolina, for a work event. Mr. Ammel met Defendant at the airport and provided her security for the event.

27. Beginning in January 2024, while Plaintiff, Mr. Ammel, and the Children were residing in Moore County, North Carolina, Plaintiff discovered Defendant frequently messaging Mr. Ammel on Signal, the messaging app. Defendant had knowledge Mr. Ammel was residing in North Carolina at the time she sent the messages, and Mr. Ammel received the messages while residing at the marital residence in Moore County, North Carolina. The messages exceeded the bounds of a normal working relationship and were of romantic and lascivious natures.

28. Plaintiff discovered messages which included a picture of Defendant wrapped in a towel; Defendant offered to help Mr. Ammel work through his mental health challenges and Mr. Ammel agreed; Mr. Ammel stated to Defendant he was intimidated by her and Defendant asked why because she only wants to be intimidating to her opponents, not to people she likes; Defendant suggested for Mr. Ammel to bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience.

29. Defendant messaged Mr. Ammel during the State of the Union Address, and when Mr. Ammel asked why she wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote.

30. Around that same time, Mr. Ammel traveled to Pennsylvania for a work trip with Staccato. During his free time, Mr. Ammel attended a baseball game by himself, but messaged Defendant during the game stating he was going to start a "fuck the troops" chant. Defendant responded stating she would "fuck the hot ones."

31. Defendant and Mr. Ammel messaged about having sex missionary style with the lights on, and Defendant stated "Boring!"

32. In March 2024, Defendant requested Mr. Ammel serve as her security at the Extra Innings Festival in Phoenix, Arizona. Mr. Ammel acknowledged to Plaintiff that Defendant was handsy with him at this event. Defendant held his hand and touched him. Mr. Ammel expressed to Plaintiff he didn't know how to get out of the situation without offending Defendant.

33. Shortly thereafter, Defendant and Mr. Ammel flew to San Francisco, California, for Defendant's work trip. While in San Francisco, Defendant invited Mr. Ammel into her hotel room, and they stayed together for hours.

34. In April 2024, Mr. Ammel traveled to Maryland for a work trip with Staccato. While he was there, Defendant invited Mr. Ammel over to her apartment in Washington, DC.

35. In May 2024, Defendant started purchasing gifts for Mr. Ammel and paid for him to receive psychedelic treatment. Defendant paid for Mr. Ammel's psychedelic treatment appointment in Nashville, Tennessee, and then flew him to Napa Valley, California, for him to provide Defendant's security at a concert. After the concert, Defendant, Defendant's friends, and Mr. Ammel stayed in a private Airbnb together.

36. Defendant purchased a theragun for Mr. Ammel and messaged him to bring it over to her apartment so that she could "work on his back."

37. Around May or June 2024, Mr. Ammel stopped wearing his wedding ring. Mr. Ammel stated it was best for "public optics" so it wouldn't look like Defendant was putting her hands on a married man when they were out at concerts and various other public events.

38. In June 2024, Defendant requested Mr. Ammel travel to New York City to be her security and guest for a wedding. From New York City, Defendant and Mr. Ammel flew to Defendant's house in Scottsdale, Arizona where they stayed together alone.

39. That same month, Defendant offered Mr. Ammel a salary position and placed him on her senate staff as a Defense and National Security Fellow. Mr. Ammel then worked as Defendant's personal security guard as well as her senate staff member.

40. Around that same time, Plaintiff discovered more messages between Defendant and Mr. Ammel. Defendant expressed to Mr. Ammel she keeps waking up during her sleep and reaching over for his arms to hold her. Plaintiff confronted Mr. Ammel.

41. In the following months, Mr. Ammel struggled to admit to Plaintiff he was having an affair with Defendant but was vocal that he was leaving Plaintiff and that they were divorcing.

42. Mr. Ammel continued to work for Defendant as her security guard and senate staff member, traveling to various states and cities within the United States and internationally.

43. In July 2024, Mr. Ammel took their minor child, C.A., to Washington, D.C. for a work trip. Mr. Ammel and C.A. attended the Green Day concert with Defendant, and Defendant provided C.A. a tour of the United States Capitol.

44. In October 2024, soon after Mr. Ammel returned home to Moore County, North Carolina, after being away with Defendant on another work trip, Defendant messaged Mr. Ammel

stating, "I miss you. Putting my hand on your heart. I'll see you soon." Plaintiff responded to the message stating, "are you having an affair with my husband? You took a married man away from his family."

45. That same month, Mr. Ammel went as Defendant's guest to the Taylor Swift concert in Miami, Florida. Months prior to the concert, Mr. Ammel arranged for Plaintiff and the Children to also attend. Plaintiff attended to the concert out of concern for the Children. After the concert was over, Plaintiff and the Children flew home to Moore County, North Carolina. Mr. Ammel stayed behind to travel with Defendant to Las Vegas, Nevada for work.

46. After returning home from Las Vegas, Nevada, Mr. Ammel insisted he and Plaintiff go together on an anniversary trip to Nashville, Tennessee. After the anniversary trip concluded, Plaintiff returned home to Moore County, North Carolina, and Mr. Ammel went on a work trip with Defendant to Saudi Arabia.

47. Shortly after Mr. Ammel returned home to Moore County, North Carolina from Saudi Arabia, on 1 November 2024, Plaintiff and Mr. Ammel separated, and Mr. Ammel moved out of the marital residence.

48. Prior to Defendant's deliberate interference in the Marriage, genuine love and affection existed between Plaintiff and Mr. Ammel.

49. Defendant knew Mr. Ammel was married to Plaintiff and that they resided together with their Children in Moore County, North Carolina.

50. Beginning in or prior to 2023, Defendant, with actual knowledge of the Marriage between Plaintiff and Mr. Ammel, began to willfully and intentionally seduce, entice, and alienate the affections of Mr. Ammel, and began to wrongfully and maliciously deprive Plaintiff of the

warmth, companionship, love, affection, consortium, society, financial contributions, services, and attention of Mr. Ammel.

51. Defendant initiated the affair with Mr. Ammel while Plaintiff and Mr. Ammel were domiciled in Moore County, North Carolina.

52. Specifically, during the Marriage and prior to Plaintiff and Mr. Ammel's Separation, Defendant engaged in numerous unlawful acts with Mr. Ammel both within and outside the State of North Carolina while Plaintiff and Mr. Ammel were domiciled in Moore County, North Carolina. Upon information and belief, such unlawful acts included, but were not limited to:

a. Initiating and engaging in numerous, lengthy communications with Mr. Ammel, including: (i) in-person conversations; (ii) telephone conversations; (iii) text message conversations; and (iv) app-based (i.e. Signal) conversations, some of which were emotionally romantic and/or sexual in nature;

b. Meeting with Mr. Ammel on a regular and consistent basis outside the professional environment, with some of such meetings being emotionally and/or physically romantic and/or sexual in nature;

c. Encouraging Mr. Ammel to leave Plaintiff; and

d. Having repeated physically romantic and/or sexual encounters with Mr. Ammel, including but not limited to repeated episodes of sexual intercourse.

53. Defendant solicited Mr. Ammel during the Marriage while Plaintiff and Mr. Ammel were domiciled and present in North Carolina and Defendant was located outside of North Carolina. Defendant effected the solicitation by using telephonic and internet communications of lascivious natures.

54. While legitimate business communication occurred between Defendant and Mr. Ammel during their time as professional colleagues, Defendant's communications to Mr. Ammel became more frequent than required of coworkers and went beyond mere professional

correspondence. Such communications were of romantic and lascivious natures, as referenced above, and did in fact alienate the affections of Mr. Ammel from Plaintiff while both Plaintiff and Mr. Ammel were residing in North Carolina.

55. Many of the communications referenced in paragraphs 52, 53, and 54 above, occurred while Mr. Ammel was in the marital residence in Moore County, North Carolina with Plaintiff and the Children.

56. Defendant had actual knowledge Mr. Ammel was physically located and present in North Carolina with Plaintiff and the Children at the time Defendant sent the messages to Mr. Ammel and the messages were received by Mr. Ammel.

57. Defendant repeated telephone calls and repeatedly sent messages to Mr. Ammel knowing he was located in North Carolina with Plaintiff and the Children.

58. Defendant could and should have known that through eliciting communication—texts and phone calls—with Mr. Ammel, she was establishing a connection with the State of North Carolina.

59. As a direct and proximate result of Defendant's intentional and wrongful actions: (a) Plaintiff and Mr. Ammel separated on 1 November 2024; (b) the genuine love and affection between Plaintiff and Mr. Ammel was lost and destroyed; (c) the Marriage was destroyed and Plaintiff suffered severe emotional pain, distress, embarrassment, mental anguish, loss of social position, disgrace, and humiliation; (d) upon discovering the unlawful affair, Plaintiff was distressed, unable to sleep, suffered a loss in general health and well-being, and suffered from depression and anxiety; (e) due to the negative impact of the unlawful affair on the Children, Plaintiff was distressed, unable to sleep, suffered a loss in general health and well-being, and suffered from depression and anxiety; (f) Plaintiff suffered financial hardship, as Mr. Ammel was

the sole source of income for the Ammel family—Plaintiff and the Children—supporting all of their daily needs; (g) Plaintiff was forced to pursue claims related to the Separation, a subsequent divorce, and the distribution of marital property in order to obtain her equitable share of the marital estate, forcing Plaintiff to incur substantial attorneys' fees, costs, and expenses; and (h) Plaintiff has been forced to incur additional attorneys' fees and litigation costs related to this action.

60. North Carolina has an interest in this case because Mr. Ammel's affection for Plaintiff was alienated and destroyed while Plaintiff and Mr. Ammel were domiciled and present in North Carolina. Moreover, evidence and witness testimony are available in this State through Defendant and Mr. Ammel's past coworkers.

61. Defendant could and should reasonably anticipate being haled into court in North Carolina because Defendant has undertaken action to purposefully avail herself of the privilege of conducting activities within the forum State. Defendant intentionally solicited the affections of Mr. Ammel while Plaintiff and Mr. Ammel were married and domiciled in Moore County, North Carolina, and Defendant knew or had reason to know Mr. Ammel was in North Carolina at the time she elicited communication with him.

62. Defendant remains engaged in a romantic and sexual relationship with Mr. Ammel.

63. Defendant frequently travels to North Carolina to visit Mr. Ammel.

64. On 18 August 2025, Defendant drove to Plaintiff and Mr. Ammel's custody and equitable distribution mediation at Van Camp, Meacham & Newman, PLLC in Pinehurst, North Carolina. Defendant sat outside in the parking lot and waited for Mr. Ammel.

65. On the weekend of 12 September 2025, Defendant and Mr. Ammel took the minor child, J.A., to a concert in Kentucky. On Sunday, 14 September, Defendant and Mr. Ammel drove

J.A. back through the night to Moore County, North Carolina. Defendant and Mr. Ammel dropped J.A. off at school at 9:00 a.m. Monday morning.

66. On 16 September 2025, Defendant accompanied Mr. Ammel to the marital residence to pick up the remainder of his belongings. Defendant sat outside in the cul-de-sac immediately adjacent to the marital residence.

67. As a direct and proximate result of Defendant's actions, Plaintiff suffered damages in excess of twenty-five thousand dollars ($25,000.00).

## FIRST CLAIM FOR RELIEF
*Alienation of Affection*

68. Plaintiff hereby realleges and incorporates by reference paragraphs 1-67 of this Complaint as if fully set forth herein.

69. Prior to Defendant's actions, Plaintiff and Mr. Ammel were happily married and genuine love and affection existed between them.

70. As a direct and proximate result of Defendant's intentional and unlawful actions, such marital love and affection was alienated and destroyed.

71. As a direct and proximate result of Defendant's intentional and unlawful actions, Plaintiff suffered loss of support and income, injury to her physical, mental, and emotional health and welfare, private and public humiliation, and has incurred costs, expenses, and attorneys' fees in connection with the Separation.

72. As a direct and proximate result of Defendant's actions, Plaintiff suffered damages in excess of twenty-five thousand dollars ($25,000.00).

73. The actions of Defendant in alienating the affections of Mr. Ammel were willful, wanton, intentional, malicious, and in reckless disregard of Plaintiff's marital rights, and entitle Plaintiff to an award of punitive damages in excess of twenty-five thousand dollars ($25,000.00).

## SECOND CLAIM FOR RELIEF

*Punitive Damages*

74. Plaintiff hereby realleges and incorporates by reference paragraphs 1-73 of this Complaint as if fully set forth herein.

75. Upon information and belief, Defendant's actions in alienating the affections of Mr. Ammel were willful, wanton, intentional, malicious, and in reckless disregard of Plaintiff's marital rights, including but not limited to engaging in the following actions, both within and outside of North Carolina:

a. Initiating and engaging in numerous, lengthy communications with Mr. Ammel, including: (i) in-person conversations; (ii) telephone conversations; (iii) text message conversations; and (iv) app-based (i.e. Signal) conversations, some of which were emotionally romantic or sexual in nature;

b. Meeting with Mr. Ammel on a regular and consistent basis outside the professional environment, with some of such meetings being emotionally or physically romantic or sexual in nature;

c. Encouraging Mr. Ammel to leave Plaintiff; and

d. Having repeated physically romantic or sexual encounters with Mr. Ammel, including but not limited to repeated episodes of sexual intercourse.

76. Defendant knew or should have known that her willful and wanton conduct was reasonably likely to cause injury, damage, and/or other harm to Plaintiff, and did in fact cause such harm to Plaintiff.

77. An award of punitive damages is warranted to punish Defendant's willful and wanton conduct and to deter Defendant and others from engaging in similar conduct.

78. Plaintiff is entitled to recover damages in excess of twenty-five thousand dollars ($25,000.00), for injuries proximately caused by Defendant's willful and wanton conduct.

**WHEREFORE**, Plaintiff respectfully requests this Court as follows:

1. That Plaintiff may have and recover compensatory damages in excess of twenty-five thousand dollars ($25,000.00) for Defendant's Alienation of Affection;
2. That plaintiff may have and recover punitive damages for Defendant's willful and wanton conduct;
3. That all costs and reasonable attorneys' fees related to this action be taxed against Defendant;
4. For pre-and post-judgment interest;
5. For a trial by jury on all issues so triable; and
6. For such other and further relief as this Court deems just and proper.

This, the 30 day of September 2025.


**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

BY: ______________________________
Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile : (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

STATE OF NORTH CAROLINA )

) **VERIFICATION**

COUNTY OF MOORE )

I, **Heather Ammel**, after first being duly sworn, depose and say:

I have reviewed the foregoing **COMPLAINT**, that the information contained therein is true and correct. With regard to any information stated therein upon information and belief, I believe it to be true as well.

This, the 30 day of September 2025.

Heather Ammel
**Heather Ammel**

Sworn to and subscribed before me this day by **Heather Ammel**.

_______ I have personal knowledge of the identity of the principal(s).
✔ I have seen satisfactory evidence of the principal's identity, by a current state or federal identification with the principal's photograph in the form of a driver's license
_______ A credible witness has sworn to the identity of the principal(s).

Date: 9-30-2025

Larisa Fitch
Notary Public

Larisa Fitch
Printed or typed name of Notary Public

My commission expires: 10-30-2026

(Official Seal) LARISA FITCH NOTARY PUBLIC MOORE COUNTY, NC

PLAINTIFF'S EXHIBIT 2 Sinema

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:26-CV-00038-DAB-JEP

| | | |
|---|---|---|
| **HEATHER AMMEL,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **DECLARATION OF HEATHER AMMEL** |
| **KYRSTEN SINEMA,** | ) | |
| **Defendant.** | ) | |

The Affiant, in addition to her verified Complaint, being first duly sworn, deposes and states as follows:

1. My name is Heather Ammel, and I am the Plaintiff in this action.
2. Unless otherwise stated, I have personal knowledge of the facts and information contained herein.
3. I am a citizen and resident of Moore County, North Carolina, and I have resided in Moore County since 2014.
4. I married my now former husband, Matthew Ammel (hereinafter "Mr. Ammel"), on 23 October 2010 (hereinafter, "the Marriage").
5. During our Marriage, Mr. Ammel and I had had three children: C.A., born 4 October 2011; I.A., born 3 January 2013; and J.A., born 29 September 2015 (hereinafter "the Children").
6. Mr. Ammel and I, along with our Children, resided together as a family in Moore County, North Carolina from 2014 until Mr. Ammel and I separated on 1 November 2024

(hereinafter, "the Separation").

7. Prior to Defendant's malicious interference, Mr. Ammel and I had a good and loving marriage and genuine love and affection existed between us.

8. Mr. Ammel started working for Defendant in April 2022 as her security detail.

9. Defendant incorrectly asserts in paragraph 2 of her declaration she "do[es] not conduct business in North Carolina, and ha[s] no contractual relationships with North Carolina business entities or residents." Mr. Ammel has worked for Defendant since 2022, whether that was through Defendant's security organizations or senate staff.

10. Defendant incorrectly asserts in paragraphs 4 & 5 of her declaration that her security organizations, Toa Group, LLC, and later Kinsaker Security Group, LLC, have no connection to North Carolina. The security organizations hired Mr. Ammel, a North Carolina resident, to work for Defendant, and then Defendant herself offered Mr. Ammel a salary position and placed him on her senate staff as a Defense and National Security Fellow.

11. Defendant incorrectly asserts in paragraph 9 of her declaration she did not know where Mr. Ammel resided until the fall of 2023, at which point she received his telephone number to maintain contact with him, and discovered he had a Kansas area code. Defendant has known Mr. Ammel resided in North Carolina since he began working for her. Defendant values Mr. Ammel's military experience and knows Mr. Ammel was a member of the 3rd Special Forces Group, a military group permanently stationed and headquartered in Fort Bragg, North Carolina. Additionally, in the fall of 2023, Mr. Ammel went with Defendant alone to Napa Valley, California. It was on this trip where Defendant really got to know Mr. Ammel. When Mr. Ammel returned home from Napa Valley, he appeared


Case 1:26-cv-00038-DAB-JEP Document 37-2 Filed 08/12/26 Page 146 of 430

uncomfortable and informed me that if anyone had seen them together on the trip, it would have appeared as if they were on a romantic getaway.

12. Defendant incorrectly asserts in paragraph 11 of her declaration she "did not learn Mr. Ammel resided in North Carolina, and lived there with his wife and [C]hildren, until approximately December 2023." To begin, Mr. Ammel began working for Defendant in April 2022. Defendant, whether through her security group, or individually, would arrange and pay for Mr. Ammel's travel and would fly Mr. Ammel out of Raleigh-Durham International Airport. While it is true Defendant met me for the first time in December 2023 in Las Vegas, Nevada, at the U2 concert, she knew about me well before then. When Defendant greeted me in Las Vegas, she told me "I feel like I already know you, because I've heard so much about you from Matt." On the same trip, Defendant also made a comment about my curly hair and said, "well that's because you live in the humid south." She also commented on Mr. Ammel's military experience, specifically his special forces background.

13. Defendant incorrectly asserts in paragraph 11 of her declaration she "never had personal knowledge of Mr. Ammel being physically present in North Carolina at any time [she] initiated or had communications with Mr. Ammel prior to November 2024." When Mr. Ammel was not with Defendant traveling to various locations, both within and outside of the United States, Defendant knew, or at the very least, had reason to know Defendant returned home to his family in Moore County, North Carolina.

14. Of the messages I reference in my verified Complaint, I personally witnessed Defendant send Mr. Ammel the following messages while he was physically present in North Carolina, prior to the date of Separation:

a. In January 2024, I witnessed Defendant send Mr. Ammel a message about helping him with his mental health.

b. In or around early spring 2024, I witnessed Defendant send Mr. Ammel the following messages:

   i. A picture of Defendant wrapped in a towel. Mr. Ammel was physically present in North Carolina and at our marital residence when Defendant sent a photo of herself wrapped in a towel. I was standing in our kitchen when I read the message. Defendant was wrapped in a white towel, and the picture showed her bare upper back with cupping bruises. Mr. Ammel responded to the picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman who doesn't."

   ii. Mr. Ammel messaged Defendant stating he was intimidated by Defendant while Mr. Ammel was physically present in North Carolina. Defendant responded to the message asking why because she only wants to be intimidating to her opponents, not to people she likes. Mr. Ammel received Defendant's message while he was at our marital residence. I read the message standing in our kitchen.

   iii. Defendant messaged Mr. Ammel suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience while Mr. Ammel was physically present in North Carolina. Mr. Ammel received Defendant's message while he was at our marital residence, packing and preparing to go on another trip with Defendant.

iv. Defendant messaged Mr. Ammel during the State of the Union address while Mr. Ammel was physically present in North Carolina and at our marital residence. While Defendant and Mr. Ammel were messaging during the State of the Union, Mr. Ammel and I were sitting on the couch in our living room. I personally witnessed the live message exchange. When Mr. Ammel asked why Defendant wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote.

v. Defendant and Mr. Ammel messaged about having sex missionary style with the lights on while Mr. Ammel was physically present in North Carolina. I read the message standing in my kitchen.

c. In or around 3 October 2024, I witnessed Defendant message Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." I responded to the message stating, "are you having an affair with my husband? You took a married man away from his family." Mr. Ammel was physically present in North Carolina and at the marital residence when Defendant sent the message. At this point, I took Mr. Ammel's phone and responded to the message. Defendant knew or had reason to know Mr. Ammel was in North Carolina when she sent Mr. Ammel the message, because Mr. Ammel was with Defendant in Phoenix, Arizona 1-2 October 2024, and purposefully flew home on 3 October 2024, for our daughter's birthday. Mr. Ammel was only home for two days, before flying back to Phoenix to be with Defendant on 5 October 2024. See attached as **Exhibit A.**

15. Defendant incorrectly asserts in paragraph 12 of her declaration that between 2022 and October 2024, Defendant and Mr. Ammel did not engage in any communications via SMS (text) messages during that time period, and that the only phone she ever used to communicate with him was her personal cell phone. I have attached a text exchange between Defendant and Mr. Ammel from Mr. Ammel's work phone from June, July, and August 2024 for reference. In the June message exchange, Defendant sent Mr. Ammel a ticket titled Noah Kahan: We'll All Be Here Forever Tour. In the July message exchange, Defendant shared her location with Mr. Ammel. In the August message exchange, Defendant sent Mr. Ammel a code and a separate message stating, "I cannot sleep, I am miserable, and I want at least one of my pens back. You have them both. Pls give me one back now." See attached as **Exhibit B.**

16. Defendant incorrectly asserts in paragraph 13 of her declaration she has carefully reviewed the records of her cellphone and email communications with Mr. Ammel and used those records to ascertain where she was and where he was when such communications occurred. In addition to my own evidence showing otherwise, Defendant and Mr. Ammel primarily communicated through Signal, the messaging app. Defendant, through her own admission, in paragraph 7 admits "[e]ncrypted Signal messages disappear shortly after they are sent to the recipient and cannot thereafter be retrieved on the device of either the sender or the recipient; they also cannot be retrieved by Signal or phone service providers." Signal does not reveal the location of the person or the content of their messages.

17. Defendant incorrectly asserts in paragraph 14 of her declaration that none of her "telephone or email communications with Mr. Ammel between early 2023 and 1 November 2024 occurred while [Mr. Ammel] was physically present in North Carolina" and that "Mr.


Case 1:26-cv-00038-DAB-JEP Document 37-2 Filed 08/12/26 Page 150 of 430

Ammel was physically outside the State of North Carolina at the time [she] directed 100% of [her] telephone and email communications to him during such time period." I have named every message I witnessed Defendant send to Mr. Ammel while he was physically present in North Carolina and at the marital residence. I have also attached the message I sent to Defendant confronting her about the affair to this declaration. See **Exhibit A** attached.

18. Defendant incorrectly asserts in paragraph 19 of her declaration she has no recollection of any Signal messages she sent to Mr. Ammel in January 2024, or if she did send him a Signal message in that month, she had no knowledge as to where Mr. Ammel was physically located. Specifically, in the month of January, I personally witnessed Defendant send Mr. Ammel a message about helping him with his mental health.

19. Defendant offering to help Mr. Ammel with his mental health, is what I believe to be, one of the many ways Defendant lured Mr. Ammel away from me and our family. Mr. Ammel, when he began working for Defendant, was already suffering from PTSD, TBI, and substance abuse. Defendant knew he was in a vulnerable place and took advantage of that. Defendant paid for Mr. Ammel to participate in psychedelic drug treatment in an effort to "help" him with his mental health. Instead, Mr. Ammel's mental health has progressively gotten worse, and he has completely forgotten who he is and has left our family.

20. Defendant incorrectly asserts in paragraph 20 of her declaration she did not send Mr. Ammel any messages that included a picture of her wrapped in a towel and she "has no recollection of any message of the type Plaintiff alleges." Although Defendant denies remembering this event, I read the message standing in the kitchen of our marital residence. Defendant was wrapped in a white towel, and the picture showed her bare upper back with


Case 1:26-cv-00038-DAB-JEP Document 37-2 Filed 08/12/26 Page 151 of 430

cupping bruises. Mr. Ammel responded to the picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman who doesn't." Although Defendant contends this message was not of a romantic or intimate nature, I was deeply offended by the message.

21. In paragraph 20 of Defendant's declaration, Defendant does not deny she sent Mr. Ammel a message suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience. I read the message at our marital residence. Defendant sent Mr. Ammel the message as he was preparing to go on another work trip. Defendant sent this message in the early spring of 2024, and by Defendant's own admission in paragraph 11, she already knew where Mr. Ammel lived at that point. Although Defendant contends this message was not of a romantic or intimate nature, I was deeply offended by the message.

22. In paragraph 22 of Defendant's declaration, Defendant does not deny she sent Mr. Ammel messages during the State of the Union address. Although Defendant asserts she had no knowledge as to where Mr. Ammel was physically located when she sent the message, I read the message at our marital residence. Defendant sent this message in the early spring of 2024, and by Defendant's own admission in paragraph 11, she already knew where Mr. Ammel lived at that point. Although Defendant contends this message was not of a romantic or intimate nature, I was deeply offended by the message.

23. Defendant incorrectly asserts in paragraph 24 of her declaration she does not recall messaging Mr. Ammel about having sexual intercourse missionary style with the lights on and that she stated "Boring!" Although Defendant denies remembering the message and contends it was not of a romantic or intimate nature, I read the message standing in the

kitchen of our marital residence and was deeply offended by it.

24. Defendant acknowledges in paragraph 28 of her declaration that at the end of May 2024, her relationship with Mr. Ammel became romantic and intimate. Although Defendant correctly speaks to the nature of Defendant and Mr. Ammel's relationship at that time, based on the communications and events that occurred prior to May 2024, I deny the affair occurred as late as May 2024.

25. In paragraph 49 of Defendant's declaration, Defendant does not deny she messaged Defendant while he was physically present in North Carolina stating, "I miss you. Putting my hand on your heart. I'll see you soon." I responded to the message stating, "are you having an affair with my husband? You took a married man away from his family."

26. Although Defendant disputes the timeline for this particular message, I am certain Defendant sent the message in or around 3 October 2024. Mr. Ammel was physically present in North Carolina and at the marital residence when Defendant sent the message. I took Mr. Ammel's phone and responded to the message. See **Exhibit A** attached. Additionally, Defendant knew or had reason to know Mr. Ammel was in North Carolina when she sent Mr. Ammel the message, because Mr. Ammel was with Defendant in Phoenix, Arizona 1-2 October 2024, and purposefully flew home on 3 October 2024, for our daughter's birthday. Mr. Ammel was only home for two days, before flying back to Phoenix to be with Defendant on 5 October 2024.

27. In paragraph 51 of her declaration, Defendant contends that at the time she sent the October message, "it was very clear to [her] that Mr. Ammel's [M]arriage with Plaintiff was over." Despite Defendant's contention, our relationship was not over. Mr. Ammel and I went on an Anniversary trip 25-26 October 2024. We held hands on the plane, were

physically intimate on the trip, including engaging in sexual intercourse, and were still very much emotionally connected. Mr. Ammel and I attended a concert together, and throughout the three-and-a-half-hour concert, Mr. Ammel held me and hugged me. I have attached pictures that we took together on the trip as well as our text exchange immediately after the trip. Mr. Ammel told me he loved me and missed me. See attached as **Exhibit C.**

28. After the anniversary trip concluded, I returned home to Moore County, North Carolina, and Mr. Ammel went on a work trip with Defendant to Saudi Arabia. Mr. Ammel and I parted ways at the airport, but Mr. Ammel messaged me stating he loved and missed me. See **Exhibit C** attached.

29. Shortly after Mr. Ammel returned home to Moore County, North Carolina from Saudi Arabia, on 1 November 2024, we separated. However, Defendant did not completely move out of the marital residence until the middle of November.

30. Mr. Ammel traveled to Washington, DC to move furniture from Defendant's apartment into his new apartment in Moore County, North Carolina.

31. After Mr. Ammel and I separated, Mr. Ammel continued to frequent the martial residence and would physically touch me in a romantic way each time he stopped by. Mr. Ammel's brother's family stayed with me and the Children for Thanksgiving 2024, and Mr. Ammel came over for Thanksgiving Day. Additionally, we all traveled to Kansas together for Christmas 2024, and Mr. Ammel and I slept in the same bed on Christmas Eve. After spending Christmas in Kansas, we went skiing together as a family.

32. After the ski trip in December 2024, Mr. Ammel and I officially parted ways.

33. After the Separation, Defendant started making her presence known in North Carolina and

would frequently travel to North Carolina to visit Mr. Ammel.

34. On 18 August 2025, Defendant drove to our custody and equitable distribution mediation at Van Camp, Meacham & Newman, PLLC in Pinehurst, North Carolina. Defendant sat outside in the parking lot and waited for Mr. Ammel.

35. On the weekend of 12 September 2025, Defendant and Mr. Ammel took our minor child, J.A., to a concert in Kentucky. On Sunday, 14 September, Defendant and Mr. Ammel drove J.A. back through the night to Moore County, North Carolina. Defendant and Mr. Ammel dropped J.A. off at school at 9:00 a.m. Monday morning.

36. On 16 September 2025, Defendant accompanied Mr. Ammel to the marital residence to pick up the remainder of his belongings. Defendant sat outside in the cul-de-sac immediately adjacent to our marital residence.

37. On 19 November 2025, Mr. Ammel's property manager filed a 50C Complaint for No-Contact Order against him. Mr. Ammel was involuntarily committed to the hospital, and on 20 November 2025, Mr. Ammel was arrested for assaulting the physician assistant at the hospital. Defendant traveled to Moore County, North Carolina to bond Mr. Ammel out of jail and moved him out of his rental property to her house in Arizona.

38. On 24 November 2025, I was awarded emergency custody of all three of the Children.

39. The Children have been in my custody ever since. We continue to reside at the marital residence in Moore County, North Carolina.

I declare under penalty of perjury that the foregoing statements are true, correct, and compete, to the best of my knowledge and belief.

**FURTHER THE DECLARANT SAYETH NAUGHT.**

**[Signature page to follow]**

This, the 17 day of April 2026.

Heather Ammel

Heather Ammel

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that the undersigned has this date served the foregoing **DECLARATION OF HEATHER AMMEL** upon the persons listed below via email addressed as follows:

Steven B. Epstein, Esq.
*Attorney for Defendant Kyrsten Sinema*
301 Fayetteville Street
Suite 1900
Post Office Box 1801 (27602-1801)
Raleigh, North Carolina 27601
Telephone: (919) 783-2846
Facsimile: (919) 783-1075
sepstein@poynerspruill.com

This, the 17th day of April 2026.

VAN CAMP, MEACHAM & NEWMAN, PLLC
*Attorneys for Plaintiff*

By: */s/ Thomas M. Van Camp*
Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

**EXHIBIT**
**A**


08:00
LTE
K S
8h
K S
+1 602-904-9665
Member of R2R, Bottlerock, and 3 additional groups
Yesterday
I miss you 21:57
Putting my hand on your heart 21:58
I'll see you soon 21:58
Today
Are you having an affair with my husband
Now
Message

EXHIBIT
B


KS
Thu, Jun 20 at 12:02 PM
Noah Kahan: We'll All Be Here Forever Tour
verified-ticket.com
8/19/24
Thu, Jul 18 at 1:32 PM
KS's location expired
KS started sharing location with you.
Mon, Jul 29 at 6:13 PM
KS's location expired
Tue, Aug 6 at 9:31 AM
1787 enter
Today 12:38 AM
I cannot sleep, I am miserable, and I want at least one of my pens back. You have them both. Pls give me one back now.
iMessage

**EXHIBIT**
**C**


3:45
3
MA
Matt
Oct 26, 2024 at 12:38 PM
That was fun!
The best ❤️
Text Message • SMS

3:45

MA

Matt >



I can see you on the left



Oct 26, 2024 at 3:15 PM

Did you make it home okay?

👍

Just got to the car 😘

Oct 26, 2024 at 4:19 PM

MA

Text Message • SMS

3:46

3

MA

Matt

Oct 27, 2024 at 1:51PM

I miss you. Thanks for going to Sturgill with me. Let's make more time to have fun together 💜

I miss you too!

Could Toes ands Bubs come to AZ 12/6-9? It'll be Josh flys to rdu to get them and meets me. Or I'll fly back and pick them up.

I think so but let me see what th cheer schedule is. It's supposed to be available really soon. When do you need to know by

Maybe tomorrow

There's a meeting with a grenade and rocket company and a country concert for Isla

Cool. What concert?

Luke Grimes?

Sounds familiar

Text Message • SMS

3:46

MA

Matt

That was little dude that called

It didn't ring. Does he still want to talk?

I love you! Text me when you arrive

I love you too

Oct 27, 2024 at 9:30 PM



Text Message • SMS

PLAINTIFF'S EXHIBIT
3
Sinema

EXHIBIT
A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:26-cv-00038-DAB-JEP

HEATHER AMMEL,

Plaintiff,

v.

KYRSTEN SINEMA,

Defendant.

**DECLARATION OF KYRSTEN SINEMA**

I, KYRSTEN SINEMA, declare and state as follows:

1. I am over the age of eighteen and am competent to make this declaration. I have personal knowledge of all facts described below.

2. I reside in Arizona. I have never resided in North Carolina, own no property in North Carolina, do not conduct business in North Carolina, and have no contractual relationships with North Carolina business entities or residents.

3. I represented the State of Arizona in the U.S. House of Representatives from 2013 to 2019 and in the U.S. Senate from 2019 until 2025. During my time as a Senator, I had approximately 70 people working for me and/or my campaign who worked out of several different offices and/or remotely. I traveled frequently by airplane, in most cases more than twice per week. It was very difficult for me to keep up with my own schedule and whereabouts and, with the one exception of an aide who traveled with me, I was unable to and did not attempt to keep track of whereabouts of the other members of my staff or consultants at any given time.

4. Due to numerous threats made against me as a Senator, in 2021, my Senate campaign and political action committee ("PAC") engaged a security company to provide

security details at my public events. The first company engaged was Toa Group, LLC ("Toa Group"), which typically dispatched at least three security guards to attend my public events. Toa Group is based in Phoenix, Arizona and has no connection to North Carolina.

5. As of October 2023, due to leadership changes at Toa Group, my campaign engaged Kinsaker Security Group, LLC ("Kinsaker") to provide security details at my public events. Again, Kinsaker typically dispatched at least three security guards to attend my public events. Kinsaker is based in Phoenix, Arizona and has no connection to North Carolina.

6. The security details dispatched to my events by Toa Group and Kinsaker included at least the following three positions:

a. "Body," meaning the person who stood by or walked near me at all times I was in public;

b. "Driver," meaning the person who stayed with or in the vehicle used to transport me to ensure swift departure in case of emergency;

c. "Advance," meaning the person who came to each public event in advance to ensure it was safe prior to my arrival. Upon my arrival, the advance person would depart, often to the next public event on my schedule. I was never alone with the advance member of my security detail.

7. As a Senator, I was trained to communicate using the Signal Messenger LLC ("Signal") messaging app for communications related to my public service or governmental activities. Encrypted Signal messages disappear shortly after they are sent to the recipient and cannot thereafter be retrieved on the device of either the sender or the recipient; they also cannot be retrieved by Signal or phone service providers. I routinely used the Signal messaging app


Case 1:26-cv-00038-DAB-JEP Document 37-2 Filed 08/12/26 Page 165 of 430

during the time period I was a Senator, including to communicate with all security guards dispatched to my events by Toa Group and Kinsaker.

8. During the entire time Toa Group and Kinsaker provided security for me, I entered the State of North Carolina one time, a campaign-related event in Charlotte on February 6, 2023. I flew into Charlotte with a staffer, arriving at 2:00 pm. I was accompanied by a staffer and two additional security members to an office building in Charlotte, then went straight back to the airport at the conclusion of the event. The staffer and I departed from the Charlotte airport at 6:00 pm. I was in North Carolina for approximately four hours. I did not return to North Carolina thereafter until May 2025.

9. I became aware of Matthew Ammel in 2022 after he began providing security services to me and my campaign through Toa Group and later Kinsaker. Initially, I did not know where he resided, but at some point in the fall of 2023 received his telephone number in order to maintain contact with him related to his role on security details for me—as I did with all members of my security details. I became aware at that point that the area code of Mr. Ammel's telephone number was "913," which I knew to be a Kansas area code.

10. Mr. Ammel was on numerous security details for me from 2022 through 2024, initially for Toa Group, as of October 2023 for Kinsaker, and as of June 2024, also as a paid employee of the Senate; most of his security detail work for me occurred in the Western United States, Texas, New York, Chicago, and Washington, DC. At some point I learned he was working simultaneously for Ridgeline Defense, LLC ("Ridgeline"), a firearms training facility in New Hampshire, and for Staccato 2011, LLC ("Staccato"), a firearms manufacturer based in Texas. Between his work for Ridgeline and Staccato, I was aware he traveled very frequently throughout the country and needed to coordinate his travel for me and my campaign with his


Case 1:26-cv-00038-DAB-JEP Document 37-2 Filed 08/12/26 Page 166 of 430

travel for Ridgeline and Staccato. I was unaware of Mr. Ammel's physical whereabouts on a day-to-day basis—due to my hectic work schedule and his extensive travels—other than the occasions he was part of a security detail assigned for my protection and was either en route to my location, physically present in my location, or departing my location.

11. I did not learn that Mr. Ammel resided in North Carolina, and lived there with his wife and children, until approximately December 2023. He introduced me to his wife that month in Las Vegas, Nevada, following a U2 concert I acquired tickets for them to attend. Though I knew from that point forward that Mr. Ammel resided in North Carolina, I also knew that he was traveling outside of North Carolina for Ridgeline, Staccato, and/or me and my campaign the vast majority of each month. I never had personal knowledge of him being physically present in North Carolina at any time I initiated or had communications with Mr. Ammel prior to November 2024.

12. Between the commencement of his security detail work for me and my campaign in 2022 and October 2024, Mr. Ammel and I engaged in communications through three means: (1) telephone; (2) email; and (3) Signal messages. We did not engage in any communications via SMS (text) messages during that time period. The only phone I ever used to communicate with him was my personal cellphone.

13. I have carefully reviewed the records of my cellphone and email communications with Mr. Ammel and used those records to ascertain where I was and where he was when such communications occurred. I can produce those records upon request, but am not attaching them hereto because they are voluminous and are private records that would require some form of protection both from the public court file and from further dissemination.


Case 1:26-cv-00038-DAB-JEP Document 37-2 Filed 08/12/26 Page 167 of 430

14. Based upon my review of those records, none of my telephone or email communications with Mr. Ammel between early 2023 and November 1, 2024 occurred while he was physically present in North Carolina. Stated another way, Mr. Ammel was physically outside the State of North Carolina at the time I directed 100% of my telephone and email communications to him during such time period. Furthermore, virtually all such telephone and email communications I directed to him during such time related solely to the security services he provided to me and my campaign.

15. Below I detail all of my telephone and email communications with Mr. Ammel during the relevant time period, and I address the Signal messages Plaintiff alleges in her Complaint I sent to Mr. Ammel at times she alleges I knew he was physically located in North Carolina.

16. On September 23, 2023, at 11:47 am, I called Mr. Ammel from Sonoma County, CA to let him know that I and my two friends were ready to depart our hotel for a local winery. Mr. Ammel was providing security that weekend while I cycled with a friend and his wife. Mr. Ammel was in Sonoma County, CA at the time of the call. The call lasted 1 minute.

17. On September 24, 2023, at 7:28 pm, I called Mr. Ammel from Sonoma County, CA to let him know that my two friends and I were ready to depart to dinner. Mr. Ammel was in Sonoma County, CA at the time of the call. The call lasted 1 minute.

18. On October 26, 2023, at 8:00 am, I forwarded an email to Mr. Ammel. It was the registration confirmation of the Canyonlands Ultra marathon taking place in St. George, UT. The email contained no other communication. My research has confirmed that Mr. Ammel was in St. George, UT when I sent this email.


Case 1:26-cv-00038-DAB-JEP Document 37-2 Filed 08/12/26 Page 168 of 430

19. I have no recollection of any Signal messages I sent to Mr. Ammel in January 2024, as is alleged in paragraph 27 of Plaintiff's Complaint. If I did send him Signal messages in that month: (1) for the reasons described above, at the time, I had no knowledge as to where Mr. Ammel was physically located; and (2) any such communications would have related solely to the security services he was providing to me and my campaign, and were not of a romantic or intimate nature. To the extent Plaintiff alleges that such messages "exceeded the bounds of a normal working relationship and were of romantic and lascivious natures," that allegation is false.

20. In paragraph 28 of her Complaint, Plaintiff alleges that I sent Mr. Ammel messages that included a picture of me "wrapped in a towel" and that I offered to help him work through his mental health challenges and suggested for him to bring MDMA drugs on a work trip so I could "guide him through a psychedelic experience." First, I never sent Mr. Ammel any messages that included a picture of me wrapped in a towel and have no recollection of any message of the type Plaintiff alleges. Second, whatever messages and/or photo I sent to Mr. Ammel that pertain in any way to Plaintiff's allegations in paragraph 28 of her Complaint were (1) not of a romantic or intimate nature and (2) for the reasons described above, at the time, I had no knowledge as to where Mr. Ammel was physically located.

21. On March 2, 2024, at 2:41 pm, I called Mr. Ammel from Phoenix, AZ to let him know that my staff and I were ready to depart to the Innings Festival. Mr. Ammel was one of three security personnel assigned to me that afternoon, and was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

22. Plaintiff alleges in paragraph 29 of her Complaint that I messaged Mr. Ammel during the State of the Union address, which occurred on March 7, 2024. As is apparent from

paragraph 29, (1) such communication was not of a romantic or intimate nature; and (2) for the reasons described above, at the time, I had no knowledge as to where Mr. Ammel was physically located.

23. Plaintiff alleges in paragraph 30 of her Complaint that Mr. Ammel messaged me while at a baseball game during a work trip for Staccato in Pennsylvania that he was going to start a "fuck the troops" chant and that I responded I would "fuck the hot ones." As is apparent from paragraph 30, this communication (1) was not of a romantic or intimate nature and (2) occurred while Mr. Ammel was in Pennsylvania.

24. Plaintiff alleges in paragraph 31 of her Complaint that Mr. Ammel and I messaged each other about having sex missionary style with the lights on and that I stated "Boring!" Though I don't have a specific recollection of such message, it would have occurred at the same time as those referenced in paragraph 30 of Plaintiff's Complaint and related to the same subject matter—about American troops, not about me and Mr. Ammel. This communication (1) was not of a romantic or intimate nature and (2) occurred while Mr. Ammel was in Pennsylvania.

25. On April 6, 2024, at 5:41 pm, I called Mr. Ammel from Washington, DC to coordinate walking me and my friends to dinner. Mr. Ammel was in Washington, DC at the time of the call. The call lasted 2 minutes.

26. On April 7, 2024, at 6:50, 6:51 and 6:53 am, I called Mr. Ammel from Washington, DC three times as my friends and I were navigating our way to our destination. Mr. Ammel was in Washington, DC at the time of the call. Each call lasted 1 minute.

27. On May 25, 2024, at 2:32 pm, I called Mr. Ammel from Sonoma, CA to let him know that my flight had arrived and my friends and I would walk out of the airport terminal soon. Mr. Ammel was in Sonoma, CA at the time of the call. The call lasted 1 minute.

28. At the end of May 2024, my relationship with Mr. Ammel became romantic and intimate. On May 27, 2024, while Mr. Ammel was on a security detail for me Sonoma, CA, we were physically intimate for the first time. Thereafter, we were physically intimate in mid-June in New York City, NY, in mid-July in Washington, DC, in late-August in Aspen, CO, in late-September in Washington, DC, and in early-October in Phoenix, AZ.

29. On June 21, 2024, at 1:40 pm, I called Mr. Ammel from Los Angeles, CA to let him know that a staffer and I had completed our run to the beach and to locate him and my other friend, who was with him. Mr. Ammel was in Los Angeles, CA at the time of the call. The first call did not go through, so I called again. Each call lasted 1 minute.

30. On June 22, 2023, at 7:09 pm, I forwarded an email to Mr. Ammel. It was the receipt for his hotel room, which he needed to submit to his superiors for reimbursement. The email contained no other communication. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time I sent this email.

31. Plaintiff alleges in paragraph 40 of her Complaint that I sent Mr. Ammel a message in June 2024 expressing that I kept waking up during my sleep and reaching over for his arms to hold me. I can confirm that on or about June 22, 2024, I sent four Signal messages to Mr. Ammel. I was in Scottsdale, AZ when I sent those messages. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time I sent those messages. Those messages were as follows:

a. "I hope your day was ok";

b. "Thinking of you";

c. "I am with you"; and

d. "I keep waking up during my sleep and reaching over for your arms to hold me."

32. I was able to reconstruct the foregoing Signal messages from a screenshot Plaintiff made of them—presumably from Mr. Ammel's phone—and thereafter texted to herself. Plaintiff produced her entire text stream with Mr. Ammel in their domestic litigation and the screenshot containing these Signal messages appears on page 79 of the text stream. The messages before and after that screenshot confirm that Mr. Ammel was with his family, including Plaintiff, in Leavenworth, KS when these Signal messages were sent.

33. On June 24, 2024, at 3:02 pm, I forwarded an email to Mr. Ammel. It was the receipt for his hotel room, which he needed to submit to his superiors for reimbursement. The email contained no other communication. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time he received the email.

34. On July 4, 2024 at 2:31 pm, I called Mr. Ammel from Tokyo, Japan. I had just climbed Mount Fuji with a staffer and called Mr. Ammel to discuss an upcoming Grand Canyon hike with a group of hikers. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time of the call. The call lasted 19 minutes.

35. On July 11, 2024, at 9:42 pm, I called Mr. Ammel from Idaho to further discuss the Grand Canyon hike. Mr. Ammel called me back at 9:46 pm and we talked for 23 minutes. My research has confirmed that Mr. Ammel was in Washington, DC at the time of the call.

36. On July 20, 2024, at 8:14 am, I called Mr. Ammel from Phoenix, AZ to coordinate my departure at the airport. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

37. On August 8, 2024, at 12:19 pm, I forwarded an email to Mr. Ammel. It was the receipt for his hotel room, which he needed to submit to his superiors for reimbursement. The

email contained no other communication. My research has confirmed that Mr. Ammel was in New York City, NY when I sent this email.

38. On September 3, 2024, at 9:04 pm, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a dinner I was having with a friend. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

39. On September 4, 2024, at 2:47 pm, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a meeting. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

40. On September 7, 2024, at 1:12 pm, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a meeting. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

41. On September 19, 2024, at 2:46 pm, I called Mr. Ammel from New York City, NY, to coordinate my departure from a hotel I was staying at with friends. Mr. Ammel was in New York City, NY at the time of the call. The call lasted 1 minute.

42. Mr. Ammel was on security details for me in Arizona all but two nights from October 1, 2024 until October 11, 2024. That included the three-day trip to the Grand Canyon from October 7-9.

43. On October 1, at 5:40 pm, I started a staff call on my conference line while I was in Phoenix, AZ. At 5:42 pm, I called Mr. Ammel to merge him into the staff conference line for the staff meeting, as he had not dialed into the call. Mr. Ammel was in Phoenix, AZ at the time of the call. The meeting lasted 30 minutes; Mr. Ammel was merged through my line for 28 minutes.

44. On October 7, at 11:33 am, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a meeting. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 2 minutes.

45. On October 8, 2024, at 3:06 pm, I called Mr. Ammel from the Grand Canyon. Mr. Ammel was at the Grand Canyon at the time of the call. The call did not go through, and is listed in my phone records as lasting 1 minute.

46. On October 8, 2024, at 10:22 pm, I called Mr. Ammel from the Grand Canyon to coordinate leaving the restaurant and returning the group of hikers to our cabins. Mr. Ammel was at the Grand Canyon at the time of the call. The call lasted 2 minutes.

47. Mr. Ammel returned with me and our group of hikers to Phoenix, AZ on October 10, 2024. He left Phoenix the following day.

48. I traveled from Phoenix to Montana on October 10—while Mr. Ammel was still in Phoenix—and then left Montana on October 11 to travel to Paris, a trip that lasted from October 12-16. I then flew from Paris to Salt Lake City, UT, arriving on October 17. I was in Utah until the evening of October 18 and boarded a flight bound for Miami, FL just before midnight on October 18. I met Mr. Ammel, his wife, and children in Miami on October 19. They had come to Miami as my guests to see the Taylor Swift concert that evening. I was together with Mr. Ammel and his family October 19 and 20 before flying back to Phoenix on October 21.

49. In paragraph 44 of her Complaint, Plaintiff alleges that Mr. Ammel was in Moore County, NC in October 2024 when I messaged him, "I miss you. Putting my hand on your heart. I'll see you soon." She further alleges that she responded to my message by stating, "Are you having an affair with my husband? You took a married man away from his family." The Complaint does not allege the specific timing of this message exchange.


Case 1:26-cv-00038-DAB-JEP Document 37-2 Filed 08/12/26 Page 174 of 430

50. I recall sending Mr. Ammel a Signal message similar to the one described in foregoing paragraph—and also remember receiving Plaintiff's response about taking "a married man away from his family." The earliest that message exchange occurred would have been at the end of my trip to Paris—on or about October 16—which is why I closed my message to Mr. Ammel, "See you soon." Because I had acquired the Taylor Swift tickets for Mr. Ammel and his family, I knew they would be in Miami on or about October 19—three days following the end of my Paris trip. It is also possible that I sent that Signal message even closer to the time we would all be together in Miami, which would have been while I was in Utah on October 17 or 18. Thus, my very best memory is that I sent the Signal message described in the foregoing paragraph somewhere between October 16 and October 18, 2024.

51. At the time I sent the message to Mr. Ammel described in the foregoing paragraph, due to my extensive travels—which included both Paris and Utah—and my knowledge that Mr. Ammel traveled for work frequently and was rarely in North Carolina, I did not know where he was physically located. Specifically, I did not know he was with in North Carolina when that message was sent—and/or that he was in the proximity of Plaintiff—until I received her responsive message. In any event, at the time I sent that message, it was very clear to me that Mr. Ammel's marriage with Plaintiff was over and that he had found a new apartment he planned to move into imminently.

52. On October 22, 2024, at 4:40 pm, I called Mr. Ammel from Las Vegas, NV to find him as we were leaving the conference center. Mr. Ammel was in Las Vegas at the time of the call. Mr. Ammel did not answer the call; it is listed on my phone records as 1 minute. I called again at 4:41 pm and Mr. Ammel answered as he was walking towards the rest of the group inside the conference center. The call lasted 2 minutes.

53. Mr. Ammel was physically with me from October 26 until November 1, 2024, first in Phoenix, AZ and then in the Middle East.

54. I did not, as Plaintiff alleges in paragraph 53 of her Complaint, solicit Mr. Ammel "by using telephonic and internet communications of lascivious natures" while "Plaintiff and Mr. Ammel were domiciled and present in North Carolina[.]"

55. It is untrue, as Plaintiff alleges in paragraph 55 of her Complaint, that "[m]any of the communications" referenced in her Complaint "occurred while Mr. Ammel was in the marital residence in Moore County, North Carolina with Plaintiff and the Children."

56. It is untrue, as Plaintiff alleges in paragraph 56 of her Complaint, that I "had actual knowledge that Mr. Ammel was physically located and present in North Carolina with Plaintiff and the Children at the time [I] sent the messages to Mr. Ammel and the messages were received by Mr. Ammel."

57. It is untrue, as Plaintiff alleges in paragraph 57 of her Complaint, that I had "repeated telephone calls and repeatedly sent messages to Mr. Ammel knowing he was located in North Carolina with Plaintiff and the Children."

58. It is untrue, as Plaintiff alleges in paragraph 58 of her Complaint, that I "could have and should have known that through eliciting communication—texts and phone calls—with Mr. Ammel, [I] was establishing a connection with the State of North Carolina."

59. The opposite of Plaintiff's allegations is true. I had no knowledge at the time I initiated any communications with Mr. Ammel that he was located in North Carolina at the time. Indeed, my research has confirmed that Mr. Ammel was located outside of North Carolina when virtually all of the communications addressed in this declaration occurred.

60. I declare under the penalty of perjury and the laws of the United States that the foregoing is true and accurate.

This the 7th day of March, 2026.

KYRSTEN SINEMA

PLAINTIFF'S EXHIBIT 4 Sinema

EXHIBIT B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:26-cv-00038-DAB-JEP

HEATHER AMMEL,

Plaintiff,

v.

KYRSTEN SINEMA,

Defendant.

**DECLARATION OF MATTHEW JOSEPH AMMEL**

I, MATTHEW JOSEPH AMMEL, declare and state as follows:

1. I am over the age of eighteen and am competent to make this declaration. I have personal knowledge of all facts described below.

2. Plaintiff and I were married on October 23, 2010. Our marital relationship ended in October 2024.

3. I was in the United States Army until my official retirement in 2022. Plaintiff and I were living in Moore County, North Carolina at the time with our three children.

4. In 2022, I began working as an independent contractor for four different companies: as a firearms instructor for Ridgeline Defense, LLC ("Ridgeline"), a firearms training facility in New Hampshire; as a firearms instructor for Staccato 2011, LLC ("Staccato"), a firearms manufacturer based in Texas; as a maritime operations instructor for Consolidated Analysis Centers, Inc. ("CACI") in Tunisia, North Africa; and as a private security guard for Toa Group, LLC ("Toa Group"), a security services company based in Arizona. As part of my work for Toa Group, I was a member of security details for Defendant. During 2022, my travel for these four companies was extensive—throughout the United States and, for CACI, in Tunisia. In

addition, during the summer, I traveled with my wife and children by car across the country to visit our extended family members in Kansas for approximately two weeks. Thus, I was rarely in North Carolina during 2022, on average only a few days per month.

5. I continued working for Ridgeline, Staccato, and Toa Group in 2023. My travel for these three companies throughout the United States was extensive. I also traveled to Mexico for medical treatment. In addition, during the summer, I traveled with my wife and children by car across the country to visit our extended family members in Kansas for approximately two weeks. Thus, I was rarely in North Carolina during 2023, on average only a few days per month.

6. In October 2023, I ceased working as a private security guard for Toa Group and began working as a private security guard for Kinsaker Security Group, LLC ("Kinsaker"), a security services company based in Arizona. I worked for Kinsaker as an independent contractor. As part of my work for Kinsaker, I was a member of security details for Defendant. As a private security guard affiliated with Kinsaker, my travels across the United States actually increased from the work I had been doing for Toa Group.

7. During the first half of 2024, I continued working as an independent contractor for Ridgeline and Staccato and was providing firearms training across the country. I also continued working as a private security guard for Kinsaker, providing security services across the country.

8. In June 2024, I was hired by the United States Senate as a W2 employee to provide security services on governmental trips, both across the country and throughout the world. Once I began that W2 employment, I stopped working for Ridgeline and for Staccato, but continued my work providing security services for Kinsaker across the country. My work for both the United States Senate and Kinsaker in 2024 included being a member of security details

for Defendant. My travels outside of North Carolina were even more extensive in 2024 than they had been in 2022 and 2023 and kept me away from North Carolina during most of the year.

9. During the summer of 2024, my wife, children, and I once again drove to Kansas to visit our extended family members there and eventually drove to Oregon as well. We left North Carolina on June 12 and did not return until July 6. On June 14, while my wife and children were in Kansas, I departed to provide security services for Defendant in New York, Arizona, and Los Angeles. I returned to Kansas City at about 12:20 a.m. on June 22. Plaintiff picked me up from the airport we drove to my in-laws' residence in Leavenworth together. I remained with Plaintiff and my family until we returned to North Carolina on July 6.

10. I provided security services for Defendant in Phoenix, AZ from October 1-3, 2024.

11. A true and accurate copy of text message exchanges between myself and Plaintiff—excerpted for brevity—is attached hereto as Exhibit 1. My texts are shaded in gray and Plaintiff's are shaded in blue.

12. On October 3, as I was flying to North Carolina from Phoenix, I texted Plaintiff the following message: "Do I need to get a hotel tonight?" Plaintiff responded as follows:

> At this point all I care about is protecting my children and preventing as much as possible any more emotional harm you're inflicting on them because of your selfish decisions. You are being manipulative asking about the hotel when you know damn well you told the kids you would be home today and they're expecting to see you. You've requested to separate many times. It's your decision to leave. That being said, ONLY BECAUSE it's my daughter's 13th birthday tomorrow, and in no way do I want her to associate this with her birthday, you can stay at the house until Sunday when you leave for your next trip. But thereafter, you need to get a hotel or apartment. Don't ask me again. That's my answer.

Ex. 1, p. 336.

13. I stayed at the marital residence in North Carolina for the next three nights, October 3, 4, and 5. During that time, I slept downstairs in the spare bedroom, a floor below the master bedroom. I then departed for Phoenix, AZ on October 6 for a work trip that involved providing security for a group of hikers in the Grand Canyon, including Defendant.

14. That same day, October 6, Plaintiff texted me the following message: "I know you've got a busy week ahead but if you have a few spare minutes this puts it really well. About how to do a structured separation. I love you and hope you have a good week." Ex. 1, p. 343. As of that date, as is indicated in Plaintiff's text, we had already decided we were going to separate and were working on the logistics of our separation.

15. The work trip I began on October 6, 2024 lasted until October 11. Before I departed Phoenix on Friday morning October 11, I received text messages from Plaintiff as follows:

> Please make sure to have a hotel arranged from Saturday to Friday. I will be in class Wednesday and Thursday this week. That is your opportunity to come finish the office project. When I am home, you can't be. You can come pick up the kids for school. There are games Monday and Wednesday this week where you can meet us. I highly suggest you use this week to find an apartment and therapist. You need help, Matt. You are destroying every relationship you have with your poor choices. When we tell the kids on Saturday, I will not take the fall for your choices. These are consequences for the choices you've made, and you haven't made choices that protect your marriage or your family.
>
> You have repeatedly told me you want a divorce. I won't allow you to continue to hurt me or the kids.

Ex. 1, p. 352.

16. Following my receipt of Plaintiff's October 3 and October 11 text messages, I began making arrangements to live separate and apart from her. I visited the apartment community Tylers Ridge at Sand Hills Apartments in Southern Pines, NC ("Tylers Ridge") on

Monday, October 14 and toured one of their apartments. I learned that they could have an apartment ready for me to move into before the end of October. I informed Plaintiff later that day that I had found an apartment and would be moving into it as soon as it was ready. As of that discussion, we had a very clear, mutual understanding that our marriage was over and that I would be moving out of the marital residence and into an apartment at Tylers Ridge as soon as possible.

17. I stayed at the marital residence in North Carolina October 12 through October 18. During that time, I slept in the spare bedroom downstairs, a floor below the master bedroom. Plaintiff and I had no physical contact of any kind during that time period.

18. On Tuesday, October 15, 2024, I received an email from Tylers Ridge following up on my visit there the prior day. A true and accurate copy of that email is attached hereto as Exhibit 2.

19. Plaintiff and I had an appointment with her therapist at 2:00 p.m. on October 17, 2024. At that appointment, we discussed the fact that we were in the process of separating and that I had found an apartment at Tylers Ridge that I planned to move into shortly.

20. From October 19-21, I traveled to Miami, FL with Plaintiff and our three children to see a Taylor Swift concert, an event that had been planned for several months. For the two nights we were in Miami, we had separate hotel rooms. I had one room with our son and Plaintiff had another room with our daughters. Plaintiff kept forgetting my room number and had to text me to have me remind her. *See* Ex. 1, p. 375. I did not have any physical contact of any kind with Plaintiff during our entire trip to Miami. We went together on this trip despite being in the process of separating because we did not want to disappoint our children.

21. On October 21, I left Miami for a work trip in Phoenix, AZ and Las Vegas, NV and returned to North Carolina on October 23. I provided security services to Defendant on that trip. I stayed in the martial residence the evenings of October 23 and 24. During that time, I slept in the spare bedroom downstairs, a floor below the master bedroom. Plaintiff and I had no physical contact of any kind during that time period.

22. I submitted my lease application to Tylers Ridge on Thursday, October 24. True and accurate copies of emails I received from Tylers Ridge acknowledging receipt of my lease application materials are attached hereto as Exhibit 3.

23. I am aware that Plaintiff has alleged in paragraph 46 of her complaint in this action that shortly after I returned from my October 21-23 work trip to Phoenix and Las Vegas, I "insisted" that Plaintiff and I "go together on an anniversary trip to Nashville, Tennessee." That allegation is false. I have reviewed my text message history with Plaintiff in order to reconstruct how that trip to Nashville actually came about.

24. Plaintiff and I had been wanting to see a concert by country artist Sturgill Simpson. Plaintiff searched online for tickets in early August 2024 and informed me she could not find affordable tickets. *See* Ex. 1, p. 165. That September, we made tentative plans to see his concert in Greensboro, but I had to back out due to my extensive travels. *See* Ex. 1, p. 293. At that time, Plaintiff and I discovered he was scheduled to perform in Nashville on October 25 as well as in Georgia about the same time. *See* Ex. 1, p. 294. Plaintiff suggested that we go to Nashville for a couple of nights and have her mother watch the kids. *See* Ex. 1, pp. 294-95. I told her that should work. At no point did we discuss anything about our anniversary. We actually made no plans for our anniversary other than me taking my son to his baseball game. *See* Ex. 1, p. 313.

25. I booked our flights to Nashville to see the Sturgill Simpson concert on September 23. Ex. 1, pp. 325-27. That was ten days before Plaintiff instructed me to find another place to live. Following her second directive for me to find another place to live on October 11, she texted me, "Are we going on our sturgill date[?]" I responded, "Yes I would like to." Ex. 1, p. 359. In view of the fact that we were in the midst of separating, this trip—which ended up being just one night—was nothing more than a way for us to see an artist we both love. We discussed in advance that the trip would be a nice way of saying "goodbye" to our marriage and all the years we had together. There was nothing romantic about this trip whatsoever. By then, our marriage had been over for weeks for all intents and purposes.

26. We flew to Nashville the morning of the concert, did some sightseeing, and went to the concert that evening at the Bridgestone Arena. Though we did stay in the same hotel room, I slept on the couch. We had no physical contact of any kind during our entire time in Nashville. The next morning, Saturday, October 26, Plaintiff boarded a flight for RDU and I boarded a flight for Phoenix, AZ. Our physical separation—along with my intent to permanently separate from Plaintiff—began at that moment. We never again spent an evening together.

27. At no point during the October 25-26 trip to Nashville did Plaintiff and I discuss the notion of continuing our marriage. The marriage effectively ended when Plaintiff instructed me to move out of the marital residence in early October.

28. I began a seven-day work trip on Saturday, October 26 that included time in Phoenix, AZ and in the Middle East. My rental application at Tylers Ridge was approved that same morning, October 26, and I paid my $200.00 security deposit that day. True and accurate copies of emails I received from Tylers Ridge confirming the approval of my lease application and the payment of my security deposit are attached hereto as Exhibit 4.

29. I returned to North Carolina on Friday, November 1 and moved into my new apartment at Tylers Ridge that day. I did not return to the marital residence again other than to see my children, perform handiwork, or to retrieve my belongings.

30. I declare under the penalty of perjury and the laws of the United States that the foregoing is true and accurate.

This the 3 day of March, 2026.

MATTHEW JOSEPH AMMEL

8/5/24, 6:15 PM
iPhone (87) (19132403852)

Oct 22

8/5/24, 6:16 PM
iPhone (87) (19132403852)

We can hold off on sturgill for a little bit

8/5/24, 6:16 PM
iPhone (87) (19132403852)

That was just the cheapest I've seen so far for his tix

8/5/24, 6:16 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I really want to go. It's just going to be really busy around then.

8/5/24, 6:17 PM
iPhone (87) (19132403852)

Yeah, let's play it by ear 👍

8/5/24, 6:17 PM
iPhone (87) (19132403852)

Did you see scout had half siblings

8/5/24, 6:18 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah. I want one…I just don't know

8/5/24, 6:18 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I really do want to breed scout and get his little dude

8/5/24, 6:19 PM
iPhone (87) (19132403852)

Yeah, I feel the same. I might go look at the puppies when I'm in Kansas with the girls. If I do, I'll ask the breeder if maybe we can arrange things

8/5/24, 6:19 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah that's a good idea

EXHIBIT 1

9/19/24, 11:49 AM (Viewed 9/19/24, 11:56 AM)
Matthew Ammel (matthew.ammel@hotmail.com)




Done

9/19/24, 11:56 AM
iPhone (87) (melansonh@yahoo.com)

Thank you 🙏

9/19/24, 12:03 PM (Viewed 9/19/24, 12:04 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Of course! I'm glad they moved it. That fucking flight better not be gay

9/19/24, 12:06 PM (Viewed 9/19/24, 12:15 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

I'm not going to be able to go to sturgill in Greensboro. We got invited to a MAPS event in Vegas. I'll catch the red eye home and be there for our anny. Can I get us tickets someplace else?

**9/19/24, 12:15 PM**
iPhone (87) (melansonh@yahoo.com)

Ah bummer. We'll talk about it when you get home

**9/19/24, 12:16 PM**
Matthew Ammel (matthew.ammel@hotmail.com)

Could you go to GA on the 24th?

**9/19/24, 12:16 PM (Delivered 9/19/24, 12:17 PM)**
iPhone (87) (melansonh@yahoo.com)

Yeah possibly let me talk to my mom

**9/19/24, 12:17 PM**
iPhone (87) (melansonh@yahoo.com)

Is there a Nashville date too?

**9/19/24, 12:17 PM (Viewed 9/19/24, 12:20 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

25th

**9/19/24, 12:20 PM**
iPhone (87) (melansonh@yahoo.com)

Let me talk to my mom. Are you going Miami to Vegas

**9/19/24, 12:21 PM (Viewed 9/19/24, 12:22 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Mia-phx-las

**9/19/24, 12:22 PM**
iPhone (87) (melansonh@yahoo.com)

😩 dang

**9/19/24, 1:39 PM**
iPhone (87) (melansonh@yahoo.com)

So that Georgia show is only five hours away on thursday. Or we go to Nashville for a couple nights?

**9/19/24, 1:57 PM**
iPhone (87) (melansonh@yahoo.com)
Message was edited 9/19/24, 1:57 PM

My mom is going to verify with work that she be here to watch the kids. It sounds doable. She also said she has time off right before we fly to Miami if we want her to come early and watch

scout. That just means she would be in town for a solid week, if you're ok w that.

**9/19/24, 3:01 PM (Viewed 9/19/24, 3:02 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah that should work

**9/19/24, 3:07 PM**
iPhone (87) (melansonh@yahoo.com)

Ok, we can talk more about it in person tomorrow

**9/19/24, 3:15 PM (Viewed 9/19/24, 3:16 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

I'm about to ride the dc metro…if you don't hear back from me

**9/19/24, 3:16 PM**
iPhone (87) (melansonh@yahoo.com)

Haha I'm so confused on where you are. Are you going to new York?

**9/19/24, 3:16 PM**
iPhone (87) (melansonh@yahoo.com)

Bubba is back inside from playing if you want to call

Sunday. We can do pizza and cake, and breakfast. Shane, Joey, and Bodhi

9/22/24, 12:59 PM

iPhone (87) (melansonh@yahoo.com)

Maybe we can set up the projector for them to watch a movie on the porch

9/22/24, 1:12 PM

Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

9/22/24, 1:23 PM

iPhone (87) (melansonh@yahoo.com)

You'll be able to take bubba man to his game on our anniversary at 6? I'll be getting my mom from the airport at 5:30 and come straight to the game.

9/22/24, 1:23 PM

Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

9/22/24, 1:23 PM

iPhone (87) (melansonh@yahoo.com)

Cool. Can you book our hotel?

9/22/24, 1:27 PM

Matthew Ammel (matthew.ammel@hotmail.com)

Can you send me a picture of your Credit card

9/22/24, 1:28 PM

iPhone (87) (melansonh@yahoo.com)

Your new card is here. Would you rather I activate it and send to a picture?

9/22/24, 1:28 PM

Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

9/23/24, 5:11 PM
iPhone (87) (melansonh@yahoo.com)

Are the kids and I sitting by each other on that flight out

9/23/24, 5:12 PM
Matthew Ammel (matthew.ammel@hotmail.com)

The flight took off before I could change it. Kyrsten has to go vote then she's going to call concierge and change them.

9/23/24, 5:13 PM
iPhone (87) (melansonh@yahoo.com)

Tell her thank you 🙏 thank goodness I looked for that Nashville flight or it would've gone unnoticed

9/23/24, 5:13 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Yes thank you!

9/23/24, 5:13 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I don't know how I fucked that up

9/23/24, 5:13 PM
iPhone (87) (melansonh@yahoo.com)

You have a lot going on. Its okay

9/23/24, 5:14 PM
iPhone (87) (melansonh@yahoo.com)

Do you want to book those Nashville flights I sent you?

9/23/24, 5:17 PM (Viewed 9/23/24, 5:21 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

What's your AADVANTAGE #

**9/23/24, 5:21 PM**
iPhone (87) (melansonh@yahoo.com)




**9/23/24, 5:22 PM**
iPhone (87) (melansonh@yahoo.com)

BF720A6

9/23/24, 5:34 PM
Matthew Ammel (matthew.ammel@hotmail.com)

18:34
Your trip is booked Home

$617.92

Your trip to Nashville, TN
Record locator: KJTKPI
Trip name: RDU/BNA

DEPART
RDU to BNA
Fri Oct 25 2024

RETURN
BNA to RDU
Sat Oct 26 2024

Passengers

Ticket number: 0012178523817
Status: Ticketed

Ticket number: [redacted]

9/23/24, 5:35 PM
iPhone (87) (melansonh@yahoo.com)

Those dates are right 😁 yeah! I can't wait

9/23/24, 5:45 PM
iPhone (87) (melansonh@yahoo.com)

Cooper just got a legit home run

9/23/24, 5:45 PM (Viewed 9/23/24, 5:46 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Dang

9/23/24, 5:50 PM
iPhone (87) (melansonh@yahoo.com)

He's going to be pumped to talk to you tonight

9/30/24, 1:28 PM (Viewed 9/30/24, 1:32 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

9/30/24, 5:44 PM (Delivered 9/30/24, 7:50 PM)
iPhone (87) (melansonh@yahoo.com)

Cooper just told me he wishes you were home. I think you need to do some serious soul searching. Really evaluate the decisions you're making. The consequences are going to be devastating.

10/3/24, 12:12 PM (Viewed 10/3/24, 12:46 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Do I need to get a hotel tonight?

10/3/24, 1:28 PM
iPhone (87) (melansonh@yahoo.com)

At this point all I care about is protecting my children and preventing as much as possible any more emotional harm you're inflicting on them because of your selfish decisions. You are being manipulative asking about the hotel when you know damn well you told the kids you would be home today and they're expecting to see you. You've requested to separate many times. It is your decision to leave. That being said, ONLY BECAUSE it's my daughter's 13th birthday tomorrow, and in no way do I want her to associate this with her birthday, you can stay at the house until Sunday when you leave for your next trip. But thereafter, you need to get a hotel or apartment. Don't ask me again. That's my answer.

10/6/24, 7:15 PM
iPhone (87) (melansonh@yahoo.com)

I know you've got a busy week ahead but if you have a few spare minutes this puts it really well. About how to do a structured separation. I love you and I hope you have a good week.

10/7/24, 10:09 AM
iPhone (87) (melansonh@yahoo.com)

The therapist can see us Thursday the 17th at 2

10/7/24, 10:40 AM (Viewed 10/7/24, 10:44 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Loved "I know you've got a busy week ahead but if you hav…"

10/7/24, 10:40 AM (Viewed 10/7/24, 10:44 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Liked "The therapist can see us Thursday the 17th at 2"

10/7/24, 12:31 PM
iPhone (87) (melansonh@yahoo.com)

I got our taxes situated if you get a second to call I can run you through it

10/7/24, 1:26 PM (Viewed 10/7/24, 1:52 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

I have to do this clearance thing. I will call before we leave.

10/7/24, 1:52 PM
iPhone (87) (melansonh@yahoo.com)

Liked "I have to do this clearance thing. I will call bef…"

10/7/24, 3:07 PM
iPhone (87) (melansonh@yahoo.com)

Are you finished with the clearance

10/10/24, 7:05 PM
iPhone (87) (melansonh@yahoo.com)

It doesn't really look like you're working very hard. You could sit around at HER house but not contact your kids until I said something.

10/10/24, 7:05 PM
iPhone (87) (melansonh@yahoo.com)

Don't ever call them from her house again.

10/10/24, 8:50 PM (Viewed 10/10/24, 8:52 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

What year was Regina?

10/10/24, 8:52 PM
iPhone (87) (melansonh@yahoo.com)

2016

10/10/24, 9:02 PM (Viewed 10/11/24, 5:10 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Thanks

10/11/24, 7:43 AM
iPhone (87) (melansonh@yahoo.com)

Please make sure to have a hotel arranged from Saturday to Friday. I will be in class Wednesday and Thursday this week. That is your opportunity to come finish the office project. When I am home, you can't be.  You can come to pick up the kids for school. There are games Monday and Wednesday this week where you can meet us. I highly suggest you use this week to find an apartment and therapist. You need help, Matt. You are destroying every relationship you have with your poor choices. When we tell the kids on Saturday, I will not take the fall for your choices. These are consequences for the choices you've made, and you haven't made choices that protect your marriage or your family.

10/11/24, 7:45 AM
iPhone (87) (melansonh@yahoo.com)

You have repeatedly told me you want a divorce. I won't allow you to continue to hurt me or the kids.

10/11/24, 1:38 PM
iPhone (87) (melansonh@yahoo.com)

Is there hope

10/11/24, 5:32 PM
iPhone (87) (melansonh@yahoo.com)

Are we going on our sturgill date

10/11/24, 5:32 PM (Viewed 10/11/24, 5:33 PM)
Matthew Ammel (matthew.ammel@hotmail.com)
Message is a reply to thread "Are we going on our sturgill date"

Yes I would like to

10/11/24, 5:33 PM
iPhone (87) (melansonh@yahoo.com)

😎

10/11/24, 5:34 PM
iPhone (87) (melansonh@yahoo.com)




10/11/24, 8:59 PM (Delivered 10/11/24, 9:13 PM)
iPhone (87) (melansonh@yahoo.com)



10/20/24, 10:02 AM
iPhone (87) (melansonh@yahoo.com)


REDACTED

10/20/24, 11:02 AM
iPhone (87) (melansonh@yahoo.com)

What's your room number again?

10/20/24, 11:16 AM (Viewed 10/20/24, 12:35 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

1424

10/20/24, 1:25 PM (Viewed 10/20/24, 2:36 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Where are you guys?

10/20/24, 3:03 PM
iPhone (87) (melansonh@yahoo.com)

Wanna come down so coop can get dressed? His jeans are down here

10/20/24, 3:04 PM (Viewed 10/20/24, 3:09 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Coming

10/20/24, 3:09 PM
iPhone (87) (melansonh@yahoo.com)

That's what she said

10/20/24, 10:49 PM
iPhone (87) (melansonh@yahoo.com)

10/20/24, 10:50 PM
iPhone (87) (melansonh@yahoo.com)

I had like ten glasses of Dom

**From:** Tylers Ridge at Sand Hills <Leasing_Office-tylersridge@knck.io>
**Date:** October 15, 2024 at 10:15:17 MST
**To:** m ammel3222@gmail.com
**Subject: Your rental inquiry at Tylers Ridge at Sand Hills**
**Reply-To:** Tylers Ridge at Sand Hills <chats-GOKK46TC-1729011482-prospect-1055603280@knck.io>

Good afternoon, Matt!
*Thank you for your interest in Tyler's Ridge at Sandhills!*
We are excited to welcome you to our Tyler's Ridge family! We are conveniently located in beautiful Southern Pines, North Carolina - nestled between countless world-renowned golf destinations, the Moore County Airport, premier shopping destinations, Sandhills Community College, the Moore County Reservoir Park, and much, much more!

You will love our spacious 1, 2, and 3-bedroom apartment floorplans! Take an online virtual tour, browse our amazing amenities, explore our photo gallery, view current availability, and complete an application with us - all on our community website!
***Your Tyler's Ridge at Sandhills luxury apartment is just a few clicks away - just follow these quick steps:***
1. Click the link below to be directed to our property website.
www.TylersRidgeApartments.com
2. Click "Apply Now"
3. Select your desired floorplan, apartment unit, and move-in date!
4. Complete all application information requested for all lease holders.
**Payment of $75.00 application fee, per applicant is required for application to be fully committed.*
****All units highlighted below - Move In Special.. Apply Now and Move In by 09.30.2024 and receive 1st FULL MONTH FREE RENT on all 12-15 Month Leases!***
1-Bedroom 1-Bathroom

- **3105-M / $1,395 / Available *NOW* / 3rd Floor**
- **1109-M / $1,450 / Available *NOW* / 1st Floor**
- **5211-M / $1,430 / Available *NOW* / 2nd Floor**
- **5111-M / $1,450 / Available *NOW* / 1st Floor**
- **2207-M / $1,445 / Available *NOW* / 2nd Floor / Wooded View**
- 6207-M / $1,445 / Available *NOW* / 2nd Floor / Wooded View
- 5305-M / $1,430 / Available *NOW* / 3rd Floor
- 4204-M / $1,430 / Available *NOW* / 2nd Floor
- 5307-M / $1,430 / Available 11.09.2024 / 3rd Floor
- 2205-M / $1,430 / Available 12.06.2024 / 2nd Floor

2-Bedroom 2-Bathroom

- **2213-M / $1,595 / Available *NOW* / 2nd Floor**
- **1313-M / $1,595 / Available *NOW* / 3rd Floor**
- **4200-M / $1,650 / Available *NOW* / 2nd Floor**
- **1101-M / $1,670 / Available *NOW* / 1st Floor**
- **5201-M / $1,650 / Available *NOW* / 2nd Floor**
- **4312-M / $1,650 / Available *NOW* / 2nd Floor**
- **3313-M / $1,650 / Available *NOW* / 2nd Floor** / Wooded View
- 1203-M / $1,665 / Available *NOW* / 2nd Floor / Wooded View
- 1210-T / $1,665 / Available *NOW* / 3rd Floor
- 5315-M / $1,650 / Available *NOW* / 3rd Floor
- 3315-M / $1,650 / Available 10.17.2024 / 3rd Floor
- 2215-M / $1,665 / Available 10.24.2024 / 2nd Floor / Wooded View
- 1215-M / $1,665 / Available 11.26.2024 / 2nd Floor / Wooded View

3-Bedroom 2-Bathroom

- 7200-M / $1,880 / Available *NOW* / 2nd Floor

**All rental quotes listed reflect a monthly price for a 12-month lease term; 6-11-month lease terms available with additional monthly fee.*
Our incredible on-site amenities and luxurious apartments provide residents with a superior apartment living experience like nowhere else, right here in Southern Pines!

All of our 1, 2, & 3-Bedroom apartment floorplans include:
• Full Size Energy Washer and Dryer installed in all units
• Beautiful Granite Countertops
• Spacious Walk-in Closets
• Ceiling Fans
• Private Patio/Balcony

We are eager to share our beautiful community and superior apartment living experience with you and your family!
Please feel free to contact our office any time by phone, or e-mail at tylersridge@druckerandfalk.com. Our team is always here to help with any questions you may have! We hope to see you soon!
Have a wonderful day!

Best Wishes,
Lindsey Suitt

**Lindsey Suitt**
Tylers Ridge at Sand Hills
560 Moonseed Lane Carthage NC [illegible]
[illegible]

Rather text? Reply to (910) 543-8663, or [illegible].

EXHIBIT
2

**From:** Tylers Ridge at Sand Hills Phase I <no-reply@rentcafe.com>
**Date:** October 24, 2024 at 12:59:27 MST
**To:** m.ammel3222@gmail.com
**Subject:** User Registration Confirmation
**Reply-To:** tylersridge@druckerandfalk.com




Dear Matthew,

Thank you for registering on Online Lease Execution! Your account has been successfully created

Username: M.ammel3222@gmail.com

To better help you find a place to live, we've forwarded your information to the following property:

[Tylers Ridge at Sand Hills Phase I]
500 Moonseed Lane
Carthage, NC 28327

Your credentials will be valid on all RENTCafe powered web sites

EXHIBIT
3

**From:** Tylers Ridge at Sand Hills Phase I <no-reply@rentcafe.com>
**Date:** October 24, 2024 at 13:01:51 MST
**To:** m.ammel3222@gmail.com
**Subject:** **ID Successfully Verified**
**Reply-To:** tylersridge@druckerandfalk.com

DF MULTIFAMILY
BY DRUCKER-FALK




Apartment Living Designed for YOU

Dear Matthew,

Congratulations! Your ID has been successfully verified. You can now log in and continue your online leasing application.

Continue My Application

DF MULTIFAMILY
BY DRUCKER-FALK

© Copyright © 2018 Drucker & Falk LLC. All Rights Reserved. All rights reserved.

[illegible]

**From:** Tylers Ridge at Sand Hills Phase I <no-reply@rentcafe.com>
**Date:** October 24, 2024 at 13:16:14 MST
**To:** m.ammel3222@gmail.com
**Subject:** Debit Card Added
**Reply-To:** tylersridge@druckerandfalk.com

DF
DF MULTIFAMILY
BY DRUCKER•FALK




Apartment Living Designed for YOU

Dear Matthew

This email confirms your addition of a new debit card to your profile. To review the account information, please log in to your Guest account at
https://tylersridgeapartments.securecafe.com/onlineleasing/tylers-ridge-at-sand-hills/guestlogin.aspx

Please keep this email for your personal records.

Your account security is important to us. If you find that any of the above is inaccurate or you did not authorize this account addition, please contact us immediately.

DF
DF MULTIFAMILY
BY DRUCKER•FALK

© Copyright © 2018 Drucker & Falk LLC. All Rights Reserved. All rights reserved.

From: Tylers Ridge <tylersridge@druckerandfalk.com>
Date: October 26, 2024 at 08:25:23 MST
To: m.ammel3222@gmail.com
Subject: ACTION REQUIRED - Security Deposit Payment Information

Hello Matthew,

*You have been approved for an apartment with us with a security deposit of $200.00*

- Please log-on to your online portal **NO LATER THAN 5:00pm on MONDAY 10/28/2024**, with the username and email address created at the time of your application through the Applicant Portal (CLICK HERE), to make your security deposit payment. Use the drop-down menu, to select the *Application Charges* tab. There, you will see the posted security deposit fee, and directions for making your payment.

- **If your $200.00 Security Deposit is not paid in the time frame indicated above, your application with Tyler's Ridge will be transferred to our Waiting List** for a future available apartment, and the unit you are currently assigned to will be placed back on our website for rent.

**YOUR IMMEDIATE ACTION IS NEEDED.** If you have any questions or concerns, please do not hesitate to reach out to our office. Thank you for choosing to call Tyler's Ridge home, and please feel free to contact our office at any time with any further questions or inquiries.

Best Wishes,

Ali

EXHIBIT 4

**From:** Tylers Ridge at Sand Hills Phase I <no-reply@rentcafe.com>
**Date:** October 26, 2024 at 12:52 20 MST
**To:** m.ammel3222@gmail.com
**Subject:** **Your Rental Application - Additional Payment Confirmation**
**Reply-To:** tylersridge@druckerandfalk.com




Dear Matthew,

Thank you for the payment on your application to Tylers Ridge at Sand Hills Phase I

This email confirms that we have received the following payment Please save this email for your personal records

**PAYMENT INFORMATION**
Payment confirmation number: 795447
Payment Date 10/26/2024
Payment Amount $200.00

To view or edit your online application account, click the link below and select the Guest Login tab
https://www.dfapartments.com/apartments/nc/carthage/tylers-ridge-at-sand-hills-phase-i/index.aspx

In the meantime, if you have any questions about the application process, please contact us at (655) 694-5946

**PROPERTY:**
Tylers Ridge at Sand Hills Phase I
500 Moonseed Lane
Carthage NC 28327
tylersridge@druckerandfalk.com

DF MULTIFAMILY

BY DRUCKER+FALK

© Copyright © 2018 Drucker & Falk LLC. All Rights Reserved. All rights reserved.

*THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify the sender and permanently delete it from your computer and destroy any printout thereof.*

PLAINTIFF'S EXHIBIT 5 Sinema

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
MOORE COUNTY, NORTH CAROLINA
25CV000606-620

HEATHER LYNNE AMMEL, Plaintiff;

vs.

MATTHEW JOSEPH AMMEL, Defendant.

- - - - - - - - - - - - - - - - -

DEPOSITION

OF

MATTHEW JOSEPH AMMEL

At Pinehurst, North Carolina
August 12, 2025
At 11:22 A.M. to 3:01 P.M.
August 13, 2025
At 10:38 A.M. to 11:51 A.M.

Reported by: Cynthia J. Dotson

COBB COURT REPORTING
6331 NC 27E
COATS, NORTH CAROLINA 27521

ORIGINAL

919 894-7249

A P P E A R A N C E S

FOR THE PLAINTIFF: Ms. Whitney S.P. Foushee
Van Camp, Meacham & Newman
P.O. Box 1389
Pinehurst, NC 28370

FOR THE DEFENDANT: Mr. Brent Tanner
Parker Bryan Britt
Tanner & Jenkins
133 Fayetteville St.
Suite 500
Raleigh, NC 27602

ALSO PRESENT: Ms. Heather Ammel

I N D E X

| | Page |
|---|---|
| Direct Examination by Ms. Foushee . . . . . . . . . . | 5 |
| Certificate of Notary Public/Reporter. . . . . . . . . | 139 |

S T I P U L A T I O N S

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record:

(1) That the deposition of Matthew Joseph Ammel may be taken on August 12, 2025, at the offices of Van Camp, Meacham & Newman, 2 Regional Circle, Pinehurst, North Carolina, before Cynthia J. Dotson, Notary Public/Reporter.

(2) That this examination shall be taken for the purpose of discovery, or for use as evidence in the above-entitled action, or for both purposes.

(3) That this deposition is deemed opened and all formalities and requirements with respect to opening the same, expressly including notice of the opening of this deposition, are hereby waived, and this deposition shall have the same effect as if all formalities in respect to opening the same had been complied with in detail.

(4) The North Carolina Rules of Civil Procedure shall control the taking of said deposition and the use thereof in court.

(5) Objections to questions and motions to strike answers need not be made during the taking of this deposition, but may be made for the first time during the progress of the trial of this case, or any pretrial hearing held before any superior court judge or magistrate for the purpose of ruling thereon, or at any other hearing of said

case at which said deposition might be used, except that an objection as to the form of a question must be made at the time such question is asked or objection is waived as to the form of the question.

(6) That the witness hereby waives the right to read and sign this deposition.

(7) That the sealed original transcript of this deposition shall be mailed first-class postage or hand delivered to the party taking the deposition for preservation and delivery to the court, if and when necessary.

---

WHEREUPON,

Matthew Joseph Ammel,

Having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MS. FOUSHEE:

Q Please state your name.

A **Matthew Ammel.**

Q Okay. Have you ever been deposed before?

A **I have not.**

Q All right. So I want to go over a few ground rules. First and foremost, this nice lady here is going to record everything and type it up. So as I ask you questions, it's very important that you verbalize your answer, don't nod your head, so that she has a clear record of what your response was.

A **Of course.**

Q Okay. Secondly it's important that we not talk over each other, so if you'll let me finish my question, I will do my best to let you finish your answer. Understood?

A **Okay.**

Q Do you understand that you're under oath here today?

A **I do.**

Q And you understand that means you have to tell the truth?

A I do.
Q The whole truth? And so by example, I always use the same one. If I ask you what you had for breakfast and you had orange juice, cereal and toast, you understand that just responding with two of those and not three is an incomplete answer?
A I do.
Q Is there any reason you wouldn't be able to tell the truth here today?
A No.
Q Are you on any medication currently?
A Just my regular medications.
Q What would that be?
A I am on Armour Thyroid. I am on HCG. And I am on testosterone.
Q All right. At any time you need to take a break, you are welcome to take a break. You just have to finish the question or answering the question that I just asked. Understood?
A Certainly.
Q If you ever need to talk to your attorney, you certainly can walk outside. Again you just have to finish answering the question that's asked. Understood?
A Certainly.

Q All right. Where do you reside?

**A I reside at 310 Parrish Lane.**

Q How long have you lived there?

**A I have lived there since May 21st, I believe.**

Q Of this year?

**A Correct.**

Q And do you rent that home?

**A I do.**

Q Is anyone else on the lease?

**A No, there's not.**

Q How much is the monthly rent?

**A It's twenty-eight hundred a month.**

Q And how long is the lease?

**A Twelve months.**

Q How many bedrooms is it?

**A Four bedrooms.**

Q Do you rent it through a company or an individual that you know?

**A No, it's through a real estate company, Southern Pines.**

Q Where were you residing before you were at 310?

**A I was at -- I forgot my address. It was 5305 Moonseed Lane.**

Q Okay. And did you rent that residence?

**A I did.**

Q Okay. Was it just month to month?

**A It was a six-month lease and I rented it for an additional month.**

Q And how much was the rent each month on that residence?

**A I believe it was fourteen hundred.**

Q How many bedrooms?

**A Just one.**

Q Why did you change from 5305 to the 310 residence?

**A Because I have three children, so they could fit.**

Q Why the change, though? I mean, you had three children when you were renting the 5305, right?

**A It was all I could afford at the time.**

Q Okay. Where are you currently employed?

**A I'm currently employed at Arizona State University and by Sinema for Arizona.**

Q By --

**A Sinema for Arizona.**

Q Okay. How long have you worked for that company?

**A I have worked for that company since January 3rd.**

Q And what do you do for that company?

**A I am a consultant.**

Q And what do you consult on?

**A I consult on psychedelic policy and regenerative farming and domestic defense issues for the U.S.**

government.

Q Do you have -- other than -- so you're employed by Arizona State?

**A Correct.**

Q Okay. And what's the ties with Sinema for Arizona then? I'm confused. You said you're employed by both?

**A I am.**

Q Okay. So when you said you consult, is that to Arizona State or is that for --

**A No, that's for Sinema for Arizona.**

Q And are you a salaried employee?

**A I am.**

Q What's your salary?

**A Fifty thousand.**

Q And you've worked for them since January 3rd?

**A Correct.**

Q Have you had any changes in your income?

**A I have.**

Q What were those changes?

**A Due to the temporary agreement, my limited access to my children prevented me from traveling. So my -- I missed some important meetings and my company reduced my salary.**

Q What was your salary?

A It was two hundred and fifty thousand.
Q So they reduced your salary by two hundred thousand dollars?
A It went down to a hundred and thirty and then the opportunity -- no, I apologize. And then the opportunity presented itself at Arizona State University, so I took it, and so they dropped me down to part-time of fifty thousand.
Q You're going to have to flesh that out for me. Arizona State, you started working for them when?
A July 1st.
Q Okay. And that is completely new employment?
A Correct.
Q And how much do they pay you?
A Fifty thousand.
Q And you're paid directly from Arizona State?
A Correct.
Q And you do what for Arizona State?
A I work in the future securities initiatives.
Q And who is -- who do you report to or who's your boss?
A I report to -- just a minute. I report to Daniel Rothenberg and Peter Bergen.
Q What are their titles?
A I believe they're the directors of the future securities initiatives.

Q And how did you find this job?
**A Through contacts in my previous employment.**
Q Which is who?
**A The U.S. Senate and the Department of Defense.**
Q Which individuals?
**A I'm sorry?**
Q You said the U.S. Senate. Which individuals referred you to Peter and I think you said -- well, how did you -- you said you were referred by U.S. Senators, right, or Senate, U.S. Senate?
**A That's correct. I worked for a U.S. Senator that represents Arizona.**
Q Okay.
**A And so we had pretty good contact with Arizona State University.**
Q Okay.
**A And while I was still in the Senate, we began working on projects through Arizona State University. And they offered me a job.**
Q Okay. So out of the blue, who offered -- this Peter individual offered you a job?
**A I think Adam Deguire --**
Q Okay.
**A -- is the one who offered me the job. And I report to Peter and Daniel.**

Q Okay. And when did Adam reach out to you?
**A This has been the talk since January, actually even since last year, like around July, but in January the talk became more specific on where I would work at ASU.**
Q And what is your obligations? Do you have to go in person, remote? What are your hours?
**A I have a pretty flexible schedule where the projects that we're working on, it kind of depends on the context that we're making to build a program.**
Q Okay. So you don't have a schedule?
**A I do not, no.**
Q Do you have a minimum number of hours you have to work?
**A I do not.**
Q Do you have to be anywhere in person or is it all remote?
**A No, I do have to be there in person occasionally.**
Q Okay. So you started the job a month and a half ago, is that right?
**A Roughly, yes.**
Q How often have you had to travel for that job?
**A In a month and a half?**
Q Since you started.
**A I've had three in person engagements and one, two Zoom**

**meetings.**

Q Okay. And how long -- or where did you have to travel for in person engagements?

**A Twice to Arizona and once to California.**

Q How long were those trips?

**A Two days each, day and a half in California.**

Q And how do you keep track of your schedule and travel, through a calendar?

**A Through a calendar, and then our company has two schedulers as well.**

Q Is it a Outlook calendar, Google calendar?

**A Google.**

Q So that's your employment with Arizona State, who pays you directly?

**A Correct.**

Q And that is fifty grand annually?

**A Correct.**

Q Are you subject to any bonuses, incentives?

**A Not at this time, no. I get -- that's not true. I get health care and then my children and myself will get free tuition.**

Q As long as you're working for them or --

**A No, for life.**

Q Okay. Do you have an employment contract with them?

**A I do.**

Q So that's your employment with ASU, and then you said you have a second source of income?

**A Correct, with SFA, Sinema for Arizona.**

Q SFA. And that you consult?

**A I do.**

Q And how much do they pay you?

**A Currently fifty thousand.**

Q How long have you worked for them?

**A Since January 3rd.**

Q What were you previously paid by them?

**A It went down to one thirty in June, I believe. And then it -- prior to that it was two fifty from January 3rd through April.**

Q Did you have an employment contract with SFA?

**A I believe I do, yes.**

Q Okay. And who do you report to at SFA?

**A Michelle Davidson and Daniel Winkler.**

Q What are their titles?

**A Daniel is the chief of staff and Michelle is -- I'm not sure what her current title is now.**

**She is the executive director of university affairs at Arizona State University.**

Q And can you describe what SFA is?

**A I believe it was the campaign -- I'm not sure what type of business it is, but it's the campaign funding**

**for a U.S. Senate campaign.**
Q But they're your employer, correct?
**A Correct.**
Q And you don't know what they do?
**A I don't know the inner functionings of the business, no. I'm a consultant for them.**
Q Okay. So you started working for them January 3rd and you were paid two hundred and fifty thousand dollars?
**A Through April. That's correct.**
Q Through April. Okay.
**A April or May. Let's see. It changed on May 15th.**
Q What do you mean, that changed?
**A My salary changed from two fifty to one thirty.**
Q And why is that?
**A Because I missed a few meetings and times that I had to travel because of the custody arrangements.**
Q So those meetings, and they were on weekends when you had the kids, is that what you're saying?
**A No, it's because of my limited access to my children. It was times when there was like baseball games or gymnastics practice and I wasn't going to miss the rare opportunities I had to see my kids.**
Q Okay. So did you then -- so you skipped the meetings?
**A Yes. I've missed meetings.**
Q Okay. When were those meetings?

A Friday, May the 16th was the day I was supposed to onboard at ASU, and I had custody that weekend so I did not make it.

There was a event in Mexico I was supposed to attend from May 5th to May 9th. I was not able to attend that.

Q What was that event?

A It was a meeting to -- it was a observation of a treatment facility.

Q Okay. What other meetings did you miss that changed your income?

A The ASU one was the primary one that caused the pay change. And then I missed a meeting in Washington, D.C., due to custody mediation on Thursday, May 29th. There was a meeting in California that I missed on June 13th.

Q What was that for?

A Consulting.

Q For who?

A For AI.

Q Is that everything?

A Do you need -- do you need the company names?

Q Yes.

A Palantir and Chat GPT.

Q Did you reschedule any of these meetings or you just

missed them?

A **No, I just missed them. The ASU onboarding was rescheduled.**

Q What was the onboarding for?

A **For employment.**

Q And you had an employment contract for the company as of January 3rd?

A **With Sinema for Arizona, not with ASU.**

Q Okay. SFA. Okay. And who made the decision to reduce your income?

A **Michelle Davidson.**

Q Did you receive disciplinary letters?

A **Just a letter stating the reason why and the reduction in rate. We had spoken about it previously.**

Q And what did she say?

A **That I was missing too much stuff. She was understanding due to the divorce, but due to the lack of flexibility in travel, it made sense.**

Q What is the corporate structure of SFA? Who's the boss?

A **Michelle Davidson is the boss.**

Q And how big is the company?

A **I believe there's seven of us.**

Q And so is your current income one thirty from SFA?

A **From SFA it's fifty thousand.**

Q And when was it reduced from one thirty to fifty?
A On July 15th after I started the job with ASU.
Q Why would that impact your income?
A Because it was never a permanent job. The plan was always to replace it with a permanent income.
It's a pot of money that's left over from campaigning and we're spending it till it's gone, and then no one will work for the company anymore.
Q When you were offered two hundred and fifty thousand on January 3rd, was that for a specific term?
A I don't remember what the contract was, but I can look. It might be something I'm going to have to bring back later.
That's something I'm going to have to bring back for you later. I don't have it.
Q Okay. Outside of ASU and SFA, do you have any other sources of income?
A I do not.
Q Do you receive disability each month?
A I do.
Q How much is that?
A It is -- I receive four thousand five hundred and forty-nine dollars and sixty-nine cents in disability. And I receive two thousand two hundred and forty-five dollars in combat-related service-connected pay.

Q Okay. When did you retire, presumably Army?
**A Correct. I retired from the United States Army.**
Q When was that?
**A August 11th, 2022.**
Q What was your rank?
**A Sergeant First Class.**
Q After how many years?
**A Seventeen and a half.**
Q What's your VA rating?
**A A hundred percent.**
Q What are your disabilities?
**A They're pretty extensive to list. Let's see. I don't have my medical records with me.**
Q Okay. Do you have a diagnosis of TBI?
**A I do.**
Q Do you know what percentage that is?
**A I believe it's fifty percent.**
Q Do you have a diagnosis of PTSD?
**A I do.**
Q Do you know what that percentage is?
**A I believe fifty percent.**
Q Any other mental health disabilities?
**A I do not.**
Q Depression?
**A I do not.**

Q Is it your position that you are not physically capable of earning an income or working?

A I'm sorry?

Q Do you have any physical limitations on your ability to work?

A I do, yes.

Q What are they?

A A career in the United States Army Special Forces has left me with many injuries and health conditions.

Q Okay. Well, what are they and how do they impact your ability to work?

A I have debilitating ulcerative colitis.

Q Okay.

A It developed after I received the anthrax vaccine in 2009. When it flares up, it causes me to shit my pants thirty to forty times a day.

It causes severe migratory arthritis, which targets my knees and my hips, my fingers and my jaw joints. It caused uveitis in my eyes, which led to a degradation of my eyes and near blindness for a while.

I broke my upper back when I was twenty years old in Iraq, defending my country. But it never healed properly and now I have severe degenerative disk disease.

Q And how does that limit your ability to get around and

do things?
A **Oh, I don't have feeling in my hands.**
Q Okay. And what treatment do you get for GI issues?
A **I started receiving a prescription for Marinol from the United States Army in -- it was roughly January of 2022. It gave me the best relief for my symptoms that I've had in my adult life.**
Q Do you still take that medication?
A **I do.**
Q Who prescribes it?
A **A doctor in Arizona.**
Q What's that person's name?
A **I'll get back to you on that one.**
Q Where are they located? You said Arizona?
A **Yes. Cave Creek, Arizona.**
Q And what's the facility's name?
A **It's a chiropractic office.**

THE WITNESS: Can we take a break so I can step out and use the bathroom?

(FIFTEEN-MINUTE RECESS)

Q So you said you see a chiropractor at -- is it Cove Creek?
A **Cave Creek.**
Q Cave Creek. And --
A **It is Healthy Images. And it is a physician assistant**

**I see named Cara Riek.**

Q Okay. Do you see that Cave Creek for any other treatments?

**A Yes. I have had quite a bit of treatment there.**

Q Okay. For what?

**A So asking me about my health conditions and disability is a HIPAA violation and I don't have to disclose my symptoms and conditions to you.**

Q Okay. So maybe you guys take a minute, because we can get a judge on the phone. I have every right to ask you about your health conditions.

**A No, you don't.**

MR. TANNER: And I think we would feel comfortable having something in place that just says that outside the litigation, it wouldn't be disseminated to a third party.

MS. FOUSHEE: Sure.

MR. TANNER: Obviously --

THE WITNESS: You've just gotten away with it up to this point, Whitney.

MS. FOUSHEE: I misunderstood when you got your law degree. Do you want to have a chat with him or should we get a judge on the phone for you to be ordered for you to answer this information?

THE WITNESS: I would gladly do so.

MS. FOUSHEE: Okay. Where do you want to have a chat?

MR. TANNER: Do you want to have a discussion about it?

THE WITNESS: Sure.

MS. FOUSHEE: And maybe some case law that says custody trumps HIPAA. I'm happy to provide him with that as well.

(TWO-MINUTE RECESS)

Q Would you like to answer the question?

**A Can you state it again for me, please?**

Q Sure. I was asking you about any other providers that you've seen at Cove Creek.

**A I've received various treatment for symptoms of operator's syndrome there.**

Q Okay. What type of treatment have you received?

**A Various different types of treatment.**

Q You don't remember?

**A I received chiropractic treatment and injections. I've received chiropractic therapy.**

Q Okay. Anything else?

**A No, that's it for that provider.**

Q That would be it. Okay. Now, during the break, did you reach out to anybody? The break we just took?

**A Yes, I did.**

Q Who was that?
**A Kyrsten Sinema.**
Q Okay. And what did she say?
**A I couldn't remember the name of the physician's assistant. She reminded me what it is.**
Q Okay. And what is your relationship with her?
**A She's my former employer and we are now currently dating.**
Q Okay. When did you start dating?
**A In January this year.**
Q Okay. When did you first meet Kyrsten? Kyrsten?
**A Kyrsten.**
Q Kyrsten.
**A I think it was April of 2022.**
Q And you said she's your former employer?
**A Correct.**
Q What did you do for her?
**A Defense policy.**
Q And that was starting in April of '22?
**A No, in April of '22 I was on the security detail through June 6th of 2024, when I moved over to the defense policy side.**
Q What were you paid from April of '22 until June of '24?
**A I was a 1099 employee at a few different companies.**

Q Explain that to me. You worked for her security?
**A I worked a few different jobs for the first year and a half that I was out of the Army.**
Q Okay. What were they?
**A I worked for a company called Ridgeline Defense from roughly the same time period, I think May of 2022 through summertime of '24, around the same time that I started in the Senate.**
Q What did you do for Ridgeline?
**A I was an instructor.**
Q What type?
**A Shooting and driving and breaching.**
Q All right. So you said Ridgeline, and you worked for a few other companies. Which other ones?
**A I worked for Staccato 2011.**
Q What did you do there?
**A I was a firearms instructor.**
Q Okay. Where else?
**A I briefly worked for CACI.**
Q What did you do for CACI?
**A I was a maritime operations instructor in Tunisia.**
Q Was Ridgeline a local job? Did you work locally?
**A No, it's in northern New Hampshire.**
Q Have you looked for employment in North Carolina?
**A Yes, I have.**

Q Where?
A **I came very close to joining the Raleigh Fire Department. Applied to the Southern Pines Fire Department, the Southern Pines Police Department, the Pinehurst Police Department, the Asheville Fire Department.**
Q Are any of these applications recent?
A **I recently submitted a application for a volunteer Southern Pines firefighting position.**
Q Any other recent efforts to have local employment?
A **No, I have not.**
Q You mentioned earlier that you've been diagnosed with TBI and PTSD.
A **Correct.**
Q Any other mental health diagnosis?
A **Yes. I was diagnosed with depression as well.**
Q When was that diagnosis?
A **I believe it was in -- I was in a nine-week traumatic brain injury rehabilitation program run by the VA in Richmond, Virginia. It was when I was there. I think that was April and May of '21.**
Q Okay.
A **May and June maybe. No, April and May.**
Q Any other mental health diagnoses?
A **No.**

Q Do you take any medication for any of your mental health diagnoses?

**A No, I do not.**

Q Okay.

**A I have received treatment for my mental health conditions but I do not take daily medication for them.**

Q What treatments have you taken?

**A Like I had stated, I've been through a nine-week traumatic brain injury rehabilitation program. I was part of a study through UC-Davis in Dallas on traumatic brain injury. I have been to rehabilitation for a chemical dependence on opiates.**

Q When was that?

**A That was January -- December and January 2016 to '17.**

Q When was the -- where was the nine-week TBI program?

**A Richmond, Virginia.**

Q What facility?

**A The VA Hospital.**

Q Okay.

**A I think it's McGuire.**

Q Okay. And your treatment in '16-'17, where was that?

**A FirstHealth Behavioral Health.**

Q How long was that program?

**A Three or four weeks.**

Q In-patient?
A **No.**
Q And you said it was for chemical dependency?
A **Correct.**
Q Anything else?
A **No.**
Q What were you dependent upon?
A **Opiate painkillers.**
Q Were you prescribed those opiates?
A **I was.**
Q Which ones?
A **I was prescribed a wide variety of opiates from various physicians over the years.**
Q Okay. And you became addicted?
A **Correct.**
Q Was there an alcohol addiction as well?
A **Yes.**
Q Any other addictions that you were treated for?
A **No.**
Q Did you also attend Warrior's Heart?
A **Yes, I did.**
Q When was that?
A **That was in May of 2022.**
Q What was that for?
A **That was under pressure.**

Q Someone forced you to go?

**A Yes.**

Q Who?

**A Heather.**

Q Okay. How long were you in the program?

**A About a week.**

Q What was the recommended stay?

**A I don't remember.**

Q When you say under pressure, why did you feel pressured to go?

**A I hadn't had access to my kids in a few weeks.**

Q In 2022?

**A Correct.**

Q What happened? Tell me.

**A I had come off of -- I think I was on nine different medications, and I kind of foolishly came off of them all at once and had withdrawal symptoms from coming off that many medications at the same time.**

**And it was believed to be that I was drinking excessively and taking drugs, which was little to no fact over the issue, and that it was a -- withdrawal symptoms from many different kind of medications.**

Q What medications were you on?

**A I was on various medications for my symptoms of operator's syndrome.**

Q Do you remember what those are?

A **It's various medications that they regularly prescribe for operator's syndrome.**

Q Do you remember what they are?

A **I was on amphetamines. I was on five different ulcerative colitis medications. I was on three different medications for migraines.**

Q Were you drinking at the time?

A **I was not.**

Q Do you drink now?

A **Occasionally I do.**

Q And you've previously been diagnosed with an addiction to alcohol?

A **Previously, yes.**

Q Okay. When was the last time you drank?

A **I had two beers this weekend with my kids at the beach at dinner.**

Q Were you diagnosed with anything at Warrior's Heart?

A **Traumatic brain injury.**

Q What do you do to treat your TBI?

A **I have been through treatment with Ibogaine twice, Most recently I went through a new form of TMS called SAINT.**

**I have done hyperbaric oxygen therapy. I have taken various medications recommended by traumatic**

**brain injury experts.**

Q What are the side effects of your TBI?

**A They're pretty standard side effects of traumatic brain injury and operator's syndrome.**

Q Can you explain those to me? What you personally endure.

**A Endocrine dysfunction, sleep disturbance, obstructive sleep apnea, chronic joint and back pain, orthopedic problems and headaches, depression, anger, worry, rumination, stress reactivity, marital, family, community dysfunction, problems with sexual health and intimacy, being on guard or hypervigilant, memory, concentration and cognitive impairments, vestibular and vision impairments, and transition -- and challenges of the transition from military to civilian life, and common existential issues. You want me to read that again?**

Q What cognitive issues do you go through? Describe those to me.

**A I -- prior to receiving traumatic brain injury treatments, I had pretty severe short-term memory loss.**

Q Okay. Any current symptoms?

**A I still struggle with my memory sometimes.**

Q And you said you've gone through a few treatments.

You said you've been through two sessions of Ibogaine?
A Correct.
Q When were those?
A The first one was in May of 2023. And the most recent one was in March of this year.
Q Okay. And what triggered those treatments?
A An overwhelming amount of stress.
Q Where did you go to be treated?
A I went to Ambio Life Sciences in Tijuana, Mexico.
Q And how long were you there?
A It's a five-day stay with a one overnight, San Diego.
Q And what is treatment?
A You receive a medicine that heals your brain.
Q Okay. That medicine being what?
A Ibogaine.
Q Okay. And that is a -- what do you know about Ibogaine?
A I know quite a bit about Ibogaine.
Q Tell me about it.
A It comes from the bush of the Iboga plant which grows in West Africa, Gabon and Cameroon. It is currently a Schedule 1 narcotic under the FDA.
It has shown profound success in treating various mental health problems and neurodegenerative problems as well. And it is currently under a few different

research programs in the United States and under heavy review by the FDA right now.
Q Okay. But as we sit here, in the United States it is not a lawful substance, correct?
A I went to Mexico.
Q Okay. But you would agree it's not lawful here?
A I haven't taken it in the United States, Whitney.
Q Okay.
A Mexico's a different country.
Q You said you had some TMS procedure?
A I did.
Q What is that?
A Transmagnetic stimulation is where you use a magnet to restimulate dead cell brain growth in the brain.
Q Where did you get that treatment?
A In LaJolla, California.
Q What facility?
A Kaizen Brain Center.
Q And you said you've taken other medications?
A Various supplements which is supposed to restimulate brain growth.
Q Who is your treating physician currently?
A Jesse Greer in Scottsdale, Arizona.
Q What facility is Jesse at?
A They are called Preamble.

Q Pre --
A **Amble.**
Q Okay. Do you see a counselor or therapist?
A **I do.**
Q Who is that?
A **It is Zach Embree.**
Q And where is that person located?
A **I believe he lives in Vancouver and we meet remotely.**
Q When did you start with Zach?
A **In March of this year.**
Q Okay. Do you have any local physicians?
A **I do not, no.**
Q Did you historically see a Justin Ball?
A **Very briefly.**
Q When did you see him?
A **Around the time of the separation, so probably October or November of last year.**
Q Why did you stop?
A **I didn't like him as a therapist.**
Q Did he make any diagnoses?
A **No. I don't believe so.**
Q Did you recently have to go to the hospital on a work trip?
A **I did.**
Q When was that?

A That was while I was receiving a SAINT treatment, so it wasn't really -- I guess it is kind of a work trip. That would have been -- I spent the night of Wednesday to Thursday night at the ER in LaJolla.
Q What for?
A I -- I passed out and the doctors that were treating me there recommended that I go to the ER.
Q Where were you when you passed out?
A You have a little waiting room when you're in between the treatment sessions.
Q What treatment sessions?
A The SAINT treatment.
Q I'm sorry?
A This was while I was doing TMS.
Q Okay.
A SAINT treatments.
Q And at the ER, were you diagnosed with any issues?
A Atrial fibrillation.
Q Okay. In March of this year, did you make statements of -- about self harm?
A I had reassured my son that everything was okay.
Q What did you tell him?
A That I had previously thought of hurting myself but that everything was okay and that everything was going to be okay.

Q Had you in fact had thoughts of self harm?
A **I had not, no.**
Q Okay. Did you tell your wife that you had actually attempted to take your own life?
A **I did not, no.**
Q Okay. Have you in the past had these suicidal thoughts?
A **I have not, no.**
Q Have you told any professionals that you've had such thoughts?
A **I've never had suicidal thoughts.**
Q Do you consume marijuana, THC, CBD, any of those?
A **I do now through my Marinol prescription, yes.**
Q Okay. When did you get prescribed that?
A **I believe it started last month.**
Q Before that did you use marijuana?
A **Yes.**
Q Do you continue to use marijuana?
A **No, I have a prescription for it now.**
Q But prior to having a prescription, you did use marijuana?
A **Yes. I would purchase it in states where it's legal. I purchased the legally -- federally legal version.**
Q Okay. But you would consume it in North Carolina?
A **Occasionally, yes.**

Q Gummies, smoke?
**A Usually gummies and vape.**
Q Okay. Other than marijuana, any other illegal substances consumed?
**A No.**
Q Any other prescriptions not prescribed to you?
**A No.**
Q You may have already said this but who prescribed you your Marinol?
**A It is a physician assistant named Cara Riek.**
Q Okay.
**A Prior to that it was the pain management department at Womack Army Hospital.**
Q Do you still receive services from Womack?
**A I do not, no.**
Q New Year's Eve, did you have an altercation with your brother?
**A That is hearsay and not relevant for this.**
Q What happened on New Year's Eve with your brother?
**A That's hearsay, not relevant for this.**
Q What happened with your brother on New Year's Eve?
**A That's hearsay and not relevant for this conversation. There's no one in this room that has --**
Q I'm asking you --
**A -- personal knowledge of that, what happened between**

**me and my little brother.**

Q But I'm asking you what happened on New Year's Eve. You have personal knowledge of it. You were there, right?

**A And it's not relevant to this conversation.**

Q Did you assault your brother?

**A That's not relevant to this conversation.**

Q Do you want to take a minute?

MR. TANNER: Talk about it briefly?

THE WITNESS: Uh-huh.

(FIVE-MINUTE RECESS)

Q Did you get in an altercation with your brother on New Year's?

**A Yes. My younger brother and I got into a disagreement on New Year's.**

Q Okay. Did you get into a physical fight?

**A No.**

Q No. Did he suffer any injuries from that evening that led him to be at a hospital?

**A He went to the hospital that evening.**

Q Okay. So is it your testimony that your brother did not have broken ribs that evening?

**A No. He was highly intoxicated and fell and he had a broken collarbone, not ribs.**

Q Okay. So that evening the two of you did not get into

any type of fight is your testimony?
A **No, we got into a disagreement.**
Q Okay. You never put your hands on him?
A **No.**
Q Okay. And he fell and broke his collarbone is your testimony?
A **He was heavily intoxicated.**
Q Were you too?
A **No, I was not.**
Q How much did you have to drink that night?
A **I had a quarter of a beer.**
Q Where did you go drinking?
A **It was a little bar in Leavenworth, Kansas.**
Q What was it called?
A **I believe it's Fat -- yeah, it's Fathead's Irish Pub.**
Q Okay. Are you and your brother on good terms now?
A **I don't communicate much with my brother Jordan right now, no.**
Q Okay. Did firearms come out that evening?
A **No.**
Q Did you play Russian roulette with him?
A **No.**
Q Was anybody else in the home?
A **No.**
Q Have you received any DMT treatment or consumed any

DMT?

A Yes, at both Ibogaine treatments. They finish with a round of DMT.

Q Okay. Any outside of those two treatments?

A Yes. I received it in a therapy session in May of 2024.

Q With which provider?

A It's with a provider outside of the United States.

Q Where?

THE WITNESS: Can I talk to you outside?

MR. TANNER: Sure.

(ONE-MINUTE RECESS)

Q Would you like to finish your answer?

A I don't recall the name or location of the provider but you can ask Heather because she saw the same provider and received the same treatment.

Q You don't remember what state you were in?

A I don't recall.

Q Don't even remember a country?

A I don't recall, no.

Q Okay. But you remember it was in May of '24?

A I do.

Q Okay. Other than your Marinol, what other medications are you on currently?

A I take Armour Thyroid.

Q What is that for?
A **Hypothyroidism.**
Q Okay. What else?
A **And then I am on various hormones for symptoms of operator's syndrome.**
Q And you said steroids? Steroids?
A **I am on testosterone replacement therapy.**
Q What is the prescription?
A **It currently is an injectable testosterone, and HCG twice a week.**
Q And who prescribes that?
A **The Transcend Foundation. I don't know the PA's name.**
Q Where are they located?
A **They are in Michigan.**
Q Why do you see a provider in Michigan?
A **It's a foundation that provides treatment for former special operators that are suffering from the hormone dysfunction that comes with operator's syndrome.**
Q Any other medications?
A **No, that is it.**
Q Okay. You have health insurance through which employer? Is it through --
A **I still currently have -- it's a health care program you get after you work for the Senate and it is switching over to Arizona State University right now.**

**Then I also have TRICARE.**

Q Did you remove your wife from your insurance policy?

**A I did.**

Q Why?

THE WITNESS: Can we step outside?

MR. TANNER: Sure.

MS. FOUSHEE: We're violating all the rules. You're supposed to answer the question. I mean, I'm not -- I've been pretty loose, but --

MR. TANNER: Let me talk to him real quick and we'll talk about it.

THE WITNESS: So have I, Whitney.

(DISCUSSION OFF RECORD)

**A Ready now, Whitney.**

Q All right.

**A I removed her from my TRICARE because it was in the written agreement that you wrote.**

Q It says in there you can remove her from your health insurance?

**A It says I'm required to cover the children.**

Q Okay. So it says -- it does not say remove her from your health insurance, does it?

**A It doesn't say I have to cover her.**

Q Okay. But --

**A You wrote the agreement.**

Q I did.
A **And then forced me into signing it.**
Q Let's talk about -- well, no. I'll --
A **I would --**
Q -- get to the coercion.
A **I would love to.**
Q Okay. So tell me this. How much extra did it cost you to continue to provide her health insurance?
A **It doesn't matter. You wrote the agreement, Whitney.**
Q I'm going to ask you again. How much extra did it cost you to continue to provide her with health insurance?
A **Whitney, I was following the rule that you outlined --**
Q How much, sir?
A **-- in the temporary agreement that we signed.**
Q How much, sir?
A **I don't know, Whitney. I was following your temporary agreement and the rules that you outlined in it.**
Q So is your answer you don't know how much --
A **Whitney --**
Q -- extra?
A **I don't know how much, because you wrote the temporary agreement. It said that I had to cover my children under health insurance. It did not mention Heather so I removed her from my health insurance.**

Q Okay.

A **That was your decision.**

Q Did you provide her with notice that you were removing her from your health insurance?

A **You didn't say in the temporary agreement that I had to provide her notice, Whitney. You said I didn't have to cover her.**

Q So is that a yes or a no, sir?

A **Whitney, it was not in the temporary agreement that you wrote.**

MS. FOUSHEE: Brent, we can be here all day if he's going to play these games. I just want my answer.

A **I want to get to the good games, Whitney.**

MR. TANNER: All right. Just a yes or no, if you gave her notice or not.

A **I did not give her notice because it was not in the temporary order agreement that you wrote.**

Q Did you report that she had other insurance coverage to your insurance provider?

A **I don't know the status of her insurance.**

Q But did you tell the insurance company that she had alternative insurance coverage?

A **I don't recall.**

Q What did you tell the company when you had her

removed?

A I don't recall. It was an online thing.

Q Okay. Where do you bank?

A I have a USAA account that Heather will not relinquish control over. And I have a US Bank account. And then I have a First Bank account for an LLC that I have.

Q Is that all your bank accounts?

A USAA uses a off bank for the IRA. It's Victory Capital.

Q Other than your IRA, do you have any other retirement accounts?

A I do not, no.

Q Do you currently contribute to retirement?

A I briefly was contributing to a TSP when I was a Senate employee.

Q Do you still have a TSP?

A Yes. I believe whatever money I contributed is still there.

Q Where -- which bank account, USAA, US or First Bank, is your primary checking account?

A Bank of America.

Q Bank of America?

A Oh, I did not mean to say US Bank. I do not have a US Bank account. My primary account is my Bank of America account.

Q Okay. And is that where all your income is deposited?
**A It is, yes.**
Q To include both jobs, your VA and your CRSC?
**A Yes.**
Q What credit cards do you use?
**A I use a -- my First Bank credit card and then when I'm traveling for work, I have a work card that I use.**
Q And who's that with?
**A It's a US Airways business account.**
Q Have you purchased a vehicle since you've been separated?
**A I have not.**
Q How often do you go to Arizona?
**A It's been about two times a month, I would say, in the past few months.**
Q For about how long?
**A It depends.**
Q Where do you stay when you go?
**A I stay at my girlfriend's house now.**
Q And where is that?
**A In Scottsdale.**
Q What vehicle do you drive when you're there?
**A I drive my company vehicle when I'm there.**
Q What company pays for a vehicle?
**A I believe that's Sinema for Arizona.**

Q And so when you're not there, who's using that vehicle?
**A Various other employees will use it.**
Q Have you put any cost towards that vehicle?
**A I have not, no. It's a company vehicle.**
Q Do you get per diem when you travel?
**A Not since I became a salary -- no, I do. No, not since I became a salaried employee.**
Q When did you become a salaried employee?
**A In January of this year.**
Q You said you're a consultant?
**A That's correct.**
Q For which company?
**A Sinema for Arizona.**
Q What do you consult on?
**A Various policies for the US government.**
Q Like what?
**A Psychedelic policy. Defense policy.**
Q What else?
**A Regenerative farming.**
Q What is your expertise in regenerative farming?
**A Years of studying it.**
Q Where?
**A Self study.**
Q The internet?

A Yeah, internet, books. I hold a arboriculture certification through Alamance Community College. I worked in the tree industry for two years.
Q When was that?
A Starting with my SkillBridge internship in 2021.
Q Okay. And what's your expertise in psychedelic policy?
A I guess personal experience and then various research and connections that I've made over the years.
Q With the two treatments? When you say personal experience, what are you referring to?
A Years of research, and yes, the two treatments that I went through myself. And then lots of time spent with the biggest subject matter experts on Ibogaine in the world.
Q When was the last time you paid support to your wife?
A It was -- it was June 15th.
Q So you haven't provided any support, we're approaching, in two months, is that correct?
A Three paychecks.
Q Why have you not?
A Because I had a change in salary, which you and her were both aware of, when I signed the temporary agreement.
And I paid her the entire -- entirety of my

salary in May and June, and I didn't have any income.
Q Okay. So is it your position you haven't received any money for July?
A Now I -- yes, I paid myself for July. I gave her my entire month's salary for June and so I gave myself July, and then this month I will give her half of my paycheck.
Q So you don't think you should have to pay child support per the order?
A Since separating on November 1st, I've paid a hundred and twenty-seven thousand dollars to Heather.
Q Okay. So you signed an agreement that said you would pay her X amount, correct?
A I mean, I was told I wouldn't see my children till September if I didn't sign the agreement, but yes.
Q Is it your position you can't afford to pay her?
A No, in June I could not afford to pay her because she received my -- or in July I could not, because she received my entire salary in June.
Q So you didn't have the money, is that your testimony?
A No, I overpaid her from November 1st through most recently, and I'm contesting the temporary agreement that I signed.
Q So you did have the money to pay her in July?
A I needed the income, yes.

Q So did you have money in your bank account?
**A Yes, there was some money in my bank account.**
Q Okay. But you didn't give it to her?
**A I gave her a hundred and twenty-seven thousand dollars from November. It's eight months. I gave her a hundred and twenty-seven thousand dollars.**
Q And during that period of time, you weren't under an order to do that, were you?
**A No, I was trying to have a cordial divorce until you got involved and have provided horrible, horrible legal advice.**
Q Hmm. Can you -- what legal advice is so bad that I've given your wife?
**A You lied to a judge to get a temporary custody.**
Q Oh, what did I lie to the judge about?
**A About me being suicidal and my drug use.**
Q Okay. So you --
**A I have never purchased drugs in Mexico.**
Q Okay.
**A I've never been suicidal.**
Q You just told your son that you were having suicidal thoughts?
**A I said previously. I --**
Q Why --
**A -- was pretty low. Yeah.**

Q Why would you tell your son that you were having suicidal thoughts if you hadn't?

A **I was countering a narrative that Heather was creating that I was suicidal.**

Q Okay. How else did I lie to a judge?

A **That is a big one right there.**

Q Okay. Anything else?

A **I would have to review the ex parte order, but there was quite a few egregious lies in it.**

Q Okay. And how were you coerced into signing that temporary agreement?

A **My former attorney told me that I wouldn't see my kids until September if I didn't sign it.**

Q Is that it?

A **Yeah.**

Q Okay.

A **It was a government-sanctioned hostage program.**

Q What does that mean?

A **You lied to a judge to get an ex parte order to extract wealth from me.**

Q Uh-huh.

A **That's theft.**

Q Okay. In the last month, where have you traveled?

A **In the past month I have traveled to -- in the past thirty days I have traveled to Kansas City on a**

personal trip. I have traveled to Phoenix for a surgery. I traveled to San Diego for a work trip in San Luis Obispo.
Then I traveled to San Diego for a medical treatment. Then I traveled to Washington, D.C., for work, and then to Phoenix for a personal trip.
Q What was your Phoenix surgery?
A A double vasectomy.
Q Do you or have you had a diagnosis for MS?
A I have, yes.
Q Have had? Do you currently have a diagnosis?
A No, I had a diagnosis for MS.
Q Okay. But you don't currently?
A No, they disproved the lesions were MS by a spinal fluid pressure test.
Q Okay.
A About three months later, four months later.
Q What was your personal trip for Kansas City, to Kansas City for?
A To pick up my kids for the one week that I got with all three children and for the two weeks that I got with two kids.
Q Okay. How would you say the kids are doing right now? What's their current state?
A I think that they have been through a very strategic

psychological campaign and they are very confused about what is going on.

Q Well, let's break it down. How is your relationship with your oldest, Clara?

A It's confusing as it is with a thirteen-year-old daughter while you're going through a divorce.

Q Would you say that your relationship with her is strained?

A Yeah, I'd say a divorce puts challenges on a parent and his child.

Q Well, how would you say Clara is doing?

A She's a tough kid and she's hanging in there, but she receives a lot of wildly exaggerated truths and a lot of misinformation from Heather.

Q Okay.

A So I have to spend a lot of my time countering narratives that are either boldly untrue or have been very exaggerated.

Q Tell me how you've counteracted those narratives.

A By telling them the truth, and sometimes the truth is difficult on a relationship.

Q So what truths have you told them?

A Everything about whatever false narrative Heather has created. There's been quite a few.

Q Tell me what they are.

A My relationship with Kyrsten, what I do for a living, my drug use, my mental health, my physical health.
Q So what is your understanding of what she told the kids about your mental health?
A She has painted a picture that I'm some kind of like drug-crazed, psychotic, crazy combat veteran guy.
And yes, serving in combat does leave your mind, especially when you separate from the military, is a difficulty process, something that a lot of guys struggle with. And that has made the past few years difficult, honestly probably a big part of the reason why we're divorcing.
Q And what did you tell the kids?
A I told the kids the truth about, you know, my mental health and my physical health and some of the things I struggle with, yeah.
Q What did you tell them?
A I've had lots of conversations with my children about this.
Q Okay. Well, you testified that you're trying to counteract what she's allegedly told the kids by telling them the truth. And I'm asking you what you told your kids to counteract what you think she said.
A You want me to recall every conversation I've had with my children about narratives that Heather has created?

Q Generally speaking, what do you tell the kids about your drug use?

**A That I have used medicines that are not currently legal through the American -- through the FDA, outside of the country, to heal severe traumatic brain injury.**

Q Okay. And what did you tell them about your relationship with your girlfriend?

**A That she was previously my employer and that in our -- we became friends, and then in January became -- we started dating.**

Q Has she met the children?

**A She has.**

Q When?

**A She met Clara in -- it was summertime of '24.**

Q What about your other two children?

**A She met Cooper in December of '24. And then she met Isla in January of '25. No, October. Excuse me. October of '24.**

Q Is that the only contact the children have had with her?

**A That is, yes.**

Q Have they Facetimed?

**A Yeah, sometimes my son is in the room when I Facetime her.**

Q Is it your intent to introduce her -- well,

reintroduce the children to her again?
A **Yes.**
Q And we've been dating for eight months now, is that correct?
A **Yeah, about eight months now.**
Q Has she traveled to North Carolina?
A **To see me?**
Q Uh-huh.
A **She's traveled once to North Carolina to see me.**
Q When was that?
A **That was in May of this year.**
Q And how long was she here?
A **Two days.**
Q Is it your intent to live with her in the near future?
A **It -- in the near future, I signed a twelve-months lease in North Carolina. I plan to reside in North Carolina.**
Q Indefinitely you're going to stay in North Carolina?
A **I will stay in North Carolina through my twelve-month lease.**
Q Is it your intent to move to Arizona after that?
A **Yes.**
Q Going back to the kids' current state, would you agree they're doing well academically?
A **I would, yes.**

Q What about behaviorally?

**A Yeah, I think they're good kids.**

Q Okay. So you said they're struggling with the divorce, is that true? I don't want to --

**A Yeah, divorce is really hard.**

Q How is your parenting time going when the kids are in your care?

**A It's great with my son. It's challenging with my two daughters right now.**

Q What makes it challenging? What makes you say it's challenging?

**A Because challenging misinformation with truth is difficult, and they're twelve and thirteen-year-old girls, which just makes it all that much harder.**

Q It's your position you should have fifty-fifty custody?

**A It is.**

Q What concerns, if any, do you have about the kids being in Heather's care?

**A The campaign of misinformation that they receive.**

Q Anything else?

**A The fact that she is violating the temporary agreement that we signed by leaving them in the sole custody of her parents during her custody time.**

Q So you -- is it your position that the children

shouldn't have time with their grandparents?
A In the case of sole custody, it should fall to me if she is going to spend their summer vacation time away from them.
Q Have they historically spent time with the grandparents during the summer?
A I historically saw them more than six days in six weeks in previous summers.
Q Do you have any concerns about the children being in her father's care?
A I do, yes.
Q What? What are your concerns?
A He's an alcoholic and a marijuana user and has a previous history of cocaine use.
Q What makes you say he has previous cocaine use?
A He told me that when he was an officer in the United States Army, him and Heather's mom would go to Lake Tahoe and they would ski and gamble and do cocaine and drink.
Q How long ago was that?
A It was probably thirty years ago, forty years ago.
Q Have you left your kids alone with him since?
A Outside of my control, yes.
Q And you said he's previously an alcoholic?
A He's currently an alcoholic.

Q Currently. What makes you say that?
**A Consuming more than two drinks a day is my definition of an alcoholic.**
Q Okay. So if your medical records say that you consume more than two drinks a day, is that -- that's a fair assessment to apply to everybody?
**A Yeah, I mean, I'd say if you're drinking more than two drinks every single day, you're probably an alcoholic, yeah.**
Q And you previously had alcohol abuse?
**A Yeah, I previously had alcohol issues.**
Q Okay. So the kids shouldn't be around him because of alleged alcohol abuse?
**A He has an active addiction. I do not suffer from alcoholism.**
Q And you said he uses marijuana?
**A He does.**
Q Okay. So you have an issue with marijuana?
**A I have an issue with double standards.**
Q So do you have an issue with marijuana?
**A No, I don't.**
Q Do you think you should be caring for the kids while you're high?
**A I don't.**
Q Have you?

A In dual care of both myself and Heather when we were still married, yes. Heather has consumed marijuana in the presence of the children as well.
Q Any other concerns about Heather as a mother?
A It's the lengths that she's willing to go to try and extract money out of me and blame me for her personal issues and problems instead of moving on and seeking a healthier way to spend her time.
Q What would you say her personal issues and problems are?
A I mean, she has diagnosed mental health conditions that have been untreated.
Q What are those?
A OCD.
Q Okay.
A Depression.
Q Anything else?
A No, those are the two diagnosed ones, I believe.
Q Have you asked the children to take pictures while they're in mom's home, in Heather's home?
A What do you mean, pictures?
Q Have you asked the kids to gather evidence while they're either in her home or at granddad's house?
A Yes. I asked them to get a picture of her father's whiskey bottle.

Q Which child did you ask?
**A I believe all three were in the car.**
Q How did that conversation go?
**A My daughters got angry about hearing the truth about their father-in-law.**
Q What did you tell the kids about their grandfather?
**A His history of -- extensive history of substance abuse.**
Q What did you tell them?
**A That he's an alcoholic, that he's also a daily cannabis user and has a history of cocaine use.**
Q Okay. Why did you feel the need to tell your children that about their grandfather?
**A Because the narrative has been created that I'm some kind of drug-crazed psychotic person when the actuality is that I was over-prescribed opiates by Army doctors, like I've never put anything in my mouth for heroin, Whitney.**
**I was picking them up from, you know, like Clark Clinic on Fort Bragg. Eventually, yes, I probably sourced some opiates from outside of prescribers, but it was due to over-prescription.**
**It's a pretty common problem. I'm not sure if you're aware of the opiate epidemic in this country. Bunch of lawyers have made lots of money off of the**

opiate epidemic.

Q Do you --

A That's your profession.

Q Did you speak badly about Heather to the children?

A I've never spoken badly about Heather to the children, no.

Q Okay. So if the girls are saying that you bad-mouthed their mom, they're not telling the truth?

A I think that they have a confusion about what the truth is, and the truth is difficult to hear sometimes. And there has been a very, very strong campaign to paint me as some kind of horrible, evil person when this divorce was -- both the divorce and separation were Heather's idea. And she has been telling people for over two years now that she wanted to divorce me.

She created the plan for separation. This -- and then all of a sudden because I had a conversation with Heather to ask her to stop harassing me, you guys were able to spin this little story that I'm a suicidal, drug-crazed person, when in all actuality, Whitney, I'm a great father and a great citizen of this country. I am not a slimy, greasy divorce lawyer.

Q Who did she tell two years ago that she wanted a divorce?

A She told her friend Carmen back in May of '21 when I went to Warrior's Heart. That was when she started telling people about the divorce.
Specifically I'm recalling an incident. I took Heather on a work trip when I was still on the security detail to a concert in Las Vegas, and she told my current girlfriend, who was my employer at the time. She had taken drugs with her best friend, she had taken MDMA, and she told her best friends that she wanted to divorce me.
Q Which concert was this?
A It was a U2 concert.
Q And you were at the concert?
A Yes.
Q Would you agree that your relationship with your girlfriend was inappropriate prior to January?
Well, strike that. Before you were separated from Heather?
A We had become close friends and she was like a confidante, but no, I would not say our relationship was inappropriate.
Q Did you have feelings for her at that time?
A No.
Q When did you first become physical, intimate with your girlfriend?

A In January of this year.
Q Did you ever share a room with her prior to January of this year?
A I don't believe so, no.
Q Did you share any romantic feelings with her prior to January of this year?
A No, just we were close friends.
Q Okay. Did she share any romantic feelings to you prior to January?
A I mean, the entire time I've known her, she's been flirty with me.
Q Did you two kiss before January of this year?
A No, we did not.
Q No physical intimate interaction before January?
A No, I don't believe so. Not that I recall.
Q Never stayed in the same room together prior to January?
A We have stayed in like separate room hotel rooms or Air B&B's before.
Q Okay.
A But that's been the entire time that I worked for her as well.
Q Was it ever just the two of you?
A In November -- no, let's -- we had a trip to Riyadh where we shared a multi-bedroom in November.

Q Going back to your relationship with the girls, is it your position that they would want to spend half of their time with you?
A I think the next few months are going to be a challenge based upon the misinformation and the narrative that's been created in my daughters' eyes about myself.
And yes, I'm sure Heather has told you that the girls have told her after she coached them what to say that they do not want fifty-fifty custody with me.
But the fact that Heather would go to that length, even make splitting the children up an option, I think shows the immaturity and like borderline like evil, morally reprehensible action that you guys have taken in the past few months.
Q Okay. So even though the girls don't want to go, you think they should be forced to?
A That's not what I said. I said that yes, the next few months are going to be a challenge that you have created, Whitney, with your ex parte order that you gained under misconduct, possibly criminal activity.
Yes, you have made this process much harder, Whitney. Thank you. Thank you for doing that to my daughters, Whitney. You are a wonderful person.
Q Thank you. Okay.

A **When I grow up, I want to be a parasite.**
Q Would you agree that you've punched holes in the marital house?
A **I have never punched a hole in the marital house, no.**
Q No. You haven't become -- you haven't thrown things -- well, strike that. Have you thrown things at Heather?
A **I have never thrown anything at Heather, no.**
Q And it's -- you've never put a hole in the house?
A **I damaged a door frame in 2016 when I was still struggling with opiate addiction. It was actually the peak of my opiate addition.**
**Following that incident, I went forward at work and sought help from my chain of command, who did not enroll me in ASAP because I wasn't like a piece of shit drug user. I had a chemical dependency to a medication that was prescribed to me by Army doctors, and they were able to help get me off of the chemical dependency that I had to opiates due to severe spinal injuries that I suffered during my time in combat, Whitney.**
Q So if Heather put in her complaint that you break -- you broke and destroyed furniture, is it your position that that is true or not true?
A **I damaged a table. It was a little cheap outdoor**

table that was rotted that I had made.
Q Is that it?
A I think I bent a -- like an iron yard chair.
Q When was that?
A It probably would have been like winter or spring of '24.
Q Okay. What was going on that you bent a arm -- metal armchair?
A There were a couple serious incidents of Heather physically abusing me, starting in January of 2024. She hit me between the bridge of my nose and my phone. And if you want to look, you can see the little scar right here that I didn't get medical treatment for so it healed poorly.
And then two weeks after that, I could tell that she was going to hit me again, and so I curled up into a ball on the kitchen floor, and she held me down and punched me in the back of the head three times.
And she'd become incredibly, incredibly aggressive where -- to the point that she would -- like minor disagreements would set her into these states of rage and agitation where it was like she was out of control of her aggression, and she would chase me around the house and try and hit me and grab me by the arms and dig her fingernails into me and

physically back me into corners.

And I was terrified, and to -- sometimes to get her away from me, in periods of the times where -- my brain from my time spent in combat and my time training for combat is so severely damaged that sometimes too much stress overwhelms me to the point that I have a hard time thinking.

And prior to receiving brain treatments, like to get her away when she was being like physically aggressive with me, it would be to get loud and angry so she would back off, and then to run away.

So I mean, there was probably ten or fifteen incidences prior to me moving out last year where she was physically like chasing me through the yard or down the street as I tried to drive away to get away from her as she was trying to hit me.

Q And your response was to become -- you said yell back at her?

A Yeah, be big and scary and then to create distance and then get away.

Q Okay. Defense was to become big and scary?

A To be loud and to create space so that I could run away to avoid a physical confrontation with her, yes. That's exactly what I did, Whitney.

Q Did you ever call law enforcement?

A No, Whitney. I'm a six foot three, two hundred and thirty-pound ex-Green Beret. It would be quite embarrassing to have the police show up at my house with my blood running down my face and all over my first floor on the way to the bathroom because I was the victim of domestic violence. That's embarrassing for a man to come forward and say.
Q Would you agree that you have cursed and called Heather bad names?
A Yes, I have sworn at Heather before.
Q Including in her complaint, you called her a nasty cunt, would you agree with that?
A Yes. Cunt is a word that most Americans don't regularly use. Due to my career in the Airborne Infantry and the Army Special Forces, I deployed to combat multiple times with both the British para regiment and the British Special Air Service, Austri unit or the Australian T commando unit. These militaries use that word quite heavily, so you become desensitized to it.
Q Okay.
A One of the wildest times I ever heard someone say it was in 2007. We just teamed up, three dudes from the other side of the Euphrates River. It was two of us onboarders and then there was two British para guys,

and there was a sniper up on the roof. They're in placing an IED to fucking whack these dudes. And one of the Brits goes -- yells out loud and goes "Cunt," and it was the funniest fucking thing I have ever heard.

Q So do you think it's funny that you call your wife a cunt?

A No, I think that when she would aggressively attack me in the state where my brain was struggling to handle the situation, part of being loud and scary would be to say mean swear words, yes, Whitney.

Q Okay. Have you done that in front of the kids?

A She has provoked many yelling matches in front of the kids, and yes, the kids have probably heard me responding to her aggression by being loud and scary so I could create space and get away.

Q In Heather's complaint she said that you sought treatment at Warrior's Heart, which you agree to -- you said that's accurate, right?

A Yes, I went there for a brief period of time.

Q And that you withdrew from that treatment against medical advice, is that accurate?

A No, I'm friends with the co-owner of Warrior's Heart. He's a retired sergeant major named Tom Spooner. Served in Delta Force for a long time. He started

Warrior's Heart. And one of my former coworkers, Teddy Lanier, is on the board of directors at Warrior's Heart as well.

And so I was getting pressured to go to rehab when I was telling people it wasn't a drug problem. Warrior's Heart sounded like a good option because I had a very, very good relationship with the people that run it.

And I went down there and realized that I wasn't struggling with addiction problems. I had been going through withdrawals from some pretty serious medications, some pretty high doses, with a severely damaged brain.

And it was with Tom Spooner's agreement and the medical staff's agreement that what I needed was traumatic brain injury treatment and not substance abuse treatment.

Q Okay. So they would say that you didn't -- you left that program not needing treatment?

A I don't know what they think, but what I sought was treatment for my traumatic brain injury, which was what I was struggling with.

And I'd been on a cocktail of medications prescribed by the Army to keep me functioning while I was still in the Army, and I decided to come off of

those because it's -- I don't know if you heard this, but Adderall is really, really bad for your mental state. And the military at the end of your career pumps you full of it, 'cause you can just kind of push through the last few years where your brain is just fucking mush and you can't fucking think anymore, and the only thing you know how to do is just like love your kids and be a good dad, and like make sure the young kids don't die in fucking combat, and you just want to keep doing the fucking job but it's so fucking hard, and so you just get on all these different fucking medications, and like your fucking mind just melts, and when you hit the fucking end of the fucking road, and you realize that all that shit that you're on is really fucking bad for you and you stop taking them, like it's a alarming fucking experience.

And yeah, it was terrifying. I don't know if divorce lawyers ever experience something like that at the end of their career.

Have you heard of divorce lawyers going through, you know, a big dip like that when they end a, you know, job where they had purpose and reason, and just extract other people's wealth?

Q So when you left, was it against their advice at Warrior's Heart?

A It was in complete agreement with the advice that I needed, which was from the co-owner, Tom Spooner, and my friend, Teddy Lanier. I am not sure what the medical staff will say I needed while I was there.

I mean, there is -- part of the job that I do now is the pharmaceutical industry is pretty heavily corrupted, and rehab programs a lot of the time, they'll keep people in the program to make money off of them whether they need the program or not. So I don't know what the medical staff would say, Whitney.

Q How many times is it your contention that Heather's become physically abusive towards you?

A There were the two serious incidents that I spoke about, and I'd say there's probably ten to fifteen incidences in late '23 through me moving out in October of '24, and then a few attempted aggressive incidences after that.

Q With the most recent being when?

A I was trying to leave the house the night that Heather got that recording of me saying that I'm suicidal, and she was holding onto the door handle of my car as me and my son were trying to drive away. So I'd say that's the most recent aggressive incident. So that would have been in March.

Q How flexible is your travel schedule?

A Due to the temporary agreement that you wrote, it's been very difficult to get efficient work trips in. I've seen my children so few times since March that when there's like a baseball game or a gymnastics practice or a band concert or jiu jitsu practice or something that, you know, with a realistic non-evil schedule, I would be able to miss, you know, the weekly baseball game, but because of the agreement that you wrote, I am not going to miss the few opportunities that I have to see my children.

And so what happens is I wind up having to take these short like two or three-day cross-country trips and then bounce back in for this process, and for the few times that I get to see my kids outside of the six days in six weeks and then the one week with all three of them during their summer vacation, and then two weeks with the two of them.

Q So do you get to pick your travel schedule, yes or no?

A In between my custody, yes, I can. In between my custody and opportunities to see my children, I'm able to be flexible with my travel.

Q Okay. And your testimony is that you missed work stuff to watch baseball games during the week?

A Yes.

Q Okay.

A Yeah. Yeah, I'm not going to miss the rare opportunities that I get to see my children, Whitney. That's insane.

Do you think I'm happy seeing them six days in six weeks or for a one-week trip with all three and then two weeks with both of them? Does that sound like healthy -- healthy to you or do you not care 'cause you're just making money?

Q But if you had the kids more, you would still have to travel, correct?

A Yes, but I wouldn't -- if I have the kids for one week and then Heather has the kids for the following week, if there's a baseball game the week that I have them, I'm going to take my son to his baseball game. If my daughter wants to go to jiu jitsu practice, I will take her to jiu jitsu practice that week. My other daughter has cheerleading or gymnastics or whatever, I will take them that week. The next week I could then travel for work.

And because I had the week with my children, which is, you know, like a fair way to treat children, because any other way to treat children that love their dad would be, you know, insane and evil, the following week, and I would miss the baseball game and the jiu jitsu practice and the cheerleading because I

had the week with them, because you know, that's like the humane way to treat another human being.

Q So you can pick when you work?

A With the current -- with the temporary agreement that you wrote, Whitney, I cannot pick when I travel, no.

Q Okay. But if it was to change and you got more time, you can pick?

A I could travel the week that I wouldn't have custody with my children, yes, Whitney.

Q So you can pick when you travel?

A Given the current schedule that we have, that you wrote, I cannot pick when I travel, Whitney.

Q Okay. Just to be clear, you signed that agreement?

A Yes, under coercion that I would not see my children until September.

Q After Judge Bibey said are you under any influence and you said no?

A No, we are not here to talk about Judge Bibey's behavior that day.

Q Your answer to his question was "No, I'm not under any influence," was it not? I mean, it's recorded. We can --

A I'm currently requesting the recording myself, Whitney. I have -- was terrified at the thought of not getting to see my children till September and so I

agreed to the ransom note, yes. That's right, you know it is. You took my kids' ransom to steal money. It's evil.

Q In your motion to review, you alleged that Heather has illegally and inappropriately accessed your online portal. What makes you say that she did that?

A Yes, she has accessed my military and VA accounts through a laptop of mine that is at the house still.

Q And when is it your position she accessed that information?

A It was -- I filed a police report. She used my email to log into her Yahoo account on May 4th of 2025. And she used that to get onto my milConnect account.

Q What makes you say that?

A Because there is access to that account on the day that she used my email to reset the password for it.

Q And in your motion it said that government agencies confirmed that she was the one who likely accessed it?

A Yes. I called the support staff at milConnect to confirm that someone that was not me attempted to log on that day.

Q And what is it your position she was able to access?

A My entire VA education and disability program and all the stuff that you can access through the milConnect website.

Q You said that you're going to pay Heather in August, right?

A **Yes.**

Q How much?

A **I'll probably seek the advice of my counsel on how much I should pay.**

Q Okay. And you understand you're under a court order to pay the eight grand?

A **I understand that I was coerced into signing a temporary agreement that was awarded under perjury and that it was such a poorly written temporary agreement that there are all kinds of discrepancies in there.**

**I told my previous attorney below me that my salary was going to change the date that he forced me into signing it, and I signed it anyway because I was terrified of not seeing my children until September because that would be a -- going that long without seeing my children is a terrifying idea. I used to do it for a living. I don't like doing it anymore.**

Q In your motion you said that you changed your employment due to the custodial schedule. Did you make that decision?

A **Work and I agreed that I cannot continue the full-time travel schedule that I was on due to the custody arrangement and the divorce proceedings, and so it was**

agreement between myself and work.
Q Who at your work?
A My employer, Michelle Davidson.
Q And what is your girlfriend's position at this place of employment?
A I guess she would be the CEO of SFA.
Q So you're employed by your girlfriend?
A We're both employed at SFA. She was the former principal of the business, yes.
Q You said that your position at SFA is based on -- wait, S -- SFA is based on campaign funds and that'll run out, did I understand that correctly?
A Correct.
Q So that's just a temporary job?
A It is.
Q What's your plan for long-term employment?
A I mean, I have ASU, so figure out if I can start spending some more time there and get a salary increase.
The projects that we're working on are picking up steam pretty quick, so it should be okay.
Q Do you think it would be difficult to find a local job making more than fifty grand a month?
A I don't want to get a local job.
Q Why not?

A Because a big part of what guys struggle with when they get out of the military is finding purpose and reason. I was stationed on Fort Bragg for almost seventeen years of my life and deployed eight times out of there and drove to work every day and trained and prepared for combat.

And the idea of driving onto Fort Bragg is like a -- go work in the fucking basement of USSSA soccer and go sit on the range and be a fat old guy yelling at the young studs, I think, would be -- would be really difficult for my mental health.

And that was kind of the -- a big part of the reason that Heather and I are divorced is I -- this was like the one thing that I told her getting out of the military, is that I wasn't going to drive onto fucking Fort Bragg and get stuck behind like a group of guys coming home from the fucking range or whatever, and that I would have done -- laid out probably ten serious career paths that would have resulted in me finding a fulfilling job and she disagreed to all of those. And so that is the reason why we are divorcing.

Q What's the reason?

A Her unwillingness to allow me to pursue a job that provides me purpose and meaning following my military

career. I think that's a pretty justifiable reason to end a what had become toxic marriage.

She could have taken a job for four months and I would have been a Pinehurst police officer, but she refused to do that. She could have taken a job for four months and I would have been a Raleigh firefighter and drove to Raleigh two days a week.

I could have deployed as a contractor for multiple different three-letter agencies for sixty to ninety days a year and made an exorbitant amount of money, but she disagreed to that. And so we are in the position that we are in, and she has still not sought employment.

Q She disagreed with you contracting?

A Uh-huh. No, she preferred the job that I had that led to the eventual relationship that I had. It was her preferred job. It was relatively low travel and a pretty decent daily rate.

Q And which job is this?

A That was when I was a security detail member. And then she encouraged the US Senate job as well because the work there is really, really important, saving a lot of people.

Q You opened up a business, Matthew -- your name, LLC?

A Uh-huh.

Q Why?
A Because I was a 1099 employee for multiple companies like we talked about earlier, and I'm not super financially smart, but I know it's good to route 1099 money through an LLC.
And then in addition to that, throughout our -- Heather and I had already decided that we were going to separate, but throughout our marriage Heather controlled the accounts.
And I guess the nice way to say it would be our views on finances are very different, and she spent -- would keep the amount of money in our accounts very, very low, and so I couldn't afford to separate.
And so leading up to the separation, I was able to leave some money in my business accounts that I then transferred to my new account when she wouldn't relinquish control over my USAA account that I've had since I left high school early at eighteen years old and got at Fort Benning, Georgia.
Q Where are you incorporated?
A North Carolina.
Q You said you had how many deployments during the marriage?
A Seven.
Q Any vacations this summer? Have you traveled for

vacation?

A I took the kids to go visit my little brother and his family in Idaho. I don't think -- this past weekend me and the kids went down to the beach. I don't think I've taken a personal vacation.

I don't think I've taken a vacation, personal one. Oh, no, we're -- no, I've not taken a personal vacation.

Q In one of your motions you allege that Heather's opened your mail. What do you contend she's opened? What has she opened?

A Heather opened every single piece of documentation that was delivered to 18 Cayman Court after I moved out that was from First Bank, the VA, TRICARE. What's the -- DFAS, the Army's pay system where I get my CRSC from.

I was getting a bunch of HIPAA mail from the FAA 'cause I was applying for a pilot's license and she opened every single piece of those.

Q You were applying for your pilot's license?

A Last year prior to when you guys went and lied to Judge Bibey and got the ex parte order and everything got crazy, yes, I was thinking about starting my pilot's license on the side.

Q Okay. So since the separation, what mail do you

contend she's opened?

A She opened hundreds of pieces of -- every single piece of mail from First Bank, from Pinehurst Health Clinic, from TRICARE, from the Foreign Veterans Affairs, from USAA that was titled to me and not her.

I would estimate it was hundreds of letters. I think I have four in my possession right now.

Q What -- when have you been to Pinehurst Health Clinic?

A I don't know, a few years ago.

Q And they're sending you mail now?

A Yeah.

Q How do you know she received your mail and opened it?

A Because she would hand me a bundle when we would do the child hand-off, and any piece that she thought had some kind of intel in it, she opened.

So I would receive a bundle of like thirty or forty letters at a time and usually about like half to three quarters had been opened, which is a federal offense.

Q Who is your support network locally?

A I've got a few really, really good buddies here.

Q So you're tied up, kids need something. Who do you call?

A I'd probably call my buddy Lance Webb or John Drew.

Q What's -- Lance who?

A Lance Webb.
Q Okay. And who's the other one?
A John Drew.
Q Do they have children?
A They do.
Q Are they close with your kids?
A They are.
Q And they live locally?
A They do. Lance is in the same neighborhood as the 18 Cayman Court house, so very close proximity.
Q During one of your custodial times, the girls left your house and went to Heather's. Do you recall that?
A I do.
Q What is your understanding of what took place that day?
A Yeah, I went -- they went to -- Heather told them to come home and they went over there without -- I thought that they were going over to see their friend and they went to the other house.
Q Other than asking the kids to take pictures of alcohol bottles at granddad's, have you instructed them to do anything else to -- during Heather's custodial time?
A I have not, no. Just to stay in touch as much as they can.
MS. FOUSHEE: Let's take a break.

(THIRTY-NINE MINUTE RECESS)

Q Have you previously been in any states of psychosis?

A **No, I have not.**

Q Never?

A **No. I've never been diagnosed with psychosis.**

Q Have you ever complained of being in a state of psychosis?

A **No. What you're obviously alleging to is the time that I came off of all those medications, which we have previously spoken about.**

**Heather through like deep medical research on Instagram figured out that what was affecting me was psychosis. So I don't think it is a -- any credible medical evaluation. I've never been diagnosed with psychosis.**

Q And you've never reported feeling that you've been in a state of psychosis?

A **No.**

Q Okay. When did you know that your income was going to decrease?

A **I had spoken to my boss, Michelle. I believe in February we talked about it for the first time.**

Q Okay. And how did that discussion go?

A **That because of the pending divorce procedures, I wasn't going to be able to travel as much as was**

A Primarily text or Signal, yes.
Q Are those messages still in place or have they been deleted?
A Yeah, I believe that most of them are still in place.
Q Okay. Have you ever lied to Heather about being with your girlfriend?
A Can you please --
Q Do you recall a time where you told Heather that you were hiking alone but you were really with your girlfriend?
A Yes. We did a training hike together, preparing for an incredibly challenging nineteen-mile hike that we did about a month later.
And yes, I was not honest with Heather about whether I was hiking alone or not.
Q Why would you lie to her about Kyrsten being present for that?
A I mean, I think it's fairly obvious that it would cause some kind of suspicion that I was hanging out with my former boss and friend. And our marriage at that point was ending and I didn't -- I didn't want to make it worse.
Q Okay. And you would agree that before you were separated from one another, that Kyrsten had sent you messages saying she missed you, cares about you?

**required as a full-time employee.**
Q Okay. And so you said "I'm not going to be traveling as much," and she said what?
**A That they were going to lower my salary.**
Q And so you knew as of February that your salary was going to be reduced?
**A Yes. I knew it was in discussion.**
Q Okay.
**A I believe I knew for sure in March.**
Q Okay. And did you know how much?
**A I don't think I knew that until -- that was like mid-March. I don't know the exact day. I believe it was in mid-March.**
Q What does -- I understand you have to travel twice, three times a month out of state. What does a typical day look like? Are you on Zoom calls, what do you do for work?
**A When I'm traveling or when I'm local?**
Q When you're local.
**A Yeah, usually on a workday when I'm local, I'll have two or three Zoom calls.**
Q How do you and your girlfriend communicate? Is it via text?
**A Yeah, either text or Facetime.**
Q Okay. Not Signal or WhatsApp?

A Yes. Heather committed a felony when she took a screen shot of a flirty Signal message from Kyrsten sometime last summer and sent it to herself. And that text message was used as evidence under perjury.
Q Okay. And it would include, you would agree, that Kyrsten sent you a message saying "I keep waking up during my sleep and reaching over for your arms to hold me"?
A That sounds like a flirty text message to me, Whitney.
Q And is that because the two of you have held each other leading up to that point?
A She had expressed to me that she was interested in me and was flirtatious. That is it.
Q But it's your position that you never embraced?
A We certainly hugged.
Q Never slept in the same bed before January of this year?
A No, we had not.
Q Do you think those messages are inappropriate to send to a married man?
A I mean, yeah, it's probably inappropriate to send to a married man. But you have to remember, these messages came after Heather voluntarily took MDMA with her friends in December of 2023 and had told her best friends then, the first time meeting them, that she

wanted to divorce me. And so I mean, I don't think that was probably a very smart move on Heather's part if --

Q Did you tell Kyrsten to not communicate with you that type -- that way, that it was inappropriate?

A Yes. I mean, for the large part of the time that I was employed by her is I, you know, avoided her flirtiness, I guess. I don't know.

Q And she continued to do it anyways?

A No, she was pretty professional about it.

Q How did you confront her about the flirtiness?

A I do not recall exactly how it came up.

Q Do you recall when you confronted her about it?

A Probably last summer.

Q And was it in person or via message?

A No, I'm sure it was an in person conversation.

Q How would you describe your time with the children leading up to this lawsuit? How much time were you spending with the children from when you moved out to the emergency order?

A It was challenging up through May for me to get lots of time with all three kids. I spent quite a bit of time with my son, like we discussed earlier.

I had a one-bedroom apartment and he had no problem sleeping on an air mattress on the floor. But

I obviously wasn't going to subject my thirteen and twelve-year-old daughter to sleeping on air mattresses in my one-bedroom apartment.

But I mean, I was still doing school pick-ups and drop-offs and evening activities, and I mean, back then I was still spending quite a bit of time at the 18 Cayman Court house under Heather's request. And so I'd say it was pretty good, yeah.

Q How often would you see the kids?

A Fifty percent of the month.

Q What is your proposed schedule? How -- what time would you like with the kids? What's the schedule?

A Fifty-fifty.

Q On what schedule?

A I mean, I think a week on, week off would be the -- a fixed schedule that makes the most sense.

Ideally I would have a flexible schedule and could predict ninety days out when I would like to have custody and when Heather could have custody.

That would give me far more freedom for work stuff, but I would still ensure it would be at least fifty-fifty.

Q So you think the kids' schedule and Heather's custodial schedule should be based around your work schedule?

A Heather has not been employed and she has not sought employment. I am the -- currently supporting both households. And I -- for the work that I am doing, it would be helpful to have a flexible travel schedule, yes.

Q Would you say during the marriage Heather was a good mother to the kids?

A Yes, I think Heather is an excellent mother.

Q Would you say that you hate Heather?

A No, I would not say that I hate Heather. Her behavior in our separation specifically from March has been hurtful, and in all honesty I feel bad for her. I think that she has made me the target for her rage and her unwillingness to deal with her own personal problems.

And both the separation and the divorce were her idea. And she saw an opportunity to get even more than the substantial amount of money that I was giving to her and she took it, and that has made things quite difficult.

Q How much do you contend you can afford to pay in support to Heather and the kids?

A I mean, I think roughly around three thousand dollars a month would be a realistic child support and alimony payment that I could probably afford.

Q And that would leave you with how much?
A **That would leave me with roughly about the same amount.**
Q Do you not consider your disability and -- your VA and your CRSC as income?
A **No, my understanding is that disability and the combat-related service-connected component of it are not divisible as --**
Q Okay. So when you say you would have three thousand, really you would have nine thousand and she and the kids would have three thousand?
A **No, I would have roughly about the same amount in my salary and then I would have my disability and my CRSC.**
Q Okay. So you don't pay bills with that money?
A **I pay for medical bills and supplementation for the injuries and health conditions that I incurred in combat, which is what that money's intended for.**
Q Okay. So what out of pocket expenses do you pay for your treatments?
A **I have a recommendation to pay -- there's a certain regime of supplements I'm supposed to take and those are not covered by health insurance. Those can be quite costly.**
Q You currently taking them?

A I am, yes.
Q Okay. So what is not covered by insurance that you're taking?
A I don't have my list with me. I can get it for you another time.
Q So how much out of pocket do you pay, approximately?
A I would have to look it up. I don't know.
Q But it would be reflected in your bank account that you're paying for these things?
A Yes. It would be disbursed on my bank account on the various supplements that I'm paying for.
Q Who do you get your supplements from?
A Pure Encapsulations, Amazon. Various locations depending on what it is.
Q What was the first one?
A Pure Encapsulations is generally regarded as the cleanest supplements.
Q Okay. And when you say supplements, we're talking vitamins?
A Yes. We're talking various vitamins and natural supplements.
Q And that costs thousands of dollars?
A Yes.
Q Have you always taken them?
A I mean, I've always taken some. My current therapist

recommended a big part of the regime that I'm on and then I've had a few other experts give me advice on what I should be taking.

Q Okay. So we weren't taking these vitamins prior to separation? Am I understanding that correctly?

A I mean, I've always taken some amount of supplementation, yes. It has increased through guidance from doctors.

Q And you said earlier that it's your intent to move to Arizona next summer, is that right?

A I never stated that my intent is to move to Arizona next summer.

I would like to move to Arizona at some point. My primary concern is fifty-fifty custody with my children. We will figure out that further in the rest of these divorce proceedings.

Q Are you foreseeing a further reduction in your income?

A I don't believe so, no. Not under current foreseen circumstances.

Q Do you go into an office in Arizona or where do you go in Arizona for work? Is there an office space?

A The part of the company rents office space through one of the hotels, so that is often where we'll hold our meetings if it is us hosting them.

If it's not there, it's various locations around

**the country and Arizona.**

Q Okay. Where does the -- your work truck, where is it stored?

**A Usually either at the chief of staff's house or at my girlfriend's house.**

MS. FOUSHEE: That's probably good for today. Go down another rabbit hole, but it'll take another bit. Want to pause for today and resume tomorrow? What time?

(DISCUSSION OFF RECORD)

(WHEREUPON THE DEPOSITION ADJOURNED AT 3:01 P.M. AND RESUMED AUGUST 13, 2025, AT 10:38 A.M.)

DIRECT EXAMINATION CONTINUED BY MS. FOUSHEE:

Q Sir, correct me if I'm wrong, but yesterday you testified that you took a trip in the spring of this year to Mexico for an Ibogaine session, is that correct?

**A It is correct.**

Q Did you describe that as an emergency session to Heather?

**A Yes. I was struggling with many different things in both my personal and professional life, and was feeling overwhelmed and sought professional help, and the recommendation that I got was to go get a touch-up with my friends at Ambio.**

Q Okay. What's a -- what's a touch-up mean?

A **Specifically special operators, over thirteen hundred have been treated with Ibogaine at Ambio. Many go through yearly treatments.**

**And so it had been two years since I had had a treatment, so it was recommended I go get another one.**

Q Okay. So -- but it was not originally planned, it was based on your current state, is that correct?

A **Yes. The success and like the place that I found myself in my professional life is overwhelming to me.**

**My plan getting out of the Army was to climb trees with a chainsaw, and now I go to meetings with the Secretary of Defense and the Vice President, and their assistants take notes when I talk. It's not a -- I didn't see this one in the tea leaves. And it's quite overwhelming.**

Q Okay. And you said it was a struggle. You said you were dealing with struggles?

A **Yes. I have post-traumatic stress disorder and traumatic brain injury. A side effect of a severely damaged brain is to fall into bouts of mild depression.**

Q And at that time, were you depressed and struggling with symptoms from your PTSD?

A **I was struggling with symptoms from my traumatic brain**

injury, yes.

Q And what were those symptoms in March?

A **Panic attacks, anxiety, mild depression.**

Q Okay. And what is your plan for ongoing treatment?

A **I'm in multiple forms of ongoing treatment, Whitney, as we discussed yesterday.**

Q As far as Ibogaine goes.

A **When I feel the time's right to go through another session, I'll go through another session of Ibogaine.**

Q Okay. And you have to travel out of the country for that?

A **By that time we should have research programs going on in the United States.**

**I don't know if you saw the New York Times article that came out yesterday. We're working with former Texas Governor Rick Perry. There was a big article in the New York Times with him and my friend Brian Hubbard, and my girlfriend, Kyrsten Sinema, were mentioned in it. I actually have a meeting with a reporter next week.**

**So this isn't some like sketchy illegal activity that you are trying to paint it out to be, Whitney. This is I go to meetings with the director of the FDA, Dr. Makary, about this. I've met with Dr. Oz about this. I have met with Deputy Jim O'Neill four times**

about this.

Q So is it your position that it's not an illegal substance in the States?

A It is currently not under -- not approved for research. That is correct.

Q Okay. So it is illegal to consume it here?

A I have never consumed Ibogaine in the United States, Whitney. I've mentioned that.

Q What relationships outside of your current girlfriend have you been in since January of '24?

A Relationships?

Q Yes. Romantic, sexual.

A I have been in no relationships.

Q No other ones? Do you recall telling Heather that you had a romantic interest in a Julianna Mercer?

A She is an amazing woman and very beautiful.

Q Okay. So you did admit having an interest in that individual?

A Heather was provoking a fight and I was saying things to make her angry. She's fixated on Kyrsten Sinema being the reason that our marriage ended when she knows that is certainly not the case. She is just the woman that I happened to begin dating at the end of our marriage, after our separation.

To think that there weren't other women that I

was potentially interested in as I became a separated man is kind of ridiculous.
Q Okay. How often do you see Kyrsten?
A It depends on our work schedule and our personal schedule.
Q So in the last two months, how often were you able to see her?
A In person?
Q Yes.
A I would estimate eight days a month.
Q Okay. Have you had conversation with your girls about them meeting Kyrsten again?
A So Heather had sent me a threatening text message saying that if I did not discuss my relationship with Kyrsten with the kids, that she was going to do it.
And so I -- it was obviously a very hard conversation because I was countering a false narrative that has been created. And I did exactly what she said and I had the conversation with my daughters about exactly my -- the woman that she met that was my former boss, is now my girlfriend, and I explained how that has happened.
Q What did you say?
A That the woman that I used to work for had -- at some point along the way we became friends, and then after

your mom and I separated, we began dating.
Q How did the girls react?
A As understandably traumatized as a preteen and teenage daughter would to hearing something that is wildly different than what they had been told up to that point.
Q What do you mean, wildly different from what they had been told?
A Like I said earlier, the narrative has been created that Kyrsten Sinema is the reason that Heather's and I marriage has ended. And as we discussed, Heather's been telling people since 2021 that she wanted to divorce me. This isn't some new thing that popped up on the horizon when I started working for Kyrsten Sinema.

We got married very young, had kids very young. I deployed seven times. We had a incredibly stressful marriage and life.

We both come from parents that did not have great marriages, so neither one of us witnessed a good marriage growing up. Heather's parents I think signed divorce papers within twelve months of this, at least of our separation beginning.

So it's not like this is some fixated issue because I am this evil, drug-crazed, awful husband

that I have been fabricated out to be.

Q Did you tell the girls over your summer visit that Kyrsten was going to drive them after a flight delay?

A Yeah. So in the two weeks that you guys gave me in the temporary agreement to spend with my kids during their summer vacation, the first week of that, I took my kids to go visit my little brother in Idaho. The return flight from Idaho was -- had critical timing because our oldest daughter had to be at band camp by four p.m. on Sunday.

There was severe weather all over Colorado, so our flight -- connecting flight out of Denver International was redirected to Grand Rapids, Colorado. My girlfriend happened to be flying on a separate trip, was also supposed to connect through Denver just randomly and was redirected to -- forgetting, I forget, another small Colorado airport about forty-five minutes away.

In my seventeen and a half years in training in the special forces, I've traveled all around the world, all around the States, and when severe weather or some type of contingency can prevent your plans from following through, you develop contingency plans in case your original plan fails.

So in the event that we were going to spend an

unknown amount of time in severe weather in the Grand Rapids airport in Colorado, my daughter would miss her band camp that she was very much looking forward to.
Me being a -- not an expert at a lot of things, as you mentioned yesterday, Whitney, but I have been traveling the world and living out of my backpack and a duffel bag since I was nineteen years old.
So making a plan to rent a vehicle when we were forty-five minutes from each other to drive to an airport that is open three hundred and sixty-five days out of the year and is one of the most reliable airports in the country and has two direct connecting flights to RDU at five a.m. and at three-thirty-three p.m. every single day -- I know this because I travel.
Q Maybe I should ask the question again, 'cause I think you didn't understand. Did you tell the girls that she was going to drive them?
A Yes. I told my daughters that we had a contingency plan to ensure that my daughter Clara would make it to band camp in time, that if the severe weather that was being predicted by the National Weather Service and by the airlines became -- persisted and my daughter was going to miss band camp, I made plans to ensure that that didn't happen.
Q Okay. And how did --

A I would call that good parenting, Whitney.
Q How did the girls react?
A Well, there is a narrative that has been created that Kyrsten Sinema is some kind of evil woman when it -- clearly she has been trusted with the secrets at the top level of our national government and is a licensed clinical social worker and a lawyer herself. She's a quite credible woman.
Q So how did the girls react?
A They were upset.
Q How so? What did they say?
A I don't remember what they said, Whitney.
Q But they didn't want to go with her, right?
A They were told that they didn't want to go with her, yes.
Q But they told you they didn't want to go with her, right?
A No, they never told me that.
Q What did they say?
A Whitney, I don't remember what they said.
Q Okay. You just remember what they didn't say, is that --
A I -- Whitney, I love my twelve and thirteen-year-old daughters like nothing else in this world. They're my absolute princesses.

They are these perfect, beautiful, angelic creatures that I adore and love with every part of my fucking heart. But they are twelve and thirteen-year-old girls. Involving them in travel plans doesn't make much sense. I don't know if you would agree with that.

Yes, my twelve and thirteen-year-old daughters have done some traveling, but that -- like they usually -- they haven't drove the car like across the country or they've never like purchased an airplane ticket or like gone through TSA by themselves, or I -- Whitney, is a thirteen-year-old child qualified to make travel plans to get from Grand Rapids, Colorado, to Greensboro, North Carolina, for band camp? Is a thirteen-year-old of the facilities to make those decisions?

Q Okay. So as you described your princesses, do you think their voice should matter on when they want to spend time with each parent?

A I think that Heather is going down a slippery slope, that she needs to be very careful. This vengeful plan to turn my daughters against me as being this -- this awful creature is a very strange messaging to give to your own daughters, is "I started dating and fell in love and married and procreated three times with a

monster." That is a strange thing to teach your daughters.

Q So yes, their voice matters, or no?

A Whitney, I will say that in the event of ensuring that my thirteen-year-old daughter makes it to band camp, something that she had been looking forward to for a long time, that I -- no, I will override their emotions for practical planning.

Q Okay. I'm not -- and maybe I will rephrase.

In a custodial schedule, moving forward, do you think your children's voice should be heard and considered?

A I think the fact that you and Heather are making this an option is evil and disgusting. Do you think a nine-year-old boy's voice should be heard in this matter?

Q So you --

A Whitney, do you --

Q -- don't or you do?

A Whitney, do you think a nine-year-old boy's voice --

Q I get to ask the questions, you get to answer. So I'm going to ask you again.

A Shall we depose Cooper? Shall we see who he wants to spend more time with? Is that something you really want to do? Do you think that I'm evil enough to take

my son from his mother?
Q So you think their voice does matter?
A In matters of making rational decisions, no, I'm not going to include my thirteen and twelve-year-old daughters' emotional responses to a narrative that has been created by Heather into the effect when it includes their safety.
Q Okay. So their voice does not matter?
A When it comes to matters of their safety over their emotions, no, Whitney, I will override.
Q Okay. And it's impossible for their experiences with you to have actually impacted their preferences, is that your position?
A Yes. A narrative has been created, Whitney, that every experience with me is going to be a miserable experience because I am an evil, disgusting man.
And when I can separate my daughters from this area specifically, I've found that they are their wonderful selves again. It's when they get back into the sphere of knowing that if they don't obey Heather's orders, they will receive this vengeful wrath that I am now receiving.
My daughter Isla has Heather saved in her phone as the drill sergeant. And I know that that's kind of a funny joke, but I think that should be indicative of

like the level of like emotional abuse that Heather's willing to go to create a narrative that I am a monster.

Q Have you told Cooper that he should be home schooled?

A Cooper has asked me if he could be home schooled. I don't think that it is a terrible idea.

The public school system is a waste of my children's time. All three of my children are off the charts, unbelievably intelligent. And they spend their time in the North Carolina public school systems reviewing for like the three standardized tests that they take quarterly.

There are many, many programs out there for gifted children like my children are, where they could have a part-time in school schedule, they could have a part-time home school schedule, and they could travel the world and country with me, and I could teach my children the skills that I've learned over my twenty-year career of working for the government.

Q What's your level of education?

A I have a -- what is essentially a fake associate's degree that I used Quizlet to cheat on, 'cause the Army made it a silly requirement that you had to have an associate's degree to get promoted to master sergeant around the same time that we lost both wars.

And then I also hold a certificate in arboriculture from the Alamance Community College.

And Whitney, I can see what you're getting at is the fact that I do not hold formal education, as you as a divorce lawyer do, Whitney. I got a different education myself.

When I was twenty years old, me and my friends took a -- it's kind of like a backpacking trip acrose the birthplace of civilization.

I know you probably won't have read the Bible, but the Garden of Eden is the land in between the Euphrates and the Tigris River. And so I became intimately familiar with an ancient, unbelievable culture in the birthplace of civilization, the ancient Mesopotamian empire.

I got a -- you know, what could be considered a bachelor's level study in Sunni and Shia Islam. From there I --

Q So do you practice Islam? Do you -- are you a religious --
A What? Whitney, are you fucking serious?
Q What's your religion, sir?
A I am a Christian.
Q Okay.
A What?

Q So what --

A **We got to pause.**

MR. TANNER: You need a break?

MS. AMMEL: I think he needs a break.

THE WITNESS: Are you accusing me of being -- of converting to Islam?

MS. FOUSHEE: You may need a break.

(EIGHT-MINUTE RECESS)

Q Have you looked into home schooling programs?

A **All the -- Whitney, we have to go back and touch on this last part before we move on. I, for the record, want to state that accusing me of having converted to Islam is one of the most comical things I've ever heard in my life.**

**On my second deployment to Afghanistan, following in the footsteps of Alexander the Great to the graveyard of empires, we used to spend like four or five nights at a time at a Afghan national police checkpoint.**

**And obviously the guys that have been there tell you what the -- like the eight to twelve-year-old boy, the reason why he hangs around with the Afghan police and with the Afghan commandos.**

**And it's such a vile, disgusting thing that is so far outside of the mind of what a fucking American man**

would fucking comprehend of using a little boy as a fucking object for sex, that you block it from your mind until you're sitting on fucking guard duty one night and listen to it. You sit there and listen to -- for a fucking hour to a fucking ten-year-old boy get butt fucked.

No, Whitney, I have not converted to fucking Islam.

Q So what home school programs have you looked into?

A I've looked into many different private school and home school programs for my son.

Q Okay. Which ones?

A There is a zero percent chance that Heather is going to agree to any school changes right now until we are further into the divorce proceedings, so it is not worth addressing at this time.

Q So can you name any here today?

A Whitney, are we going to come to an agreement on the future education of our children during this deposition?

Q So is the answer you don't know any?

A The answer is when Heather and I come to agreement that the Moore County school system is wasting our children's time and there are better opportunities for our children out there, we will do some research,

hopefully together, and come up with a better plan for our children's future.

Q Have you looked at private schools?

A I have done some research into many different private schools, yes, Whitney.

Q Okay. Which ones?

A Many different private schools, Whitney.

Q Can you name any here today?

A Whitney, there is no -- there is as much sense of accusing me of having joined fucking ISIS as there is of us coming up with an education plan for our children's future when we are sitting here in this deposition right now.

This -- I'm not a lawyer, but this is not the part of the divorce where this is discussed.

Q So the question, sir, wasn't have you and Heather talked about where your children should go. I'm asking you what private schools you want your children to go to.

A Heather and I cannot come upon an agreement on where we are going to live moving forward in the future, so it doesn't make any sense to do significant research into exactly which program we would get our children into.

Q Can you name any, sir?

A The Agoge school system is a incredible school system for children like mine.

Q Where is that?

A It's based out of Austin, Texas, but it is spreading around the country rapidly.

Q And what makes you say that's a good fit for your kids?

A It's a school founded by a former Green Beret that thinks the way I think and teaches children in a way that makes them prepared to be productive citizens in the future and not cubicle workers.

Q How do you spell that? I'm not familiar with it.

A I think it's A-g-o-g-e.

Q Okay. And you think that would be appropriate for all three of your children?

A I think that is one of the many options that are out there that could be an appropriate fit for our children that is vastly superior to the education they are getting through the Moore County school system, yes.

Q Okay. Any local schools, private schools?

A No, there are no local schools in Moore County that I would want to get my children into.

Q And do you know the cost associated with this school in Austin?

A No, I have not done extensive research into it, Whitney. I've been busy dealing with getting through this divorce.

Q Did you have a discussion with your son about home school?

A My son has expressed extensive interest in home schooling. His best friend and our next door neighbors, the two kids that my children play with daily, have always been home schooled.

And they are wonderful, bright, creative young kids that get to spend a lot more time playing outside while still learning just as much as my children do and not spending their time reviewing for standardized tests.

Q So what did you tell your son about home schooling, if anything?

A I said that if he's interested in that, that I will talk to his mom in the future and that we will come up with a plan to see if that is feasible.

Q Around the time of the emergency order, your son missed some school days while he was at your home, correct?

A Correct.

Q Why?

A Well, Whitney, as you can imagine, Heather went to

extensive lengths to create a narrative that I was a drug-crazed, suicidal maniac that was going to take my children and flee the country to Mexico where I purchase and consume drugs regularly, I believe it is written. And that is a lot of hard misinformation for a very rational, smart boy to understand. And there was also a narrative created that he was not going to get to see me anymore.

And so in the times where Heather would allow me to see my son when we had no custody agreement, when it was clear that he wanted to spend time with me and to sleep in my apartment and things like that, he sometimes in the morning at the school drop-off line, you are correct, Whitney, he would not want to get out of the car because he would want to spend time with his dad.

Q And did you think spending time with dad was more important than going to school?

A Whitney, my son is so fucking smart, it's insane. Like off the charts insane.

I think he could miss a semester of Moore County public school and he could come in and he could sit on their little apps and do the reviews for their standardized tests and he would test two or three grade levels higher in reading, writing and

arithmetic, and my son would be just fine without the Moore County schools.

Q Okay. So you don't think he should go to school in Moore County? You don't think it's important that he attend school while he's enrolled in school? Is that true?

A Whitney, you are trying to lawyer talk and change what I am saying. What I am saying is at the time where you and Heather created absolute turmoil in my household, my son was so traumatized and fearful that he would not get to see his dad anymore that you are right, he would not get out of my car in the school drop-off line.

I guess I could have thrown him over my shoulders as he kicked and screamed and I could have drug him into his classroom and duct taped him to the fucking chair.

I'm not sure -- I don't know your parenting style, Whitney, but when you have a son who's refusing to get out of your car in the school drop-off line, I would pull into the parking lot and spend thirty minutes saying, "Hey, buddy, you have to go to school. I know you don't want to but you have to do this."

And when you have a crying nine-year-old who just wants to spend time with his dad because his mom and

an evil witch have created a narrative that he was going to kill himself or steal him and flee to Timbuktu or whatever, yes, yes, my son was rightfully traumatized by the two of your behavior.

And yes, there were a few days that my son missed school. Guess what. He still passed the third grade, Whitney. Do you want to see his test scores?

Q And what about --

A **Whitney, would you like to see my son's tests scores after missing three days of school because he wanted to spend time with his dad, who he was not being allowed to see? Do you want me to bring in my son's test scores to see if that had any effect on his education?**

Q What about tardies? Do you not think it's -- are there often times where your son --

A **Whitney --**

Q Do I have to go over the rules? I ask the questions, you respond. You let me finish, I will let you finish. I've been very kind in letting you rant and rant and rant --

A **As Salam. As Salam. As Salam.**

Q What are you doing there?

A **I'm praying to Islam, Whitney.**

Q Okay.

A I joined ISIS after seventeen and a half years in the special forces.

Q Okay.

A After watching my best friend try and snap an Al Qaeda sniper's neck with his bare hands and then having the guy's wife pick a newborn baby off the floor and throw it across the room at me.

Q Are you on any impairing substances this morning?

A Whitney, the only thing that impaired me is the thought that a seventeen and a half year veteran of the 82nd Airborne Division and the Third Special Forces Group would convert to Islam. It's so insane.

Q So what medication did you take this morning, or any other substances?

A I took my Armour Thyroid, as I take every morning prior to eating breakfast.

Q Anything else?

A I have had approximately four cups of coffee.

MS. FOUSHEE: Okay. I need to step out. I'll be right back.

(FIVE-MINUTE RECESS)

THE WITNESS: Sorry, I was submitting a security clearance to the White House. I hope they don't find out about my Islam.

Q So would you agree, sir, that there were times that

instead of getting your son to school on time, that you would take him to breakfast or hang out with him?

A There are times when my son refused to go to the school to the point that I was not going to traumatize him by forcing him, yes, Whitney.

Q Okay. So do you not have the ability to force your son to do something he doesn't want to do?

A No, Whitney, I'm not going to force my nine-year-old son into his school kicking and screaming because he wants to spend time with me because his mom won't allow him to.

Q Okay. You stated yesterday that it is your position that you want fifty-fifty custody of the children, correct, sir?

A Yes. I'm going to get fifty-fifty custody of my children, Whitney.

Q What do you mean, you're going to?

A I'm going to get fifty-fifty custody of my children. This isn't a want, and any other thing would be ridiculous and absurd and predicated upon some lie that you and Heather fabricated.

Q So what happens if the judge --

A And perjured, the judge that you just mentioned, to not allow me to have fifty-fifty custody from the get go.

Q So what are you going to do if the judge decides that you don't get fifty-fifty?

A **I think that judicial oversight is a big problem here in Moore County, and if judges in this county are allowing criminal activity to be committed in their courtrooms, then I think need to be brought down upon it.**

Q What do you -- what makes you say that?

A **During the ex parte return custody hearing that you and my former attorney, Ronnie Scott, planned, where you coordinated to have Ron Scott show up two hours and forty-five minutes late, wearing a fake hospital bracelet while visually under the influence of cocaine, and Judge Steve Bibey allowed it to happen, and a lie was created that I would not be allowed to have access to my children until September unless I signed the -- what is going to be proven as illegal and criminal temporary custody order, yes, there needs to be some judiciary oversight of what's going on here.**

Q So it's your testimony that I coordinated with Attorney Scott on all this?

A **He admitted to it on a phone call with me. I have it on recording.**

Q Oh, what did he say?

A That you and him created --

MR. TANNER: On that, just put out there, I would invoke the issue of privilege, so you would be disseminating privileged information. Do you want to talk about that?

THE WITNESS: Yeah.

(ONE-MINUTE RECESS)

MS. FOUSHEE: Are we invoking privilege?

MR. TANNER: I think after conferring with my client, he is happy to talk about that discussion.

MS. FOUSHEE: Okay. Sure.

Q So what did Mr. Scott say to you about --

A That you and him planned the temporary custody order the night prior. He did not make me aware in any way that he had come up with a plan for you or with you. He did not notify me that he was going to be intentionally late.

I have FOIA requested the courtroom footage. He was clearly wearing a fake hospital bracelet. That is easily provable. He was clearly -- clearly visually under the influence of cocaine. For Steve Bibey to claim that he upholds the law while there is a lawyer that is geeking out on cocaine in his chambers is astonishing.

And to pretend like this hasn't been going on in

this county and that you guys all clearly don't play the little Moore County lawyer parasite game is very clear. You guys were all turning around and whispering to each other and snickering and laughing at me.
It was very obvious that a plan had been created prior to me entering the courtroom that day, Whitney. I'm not a dummy. I know that you had mentioned my lack of formal education, but I'm still here after getting through some pretty crazy stuff, so --
Q Did you get the video footage?
A I'm working on it right now, Whitney. Government is slow.
Q Okay. You said he was wearing a fake hospital bracelet. What makes you say it's fake?
A There was no personal information listed on the bracelet. The point of the bracelet is so that the hospital knows who they have inside of the hospital. There was also not a QR code on it.
Q Okay.
A I've spent lots of time in hospitals, given my health conditions and physical injuries. I know what a hospital bracelet looks like.
Q And what makes you say he was -- and I don't want to misquote you, but on some type of impairing substance?

I think you referenced cocaine.
A He was clearly on cocaine or some type of high dose amphetamine.
I am not a law enforcement officer but I have spent enough time around -- as you have lovingly accused me of being a drug user and I've spent lots of time around law enforcement and I can make a professional opinion that Ron Scott was under the influence of some type of narcotic during our return ex parte order.
Q Okay. Have you reported him in any way?
A Just State Bar complaint.
Q And what is your -- you somehow blame Judge Bibey on this?
A I mean, what you guys did is criminal and immoral.
Q What is Bibey's involvement in this criminal activity?
A If he is allowing something like this to proceed, then he is a -- not doing his job. And that is the problem with our country is that there are people in positions of authority that have gotten used to being able to operate in a certain way.
And there is a little game being played here in Moore County, home of U.S. Army Special Operations, where Whitney Foushee and Laura Creed and Ron Scott and all the different attorneys have this play that

they run where they go "Look, look, the guy that used to hunt human beings for a living is crazy."

And it is more than likely an ADA violation to target special operators either currently employed by the U.S. Army or former on grounds of mental health and injuries sustained in combat both to their emotional stability and their physical brain health and their physical health.

Q Okay. And so what was Bibey's involvement in this criminal activity?

A He watched a lawyer stand ten feet in front of him after showing up two hours and forty-five minutes later with a clear plan that was colluded ahead of time, called him back to his chambers.

It would be complete speculation to wonder what they talked about or wonder if any money changed hands or if anyone rounded third base, but clearly Steve Bibey is not innocent in this little game that the lawyers here have been playing.

Q What do you mean?

A I mean, this is small town socialism. You are extracting my wealth, my combat-related service-connected disability that I earned serving my country, predicated upon perjury that you committed in front of Steve Bibey, which he allowed, to extract my wealth

from me, an exorbitant amount of wealth, a hundred and twenty-seven thousand dollars in eight months, completely predicated upon a lie.
Q Okay. And so it's your opinion that Judge Bibey is in this collusion?
A It is my opinion that there needs to be judicial oversight in Moore County. I am not -- as you have mentioned, Whitney, I am not an expert, but I know when something does not smell right.
Q Okay. Have you reported Judge Bibey?
A I'm working on it, Whitney. I got a meeting in D.C. about it.
Q Okay. And it's your intent to report him to someone in D.C.?
A Figure out who does judicial oversight in a broken government system. You are correct, Whitney. I will figure this out.
Q Okay. So what's this meeting in D.C.? When is it and who's it with?
A Whitney, I'm not at privy to discuss who I meet with as the course of my job until after the meetings have happened.
Q Okay. When is the meeting?
A Whitney, I have a meeting in Washington, D.C., at the end of this week.

Q Okay. And that's about judicial oversight?
A It's about many different things that I'm working on that is wrong with our country, Whitney.
Q Okay. Once you, according to you, you will -- you will obtain fifty-fifty custody, will you have an increase in your income?
A I do not know what my work will look like until after I get through this divorce. This is my priority is getting fifty-fifty custody of my children.
Q Okay.
A I am fortunate that work has kept me on board. They have been flexible with the schedule.
Q And once you -- if and once you have this fifty-fifty custody, how would you coordinate your travel?
A Whitney, you and Heather have made any coordinating at all throughout this entire process extremely difficult. I in no way made coordinating a challenge at all.
I believe most divorced couples nowadays, there are parenting apps that you use to schedule pick-up times and drop-offs and school pick-ups and all the different things.
And I'm sure when we get to that point of the divorce, the four of us should come up with a plan for moving forward. But Heather has made no attempt to

communicate cordially or to engage in any kind of constructive plan for moving forward with the separation and divorce that she agreed to. She has devoted her full time, based upon your guidance, to figuring out how to extract money from me and not make a plan for the future.

Q Are you able to have a consistent schedule?

A I am able to have whatever schedule gives me fifty-fifty custody of my children, Whitney.

Q So you are able to control your schedule?

A I am going to ensure that I have fifty-fifty custody of my children, Whitney.

Q You said you would prefer for at least your son to be home schooled. Who would be doing the home school?

A I'm certainly qualified to home school. I guess I'm not, Whitney. I only have a associate's degree.

But I will figure out a -- there are many good programs. I've got many friends and neighbors and -- that are involved in lots of good programs.

One of the things that we're working on at ASU is we're using AI to figure out a better way to teach children. And so through that, they could probably find some pretty good resources.

But yeah, I -- as I stated, my goal right now is to get through this divorce and to have fifty-fifty

custody of my children.

The plan moving forward, when Heather wants to be more cordial and sit down and come up with a constructive plan for the future, we will talk about it then.

Q Are you opposed to Heather home schooling the kids?

A I would not be opposed to Heather home schooling the kids, no.

Q But it's not your assumption that she would be responsible for that?

A No, I think we could come up with a excellent split schedule of home school and I could probably find some type of gifted program for my children that they would be enrolled in while also doing home school activities.

Q It was your testimony, and correct me if I'm wrong, that Heather was the one that insisted on the divorce. Is that correct?

A That is correct, yes.

Q And would you agree that in past times you have threatened divorce?

A I'm sure that there are times when we have been fighting and I have threatened divorce in the past. I have never consistently threatened divorce. Heather has been consistently threatening divorce since the

Warrior's Heart incident that we talked about earlier.

That has been a consistent theme, and minor arguments about like whether or not I want to drive her to the grocery store would turn into "I want to fucking divorce you."

And so I think the message has been pretty clear for many years that Heather was -- was no longer interested in me as a husband, and that was her decision as well.

Q And at the time of the separation, did you want to maintain the relationship?

A I agreed with her plan that separation seemed like the only appropriate answer for the point we were at in our relationship where nothing else was working.

Q When you told her, assuming that you admit that you told her in June of '24 that you wanted a divorce, after that time, did you change your mind?

A I'm confused by the question. Can you restate it?

Q Did you tell Heather in June of '24 that you wanted a divorce?

A I do not recall whether or not I told Heather in June of '24 whether or not I wanted to divorce and whether or not I was agreeing to her saying that she wanted a divorce.

Q Do you recall telling Heather last year that you were

going to take your life by throwing yourself over the Grand Canyon?

A I do not recall that at all.

Q Do you remember having any statements about the Grand Canyon and going over the ledge?

A I do not recall that at all, Whitney.

Q Do you recall taking a walk and saying it would -- it would have been a nice night to kill yourself?

A I do not recall that, Whitney.

Q Have you ever made such or similar statements to Heather about taking your own life?

A Whitney, I've never been suicidal and I've never made statements of suicidality.

Q Do you recall stealing prescription medication or taking prescription medication from third parties that weren't prescribed to you?

A Absolutely. Addiction runs a horrible course, especially opiate addiction, the way it controls your mind and literally controls your decision making process and completely blocks your judgment, leads you to make some terrible decisions.

And yes, throughout my struggle with pain pills from 2010 through 2016, there's plenty of other medicine cabinets that I've dug through. I think that's a common theme amongst people that are addicted

to pain pills. It happens with the guys at work as my shit would come up missing as well.

I don't think that this is a uncommon problem amongst people that are addicted to pain meds, nor do I think a person being addicted to pain meds is some individual problem that only Matthew Ammel seems to have. I think that's a problem that affects close to like -- like a hundred and twenty million Americans or something.

And yes, I struggled with it for many years and that is a big part of the reason why I have -- a big part of what I'm doing right now is Ibogaine has proven eighty-three percent effectiveness against opiate addiction compared to other treatment options with like suboxone, which are around twenty-seven percent, or methadone, which are around thirty-two percent, and are really just another opiate. They are not getting a person off of opiates. You're just getting them onto an opiate made by Pfizer or Johnson & Johnson.

So I'd say yes, I fully understand the depths of depravity that opiate addiction will lead a person to. I am not sure where you're going with this.

Q Okay. And did you also take Fentanyl lollipops around that time frame too?

A I took plenty of Fentanyl lollipops out of my medic's narc boxes.

Yes, that is a problem that persists on every team in the special forces. It is a constant problem that every medic faces because opiate addiction is a problem that is common amongst special forces operators.

Same thing happens with the guys' personal prescriptions of amphetamines too, as many came up missing or progress on to more serious addictions to non-prescription amphetamines.

Q You testified earlier about a concert that Heather went to. Did you also use MDMA at that concert?

A I did not.

Q Have you at concerts with your girlfriend?

A I have taken MDMA one time and it was in a therapeutic setting at a location that I do not remember and with a provider whose name I forget.

Q Have you consumed marijuana with your girlfriend?

A Yes, I have.

Q Okay. Any other substances with your girlfriend?

A No, I have not.

Q Psilo -- psil --

MS. AMMEL: Psilocybin.

Q That one.

A I have not consumed psilocybin --
Q Never?
A -- with my girlfriend. No.
Q Have you ever consumed it?
A Yes, I have consumed psilocybin.
Q When?
A In 2008. We got home from this crazy fifteen-month adventure in which I allegedly had converted to Islam and not -- didn't cause a mass destruction to Islam at a very -- at a very young age.
Then we came home from deployment and one night we were pretty hammered. One of the guys pulled out some mushrooms and we ate some mushrooms and watched the trees grow and the fire get big and it was wild.
And it was like a really good maturing moment 'cause I was pretty reckless with my life up to that point, and I had like a horrible trip that night about waking up in the -- like I thought I was in the ICU with third degree burns all over my body. And after that I was much more responsible and took much less risk with my -- with my body.
Q When was the last time you used mushrooms?
A I don't recall.
Q Do you recall locking Heather out of the marital home?
A I remember a time when Heather was in such a fit of

rage and I was in so much fear for -- that I was going to be physically abused that the only logical thing my brain could think of in a moment of panic was to lock the door so I could run out of the other side of the house. Yes, I'm one hundred percent sure that has happened.

Q Okay. That you -- that you locked just the front door, not the other doors?

A I -- we don't live like in the -- like the Arctic Circle. Like I've never like abandoned her like in the wild. But when she's been trying to physically abuse me, I have locked the door and then run out of the other side of the house so that I wasn't physically abused. Like she didn't go long without like food and water or shelter or anything.

I don't -- what -- I think that seems like a pretty rational response to someone trying to be physically assaulted and preventing that from happening. What would you do in that situation, Whitney?

Q So yes, you locked her out of the house?

A Yes, Whitney, to protect myself from a physical assault, I probably locked her out of the house on an occasion.

Q Are you engaged?

A I am not engaged, no.
Q Have the two of you discussed getting married?
A No, we have not.
Q Have you discussed living together?
A We haven't seriously discussed living together, no.
Q Have there been discussions of you relocating to her in Arizona?
A We have already discussed extensively that yes, it makes sense with my professional opportunities and both my personal interest that I would like to move to Arizona at some point. I think that that makes sense. We have no ties here in North Carolina.
I think it's a -- almost like a trauma farming thing where special operators get out and then they stay in this town and it's very unhealthy for their mental health to have one foot into what was a very -- into their old life.
I think that's a big part of the problem why we're seeing so many of the -- like the really high quality guys are just kind of wasting away, getting drunk at McDonald's or whatever every night.
Q So how is living here impacting you?
A I -- it's not that I don't still have connections to this community here and don't still have some professional connections to this community. But the

work that I'm doing now, I don't need to be located at the home of U.S. Army Special Operations anymore.
It doesn't make sense for me to be here, over an hour from a major airport, which impacts my professional life greatly. I've spent more time in the past two and a half years driving up Highway 1 than I care for.
Q So if the kids are living here, does your staying here going to impact your mental health or well being?
A Whitney, I'm going to have fifty-fifty custody of my children. That is the greatest thing that could affect my mental health and well being. Where I am with those children, we will figure out at a later time in these divorce proceedings.
You and Heather have made no attempt to make this process cordial or professional, and I think that we're going to get to the point that the court is going to have to order us on how this is going to proceed, because we're at the point that you are accusing me of being an Islamic terrorist on record. That's a strange thing, strange -- strange reach.
Q So if the court maintains the current schedule, would you still stay in Moore County?
A If the court maintains this current schedule?
Q Yes, sir.

A If the court maintains this current schedule, then I am obviously going to see my kids at every opportunity that I can, given the ridiculous temporary agreement that we were forced into signing.

If that stands, I obviously will have much more work to do in the bigger picture of the issue behind this divorce then.

Q So you would or would not stay in Moore County?

A I mean, if -- my full-time job will be getting judicial oversight if I -- if this temporary custody agreement stands.

Q What does judicial oversight mean to you? What do you think that -- what does that mean?

A I think that an unfortunate part of what happened, what has happened with our government is you have these little tiny fiefdoms that are created.

And I don't think that Steve Bibey is probably a bad person. I know that he's a veteran himself and was a law enforcement officer.

But when someone's power goes unchecked for too long, they become authoritarian. And if you were to take a simple cell phone video of the way Steve Bibey addresses the people that are going to him and treating him respectfully and asking them questions as they are going through what is a unbelievably

confusing and like emotionally traumatizing experience, and for him to talk to them like they are his subjects is indicative of a broken government.

And when that happens is you have to bring authority down on top of them to say, yes, you've gotten away with this for too long. Here is a slap on the wrist, stop it. This is small town socialism. You are extracting the wealth of patriots to pay for parasites, to pay for Ron Scott's cocaine and Whitney's new broom.

MS. FOUSHEE: That's a lovely note to end on. Let me take a break and see if I want to ask anything else.

(DISCUSSION OFF RECORD)

(THEREUPON THE WITNESS WAS DISMISSED.)

State of North Carolina

Wake County

C E R T I F I C A T E

I, Cynthia J. Dotson, Notary Public/Reporter, do hereby certify that Matthew Joseph Ammel was duly sworn by me prior to the taking of the foregoing deposition: And that said deposition was taken by me and that the foregoing 138 pages constitute a true and accurate transcript of the testimony of the witness.

I do further certify that I am not of counsel for or in the employment of either of the parties to this action, nor am I interested in the results of this action.

In witness whereof, I have hereunto subscribed my name this 27th day of August, 2025.

______________________________

Cynthia J. Dotson

Certificate No. 19972120061

PLAINTIFF'S EXHIBIT 6 Sinema

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
CIVIL ACTION NO. 1:26-cv-00038

| | | |
|---|---|---|
| **HEATHER AMMEL,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **NOTICE OF DEPOSITION OF MATTHEW AMMEL** |
| **KYRSTEN SINEMA,** | ) | |
| **Defendant.** | ) | |

To: Mr. Matthew Ammel
Camp San Luis Obispo
Post Operations Building 738
10 Sonoma Avenue
San Luis Obispo, CA 93405

**PLEASE TAKE NOTICE** that the undersigned counsel for Plaintiff, will, pursuant to Rule 30 of the Federal Rules of Civil Procedure, take your oral examination beginning at **12:00 p.m. EDT (9:00 a.m. PDT) on July 28, 2026,** via Zoom, for the purposes of discovery or for use in evidence, or for any other lawful purpose. The deposition will continue day to day until completed and will be taken before an officer authorized to administer oaths and to take such depositions by the laws of North Carolina, will be recorded by audio and stenographic means, and may be videotaped. You are required by this notice to be present for your deposition.

This, the 16th day of July 2026.

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

By: Mary Catherine Coltrane

Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that the undersigned has this date served the foregoing **NOTICE OF DEPOSITION OF MATTHEW AMMEL** upon the persons listed below via e-mail addressed as follows:

POYNER & SPRUILL
*Attorneys for Defendant Kyrsten Sinema*
Steven B. Epstein, Esq.
Abigail R. Jenkins, Esq.
301 Fayetteville Street, Suite 1900
Post Office Box 1801 (27602-1801)
Raleigh, North Carolina 27601
Telephone: (919) 783-2846
Facsimile: (919) 783-1075
sepstein@poynerspruill.com
ajenkins@poynerspruill.com

PARKER BRIAN FAMILY LAW
Brent Tanner, Esq.
104 N McNeill Street
Carthage, North Carolina 28327
brent.tanner@parkerbryanfamilylaw.com

Mr. Matthew Ammel
Camp San Luis Obispo
Post Operations Building 738
10 Sonoma Avenue
San Luis Obispo, CA 93405

This, the 16th day of July 2026.

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

By: Mary Catherine Coltrane
Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

HEATHER AMMEL
*Plaintiff*
v.
KYRSTEN SINEMA
*Defendant*

Civil Action No. 1:26-cv-00038

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: MATTHEW AMMEL
Camp San Luis Obispo, 10 Sonoma Avenue, San Luis Obispo, CA 93405
*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: via ZOOM | Date and Time: 07/28/2026 12:00 pm (EDT) |
|---|---|

The deposition will be recorded by this method: The deposition will be taken before an officer authorized to administer oath

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

SEE EXHIBIT A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 07/16/2026

*CLERK OF COURT*

OR

_______________________________ *Signature of Clerk or Deputy Clerk*

_______________________________ *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiff _______________________________ , who issues or requests this subpoena, are:

Thomas M. Van Camp, Esq. Van Camp, Meacham & Newman, PLLC. P.O. Box 1389, Pinehurst, North Carolina 28374

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 1:26-cv-00038

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________________
on *(date)* ____________ .

☐ I served the subpoena by delivering a copy to the named individual as follows: ____________

______________________________________________________________

______________________________________ on *(date)* ____________ ; or

☐ I returned the subpoena unexecuted because: ______________________________

______________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

1. Please produce all communications between you and Kyrsten Sinema from 1 April 2022 through 1 November 2024, including but not limited to correspondence, emails, text (SMS) messages, Signal messages, audio or video recordings, voicemails, and encrypted messages.

2. Please produce all documents in your custody, control, or possession which constitute, evidence, relate, or make reference to complete copies of your telephone records, including but not limited to the following numbers: 913-240-4005, 202-981-2041, and 602-890-3368, indicating the location of every call made and received and every text (SMS) message sent and received by and between you and Kyrsten Sinema from 1 April 2022 to 1 November 2024, or make reference to any and all travel by you and Kyrsten Sinema to any State within the United States during the period 1 April 2022 to 1 November 2024, including but not limited to credit card statements, receipts, hotel reservation confirmations, rental contracts for accommodations or car rentals, airfare charges or airline tickets, or other similar documents.

PLAINTIFF'S
EXHIBIT
7
Sinema




AMMEL 1st POD 629/630


4:36
Home
October 4, 2024 7:59 AM
KS>

PLAINTIFF'S EXHIBIT 8 Sinema

**CONFIDENTIAL**

Confirmation code: **WGWCIJ**

## Monday, September 30, 2024

| | | |
|---|---|---|
| | **RDU** Raleigh-Durham **2:45 PM** | **AA 468** |
| | **CLT** Charlotte **3:55 PM** | Seat: **13C** Class: **Economy (G)** Meals: |
| | **CLT** Charlotte **4:55 PM** | **AA 540** |
| | **PHX** Phoenix **6:21 PM** | Seat: **24C** Class: **Economy (G)** Meals: **Food for purchase** |

## Thursday, October 3, 2024

| | | |
|---|---|---|
| | **PHX** Phoenix **6:22 AM** | **AA 1158** |
| | **CLT** Charlotte **1:31 PM** | Seat: **11E** Class: **Economy (G)** Meals: **Food for purchase** |
| | **CLT** Charlotte **2:37 PM** | **AA 1665** |
| | **RDU** Raleigh-Durham **3:31 PM** | Seat: **14C** Class: **Economy (G)** Meals: |

Manage your trip

SINEMA_000733

CONFIDENTIAL

# Your purchase

**Matthew Ammel - AAdvantage® #: U50******

| | |
|---|---|
| New ticket (0012176641332)<br>[$594.18 + Taxes & carrier-imposed fees $93.76] | $687.94 |
| Main Cabin Extra (CLT-PHX)<br>Document #: (0010610235134)<br>[$65.15 + Taxes & carrier-imposed fees $4.89] | $70.04 |
| Main Cabin Extra (PHX-CLT)<br>Document #: (0010610235134)<br>[$42.57 + Taxes & carrier-imposed fees $3.19] | $45.76 |

**Total cost** **$803.74**

# Your payment

| | |
|---|---|
| MasterCard (ending 3630 ) | $803.74 |
| Total paid | **$803.74** |

## Bag information

Bag fees apply at each Check-in location. Additional allowances and/or discounts may apply. For information regarding American Airlines checked baggage policies, please visit: Bag and optional fees

If your flight is operated by a partner airline, see the other airline's website for carry-on and checked bag policies.

Carry-on bags (American Airlines)

| | |
|---|---|
| **Personal item** | A small purse, briefcase, laptop bag, or similar item that must fit under the seat in front of you. |
| **Carry-on** | Maximum dimensions must not to exceed: 22" long x 14" wide x 9" tall (56 x 35 x 23 cm). |

Book a hotel »

Book a car »

Buy trip insurance »

Vacations »




Contact us
Privacy policy

Download the American app

Download on the App Store

GET IT ON Google Play

© 2024 American Airlines, Inc. All Rights Reserved.

You have up to 24 hours from the time of ticket purchase to receive a full refund if you booked at least 2 days before departure. Once canceled, your refund will be processed automatically.

If you have purchased a NON-REFUNDABLE fare, the itinerary must be canceled before the ticketed departure time of the first unused coupon or the ticket has NO VALUE. If the fare allows changes, a fee may be assessed for changes and restrictions may apply.

Some American Airlines check-in counters do not accept cash as a form of payment. For more information, visit our Airport Information page.




Some everyday products, like e-cigarettes and aerosol spray starch, can be dangerous when transported on the aircraft in carry-on and/or checked baggage. Changes in temperature or pressure can cause some items to leak, generate toxic fumes or start a fire. Carriage of prohibited items may result in fines or in certain cases imprisonment. Please ensure there are no forbidden hazardous materials in your baggage like:

Some Lithium batteries (e.g. spares in checked baggage, batteries over a certain size), Explosives / Fireworks, Strike anywhere matches/ Lighter fluid, Compressed gases / Aerosols Oxygen bottles/ Liquid oxygen, Flammable liquids, Pesticides/ Poison, Corrosive material.

There are special exceptions for small quantities (up to 70 ounces total) of medicinal and toilet articles carried in your luggage, spare lithium batteries for most consumer electronic devices in carry-on baggage, and certain

smoking materials carried on your person.

Certain items are required to be carried with you onboard the aircraft. For example, spare lithium batteries for portable electronic devices, cigarette lighters and e-cigarettes must be removed from checked or gate-checked baggage and carried onboard the aircraft. However, e-cigarettes may not be used on-board the aircraft.

Traveling with medical oxygen, liquid oxygen, mobility aids and other assistive devices may require airline pre-approval or be restricted from carriage entirely. Passengers requiring these items should contact the airline operator for information on use of such devices.

NOTICE OF INCORPORATED TERMS OF CONTRACT

Air Transportation, whether it is domestic or international (including domestic portions of international journeys), is subject to the individual terms of the transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage. Other carriers on which you may be ticketed may have different conditions of carriage. International air transportation, including the carrier's liability, may also be governed by applicable tariffs on file with the U.S. and other governments and by the Warsaw Convention, as amended, or by the Montreal Convention. Incorporated terms may include, but are not restricted to: 1. Rules and limits on liability for personal injury or death, 2. Rules and limits on liability for baggage, including fragile or perishable goods, and availability of excess valuation charges, 3. Claim restrictions, including time periods in which passengers must file a claim or bring an action against the air carrier, 4. Rights on the air carrier to change terms of the contract, 5. Rules on reconfirmation of reservations, check-in times and refusal to carry, 6. Rights of the air carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of alternate air carriers or aircraft and rerouting.

You can obtain additional information on items 1 through 6 above at any U.S. location where the transporting air carrier's tickets are sold. You have the right to inspect the full text of each transporting air carrier's terms at its airport and city ticket offices. You also have the right, upon request, to receive (free of charge) the full text of the applicable terms incorporated by reference from each of the transporting air carriers. Information on ordering the full text of each air carrier's terms is available at any U.S. location where the air carrier's tickets are sold or you can click on the Conditions of Carriage link below.

Air transportation on American Airlines and the American Eagle carriers® is subject to American's conditions of carriage.

For more on Canada passenger protection regulations visit aa.com/CanadaPassengers.

Please do not reply to this email address as it is not monitored. This email was sent to m.ammel3222@gmail.com.

NOTICE: This email and any information, files or attachments are for the exclusive and confidential use of the intended recipient. This message contains confidential and proprietary information of American Airlines (such as customer and business data) that may not be read, searched, distributed or otherwise used by anyone other than the intended recipient. If you are not an intended recipient, do not read, distribute, or take action in reliance upon this message. Do you think you received this email by mistake? If so, please forward this email to us with an explanation.

For all other questions about bookings or upcoming trips, visit our contact page. Contact American >

**one**world is a registered trademark of **one**world Alliance, LLC.

Confirmation code: **FALQSD**

## Sunday, October 6, 2024

| | | |
|---|---|---|
| Depart | **RDU**<br>Raleigh-Durham<br>**4:21 PM** | **AA 2704** |
| Arrive | **CLT**<br>Charlotte<br>**5:30 PM** | Seat: **14D**<br>Class: **Economy (G)**<br>Meals: |
| Depart | **CLT**<br>Charlotte<br>**6:02 PM** | **AA 809** |
| Arrive | **PHX**<br>Phoenix<br>**7:25 PM** | Seat: **11B**<br>Class: **Economy (G)**<br>Meals: **Food for purchase** |

## Thursday, October 10, 2024

| | | |
|---|---|---|
| Depart | **PHX**<br>Phoenix<br>**5:00 AM** | **AA 392** |
| Arrive | **CLT**<br>Charlotte<br>**12:02 PM** | Seat: **11B**<br>Class: **Economy (S)**<br>Meals: **Food for purchase** |
| Depart | **CLT**<br>Charlotte<br>**1:13 PM** | **AA 1897** |
| Arrive | **RDU**<br>Raleigh-Durham<br>**2:14 PM** | Seat: **14C**<br>Class: **Economy (S)**<br>Meals: |

Manage your trip

## Your purchase

**Matthew Ammel - AAdvantage® #: U50******

| | |
|---|---|
| New ticket (0012176645257)<br>[$563.49 + Taxes & carrier-imposed fees $91.46] | $654.95 |
| Main Cabin Extra (CLT-PHX)<br>Document #: (0010610235907)<br>[$65.15 + Taxes & carrier-imposed fees $4.89] | $70.04 |
| Main Cabin Extra (PHX-CLT)<br>Document #: (0010610235907)<br>[$35.48 + Taxes & carrier-imposed fees $2.66] | $38.14 |
| **Total cost** | **$763.13** |

## Your payment

| | |
|---|---|
| MasterCard (ending 3630 ) | $763.13 |
| Total paid | **$763.13** |

### Bag information

**Checked Bag (Airport)**

| | |
|---|---|
| 1st bag | No charge |
| 2nd bag | $45.00 |

**Checked Bag (Online*)**

| | |
|---|---|
| 1st bag | No charge |
| 2nd bag | $45.00 |

Maximum dimensions: 62 inches or 158 centimeters calculated as (length + width + height)
Maximum weight: 50 pounds or 23 kilograms
Bag fees apply at each Check-in location. Additional allowances and/or discounts may apply. For information regarding American Airlines checked baggage policies, please visit: Bag and optional fees

If your flight is operated by a partner airline, see the other airline's website for carry-on and checked bag policies.

*Online payment available beginning 24 hours (and up to 4 hours) before departure.

Carry-on bags (American Airlines)

**Personal item** A small purse, briefcase, laptop bag, or similar item that

must fit under the seat in front of you.

| | |
|---|---|
| **Carry-on** | Maximum dimensions must not to exceed: 22" long x 14" wide x 9" tall (56 x 35 x 23 cm). |

Book a hotel »

Book a car »

Buy trip insurance »

Vacations »




Contact us
Privacy policy

**Download the American app**

Download on the App Store | GET IT ON Google Play

© 2024 American Airlines, Inc. All Rights Reserved.

You have up to 24 hours from the time of ticket purchase to receive a full refund if you booked at least 2 days before departure. Once canceled, your refund will be processed automatically.

If you have purchased a NON-REFUNDABLE fare, the itinerary must be canceled before the ticketed departure time of the first unused coupon or the ticket has NO VALUE. If the fare allows changes, a fee may be assessed for changes and restrictions may apply.

Some American Airlines check-in counters do not accept cash as a form of payment. For more information, visit our Airport Information page.

Lithium Batteries · Explosives · Aerosol · Flammables · Oxidizers · Toxins · Radioactive · Corrosives · E-cigarettes

Some everyday products, like e-cigarettes and aerosol spray starch, can be dangerous when transported on the aircraft in carry-on and/or checked baggage. Changes in temperature or pressure can cause some items to leak, generate toxic fumes or start a fire. Carriage of prohibited items may result in fines or in certain cases imprisonment. Please ensure there are no forbidden hazardous materials in your baggage like:

Some Lithium batteries (e.g. spares in checked baggage, batteries over a certain size), Explosives / Fireworks, Strike anywhere matches/ Lighter fluid, Compressed gases / Aerosols Oxygen bottles/ Liquid oxygen, Flammable liquids, Pesticides/ Poison, Corrosive material.

There are special exceptions for small quantities (up to 70 ounces total) of medicinal and toilet articles carried in your luggage, spare lithium batteries for most consumer electronic devices in carry-on baggage, and certain smoking materials carried on your person.

Certain items are required to be carried with you onboard the aircraft. For example, spare lithium batteries for portable electronic devices, cigarette lighters and e-cigarettes must be removed from checked or gate-checked baggage and carried onboard the aircraft. However, e-cigarettes may not be used on-board the aircraft.

Traveling with medical oxygen, liquid oxygen, mobility aids and other assistive devices may require airline pre-approval or be restricted from carriage entirely. Passengers requiring these items should contact the airline operator for information on use of such devices.

NOTICE OF INCORPORATED TERMS OF CONTRACT

Air Transportation, whether it is domestic or international (including domestic portions of international journeys), is subject to the individual terms of the transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage. Other carriers on which you may be ticketed may have different conditions of carriage. International air transportation, including the carrier's liability, may also be governed by applicable tariffs on file with the U.S. and other governments and by the Warsaw Convention, as amended, or by the Montreal Convention. Incorporated terms may include, but are not restricted to: 1. Rules and limits on liability for personal injury or death, 2. Rules and limits on liability for baggage, including fragile or perishable goods, and availability of excess valuation charges, 3. Claim restrictions, including time periods in which passengers must file a claim or bring an action against the air carrier, 4. Rights on the air carrier to change terms of the contract, 5. Rules on reconfirmation of reservations, check-in times and refusal to carry, 6. Rights of the air carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of alternate air carriers or aircraft and rerouting.

You can obtain additional information on items 1 through 6 above at any U.S. location where the transporting air carrier's tickets are sold. You have the right to inspect the full text of each transporting air carrier's terms at its airport and city ticket offices. You also have the right, upon request, to receive (free of charge) the full text of the applicable terms incorporated by reference from each of the transporting air carriers. Information on ordering the full text of each air carrier's terms is available at any U.S. location where the air carrier's tickets are sold or you can click on the Conditions of Carriage link below.

Air transportation on American Airlines and the American Eagle carriers® is subject to American's conditions of carriage.

For more on Canada passenger protection regulations visit aa.com/CanadaPassengers.

Please do not reply to this email address as it is not monitored. This email was sent to m.ammel3222@gmail.com.

NOTICE: This email and any information, files or attachments are for the exclusive and confidential use of the intended recipient. This message contains confidential and proprietary information of American Airlines (such as customer and business data) that may not be read, searched, distributed or otherwise used by anyone other than the intended recipient. If you are not an intended recipient, do not read, distribute, or take action in reliance upon this message. Do you think you received this email by mistake? If so, please forward this email to us with an explanation.

For all other questions about bookings or upcoming trips, visit our contact page. Contact American >

**one**world is a registered trademark of **one**world Alliance, LLC.

PLAINTIFF'S EXHIBIT
9
Sinema




02:41
KS
8h
Yesterday
I hope your day was ok 20:54
Thinking of you 20:54
I really miss you. 22:38
I am with you 22:59
Today
I keep waking up during my sleep and reaching over for your arms to hold me. 01:18
You deleted this message. 19m
New Messages
What did you write and delete 1m
I am here 1m
Message


KS
Thu, Jun 20 at 12:02 PM
Noah Kahan: We'll All Be Here Forever Tour
verified-ticket.com
Thu, Jul 18 at 1:32 PM
KS's location expired
KS started sharing location with you.
Mon, Jul 29 at 6:13 PM
KS's location expired
Tue, Aug 6 at 9:31 AM
1787 enter
Today 12:38 AM
I cannot sleep, I am miserable, and I want at least one of my pens back. You have them both. Pls give me one back now.
iMessage
8/19/24
7/22/24


08:00
LTE
K S
8h
K S
+1 602-904-9665
Member of R2R, Bottlerock, and 3 additional groups
Yesterday
I miss you 21:57
Putting my hand on your heart 21:58
I'll see you soon 21:58
Today
Are you having an affair with my husband
Now
Message

verizon✓

**Account:** 426448809-00001
**Invoice:** 8571687343
**Billing period:** Sep 18 - Oct 17, 2023

PLAINTIFF'S EXHIBIT 10 Sinema

## Talk activity

**Matthew Ammel**
**913-240-4005**
**iPhone 13 Pro**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Sep 18 | 12:43 PM | 913-240-3852 | Carthage, NC | Incoming, CL | 2 | -- | -- | -- |
| Sep 18 | 1:58 PM | 910-936-7005 | Southern P, NC | Incoming, CL | 4 | -- | -- | -- |
| Sep 19 | 2:16 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Sep 20 | 2:37 PM | 910-936-7005 | Carthage, NC | Incoming, CL | 1 | -- | -- | -- |
| Sep 21 | 11:09 AM | 910-318-2477 | Raleigh, NC | Laurinburg, NC | 5 | -- | -- | -- |
| Sep 21 | 5:45 PM | 602-501-7158 | San Franci, CA | Incoming, CL | 3 | -- | -- | -- |
| Sep 21 | 6:24 PM | 602-501-7158 | Palo Alto, CA | Incoming, CL | 3 | -- | -- | -- |
| Sep 21 | 8:07 PM | 808-218-2144 | Menlo Park, CA | Incoming, CL | 5 | -- | -- | -- |
| Sep 22 | 9:13 AM | 347-403-4145 | Menlo Park, CA | Nwyrcyzn06, NY | 4 | -- | -- | -- |
| Sep 22 | 11:08 AM | 910-318-2477 | San Mateo, CA | Laurinburg, NC | 1 | -- | -- | -- |
| Sep 22 | 1:06 PM | 910-318-2477 | Millbrae, CA | Laurinburg, NC | 1 | -- | -- | -- |
| Sep 22 | 7:51 PM | 703-342-8294 | Millbrae, CA | Wsngtnzn17, VA | 4 | -- | -- | -- |
| Sep 23 | 11:47 AM | 602-904-9665 | Healdsburg, CA | Incoming, CL | 1 | -- | -- | -- |
| Sep 24 | 7:28 PM | 602-904-9665 | Healdsburg, CA | Incoming, CL | 1 | -- | -- | -- |
| Sep 25 | 6:36 AM | 913-240-3852 | Healdsburg, CA | Leavenwth, KS | 3 | -- | -- | -- |
| Sep 25 | 12:06 PM | 916-578-2142 | Santa Rosa, CA | Sacramento, CA | 9 | -- | -- | -- |
| Sep 25 | 6:12 PM | 913-240-3852 | Twinbridge, CA | Incoming, CL | 4 | -- | -- | -- |
| Sep 26 | 8:49 AM | 913-240-3852 | Beatty, NV | Incoming, CL | 14 | -- | -- | -- |
| Sep 27 | 7:36 AM | 808-218-2144 | Phoenix, AZ | Incoming, CL | 22 | -- | -- | -- |
| Sep 27 | 3:54 PM | 913-240-3852 | Charlotte, NC | Leavenwth, KS | 3 | -- | -- | -- |
| Sep 28 | 11:58 AM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Sep 29 | 6:15 PM | 910-773-1067 | Cherokee, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 2 | 12:52 PM | 919-805-3663 | Whispering, NC | Raleigh, NC | 2 | -- | -- | -- |
| Oct 2 | 2:53 PM | 910-692-6393 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Oct 2 | 4:01 PM | 201-858-4400 | Whispering, NC | Bayonne, NJ | 4 | -- | -- | -- |
| Oct 2 | 5:57 PM | 808-218-2144 | Whispering, NC | Honolulu, HI | 3 | -- | -- | -- |
| Oct 2 | 7:50 PM | 602-501-7158 | Whispering, NC | Phoenix, AZ | 14 | -- | -- | -- |
| Oct 3 | 3:14 PM | 910-639-7104 | Carthage, NC | Incoming, CL | 2 | -- | -- | -- |
| Oct 3 | 6:48 PM | 808-218-2144 | Whispering, NC | Incoming, CL | 12 | -- | -- | -- |
| Oct 4 | 10:57 AM | 910-318-2477 | Whispering, NC | Laurinburg, NC | 1 | -- | -- | -- |
| Oct 4 | 12:55 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 4 | 1:27 PM | 910-690-8671 | Whispering, NC | Southepins, NC | 3 | -- | -- | -- |
| Oct 4 | 1:31 PM | 866-200-2354 | Whispering, NC | Toll-Free, CL | 2 | -- | -- | -- |
| Oct 4 | 5:34 PM | 910-279-8576 | Whispering, NC | Wilmington, NC | 1 | -- | -- | -- |
| Oct 4 | 5:34 PM | 910-279-8576 | Whispering, NC | Wilmington, NC | 1 | -- | -- | -- |
| Oct 4 | 6:24 PM | 910-279-8576 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 5 | 11:53 AM | 808-218-2144 | Chicago, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 5 | 3:56 PM | 808-218-2144 | Chicago, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 5 | 4:15 PM | 910-773-1067 | Chicago, IL | Carthage, NC | 2 | -- | -- | -- |
| Oct 6 | 10:39 AM | 808-218-2144 | Chicago, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 7 | 9:20 AM | 808-218-2144 | Chicago, IL | Incoming, CL | 6 | -- | -- | -- |
| Oct 7 | 11:35 AM | 615-594-8150 | Chicago, IL | Nashville, TN | 11 | -- | -- | -- |
| Oct 8 | 6:40 AM | 808-218-2144 | Chicago, IL | Incoming, CL | 1 | -- | -- | -- |

SINEMA_000936 10

verizon

Account: 426448809-00001
Invoice: 8585429600
Billing period: Oct 18 - Nov 17, 2023

## Talk activity (cont.)

### Matthew Ammel
913-240-4005
iPhone 13 Pro

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 27 | 1:02 PM | 919-353-9310 | Moab, UT | Incoming, CL | 1 | -- | -- | -- |
| Oct 27 | 4:16 PM | 602-904-9665 | Thompson, UT | Incoming, CL | 1 | -- | -- | -- |
| Oct 28 | 10:39 AM | 913-240-3852 | Moab, UT | Incoming, CL | 4 | -- | -- | -- |
| Oct 28 | 4:47 PM | 917-902-2450 | Thompson, UT | Incoming, CL | 1 | -- | -- | -- |
| Oct 28 | 5:32 PM | 917-902-2450 | Thompson, UT | New York, NY | 1 | -- | -- | -- |
| Oct 28 | 6:26 PM | 602-501-7158 | Moab, UT | Incoming, CL | 1 | -- | -- | -- |
| Oct 30 | 3:23 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 30 | 3:23 PM | 913-240-3852 | Whispering, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Oct 31 | 4:03 PM | 913-240-3852 | Carthage, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 31 | 6:41 PM | 910-818-0464 | Pinehurst, NC | Incoming, CL | 2 | -- | -- | -- |
| Nov 1 | 10:31 AM | 913-240-3852 | Vass, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Nov 1 | 3:37 PM | 913-240-3852 | Charlotte, NC | Incoming, CL | 7 | -- | -- | -- |
| Nov 1 | 4:00 PM | 910-773-1067 | Charlotte, NC | Incoming, CL | 1 | -- | -- | -- |
| Nov 2 | 5:48 AM | 913-240-3852 | Independen, MO | Incoming, CL | 2 | -- | -- | -- |
| Nov 2 | 7:43 AM | 913-240-3852 | Oak Grove, MO | Leavenwth, KS | 11 | -- | -- | -- |
| Nov 3 | 2:36 PM | 913-240-3852 | Blue Sprin, MO | Incoming, CL | 15 | -- | -- | -- |
| Nov 3 | 4:10 PM | 913-240-3852 | Kansas Cit, MO | Incoming, CL | 2 | -- | -- | -- |
| Nov 5 | 5:46 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Nov 6 | 4:43 PM | 913-240-3852 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Nov 7 | 11:56 AM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Nov 7 | 4:26 PM | 480-695-1362 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Nov 8 | 4:07 AM | 919-416-5886 | Whispering, NC | Durham, NC | 1 | -- | -- | -- |
| Nov 8 | 7:15 AM | 919-416-5886 | Whispering, NC | Durham, NC | 1 | -- | -- | -- |
| Nov 8 | 2:32 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Nov 8 | 3:56 PM | 602-501-7158 | Whispering, NC | Incoming, CL | 4 | -- | -- | -- |
| Nov 9 | 9:14 AM | 800-398-2847 | Whispering, NC | Toll-Free, CL | 6 | -- | -- | -- |
| Nov 9 | 10:41 AM | 866-200-2354 | Whispering, NC | Toll-Free, CL | 2 | -- | -- | -- |
| Nov 10 | 12:55 PM | 310-877-6034 | Los Angele, CA | VM Deposit, CL | 1 | -- | -- | -- |
| Nov 10 | 1:29 PM | 818-450-7887 | Inglewood, CA | Brbn Brbn, CA | 1 | -- | -- | -- |
| Nov 10 | 1:44 PM | 818-450-7887 | Inglewood, CA | Incoming, CL | 2 | -- | -- | -- |
| Nov 10 | 3:03 PM | 877-709-7716 | Los Angele, CA | Incoming, CL | 1 | -- | -- | -- |
| Nov 10 | 3:17 PM | 602-501-7158 | Los Angele, CA | Incoming, CL | 5 | -- | -- | -- |
| Nov 10 | 6:53 PM | 310-743-5734 | Inglewood, CA | Inglewood, CA | 1 | -- | -- | -- |
| Nov 10 | 6:55 PM | 602-501-7158 | Inglewood, CA | Phoenix, AZ | 1 | -- | -- | -- |
| Nov 10 | 6:59 PM | 602-501-7158 | Inglewood, CA | Incoming, CL | 1 | -- | -- | -- |
| Nov 11 | 1:42 PM | 913-364-7292 | Beverly Hl, CA | Leavenwth, KS | 13 | -- | -- | -- |
| Nov 11 | 2:16 PM | 910-215-9777 | West Holly, CA | Incoming, CL | 2 | -- | -- | -- |
| Nov 12 | 10:01 AM | 913-240-3852 | West Holly, CA | Incoming, CL | 8 | -- | -- | -- |
| Nov 13 | 12:34 PM | 866-281-3254 | Whispering, NC | Toll-Free, CL | 8 | -- | -- | -- |
| Nov 13 | 2:35 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Nov 14 | 11:55 AM | 913-240-3852 | Whispering, NC | Leavenwth, KS | 4 | -- | -- | -- |
| Nov 15 | 9:33 AM | 855-347-8371 | Whispering, NC | Toll-Free, CL | 2 | -- | -- | -- |
| Nov 15 | 9:49 AM | 855-347-8371 | Whispering, NC | Toll-Free, CL | 2 | -- | -- | -- |
| Nov 15 | 9:51 AM | 866-289-9673 | Whispering, NC | Toll-Free, CL | 84 | -- | -- | -- |
| Nov 15 | 11:44 AM | 602-501-7158 | Southern P, NC | Phoenix, AZ | 1 | -- | -- | -- |

verizon✓

Account: 426448809-00001
Invoice: 8640619705
Billing period: Feb 18 - Mar 17, 2024

# Talk activity (cont.)

## Matthew Ammel
913-240-4005
Apple iPhone 13 Pro

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Feb 27 | 11:20 AM | 877-304-7880 | Whispering, NC | Toll-Free, CL | 8 | -- | -- | -- |
| Feb 27 | 4:43 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Feb 28 | 7:09 AM | 910-690-8249 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Feb 28 | 7:50 AM | 903-624-1796 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Feb 28 | 8:14 AM | 903-624-1796 | Whispering, NC | Denison, TX | 21 | -- | -- | -- |
| Feb 28 | 9:38 AM | 910-235-5005 | Whispering, NC | Pinehurst, NC | 1 | -- | -- | -- |
| Feb 28 | 10:34 AM | 910-235-5005 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Feb 28 | 3:59 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Feb 29 | 11:00 AM | 800-272-1919 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 1 | 11:22 AM | 602-501-7158 | Phoenix, AZ | Incoming, CL | 2 | -- | -- | -- |
| Mar 1 | 11:26 AM | 602-501-7158 | Phoenix, AZ | Incoming, CL | 2 | -- | -- | -- |
| Mar 1 | 11:44 AM | 571-277-3703 | Phoenix, AZ | Wsngtnzn08, VA | 1 | -- | -- | -- |
| Mar 1 | 11:47 AM | 571-277-3703 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |
| Mar 1 | 3:00 PM | 910-773-1067 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |
| Mar 1 | 4:17 PM | 913-240-3852 | Phoenix, AZ | Leavenwth, KS | 6 | -- | -- | -- |
| Mar 2 | 2:41 PM | 602-904-9665 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |
| Mar 3 | 4:44 PM | 650-387-5565 | Palo Alto, CA | Palo Alto, CA | 1 | -- | -- | -- |
| Mar 3 | 6:06 PM | 650-387-5565 | Palo Alto, CA | Palo Alto, CA | 1 | -- | -- | -- |
| Mar 3 | 6:28 PM | 650-387-5565 | Menlo Park, CA | Incoming, CL | 3 | -- | -- | -- |
| Mar 3 | 6:37 PM | 650-387-5565 | Half Moon, CA | Incoming, CL | 1 | -- | -- | -- |
| Mar 3 | 8:10 PM | 650-387-5565 | San Franci, CA | Incoming, CL | 1 | -- | -- | -- |
| Mar 4 | 9:55 AM | 602-501-7158 | Palo Alto, CA | Incoming, CL | 2 | -- | -- | -- |
| Mar 4 | 11:51 AM | 480-695-1362 | Millbrae, CA | Incoming, CL | 1 | -- | -- | -- |
| Mar 4 | 11:55 AM | 650-387-5565 | San Franci, CA | Palo Alto, CA | 1 | -- | -- | -- |
| Mar 4 | 11:55 AM | 650-387-5565 | San Franci, CA | Incoming, CL | 2 | -- | -- | -- |
| Mar 4 | 12:19 PM | 650-387-5565 | San Franci, CA | Incoming, CL | 2 | -- | -- | -- |
| Mar 4 | 12:29 PM | 480-695-1362 | San Franci, CA | Incoming, CL | 1 | -- | -- | -- |
| Mar 5 | 8:54 AM | 336-695-6696 | Aberdeen, NC | Winstn Sal, NC | 1 | -- | -- | -- |
| Mar 5 | 10:01 AM | 864-392-9231 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 5 | 3:19 PM | 602-501-7158 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Mar 7 | 10:40 AM | 910-603-9885 | Whispering, NC | Southepins, NC | 1 | -- | -- | -- |
| Mar 7 | 11:28 AM | 910-603-9885 | Whispering, NC | Incoming, CL | 10 | -- | -- | -- |
| Mar 7 | 3:29 PM | 877-488-6121 | Whispering, NC | Toll-Free, CL | 4 | -- | -- | -- |
| Mar 8 | 9:12 AM | 910-988-4262 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 8 | 9:41 AM | 910-988-4262 | Whispering, NC | Fayettevl, NC | 22 | -- | -- | -- |
| Mar 8 | 10:03 AM | 910-728-9323 | Whispering, NC | Fayettevl, NC | 2 | -- | -- | -- |
| Mar 8 | 10:11 AM | 480-695-1362 | Whispering, NC | Phoenix, AZ | 1 | -- | -- | -- |
| Mar 8 | 10:32 AM | 480-695-1362 | Whispering, NC | Incoming, CL | 4 | -- | -- | -- |
| Mar 8 | 12:41 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 8 | 1:38 PM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 8 | 2:25 PM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 8 | 2:39 PM | 913-240-3852 | Whispering, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Mar 8 | 6:38 PM | 857-891-7725 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 8 | 10:05 PM | 913-240-8345 | Carthage, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Mar 8 | 10:13 PM | 913-240-8345 | Carthage, NC | Incoming, CL | 3 | -- | -- | -- |

verizon✓

Account: 426448809-00001
Invoice: 8654422039
Billing period: Mar 18 - Apr 17, 2024

## Talk activity (cont.)

**Matthew Ammel**
**913-240-4005**
**Apple iPhone 13 Pro**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Mar 27 | 8:48 AM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 27 | 12:41 PM | 913-240-3852 | Whispering, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Mar 27 | 5:02 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 3 | -- | -- | -- |
| Mar 28 | 9:46 AM | 910-725-0516 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 29 | 11:10 AM | 513-404-9456 | Avon, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 29 | 5:45 PM | 513-404-9456 | Kill Devil, NC | Cincinnati, OH | 1 | -- | -- | -- |
| Mar 30 | 6:20 PM | 910-500-7227 | Kill Devil, NC | Incoming, CL | 1 | -- | -- | -- |
| Mar 30 | 6:50 PM | 910-773-1067 | Kill Devil, NC | Incoming, CL | 3 | -- | -- | -- |
| Mar 30 | 7:40 PM | 602-501-7158 | Kill Devil, NC | Incoming, CL | 2 | -- | -- | -- |
| Mar 31 | 1:50 PM | 913-240-3852 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 1 | 2:21 PM | 910-890-1425 | Whispering, NC | Lillington, NC | 2 | -- | -- | -- |
| Apr 1 | 5:15 PM | 910-773-1067 | Whispering, NC | Incoming, CL | 3 | -- | -- | -- |
| Apr 2 | 10:58 AM | 301-802-2194 | Whispering, NC | Silver Spg, MD | 2 | -- | -- | -- |
| Apr 2 | 2:16 PM | 913-240-3852 | Aberdeen, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 2 | 4:12 PM | 707-484-1861 | Carthage, NC | Incoming, CL | 3 | -- | -- | -- |
| Apr 3 | 10:19 AM | 913-240-3852 | Whispering, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Apr 3 | 10:26 AM | 913-240-3852 | Whispering, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Apr 3 | 10:34 AM | 913-240-3852 | Whispering, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Apr 3 | 11:16 AM | 913-240-3852 | Cameron, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 3 | 12:35 PM | 913-240-3852 | Spring Lak, NC | Incoming, CL | 2 | -- | -- | -- |
| Apr 3 | 1:55 PM | 301-802-2194 | Southern P, NC | Incoming, CL | 6 | -- | -- | -- |
| Apr 3 | 3:25 PM | 910-890-1425 | Southern P, NC | Incoming, CL | 2 | -- | -- | -- |
| Apr 3 | 7:01 PM | 602-501-7158 | Aberdeen, NC | Incoming, CL | 6 | -- | -- | -- |
| Apr 4 | 9:29 AM | 913-240-3852 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 4 | 6:30 PM | 910-773-1067 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Apr 4 | 10:38 PM | 903-624-1796 | Southern P, NC | Denison, TX | 1 | -- | -- | -- |
| Apr 4 | 11:01 PM | 615-594-8150 | Southern P, NC | Nashville, TN | 1 | -- | -- | -- |
| Apr 5 | 9:17 AM | 336-880-4114 | Eaglesprin, NC | Incoming, CL | 2 | -- | -- | -- |
| Apr 5 | 10:27 AM | 903-624-1796 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 5 | 11:29 AM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 5 | 11:30 AM | 913-240-3852 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 5 | 11:31 AM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 5 | 11:31 AM | 913-240-3852 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 5 | 11:32 AM | 913-240-3852 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 5 | 11:33 AM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 5 | 11:34 AM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 5 | 11:34 AM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 5 | 11:39 AM | 913-240-3852 | Southern P, NC | Leavenwth, KS | 2 | -- | -- | -- |
| Apr 5 | 11:48 AM | 913-240-3852 | Whispering, NC | Incoming, CL | 3 | -- | -- | -- |
| Apr 5 | 5:00 PM | 910-773-1067 | Vass, NC | Incoming, CL | 2 | -- | -- | -- |
| Apr 5 | 8:10 PM | 910-922-4668 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 6 | 5:41 PM | 602-904-9665 | Washington, DC | Incoming, CL | 2 | -- | -- | -- |
| Apr 7 | 6:50 AM | 602-904-9665 | Arlington, VA | Phoenix, AZ | 1 | -- | -- | -- |
| Apr 7 | 6:51 AM | 602-904-9665 | Washington, DC | Incoming, CL | 1 | -- | -- | -- |
| Apr 7 | 6:53 AM | 602-904-9665 | Arlington, VA | Incoming, CL | 1 | -- | -- | -- |

verizon✓

Account: 426448809-00001
Invoice: 8654422039
Billing period: Mar 18 - Apr 17, 2024

# Talk activity (cont.)

## Matthew Ammel
913-240-4005
Apple iPhone 13 Pro

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Apr 7 | 7:19 AM | 602-904-9665 | Washington, DC | Incoming, CL | 2 | -- | -- | -- |
| Apr 7 | 8:04 AM | 913-240-3852 | Washington, DC | Leavenwth, KS | 1 | -- | -- | -- |
| Apr 7 | 9:29 AM | 906-231-2522 | Washington, DC | Houghton, MI | 1 | -- | -- | -- |
| Apr 7 | 9:31 AM | 571-277-3703 | Washington, DC | Wsngtnzn08, VA | 2 | -- | -- | -- |
| Apr 7 | 6:34 PM | 910-773-1067 | Washington, DC | Incoming, CL | 3 | -- | -- | -- |
| Apr 8 | 1:44 PM | 913-240-3852 | Crystal Ci, VA | Incoming, CL | 1 | -- | -- | -- |
| Apr 8 | 2:50 PM | 913-240-3852 | Coraopolis, PA | Leavenwth, KS | 12 | -- | -- | -- |
| Apr 8 | 3:14 PM | 913-240-3852 | Coraopolis, PA | Leavenwth, KS | 2 | -- | -- | -- |
| Apr 8 | 5:41 PM | 913-240-3852 | Pittsburgh, PA | Incoming, CL | 5 | -- | -- | -- |
| Apr 9 | 3:37 PM | 304-777-0800 | Pittsburgh, PA | VM Deposit, CL | 1 | -- | -- | -- |
| Apr 9 | 3:39 PM | 304-777-0800 | Pittsburgh, PA | Incoming, CL | 2 | -- | -- | -- |
| Apr 9 | 4:34 PM | 913-240-3852 | Bridgevil, PA | Leavenwth, KS | 10 | -- | -- | -- |
| Apr 10 | 1:44 PM | 602-501-7158 | Pittsburgh, PA | Incoming, CL | 3 | -- | -- | -- |
| Apr 11 | 8:12 AM | 910-773-1067 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Apr 11 | 10:12 AM | 913-270-9821 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 11 | 10:36 AM | 910-773-1067 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 11 | 5:37 PM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 12 | 10:01 AM | 913-320-3413 | Aberdeen, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 12 | 10:30 AM | 910-849-7077 | Fayettevil, NC | Fayettevl, NC | 1 | -- | -- | -- |
| Apr 12 | 12:57 PM | 910-246-2266 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 12 | 1:27 PM | 888-332-7411 | Whispering, NC | Toll-Free, CL | 17 | -- | -- | -- |
| Apr 12 | 5:00 PM | 910-773-1067 | Albemarle, NC | Incoming, CL | 3 | -- | -- | -- |
| Apr 13 | 7:53 AM | 913-240-3852 | Troy, NC | Incoming, CL | 2 | -- | -- | -- |
| Apr 13 | 4:57 PM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 13 | 4:58 PM | 913-240-3852 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 14 | 9:53 AM | 843-722-7229 | Whispering, NC | Charleston, SC | 4 | -- | -- | -- |
| Apr 14 | 10:05 AM | 910-692-9642 | Carthage, NC | Southepins, NC | 1 | -- | -- | -- |
| Apr 14 | 2:00 PM | 913-320-3216 | Asheboro, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 14 | 2:17 PM | 913-240-3852 | Asheboro, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Apr 14 | 2:17 PM | 913-240-3852 | Asheboro, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 14 | 4:58 PM | 910-773-1067 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Apr 14 | 8:22 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 15 | 12:09 PM | 913-240-3852 | Vass, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Apr 15 | 1:57 PM | 913-240-3852 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 15 | 2:16 PM | 910-948-3163 | Vass, NC | Robbins, NC | 1 | -- | -- | -- |
| Apr 15 | 2:36 PM | 520-770-4732 | Whispering, NC | Incoming, CL | 3 | -- | -- | -- |
| Apr 15 | 2:57 PM | 472-215-4592 | Cameron, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 15 | 7:09 PM | 602-501-7158 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Apr 15 | 7:39 PM | 602-501-7158 | Whispering, NC | Phoenix, AZ | 1 | -- | -- | -- |
| Apr 15 | 7:41 PM | 602-501-7158 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Apr 16 | 8:33 AM | 212-413-4200 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Apr 16 | 8:39 AM | 718-917-3810 | New York, NY | Queens, NY | 1 | -- | -- | -- |
| Apr 16 | 8:41 AM | 710-244-8125 | New York, NY | 710Service, TS | 1 | -- | -- | -- |
| Apr 16 | 8:41 AM | 718-917-3810 | New York, NY | Queens, NY | 3 | -- | -- | -- |
| Apr 16 | 8:44 AM | 718-244-8160 | New York, NY | Queens, NY | 8 | -- | -- | -- |

SINEMA_001011 12

verizon✓



## Talk activity (cont.)

### Matthew Ammel
**913-240-4005**
**Apple iPhone 13 Pro**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Jul 9 | 8:42 PM | 602-501-7158 | Whispering, NC | Phoenix, AZ | 1 | -- | -- | -- |
| Jul 9 | 8:43 PM | 903-624-1796 | Whispering, NC | VM Deposit, CL | 1 | -- | -- | -- |
| Jul 10 | 8:21 AM | 903-624-1796 | Dallas, TX | Incoming, CL | 3 | -- | -- | -- |
| Jul 10 | 9:58 AM | 913-240-3852 | Irvine, CA | Incoming, CL | 2 | -- | -- | -- |
| Jul 10 | 12:24 PM | 850-280-4078 | West Holly, CA | Incoming, CL | 4 | -- | -- | -- |
| Jul 10 | 10:37 PM | 310-497-3469 | Los Angele, CA | Beverlyhls, CA | 1 | -- | -- | -- |
| Jul 11 | 1:32 PM | 866-463-9914 | Washington, DC | Incoming, CL | 1 | -- | -- | -- |
| Jul 11 | 9:35 PM | 903-624-1796 | Arlington, VA | Denison, TX | 1 | -- | -- | -- |
| Jul 11 | 11:46 PM | 602-904-9665 | Washington, DC | Phoenix, AZ | 23 | -- | -- | -- |
| Jul 12 | 11:46 AM | 913-240-3852 | Washington, DC | Incoming, CL | 1 | -- | -- | -- |
| Jul 12 | 11:47 AM | 913-240-3852 | Washington, DC | Incoming, CL | 1 | -- | -- | -- |
| Jul 12 | 1:44 PM | 913-240-3852 | Arlington, VA | Incoming, CL | 1 | -- | -- | -- |
| Jul 12 | 1:48 PM | 913-240-3852 | Arlington, VA | Leavenwth, KS | 20 | -- | -- | -- |
| Jul 12 | 2:29 PM | 913-803-0991 | Crystal Ci, VA | Incoming, CL | 1 | -- | -- | -- |
| Jul 12 | 3:00 PM | 913-407-0572 | Arlington, VA | Incoming, CL | 1 | -- | -- | -- |
| Jul 12 | 3:13 PM | 913-240-3852 | Arlington, VA | Incoming, CL | 1 | -- | -- | -- |
| Jul 12 | 4:54 PM | 913-320-8051 | Raleigh, NC | Incoming, CL | 1 | -- | -- | -- |
| Jul 12 | 6:05 PM | 615-594-8150 | Sanford, NC | Nashville, TN | 2 | -- | -- | -- |
| Jul 13 | 10:56 AM | 910-849-7077 | Whispering, NC | Incoming, CL | 4 | -- | -- | -- |
| Jul 13 | 11:03 AM | 913-407-0051 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Jul 13 | 3:24 PM | 913-407-0739 | Fayettevil, NC | Incoming, CL | 1 | -- | -- | -- |
| Jul 14 | 12:25 PM | 913-398-4107 | Ocean Isle, NC | Incoming, CL | 1 | -- | -- | -- |
| Jul 15 | 10:39 AM | 850-280-4078 | Salt Lake, UT | Ftwaltnbch, FL | 3 | -- | -- | -- |
| Jul 15 | 10:44 AM | 913-240-3852 | Salt Lake, UT | Leavenwth, KS | 3 | -- | -- | -- |
| Jul 15 | 1:57 PM | 913-240-3852 | Magna, UT | Incoming, CL | 7 | -- | -- | -- |
| Jul 15 | 3:18 PM | 850-280-4078 | West Valle, UT | Incoming, CL | 2 | -- | -- | -- |
| Jul 15 | 4:35 PM | 602-618-7034 | Salt Lake, UT | Incoming, CL | 1 | -- | -- | -- |
| Jul 16 | 9:16 AM | 913-382-5148 | Park City, UT | Incoming, CL | 1 | -- | -- | -- |
| Jul 16 | 5:00 PM | 910-773-1067 | Park City, UT | Incoming, CL | 1 | -- | -- | -- |
| Jul 17 | 7:11 AM | 850-280-4078 | Park City, UT | Ftwaltnbch, FL | 1 | -- | -- | -- |
| Jul 17 | 7:15 AM | 913-240-3852 | Park City, UT | Leavenwth, KS | 3 | -- | -- | -- |
| Jul 17 | 11:47 AM | 913-407-0308 | Park City, UT | Incoming, CL | 1 | -- | -- | -- |
| Jul 17 | 6:56 PM | 850-280-4078 | Park City, UT | Incoming, CL | 1 | -- | -- | -- |

## Talk activity

### Matthew Ammel
**919-930-7565**
**Apple Watch SE (2nd Gen)**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Jun 29 | 12:02 PM | 913-240-3852 | McMinnvill, OR | Leavenwth, KS | 1 | -- | -- | -- |

verizon

**Account:** 426448809-00001
**Invoice:** 8709425263
**Billing period:** Jul 18 - Aug 17, 2024

## Talk activity (cont.)

### Matthew Ammel
**913-240-3852**
**Apple iPhone 13 Pro**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Aug 7 | 10:12 AM | 913-240-4005 | Pinehurst, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Aug 7 | 12:16 PM | 913-379-2324 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Aug 7 | 5:07 PM | 910-773-1067 | Southern P, NC | Incoming, CL | 2 | -- | -- | -- |
| Aug 7 | 6:16 PM | 913-240-4005 | Aberdeen, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Aug 7 | 8:03 PM | 910-773-1067 | Carthage, NC | Incoming, CL | 3 | -- | -- | -- |
| Aug 7 | 9:15 PM | 913-240-4005 | Whispering, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Aug 8 | 8:33 AM | 913-240-4005 | Whispering, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Aug 8 | 9:11 AM | 913-240-4005 | Whispering, NC | Incoming, CL | 12 | -- | -- | -- |
| Aug 8 | 4:31 PM | 910-246-2867 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Aug 8 | 5:07 PM | 910-773-1067 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Aug 9 | 10:01 AM | 252-646-5553 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Aug 9 | 5:08 PM | 913-240-9063 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Aug 11 | 6:37 PM | 910-773-1067 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Aug 12 | 4:38 PM | 913-240-4005 | Waynesvill, NC | Leavenwth, KS | 2 | -- | -- | -- |
| Aug 12 | 6:50 PM | 913-240-4005 | Crossville, TN | Leavenwth, KS | 1 | -- | -- | -- |
| Aug 12 | 7:28 PM | 913-240-4005 | Silver Poi, TN | Incoming, CL | 1 | -- | -- | -- |
| Aug 12 | 8:32 PM | 913-240-4005 | Nashville, TN | Leavenwth, KS | 7 | -- | -- | -- |
| Aug 14 | 12:46 PM | 913-240-4005 | Nashville, TN | Leavenwth, KS | 3 | -- | -- | -- |
| Aug 14 | 12:55 PM | 913-240-4005 | Nashville, TN | Leavenwth, KS | 1 | -- | -- | -- |
| Aug 14 | 1:18 PM | 913-240-4005 | Nashville, TN | Leavenwth, KS | 2 | -- | -- | -- |
| Aug 14 | 1:54 PM | 615-248-1990 | Nashville, TN | Incoming, CL | 1 | -- | -- | -- |
| Aug 14 | 2:01 PM | 615-248-1990 | Nashville, TN | Incoming, CL | 1 | -- | -- | -- |
| Aug 17 | 3:31 PM | 910-715-0990 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |

## Talk activity

### Matthew Ammel
**913-240-4005**
**Apple iPhone 13 Pro**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Jul 18 | 9:24 AM | 385-479-1447 | Park City, UT | Incoming, CL | 3 | -- | -- | -- |
| Jul 18 | 10:35 AM | 385-479-1447 | Salt Lake, UT | Salt Lake, UT | 1 | -- | -- | -- |
| Jul 18 | 10:41 AM | 385-479-1447 | Salt Lake, UT | Salt Lake, UT | 1 | -- | -- | -- |
| Jul 18 | 10:43 AM | 385-479-1447 | Salt Lake, UT | Incoming, CL | 1 | -- | -- | -- |
| Jul 18 | 10:59 AM | 913-398-4107 | Salt Lake, UT | Incoming, CL | 1 | -- | -- | -- |
| Jul 18 | 1:41 PM | 850-280-4078 | Phoenix, AZ | Incoming, CL | 3 | -- | -- | -- |
| Jul 18 | 3:28 PM | 623-201-1466 | Scottsdale, AZ | Incoming, CL | 5 | -- | -- | -- |
| Jul 18 | 4:03 PM | 913-240-3852 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Jul 20 | 8:14 AM | 602-904-9665 | Cave Creek, AZ | Incoming, CL | 2 | -- | -- | -- |
| Jul 20 | 10:55 AM | 913-240-3852 | Scottsdale, AZ | Incoming, CL | 15 | -- | -- | -- |
| Jul 20 | 11:58 AM | 850-280-4078 | Phoenix, AZ | Ftwaltnbch, FL | 1 | -- | -- | -- |
| Jul 20 | 12:40 PM | 602-904-9665 | Scottsdale, AZ | VM Deposit, CL | 1 | -- | -- | -- |
| Jul 20 | 2:21 PM | 910-818-0464 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Jul 20 | 2:29 PM | 913-240-3852 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Jul 20 | 2:47 PM | 877-817-9973 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |

verizon

Account: 426448809-00001
Invoice: 8723180435
Billing period: Aug 18 - Sep 17, 2024

## Talk activity (cont.)

**Matthew Ammel**
**913-240-4005**
**Apple iPhone 13 Pro**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Aug 26 | 12:12 PM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Aug 26 | 1:09 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Aug 26 | 5:32 PM | 910-773-1069 | Southern P, NC | Incoming, CL | 3 | -- | -- | -- |
| Aug 27 | 7:14 AM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Aug 27 | 7:15 AM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Aug 27 | 11:44 AM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Aug 27 | 3:02 PM | 910-279-8576 | Carthage, NC | Wilmington, NC | 1 | -- | -- | -- |
| Aug 27 | 3:07 PM | 910-279-8576 | Carthage, NC | Wilmington, NC | 1 | -- | -- | -- |
| Aug 27 | 5:00 PM | 910-773-1069 | Carthage, NC | Incoming, CL | 3 | -- | -- | -- |
| Aug 28 | 10:53 AM | 910-773-1069 | Aberdeen, NC | Incoming, CL | 3 | -- | -- | -- |
| Aug 28 | 11:38 AM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Aug 29 | 10:26 AM | 800-272-1919 | Morrisvill, NC | Incoming, CL | 3 | -- | -- | -- |
| Aug 30 | 3:13 PM | 913-240-3852 | Arlington, VA | Incoming, CL | 1 | -- | -- | -- |
| Aug 30 | 3:20 PM | 571-230-9034 | Arlington, VA | Incoming, CL | 1 | -- | -- | -- |
| Aug 30 | 3:45 PM | 202-200-4514 | Beltsville, MD | Incoming, CL | 1 | -- | -- | -- |
| Aug 30 | 3:50 PM | 202-200-4514 | Beltsville, MD | Incoming, CL | 1 | -- | -- | -- |
| Aug 30 | 7:00 PM | 970-930-7010 | Denver, CO | Incoming, CL | 1 | -- | -- | -- |
| Aug 31 | 2:45 PM | 480-734-7397 | Snowmass V, CO | Phoenix, AZ | 2 | -- | -- | -- |
| Aug 31 | 3:21 PM | 913-294-1157 | Snowmass V, CO | Incoming, CL | 1 | -- | -- | -- |
| Sep 1 | 3:36 PM | 480-734-7397 | Commerce C, CO | Phoenix, AZ | 2 | -- | -- | -- |
| Sep 1 | 3:42 PM | 480-734-7397 | Commerce C, CO | Incoming, CL | 1 | -- | -- | -- |
| Sep 2 | 8:40 AM | 913-294-1132 | Denver, CO | Incoming, CL | 1 | -- | -- | -- |
| Sep 2 | 3:51 PM | 720-865-2494 | Morrison, CO | Denver, CO | 5 | -- | -- | -- |
| Sep 2 | 4:18 PM | 480-734-7397 | Lakewood, CO | Phoenix, AZ | 1 | -- | -- | -- |
| Sep 2 | 4:28 PM | 480-734-7397 | Lakewood, CO | Incoming, CL | 2 | -- | -- | -- |
| Sep 2 | 5:20 PM | 910-279-8576 | Lakewood, CO | Wilmington, NC | 5 | -- | -- | -- |
| Sep 2 | 6:12 PM | 480-734-7397 | Morrison, CO | Incoming, CL | 1 | -- | -- | -- |
| Sep 2 | 6:19 PM | 480-734-7397 | Lakewood, CO | Incoming, CL | 2 | -- | -- | -- |
| Sep 2 | 6:22 PM | 480-734-7397 | Lakewood, CO | Incoming, CL | 2 | -- | -- | -- |
| Sep 2 | 10:31 PM | 480-734-7397 | Morrison, CO | Incoming, CL | 2 | -- | -- | -- |
| Sep 3 | 10:35 AM | 480-734-7397 | Denver, CO | Incoming, CL | 1 | -- | -- | -- |
| Sep 3 | 10:50 AM | 910-773-1069 | Denver, CO | Incoming, CL | 2 | -- | -- | -- |
| Sep 3 | 4:37 PM | 913-240-3852 | Scottsdale, AZ | Leavenwth, KS | 20 | -- | -- | -- |
| Sep 4 | 2:47 PM | 602-904-9665 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |
| Sep 5 | 9:01 AM | 913-240-3852 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Sep 5 | 10:10 AM | 913-240-3852 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Sep 5 | 1:47 PM | 913-240-3852 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |
| Sep 5 | 2:35 PM | 913-240-3852 | Phoenix, AZ | Leavenwth, KS | 11 | -- | -- | -- |
| Sep 5 | 5:50 PM | 913-240-3852 | Scottsdale, AZ | Leavenwth, KS | 3 | -- | -- | -- |
| Sep 6 | 5:24 AM | 602-256-3003 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Sep 6 | 7:39 AM | 913-294-0780 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Sep 6 | 8:24 AM | 800-272-1919 | Phoenix, AZ | Incoming, CL | 3 | -- | -- | -- |
| Sep 7 | 9:50 AM | 704-313-1278 | Sedona, AZ | Incoming, CL | 2 | -- | -- | -- |
| Sep 7 | 1:12 PM | 602-904-9665 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Sep 7 | 2:06 PM | 913-240-3852 | Phoenix, AZ | Incoming, CL | 6 | -- | -- | -- |
| Sep 7 | 2:17 PM | 913-240-3852 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |
| Sep 7 | 2:21 PM | 913-240-3852 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |

verizon

Account: 426448809-00001
Invoice: 8736987805
Billing period: Sep 18 - Oct 17, 2024

## Talk activity (cont.)

**Matthew Ammel**
**913-240-4005**
**Apple iPhone 13 Pro**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Sep 19 | 11:03 AM | 913-912-1049 | Washington, DC | Incoming, CL | 1 | -- | -- | -- |
| Sep 19 | 5:46 PM | 602-904-9665 | Arlington, VA | Incoming, CL | 1 | -- | -- | -- |
| Sep 19 | 6:07 PM | 602-381-0696 | Washington, DC | Incoming, CL | 2 | -- | -- | -- |
| Sep 20 | 8:49 AM | 929-454-3381 | Arlington, VA | Nwyrcyzn06, NY | 1 | -- | -- | -- |
| Sep 20 | 9:11 AM | 929-454-3381 | Arlington, VA | Nwyrcyzn06, NY | 1 | -- | -- | -- |
| Sep 20 | 10:00 AM | 602-803-1980 | Astoria, NY | Gilbert, AZ | 1 | -- | -- | -- |
| Sep 20 | 10:01 AM | 929-454-3381 | Flushing, NY | Nwyrcyzn06, NY | 1 | -- | -- | -- |
| Sep 20 | 10:03 AM | 347-578-5900 | Flushing, NY | Nwyrcyzn07, NY | 1 | -- | -- | -- |
| Sep 20 | 10:18 AM | 850-280-4078 | College PO, NY | Incoming, CL | 1 | -- | -- | -- |
| Sep 20 | 11:52 AM | 850-280-4078 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Sep 20 | 4:57 PM | 910-295-2011 | Moncure, NC | Incoming, CL | 1 | -- | -- | -- |
| Sep 20 | 5:28 PM | 913-730-3820 | Vass, NC | Incoming, CL | 1 | -- | -- | -- |
| Sep 20 | 6:10 PM | 910-773-1069 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Sep 20 | 8:23 PM | 913-240-3852 | Carthage, NC | Incoming, CL | 1 | -- | -- | -- |
| Sep 20 | 8:25 PM | 913-240-3852 | Carthage, NC | Incoming, CL | 1 | -- | -- | -- |
| Sep 21 | 12:41 PM | 602-381-0696 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Sep 21 | 4:14 PM | 913-240-3852 | Durham, NC | Incoming, CL | 1 | -- | -- | -- |
| Sep 21 | 9:19 PM | 646-341-1839 | Jamaica, NY | Nwyrcyzn01, NY | 2 | -- | -- | -- |
| Sep 21 | 9:24 PM | 646-341-1839 | Jamaica, NY | Incoming, CL | 1 | -- | -- | -- |
| Sep 24 | 11:59 AM | 913-240-3852 | Washington, DC | Incoming, CL | 1 | -- | -- | -- |
| Sep 25 | 12:35 PM | 910-949-2071 | Washington, DC | Whispepins, NC | 1 | -- | -- | -- |
| Sep 25 | 12:36 PM | 910-949-2071 | Washington, DC | Whispepins, NC | 2 | -- | -- | -- |
| Sep 25 | 12:47 PM | 602-381-0696 | Washington, DC | Incoming, CL | 2 | -- | -- | -- |
| Sep 25 | 5:51 PM | 602-618-7034 | Washington, DC | Incoming, CL | 1 | -- | -- | -- |
| Sep 25 | 6:55 PM | 913-294-0397 | Washington, DC | Incoming, CL | 1 | -- | -- | -- |
| Sep 26 | 10:59 AM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Sep 26 | 1:08 PM | 910-725-0516 | Vass, NC | Incoming, CL | 2 | -- | -- | -- |
| Sep 26 | 1:44 PM | 910-773-1069 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Sep 26 | 4:03 PM | 910-773-1069 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Sep 27 | 12:50 PM | 910-949-2071 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Sep 27 | 2:37 PM | 602-381-0696 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Sep 27 | 5:01 PM | 910-773-1069 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Sep 27 | 5:53 PM | 910-773-1069 | Vass, NC | Incoming, CL | 3 | -- | -- | -- |
| Sep 29 | 4:39 PM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 1 | 8:43 AM | 910-773-1069 | Scottsdale, AZ | Incoming, CL | 2 | -- | -- | -- |
| Oct 1 | 11:11 AM | 509-292-0410 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 1 | 12:13 PM | 602-803-1980 | Tempe, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 1 | 2:22 PM | 602-803-1980 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 1 | 5:42 PM | 602-904-9665 | Phoenix, AZ | Incoming, CL | 28 | -- | -- | -- |
| Oct 2 | 9:29 AM | 888-663-6331 | Phoenix, AZ | Toll-Free, CL | 9 | -- | -- | -- |
| Oct 2 | 10:45 AM | 202-543-8118 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 2 | 10:58 AM | 659-217-6942 | Scottsdale, AZ | Incoming, CL | 2 | -- | -- | -- |
| Oct 2 | 12:26 PM | 912-344-8116 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 2 | 3:51 PM | 850-280-4078 | Scottsdale, AZ | Ftwaltnbch, FL | 1 | -- | -- | -- |
| Oct 3 | 2:40 PM | 912-344-8116 | Charlotte, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 3 | 3:48 PM | 912-344-8116 | Morrisvill, NC | Savannah, GA | 8' | -- | -- | -- |
| Oct 4 | 6:33 AM | 913-240-3852 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |

SINEMA_001094 12

verizon

Account: 426448809-00001
Invoice: 8736987805
Billing period: Sep 18 - Oct 17, 2024

## Talk activity (cont.)

### Matthew Ammel
913-240-4005
Apple iPhone 13 Pro

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 4 | 12:11 PM | 202-251-1665 | Whispering, NC | Washington, DC | 4 | -- | -- | -- |
| Oct 4 | 12:32 PM | 850-280-4078 | Vass, NC | Ftwaltnbch, FL | 1 | -- | -- | -- |
| Oct 4 | 1:18 PM | 913-240-3852 | Whispering, NC | Leavenwth, KS | 3 | -- | -- | -- |
| Oct 4 | 4:03 PM | 910-279-8576 | Chicago /, IL | Wilmington, NC | 1 | -- | -- | -- |
| Oct 4 | 4:05 PM | 913-240-3852 | Chicago /, IL | Leavenwth, KS | 2 | -- | -- | -- |
| Oct 4 | 5:31 PM | 913-240-3852 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Oct 5 | 9:10 AM | 913-240-3852 | Pinehurst, NC | Incoming, CL | 2 | -- | -- | -- |
| Oct 5 | 12:48 PM | 910-949-2071 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 5 | 4:21 PM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 5 | 4:42 PM | 913-240-3852 | Whispering, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Oct 5 | 5:16 PM | 910-725-1092 | Whispering, NC | Southepins, NC | 1 | -- | -- | -- |
| Oct 7 | 11:06 AM | 910-600-0292 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 7 | 11:33 AM | 602-904-9665 | Scottsdale, AZ | Incoming, CL | 2 | -- | -- | -- |
| Oct 7 | 1:07 PM | 913-240-3852 | Scottsdale, AZ | Leavenwth, KS | 4 | -- | -- | -- |
| Oct 7 | 2:24 PM | 202-543-8118 | New River, AZ | Incoming, CL | 4 | -- | -- | -- |
| Oct 7 | 2:34 PM | 910-773-1069 | Black Cany, AZ | Incoming, CL | 2 | -- | -- | -- |
| Oct 8 | 3:06 AM | 602-904-9665 | Williams, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 8 | 4:18 PM | 913-232-9675 | Grand Cany, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 8 | 10:22 PM | 602-904-9665 | Williams, AZ | Phoenix, AZ | 2 | -- | -- | -- |
| Oct 9 | 5:39 PM | 480-660-8823 | Phoenix, AZ | Phoenix, AZ | 1 | -- | -- | -- |
| Oct 10 | 8:06 AM | 480-660-8823 | Scottsdale, AZ | Phoenix, AZ | 1 | -- | -- | -- |
| Oct 10 | 9:47 AM | 910-949-2071 | Scottsdale, AZ | Incoming, CL | 2 | -- | -- | -- |
| Oct 10 | 1:49 PM | 480-660-8823 | Scottsdale, AZ | Incoming, CL | 3 | -- | -- | -- |
| Oct 11 | 1:00 PM | 910-773-1069 | Phoenix, AZ | Incoming, CL | 2 | -- | -- | -- |
| Oct 13 | 6:15 PM | 913-240-3852 | Carthage, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 13 | 8:19 PM | 815-238-5026 | Carthage, NC | Incoming, CL | 2 | -- | -- | -- |
| Oct 14 | 9:36 AM | 910-693-1010 | Whispering, NC | Southepins, NC | 10 | -- | -- | -- |
| Oct 14 | 10:15 AM | 910-693-1010 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 14 | 2:25 PM | 480-301-8244 | Whispering, NC | Scottsdale, AZ | 2 | -- | -- | -- |
| Oct 14 | 2:26 PM | 480-301-8244 | Whispering, NC | Scottsdale, AZ | 6 | -- | -- | -- |
| Oct 15 | 8:32 AM | 815-238-5026 | Southern P, NC | Incoming, CL | 2 | -- | -- | -- |
| Oct 15 | 11:46 AM | 815-238-5026 | Pinehurst, NC | Freeport, IL | 1 | -- | -- | -- |
| Oct 15 | 3:04 PM | 910-295-6831 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 15 | 5:20 PM | 910-773-1069 | Southern P, NC | Incoming, CL | 2 | -- | -- | -- |
| Oct 16 | 8:32 AM | 813-278-7552 | Whispering, NC | Incoming, CL | 4 | -- | -- | -- |
| Oct 16 | 8:52 AM | 813-278-7552 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Oct 16 | 12:54 PM | 931-249-1511 | Whispering, NC | Incoming, CL | 7 | -- | -- | -- |
| Oct 16 | 1:25 PM | 888-483-3768 | Whispering, NC | Toll-Free, CL | 2 | -- | -- | -- |
| Oct 16 | 1:28 PM | 888-483-3768 | Whispering, NC | Toll-Free, CL | 2 | -- | -- | -- |
| Oct 16 | 1:57 PM | 888-483-3768 | Whispering, NC | Toll-Free, CL | 1 | -- | -- | -- |
| Oct 16 | 2:11 PM | 440-348-6121 | Whispering, NC | Incoming, CL | 6 | -- | -- | -- |
| Oct 17 | 8:47 AM | 931-249-1511 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 17 | 3:03 PM | 480-660-8823 | Carthage, NC | Incoming, CL | 4 | -- | -- | -- |
| Oct 17 | 4:50 PM | 602-753-1025 | Whispering, NC | Phoenix, AZ | 30 | -- | -- | -- |
| Oct 17 | 5:29 PM | 602-753-1025 | Whispering, NC | Phoenix, AZ | 3 | -- | -- | -- |
| Oct 17 | 5:31 PM | 602-753-1025 | Whispering, NC | Phoenix, AZ | 19 | -- | -- | -- |

verizon

Account: 426448809-00001
Invoice: 8750833129
Billing period: Oct 18 - Nov 17, 2024

## Talk activity (cont.)

### Matthew Ammel
913-240-4005
Apple iPhone 13 Pro

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 19 | 10:20 AM | 954-356-7900 | Fort Laude, FL | Incoming, CL | 1 | -- | -- | -- |
| Oct 19 | 5:17 PM | 913-240-3852 | Fort Laude, FL | Incoming, CL | 1 | -- | -- | -- |
| Oct 19 | 9:03 PM | 913-240-3852 | Fort Laude, FL | Incoming, CL | 1 | -- | -- | -- |
| Oct 20 | 11:25 AM | 954-465-2300 | Fort Laude, FL | Incoming, CL | 1 | -- | -- | -- |
| Oct 21 | 12:39 AM | 913-240-3852 | Fort Laude, FL | Incoming, CL | 1 | -- | -- | -- |
| Oct 21 | 8:39 AM | 913-240-3852 | Fort Laude, FL | Incoming, CL | 1 | -- | -- | -- |
| Oct 21 | 5:29 PM | 913-240-3852 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 22 | 10:35 AM | 620-254-4482 | Scottsdale, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 22 | 3:09 PM | 480-695-1362 | Las Vegas, NV | Phoenix, AZ | 2 | -- | -- | -- |
| Oct 22 | 4:39 PM | 602-618-7034 | Las Vegas, NV | Incoming, CL | 1 | -- | -- | -- |
| Oct 22 | 4:40 PM | 602-904-9665 | Las Vegas, NV | Incoming, CL | 1 | -- | -- | -- |
| Oct 22 | 4:41 PM | 602-904-9665 | Las Vegas, NV | Incoming, CL | 2 | -- | -- | -- |
| Oct 23 | 6:52 PM | 913-240-3852 | Southern P, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Oct 23 | 6:59 PM | 913-240-3852 | Southern P, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 8:04 AM | 910-947-1301 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 11:46 AM | 704-560-3354 | Pinehurst, NC | Incoming, CL | 18 | -- | -- | -- |
| Oct 24 | 12:25 PM | 480-660-8823 | Whispering, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 4:25 PM | 855-416-2267 | Carthage, NC | Incoming, CL | 1 | -- | -- | -- |
| Oct 27 | 7:43 AM | 602-904-9665 | Scottsdale, AZ | Incoming, CL | 2 | -- | -- | -- |
| Oct 27 | 8:53 AM | 602-618-7034 | Phoenix, AZ | Incoming, CL | 1 | -- | -- | -- |
| Oct 27 | 6:35 PM | 910-773-1069 | Philadelph, PA | Incoming, CL | 3 | -- | -- | -- |
| Oct 27 | 6:54 PM | 903-624-1796 | Philadelph, PA | Denison, TX | 10 | -- | -- | -- |
| Oct 28 | 4:42 PM | Unavailable | Qatar /, ZZ | Incoming, CL | 1 | -- | -- | -- |
| Nov 1 | 4:02 PM | 602-904-9665 | Southern P, NC | Incoming, CL | 48 | -- | -- | -- |
| Nov 1 | 4:50 PM | 602-904-9665 | Southern P, NC | Incoming, CL | 3 | -- | -- | -- |
| Nov 3 | 5:39 PM | 910-773-1069 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Nov 4 | 10:51 AM | 480-660-8823 | Whispering, NC | Incoming, CL | 2 | -- | -- | -- |
| Nov 4 | 11:06 AM | 910-644-7212 | Vass, NC | Fayettevl, NC | 1 | -- | -- | -- |
| Nov 5 | 10:00 AM | 910-773-1069 | New York, NY | Incoming, CL | 2 | -- | -- | -- |
| Nov 5 | 11:07 AM | 913-294-1141 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Nov 5 | 11:41 AM | 910-728-1309 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Nov 5 | 11:41 AM | 910-728-1309 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Nov 5 | 3:32 PM | 913-240-3462 | New York, NY | Incoming, CL | 1 | -- | -- | -- |

## Talk activity

### Matthew Ammel
919-930-7565
Apple Watch SE (2nd Gen) Prepa

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 20 | 11:42 AM | 913-240-3852 | Ft. Lauder, FL | Leavenwth, KS | 1 | -- | -- | -- |
| Oct 28 | 6:53 PM | 910-603-3543 | Whispering, NC | Southepins, NC | 1 | -- | -- | -- |
| Oct 28 | 7:15 PM | 913-240-3852 | Whispering, NC | Leavenwth, KS | 1 | -- | -- | -- |
| Oct 28 | 7:17 PM | 000-000-0086 | Whispering, NC | Voice Mail, CL | 1 | -- | -- | -- |
| Nov 9 | 9:31 PM | 910-585-5168 | Whispering, NC | Southepins, NC | 1 | -- | -- | -- |

PLAINTIFF'S EXHIBIT
11
Sinema

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO. 1:26-cv-00038

| | |
|---|---|
| **HEATHER AMMEL,**<br>**Plaintiff,**<br>**v.**<br>**KYRSTEN SINEMA,**<br>**Defendant.** | **PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES, FIRST REQUEST FOR PRODUCTION OF DOCUMENTS, AND FIRST REQUEST FOR ADMISSIONS** |

NOW COMES Plaintiff, Heather Ammel ("Plaintiff"), and pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure and the Court Order entered May 7, 2026 [Dkt. 20], hereby responds to Defendant's First Set of Interrogatories, First Request for Production of Documents, and First Request for Admissions as follows:

## GENERAL RESPONSES

Plaintiff reserves the right to rely on any facts, documents or other evidence which may develop or come to Plaintiff's attention after serving these responses. The responses set forth below are based upon information presently known to Plaintiff and are made without prejudice to Plaintiff's rights to assert additional objections or supplemental responses should Plaintiff discover additional information or grounds for objections. Plaintiff reserves her right to supplement or amend these responses at any time prior to trial subject to any discovery order entered in this case.

By responding to Defendant's First Set of Interrogatories, First Request for Production of Documents, and First Request for Admissions, Plaintiff neither waives nor intends to waive any

objection regarding the use of any such information, and expressly reserves all objections regarding the competency, privilege, relevance, materiality, probative value, and admissibility of any documents produced and contents thereof, the right to object on any and all proper grounds at any time to other discovery procedures involving or relating to the subject matter of any information provided by Plaintiff, the right to challenge the competency, privilege, relevance, materiality, and admissibility of or to object on any grounds to the use of these responses in any subject proceeding or trial of this or any other action, and all objections to vagueness and ambiguity.

The inadvertent providing of information that is properly protected from disclosure by the attorney-client, work-product doctrine, or any other privilege shall not be construed as a waiver of such privilege. Nothing herein shall be construed as an admission of Plaintiff with respect to the admissibility or relevance of any information and/or documents provided at any time responsive to Defendant's First Set of Interrogatories, First Request for Production of Documents, and First Request for Admissions.

## GENERAL OBJECTIONS

1. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents insofar as it requests information and/or documents regarding the use of the terms "all," "any," and/or "each," when used with respect to persons, facts, circumstances, or documents, as such terms are overly broad, unduly burdensome, vague, and/or ambiguous.

2. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents to the extent they are overly broad, unduly burdensome, vague and/or ambiguous.

3. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents to the extent they seek information and/or documents that are not relevant or reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents to the extent they seek information and/or documentation protected from disclosure by the attorney-client privilege, the work-product doctrine, the privilege of self-evaluation, or any other legally cognizable privilege.

5. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents to the extent they seek information and/or documents not in the possession, custody, or control of Plaintiff.

6. Plaintiff objects to each Request for Admission, Interrogatory, and Request for Production of Documents to the extent they seek information and/or documents relating to confidential information, statutorily protected information, trade secrets, confidential business records, reserve information, information regarding reinsurance, proprietary information, confidential underwriting information, or other protected information.

7. Plaintiff reserves the right to claim any disclosure of confidential or privileged information was unintentional and inadvertent, to seek retrieval of such information or documents as necessary, and to preclude Defendant's use of such information or documents in any matter.

8. Plaintiff reserves her rights to challenge the competency, relevance, materiality, and admissibility of the information or responses set forth below in any subsequent proceeding or the trial of this or any other action, and to object on any ground to the use of these responses in

any subsequent proceeding or the trial of this or any other action.

## INTERROGATORIES

1. Identify any and all dates when Matthew Joseph Ammel was physically present at your home in Moore County, for any part of the day or night, from November 1, 2023 to October 31, 2024.

ANSWER: **Plaintiff objects to Interrogatory # 1 on the grounds that it is overly broad and unduly burdensome. Subject to and without waiving said objections, Plaintiff responds upon information and belief and gives approximate dates as follows:**

- **November 12-30, 2023;**
- **December 3-13, 2023;**
- **December 17-26, 2023;**
- **December 29, 2023, through January 26, 2024;**
- **February 1-4, 2024;**
- **February 6-18, 2024;**
- **February 22-23, 2024;**
- **February 25, 2024, through March 1, 2024;**
- **March 6-14, 2024;**
- **March 15-17;**
- **March 20 through April 6, 2024;**
- **March 28-31, 2024 (family vacation to Outer Banks, North Carolina);**
- **April 11-16, 2024;**

- **April 19-29, 2024;**
- **April 19-21, 2024 (family vacation to Charleston, South Carolina);**
- **May 3, 2024;**
- **May 7-14, 2024;**
- **May 17-21, 2024;**
- **May 28 through June 11, 2024;**
- **June 12, 2024, through July 6, 2024 (we were traveling outside of North Carolina)**
- **July 6-10, 2024;**
- **July 12-14, 2024;**
- **July 23-25, 2024;**
- **July 25-28, 2024 (family vacation in Bryson City, North Carolina);**
- **July 28-29, 2024;**
- **July 31, 2024, through August 4, 2024;**
- **August 8-16, 2024;**
- **August 18-29, 2024;**
- **September 7-13, 2024;**
- **September 14-18, 2024;**
- **September 25-30, 2024;**
- **October 3-5, 2024 (possibly October 3-7);**
- **October 11-19, 2024;**
- **October 23-26, 2024;**
- **November 1-5, 2024; and**

- **November 8-9, 2024.**

2. Identify all journals, logs, diaries, calendars, notes, screenshots, photographs, video and/or audio recordings, and/or any other records revealing contacts or communications between Defendant and Matthew Joseph Ammel.

ANSWER: **Plaintiff objects to Interrogatory # 2 on the grounds that it is vague, overly broad, unduly burdensome, not limited in time, and to the extent it seeks information protected by the work product doctrine. Plaintiff further objects to this interrogatory as this information is equally available to Defendant. Subject to and without waiving said objections, *see* Plaintiff's documents attached. To the extent Plaintiff has possession of said documents, Plaintiff produces all screenshots and photographs of Defendant and Mr. Ammel's communications. Plaintiff asserts that Defendant and Mr. Ammel primarily communicated over Signal, an encrypted messaging app, which enables users to delete messages after a certain period, and the messages are no longer retrievable. To the extent Plaintiff is prohibited from retrieving said messages, Plaintiff produces all screenshots and photographs in her possession and responds as follows:**

- **In April 2022, Defendant's head of security hired Mr. Ammel to work as a security detail for Defendant.**
- **At that time, Defendant was serving as a United States Senator for the State of Arizona.**
- **In April 2022, Mr. Ammel began working for Defendant.**

- In the fall of 2023, Defendant's head of security resigned from her position. Prior to leaving, Defendant's head of security expressed to Mr. Ammel she had concerns Defendant was having sexual relations with other security members. She encouraged Mr. Ammel to leave with her, but Mr. Ammel decided to stay due to the financial security of the job.
- In addition to accompanying Defendant to various work events, Mr. Ammel accompanied Defendant on several trips and went with her alone to Napa Valley, California in the fall of 2023. Upon returning home from Napa Valley, Mr. Ammel appeared uncomfortable and informed me that if anyone had seen them together on the trip, it would have appeared as if they were on a romantic getaway.
- In or around August/September 2023, Mr. Ammel went on a security detail trip to Colorado where Defendant participated in a bike race. After the race, Defendant, Mr. Ammel, and other team members went to a waterfall in their swimsuits, drank champagne, and took photos. Mr. Ammel shared some of these photos with me. When he returned from the trip, he felt paranoid about the photos and deleted them, because he felt the photos were unprofessional and might tie him to a scandal if word got out that Defendant was allegedly sleeping with other security members.
- On our anniversary on October 23, 2023, Mr. Ammel came to me and said that for my anniversary gift, he wanted to take me to Las Vegas, Nevada in December 2023 to see U2 at the Sphere. It was technically a work trip that he was inviting me on, but he received permission from Defendant to do so. When he told me about the trip, he said it would be a great opportunity for me to meet Defendant and would help

establish boundaries, because he was feeling uncomfortable with Defendant's behavior towards him.

- In December 2023, while we were in Las Vegas, Nevada, I met Defendant's best friends, Penny Croissant and Stevanie Bahnerth. They told me Defendant "preferred" Mr. Ammel for her security and that because of his size, he was intimidating, like a refrigerator sitting at the table.
- In or around late December 2023, while Mr. Ammel and I were on vacation in Vermont with our children, I personally witnessed Defendant and Mr. Ammel exchange messages over Signal, the messaging app. The messages were outside the scope of a normal working relationship. Mr. Ammel sent Defendant a photo of the Vermont landscape at night, and Defendant replied, "Hauntingly beautiful."
- Beginning in January 2024, I noticed Defendant frequently messaging Mr. Ammel on Signal, the messaging app.
- In January 2024, and while Mr. Ammel was physically present in North Carolina, I witnessed Defendant send Mr. Ammel a message about helping him with his mental health, and Mr. Ammel agreed.
- In or around early spring 2024, I witnessed Defendant send Mr. Ammel the following messages while Mr. Ammel was physically present in North Carolina:
  - A picture of Defendant wrapped in a towel. Mr. Ammel was physically present in North Carolina and at our marital residence when Defendant sent a photo of herself wrapped in a towel. I was standing in our kitchen when I read the message. Defendant was wrapped in a white towel, and the picture showed her bare upper back with cupping bruises. Mr. Ammel responded to the

picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman who doesn't."

- Mr. Ammel messaged Defendant stating he was intimidated by Defendant while Mr. Ammel was physically present in North Carolina. Defendant responded to the message asking why because she only wants to be intimidating to her opponents, not to people she likes. Mr. Ammel received Defendant's message while he was at our marital residence. I read the message standing in our kitchen. Mr. Ammel replied that he has always been intimidated by powerful, confident women. I also saw a message from Mr. Ammel to Defendant on Signal where he complimented the way she looks in a dress. I remember this being a source of tension between us in April of 2024 when we took a family trip to Charleston, South Carolina, and I confronted Mr. Ammel about why would he compliment another woman's appearance?
- Defendant messaged Mr. Ammel suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience while Mr. Ammel was physically present in North Carolina. Mr. Ammel received Defendant's message while he was at our marital residence, packing and preparing to go on another trip with Defendant. Mr. Ammel responded by saying he was not sure that it would be a good idea to do MDMA with his attractive boss, that he was not sure what might happen. Defendant then said she was not going to do MDMA with him and that Mr. Ammel would take it while she sat with him. Mr. Ammel ended up not bringing the MDMA on the work trip.

      - Around this same time, and while Mr. Ammel was physically present in North Carolina and at our marital residence, Defendant sent a Signal message to Mr. Ammel telling him to watch the Netflix documentary "How to Change Your Mind," which has an episode about MDMA.
   - On 7 March 2024, Defendant messaged Mr. Ammel during the State of the Union address while Mr. Ammel was physically present in North Carolina and at our marital residence. While Defendant and Mr. Ammel were messaging during the State of the Union, Mr. Ammel and I were sitting on the couch in our living room. I personally witnessed the live message exchange. When Mr. Ammel asked why Defendant wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote.
   - I discovered Defendant and Mr. Ammel message about having sex missionary style with the lights on while Mr. Ammel was physically present in North Carolina. I read the message standing in my kitchen.
- In or around early spring 2024, I remember addressing the Singal messages with Mr. Ammel because I felt that it was crossing boundaries and inappropriate. When I confronted Mr. Ammel about it, he became defensive and went into our garage to sit in his sauna. I was complaining to him, and he told me to leave him alone in the sauna while he figured out what to say to Defendant to get out of the situation.
- In March 2024, Mr. Ammel accompanied Defendant on a work trip to Phoenix, Arizona, where he attended the Extra Innings Festival as security detail with Defendant and her friends. Mr. Ammel told me Defendant kept grabbing his hand

and touching him during the show, it made him uncomfortable, and he did not know how to get out of the situation without offending her.

- Shortly thereafter, Defendant and Mr. Ammel flew to San Francisco, California for Defendant's work trip. During this trip, Defendant invited Mr. Ammel to her hotel room, and they stayed together for hours. Mr. Ammel told me that when he arrived at her room, he allegedly told her that he was uncomfortable and loved his wife. He also said it seemed like Defendant was trying to normalize infidelity.
- In or around spring 2024, Defendant traveled to Europe. While Defendant was in Italy, she messaged Mr. Ammel, who at the time was physically present in North Carolina and at our marital residence, that she was on her way to see Depeche Mode. Defendant included a mushroom emoji in the message, suggesting to Mr. Ammel that she was going to use mushrooms while watching the concert. Mr. Ammel shared with me that he would sometimes provide Defendant with mushrooms when they attended concerts while he was working as her security detail. Mr. Ammel told me Defendant preferred him on her security detail for concerts because she could let her guard down and have fun. Mr. Ammel was willing to blur lines and use drugs with her or provide them to her.
- On April 8, 2024, Mr. Ammel was in Pennsylvania on a work trip with Staccato. During his free time, Mr. Ammel attended a baseball game by himself, but messaged Defendant during the game stating he was going to start a "fuck the troops" chant. Defendant responded stating she would "fuck the hot ones."
- On April 18, 2024, Mr. Ammel was in Maryland on a work trip with Staccato. At the time, Mr. Ammel was sharing his location with me, and I watched him as he drove

from Maryland into Washington, D.C. to go to Defendant's apartment. I called him to ask what he was doing. Mr. Ammel initially lied and said he was going back to his hotel room and that I would not hear from him for the rest of the night because he was exhausted and going to bed. I confronted him, saying I could see that his location was moving toward Defendant's apartment. Mr. Ammel finally relented and admitted that he was going to Defendant's apartment. Mr. Ammel did not care that I told him not to go. Mr. Ammel stayed at Defendant's apartment until after 11:00 p.m. When Mr. Ammel returned home to Moore County, North Carolina, I read the Signal messages between Defendant and Mr. Ammel the evening he went to her apartment. Mr. Ammel told Defendant he had been wandering around Annapolis, and Defendant proceeded to invite him over to her apartment.

- In May 2024, Defendant started purchasing gifts for Mr. Ammel and paid for him to receive psychedelic treatment. Defendant paid for Mr. Ammel's psychedelic treatment appointment in Nashville, Tennessee, and then flew him to Napa Valley, California, for him to provide Defendant's security at a concert. After the concert, Defendant, Defendant's friends, and Mr. Ammel stayed in a private Airbnb together.
- At the beginning of May 2024, Defendant purchased a theragun for Mr. Ammel. At some point, I saw a message where Mr. Ammel was going over to Defendant's apartment to visit her, and she suggested for him to bring the theragun so that she could "work on his back."
- Around May or June 2024, Mr. Ammel stopped wearing his wedding ring. Mr. Ammel stated it was best for "public optics" so it wouldn't look like Defendant was

putting her hands on a married man when they were out at concerts and various other public events.

- In June 2024, Defendant requested Mr. Ammel travel to New York City to be her security and guest for a wedding. From New York City, Defendant and Mr. Ammel flew to Defendant's house in Scottsdale, Arizona where they stayed together alone.
- That same month, Defendant offered Mr. Ammel a salary position and placed him on her senate staff as a Defense and National Security Fellow. Mr. Ammel then worked as Defendant's personal security guard as well as her senate staff member.
- Around that same time, I discovered more messages between Defendant and Mr. Ammel. Specifically, in or around June 22-23, 2024, while our family was vacationing in Kansas, Defendant messaged Mr. Ammel expressing that she keeps waking up during her sleep and reaching over for his arms to hold her. After I read this message, I confronted Mr. Ammel.
- In the following months, Mr. Ammel struggled to admit he was having an affair with Defendant but was vocal that he was leaving me and that we were divorcing.
- In July 2024, Mr. Ammel took our minor child, C.A., to Washington, D.C. for a work trip. Mr. Ammel and C.A. attended the Green Day concert with Defendant, and Defendant provided C.A. a tour of the United States Capitol.
- In or around 3 October 2024, soon after Mr. Ammel returned home to Moore County, North Carolina, after being away with Defendant on another work trip, Defendant messaged Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." I responded to the message stating, "are you having an affair with my husband? You took a married man away from his family."

- That same month, Mr. Ammel went as Defendant's guest to the Taylor Swift concert in Miami, Florida. Months prior to the concert, Mr. Ammel arranged for the Children and I to also attend. I attended to the concert out of concern for the Children. After the concert was over, the Children and I flew home to Moore County, North Carolina. Mr. Ammel stayed behind to travel with Defendant to Las Vegas, Nevada for work.
- After returning home from Las Vegas, Nevada, Mr. Ammel insisted he and I go together on an anniversary trip to Nashville, Tennessee. Mr. Ammel and I went on an anniversary trip October 25-26, 2024. We held hands on the plane, were physically intimate on the trip, including engaging in sexual intercourse, and were still very much emotionally connected. Mr. Ammel and I attended a concert together, and throughout the three-and-a-half-hour concert, Mr. Ammel held me and hugged me. I have attached pictures that we took together on the trip as well as our text exchange immediately after the trip. Mr. Ammel told me he loved me and missed me.
- After our anniversary trip concluded, I returned home to Moore County, North Carolina, and Mr. Ammel went on a work trip with Defendant to Saudi Arabia.
- Shortly after Mr. Ammel returned home to Moore County, North Carolina from Saudi Arabia, on 1 November 2024, Mr. Ammel informed me that he wished to separate, and he initiated the separation process. However, Defendant did not completely move out of the marital residence until the middle of November.
- Mr. Ammel traveled to Washington, DC to move furniture from Defendant's apartment into his new apartment in Moore County, North Carolina.

- **After Mr. Ammel and I separated, Mr. Ammel continued to frequent the martial residence and would physically touch me in a romantic way each time he stopped by. Mr. Ammel's brother's family stayed with me and the Children for Thanksgiving 2024, and Mr. Ammel came over for Thanksgiving Day. Additionally, we all traveled to Kansas together for Christmas 2024, and Mr. Ammel and I slept in the same bed on Christmas Eve. After spending Christmas in Kansas, we went skiing together as a family.**
- **After the ski trip in December 2024, Mr. Ammel and I officially parted ways.**
- **After the Separation, Defendant started making her presence physically known in North Carolina and would frequently travel to North Carolina to visit Mr. Ammel.**
- **On 18 August 2025, Defendant drove to our custody and equitable distribution mediation at Van Camp, Meacham & Newman, PLLC in Pinehurst, North Carolina. Defendant sat outside in the parking lot and waited for Mr. Ammel.**
- **On the weekend of 12 September 2025, Defendant and Mr. Ammel took our minor child, J.A., to a concert in Kentucky. On Sunday, 14 September, Defendant and Mr. Ammel drove J.A. back through the night to Moore County, North Carolina. Defendant and Mr. Ammel dropped J.A. off at school at 9:00 a.m. Monday morning.**
- **On 16 September 2025, Defendant accompanied Mr. Ammel to the marital residence to pick up the remainder of his belongings. Defendant sat outside in the cul-de-sac immediately adjacent to our marital residence.**
- **On 19 November 2025, Mr. Ammel's property manager filed a 50C Complaint for No-Contact Order against him. Mr. Ammel was involuntarily committed to the hospital, and on 20 November 2025, Mr. Ammel was arrested for assaulting the**

**physician assistant at the hospital. Defendant traveled to Moore County, North Carolina to bond Mr. Ammel out of jail and moved him out of his rental property to her house in Arizona.**

3. Identify all communications between you and Matthew Joseph Ammel related to the subject of your marriage ending or the plan of desire of either of you to physically separate, including but not limited to verbal communications, correspondence, emails, text (SMS) messages, voicemails, and encrypted messages.

ANSWER: **Plaintiff objects to Interrogatory # 3 on the grounds that it is vague, overly broad, unduly burdensome, not limited in time, and to the extent it seeks information protected by the work product doctrine. Subject to and without waiving said objections, *see* Plaintiff's documents attached.**

4. Identify all persons you made aware of contacts or communications between Defendant and Matthew Joseph Ammel prior to November 1, 2024 and what you informed them about such contacts or communications.

ANSWER: **Plaintiff objects to Interrogatory # 4 on the grounds that it is vague, overly broad, unduly burdensome, and to the extent it seeks information protected by the work product doctrine. Subject to and without waiving said objections, Plaintiff responds as follows:**

1. **Sharon Melanson, mother: Aware of the Signal messages on June 22-23, 2024, and October 3, 2024, between Defendant and Mr. Ammel. By sharing these screenshots with my mom, I was altering her to the fact that Mr. Ammel and Defendant were**

having an affair.

2. Karmen Harris, friend: Aware of the Signal messages on June 22-23, 2024, and October 3, 2024, between Defendant and Mr. Ammel. I first shared the June 2024 screenshot with Karmen in July 2024, because I was seeking advice and her opinion about whether she thought Mr. Ammel and Defendant were having an affair. I told Karmen about the October 2024 message from Defendant to Mr. Ammel that confirmed they were having an affair.
3. Chris Harris, friend: Aware of the Signal messages on June 22-23, 2024. I made Chris aware of this message in July 2024, because I was seeking advice and his opinion about whether he thought the Signal messages implied Mr. Ammel and Defendant were having an affair.
4. Mike DeVault, Mr. Ammel's former friend and business partner: I made Mike aware that I suspected that Mr. Ammel and Defendant were having an affair. I shared the screenshot of the June 22-23, 2024, Signal messages between Defendant and Mr. Ammel around July 2024.
5. Chad Brown, current therapist: In October 2024, I contacted Chad to schedule couple's therapy after discovering the October 3, 2024, Signal message from Defendant to Mr.Ammel. I informed Chad about the various other Signal messages as well.

6. Jessica Alcorn, friend: I informed Jessica about the June 22-23, 2024, signal messages in July 2024, because I was seeking her advice and opinion on whether she thought Mr. Ammel was having an affair with Defendant. I sent Jessica the October 3, 2024, Signal screenshot from Defendant to Mr. Ammel, expressing that I was struggling and I would speak to her in person about the situation.

7. Eli VonCannon, friend: In July 2024, I shared with Eli the June 22-23, 2024, Signal messages. I was crying on his couch and asking his opinion on whether he thought the messages implied if Mr. Ammel and Defendant were having an affair.

8. Jodi McCain, former therapist: In July 2024, I had my first therapy session after discovering the June 22-23, 2024, Signal messages. I informed her about the Signal messages during that therapy session, and I was crying on her couch the entire time. I was in denial about the affair, but she was certain that Mr. Ammel and Defendant were having an affair.

9. Elise Williams, friend: During a birthday dinner for Jessica Alcorn in July 2024, I had a breakdown about Mr. Ammel and Defendant. During this breakdown, I told Elise about the June 22-23, 2024 Signal messages.

10. Laura Ammel, former sister-in-law: In October 2024, I made Laura aware that Mr. Ammel and Defendant were having an

**affair while her husband, Josh Ammel, was on a trip to Arizona with Mr. Ammel and Defendant.**

5. Identify and describe all evidence, including but not limited to documents (including ESI) you contend exists that supports your contention that the romantic relationship between Defendant and Matthew Joseph Ammel began prior to May 2024.

ANSWER: **Plaintiff objects to Interrogatory # 5 on the grounds that it is vague, overly broad, unduly burdensome, and to the extent it seeks information protected by the work product doctrine. Subject to and without waiving said objections, *see* Plaintiff's documents attached and Plaintiff responds as follows:**

- **In April 2022, Defendant's head of security hired Mr. Ammel to work as a security detail for Defendant.**
- **At that time, Defendant was serving as a United States Senator for the State of Arizona.**
- **In April 2022, Mr. Ammel began working for Defendant.**
- **In the fall of 2023, Defendant's head of security resigned from her position. Prior to leaving, Defendant's head of security expressed to Mr. Ammel she had concerns Defendant was having sexual relations with other security members. She encouraged Mr. Ammel to leave with her, but Mr. Ammel decided to stay due to the financial security of the job.**
- **In addition to accompanying Defendant to various work events, Mr. Ammel accompanied Defendant on several trips and went with her alone to Napa Valley, California in the fall of 2023. Upon returning home from Napa Valley, Mr. Ammel**

appeared uncomfortable and informed me that if anyone had seen them together on the trip, it would have appeared as if they were on a romantic getaway.

- In or around August/September 2023, Mr. Ammel went on a security detail trip to Colorado where Defendant participated in a bike race. After the race, Defendant, Mr. Ammel, and other team members went to a waterfall in their swimsuits, drank champagne, and took photos. Mr. Ammel shared some of these photos with me. When he returned from the trip, he felt paranoid about the photos and deleted them, because he felt the photos were unprofessional and might tie him to a scandal if word got out that Defendant was allegedly sleeping with other security members.
- On our anniversary on October 23, 2023, Mr. Ammel came to me and said that for my anniversary gift, he wanted to take me to Las Vegas, Nevada in December 2023 to see U2 at the Sphere. It was technically a work trip that he was inviting me on, but he received permission from Defendant to do so. When he told me about the trip, he said it would be a great opportunity for me to meet Defendant and would help establish boundaries, because he was feeling uncomfortable with Defendant's behavior towards him.
- In December 2023, while we were in Las Vegas, Nevada, I met Defendant's best friends, Penny Croissant and Stevanie Bahnerth. They told me Defendant "preferred" Mr. Ammel for her security and that because of his size, he was intimidating, like a refrigerator sitting at the table.
- In or around late December 2023, while Mr. Ammel and I were on vacation in Vermont with our children, I personally witnessed Defendant and Mr. Ammel exchange messages over Signal, the messaging app. The messages were outside the

scope of a normal working relationship. Mr. Ammel sent Defendant a photo of the Vermont landscape at night, and Defendant replied, "Hauntingly beautiful."

- Beginning in January 2024, I noticed Defendant frequently messaging Mr. Ammel on Signal, the messaging app.
- In January 2024, and while Mr. Ammel was physically present in North Carolina, I witnessed Defendant send Mr. Ammel a message about helping him with his mental health, and Mr. Ammel agreed.
- In or around early spring 2024, I witnessed Defendant send Mr. Ammel the following messages while Mr. Ammel was physically present in North Carolina:
    - A picture of Defendant wrapped in a towel. Mr. Ammel was physically present in North Carolina and at our marital residence when Defendant sent a photo of herself wrapped in a towel. I was standing in our kitchen when I read the message. Defendant was wrapped in a white towel, and the picture showed her bare upper back with cupping bruises. Mr. Ammel responded to the picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman who doesn't."
    - Mr. Ammel messaged Defendant stating he was intimidated by Defendant while Mr. Ammel was physically present in North Carolina. Defendant responded to the message asking why because she only wants to be intimidating to her opponents, not to people she likes. Mr. Ammel received Defendant's message while he was at our marital residence. I read the message standing in our kitchen. Mr. Ammel replied that he has always been intimidated by powerful, confident women. I also saw a message from Mr.

Ammel to Defendant on Signal where he complimented the way she looks in a dress. I remember this being a source of tension between us in April of 2024 when we took a family trip to Charleston, South Carolina, and I confronted Mr. Ammel about why would he compliment another woman's appearance?

- Defendant messaged Mr. Ammel suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience while Mr. Ammel was physically present in North Carolina. Mr. Ammel received Defendant's message while he was at our marital residence, packing and preparing to go on another trip with Defendant. Mr. Ammel responded by saying he was not sure that it would be a good idea to do MDMA with his attractive boss, that he was not sure what might happen. Defendant then said she was not going to do MDMA with him and that Mr. Ammel would take it while she sat with him. Mr. Ammel ended up not bringing the MDMA on the work trip.
  - Around this same time, and while Mr. Ammel was physically present in North Carolina and at our marital residence, Defendant sent a Signal message to Mr. Ammel telling him to watch the Netflix documentary "How to Change Your Mind," which has an episode about MDMA.
- On 7 March 2024, Defendant messaged Mr. Ammel during the State of the Union address while Mr. Ammel was physically present in North Carolina and at our marital residence. While Defendant and Mr. Ammel were messaging during the State of the Union, Mr. Ammel and I were sitting on the couch in our living room. I personally witnessed the live message exchange. When Mr.

Ammel asked why Defendant wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote.

  - I discovered Defendant and Mr. Ammel message about having sex missionary style with the lights on while Mr. Ammel was physically present in North Carolina. I read the message standing in my kitchen.

- In or around early spring 2024, I remember addressing the Singal messages with Mr. Ammel because I felt that it was crossing boundaries and inappropriate. When I confronted Mr. Ammel about it, he became defensive and went into our garage to sit in his sauna. I was complaining to him, and he told me to leave him alone in the sauna while he figured out what to say to Defendant to get out of the situation.
- In March 2024, Mr. Ammel accompanied Defendant on a work trip to Phoenix, Arizona, where he attended the Extra Innings Festival as security detail with Defendant and her friends. Mr. Ammel told me Defendant kept grabbing his hand and touching him during the show, it made him uncomfortable, and he did not know how to get out of the situation without offending her.
- Shortly thereafter, Defendant and Mr. Ammel flew to San Francisco, California for Defendant's work trip. During this trip, Defendant invited Mr. Ammel to her hotel room, and they stayed together for hours. Mr. Ammel told me that when he arrived at her room, he allegedly told her that he was uncomfortable and loved his wife. He also said it seemed like Defendant was trying to normalize infidelity.
- In or around spring 2024, Defendant traveled to Europe. While Defendant was in Italy, she messaged Mr. Ammel, who at the time was physically present in North

Carolina and at our marital residence, that she was on her way to see Depeche Mode. Defendant included a mushroom emoji in the message, suggesting to Mr. Ammel that she was going to use mushrooms while watching the concert. Mr. Ammel shared with me that he would sometimes provide Defendant with mushrooms when they attended concerts while he was working as her security detail. Mr. Ammel told me Defendant preferred him on her security detail for concerts because she could let her guard down and have fun. Mr. Ammel was willing to blur lines and use drugs with her or provide them to her.

- On April 8, 2024, Mr. Ammel was in Pennsylvania on a work trip with Staccato. During his free time, Mr. Ammel attended a baseball game by himself, but messaged Defendant during the game stating he was going to start a "fuck the troops" chant. Defendant responded stating she would "fuck the hot ones."
- On April 18, 2024, Mr. Ammel was in Maryland on a work trip with Staccato. At the time, Mr. Ammel was sharing his location with me, and I watched him as he drove from Maryland into Washington, D.C. to go to Defendant's apartment. I called him to ask what he was doing. Mr. Ammel initially lied and said he was going back to his hotel room and that I would not hear from him for the rest of the night because he was exhausted and going to bed. I confronted him, saying I could see that his location was moving toward Defendant's apartment. Mr. Ammel finally relented and admitted that he was going to Defendant's apartment. Mr. Ammel did not care that I told him not to go. Mr. Ammel stayed at Defendant's apartment until after 11:00 p.m. When Mr. Ammel returned home to Moore County, North Carolina, I read the Signal messages between Defendant and Mr. Ammel the evening he went to her

apartment. Mr. Ammel told Defendant he had been wandering around Annapolis, and Defendant proceeded to invite him over to her apartment.

- In May 2024, Defendant started purchasing gifts for Mr. Ammel and paid for him to receive psychedelic treatment. Defendant paid for Mr. Ammel's psychedelic treatment appointment in Nashville, Tennessee, and then flew him to Napa Valley, California, for him to provide Defendant's security at a concert. After the concert, Defendant, Defendant's friends, and Mr. Ammel stayed in a private Airbnb together.
- At the beginning of May 2024, Defendant purchased a theragun for Mr. Ammel. At some point, I saw a message where Mr. Ammel was going over to Defendant's apartment to visit her, and she suggested for him to bring the theragun so that she could "work on his back."
- Around May or June 2024, Mr. Ammel stopped wearing his wedding ring. Mr. Ammel stated it was best for "public optics" so it wouldn't look like Defendant was putting her hands on a married man when they were out at concerts and various other public events.
- In June 2024, Defendant requested Mr. Ammel travel to New York City to be her security and guest for a wedding. From New York City, Defendant and Mr. Ammel flew to Defendant's house in Scottsdale, Arizona where they stayed together alone.
- That same month, Defendant offered Mr. Ammel a salary position and placed him on her senate staff as a Defense and National Security Fellow. Mr. Ammel then worked as Defendant's personal security guard as well as her senate staff member.
- Around that same time, I discovered more messages between Defendant and Mr. Ammel. Specifically, in or around June 22-23, 2024, while our family was vacationing

in Kansas, Defendant messaged Mr. Ammel expressing that she keeps waking up during her sleep and reaching over for his arms to hold her. After I read this message, I confronted Mr. Ammel.

- In the following months, Mr. Ammel struggled to admit he was having an affair with Defendant but was vocal that he was leaving me and that we were divorcing.
- In July 2024, Mr. Ammel took our minor child, C.A., to Washington, D.C. for a work trip. Mr. Ammel and C.A. attended the Green Day concert with Defendant, and Defendant provided C.A. a tour of the United States Capitol.
- In or around 3 October 2024, soon after Mr. Ammel returned home to Moore County, North Carolina, after being away with Defendant on another work trip, Defendant messaged Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." I responded to the message stating, "are you having an affair with my husband? You took a married man away from his family."
- That same month, Mr. Ammel went as Defendant's guest to the Taylor Swift concert in Miami, Florida. Months prior to the concert, Mr. Ammel arranged for the Children and I to also attend. I attended to the concert out of concern for the Children. After the concert was over, the Children and I flew home to Moore County, North Carolina. Mr. Ammel stayed behind to travel with Defendant to Las Vegas, Nevada for work.
- After returning home from Las Vegas, Nevada, Mr. Ammel insisted he and I go together on an anniversary trip to Nashville, Tennessee. Mr. Ammel and I went on an anniversary trip October 25-26, 2024. We held hands on the plane, were physically intimate on the trip, including engaging in sexual intercourse, and were still very

much emotionally connected. Mr. Ammel and I attended a concert together, and throughout the three-and-a-half-hour concert, Mr. Ammel held me and hugged me. I have attached pictures that we took together on the trip as well as our text exchange immediately after the trip. Mr. Ammel told me he loved me and missed me.

- After our anniversary trip concluded, I returned home to Moore County, North Carolina, and Mr. Ammel went on a work trip with Defendant to Saudi Arabia.
- Shortly after Mr. Ammel returned home to Moore County, North Carolina from Saudi Arabia, on 1 November 2024, Mr. Ammel informed me that he wished to separate, and he initiated the separation process. However, Defendant did not completely move out of the marital residence until the middle of November.
- Mr. Ammel traveled to Washington, DC to move furniture from Defendant's apartment into his new apartment in Moore County, North Carolina.
- After Mr. Ammel and I separated, Mr. Ammel continued to frequent the martial residence and would physically touch me in a romantic way each time he stopped by. Mr. Ammel's brother's family stayed with me and the Children for Thanksgiving 2024, and Mr. Ammel came over for Thanksgiving Day. Additionally, we all traveled to Kansas together for Christmas 2024, and Mr. Ammel and I slept in the same bed on Christmas Eve. After spending Christmas in Kansas, we went skiing together as a family.
- After the ski trip in December 2024, Mr. Ammel and I officially parted ways.
- After the Separation, Defendant started making her presence physically known in North Carolina and would frequently travel to North Carolina to visit Mr. Ammel.

- **On 18 August 2025, Defendant drove to our custody and equitable distribution mediation at Van Camp, Meacham & Newman, PLLC in Pinehurst, North Carolina. Defendant sat outside in the parking lot and waited for Mr. Ammel.**
- **On the weekend of 12 September 2025, Defendant and Mr. Ammel took our minor child, J.A., to a concert in Kentucky. On Sunday, 14 September, Defendant and Mr. Ammel drove J.A. back through the night to Moore County, North Carolina. Defendant and Mr. Ammel dropped J.A. off at school at 9:00 a.m. Monday morning.**
- **On 16 September 2025, Defendant accompanied Mr. Ammel to the marital residence to pick up the remainder of his belongings. Defendant sat outside in the cul-de-sac immediately adjacent to our marital residence.**
- **On 19 November 2025, Mr. Ammel's property manager filed a 50C Complaint for No-Contact Order against him. Mr. Ammel was involuntarily committed to the hospital, and on 20 November 2025, Mr. Ammel was arrested for assaulting the physician assistant at the hospital. Defendant traveled to Moore County, North Carolina to bond Mr. Ammel out of jail and moved him out of his rental property to her house in Arizona.**

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. All documents (including ESI) identified in response to the foregoing interrogatories.

**RESPONSE: Plaintiff objects to Request # 1 on the grounds that it is vague, overly broad, unduly burdensome, and to the extent it seeks information protected by the work product doctrine. Subject to and without waiving said objections, to the extent Plaintiff has possession of the**

**requested documents they are attached.**

2. All documents (including ESI) in your possession, custody, or control—including those contained on the laptop formerly belonging to Matthew Joseph Ammel—evidencing written communications (via SMS/text, email, or any other means) between Defendant and Mr. Ammel or between Mr. Ammel and third parties regarding Defendant and/or his impending separation from you.

RESPONSE: **Plaintiff objects to Request # 2 on the grounds that it is vague, overly broad, unduly burdensome, not limited in time, and to the extent it seeks information protected by the work product doctrine. Plaintiff further objects to this request as this information is equally available to Defendant. Subject to and without waiving said objections, to the extent Plaintiff has possession of the requested documents they are attached.**

3. All notes and records of your therapy sessions with Chad Brown, LMFT, LCAS that refer to: (1) your marriage to Matthew Joseph Ammel; (2) the possibility of separation between you and Matthew Joseph Ammel; and/or (3) Defendant.

RESPONSE: **Plaintiff objects to Request # 3 on the grounds that it is vague, overly broad, unduly burdensome, contains confidential information, and is not likely to lead to the discovery of admissible evidence. Plaintiff further objects on the grounds that the documents requested are protected by the psychotherapist-patient privilege and the work-product doctrine. Subject to and without waiving said objections, to the extent Plaintiff has possession of the requested documents they**

**are attached.**

4. All photos/screenshots in native format (with metadata intact revealing, at a minimum, the date and time such photo/screenshot was taken) evidencing any communications you claimed to have witnessed between Defendant and Matthew Joseph Ammel, including but not limited to the photo/screenshot attached as Exhibit A to your April 17, 2026 declaration in this matter.

RESPONSE: **Plaintiff objects to Request # 4 on the grounds that it is vague, overly broad, and unduly burdensome, not limited in time, and to the extent it seeks information protected by the work product doctrine. Plaintiff further objects to this request as this information is equally available to Defendant. Subject to and without waiving said objections, to the extent Plaintiff has possession of the requested documents they are attached.**

5. All communications between you and Matthew Joseph Ammel related to the subject of your marriage ending or the plan of desire of either of you to physically separate, including but not limited to correspondence, emails, text (SMS) messages, audio or video recordings, voicemails, and encrypted messages.

RESPONSE: **Plaintiff objects to Request # 5 on the grounds that it is vague, overly broad, unduly burdensome, not limited in time, and to the extent it seeks information protected by the work product doctrine. Subject to and without waiving said objections, to the extent Plaintiff has possession of the requested documents they are attached.**

## REQUESTS FOR ADMISSIONS

Plaintiff is requested to admit the following:

1. You possess no physical evidence establishing that Defendant's messages as revealed in Exhibit A to your April 17, 2026 declaration in this matter were sent to Matthew Joseph Ammel's cellphone on or about October 3, 2024.

Admit ☐ Deny ☒

**RESPONSE: Plaintiff has produced a photograph of the October 3, 2024, Signal message where Defendant messaged Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." Plaintiff responded to the message stating, "are you having an affair with my husband? You took a married man away from his family." The date on the photograph shows Plaintiff took the photo and responded to the Signal message on October 4th, 2024, at 8:00am, and Defendant sent the message the night before.**

2. You possess no physical evidence of any communications of a romantic nature between Defendant and Matthew Joseph Ammel prior to October 2024 that occurred while he was physically present in the State of North Carolina.

Admit ☒ Deny ☐

**RESPONSE: While Plaintiff does not possess any physical evidence of messages Defendant sent to Mr. Ammel while he was physically present in North Carolina prior to October 3rd, 2024, Plaintiff personally witnessed all the messages described herein and set forth in her verified complaint and declaration.**

3. You possess no physical evidence revealing that Defendant was aware of the physical location of Matthew Joseph Ammel at the time of any of the communications between them that you describe in your April 17, 2026 declaration in this matter.

Admit ☒ Deny ☐

**RESPONSE: Plaintiff objects to this Request as it requires Plaintiff to speculate as to Defendant's knowledge. However, Plaintiff asserts that based on the information described herein and set forth in her verified complaint and declaration, Defendant knew or should have known where Mr. Ammel was located at the time Defendant sent Mr. Ammel the messages described herein and set forth in Plaintiff's verified complaint and declaration.**

4. On or about October 17, 2024, you and Matthew Joseph Ammel attended a therapy session with your therapist, Mr. Chad Brown, during which the topic of your impending separation was discussed.

Admit ☐ Deny ☒

**RESPONSE: Plaintiff objects to this Request as it seeks confidential information and is not likely to lead to the discovery of admissible evidence. Plaintiff further objects on the grounds that the information requested is protected by the psychotherapist-patient privilege. Subject to and without waiving said objections, Plaintiff and Mr. Ammel attended a joint therapy session with Mr. Brown on October 24th, 2024, and the topic of separation was discussed.**

5. You were aware that Matthew Joseph Ammel had toured an apartment into which he planned to move prior to the trip you and Mr. Ammel took to Nashville, Tennessee on or about October 25, 2024.

Admit ☒ Deny ☐

**RESPONSE: Plaintiff objects to this Request as to relevance, as it is irrelevant whether Mr. Ammel toured an apartment prior to their anniversary trip on October 25-26th,**

**2024. Plaintiff asserts that Plaintiff and Mr. Ammel's anniversary trip and the events that occurred between them on the anniversary trip is sufficient in and of itself to demonstrate that their marriage was not over prior to their anniversary trip.**

This, the 17 day of June 2026.

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

By: Mary Catherine Coltrane

Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that the undersigned has this date served the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES, AND FIRST REQUEST FOR PRODUCTION OF DOCUMENTS, FIRST REQUEST FOR ADMISSIONS, TO PLAINTIFF** upon the persons listed below via e-mail addressed as follows:

Steven B. Epstein, Esq.
*Attorney for Defendant Kyrsten Sinema*
301 Fayetteville Street
Suite 1900
P.O. Box 1801 (27602-1801)
Raleigh, North Carolina 27601
Telephone: (919) 783-2846
Facsimile: (919) 783-1075
sepstein@poynerspruill.com

This, the 17 day of June 2026.

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

By: Mary Catherine Coltrane
Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

STATE OF NORTH CAROLINA )

) **VERIFICATION**

COUNTY OF MOORE )

I, **HEATHER AMMEL**, after first being duly sworn, depose and say:

I have reviewed the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES**. That the information contained therein is true and correct. With regard to any information stated therein upon information and belief, I believe it to be true as well.

This, the 17 day of June 2026.

Heather Ammel
**HEATHER AMMEL**

On this 17 day of June 2026, before me Audrey Villatoro a notary public, personally appeared **HEATHER AMMEL**, proved on the basis of satisfactory evidence to be the person whose name is subscribed to this Verification, and acknowledged she executed the same.

Witness my hand and official seal.

A. Villatoro
*Notary signature*

My Commission Expires: 04/11/2028

AUDREY VILLATORO
MY COMMISSION EXPIRES
(Seal)
NOTARY
PUBLIC
04/11/2028
LEE COUNTY, NC

PLAINTIFF'S EXHIBIT
12
Sinema

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO. 1:26-cv-00038

| | | |
|---|---|---|
| HEATHER AMMEL,<br><br>Plaintiff,<br><br>v.<br><br>KYRSTEN SINEMA,<br><br>Defendant. | ) | **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSIONS, FIRST SET OF INTERROGATORIES, AND FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS** |

NOW COMES Defendant, Kyrsten Sinema, pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure, and hereby responds to Plaintiff's First Requests for Admissions, First Set of Interrogatories, and First Requests for Production of Documents.

## REQUESTS FOR ADMISSIONS

1. Please admit that prior to 1 November 2024, you and Mathew Ammel engaged in communication through Signal, the messaging app.

**RESPONSE: Admitted**

2. Please admit that prior to 1 November 2024, you knew or had reason to know Matthew Ammel resided with his wife and children in Moore County, North Carolina.

**RESPONSE: Admitted**

3. Please admit that prior to 1 November 2024, you communicated with Matthew Ammel via Signal, the messaging app, while Matthew Ammel was physically present in North Carolina.

**RESPONSE: Defendant states that after reasonable inquiry, the information she knows or can readily obtain is insufficient to enable her to admit or deny this request, and it is therefore denied.**

4. Please admit that you enabled a feature on the Signal app to delete your Signal messages to Matthew Ammel within a specified time.

**RESPONSE: Denied**

5. Please admit that you caused and/or directed Signal messages between you and Matthew Ammel to be deleted.

**RESPONSE: Denied**

## INTERROGATORIES

1. Identify all communications between you and Matthew Ammel from 1 April 2022 through 1 November 2024, including but not limited to verbal communications, correspondence, emails, text (SMS) messages, Signal messages, voicemails, and encrypted messages.

**ANSWER: Defendant objects to this request on the ground that it is overly broad and unduly burdensome. Defendant further states that she has no means of recalling verbal communications between her and Mr. Ammel that occurred between 18 months and 4+ years ago. Subject to and without waiving her objections, and in accordance with Rule 33(d) of the Federal Rules of Civil Procedure, upon the entry of an appropriate protective order, Defendant will produce all email and phone records which contain information responsive to this interrogatory; the burden of ascertaining responsive information is substantially the same for Plaintiff as for Defendant. Defendant further states that she has no written correspondence, text**

**(SMS) messages, Signal messages, voicemails, or encrypted messages within her possession, custody, or control that are responsive to this interrogatory.**

2. Identify each and every occasion by date and location when Matthew Ammel was physically present with you for any work or non-work-related purpose from 1 April 2022 through 1 November 2024.

**ANSWER: Defendant states that she is unable to recall all the instances in which Mr. Ammel worked as a security contractor for her trips/events, and does not have records of which trips/events he staffed. Defendant is therefore listing all instances she could recall and all she could assemble from Mr. Ammel's email account and her own daily rundown emails to which she still has access:**

**April 20-21, 2022, Sonoma, CA (fundraising retreat)**

**January 27-30, 2023, Park City, UT (fundraising retreat)**

**February 6, 2023, Charlotte, NC (event with US Senator)**

**April 29-30, 2023 Los Angeles (fundraising and speeches)**

**May 25, 2023, Los Angeles, CA (fundraising)**

**June 3-5, 2023, San Diego, CA (fundraising)**

**August 7, 2023, Washington, DC (fundraiser at concert)**

**August 9, 2023, either Bullhead City or Lake Havasu, AZ (Mr. Ammel staffed events in one of these cities)**

**August 19-22, 2023, Steamboat Springs, CO and Aspen, CO (fundraising)**

**August 23, 2023, Dallas, TX (fundraising, concert)**

**September 5-6, Kansas City, MO (fundraising, concert)**

**September 23-25, 2023, Sonoma, CA (bike trip with Defendant's friends)**

**October 6-7, 2023, Chicago, IL (fundraising, Chicago marathon)**

**October 21-23, 2023, Sedona and Grand Canyon (fundraising retreat and Grand Canyon hike)**

**October 27-29, 2023, Moab, UT (Ultra marathon)**

**December 2-3, 2023, NYC, NY (fundraising retreat)**

**Thursday, December 7, 2023, Nashville, TN (fundraising trip)**

**December 16, 2023, Las Vegas, NV (fundraiser at concert)**

**January 26-28, 2024, Park City, UT (fundraiser)**

**February 1-5, 2024, NYC, NY (fundraising)**

**February 20-22, 2024, either Douglas or Sierra Vista, AZ (Mr. Ammel staffed events in one of these cities)**

**March 1-2, 2024, Phoenix, AZ (fundraising retreat, music festival)**

**March 3-4, 2024, Palo Alto, CA (fundraising)**

**March 14-15, 2024, NYC, NY (fundraising)**

**April 6-7, 2024, Washington, DC (Cherry Blossom Run)**

**May 5, 2024, Los Angeles, CA (speech and fundraising)**

**May 16-17, 2024, Dallas, TX (fundraising)**

**May 23-27, 2024, Napa, CA (music festival)**

**June 15-16, 2024, NYC, NY (friend's wedding)**

**June 16-19, 2024, Phoenix, AZ (state work period)**

**June 19-21, 2024, Los Angeles, CA (fundraising, concert)**

**July 10, 2024, Orange County, CA (fundraising, concert)**

**July 11, 2024, Washington, D.C. (Senate votes)**

**July 15-18, 2024, Park City, UT (fundraising, training for Grand Canyon hike)**

**July 19-23, 2024, Phoenix, AZ (state work period)**

**July 29-31, Washington, DC (Senate work, concert)**

**August 5-8, 2024, NYC, NY (fundraising)**

**August 29, 2024, Washington, DC (award celebration dinner for security contractor)**

**August 30-September 3, 2024, Aspen and Denver, CO (fundraising, multiple concerts)**

**September 3-7, 2024, Phoenix and Sedona, AZ (state work period, Grand Canyon training hike)**

**September 13-14, 2024, Washington, DC (Senate meetings, concert)**

**September 19-20, 2024, NYC, NY (grand opening for Mount Sinai Center for Psychedelic Healing, fundraising)**

**September 22, 2024, NYC, NY (fundraising)**

**September 23-25, 2024, Washington, DC (Senate work)**

**September 30-October 3, 2024, Phoenix, AZ (state work period)**

**October 6-9, Phoenix and Grand Canyon, AZ (Grand Canyon hike)**

**October 19-20, 2024, Miami, FL (Taylor Swift concert)**

**October 21, 2024, Phoenix, AZ (state work period)**

**October 22, 2024, Las Vegas, NV (speech at a conference)**

**October 27-November 1, 2024 Riyadh, Saudi Arabia (attended conference)**

3. Identify each and every occasion by date and location when you made contact with the State of North Carolina from the period 1 April 2022 through 1 November 2024, stating for each such occasion any and all contact, whether in person, by telephone, text (SMS) message, social media message, Signal message, or otherwise that you had with Matthew Ammel.

**ANSWER: Defendant states that she did not purposely make contact with the State of North Carolina between April 1, 2022 and November 1, 2024 except for a brief campaign event in Charlotte with another U.S. Senator that occurred on February 6, 2023. Defendant was physically present in North Carolina for approximately four hours. Defendant states that she did not have any contact with Mr. Ammel on such occasion.**

4. Identify each and every occasion by date and location when you either made or received telephone calls or sent or received messages (including but not limited to Signal messages) to/from Matthew Ammel during the period 1 April 2022 to 1 November 2024, and for each occasion state your location when the call or message was sent/received and to the best of your knowledge Matthew Ammel's location when the call or message was sent/received.

**ANSWER: In accordance with Rule 33(d) of the Federal Rules of Civil Procedure, upon the entry of an appropriate protective order, Defendant will produce all of her phone records for the time period in question, as well as all of Mr. Ammel's phone records that are within her possession, custody, and control; the burden of ascertaining responsive information is substantially the same for Plaintiff as for Defendant. Defendant further refers Plaintiff to her March 7, 2026 declaration, which contains Defendant's best memory of her Signal messages with Mr. Ammel and her knowledge—or lack thereof—of Mr. Ammel's location when she communicated with him.**

5. Describe fully and completely each and every act of intimacy in which you have engaged with Matthew Ammel, said acts include, but not limited to kissing, physical embracing, fondling, sexual intercourse, and any other sexual act, from the date you first met Matthew Ammel to present, stating for each act identified: The date, time, and place where each act occurred; Who initiated the act; and The identity of all third persons, if any, who witnessed the act.

**ANSWER: Defendant objects to this interrogatory on the grounds that it is overly broad and unduly burdensome to the extent it seeks responsive information at a time subsequent to Mr. Ammel's separation from Plaintiff, when acts of intimacy between Mr. Ammel and Defendant could not possibly support the legal claims asserted in this matter. Subject to and without waiving these objections, Defendant refers Plaintiff to paragraph 28 of her March 7, 2026 declaration, which recounts each instance of sexual intimacy between Defendant and Mr. Ammel up to November 1, 2024. Defendant further states that Mr. Ammel initiated the acts of sexual intimacy described therein and that no third parties witnessed any such acts. Defendant further states that she is unable to recall specific instances in which she and Mr. Ammel merely kissed or embraced without sexual intimacy between May 27, 2024 (which was the first time) and November 1, 2024.**

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. All documents (including ESI) in your custody, control, or possession which support your responses to Plaintiff's First Set of Interrogatories.

**RESPONSE: Defendant objects to the production of such documents pursuant to Rule 26(c) of the Federal Rules of Civil Procedure on the grounds that they contain confidential information that must be protected by the entry of a protective order. Upon the entry of an appropriate protective order, Defendant will produce all documents responsive to this request.**

2. All documents (including ESI) in your custody, control, or possession related to Matthew Ammel's employment and/or work relationship with you and/or your security groups, including but not limited to Matthew Ammel's personnel file, employment contracts, W-2 forms, W-9 forms, 1099 forms, pay stubs, background checks, travel forms, reimbursement forms, and any other documents or information related to Matthew Ammel's employment from 1 April 2022 to present.

**RESPONSE: Defendant objects to this request to the extent it seeks information or documents at a time subsequent to Mr. Ammel's separation from Plaintiff, as Plaintiff's claims are based solely on acts that predated such separation. Defendant further states that the phrase "your security groups" has no meaning, as she does not have, and has never had, ownership or control of any "security groups" and that Defendant no longer has access to any documents related to her position as a United States Senator or her campaign for the United States Senate. Subject to and without waiving her objections, Defendant states that she will produce all documents in her possession, custody, or control related to Mr. Ammel's role as a security contractor for her Senate campaign or Senate-related work between April 1, 2022 and November 1, 2024.**

3. All communications between you and Matthew Ammel from 1 April 2022 through 1 November 2024, including but not limited to correspondence, emails, text (SMS) messages, Signal messages, audio or video recordings, voicemails, and encrypted messages.

**RESPONSE: Defendant objects to the production of such documents pursuant to Rule 26(c) of the Federal Rules of Civil Procedure on the grounds that they contain confidential information that must be protected by the entry of a protective order. Subject to and without waiving her objections, upon the entry of an appropriate protective order, Defendant will produce all emails and phone records which contain information responsive to this request. Defendant further states that she has no written correspondence, text (SMS) messages, Signal messages, audio or video recordings, voicemails, or encrypted messages within her possession, custody, or control that are responsive to this request.**

4. All documents in your custody, control, or possession which constitute, evidence, relate, or make reference to complete copies of your telephone records, including but not limited to the following numbers: 602-904-9665 and 602-890-3080, indicating the location of every call made and received and every text (SMS) message sent and received by and between you and Matthew Ammel from 1 April 2022 to 1 November 2024, or make reference to any and all travel by you and Matthew Ammel to any state within the United States during the period 1 April 2022 to 1 November 2024, including but not limited to credit card statements, receipts, hotel reservation confirmations, rental contracts for accommodations or car rentals, airfare charges or airline tickets, or other similar documents.

**RESPONSE: Defendant objects to the production of such documents pursuant to Rule 26(c) of the Federal Rules of Civil Procedure on the grounds that they contain confidential information that must be protected by the entry of a protective order. Subject to and without waiving her objections, upon the entry of an appropriate protective order, Defendant will produce all documents which contain information responsive to this request that are within her possession, custody, or control.**

5. All documents in your custody, control, or possession which relate or pertain in any manner whatsoever to any payment or expenditure made by you and/or any of your security groups to Matthew Ammel, and/or for the benefit of Matthew Ammel, for the period 1 April 2022 to

present, whether as a gift, loan, payment for services rendered or otherwise, including, but not limited to, the following: airline tickets, hotel accommodations, food, transportation, gasoline, clothing, personal items, communication device of any type (cell phone, track phone, calling card), gifts, personal bills or liabilities, medical bills, and any other reason.

**RESPONSE: Defendant objects to this request to the extent it seeks information or documents at a time subsequent to Mr. Ammel's separation from Plaintiff, as Plaintiff's claims are based solely on acts that predated such separation. Defendant further states that the phrase "your security groups" has no meaning, as she does not have, and has never had, ownership or control of any "security groups." Subject to and without waiving her objections, Defendant states that she does not have possession, custody, or control of any documents responsive to this request.**

This the 29th day of June, 2026.

**POYNER SPRUILL LLP**

By: /s/ Steven B. Epstein
Steven B. Epstein
N.C. State Bar No. 17396
Abigail R. Jenkins
N.C. State Bar No. 63998
Post Office Box 1801
Raleigh, NC 27602-1801
Telephone: (919) 783-6400
Facsimile: (919) 783-1075
sepstein@poynerspruill.com
ajenkins@poynerspruill.com

*Attorneys for Defendant Kyrsten Sinema*

STATE OF ARIZONA

MARICOPA COUNTY

**VERIFICATION**

Kyrsten Sinema, being first duly sworn, deposes and says that she is the Defendant in this action, that she has read her responses to **Plaintiff's First Set of Interrogatories**, and that the same are true of her personal knowledge, except as to those matters and things stated on information and belief, and as to those, she believes them to be true.

Sworn and subscribed before me
this the 25th day of June, 2026.

Notary Public

My commission expires: Aug. 14 2027

RICHARD REHM
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 654548
Expires August 14, 2027

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date the foregoing was served on the following:

Thomas M. Van Camp
Mary Catherine Coltrane
Van Camp, Meacham & Newman, PLLC
Post Office Box 1389
Pinehurst, NC 28370
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

This the 29th day of June 2026.

/s/ Steven B. Epstein
Steven B. Epstein

PLAINTIFF'S EXHIBIT 13 Sinema

7:43

POSTS STORIES HIGHLIGHTS REELS




Big sports month

Download

anonyig.com

PLAINTIFF'S EXHIBIT
14
Sinema




PLAINTIFF'S EXHIBIT
15
Sinema
KS
iMessage
Mon, Jun 17 at 9:48 AM
Matt
Mon, Jun 17 at 11:02 AM
My other phone is in the room. Text here if you need me.
Delivered
Kk
Going to gym now
Thu, Jun 20 at 12:02 PM
Noah Kahan: We'll All Be Here Forever Tour
verified-ticket.com
Thu, Jul 18 at 1:32 PM
KS's location expired
KS started sharing location with you.
Mon, Jul 29 at 6:13 PM
iMessage

PLAINTIFF'S
EXHIBIT
16
Sinema



PLAINTIFF'S
EXHIBIT
17
Sinema



**verizon✓**

PO BOX 489
NEWARK, NJ 07101-0489

**Billing period** Jan 18, 2023 - Feb 17, 2023 | **Account #** 426448809-00001 | **Invoice #** 8461633581

PLAINTIFF'S EXHIBIT
18
Sinema

KEYLINE

MATTHEW J AMMEL
18 CAYMAN CT
WHISPERING PINES, NC 28327-0029




Your February bill is $4.78 higher than last month's. You can see a full breakdown of all this month's charges on go.vzw.com/mybill.

# Your February bill is $163.90

It's due on Mar 9, 2023.You have Auto Pay scheduled for Mar 2, 2023.

| | |
|---|---|
| Account charges | **-$25.00** |
| **Matthew Ammel**<br>910-279-8576 | **$50.38** |
| **Matthew Ammel**<br>913-240-3852 | **$68.83** |
| **Matthew Ammel**<br>913-240-4005 | **$69.69** |
| | **$163.90** |

## Balance forward from last bill

| | |
|---|---|
| Previous balance (through Jan 17) | $159.12 |
| Payment received - Thank you (Feb 2) | -$159.12 |
| **Total balance forward** | **$0.00** |

## Good to know

**Check your online bill for all surcharges, taxes and gov fees**

The total amount due for this month includes surcharges of **$11.81** and taxes and gov fees of **$4.59**. For an itemized list of taxes, fees and surcharges visit go.vzw.com/mybill.

**CONFIDENTIAL**

PLAINTIFF'S EXHIBIT 19 Sinema

AT&T


Issue Date: Apr 01, 2022
Account Number: 265002356120

## Service activity

### Wireless

| Number | User | Page | Monthly charges Plan | Add-ons | Company fees & surcharges | Total |
|---|---|---|---|---|---|---|
| Group 1 | | 2 | $110.00 | - | $1.98 | $111.98 |
| 480.823.7067 | KYRSTEN SINEMA | 3 | $10.00 | - | $4.44 | $14.44 |
| 520.560.4261 | KYRSTEN SINEMA | 3 | $10.00 | - | $3.49 | $13.49 |
| 602.904.9665 | KYRSTEN SINEMA | 3 | $15.00 | $15.00 | $4.65 | $34.65 |
| Total | | | $145.00 | $15.00 | $14.56 | $174.56 |

## Group 1
3 Devices

| Monthly charges | Apr 02 - May 01 | |
|---|---|---|
| 1. Mobile Share Value 30GB with Rollover Data | | $110.00 |
| **Company fees & surcharges** | | |
| 2. AZ State Telecom Surcharge | | $0.48 |
| 3. City Telecom Surcharge | | $0.40 |
| 4. County Telecom Surcharge | | $0.06 |
| 5. Federal Universal Service Charge | | $1.04 |
| **Total for Group 1** | | **$111.98** |






**Shared usage summary** (Mar 02 - Apr 01)

| Number | User | Data (GB) | Text | Talk |
|---|---|---|---|---|
| 480.823.7067 | KYRSTEN SINEMA | 0.06 | 16 | 0 |
| 520.560.4261 | KYRSTEN SINEMA | 0.28 | 0 | 0 |
| 602.904.9665 | KYRSTEN SINEMA | 12.28 | 195 | 390 |
| Total usage | | 12.61 | 211 | 390 |
| Included in plan | | 30.00 | unlimited | unlimited |
| *Rollover available through Apr 01: 17.24GB | | 0.00 | | |
| **Rollover available starting Apr 02** | | **17.40** | | |

*Usage is rounded up based on your plan. For more details on your Shared usage summary, visit att.com/myusage.*
** Unused Rollover Data expires after 1 billing period or when you change your plan or account.*


*Wireless continues...*

PLAINTIFF'S EXHIBIT 20 Sinema LP

**CONFIDENTIAL**

**From:** **Piccioli, Laura (Sinema)** Laura_Piccioli@sinema.senate.gov
**Subject:** Friday, November 1, 2024
**Date:** October 31, 2024 at 1:49 PM
**To:** Sinema, Kyrsten (Sinema) betty@sinema.senate.gov, [redacted] Brownlie, Michael (Sinema) Michael_Brownlie@sinema.senate.gov, Sierra-Carmona, Pablo (Sinema) Pablo_Sierra-Carmona@sinema.senate.gov, DeSpain, Mike (Sinema) Mike_DeSpain@sinema.senate.gov, Davidson, Michelle (Sinema) Michelle_Davidson@sinema.senate.gov, Winkler, Daniel (Sinema) Daniel_Winkler@sinema.senate.gov, Sauder, Courtney (Sinema) Courtney_Sauder@sinema.senate.gov, Leuchten, Chris (Sinema) Chris_Leuchten@sinema.senate.gov, Furber, Megan (Sinema) Megan_Furber@sinema.senate.gov, Burton, Gentry (Sinema) Gentry_Burton@sinema.senate.gov

1:20am Qatar – 9:20am DC: Qatar 709. Conf# 3LFQL3. Seat 2J. -- DOH > IAD
*Meet Escort at Gate

11:09am DC – 12:29pm NY: Delta 5453. Conf# JJUJB3. Seat 5B. -- IAD > JFK

12:45pm – 1:45pm: D/p to NY EDITION - Driving w/ Security -- JFK > The New York EDITION, 5 Madison Ave, New York, NY 10010

Laura E. Piccioli I Director of Scheduling
Office of U.S. Senator Kyrsten Sinema of Arizona
202.224.4521
317 Hart Office Building, Washington, D.C. 20510
Sinema.Senate.Gov

SINEMA_000574