IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 1-:26-cv-00038

| | | |
|---|---|---|
| HEATHER AMMEL, | ) | V I D E O T A P E D |
| Plaintiff, | ) | V I D E O C O N F E R E N C E |
| vs. | ) | D E P O S I T I O N |
| KYRSTEN SINEMA, | ) | O F |
| Defendant. | ) | M A T T H E W |
| | ) | A M M E L |

A P P E A R A N C E S:

| | |
|---|---|
| For the Plaintiff: | Mr. Mary Catherine Coltrane<br>Mr. Thomas M. Van Camp<br>Van Camp, Meacham & Newman, PLLC<br>P.O. Box 1389<br>Pinehurst, North Carolina 28370 |
| For the Defendant: | Mr. Steven B. Epstein<br>Ms. Abby Jenkins<br>Poyner & Spruill<br>P.O. Box 1801<br>Raleigh, North Carolina 27601 |
| For the Witness: | Mr. Brent Tanner<br>Parker Bryan Family Law<br>104 N. McNeill Street<br>Carthage, North Carolina 28327 |
| Notary: | Mr. Geoffrey Hall |
| Videographer: | Ms. Amanda Smith |
| In Attendance: | Ms. Kyrsten Sinema<br>Ms. Jaida Huhn, CER |
| In Wilmington, N.C.<br>July 28, 2026 | Reported by:<br>Lisa S. Marion, CER |

E X A M I N A T I O N   I N D E X


| Examination | By Whom | Page No. |
|---|---|---|
| Direct | Ms. Coltrane | 8 |
| Cross | Mr. Epstein | 85 |
| Redirect | Ms. Coltrane | 111 |

E X H I B I T  I N D E X

| Exhibit No. | Description | Page Marked |
|---|---|---|
| Plaintiff's 1 | Verified Complaint | 5 |
| Plaintiff's 2 | Declaration of Heather Ammel | 5 |
| Plaintiff's 3 | Declaration of Kyrsten Sinema | 5 |
| Plaintiff's 4 | Declaration of Matthew Joseph Ammel | 5 |
| Plaintiff's 5 | Deposition of Matthew Joseph Ammel | 5 |
| Plaintiff's 6 | Notice of Deposition of Matthew Ammel | 5 |
| Plaintiff's 7 | Messages | 5 |
| Plaintiff's 8 | Flight Information | 5 |
| Plaintiff's 9 | Messages | 5 |

S T I P U L A T I O N S

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record:

(1) That the videotaped videoconference deposition of MATTHEW AMMEL may be taken on July 28, 2026, beginning at 12:02 P.M., before Lisa S. Marion, CER, a Notary Public.

(2) That the deposition shall be taken and used as permitted by the applicable Federal Rules of Civil Procedure.

(3) That any objections of any party hereto as to notice of the taking of said deposition or as to the time or place thereof, or as to the competency of the person before whom the same shall be taken, are deemed to have been met.

(4) Objections to questions and motions to strike answers need not be made during the taking of this deposition, but may be made for the first time during the progress of the trial of this case, or at any pretrial hearing held before any judge of competent jurisdiction for the purpose of ruling thereon, or at any other hearing of said case at which said deposition might be used, except that an objection as to the form of a question must be made at the time such question is asked, or objection is waived as to the form of the question.

(5) That the witness waives the right to read and sign the deposition prior to filing.

(6) That the sealed original transcript of this deposition shall be mailed first-class postage or hand-delivered.

(7) That the witness was identified by a government-issued photo ID.

* * * * *

(PLAINTIFF'S DEPOSITION EXHIBITS NO. 1 - 9
MARKED FOR IDENTIFICATION PRIOR TO TESTIMONY)

THE VIDEOGRAPHER: Good morning. Or good afternoon. We are on the record to begin the deposition of Matthew Ammel in the matter of Heather Ammel versus Kyrsten Sinema. This case is venued in the United States District Court for the Middle District of North Carolina, Western Division. The case number is 1:26-cv-00038. Today's date is Tuesday, July 28th, 2026, and the time is 12:02 p.m. Eastern time.

The deposition is taking place online via Zoom. The legal videographer is Amanda Smith, here on behalf of TCB Legal Video Services, and the reporter is Lisa Marion, here on behalf of Pace Reporting.

Counsel, be aware your microphones are sensitive and they may pick up whispers, private conversations, and cellular interference, which may be captured on the video, as well as taken down by the reporter as a part of the record of these proceedings.

Would counsel please identify yourselves and state

whom you represent?

MS. COLTRANE: Good morning. My name is Mary Catherine Coltrane. Tom Van Camp and I represent Plaintiff, Heather Ammel.

MR. EPSTEIN: I'm Steven Epstein, and I represent the defendant, Kyrsten Sinema.

THE VIDEOGRAPHER: Thank you. The court reporter may now swear in the witness.

MR. EPSTEIN: I think there's one more lawyer who needs to identify.

MS. COLTRANE: That's correct.

MR. TANNER: Yeah. I'm Brent Tanner. I am Mr. Ammel's attorney for limited purpose of this deposition.

THE VIDEOGRAPHER: Thank you. The court reporter may now swear in the witness.

THE NOTARY: Good afternoon. My name is Geoffrey Hall, and I am a Notary Public authorized in the Commonwealth of Virginia. I will be administering the oath today. I verified the identity of the witness through satisfactory evidence.

Mr. Ammel, please state your full name for the record.

THE WITNESS: Matthew Joseph Ammel.

Whereupon,

MATTHEW AMMEL,

having been first duly sworn,
was examined and testified
as follows:

THE VIDEOGRAPHER: Thank you. We may now proceed.

DIRECT EXAMINATION BY MS. COLTRANE:

Q Good afternoon, all, and good morning to you, Mr. Ammel, since we are in different time zones. My name is Mary Catherine Coltrane. Tom Van Camp and I represent Plaintiff, Heather Ammel, in her alienation of affection case against Defendant, Kyrsten Sinema. I will be conducting your deposition today. And I understand your attorney, Mr. Brent Tanner, will be sitting in for you today.

Today is not meant to be an inquisition. I am simply here to have a conversation with you and to gather your testimony in preparation for trial. If you do not understand a question or my question is not clear, please feel free to speak up and ask me to reword my question or ask me to repeat my question, and I am happy to do that for you.

Although this deposition is taking place over Zoom today, the same rules apply as if we were taking this deposition in person. If you need to take a break at any time, you just let me know, and we can take a break for however long you need. All I ask is that if I'm asking a question, you give your answer before you request to take a break.

Also, since this Zoom deposition -- we are taking place over an electronic platform. We have

provided all of the exhibits electronically today. You should have received nine of them. And I just want to make sure all the attorneys here have received all the exhibits and you have access to the exhibits, as well.

A Yes.

Q Great. So I'll be asking you several questions today. I ask that you give a verbal response. If a question prompts a yes or no answer, please avoid any head shaking or head nodding, but please give a verbal response, a "yes" or a "no." Please also be sure to avoid any "uh-huhs" or "uh-uh," as that will translate really into the same verbal language on the transcript. We do have a court reporter here today who is going to be taking a verbatim transcript of the deposition, so please be sure to enunciate your words. Speak loudly and clearly into the microphone so that she can capture all of the questions I ask and all of your answers.

Please do not begin your answer to a question until I finish asking the question, and I will give you the same respect, and I will allow you to answer before I begin my next question.

If you need to correct your answer at any time, please let me know, and we can, by all means,

do that.
Do you have any other questions before we begin?
A No.
Q Do you understand all the rules that we just went over?
A Yes.
Q Okay. Let's begin. Can you state your full name for the record and please spell it out loud for the court reporter?
A Matthew Joseph Ammel. M-A-T-T-H-E-W J-O-S-E-P-H A-M-M-E-L.
Q And, Mr. Ammel, what do you prefer I call you? Mr. Ammel or Matt? Do you have a preference?
A Mr. Ammel.
Q Okay. Mr. Ammel, have you ever been deposed before?
A Yes.
Q When was that?
A I believe last fall.
Q Can you give me a month and a date?
A I don't remember the date.
Q Would this have been the deposition in your family law case, the domestic deposition?
A Yes.

Q Okay. I've included that as an exhibit. So if you look on Exhibit 6 -- or excuse me. It's Exhibit 5. It looks like it was --
A I got it right here.
Q Okay. August 12th, 2025. Does that sound accurate?
A Correct.
Q Okay. Do you understand that you're testifying under oath today and that you are legally obligated to tell the truth?
A Yes.
Q Did you consume any alcoholic beverages in the last 24 hours?
A No.
Q Did you take any narcotics in the past 24 hours?
A No.
Q Did you take any prescription medicines in the last 24 hours that could impair your memory, your ability to understand my questions, or your ability to testify fully and truthfully?
A No.
Q Is there any other reason that you may not be able to recall events or testify fully and truthfully today?
A No.

Q Have you been a party to or a witness in any other litigation?
A No.
Q What about your domestic case? Is that a case that's pending litigation?
A Yes. I don't know.
Q Have you ever been arrested before?
A Yes.
Q When was that?
A November 23rd, 2025.
Q And why were you arrested?
A I was involuntarily committed to the hospital.
Q Why was that?
A It was perceived that I made threats against my landlord.
Q And so how did that lead to your arrest?
A I assaulted a guy who had bullied me for three years.
Q And how long were you in jail?
A One night.
Q And who got you out of jail?
A Kyrsten Sinema.
Q What did you do to prepare for your deposition today?
A I met with Attorney Epstein and Attorney Brent

Tanner yesterday.

Q And who is your attorney?

A Brent Tanner.

Q So in your conversations with Mr. Epstein, what did you discuss?

MR. EPSTEIN: Objection. Under Rule -- Federal Civil Procedure 30(c)(2), Local Rule 30.1.1, we are instructing the witness not to answer. The information sought is protected by the joint defense privilege.

MR. TANNER: And I will second that objection.

MS. COLTRANE: Is there a joint defense agreement?

MR. EPSTEIN: There is.

MS. COLTRANE: Okay. Thank you for that.

Q So, Mr. Ammel, did you review any documents in preparation for today's deposition?

MR. EPSTEIN: The same -- the same objection. To the extent that it happened in that session, the same instruction not to answer and the same objection.

MS. COLTRANE: Okay.

MR. TANNER: I agree.

Q Did you bring any documents with you today, Mr.

Ammel?

A Yes.

Q Who have you provided those documents to?

A Can you repeat the question, please?

Q Did you bring any documents with you to this deposition today?

A Yes.

Q Who did you give those documents to?

MR. EPSTEIN: I don't think he's understanding your question, because I think he's referring -- I may be wrong, but I think he's referring to the exhibits that you provided, which have been printed out. He's brought those with him. He may have others. I don't know. But I think that's his confusion.

Q Okay. I can clarify. So aside from the exhibits that our office has provided, have you personally brought any other documents that we asked you to bring to this deposition today?

A No.

Q Okay. Were you served with a subpoena for your deposition today?

A Yes.

Q Okay. Can we look at that subpoena? And we can also share the screen.

MR. EPSTEIN: Which exhibit is it?

MS. COLTRANE: 6. Exhibit 6.

Q And if you can look at Exhibit 6, on the last page is Exhibit A. Do you see that?

A Yes.

Q Do you see where we have asked you to "Produce all communications between you and Kyrsten Sinema from the 1st of April 2022 through the 1st of November 2024, including, but not limited to, correspondence, e-mails, texts, SMS messages, Signal messages, audio or video recordings, voicemails, and encrypted messages"? Do you see that?

A Yes.

Q And then do you see that we have asked you to "Produce all documents in your custody, control, or possession which constitute, evidence, relate, or make reference to complete copies of your telephone records, including, but not limited to, the following numbers, and indicating the location of every call made and received and every message sent and received by and between you and Kyrsten Sinema from the 1st of April 2022 to the 1st of November 2024"? Do you see that?

A Yes.

Q Okay. And have you provided those documents today?
A I don't know.
Q Okay. We'll go on to the next question. Mr. Ammel, what is your current address?
A I don't know.
Q You don't know where you live?
A I don't know the address. It's the Cross Creek Ranch.
Q So if you don't know your address, how do you receive mail?
A I receive mail at Camp San Luis Obispo, my place of business.
Q What is the address for that?
A I would have to look it up.
Q Well, during the break, if you don't mind looking up that address.
And who do you live with?
A I live alone.
Q Are you married?
A No.
Q Do you have any children?
A Yes.
Q Can you give their names and their ages?
A Clara Grace Ammel, 14; Isla Rose Ammel, 13; James Cooper Ammel, 10.

Q Were you previously married?
A Yes.
Q Who were you previously married to?
A Heather Ammel.
Q How long were you and Ms. Ammel married?
A Fourteen years.
Q When did you and Ms. Ammel get married?
A October 23rd, 2010.
Q When did you and Ms. Ammel separate?
A November 1st, 2024.
Q And where did you live when you were married to Ms. Ammel?
A We lived in two locations. We lived in Raeford, North Carolina and Whispering Pines, North Carolina.
Q Okay. And how long did you live in Whispering Pines or Moore County, North Carolina?
A Approximately 10 years.
Q And when did you move away from North Carolina?
A November of 2025.
Q And where did you go after you moved away from North Carolina?
A Cave Creek, Arizona.
Q How long did you live there?
A From November until March.

Q And then where did you go in March?
A Camp San Luis Obispo.
Q Mr. Ammel, what is your current occupation?
A Cowboy.
Q Who is your employer? Or are you self-employed?
A Erick Czaja and the United States Army.
Q All right. Tell me about your educational background. Where did you attend school?
A Leavenworth, Kansas.
Q Was that the name of the school?
A Yes.
Q Do you have a college degree?
A An associate's.
Q Where did you get your associate's?
A Some online school in New Jersey. I don't remember.
Q What is your associate's degree in?
A I believe it's an associate's of science.
Q What did you do after you obtained your associate's degree?
A I don't understand your question.
Q What did you do career-wise after you obtained your associate's degree?
A I was a Green Beret in the United States Army when I achieved my associate's degree.

Q And how long were you in the military?
A Seventeen and a half years.
Q What was your position in the military?
A Repeat your question, please.
Q What was your position in the military?
A I was an airborne infantryman and a Special Forces engineer sergeant.
Q Are you still in the military?
A No.
Q When did you retire from the military?
A August of 2022.
Q And what did you do after you retired from the military?
A I was a tactical firearms instructor and a close protection agent.
Q Okay. Did you do anything else?
A I was a Maritime Special Operations instructor, and I was an arborist.
Q Okay. Could you describe your understanding of why you're here today?
MR. EPSTEIN: Objection to the form.
A My ex-wife is suing my current girlfriend for alienation of affection.
Q How do you know the parties involved in the case?
A I was married to Heather Ammel, and I am in a

relationship with Kyrsten Sinema.
Q How did you meet Ms. Sinema?
A I was a member of her security detail from April of 2022.
Q And who hired you for the security detail job?
A Vrindavan Bellord at TOA Group.
Q Could you repeat that name?
A Vrindavan Bellord.
Q And when were you hired to be a security member?
A April of 2022.
Q I believe you said her name was Davan [sic]. Was she the head of security at the time that you started working there in April 2022?
A Yes. Vrindavan was the head of security.
Q Did you know her well?
A Yes.
Q When did she leave her position?
A I don't remember the exact date. I believe it was in 2023.
Q Do you know why she left?
A Personal differences with the employer.
Q Who was the employer?
A Kyrsten Sinema.
Q Do you know what those personal differences were?
A I do not.

Q So when she left, did she encourage you to leave with her?
A She did not.
Q So describe your job as a security detail.
A Responsible for all movement and security of both Kyrsten and her staff during campaign events and fundraising events.
Q Did you travel a lot?
A Yes.
Q When did you take your first trip with Ms. Sinema?
A April 2022.
Q Where did you go?
A Sonoma, California.
Q Did anything romantic or sexual happen on that trip?
A No.
Q When was the first time you traveled alone with Ms. Sinema?
A I believe it was in 2023.
Q Do you know when in 2023?
A I would have to look up the date.
Q So if we can pull up Exhibit 1, that would be Plaintiff's complaint. And I can share the screen, as well. Can you see my screen?
A I cannot.

Q Now can you see it?
A Yes.
Q Okay. So Ms. Ammel in her complaint -- and you should have it with you, as well -- mentions that the first trip that she remembers that you took with Ms. Sinema was to Napa Valley, California. Do you see that?
A Yes.
Q In the fall of 2023?
A Yes.
Q Is that the first trip that you remember taking with her alone?
A Yes.
Q Did anything romantic or sexual happen on that trip?
A No.
Q So when Ms. Ammel says that you appeared uncomfortable after that trip and that you informed her that if anyone would have seen you on the trip, it would have appeared as if you were on a romantic getaway, would you agree with that?
A No.
Q When you weren't working either with a security group or for Ms. Sinema, did you return home to Moore County, North Carolina?

A Not always.
Q Okay. Well, did you sometimes?
A Sometimes.
Q Okay. Did she ever contact you while you were at home in Moore County, North Carolina?
A Not until 2024, I believe.
Q So you began working for her in 2022, correct?
A Correct.
Q But she didn't ever reach out to you while you were at home until 2024?
A I don't believe so. No.
Q Did you ever talk on the phone to Ms. Sinema while you were at home in Moore County, North Carolina?
A I don't believe so. No.
Q Ever? Or until 2024?
A I don't recall ever having a phone conversation with her in North Carolina.
Q Ever?
A No.
MR. EPSTEIN: Well, let me make sure we're clear on this, 'cause your end date is not clear, Mary Catherine. Are you ending your questions at November 1st, or are you including all the way up until July 2026 in your question?
Q I can ask both questions. Did you and Ms. Sinema

ever, meaning indefinitely, have a phone conversation while you were located in North Carolina?

A Post-separation, yes.

Q But not prior to the separation?

A No.

Q Okay. So just so everybody is clear, your testimony is that you and Ms. Sinema never had a phone call in North Carolina prior to November 1st?

A I don't believe so. No.

Q What about on November 1st? Did you have a phone call with Ms. Sinema on November 1st?

MR. EPSTEIN: And to be clear, November 1st could mean any year. You mean November 1st --

MS. COLTRANE: November 1st --

MR. EPSTEIN: -- 2024?

MS. COLTRANE: -- 2024. Thank you.

A I don't believe so. No.

Q Okay. Did you and Ms. Sinema message one another while you were at home in Moore County, North Carolina?

A On occasion.

Q And what messaging platform would you and Ms. Sinema use?

A Signal.

Q And just so we're clear on timelines, when did that messaging occur? So it seems like you met her in April of 2022. So were there messages from April 2022 through November 2024 -- let's do November 1st, to be exact?
A The first time I had Kyrsten Sinema's phone number was for the California trip that you mentioned in 2023, the first time I became the security detail lead.
Q Okay. But --
A So there were no communications prior to that, and all communications from that point until separation were generally about work.
Q Okay. So did she message you while you were at home in Moore County, North Carolina at any time from April 2022 to November 1st, 2024?
A Yes. I recall a few messages.
Q Okay. And you said that you would primarily communicate over Signal?
A Correct.
Q What about text messages?
A I don't recall any text messages between me and her until after separation.
Q Okay. So I want us to look at an exhibit. If you can, let's look at Exhibit 3 first. That should be

in front of you. So that's Ms. Sinema's declaration. I can pull it up here, too. Can you see my screen?

A Yes.

Q Okay. So Exhibit 3, Page 4. Okay. Ms. Sinema says that you did not engage in any communications via SMS text messages during this period. So that would have been from 2022 through October 2024. So your testimony today seems to align with that, that there were no text messages in that period. Is that correct?

A Yes.

Q Okay. So now will you turn with me to Exhibit 5? That is your deposition transcript from your domestic case. And if you'll go to Page 88 -- okay. Are we on the same page?

A We are.

Q So on 87, Ms. Foushee asks you about your communication platforms with Ms. Sinema. "How did you and your girlfriend communicate? Is it via text?" And it looks like you responded, "Yeah. Either text or FaceTime." And then she says, "Okay. Not Signal or WhatsApp?" And then you say, "Primarily text or Signal. Yes."

So can you help me understand the difference

in your testimony today where you say you primarily communicate over Signal versus here, it looks like you testified that it was over text and Signal?
A "Text" is a vague term that can be used for messaging. I didn't say SMS.
Q Okay. But would you say that there is a difference between a text message and a Signal message?
A No.
Q Okay.
A There is a difference between an SMS message and a text message.
Q Okay. So when you say "text," you meant that to mean also Signal?
A Correct.
Q Okay. And then there is one other exhibit I want us to look at, Exhibit 2. That's Ms. Ammel's declaration. And she included some exhibits with that. So if you'll go to Exhibit 2. And along with Exhibit 2, she had some exhibits. And if you go to Exhibit B, this appears to be a message between you and Ms. Sinema. It's on the screen, as well. Do you see that?
A Yes, I do.
Q Would you consider this a text message?
A Yes. I didn't remember sending it.

Q Okay. So I want to talk about Signal for a few seconds. Does Signal automatically delete messages?
A Yes. I believe that is a default setting.
Q How long will the messages be available over Signal before they delete?
A The user can choose that.
Q Did you enable a feature on the Signal app to delete the messages after a certain period of time?
A The default setting on Signal is to delete after eight hours.
Q Was that the setting that you had?
A Yes.
Q Did that ever change, or was it always eight hours?
A I don't believe it ever changed.
Q So the eight-hour deletion period, that was a feature that you selected?
A That is the default feature that comes with Signal.
Q Okay. Did you delete any of the messages between you and Ms. Sinema?
A No.
Q So the app, just through its default feature, would just delete the messages after eight hours?
A The default setting on Signal is to delete after eight hours.

Q Okay. So that's what deleted the message? The Signal app?
A Yes. The default setting on Signal is to delete after eight hours.
Q Okay. Are you able to access any of the Signal messages between you and Ms. Sinema?
A No.
Q Let's take a look at your domestic deposition again, again, Exhibit 5, Page 88. Can you see my screen?
A Yes.
Q Okay. So it looks like in your domestic deposition, Ms. Foushee asked you about those messages between you and your girlfriend, and it looks like she asked you --
MR. EPSTEIN: Mary Catherine, I'm sorry. I don't mean to interrupt. But when you're referring to a document like a deposition or a declaration, if you can be specific, so, for instance, for a deposition, line number; for a declaration, paragraph number, that would -- that would be very helpful not only to me, but to the witness, I think.
MS. COLTRANE: Sure. No problem.
Q So we are looking at Exhibit 5. This is your

domestic deposition transcript. It's Page 88 and 87. You can tell from the conversation between you and Ms. Foushee that she asks you -- looks like Line 2020 -- or excuse me -- Line 22 on Page 87, "How do you and your girlfriend communicate? Is it via text?" You responded, "Yeah. Either text or FaceTime." And then she says, "Okay. Not Signal or WhatsApp?" You say, "Primarily text or Signal. Yes." And then Line 2 of Page 88, Ms. Foushee says, "Are those messages still in place or have they been deleted?" And your response is, "Yeah. I believe that most of them are still in place."

So could you help me understand why your testimony today is that those messages are no longer available, where here it looks like you said that most of them were still there?

A Well, as you can see, that's Page 88 of a very long deposition. My memory failed me.

Q So is your testimony that you couldn't remember if they were still in place or not?

A Correct.

Q Okay. So why did you and Ms. Sinema primarily communicate over Signal?

A I primarily communicate all of my work communications through Signal.

Q And why is that?
A It's a practice that I started while I was a Green Beret in the United States Army.
Q What about Ms. Sinema? Would you say that she primarily uses that platform?
A I don't know.
Q So what would you and Ms. Sinema communicate about over Signal?
MR. EPSTEIN: Objection to the form. Do you have any particular time period, or do you mean from the beginning of time until now?
Q So I can ask it both ways. For the period of April 2022 through November 1st, 2024, what did you and Ms. Sinema communicate about over Signal?
A Can you repeat the dates, please?
Q Yes. From April 2022 through November 1st, 2024, what did you and Ms. Sinema communicate about over Signal?
A Generally, it would be drop-off and pickup times and when she was ready to go from one meeting to the next.
Q Would that be a work-related matter?
A Yes.
Q Are you able to make phone calls over Signal?
A Yes.

Q Are you able to receive calls over Signal?
A Yes.
Q Okay. All right. I want us to look at Exhibit 2. This is the declaration of Ms. Heather Ammel, Pages 3 through 5. Can you see my screen okay?
A I can.
Q Okay. So in Ms. Ammel's complaint and in her declaration, she alleges that she witnessed Ms. Sinema send you several messages. And in her declaration, she identifies the messages that she remembers you receiving while you were in North Carolina. So I want to walk through some of those messages today.
A Okay.
Q Okay. So you can see on Page 3 this is where she says, "Of the messages I reference in my verified complaint, I personally witnessed Defendant send Mr. Ammel the following messages while he was physically present in North Carolina prior to date of separation," which your testimony is the separation date was November 1st, 2024.
So let's start with the first one, which is A. So in January 2024, Ms. Ammel witnessed Ms. Sinema send you a message about helping you with your mental health. Do you remember this message

at all?

A I do not.

Q Are you saying you didn't receive such a message, or you don't remember the message?

A I do not recall receiving such a message.

Q Okay. Let's go to the next one. So in or around early spring 2024, Ms. Ammel witnessed Ms. Sinema send you the following messages. And those are -- you can see below B the messages that she references. So let's walk through those, starting with I. A picture of Ms. Sinema wrapped in a towel. Ms. Ammel says "You were physically present in North Carolina and at the marital residence when Ms. Sinema sent a photo of herself wrapped in a towel. Ms. Sinema was wrapped in a white towel, and the picture showed her bare upper back with cupping bruises." She says that you responded to the picture stating that she didn't need -- that she needed more iron in her diet, and Ms. Sinema replied stating, "Show me a woman who doesn't." Do you remember this message?

A I do not recall ever receiving a picture of Kyrsten wrapped in a towel.

Q Is it you don't remember, or you're saying you did not receive such a message?

A I do not remember ever receiving a message of her wrapped in a towel.
Q Let's go on to the next one. Ms. Ammel says that you messaged Ms. Sinema stating that you were intimidated by her while you were physically present in North Carolina. Ms. Sinema responded to the message asking why, because she only like -- she only wants to be intimidating to her opponents, not to people that she likes. Do you remember this message?
A I do not recall receiving that message.
Q Are you saying you didn't receive the message or you don't remember the message?
A I don't believe I received that message.
Q Okay. Let's move to the next one. Ms. Ammel says that Ms. Sinema messaged you, suggesting you to bring MDMA drugs on a work trip so that she could guide you through a psychedelic experience, and that you received that message when you were physically present in North Carolina preparing to go on another work trip with Ms. Sinema. Do you remember this message?
A I do not recall ever receiving that message.
Q Are you saying you didn't receive it or you don't remember it?

A I do not remember receiving that message.
Q Let's go to the next one. Ms. Ammel says that she remembers Ms. Sinema messaged you during the State of the Union address when you were physically present in North Carolina at the marital residence. When you asked Ms. Sinema why she wasn't attending the State of the Union that year, Ms. Sinema stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote. Do you remember this message?
A Yes, I do.
Q Do you still have access to this message?
A No.
Q Why?
A It would have automatically deleted after eight hours.
Q Do you know where you were when you received the message?
A In North Carolina.
Q Where in North Carolina?
A Moore County.
Q Where in Moore County?
A In my home.
Q Let's move to the next one. Ms. Ammel says that she remembers Ms. Sinema messaged you about having

sex missionary style with the lights on while you were in North Carolina. Do you remember this message?

A I do not.

Q Are you saying you don't remember it or you didn't receive it?

A I did not receive that message. The joke --

A You didn't receive --

A -- doesn't even make sense.

Q Sorry. Go ahead.

A The joke doesn't even make sense. It wouldn't have been a message I would have ever sent or received.

Q Okay. Let's look at the next one. Okay. Ms. Ammel remembers that on October 3rd, 2024, Ms. Sinema messaged you, saying, "I miss you. Putting my hand on your heart. I'll see you soon." Ms. Ammel responded to the message stating, "Are you having an affair with my husband? You took a married man away from his family." Do you remember this message?

A I do not remember receiving this message. I remember Heather confronting me about this message.

Q So if you don't remember receiving the message, do you remember where you were?

A On October 3rd, I was traveling, and on October

4th, I was in Moore County, North Carolina.

Q So let's look -- I want to look at another exhibit, if you don't mind. Let's look at Exhibit 8. And I pulled it up for you. You can see the screen. So you said on October 3rd, you were traveling, correct?

A Correct.

Q Okay. Looks like you left Phoenix at 6:22 a.m. You arrived --

MR. EPSTEIN: Objection to form. You're referring to a flight itinerary; you're not referring to anything reflecting when planes left or where they were. So I object to the characterization of the exhibit.

MR. VAN CAMP: That's coaching the witness, Steve. Let's stop doing that. Okay?

MR. EPSTEIN: I'm making my objection.

MR. VAN CAMP: It's against the local -- it's a violation of the local rules.

MR. EPSTEIN: Okay. First of all -- first of all, Tom, you get -- you've chosen who is conducting this deposition. It's not you. You don't have a speaking role.

Number two, I get to object to an exhibit, and I -- object to a question, and I'm doing that

as specifically as I can, objecting to the form of the question because it mischaracterizes. And I ask -- Tom, I ask that you not have a speaking role. We might have to seek intervention from a judge if you continue.

MR. VAN CAMP: Stop your speaking objections that coach the witness, please.

MR. EPSTEIN: I understand my obligations under the rules, Tom. I need you to respect the rules in the Middle District.

MR. VAN CAMP: I'm asking you to do the same. Thank you.

Q Okay. Let's look at --

THE WITNESS: Can I -- can I ask who is interrupting my deposition? And can they identify themselves on camera?

MR. VAN CAMP: I'll be happy to. My name is Tom Van Camp. I'm lead counsel, and I'm sitting right here during the deposition.

THE WITNESS: Okay. Please stay quiet, Tommy.

MR. VAN CAMP: Don't tell me what to do, Steve.

Q All right, Mr. Ammel. Let's look at Exhibit 8. Do you recognize this flight schedule?

A I see that is the flight schedule. Yes.
Q Okay. Would you say this is an accurate representation of your flight schedule on October 3rd, since you said that you were traveling that date?
A I do not recall if the flights were on time.
Q Okay. Is this the flight that you booked on October 3rd?
A I don't recall if I booked the flight or if someone on the staff booked it.
Q Okay. Well, whether you booked the flight or someone else booked the flight, was this your intended travel plans on October 3rd?
A This is my travel records from American Airlines. Correct.
Q Okay. Great. Thank you. So assuming everything was on schedule, it looks like you left Phoenix at 6:22 a.m. Is that correct?
A I don't recall.
Q Okay.
A That was when the flight was scheduled.
Q Well, assuming everything was on schedule, it looks like you were to arrive at Raleigh-Durham International Airport on October 3rd at 3:31 p.m. Is that correct?

A I cannot recall if the flight was on schedule. That was two years ago.

Q Okay. All right, Mr. Ammel. Let's look at the next exhibit, which is Exhibit 7. Can you go there for me, please? Are you there?

A Yes.

Q You can see -- it's Exhibit 7. Do you see October 4th, 2024, 8:00 a.m.?

A I do.

Q Okay. And this is the message that we were just speaking of from October 3rd. Do you recognize this message?

A I recognize it from when Heather confronted me with it.

Q Did she confront you immediately after she sent the message, "Are you having an affair with my husband?"

A I do not recall.

Q Okay. Who sent the message, "I miss you. Putting my hand on your heart. I'll see you soon"?

A Based upon the messenger app, it looks like Kyrsten Sinema sent it.

Q Okay. And you said that you were home on October 4th?

A I was home on October 4th.

Q And based on the flight records, you were also home on October 3rd that evening?
A I do not recall when my flight returned home.
Q Okay.
A And how long it took me to get from RDU to my home.
Q Okay. Do you know why you traveled home that weekend?
A October 4th is my oldest daughter's birthday.
Q Did Ms. Sinema know that that weekend was your oldest daughter's birthday?
A I don't know.
Q You said you were previously married to Ms. Ammel. Why did your relationship with Ms. Ammel end?
A In 2016, she became psychologically abusive, and then in January of 2024, she became physically abusive.
Q Let's go back to your domestic deposition, which is Exhibit 5.

THE WITNESS: Can we go ahead and take a 10-minute break?

MS. COLTRANE: Sure.

THE VIDEOGRAPHER: The time is 12:53 p.m. Eastern time, and we are now off the record.

(FOURTEEN-MINUTE RECESS)

THE VIDEOGRAPHER: The time is 1:07 p.m.

Eastern time. We are back on the record.

Q Mr. Ammel, I want us to go back to Exhibit 7, which is the October message.

A Okay.

Q Can you see my screen?

A I can.

Q So it looks like Ms. Ammel responded to the message at 8:00 a.m. on October 4th. You can see that at the top. But if we zoom in, the messages that Ms. Sinema sent to you, "I miss you. Putting my hand on your heart. I'll see you soon" -- do you acknowledge that those were sent the night before?

A I do not recall receiving those messages. You can tell by the timer on them that they were just opened.

Q But you don't recall receiving the messages?

A You can tell by the timer on them that they were just opened.

Q I need you to respond "yes" or "no." Do you recall receiving the messages?

A I do not recall receiving the messages.

Q Okay. And do you remember -- I know you said that your flight schedule -- you're not sure what time you arrived home on October 3rd. But do you remember doing anything with your family the night

of October 3rd?

A I do not remember.

Q You don't remember going to dinner October 3rd?

A I do not.

Q You don't remember going to Red's Corner on October 3rd?

A I do not.

Q Okay. I want to go back to the question where I asked you why did your relationship with Ms. Ammel end? Can you give your response again, please?

A Heather became psychologically abusive after I sought mental health treatment in November of 2016, and then she became physically abusive in January of 2024.

Q Okay. Can you explain to me -- you said she's psychologically abusive. What does that mean?

A She used -- I had become chemically dependent on narcotic painkillers due to extensive health problems and injuries, and she held that over my head, and my childhood abuse.

Q So what does that mean she held it over your head?

A She threatened to -- she blackmailed me with telling everyone that I know that I had been abused as a little boy and that I was dependent on narcotic painkillers.

Q Who did she tell that to?
A She would tell it to everyone she met. So she told all of her family, and then her few friends that she has, and she'd tell the neighbors.
Q Can you tell me -- you said that she was physically abusive. Can you explain that to me?
A Yeah. Starting in January 2024, she began -- she first hit me in my face with my cell phone. You can see the scar right here. She split my face open right here. And then after I didn't call the police that first time, she began regularly hitting me after that. So due to her untreated mental health conditions, her eyes go all schizophrenic and her face turns purple, and then she would chase me around the house or through the yard trying to hit me.
Q And you continued to stay with her even though you say she was physically abusive?
A This is common with domestic violence victims.
Q Are you saying that you're a domestic violence victim?
A Yes.
Q All right. Let's go back to your domestic deposition transcript again, Exhibit 5. Let's pull that up.

A Okay.
Q Okay. Let's go to Page 62.
A What page was that again?
Q 62. So I want to ask you a question first. Whose decision was it to separate?
A It was mine.
Q Okay. So if we look at Page 62 of your domestic deposition transcript, Lines 13 through 16, it looks like you said -- you testified here that both the divorce and separation were Heather's idea. Can you explain to me how your testimony today differs from what you said on the date of your domestic deposition?
MR. EPSTEIN: Objection to form.
Q I can rephrase the question. Explain why your testimony today that it was your idea to separate is different from your testimony given at your domestic deposition where you said that it was Heather's idea to separate.
A Heather had been threatening me with divorce since 2016. And it was my decision to physically separate.
Q Okay. So your testimony in your domestic deposition is not truthful?
A I disagree.

Q But you acknowledge that you said on Lines 13 through 15 that both the divorce and separation were Heather's idea?
A Yes. Heather had been talking about divorce and separation since 2016, and I was the one that ultimately decided to separate.
Q Okay.
A She had planned for the divorces and the separations. I chose to separate my own way.
Q Can you explain that?
A She wanted to do some type of structured separation, and I had no desire to do that.
Q Why?
A Because after she became physically abusive, I had no desire to stay in the marriage.
Q And when did you make that decision?
A In January of 2024.
Q But you didn't officially separate until November 1st, 2024?
A This is common with domestic abuse victims to protect their abuser. And she had threatened me with blackmail to expose my childhood abuse on a public level.
Q So just to clarify, it was -- your testimony today is it was your decision to separate, and that was

due to Ms. Ammel being physically and psychologically abusive?

A And threatening me with divorce for over eight years.

Q Okay. Will you scroll down with me in Exhibit 5 to Page 92? Or actually, stop at 80. Let's stop at 80. So it looks like at the bottom of 80, Ms. Foushee asked, "What is the reason for your divorce?" And it looks like your answer is -- and you can see that line --

MR. EPSTEIN: Well, object to the form. That's not what it says.

Q Okay. Let me rephrase. Mr. Ammel, do you see in Paragraph 12 through 22, you give --

MR. EPSTEIN: Do you mean lines -- do you mean Lines 12 through 22?

MS. COLTRANE: Yes.

Q Lines 12 through 22. This is your testimony that day. And the last sentence is, "And so that is the reason why we are divorcing." Then Ms. Foushee asked the question in Line 23, "What is the reason?" And in Line 24, your answer is, "Her unwillingness to allow me to pursue a job that provides me purpose and meaning following my military career. I think that's a pretty

justifiable reason to end what became a toxic marriage." Do you see that?

A I do.

Q Okay. Can you explain to me why your testimony today that the reason why you ended your marriage was because Ms. Ammel was physically and psychologically abusive versus your testimony during your domestic deposition where you say the reason is her unwillingness to allow you to pursue the job that you wish to have?

MR. EPSTEIN: Objection to form.

Q I can rephrase the question. Can you explain to me why your testimony today differs from how you testified during your domestic deposition for the reason of your divorce?

A Those two reasons are exactly the same. You're trying to split hairs here. She would not allow me to pursue a purposeful career, and would hit me when I would ask her -- for example, I was trying to become a Raleigh firefighter, but she had to take a minimum-wage job so we could afford for me to go through the academy. And when I would ask her to do that, she would hit me.

Q So is your testimony that her not allowing you to pursue the career of your choice is the same as

physical and psychological abuse?
A Yes.
Q Okay. All right. So the date that you said you and Ms. Ammel separated was November 1st, 2024. Is that correct?
A I don't remember if the official date is October 31st or November 1st.
Q You testified earlier that the date was November 1st, 2024.
A Okay.
Q Did you and Ms. Sinema have an affair prior to your separation?
A Yes.
Q Okay. And when, in your opinion, did your relationship with Ms. Sinema begin?
MR. EPSTEIN: Objection to form.
A Memorial Day weekend. Sorry. Repeat the question, please.
Q I believe I heard you say Memorial Day weekend. Is that correct?
A Memorial Day weekend 2024.
Q Do you know those dates?
A I believe it was the 23rd through the 27th.
Q Of?
A May.

Q Of 2024?
A Correct.
Q And how do you know it was that date?
A Travel records.
MR. EPSTEIN: I'm sorry. I didn't hear that. Can you say that again? Can you -- Matt, can you say what you just said? I couldn't hear it. Sorry.
THE WITNESS: I looked at my travel records.
MR. EPSTEIN: Thank you.
Q So what about the travel records helped you determine that that was the date that your relationship with Ms. Sinema began?
A Because it was when I was in Napa, California.
Q And what happened on that trip?
A We had sex.
Q Was that the first time you had sex with Ms. Sinema?
A It was.
Q Okay. You mentioned documents -- that you looked at your travel records to support that date. Did you bring those documents with you today?
A I did.
Q Can you send them to us? Can you provide us with those documents?

A I believe you have them.

THE WITNESS: Steve, don't they have my American Airlines travel records?

MR. EPSTEIN: Yeah. These are the same records that were produced.

THE WITNESS: Exhibit 8.

MR. EPSTEIN: And apparently, that is Exhibit 8, as well. So they were produced --

MS. COLTRANE: Okay.

MR. EPSTEIN: -- to you, and you've marked them as an exhibit for today as Exhibit 8.

Q Okay. So just to clarify, the documents that we requested that you bring to the deposition --

MS. COLTRANE: Steve, is it your position that those documents have already been produced with your client's discovery responses?

MR. EPSTEIN: I don't have a position. I don't recall ever seeing that subpoena. If that's -- if I've seen that subpoena, I didn't recall that there was an Exhibit A. So the first time I ever looked at that Exhibit A was earlier today during the deposition. So I don't have --

MS. COLTRANE: Okay.

MR. EPSTEIN: -- any position. But I do know that there were numerous travel records of Mr.

Ammel's that were produced by Ms. Sinema, including what you marked as Exhibit 8.

MS. COLTRANE: Right. So who produced those records to you?

Q So I guess, Mr. Ammel, I can ask you the question. Mr. Ammel, were you aware that you were supposed to produce documents and bring them to this -- to this deposition today?

A No.

Q Okay. So let's look at -- let's go back to Exhibit 6. We addressed this earlier at the beginning of the deposition, but let's everyone go back. Mr. Ammel, earlier in the deposition, I asked you if you had been served with a subpoena to appear today, and you said that you had. And then we walked through Exhibit A, which is attached to the subpoena, which we read through all of the documents that you were required to bring to today's deposition, and you said you didn't know if you had them. So I'll ask the question again. Do you have those documents that we've asked you to bring today?

A I don't believe so.

Q Have you previously produced these documents?

A I don't know.

Q You don't know? It's a yes or no answer. Have you given these documents to anyone?
A No, I have not.
Q How did Mr. Epstein receive your travel records?
A From Ms. Sinema.
Q So did you provide those travel records to Ms. Sinema?
A I gave her access to my American Airlines account.
Q When did you do that?
A I don't recall.
Q Was that recently?
A I don't recall.
Q Okay. All right. Let's everyone go back to Exhibit --
MR. EPSTEIN: Did you say 5?
MS. COLTRANE: 5. That's correct.
A 5.
Q Page 64. Actually, let's look at the bottom of 63, Lines 24 and 25. Are we there, Mr. Ammel?
A Yes.
Q Okay. Again, this is during your domestic deposition. Ms. Foushee says, "When did you first become physical intimate with your girlfriend?" It looks like you respond, "In January of this year." And January of this year -- you were deposed in

2025, to be exact, August 12th, 2025. So in January, I assume that you're talking about January 2025. Is that correct?
A I don't know.
Q You don't know which January you were talking about during your deposition?
A It says, "January of this year," so that would have been January 2025.
Q Okay. So it looks like you testified here that your relationship with Ms. Sinema began in January of 2025. And today your -- or your testimony is that your relationship began Memorial Day weekend of 2024. Can you explain why those dates are different?
A I lied during the first deposition because I was scared I was going to lose my children.
Q How does you having an affair impact your children?
A Heather had always threatened me that she is going to destroy my life if we have a divorce and take my kids from me, and she has done that since separation.
Q She took your kids?
A Yes.
Q Who determined that?
A The Court.

Q The Court determined that she have custody of your kids?
A Yes.
Q Okay. So you said that -- here, I'll exit off this for now.
You and Ms. Sinema had sex for the first time Memorial Day weekend 2024. Where did -- where was that?
A It was in Napa, California.
Q Where?
A At an Airbnb.
Q Do you have the address of that Airbnb?
A I do not.
Q Did anyone else know about your relationship with Ms. Sinema?
A No.
Q Did you inform Ms. Ammel about your relationship with Ms. Sinema?
A No.
Q Did she know about it?
A No.
Q Did you try to hide your relationship from Ms. Ammel?
A Yes.
Q Why did you want to keep it a secret?

A To protect my children.
Q Why?
A Because of the -- I knew that their mom was going to describe the separation as all my fault.
Q All right. After your relationship with Ms. Sinema became sexual, would you and Ms. Sinema communicate regularly?
A No.
Q Would you ever communicate when you were in North Carolina after you began your relationship with Ms. Sinema?
A No.
Q Ever?
A No.
Q So in the times that you and Ms. Sinema did communicate, what would you discuss?
A I was still on her security detail, so on travel trips, we would still discuss pickup times, drop-off times, and addresses of meetings.
Q Okay. Did Ms. Sinema ever come visit you in North Carolina?
MR. EPSTEIN: When you say "ever," please define --
MS. COLTRANE: Prior to the --
MR. EPSTEIN: -- what you mean by "ever."

MS. COLTRANE: -- date of separation.

MR. EPSTEIN: Thank you.

A No.

Q Did Ms. Sinema ever come visit you after the date of separation?

A Yes.

Q When?

A She helped me move into my house. I believe that was in May of 2025.

Q Was that her first visit to North Carolina?

MR. EPSTEIN: When you say, "Was that her first visit to North Carolina," what do you -- what do you mean by that?

Q Was that her first visit to North Carolina to see you after your relationship with her began?

A Yes. I believe so.

Q When did Ms. Ammel learn of your relationship with Ms. Sinema?

A I don't know.

Q Let's look at Exhibit 9. Can you see the screen?

A Yes.

Q Okay. So these are some messages that Ms. Ammel captured between you and Ms. Sinema. So on the first one, it looks like Ms. Sinema said, "I hope your day was okay. Thinking of you." Looks like

you responded, "I really miss you." Then she says, "I'm with you." And then Ms. Sinema says, "I keep waking up during my sleep and reaching over for your arms to hold me." Do you remember this message?
A I do. I remember Heather confronting me with this message.
Q Do you know when this was?
A I do not.
Q Do you remember where you were when you received the message?
A I do not.
Q And then if you scroll down, it looks like there's another message. Looks like at one point she shared her location with you. Did she do that frequently?
A Yes. Whenever she was doing a running event, we would track her location for security.
Q Okay. There looks like she sends you some code. And then she says, "I cannot sleep. I am miserable. And I want at least one of my pens back. You have them both. Please give me one back now." Do you remember this message?
A I do not.
Q And then if you scroll down, there is the October

message. So did Ms. Ammel confront you about the affair after October, or once this message was received in October, October 3rd and October 4th?

A I do not recall the date that she confronted me.

Q Okay. So if we look at Exhibit 1, which is Ms. Ammel's complaint, Ms. Ammel alleges that --

MR. EPSTEIN: Can you tell me where you are?

MS. COLTRANE: Yes. Exhibit 1. That's Ms. Ammel's complaint. Page 4.

MR. EPSTEIN: Thank you.

Q So if we look at Paragraphs 38, 39, and 40 --

MR. EPSTEIN: Wait a second. 38, 39, and 40 are not on Page 4.

MS. COLTRANE: Excuse me. Page 7 of 14. Yeah.

MR. EPSTEIN: Thank you.

Q Do you see where I am, Mr. Ammel?

A Yes.

Q Okay. Paragraphs 38, 39, and 40. We're talking around the time frame of June 2024. So Ms. Ammel -- based on the plain language of what she says here, she discovered the message of -- where Ms. Sinema says that she keeps waking up during her sleep and reaching over for your arms to hold her. That would have been around the time of June 2024.

Would you say that that timeline is when you remember receiving the first message that we just discussed, the message where Ms. Sinema says she keeps waking up during her sleep and reaching over for your arms to hold her?

A Can you repeat your question, please? I'm confused.

Q So according to Ms. Ammel's complaint, she remembers you receiving the message around June 2024, the one that you received from Ms. Sinema where she says she keeps waking up during her sleep and reaching over for your arms to hold her. Would you agree with that timeline?

A I do not recall when I received that message.

Q Do you remember Ms. Ammel confronting you about that message?

A I do.

Q Do you remember Ms. Ammel confronting you after the October message?

A Yes.

Q And how did that conversation go?

A I don't remember.

Q So you don't remember how the interaction went when Ms. Ammel confronted you about the affair?

A I do not. She more than likely hit me.

Q How are you so sure that she did that?
A It was a regular occurrence. That's why I traveled and stayed away from home so much. Any time I was home, she would become physically abusive.
Q Okay. So after Ms. Ammel confronted you about the affair, although you don't remember that exact interaction, how was your relationship with Ms. Ammel after that?
A I decided on January 24 that I was going to separate and divorce her, and so I did whatever I could to keep her calm during that time period.
Q Did you and Ms. Ammel do anything to try to restore or preserve your relationship after the October 3rd message?
A No.
Q Did you and Ms. Ammel go to counseling?
A I went with her to see her substance abuse counselor twice, I believe.
Q Why did you do that?
A She had asked me to.
Q Was the topic of marriage discussed at all?
A The topic of separation was discussed.
Q Did Ms. Ammel want to remain married to you?
A I don't know.
Q When did you go to counseling with Ms. Ammel?

A It would have been sometime during 2024. I don't recall the exact dates.
Q Was it after the October message?
A I believe we did see him after the October message.
Q Do you have a date for that?
A I think October 17th.
Q And what type of counselor did you say this was?
A He's a substance abuse counselor.
Q Did you and Ms. Ammel go on any trips in October?
A Yes. We went to Nashville for one night.
Q And when was that?
A It was October 25th.
Q You said it was for one night. So October 25th through the 26th. Is that right?
A I don't know. It sounds about right.
Q And where did you and Ms. Ammel go?
A To Nashville, Tennessee.
Q And where did you stay?
A At a hotel.
Q What hotel?
A I don't recall. I'm sure it was a Marriott.
Q Were you looking forward to that trip?
A I'm a big fan of Sturgill Simpson.
Q Did you plan the trip?
A No.

Q Who planned the trip?
A I think we jointly planned it.
Q Did you book the flights for the trip?
A More than likely, yes.
Q Did you buy the tickets for the trip?
A More than likely, yes.
Q Did you know that you were going for the purpose of your anniversary?
A No.
Q So you were not going on the trip to celebrate your anniversary?
A No. It was known that we were going to -- as one final thing for the end of our marriage.
Q Okay. What happened on this trip?
MR. EPSTEIN: Objection to form.
Q What all events occurred on the trip? You mentioned you saw a concert. What else happened between you and Ms. Ammel on the trip?
A Can you clarify?
Q I'm sorry?
A Can you clarify what you're asking?
Q What did you and Ms. Ammel do on this trip in Nashville?
A We went to a concert and we went to a bar.
Q Did you stay in the same hotel room?

A We did.
Q Did you have sex in the hotel room?
A We did not.
Q Did you have sex in the shower on this trip?
A We did not.
Q Did you shower together on this trip?
A We did not.
Q Did you sleep in the same bed on this trip?
A I slept on the couch.
Q Did you attend the concert together?
A Yes.
Q Did you take any photos at the concert together?
A Yes.
Q All right. I want to look at some more exhibits. We'll start with Exhibit 2, Page 10. Page 9 and 10. Excuse me. Are you there?
A Yes.
Q So Ms. Ammel's recollection of this trip seems quite different from yours. She remembers you being very romantic on the trip, having sex on the trip, being physically together on the trip. So is it your testimony today that none of this happened?
A That's correct.
Q All right. Now let's go to Exhibit 4, Pages 6 through 7. That's your declaration. Okay. At the

bottom, you say -- the bottom of Page 6, Paragraph 24 -- do you see where I am?

A I do.

Q It looks like you say, "At no point did we discuss anything about our anniversary. We actually made no plans for our anniversary other than me taking my son to his baseball game." Would you say that's a true -- your true and accurate statement?

A Yes.

Q Okay. So if you'll scroll down, I'm going to talk about a few messages. Looks like at the bottom -- looks like 293 here, but you can see at the bottom Page 10 of 28. It looks like you sent a message that says, "I'm not going to be able to go to Sturgill in Greensboro. We got invited to a MAPS event in Vegas. I'll catch the redeye home and be there for our anny. Can I get us tickets someplace else?" Do you acknowledge that you were talking about an anniversary trip there?

MR. EPSTEIN: Objection to form.

Q When you say, "I'll catch the redeye home and be there for our anny," whose anny are you talking about?

A I mean, the date of our anniversary coincided with the concert.

Q Okay. But when you say, "I'll be there for our anny," what does that mean?
A The date of the concert coincided with the date of our anniversary, so it was a reference to a date.
Q Okay. And if you scroll down, you can see that you and Ms. Ammel --
MR. EPSTEIN: Can you tell me where you're at specifically? Thank you.
MS. COLTRANE: Yes. Page 12 of 28. That's what's at the bottom. Just keep scrolling.
Q So in your declaration, you said that you didn't make any plans for your anniversary, but it looks like on 9-22-24, Ms. Ammel sent you a message, "You'll be able to take Bubba man to his game on our anniversary at 6:00. I'll be getting my mom from the airport at 5:30 and can come straight to the game." And it looks like you said, "Yeah." Ms. Ammel says, "Cool. Can you book our hotel?" And you say, "Can you send me a picture of your credit card?"
So did someone keep your kids during this trip?
A Yes.
Q Who?
A My ex-mother-in-law.

Q So this was a planned event?
A To attend a concert.
Q Together --
A Yes.
Q -- with Ms. Ammel?
A Yes. We planned to attend a concert together.
Q Did you want to go?
A Yes. I'm a big fan of Sturgill Simpson.
Q Did you want to be there with Heather?
A No.
Q Or Ms. Ammel?
A No.
Q Then why did you go?
A It's common with domestic abuse victims to protect their abuser.
Q Okay. All right. I want to scroll back up to your declaration. Okay. Paragraph 26, Page 7. Looks like you said in Paragraph --
A Which exhibit? Which exhibit is this?
Q This is -- we're on the same exhibit. This is his [sic] declaration, Exhibit 4, Paragraph 26, Page 7. Are we there?
A Yes.
Q You say in Paragraph 26, "We had no physical contact of any kind during our time in Nashville."

Would you say that that is a true and accurate statement? Is that your testimony today?

A I should have said we had no romantic physical contact.

Q So now let's go back to Exhibit 2. This is Ms. Ammel's declaration. And if we scroll to Exhibit C -- I have it also pulled up on the screen. Are you there?

A Yes.

Q So Ms. Ammel incorporated some messages when she explains what happened or her recollection of the anniversary trip and the messages that looks like you sent to her on October 26, which would have corresponded with your dates of the anniversary trip. It looks like this is a message from you that says, "That was fun," and it's a picture of the two of you at a concert. Would you say that that's a -- did you -- did you send that message to Ms. Ammel?

A Yes.

Q And did she respond "The best" with a heart?

A It appears so.

Q If we scroll down, looks like you messaged her and said, "Did you make it home okay?" She said, "Just got to the car," kissy face. And then if you keep

scrolling, she says, "I miss you. Thanks for going to Sturgill with me. Let's make some time to have fun together." And you say, "I miss you, too." Did you send that message where you say, "I miss you, too"?

A It appears so.

Q Did you miss her?

A This is common with domestic abuse violence to protect their abuser.

Q Answer the question. Did you miss her?

A No.

Q So you just said it even though you didn't miss her?

A This is common with domestic abuse violence. Yes.

Q Okay. And if you scroll down to the last text, it looks like at one point she said, "I love you. Text me when you arrive." And you say, "I love you, too." And then she sent a picture of the two of you in a hotel room. Did you receive this message?

A It appears so.

Q And you said, "I love you"?

A Yes. Again, this is common with domestic abuse victims to protect their abuser.

Q Okay. So where did you go after the Nashville

trip?
A I believe to Phoenix.
Q Okay. Who was in Phoenix?
A My little brother, and Kyrsten, and some of her friends.
Q And where did you go after you left Phoenix?
A The Grand Canyon.
Q And where did you go after you left the Grand Canyon?
A I believe I returned to Moore County, North Carolina.
Q When did you go to Saudi Arabia?
A Saudi Arabia was in -- no. You are right. We went to Saudi Arabia following the Phoenix trip.
Q And who went to Saudi Arabia?
A Myself, Kyrsten, and some of her staff.
Q And what were you doing in Saudi Arabia?
A We were there for the ILA conference.
Q Do you know the dates that you were there?
A I would have to look them up.
Q Okay. You can do that.
A You want me to do it now?
Q Yes. Please look up the dates that you were in Saudi Arabia.
A I was incorrect. I was in Saudi Arabia from

October 27th to November 1st.

Q Okay. So you left Saudi Arabia on November 1st, correct?

A Correct.

Q And where did you go on November 1st?

A I returned to North Carolina and moved into my apartment.

Q Did anyone return to North Carolina with you?

A No.

Q Did Ms. Sinema come with you to North Carolina that day?

A No.

Q Where was she?

A I don't know.

Q So you don't know where she went when she left Saudi Arabia?

A I don't know.

Q Did you travel together?

A Home from Saudi Arabia? Yeah.

Q Did you and Ms. Sinema travel together home from Saudi Arabia?

A Yeah.

Q But you don't know where she went?

A After we split ways, no.

Q Where did you split ways?

A I don't recall what airport we landed at.
Q So you don't remember where she went?
A No.
Q So after you and Ms. Ammel separated on November 1st -- or rather on November 1st, how did you present it to the children?
A I told them me and their mom were divorcing, and that I was moving to an apartment down the road, and that I still loved them very much.
Q Did they believe that, or did -- do you believe that they still had hope that this marriage would be restored?
A I don't know what my children thought.
Q But based on what you told them, did they think that this was temporary or permanent?
A I told them I was divorcing their mom.
Q Okay. Did Ms. Ammel -- do you think Ms. Ammel had hope that the marriage would be restored?
A I don't know what Ms. Ammel thought.
Q She didn't say anything to you?
A I know that she had wanted to do some type of structured separation, but I was not interested in that.
Q What is a structured separation?
A Great question.

Q Based on what she told you, what did she say a structured separation was?
A She still wanted to exhibit control over me.
Q So is it your testimony a structured separation is Ms. Ammel asserting her control over you?
A Yes.
Q So after you and Ms. Ammel separated, did you ever go back to the marital residence?
A Yes. My children were still there.
Q What would you do there?
A Play with my kids. Mostly build bike jumps in the yard.
Q You never touched Ms. Ammel in a romantic way when you would go back to the marital residence?
A I'm sure I gave her a hug at some point.
Q Why did you do that?
A To comfort her through the divorce. I don't know.
Q But you did -- you said that you didn't love her?
A That's correct.
Q Did you still have feelings for her?
A She's the mother of my children.
Q Well, what does that mean? I mean, that's not answering the question. Did you still have feelings for her?
A I do not have romantic feelings for her. No.

Q So where did you spend Thanksgiving in 2024?
A I don't recall.
Q You don't remember Ms. Ammel hosting your family that Thanksgiving?
A Actually, yes, I do. My little brother and his family came up for Thanksgiving.
Q Did you go over for Thanksgiving?
A I did.
Q Who prepared the meal at Thanksgiving?
A I'm sure both myself and Heather prepared the meal.
Q And where did you spend Christmas in 2024?
A In Leavenworth, Kansas.
Q And who went on that trip?
A My three children and Heather.
Q Did you travel together as a family?
A Yes. We drove from North Carolina to Kansas together.
Q Even though you were separated?
A Yes.
Q Why?
A To provide safety for my children.
Q Okay. Did you and Ms. Ammel sleep in the same bed on that trip?
A On Christmas Eve, we slept in the same bed in my parents' house.

Q Why did you do that?
A Because she wanted to spend Christmas morning at my parents' house with the kids.
Q Did anything sexual happen then?
A No.
Q When did you and Ms. Ammel last have sex?
A I believe it was summertime of 2024.
Q So after your relationship with Ms. Sinema began, you still had sex with Ms. Ammel?
A Yes. I believe two or three times.
Q But your testimony is that you didn't have sex on the anniversary trip?
A That's correct.
Q Did Ms. Sinema know about the anniversary trip?
A Yes.
Q What did she think about that?
A It was not an anniversary trip. We were just attending a concert together.
Q But she was okay even though she was -- Ms. Sinema, your girlfriend at the time, was okay with you going on a trip with your wife?
A I believe she understood it to be the last thing I was going to do with her.
MS. COLTRANE: Okay. Let's take a 10-minute break and then we'll come back.

THE VIDEOGRAPHER: The time is 12:01 [sic] p.m. Eastern time, and we are now off the record.

(TWELVE-MINUTE RECESS)

(Whereupon, Ms. Jenkins enters the deposition.)

THE VIDEOGRAPHER: The time is 2:13 p.m. Eastern time. When we went off the record earlier, I said it was 12:01. It was actually 2:01 p.m. Eastern time, and we are now back on the record at 2:13 p.m. Eastern time.

Q Mr. Ammel, I want to talk about your relationship with Ms. Sinema.

A Okay.

Q Would you say that Ms. Sinema pursued you?

A No.

Q Did you pursue her?

A No.

Q Was she flirty with you at all prior to November 1st, 2024, the date of your separation?

A Can you describe flirty?

Q Well, you can tell me what's flirty. How would you describe flirty?

A I don't know.

Q Sexual? Romantic?

A There was no sexual or romantic flirtation between myself and Kyrsten prior to our relationship

starting.

Q Okay. Let's go back to Exhibit 5, your domestic deposition transcript. If you will, pull up Page 64. Are you there, Mr. Ammel? Do you see the screen?

A What page?

Q Page 64. We're on Exhibit 5.

A Okay.

Q So when we asked you about this page earlier, this is where you said that you lied, because in your domestic deposition, you testified that your relationship with Ms. Ammel [sic] began in January of 2025, and your testimony today is that your relationship -- or excuse me -- with Ms. Sinema began Memorial Day weekend 2024.

So I want to direct you to Line 8 through 10. And, again, this is the conversation where Ms. Foushee is asking you about your relationship with Ms. Sinema. And Ms. Foushee says, "Did she share any romantic feelings to you prior to January?" And you say, "I mean, the entire time I've known her, she's been flirty with me." Can you explain your testimony there?

A I've already explained earlier that I lied during this section because I was scared of losing my

children.

Q Okay. So you're confident today that your relationship with Ms. Sinema began Memorial Day weekend 2024. Is it also your testimony -- because you said this earlier -- that there were absolutely no romantic messages between you and Ms. Sinema from April 2022 to November 1st, 2024?

A Can you repeat --

MR. EPSTEIN: Objection to form. Romantic messages other than the ones that you showed? I'm confused.

MS. COLTRANE: I can clarify.

MR. EPSTEIN: Yeah.

Q Since your relationship began in May -- or Memorial Day weekend 2024, is it your testimony today that you and Ms. Sinema engaged in any communication other than work-related communications? You didn't talk about your relationship?

A Ms. Coltrane, your question doesn't make any sense.

Q Okay. I'll rephrase. Your relationship with Ms. Sinema began Memorial Day weekend 2024. Is that correct?

A Yes.

Q Okay. You testified earlier that from April 2022 to November 1st, 2024, that there were absolutely

no romantic communications between the two of you during that period. Is that correct?

A We previously discussed romantic communications between me and Ms. Sinema, so I'm confused by your question.

Q Did you talk about sex with Ms. Sinema after Memorial Day weekend 2024 to November 1st, 2024?

A Did we discuss sex?

Q Correct.

A Yes.

Q Where did you discuss sex?

A In person.

Q Did you ever have any communications over the phone about sex?

A Not that I recall.

Q Were there any messages that you sent back and forth about sex?

A No.

Q So you never discussed sex with Ms. Sinema from -- we'll start with this date first -- from April 2022 through November 1st, 2024?

MR. EPSTEIN: Objection. Objection to form.

Q I'll ask it again. Did you and Ms. Sinema ever discuss sex from April 2022 through November 1st, 2024?

MR. EPSTEIN: You've asked that question and he's answered that question. But go ahead.

MS. COLTRANE: He asked the -- he answered that they discussed it in person, not over text or messaging.

Q Did you discuss it over messaging?

A No. You've already asked this question.

Q Okay. Where are you now, Mr. Ammel?

A I'm in Cave Creek, Arizona.

Q Who is with you?

A I'm alone in my home office.

Q Is Ms. Sinema with you?

A Not in my office. No.

Q Is she in the house?

A Yes.

Q Where?

A I believe she's in the kitchen.

Q Did she help you prepare for your deposition today?

A No.

Q Did you discuss this deposition at all with her today?

A Did we talk about the deposition? Yes.

Q What did you talk about?

A That the deposition is today.

Q Anything else?

A We said a prayer beforehand.
Q Did you discuss how you were going to respond to questions today?
A No.
Q Did you review any documents in preparation for your deposition today?
MR. EPSTEIN: Objection to form. I'm going to instruct you again not to answer regarding anything that happened during your preparation session that occurred yesterday.
MR. TANNER: I second that.
Q Outside of your preparation session with your two attorneys, did you review any documents to prepare for this today?
A Yes.
Q What were those documents?
A The nine exhibits that I have in front of me.
Q And you did not bring any other documents that we requested you bring in the subpoena today?
A I did not. I do not know if my lawyer did.
Q Did you produce those documents to your lawyer?
A I don't know.
Q You don't know if you produced those documents to your attorney?
A Yes. I don't know.

Q And then going back to a question in the beginning, I asked, you know, "What is your current occupation," and you said, "Cowboy." Can you explain to me what that is?
A A cowboy is a person who manages a herd of cattle.
Q And where are you a cowboy?
A Camp San Luis Obispo, California.
Q Where do you live there?
A I live at the Cross Creek Ranch.
Q Do you live in a house?
A Yes.
Q But you don't have an address for that house?
A I can look it up for you.
Q Yes. We need that.
A Would you like me to do that?

MR. EPSTEIN: Are you asking -- are you asking him to do that right now?

MS. COLTRANE: Correct. Yes.

A The address is 76540 Indian Valley Road, San Miguel, California 93451.
Q Thank you. Mr. Ammel, do you plan to be at the evidentiary hearing on August 19th?
A No.
Q Why?
A I have work.

Q Just a few more questions, Mr. Ammel. So it was your testimony earlier that after you and Ms. Ammel separated that there was nothing that you did to try to preserve your marriage. But do you remember you and Ms. Ammel discussing a marriage retreat?
A Yes. I remember her discussing that.
Q Did you agree to it?
A No.
Q You said no?
A No. She attended it with her friend.
Q The marriage retreat wasn't planned -- she didn't plan to attend the marriage retreat with you?
A I don't know what she planned, but I did not plan to attend the marriage retreat with her.
Q Did she ask you to attend it with her?
A Yes.
Q Do you know when it was?
A I believe it was Memorial Day weekend 2024.
Q There was -- it wasn't after the separation?
A No.
Q Okay. Mr. Ammel, did Ms. Sinema influence your decision at all -- since it's your testimony today that the separation and divorce was your idea, which contradicts your previous testimony. But did Ms. Sinema have any influence over your decision to

separate from Ms. Ammel?

MR. EPSTEIN: Objection to form.

Q You can answer the question, Mr. Ammel.

A Repeat -- it doesn't make any sense. Can you restate the question?

Q In your previous testimony in your domestic deposition, you testified that it was Ms. Ammel's idea for the separation and divorce. Today, your testimony is that it was your idea for the separation and divorce. So my question to you is this: Did Ms. Sinema have any influence over your decision to separate?

MR. EPSTEIN: Objection to form.

Q Mr. Ammel, do you understand my question?

A No.

Q Did Ms. Sinema have any influence over your decision to separate from Ms. Ammel?

A No.

Q And it was your testimony earlier that Ms. Ammel was psychologically and physically abusive. Are you scared of Ms. Ammel?

A Yes.

Q But you're a security guard?

A I mean, that's obviously a ridiculous statement, as a man cannot retaliate physically against a woman,

even though she is hitting him. So as a security guard, what was I supposed to do when I would be hit? Was I supposed to hit her back, Mary?

MS. COLTRANE: I'm not the one answering questions today, Mr. Ammel.

All righty. I think I am done with my questions for today, so that concludes this deposition.

MR. EPSTEIN: Well, no. Actually, it concludes your part of the deposition. So we're going to take a break. Let's take 10 minutes before I start my part of the deposition.

MS. COLTRANE: Sounds great.

THE VIDEOGRAPHER: The time is 2:28 p.m. Eastern time, and we are now off the record.

(EIGHT-MINUTE RECESS)

THE VIDEOGRAPHER: The time is 2:36 p.m. Eastern time, and we are back on the record.

CROSS-EXAMINATION BY MR. EPSTEIN:

Q Good afternoon, morning, whichever it is out there, Mr. Ammel. Do you presently reside in the State of California?

A Yes.

Q Since when have you resided in California?

A Since March.

Q March of this year, 2026?
A Correct.
Q Are you employed in California?
A Yes.
Q Where did you reside before California?
A Cave Creek, North Carolina. Or sorry. Cave Creek, Arizona.
Q How long did you reside in Arizona?
A From November until March.
Q From November of 2025 until March of 2026?
A Correct.
Q Okay. And were you employed while you were residing in Arizona?
A Yes.
Q When did you last live or reside in North Carolina?
A I left in November of 2025.
Q Okay. Do you still have a house or an apartment in North Carolina?
A No.
Q All right. Did you and Ms. Sinema begin a romantic affair while you were still married to Heather Ammel?
A Yes.
Q When did that affair begin?
A Memorial Day weekend 2024.

Q Where -- what city were you in when that affair began Memorial Day weekend?
A Napa Valley, California.
Q Were you working a security detail for Ms. Sinema that weekend?
A Yes.
Q Was there -- was there an Airbnb that was rented for several people?
A Yes.
Q Who was staying at that Airbnb, as best you can remember?
A Myself, the other member of the security detail, Ms. Sinema, and two of her friends.
Q Did you have your own room?
A Yes.
Q Did Ms. Sinema have her own room?
A Yes.
Q At some point in the evening, did you and Ms. Sinema kiss?
A Yes.
Q Where were you physically when that happened?
A Outside.
Q Outside at the Airbnb?
A Yes.
Q Who initiated that kiss?

A I did.

Q Prior to you initiating that kiss Memorial Day weekend in Napa Valley, California, had there been any physical intimate contact between you and Ms. Sinema from the time you met her in 2022 until that moment?

A She would give hugs. That's the only physical contact I had with her.

Q Okay. And what would be the occasion of those hugs that you would receive from her prior to Napa, California?

A At the end of trips, she would hug myself and the other members of the security detail and the rest of her staff to thank them for their work.

Q Serial hugs to everybody involved in the trip?

A Yes.

Q Okay. And that happened on every security detail that you did for her?

A Sometimes circumstances wouldn't allow it, but most of them, yes.

Q Okay. What -- did you ever interpret any of those hugs as being romantic or intimate?

A No.

Q What happened after the two of you kissed outside of the -- outside of the Airbnb in Napa, California

Memorial Day weekend 2024?
A We went back to my room and had sex.
Q Did you actually sleep together that night, as well?
A Yes.
Q Were you and Ms. Sinema physically intimate, including sexual intercourse, in New York City in June 2024?
A Yes.
Q Were you and Ms. Sinema physically intimate, including sexual intercourse, in Washington, DC in July 2024?
A Yes.
Q Were you and Ms. Sinema physically intimate, including sexual intercourse, in Aspen, Colorado in August 2024?
A Yes.
Q Were you and Ms. Sinema physically intimate, including sexual intercourse, in Washington, DC in September 2024?
A Yes.
Q Were you and Ms. Sinema physically intimate, including sexual intercourse, in Phoenix, Arizona in October 2024?
A Yes.

Q And all of that happened prior to your separation from Heather Ammel?

A Yes.

Q Were you ever physically together with Ms. Sinema in the State of North Carolina prior to your separation from your wife, whatever the occasion? Did it ever happen prior to your separation that the two of you were physically together in the same space?

A Can you repeat the question for me?

Q Yeah. I'm sorry. I phrased it badly. I'll try again. Were you and Ms. Sinema ever at some security-related event in North Carolina prior to your separation from Heather Ammel?

A Yes. In February of 2023, Ms. Sinema attended an event with Senator Tom Tillis that lasted approximately six hours.

Q And you and she were at that event at the same time?

A Yes.

Q Were you physically intimate or romantic with her in any way during those six hours?

A No.

Q And was that over a year prior to the beginning of your romantic relationship with her?

A Yes.

Q Was there any other occasion that you are aware of Ms. Sinema having been in the State of North Carolina prior to November 1st, 2024?

A Not that I'm aware of. No.

Q From April of 2022 until November 1st, 2024, did you travel with Ms. Sinema on her security detail throughout the United States?

A Yes.

Q Were you with her virtually every month during those two and a half years?

A Yes.

Q Were you with her in California?

A Yes.

Q Multiple times?

A Yes.

Q Were you with her in Arizona?

A Yes.

Q Multiple times?

A Yes.

Q Were you with her in Nevada?

A Yes.

Q Multiple times?

A Yes.

Q Were you with her in Utah?

A Yes.
Q Multiple times?
A Yes.
Q Were you with her in Colorado?
A Yes.
Q Multiple times?
A Yes.
Q Were you with her in Texas?
A Yes.
Q Multiple times?
A Yes.
Q Were you with her in Illinois?
A Yes.
Q Multiple times?
A No.
Q Just once?
A Just once.
Q Were you with her in New York?
A Yes.
Q Multiple times?
A Yes.
Q Were you with her in Washington, DC?
A Yes.
Q Multiple times?
A Yes.

Q Were you with her in Florida?
A Yes.
Q Multiple times?
A Yes.
Q And were you with her in Saudi Arabia the week prior to your separation from your wife?
A Yes.
Q And all of those trips that you were with her on that we've just discussed in all of those different states, all of that occurred during your marriage to Heather Ammel?
A Yes.
Q Were you together with Ms. Sinema over 100 separate times outside the State of North Carolina during your marriage to Heather Ammel?
A Yes.
Q And just that one time in North Carolina that you described earlier?
A Yes. 2023, I believe.
Q Did you ever receive a single piece of mail from Ms. Sinema in North Carolina before the separation from your wife?
A No.
Q Did you ever have a single phone call with her while you were physically present in North Carolina

before separating from your wife?
A No.
Q Did you ever exchange a single e-mail with her while you were physically present in North Carolina before separating from your wife?
A No.
Q Okay. I want to have you look at what was marked as Plaintiff's Exhibit 4, the declaration of Matthew Joseph Ammel. And the first thing I'm going to ask you is to go to Page 8 and ask if that is your signature dated March the 3rd, 2026.
A It is.
Q And prior to your signature, Paragraph 30 indicated, "I declare under the penalty of perjury and the laws of the United States that the foregoing is true and accurate," right?
A Yes.
Q Was what was written in this declaration true and accurate, to the best of your knowledge at the time you signed this declaration?
A Yes.
Q Okay. I want to go through it with you specifically, so we're going to go back to Page 1. Paragraph 1 just indicated your age, and that you were competent to make the declaration, and that

you had personal knowledge of the facts described. And you did have personal knowledge of the facts described in your declaration. Is that right?

A Yes.

Q Paragraph 2 said that you and Ms. Ammel were married on October 23, 2010, and that your marital relationship ended in October 2024. Is that correct?

A That's correct.

Q Paragraph 3 indicated that you were in the United States Army until your official retirement in 2022, and that Ms. Ammel and you were living in Moore County, North Carolina at the time with your three children. Was that true then and is that true -- was that true at the time you signed the declaration?

A Yes.

Q Okay. Paragraph 4 says that in 2022, you began working as an independent contractor for four different companies: As a firearms instructor for Ridgeline Defense, a firearms training facility in New Hampshire; as a firearms instructor for Staccato 2011, a firearms manufacturer based in Texas; as a maritime operations instructor for Consolidated Analysis Centers, Inc. in Tunisia,

North Africa; and as a private security guard for TOA Group, a security services company based in Arizona.

"As part of my work for TOA Group," you said, "I was a member of security details for Defendant," which was Ms. Sinema. "During 2022, my travel for these four companies was extensive throughout the United States and for CACI in Tunisia. In addition, during the summer, I traveled with my wife and children by car across the country to visit our extended family members in Kansas for approximately two weeks. Thus, I was rarely in North Carolina during 2022, on average, only a few days per month." Is everything that was written in that paragraph true and accurate, to the best of your knowledge?

A Yes.

Q Let's go to Paragraph 5. It says, "I continued working for Ridgeline, Staccato, and TOA Group in 2023. My travel for these three companies throughout the United States was extensive. I also traveled to Mexico for medical treatment. In addition, during the summer, I traveled with my wife and children by car across the country to visit our extended family members in Kansas for

approximately two weeks. Thus, I was rarely in North Carolina during 2023, on average, only a few days per month." Is everything that was written in that paragraph accurate, to the best of your knowledge?

A Yes.

Q Okay. Paragraph 6, "In October 2023," you said, "I ceased working as a private security guard for TOA Group and began working as a private security guard for Kinsaker Security Group, a security services company based in Arizona. I worked for Kinsaker as an independent contractor. As part of my work for Kinsaker, I was a member of security details for Defendant. As a private security guard affiliated with Kinsaker, my travels across the United States actually increased from the work I had been doing for TOA Group." Is everything that is written in that paragraph, Paragraph 6, accurate, to the best of your knowledge?

A Yes.

Q Paragraph 7, it says, "During the first half of 2024, I continued working as an independent contractor for Ridgeline and Staccato and was providing firearms training across the country. I also continued working as a private security guard

for Kinsaker providing security services across the country." Is everything that's written in Paragraph 7 accurate, to the best of your knowledge?

A Yes.

Q Paragraph 8 says, "In June of 2024, I was hired by the United States Senate as a W-2 employee to provide security services on governmental trips both across the country and throughout the world. Once I began that W-2 employment, I stopped working for Ridgeline and for Staccato, but continued my work providing security services for Kinsaker across the country. My work for both the United States Senate and Kinsaker in 2024, including" -- "included being a member of security details for Defendant. My travels outside of North Carolina were even more extensive in 2024 than they had been in 2022 and 2023 and kept me away from North Carolina during most of the year." Is everything that is written in Paragraph 8 accurate, to the best of your knowledge?

A Yes.

Q Paragraph 9 says that "During the summer of 2024, my wife, children, and I once again drove to Kansas to visit our extended family members there and

eventually drove to Oregon, as well. We left North Carolina on June 12th, and did not return until July 6th. On June 14th, while my wife and children were in Kansas, I departed to provide security services for Defendant in New York, Arizona, and Los Angeles. I returned to Kansas City at about 12:20 a.m. on June 22nd. Plaintiff picked me up from the airport. We drove to my" -- "Plaintiff picked me up from the airport. We drove to my in-laws' residence in Leavenworth together. I remained with Plaintiff and my family until we returned to North Carolina on July 6th." Is everything written in Paragraph 9 accurate, to the best of your knowledge?
A Yes.
Q Paragraph 10 says, "I provided security services for Defendant in Phoenix, Arizona from October 1 through 3rd, 2024." Is that paragraph accurate, to the best of your knowledge?
A Yes.
Q Paragraph 11 says, "A true and accurate copy of text messages exchanged" -- "text message exchanges between myself and Plaintiff, excerpted for brevity, is attached hereto as Exhibit 1. My texts are shaded in gray, and Plaintiff's are shaded in

blue." Just check to make sure that is accurate, that there is an Exhibit 1, and that, in fact, the bubbles that are shaded in gray are yours and the bubbles shaded in blue are hers.

A Yes.

Q Paragraph 12 on Page 3 says, "On October 3rd, as I was flying to North Carolina from Phoenix, I texted Plaintiff," which is Ms. Ammel, your wife, "the following message: 'Do I need to get a hotel tonight?' Plaintiff responded as follows: 'At this point, all I care about is protecting my children and preventing as much as possible any more emotional harm you're inflicting on them because of your selfish decisions. You are being manipulative asking about the hotel when you know damn well you told the kids you would be home today and they're expecting to see you. You've requested to separate many times. It's your decision to leave. That being said, only because it's my daughter's 13th birthday tomorrow, and in no way do I want her to associate this with her birthday, you can stay at the house until Sunday when you leave for your next trip. But thereafter you need to get a hotel or apartment. Don't ask me again. That's my answer.'" Was that, in fact, a message that you

received from your wife on or about October 3rd, 2024?

A Yes.

Q Paragraph 13 on Page 4 says, "I stayed at the marital residence in North Carolina for the next three nights, October 3, 4, and 5. During that time, I slept downstairs in the spare bedroom, a floor below the master bedroom. I then departed for Phoenix, Arizona on October 6th for a work trip that involved providing security for a group of hikers in the Grand Canyon, including Defendant." Is Paragraph 13 accurate, to the best of your knowledge?

A Yes.

Q Paragraph 14 says, "That same day, October 6th, Plaintiff texted me the following message, quote, 'I know you've got a busy week ahead, but if you have a few spare minutes, this puts it really well about how to do a structured separation. I love you and hope you have a good week.' As of that date, as is indicated in Plaintiff's text, we had already decided we were going to separate and were working on the logistics of our separation." Is everything that's written in Paragraph 14 accurate, to the best of your knowledge?

A Yes.
Q Paragraph 15 says, "The work trip I began on October 6th, 2024 lasted until October 11. Before I departed Phoenix on Friday morning, October 11, I received text messages from Plaintiff as follows, quote, 'Please make sure to have a hotel arranged from Saturday to Friday. I will be in class Wednesday and Thursday this week. That is your opportunity to come finish the office project. When I am home, you can't be. You can come pick up the kids for school. There are games Monday and Wednesday this week where you can meet us. I highly suggest you use this week to find an apartment and therapist. You need help, Matt. You are destroying every relationship you have with your poor choices. When we tell the kids on Saturday, I will not take the fall for your choices. These are consequences for the choices you've made, and you haven't made choices that protect your marriage or your family. You have repeatedly told me you want a divorce. I won't allow you to continue to hurt me or the kids.'" Was that a message that you, in fact, received from your wife, Heather Ammel, on or about the 11th of October 2024?

A Yes.

Q Paragraph 16 says, "Following my receipt of Plaintiff's October 3rd and October 11th text messages, I began making arrangements to live separate and apart from her. I visited the apartment community Tyler's Ridge at Sandhills Apartments in Southern Pines, North Carolina on Monday, October 14 and toured one of their apartments. I learned that they could have an apartment ready for me to move into before the end of October. I informed Plaintiff later that day that I had found an apartment and would be moving into it as soon as it was ready. As of that discussion, we had a very clear mutual understanding that our marriage was over and that I would be moving out of the marital residence and into an apartment at Tyler's Ridge as soon as possible." Is everything that I just read in Paragraph 16 true and accurate, to the best of your knowledge?

A Yes.

Q In Paragraph 17, it says, "I stayed at the marital residence in North Carolina October 12th through October 18th. During that time, I slept in the spare bedroom downstairs, a floor below the master

bedroom. Plaintiff and I had no physical contact of any kind during that time period." Is everything I just read from Paragraph 17 true and accurate, to the best of your knowledge?

A Yes.

Q Paragraph 18 says, "On Tuesday, October 15, 2024, I received an e-mail from Tyler's Ridge following up on my visit there the prior day. A true and accurate copy of that e-mail is attached hereto as Exhibit 2." Can you check Exhibit 2 to make sure that, in fact, is a true and accurate copy of an e-mail you received from Tyler's Ridge about your visit there?

A Yes.

Q It is. Okay. Paragraph 19 says, "Plaintiff and I had an appointment with her therapist at 2:00 p.m. on October 17, 2024. At that appointment, we discussed the fact that we were in the process of separating and that I had found an apartment at Tyler's Ridge that I planned to move into shortly." Is what is written in Paragraph 19 true and accurate, to the best of your knowledge?

A Yes.

Q Paragraph 20 says that "From October 19 through 21st, I traveled to Miami, Florida with Plaintiff

and our three children to see a Taylor Swift concert, an event that had been planned for several months. For the two nights we were in Miami, we had separate hotel rooms. I had one room with our son, and Plaintiff had another room with our daughters. Plaintiff kept forgetting my room number and had to text me to have me remind her. I did not have any physical contact of any kind with Plaintiff during our entire trip to Miami. We went together on this trip despite being in the process of separating because we did not want to disappoint our children." Is everything that I just read from Paragraph 20 true and accurate, to the best of your knowledge?

A Yes.

Q Paragraph 21 says, "On October 21st, I left Miami for a work trip in Phoenix, Arizona and Las Vegas, Nevada, and returned to North Carolina on October 23rd. I provided security services to Defendant on that trip. I stayed in the marital residence the evenings of October 23rd and October 24th. During that time, I slept in the spare bedroom downstairs, a floor below the master bedroom. Plaintiff and I had no physical contact of any kind during that time period." Is what I just read from Paragraph

21 true and accurate, to the best of your knowledge?

A Yes.

Q Paragraph 22 states, "I submitted my lease application to Tyler's Ridge on Thursday, October 24th. True and accurate copies of e-mails I received from Tyler's Ridge acknowledging receipt of my lease application materials are attached hereto as Exhibit 3." Can you confirm that that, in fact, is true, that Exhibit 3 are e-mails back and forth from Tyler's Ridge regarding your lease application?

A Yes.

Q Paragraph 23 says, "I am aware that Plaintiff has alleged in Paragraph 46 of her complaint in this action that shortly after I returned from my October 21st through 23rd work trip to Phoenix and Las Vegas, I, quote, 'insisted,' unquote, that Plaintiff and I, quote, 'go together on an anniversary trip to Nashville, Tennessee,' unquote. That allegation is false. I have reviewed my text message history with Plaintiff in order to reconstruct how that trip to Nashville actually came about." Do you stand by your -- by what you averred under oath in Paragraph 23?

A Yes.

Q Paragraph 24 says, "Plaintiff and I had been wanting to see a concert by country artist Sturgill Simpson. Plaintiff searched online for tickets in early August 2024 and informed me she could not find" -- "she could not find affordable tickets. That September, we made tentative plans to see his concert in Greensboro, but I had to back out due to my extensive travels. At that time, Plaintiff and I discovered he was scheduled to perform in Nashville on October 25th, as well as in Georgia about the same time. Plaintiff suggested that we go to Nashville for a couple of nights and have her mother watch the kids. I told her that should work. At no point did we discuss anything about our anniversary. We actually made no plans for our anniversary other than me taking my son to his baseball game." Is what I just read from Paragraph 24 true and accurate, to the best of your knowledge?

A Yes.

Q Paragraph 25 says, "I booked our flights to Nashville to see the Sturgill Simpson concert on September 23rd. That was 10 days before Plaintiff instructed me to find another place to live.

Following her second directive for me to find another place to live on October 11th, she texted me, quote, 'Are we going on our Sturgill date?' I responded, 'Yes. I would like to.' In view of the fact that we were in the midst of separating, this trip, which ended up being just one night, was nothing more than a way for us to see an artist we both love. We discussed in advance that the trip would be a nice way of saying goodbye to our marriage and all the years we had together. There was nothing romantic about this trip whatsoever. By then, our marriage had been over for weeks, for all intents and purposes." Is everything that I just read from Paragraph 25 true and accurate, to the best of your knowledge?

A Yes.

Q Paragraph 26 says, "We flew to Nashville the morning of the concert, did some sightseeing, and went to the concert that evening in the Bridgestone Arena. Though we did stay in the same hotel room, I slept on the couch. We had no physical contact of any kind during our entire time in Nashville. The next morning, Saturday, October 26th, Plaintiff boarded a flight for RDU, and I boarded a flight for Phoenix, Arizona. Our physical separation,

along with my intent to permanently separate from Plaintiff, began at that moment. We never spent an evening" -- "we never again spent an evening together."

Earlier in your deposition, you clarified that you had no romantic physical contact of any kind during your time in Nashville. Apart from that modification, is everything else in Paragraph 26 true and accurate, to the best of your knowledge?

A Yes.

Q Paragraph 27 says, "At no point during the October 25 to 26 trip to Nashville did Plaintiff and I discuss the notion of continuing our marriage. The marriage effectively ended when Plaintiff instructed me to move out of the marital residence in early October." Is everything that I just read from Paragraph 27 true and accurate, to the best of your knowledge?

A Yes.

Q Paragraph 28 says, "I began a seven-day work trip on Saturday, October 26th, that included time in Phoenix, Arizona and in the Middle East. My rental application at Tyler's Ridge was approved that same morning, October 26th, and I paid my $200 security

deposit that day. True and accurate copies of e-mails I received from Tyler's Ridge confirming the approval of my lease application and the payment of my security deposit are attached hereto as Exhibit 4." First of all, is everything that was written in that Paragraph 28 true and accurate, to the best of your knowledge?
A Yes.
Q And is what is in Exhibit 4 at the very back of your declaration the e-mails that you received from Tyler's Ridge approving your lease application and regarding the payment of your security deposit?
A Yes.
Q Finally, Paragraph 29 on Page 8. It says, "I returned to North Carolina on Friday, November 1st, and moved into my new apartment at Tyler's Ridge that day. I did not return to the marital residence again other than to see my children, perform handiwork, or to retrieve my belongings." Is what is written in Paragraph 29 true and accurate, to the best of your knowledge?
A Yes.
MR. EPSTEIN: All right. I think I might be done, but before I conclude, I'm going to take a brief break -- I'm going to say five minutes --

before passing the baton back to Ms. Coltrane. So let's take a quick break.

THE VIDEOGRAPHER: Okay. The time is 3:04 p.m. Eastern time, and we are now off the record.

(SEVEN-MINUTE RECESS)

THE VIDEOGRAPHER: The time is 3:11 p.m. Eastern time, and we are back on the record.

MR. EPSTEIN: All right. I have no further questions at this time. Thank you so much, Mr. Ammel.

THE WITNESS: Thank you.

MS. COLTRANE: Okay. Just a few follow-up questions.

REDIRECT EXAMINATION BY MS. COLTRANE:

Q Mr. Ammel, other than the date you said your relationship with Ms. Sinema began in your domestic deposition, is everything else in your domestic deposition true and accurate?

MR. EPSTEIN: Objection to form.

Q You can answer, Mr. Ammel.

A I would have to review the document to confirm that.

Q Okay. You can.

MR. EPSTEIN: I object to that. That's improper to have him go through a couple hundred

pages in the course of the deposition. It's not a proper way of asking a witness a question.

Q Mr. Ammel, you swore to tell the truth in your domestic deposition, correct?

A Correct.

Q And you admitted earlier that the date that you said the relationship began with Ms. Sinema in your domestic deposition is a lie, correct?

A That's correct.

Q Are there any other lies that you need to bring to our attention?

MR. EPSTEIN: Objection to the form of the question.

Q You can answer the question, Mr. Ammel.

A I'm confused by your question.

Q Are there any other lies in your domestic deposition that you need to tell us about?

MR. EPSTEIN: Same objection.

A Like I said, I would have to review the document.

Q Okay. I want to go back to the substance abuse counselor that you said that you and Ms. Ammel went to. Who was that?

A I believe his name was Chad Brown.

Q And you said he was a substance abuse counselor. Was anyone abusing substances?

A Heather has a drinking problem. Yes.
Q I'm sorry. What problem?
A Heather has a drinking problem. Yes. I believe that's why she was seeing him.
Q And have you abused any substances?
MR. EPSTEIN: Ever in his life? Is that what you're asking?
MS. COLTRANE: Yes. Ever.
Q Have you abused any substances?
A As we discussed earlier, yes. I was dependent on narcotic painkillers for approximately six years.
Q So is that the reason why you went to the substance abuse counselor?
A It was not my substance abuse counselor. It was Heather's.
Q So why did you go with her?
A She asked me to go with him to see her [sic] to discuss separation.
Q How many conversations -- and without disclosing any substance -- so without disclosing any substance of the conversations, about how many conversations have you had with Mr. Epstein prior to today's deposition?
A I believe two.
Q And have you communicated with anyone today during

the deposition?

MR. EPSTEIN: You mean apart from the back and forth of the deposition itself, like during breaks?

MS. COLTRANE: Correct.

Q Have you communicated with anyone other than myself or the people on the Zoom call about the deposition today?

A Yes. I sent a text message to Major Erick Czaja and his wife, Angela, to ask the address of the Cross Creek Ranch.

Q So there were no other messages?

A I've received quite a few messages, but I have not replied to any of them.

Q And is it your testimony that everything that you testified about today is true and accurate?

A Yes.

MS. COLTRANE: All right. No further questions.

MR. EPSTEIN: And I have nothing further either.

THE COURT REPORTER: Before we wrap up, if I can just get the attorneys' copy orders. Ms. Coltrane, what can I get for you?

MS. COLTRANE: I'm sorry?

THE COURT REPORTER: What would you like for a copy order?

MR. VAN CAMP: The standard.

MS. COLTRANE: Just the standard copy order is just --

THE COURT REPORTER: Okay. Just an E-Trans? Is that good?

MS. COLTRANE: Yes. That's good.

THE COURT REPORTER: All right. Sounds good. And, Mr. Epstein, what can I get for you?

MR. EPSTEIN: An E-Tran is fine. I'm more concerned about the timing. So --

MS. COLTRANE: Correct.

MR. EPSTEIN: -- what should we expect if we didn't expedite? What should we expect for delivery?

THE COURT REPORTER: Our standard turnaround is two weeks, which would put us at August 11th.

MR. EPSTEIN: Okay. So I'm going to ask, for me, that we make that one week instead of two weeks.

MS. COLTRANE: We would agree with that.

THE COURT REPORTER: Okay. I will need to check with my office on that, and I will send you guys an e-mail in just a little bit.

MR. EPSTEIN: Okay. Fantastic.

THE COURT REPORTER: And, Mr. Tanner, what can I get for you?

MR. TANNER: I'm okay. Thank you.

THE COURT REPORTER: All right. Sounds good. Thank you so much.

THE VIDEOGRAPHER: Okay.

MR. EPSTEIN: All right. Thank you. We're going to sign off.

THE VIDEOGRAPHER: Before I read us off the record, I do need video orders. So beginning with Ms. Coltrane, would you like an MPEG or a text-video sync?

MS. COLTRANE: We can do the -- whatever is -- let's do the MPEG.

THE VIDEOGRAPHER: MPEG. Okay. And anyone else want a video?

MR. EPSTEIN: Yeah.

MS. COLTRANE: But the same request for the expedite. We need it in an expedited manner.

THE VIDEOGRAPHER: Okay. Anyone else?

MR. EPSTEIN: We'll need the sync.

THE VIDEOGRAPHER: The sync. (Inaudible) synced. Okay. And Mr. Tanner?

MR. TANNER: I'm good. Thank you.

THE VIDEOGRAPHER: Okay. No video. All right. Thank you very much.

This concludes Volume 1 of the deposition of Matthew Ammel. We are now off the record. The time is 3:17 p.m. Eastern time.

(Whereupon, the deposition was concluded at 3:17 P.M.)

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

I, Lisa S. Marion, CER, a Notary Public in and for the State of North Carolina, duly commissioned and authorized to administer oaths and to take and certify depositions, do hereby certify that on July 28, 2026, MATTHEW AMMEL, being duly sworn to tell the truth by Geoffrey Hall, Notary Public for the State of Virginia, (signed certificate attached hereto), according to the emergency video notarization requirements contained in G.S. 10B-25, thereupon testified as above set forth as found in the preceding 117 pages, his examination being reported by me verbatim and then reduced to typewritten form under my direct supervision; that the foregoing is a true and correct transcript of said proceedings to the best of my ability and understanding; that I am not related to any of the parties to this action; that I am not interested in the outcome of this case; that I am not of counsel nor in the employ of any of the parties to this action, and that signature of the witness was waived.

IN WITNESS WHEREOF, I have hereto set my hand, this the 6th day of August, 2026.

Lisa S. Marion

______________________

Notary Public

Certificate No. 200630000110

STATE OF Virginia CERTIFICATE OF
COUNTY OF Norfolk NOTARY PUBLIC

I, Geoffrey Hall, a Notary Public, duly commissioned and authorized to administer oaths, do hereby certify that on this date Matthew Ammel, having presented satisfactory evidence of identification, was by me duly sworn to tell the truth, and thereupon, was voluntarily deposed via videoconference in the matter of Heather Ammel v. Kyrsten Sinema.

This the 28th date of July, 2026.

Geoffrey Hall

Geoffrey Hall Digitally signed by Geoffrey Hall Date: 2026.08.05 10:29:03 -04'00'

Signature of Notary Public

My Commission Expires: 12/31/2029



PLAINTIFF'S EXHIBIT 1

STATE OF NORTH CAROLINA

COUNTY OF MOORE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.

25CV001930-620

| | | |
|---|---|---|
| HEATHER AMMEL, | ) | |
| Plaintiff, | ) | |
| v. | ) | **VERIFIED COMPLAINT (Jury Trial Demanded)** |
| KYRSTEN SINEMA, | ) | |
| Defendant. | ) | |

**COMES NOW** Plaintiff, Heather Ammel, by and through her undersigned counsel, and complaining of Defendant, Kyrsten Sinema, hereby alleges and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is a citizen and resident of Moore County, North Carolina and has been for more than six months preceding the filing of this action.

2. Defendant is a citizen and resident of Cave Creek, Arizona.

3. The Superior Court of Moore County has both personal and subject-matter jurisdiction over the parties and the claims set forth in this Complaint.

4. Venue is proper in Moore County, North Carolina pursuant to N.C. Gen. Stat. § 1-82.

## PREDICATE FACTS

5. Plaintiff hereby realleges and incorporates by reference paragraphs 1-4 of this Complaint as if fully set forth herein.



Electronically Filed Date: 9/30/2025 9:56 AM Moore Superior Court County Clerk of Superior Court

6. Plaintiff married her husband, Matthew Ammel (hereinafter "Mr. Ammel"), on 23 October 2010 (hereinafter, "the Marriage"). Plaintiff and Mr. Ammel separated on 1 November 2024 (hereinafter, "the Separation").

7. During the Marriage, Plaintiff and Mr. Ammel had three children: C.A., born 4 October 2011; I.A., born 3 January 2013; and J.A., born 29 September 2015 (hereinafter "the Children").

8. Mr. Ammel was a member of the United States Army. Prior to moving to Moore County in 2014, Plaintiff and Mr. Ammel lived in Raeford, North Carolina. Over the course of four years, Mr. Ammel deployed on four separate occasions to Afghanistan and to the Middle East. During this period, Plaintiff and Mr. Ammel had their two children, C.A. and I.A..

9. From 2014 until 2024, the Ammel family resided together in Moore County, North Carolina.

10. On 29 September 2015, while residing together in Moore County, Plaintiff and Mr. Ammel had their third child, J.A.

11. Throughout the Marriage, Plaintiff was a dutiful spouse and mother and provided a comfortable and loving home and environment for Mr. Ammel. Plaintiff supported Mr. Ammel's career, caring for the Children and household as Mr. Ammel had a demanding schedule with the Army between deployments and military trainings when he was stateside.

12. Specifically, throughout the Marriage, Plaintiff was the primary homemaker, taking care of all basic needs of the Children, including but not limited to: (a) waking, dressing, grooming, feeding, and preparing the Children for daily activities; (b) waking up at night to care for the Children's nighttime needs; (c) preparing breakfast, lunch, and dinner for both Mr. Ammel and the Children on a daily basis; (d) transporting the Children to and from school, activities, and social

functions; (e) facilitating and participating in after-school activities, weekend activities, and social engagements for the Children; (f) facilitating, hosting, and participating in social engagements for Mr. Ammel; (g) cleaning the household on a daily basis; (h) doing laundry for both Mr. Ammel and the Children on a daily basis; (i) completing basic repairs and maintenance in the household; (j) caring for the Children and Mr. Ammel when they were ill; (k) facilitating family routines, traditions, and activities; and (l) caring for family pets.

13. Plaintiff and Mr. Ammel had an active, generous, and fulfilling sexual relationship and remained emotionally and physically intimate throughout the Marriage.

14. Prior to Defendant's intentional and malicious interference, Plaintiff and Mr. Ammel had a good and loving marriage, and genuine love and affection existed between them.

15. Due to the stress and responsibilities associated with his job in the military, Mr. Ammel suffers from substance abuse, post-traumatic stress disorder, and traumatic brain injuries (TBI). Plaintiff ensured Mr. Ammel received proper treatment and care, including taking him to substance-abuse appointments and facilitating his enrollment in various treatment programs.

16. In 2020, Mr. Ammel separated from the Army. Shortly thereafter, Mr. Ammel and his friend, Mike DeVault, started a tree removal company based in Tennessee. Plaintiff and Mr. Ammel made plans to move to Nashville, Tennessee, but in 2021, Mr. Ammel stopped taking his prescription medications, began to rely heavily on marijuana, and was emotionally unstable. As a result, Plaintiff and Mr. Ammel decided to stay in North Carolina for the time being.

17. In 2022, Mr. Ammel officially retired from the Army. Plaintiff and Mr. Ammel initially experienced difficulty obtaining Mr. Ammel's retirement pay and went through an extensive process to secure his retirement.

18. Plaintiff maintained the household while Mr. Ammel searched for stable employment and focused on improving his mental and physical health.

19. In 2022, Mr. Ammel secured employment in a few different jobs. Ridgeline Defense hired Mr. Ammel as a shooting, driving, and breaching instructor. Consolidated Analysis Centers, Inc. ("CACI") hired Mr. Ammel as a maritime operations instructor in Tunisia. Staccato, a nationally recognized firearm company, hired Mr. Ammel to train law enforcement on how to use their pistols.

20. That same year, in 2022, Defendant's head of security hired Mr. Ammel to work as a security detail for Defendant.

21. At that time, Defendant was serving as a United States Senator for the State of Arizona.

22. In April 2022, Mr. Ammel began working for Defendant.

23. In the fall of 2023, Defendant's head of security resigned from her position. Prior to leaving, Defendant's head of security expressed to Mr. Ammel she had concerns Defendant was having sexual relations with other security members. She encouraged Mr. Ammel to leave with her, but Mr. Ammel decided to stay due to the financial security of the job.

24. In addition to accompanying Defendant to various work events, Mr. Ammel accompanied Defendant on several trips and went with her alone to Napa Valley, California in the fall of 2023. Upon returning home from Napa Valley, Mr. Ammel appeared uncomfortable and informed Plaintiff that if anyone had seen them together on the trip, it would have appeared as if they were on a romantic getaway.

25. In December of 2023, Defendant requested Mr. Ammel serve as her security for the U2 concert at the Sphere in Las Vegas, Nevada. Mr. Ammel asked Plaintiff to accompany him on

the trip and presented it to her as a "gift." Mr. Ammel expressed that the trip would be a great opportunity for Plaintiff to meet Defendant and would help establish boundaries. Mr. Ammel introduced Plaintiff to Defendant as his wife. Plaintiff met Defendant, Defendant's friends, and several others on the trip, including American diplomat and Executive Director of the World Food Programme, Cindy McCain. After the concert was over, the group went to McCain's suite. Defendant offered Plaintiff a glass of Dom Perignon and stated to Plaintiff "Did you ever think you would be drinking Dom Perignon in Cindy McCain's Suite?"

26. In or around 2023, Defendant traveled to Charlotte, North Carolina, for a work event. Mr. Ammel met Defendant at the airport and provided her security for the event.

27. Beginning in January 2024, while Plaintiff, Mr. Ammel, and the Children were residing in Moore County, North Carolina, Plaintiff discovered Defendant frequently messaging Mr. Ammel on Signal, the messaging app. Defendant had knowledge Mr. Ammel was residing in North Carolina at the time she sent the messages, and Mr. Ammel received the messages while residing at the marital residence in Moore County, North Carolina. The messages exceeded the bounds of a normal working relationship and were of romantic and lascivious natures.

28. Plaintiff discovered messages which included a picture of Defendant wrapped in a towel; Defendant offered to help Mr. Ammel work through his mental health challenges and Mr. Ammel agreed; Mr. Ammel stated to Defendant he was intimidated by her and Defendant asked why because she only wants to be intimidating to her opponents, not to people she likes; Defendant suggested for Mr. Ammel to bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience.

29. Defendant messaged Mr. Ammel during the State of the Union Address, and when Mr. Ammel asked why she wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote.

30. Around that same time, Mr. Ammel traveled to Pennsylvania for a work trip with Staccato. During his free time, Mr. Ammel attended a baseball game by himself, but messaged Defendant during the game stating he was going to start a "fuck the troops" chant. Defendant responded stating she would "fuck the hot ones."

31. Defendant and Mr. Ammel messaged about having sex missionary style with the lights on, and Defendant stated "Boring!"

32. In March 2024, Defendant requested Mr. Ammel serve as her security at the Extra Innings Festival in Phoenix, Arizona. Mr. Ammel acknowledged to Plaintiff that Defendant was handsy with him at this event. Defendant held his hand and touched him. Mr. Ammel expressed to Plaintiff he didn't know how to get out of the situation without offending Defendant.

33. Shortly thereafter, Defendant and Mr. Ammel flew to San Francisco, California, for Defendant's work trip. While in San Francisco, Defendant invited Mr. Ammel into her hotel room, and they stayed together for hours.

34. In April 2024, Mr. Ammel traveled to Maryland for a work trip with Staccato. While he was there, Defendant invited Mr. Ammel over to her apartment in Washington, DC.

35. In May 2024, Defendant started purchasing gifts for Mr. Ammel and paid for him to receive psychedelic treatment. Defendant paid for Mr. Ammel's psychedelic treatment appointment in Nashville, Tennessee, and then flew him to Napa Valley, California, for him to provide Defendant's security at a concert. After the concert, Defendant, Defendant's friends, and Mr. Ammel stayed in a private Airbnb together.

36. Defendant purchased a theragun for Mr. Ammel and messaged him to bring it over to her apartment so that she could "work on his back."

37. Around May or June 2024, Mr. Ammel stopped wearing his wedding ring. Mr. Ammel stated it was best for "public optics" so it wouldn't look like Defendant was putting her hands on a married man when they were out at concerts and various other public events.

38. In June 2024, Defendant requested Mr. Ammel travel to New York City to be her security and guest for a wedding. From New York City, Defendant and Mr. Ammel flew to Defendant's house in Scottsdale, Arizona where they stayed together alone.

39. That same month, Defendant offered Mr. Ammel a salary position and placed him on her senate staff as a Defense and National Security Fellow. Mr. Ammel then worked as Defendant's personal security guard as well as her senate staff member.

40. Around that same time, Plaintiff discovered more messages between Defendant and Mr. Ammel. Defendant expressed to Mr. Ammel she keeps waking up during her sleep and reaching over for his arms to hold her. Plaintiff confronted Mr. Ammel.

41. In the following months, Mr. Ammel struggled to admit to Plaintiff he was having an affair with Defendant but was vocal that he was leaving Plaintiff and that they were divorcing.

42. Mr. Ammel continued to work for Defendant as her security guard and senate staff member, traveling to various states and cities within the United States and internationally.

43. In July 2024, Mr. Ammel took their minor child, C.A., to Washington, D.C. for a work trip. Mr. Ammel and C.A. attended the Green Day concert with Defendant, and Defendant provided C.A. a tour of the United States Capitol.

44. In October 2024, soon after Mr. Ammel returned home to Moore County, North Carolina, after being away with Defendant on another work trip, Defendant messaged Mr. Ammel

stating, "I miss you. Putting my hand on your heart. I'll see you soon." Plaintiff responded to the message stating, "are you having an affair with my husband? You took a married man away from his family."

45. That same month, Mr. Ammel went as Defendant's guest to the Taylor Swift concert in Miami, Florida. Months prior to the concert, Mr. Ammel arranged for Plaintiff and the Children to also attend. Plaintiff attended to the concert out of concern for the Children. After the concert was over, Plaintiff and the Children flew home to Moore County, North Carolina. Mr. Ammel stayed behind to travel with Defendant to Las Vegas, Nevada for work.

46. After returning home from Las Vegas, Nevada, Mr. Ammel insisted he and Plaintiff go together on an anniversary trip to Nashville, Tennessee. After the anniversary trip concluded, Plaintiff returned home to Moore County, North Carolina, and Mr. Ammel went on a work trip with Defendant to Saudi Arabia.

47. Shortly after Mr. Ammel returned home to Moore County, North Carolina from Saudi Arabia, on 1 November 2024, Plaintiff and Mr. Ammel separated, and Mr. Ammel moved out of the marital residence.

48. Prior to Defendant's deliberate interference in the Marriage, genuine love and affection existed between Plaintiff and Mr. Ammel.

49. Defendant knew Mr. Ammel was married to Plaintiff and that they resided together with their Children in Moore County, North Carolina.

50. Beginning in or prior to 2023, Defendant, with actual knowledge of the Marriage between Plaintiff and Mr. Ammel, began to willfully and intentionally seduce, entice, and alienate the affections of Mr. Ammel, and began to wrongfully and maliciously deprive Plaintiff of the

warmth, companionship, love, affection, consortium, society, financial contributions, services, and attention of Mr. Ammel.

51. Defendant initiated the affair with Mr. Ammel while Plaintiff and Mr. Ammel were domiciled in Moore County, North Carolina.

52. Specifically, during the Marriage and prior to Plaintiff and Mr. Ammel's Separation, Defendant engaged in numerous unlawful acts with Mr. Ammel both within and outside the State of North Carolina while Plaintiff and Mr. Ammel were domiciled in Moore County, North Carolina. Upon information and belief, such unlawful acts included, but were not limited to:

a. Initiating and engaging in numerous, lengthy communications with Mr. Ammel, including: (i) in-person conversations; (ii) telephone conversations; (iii) text message conversations; and (iv) app-based (i.e. Signal) conversations, some of which were emotionally romantic and/or sexual in nature;

b. Meeting with Mr. Ammel on a regular and consistent basis outside the professional environment, with some of such meetings being emotionally and/or physically romantic and/or sexual in nature;

c. Encouraging Mr. Ammel to leave Plaintiff; and

d. Having repeated physically romantic and/or sexual encounters with Mr. Ammel, including but not limited to repeated episodes of sexual intercourse.

53. Defendant solicited Mr. Ammel during the Marriage while Plaintiff and Mr. Ammel were domiciled and present in North Carolina and Defendant was located outside of North Carolina. Defendant effected the solicitation by using telephonic and internet communications of lascivious natures.

54. While legitimate business communication occurred between Defendant and Mr. Ammel during their time as professional colleagues, Defendant's communications to Mr. Ammel became more frequent than required of coworkers and went beyond mere professional

correspondence. Such communications were of romantic and lascivious natures, as referenced above, and did in fact alienate the affections of Mr. Ammel from Plaintiff while both Plaintiff and Mr. Ammel were residing in North Carolina.

55. Many of the communications referenced in paragraphs 52, 53, and 54 above, occurred while Mr. Ammel was in the marital residence in Moore County, North Carolina with Plaintiff and the Children.

56. Defendant had actual knowledge Mr. Ammel was physically located and present in North Carolina with Plaintiff and the Children at the time Defendant sent the messages to Mr. Ammel and the messages were received by Mr. Ammel.

57. Defendant repeated telephone calls and repeatedly sent messages to Mr. Ammel knowing he was located in North Carolina with Plaintiff and the Children.

58. Defendant could and should have known that through eliciting communication—texts and phone calls—with Mr. Ammel, she was establishing a connection with the State of North Carolina.

59. As a direct and proximate result of Defendant's intentional and wrongful actions: (a) Plaintiff and Mr. Ammel separated on 1 November 2024; (b) the genuine love and affection between Plaintiff and Mr. Ammel was lost and destroyed; (c) the Marriage was destroyed and Plaintiff suffered severe emotional pain, distress, embarrassment, mental anguish, loss of social position, disgrace, and humiliation; (d) upon discovering the unlawful affair, Plaintiff was distressed, unable to sleep, suffered a loss in general health and well-being, and suffered from depression and anxiety; (e) due to the negative impact of the unlawful affair on the Children, Plaintiff was distressed, unable to sleep, suffered a loss in general health and well-being, and suffered from depression and anxiety; (f) Plaintiff suffered financial hardship, as Mr. Ammel was

the sole source of income for the Ammel family—Plaintiff and the Children—supporting all of their daily needs; (g) Plaintiff was forced to pursue claims related to the Separation, a subsequent divorce, and the distribution of marital property in order to obtain her equitable share of the marital estate, forcing Plaintiff to incur substantial attorneys' fees, costs, and expenses; and (h) Plaintiff has been forced to incur additional attorneys' fees and litigation costs related to this action.

60. North Carolina has an interest in this case because Mr. Ammel's affection for Plaintiff was alienated and destroyed while Plaintiff and Mr. Ammel were domiciled and present in North Carolina. Moreover, evidence and witness testimony are available in this State through Defendant and Mr. Ammel's past coworkers.

61. Defendant could and should reasonably anticipate being haled into court in North Carolina because Defendant has undertaken action to purposefully avail herself of the privilege of conducting activities within the forum State. Defendant intentionally solicited the affections of Mr. Ammel while Plaintiff and Mr. Ammel were married and domiciled in Moore County, North Carolina, and Defendant knew or had reason to know Mr. Ammel was in North Carolina at the time she elicited communication with him.

62. Defendant remains engaged in a romantic and sexual relationship with Mr. Ammel.

63. Defendant frequently travels to North Carolina to visit Mr. Ammel.

64. On 18 August 2025, Defendant drove to Plaintiff and Mr. Ammel's custody and equitable distribution mediation at Van Camp, Meacham & Newman, PLLC in Pinehurst, North Carolina. Defendant sat outside in the parking lot and waited for Mr. Ammel.

65. On the weekend of 12 September 2025, Defendant and Mr. Ammel took the minor child, J.A., to a concert in Kentucky. On Sunday, 14 September, Defendant and Mr. Ammel drove

J.A. back through the night to Moore County, North Carolina. Defendant and Mr. Ammel dropped J.A. off at school at 9:00 a.m. Monday morning.

66. On 16 September 2025, Defendant accompanied Mr. Ammel to the marital residence to pick up the remainder of his belongings. Defendant sat outside in the cul-de-sac immediately adjacent to the marital residence.

67. As a direct and proximate result of Defendant's actions, Plaintiff suffered damages in excess of twenty-five thousand dollars ($25,000.00).

## FIRST CLAIM FOR RELIEF

*Alienation of Affection*

68. Plaintiff hereby realleges and incorporates by reference paragraphs 1-67 of this Complaint as if fully set forth herein.

69. Prior to Defendant's actions, Plaintiff and Mr. Ammel were happily married and genuine love and affection existed between them.

70. As a direct and proximate result of Defendant's intentional and unlawful actions, such marital love and affection was alienated and destroyed.

71. As a direct and proximate result of Defendant's intentional and unlawful actions, Plaintiff suffered loss of support and income, injury to her physical, mental, and emotional health and welfare, private and public humiliation, and has incurred costs, expenses, and attorneys' fees in connection with the Separation.

72. As a direct and proximate result of Defendant's actions, Plaintiff suffered damages in excess of twenty-five thousand dollars ($25,000.00).

73. The actions of Defendant in alienating the affections of Mr. Ammel were willful, wanton, intentional, malicious, and in reckless disregard of Plaintiff's marital rights, and entitle Plaintiff to an award of punitive damages in excess of twenty-five thousand dollars ($25,000.00).

## SECOND CLAIM FOR RELIEF

*Punitive Damages*

74. Plaintiff hereby realleges and incorporates by reference paragraphs 1-73 of this Complaint as if fully set forth herein.

75. Upon information and belief, Defendant's actions in alienating the affections of Mr. Ammel were willful, wanton, intentional, malicious, and in reckless disregard of Plaintiff's marital rights, including but not limited to engaging in the following actions, both within and outside of North Carolina:

a. Initiating and engaging in numerous, lengthy communications with Mr. Ammel, including: (i) in-person conversations; (ii) telephone conversations; (iii) text message conversations; and (iv) app-based (i.e. Signal) conversations, some of which were emotionally romantic or sexual in nature;

b. Meeting with Mr. Ammel on a regular and consistent basis outside the professional environment, with some of such meetings being emotionally or physically romantic or sexual in nature;

c. Encouraging Mr. Ammel to leave Plaintiff; and

d. Having repeated physically romantic or sexual encounters with Mr. Ammel, including but not limited to repeated episodes of sexual intercourse.

76. Defendant knew or should have known that her willful and wanton conduct was reasonably likely to cause injury, damage, and/or other harm to Plaintiff, and did in fact cause such harm to Plaintiff.

77. An award of punitive damages is warranted to punish Defendant's willful and wanton conduct and to deter Defendant and others from engaging in similar conduct.

78. Plaintiff is entitled to recover damages in excess of twenty-five thousand dollars ($25,000.00), for injuries proximately caused by Defendant's willful and wanton conduct.

**WHEREFORE**, Plaintiff respectfully requests this Court as follows:

1. That Plaintiff may have and recover compensatory damages in excess of twenty-five thousand dollars ($25,000.00) for Defendant's Alienation of Affection;
2. That plaintiff may have and recover punitive damages for Defendant's willful and wanton conduct;
3. That all costs and reasonable attorneys' fees related to this action be taxed against Defendant;
4. For pre-and post-judgment interest;
5. For a trial by jury on all issues so triable; and
6. For such other and further relief as this Court deems just and proper.

This, the 30 day of September 2025.

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

BY: ______________________________

Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile : (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

**STATE OF NORTH CAROLINA )**

**)** **VERIFICATION**

**COUNTY OF MOORE )**

I, **Heather Ammel**, after first being duly sworn, depose and say:

I have reviewed the foregoing **COMPLAINT**, that the information contained therein is true and correct. With regard to any information stated therein upon information and belief, I believe it to be true as well.

This, the 30 day of September 2025.

Heather Ammel
**Heather Ammel**

Sworn to and subscribed before me this day by **Heather Ammel**.

_____ I have personal knowledge of the identity of the principal(s).
✔ I have seen satisfactory evidence of the principal's identity, by a current state or federal identification with the principal's photograph in the form of a driver's license
_____ A credible witness has sworn to the identity of the principal(s).

Date: 9-30-2025

Larisa Fitch
Notary Public

Larisa Fitch
Printed or typed name of Notary Public

My commission expires: 10-30-2026

(Official Seal) LARISA FITCH NOTARY PUBLIC MOORE COUNTY, NC

PLAINTIFF'S EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:26-CV-00038-DAB-JEP

| | | |
|---|---|---|
| **HEATHER AMMEL,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **DECLARATION OF HEATHER AMMEL** |
| **KYRSTEN SINEMA,** | ) | |
| **Defendant.** | ) | |

The Affiant, in addition to her verified Complaint, being first duly sworn, deposes and states as follows:

1. My name is Heather Ammel, and I am the Plaintiff in this action.
2. Unless otherwise stated, I have personal knowledge of the facts and information contained herein.
3. I am a citizen and resident of Moore County, North Carolina, and I have resided in Moore County since 2014.
4. I married my now former husband, Matthew Ammel (hereinafter "Mr. Ammel"), on 23 October 2010 (hereinafter, "the Marriage").
5. During our Marriage, Mr. Ammel and I had had three children: C.A., born 4 October 2011; I.A., born 3 January 2013; and J.A., born 29 September 2015 (hereinafter "the Children").
6. Mr. Ammel and I, along with our Children, resided together as a family in Moore County, North Carolina from 2014 until Mr. Ammel and I separated on 1 November 2024

(hereinafter, "the Separation").

7. Prior to Defendant's malicious interference, Mr. Ammel and I had a good and loving marriage and genuine love and affection existed between us.

8. Mr. Ammel started working for Defendant in April 2022 as her security detail.

9. Defendant incorrectly asserts in paragraph 2 of her declaration she "do[es] not conduct business in North Carolina, and ha[s] no contractual relationships with North Carolina business entities or residents." Mr. Ammel has worked for Defendant since 2022, whether that was through Defendant's security organizations or senate staff.

10. Defendant incorrectly asserts in paragraphs 4 & 5 of her declaration that her security organizations, Toa Group, LLC, and later Kinsaker Security Group, LLC, have no connection to North Carolina. The security organizations hired Mr. Ammel, a North Carolina resident, to work for Defendant, and then Defendant herself offered Mr. Ammel a salary position and placed him on her senate staff as a Defense and National Security Fellow.

11. Defendant incorrectly asserts in paragraph 9 of her declaration she did not know where Mr. Ammel resided until the fall of 2023, at which point she received his telephone number to maintain contact with him, and discovered he had a Kansas area code. Defendant has known Mr. Ammel resided in North Carolina since he began working for her. Defendant values Mr. Ammel's military experience and knows Mr. Ammel was a member of the 3rd Special Forces Group, a military group permanently stationed and headquartered in Fort Bragg, North Carolina. Additionally, in the fall of 2023, Mr. Ammel went with Defendant alone to Napa Valley, California. It was on this trip where Defendant really got to know Mr. Ammel. When Mr. Ammel returned home from Napa Valley, he appeared

uncomfortable and informed me that if anyone had seen them together on the trip, it would have appeared as if they were on a romantic getaway.

12. Defendant incorrectly asserts in paragraph 11 of her declaration she "did not learn Mr. Ammel resided in North Carolina, and lived there with his wife and [C]hildren, until approximately December 2023." To begin, Mr. Ammel began working for Defendant in April 2022. Defendant, whether through her security group, or individually, would arrange and pay for Mr. Ammel's travel and would fly Mr. Ammel out of Raleigh-Durham International Airport. While it is true Defendant met me for the first time in December 2023 in Las Vegas, Nevada, at the U2 concert, she knew about me well before then. When Defendant greeted me in Las Vegas, she told me "I feel like I already know you, because I've heard so much about you from Matt." On the same trip, Defendant also made a comment about my curly hair and said, "well that's because you live in the humid south." She also commented on Mr. Ammel's military experience, specifically his special forces background.

13. Defendant incorrectly asserts in paragraph 11 of her declaration she "never had personal knowledge of Mr. Ammel being physically present in North Carolina at any time [she] initiated or had communications with Mr. Ammel prior to November 2024." When Mr. Ammel was not with Defendant traveling to various locations, both within and outside of the United States, Defendant knew, or at the very least, had reason to know Defendant returned home to his family in Moore County, North Carolina.

14. Of the messages I reference in my verified Complaint, I personally witnessed Defendant send Mr. Ammel the following messages while he was physically present in North Carolina, prior to the date of Separation:

a. In January 2024, I witnessed Defendant send Mr. Ammel a message about helping him with his mental health.

b. In or around early spring 2024, I witnessed Defendant send Mr. Ammel the following messages:

   i. A picture of Defendant wrapped in a towel. Mr. Ammel was physically present in North Carolina and at our marital residence when Defendant sent a photo of herself wrapped in a towel. I was standing in our kitchen when I read the message. Defendant was wrapped in a white towel, and the picture showed her bare upper back with cupping bruises. Mr. Ammel responded to the picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman who doesn't."

   ii. Mr. Ammel messaged Defendant stating he was intimidated by Defendant while Mr. Ammel was physically present in North Carolina. Defendant responded to the message asking why because she only wants to be intimidating to her opponents, not to people she likes. Mr. Ammel received Defendant's message while he was at our marital residence. I read the message standing in our kitchen.

   iii. Defendant messaged Mr. Ammel suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience while Mr. Ammel was physically present in North Carolina. Mr. Ammel received Defendant's message while he was at our marital residence, packing and preparing to go on another trip with Defendant.

iv. Defendant messaged Mr. Ammel during the State of the Union address while Mr. Ammel was physically present in North Carolina and at our marital residence. While Defendant and Mr. Ammel were messaging during the State of the Union, Mr. Ammel and I were sitting on the couch in our living room. I personally witnessed the live message exchange. When Mr. Ammel asked why Defendant wasn't attending the State of the Union that year, Defendant stated she didn't need to listen to some old man, President Biden, talk about the legislation that she wrote.

v. Defendant and Mr. Ammel messaged about having sex missionary style with the lights on while Mr. Ammel was physically present in North Carolina. I read the message standing in my kitchen.

c. In or around 3 October 2024, I witnessed Defendant message Mr. Ammel stating, "I miss you. Putting my hand on your heart. I'll see you soon." I responded to the message stating, "are you having an affair with my husband? You took a married man away from his family." Mr. Ammel was physically present in North Carolina and at the marital residence when Defendant sent the message. At this point, I took Mr. Ammel's phone and responded to the message. Defendant knew or had reason to know Mr. Ammel was in North Carolina when she sent Mr. Ammel the message, because Mr. Ammel was with Defendant in Phoenix, Arizona 1-2 October 2024, and purposefully flew home on 3 October 2024, for our daughter's birthday. Mr. Ammel was only home for two days, before flying back to Phoenix to be with Defendant on 5 October 2024. See attached as **Exhibit A.**

15. Defendant incorrectly asserts in paragraph 12 of her declaration that between 2022 and October 2024, Defendant and Mr. Ammel did not engage in any communications via SMS (text) messages during that time period, and that the only phone she ever used to communicate with him was her personal cell phone. I have attached a text exchange between Defendant and Mr. Ammel from Mr. Ammel's work phone from June, July, and August 2024 for reference. In the June message exchange, Defendant sent Mr. Ammel a ticket titled Noah Kahan: We'll All Be Here Forever Tour. In the July message exchange, Defendant shared her location with Mr. Ammel. In the August message exchange, Defendant sent Mr. Ammel a code and a separate message stating, "I cannot sleep, I am miserable, and I want at least one of my pens back. You have them both. Pls give me one back now." See attached as **Exhibit B.**

16. Defendant incorrectly asserts in paragraph 13 of her declaration she has carefully reviewed the records of her cellphone and email communications with Mr. Ammel and used those records to ascertain where she was and where he was when such communications occurred. In addition to my own evidence showing otherwise, Defendant and Mr. Ammel primarily communicated through Signal, the messaging app. Defendant, through her own admission, in paragraph 7 admits "[e]ncrypted Signal messages disappear shortly after they are sent to the recipient and cannot thereafter be retrieved on the device of either the sender or the recipient; they also cannot be retrieved by Signal or phone service providers." Signal does not reveal the location of the person or the content of their messages.

17. Defendant incorrectly asserts in paragraph 14 of her declaration that none of her "telephone or email communications with Mr. Ammel between early 2023 and 1 November 2024 occurred while [Mr. Ammel] was physically present in North Carolina" and that "Mr.

Ammel was physically outside the State of North Carolina at the time [she] directed 100% of [her] telephone and email communications to him during such time period." I have named every message I witnessed Defendant send to Mr. Ammel while he was physically present in North Carolina and at the marital residence. I have also attached the message I sent to Defendant confronting her about the affair to this declaration. See **Exhibit A** attached.

18. Defendant incorrectly asserts in paragraph 19 of her declaration she has no recollection of any Signal messages she sent to Mr. Ammel in January 2024, or if she did send him a Signal message in that month, she had no knowledge as to where Mr. Ammel was physically located. Specifically, in the month of January, I personally witnessed Defendant send Mr. Ammel a message about helping him with his mental health.

19. Defendant offering to help Mr. Ammel with his mental health, is what I believe to be, one of the many ways Defendant lured Mr. Ammel away from me and our family. Mr. Ammel, when he began working for Defendant, was already suffering from PTSD, TBI, and substance abuse. Defendant knew he was in a vulnerable place and took advantage of that. Defendant paid for Mr. Ammel to participate in psychedelic drug treatment in an effort to "help" him with his mental health. Instead, Mr. Ammel's mental health has progressively gotten worse, and he has completely forgotten who he is and has left our family.

20. Defendant incorrectly asserts in paragraph 20 of her declaration she did not send Mr. Ammel any messages that included a picture of her wrapped in a towel and she "has no recollection of any message of the type Plaintiff alleges." Although Defendant denies remembering this event, I read the message standing in the kitchen of our marital residence. Defendant was wrapped in a white towel, and the picture showed her bare upper back with

cupping bruises. Mr. Ammel responded to the picture stating that she needed more iron in her diet, and Defendant replied to Mr. Ammel stating, "show me a woman who doesn't." Although Defendant contends this message was not of a romantic or intimate nature, I was deeply offended by the message.

21. In paragraph 20 of Defendant's declaration, Defendant does not deny she sent Mr. Ammel a message suggesting he bring MDMA drugs on a work trip so that she could guide him through a psychedelic experience. I read the message at our marital residence. Defendant sent Mr. Ammel the message as he was preparing to go on another work trip. Defendant sent this message in the early spring of 2024, and by Defendant's own admission in paragraph 11, she already knew where Mr. Ammel lived at that point. Although Defendant contends this message was not of a romantic or intimate nature, I was deeply offended by the message.

22. In paragraph 22 of Defendant's declaration, Defendant does not deny she sent Mr. Ammel messages during the State of the Union address. Although Defendant asserts she had no knowledge as to where Mr. Ammel was physically located when she sent the message, I read the message at our marital residence. Defendant sent this message in the early spring of 2024, and by Defendant's own admission in paragraph 11, she already knew where Mr. Ammel lived at that point. Although Defendant contends this message was not of a romantic or intimate nature, I was deeply offended by the message.

23. Defendant incorrectly asserts in paragraph 24 of her declaration she does not recall messaging Mr. Ammel about having sexual intercourse missionary style with the lights on and that she stated "Boring!" Although Defendant denies remembering the message and contends it was not of a romantic or intimate nature, I read the message standing in the

kitchen of our marital residence and was deeply offended by it.

24. Defendant acknowledges in paragraph 28 of her declaration that at the end of May 2024, her relationship with Mr. Ammel became romantic and intimate. Although Defendant correctly speaks to the nature of Defendant and Mr. Ammel's relationship at that time, based on the communications and events that occurred prior to May 2024, I deny the affair occurred as late as May 2024.

25. In paragraph 49 of Defendant's declaration, Defendant does not deny she messaged Defendant while he was physically present in North Carolina stating, "I miss you. Putting my hand on your heart. I'll see you soon." I responded to the message stating, "are you having an affair with my husband? You took a married man away from his family."

26. Although Defendant disputes the timeline for this particular message, I am certain Defendant sent the message in or around 3 October 2024. Mr. Ammel was physically present in North Carolina and at the marital residence when Defendant sent the message. I took Mr. Ammel's phone and responded to the message. See **Exhibit A** attached. Additionally, Defendant knew or had reason to know Mr. Ammel was in North Carolina when she sent Mr. Ammel the message, because Mr. Ammel was with Defendant in Phoenix, Arizona 1-2 October 2024, and purposefully flew home on 3 October 2024, for our daughter's birthday. Mr. Ammel was only home for two days, before flying back to Phoenix to be with Defendant on 5 October 2024.

27. In paragraph 51 of her declaration, Defendant contends that at the time she sent the October message, "it was very clear to [her] that Mr. Ammel's [M]arriage with Plaintiff was over." Despite Defendant's contention, our relationship was not over. Mr. Ammel and I went on an Anniversary trip 25-26 October 2024. We held hands on the plane, were

physically intimate on the trip, including engaging in sexual intercourse, and were still very much emotionally connected. Mr. Ammel and I attended a concert together, and throughout the three-and-a-half-hour concert, Mr. Ammel held me and hugged me. I have attached pictures that we took together on the trip as well as our text exchange immediately after the trip. Mr. Ammel told me he loved me and missed me. See attached as **Exhibit C.**

28. After the anniversary trip concluded, I returned home to Moore County, North Carolina, and Mr. Ammel went on a work trip with Defendant to Saudi Arabia. Mr. Ammel and I parted ways at the airport, but Mr. Ammel messaged me stating he loved and missed me. See **Exhibit C** attached.

29. Shortly after Mr. Ammel returned home to Moore County, North Carolina from Saudi Arabia, on 1 November 2024, we separated. However, Defendant did not completely move out of the marital residence until the middle of November.

30. Mr. Ammel traveled to Washington, DC to move furniture from Defendant's apartment into his new apartment in Moore County, North Carolina.

31. After Mr. Ammel and I separated, Mr. Ammel continued to frequent the martial residence and would physically touch me in a romantic way each time he stopped by. Mr. Ammel's brother's family stayed with me and the Children for Thanksgiving 2024, and Mr. Ammel came over for Thanksgiving Day. Additionally, we all traveled to Kansas together for Christmas 2024, and Mr. Ammel and I slept in the same bed on Christmas Eve. After spending Christmas in Kansas, we went skiing together as a family.

32. After the ski trip in December 2024, Mr. Ammel and I officially parted ways.

33. After the Separation, Defendant started making her presence known in North Carolina and

would frequently travel to North Carolina to visit Mr. Ammel.

34. On 18 August 2025, Defendant drove to our custody and equitable distribution mediation at Van Camp, Meacham & Newman, PLLC in Pinehurst, North Carolina. Defendant sat outside in the parking lot and waited for Mr. Ammel.

35. On the weekend of 12 September 2025, Defendant and Mr. Ammel took our minor child, J.A., to a concert in Kentucky. On Sunday, 14 September, Defendant and Mr. Ammel drove J.A. back through the night to Moore County, North Carolina. Defendant and Mr. Ammel dropped J.A. off at school at 9:00 a.m. Monday morning.

36. On 16 September 2025, Defendant accompanied Mr. Ammel to the marital residence to pick up the remainder of his belongings. Defendant sat outside in the cul-de-sac immediately adjacent to our marital residence.

37. On 19 November 2025, Mr. Ammel's property manager filed a 50C Complaint for No-Contact Order against him. Mr. Ammel was involuntarily committed to the hospital, and on 20 November 2025, Mr. Ammel was arrested for assaulting the physician assistant at the hospital. Defendant traveled to Moore County, North Carolina to bond Mr. Ammel out of jail and moved him out of his rental property to her house in Arizona.

38. On 24 November 2025, I was awarded emergency custody of all three of the Children.

39. The Children have been in my custody ever since. We continue to reside at the marital residence in Moore County, North Carolina.

I declare under penalty of perjury that the foregoing statements are true, correct, and compete, to the best of my knowledge and belief.

**FURTHER THE DECLARANT SAYETH NAUGHT.**

**[Signature page to follow]**

This, the 17 day of April 2026.

Heather Ammel

Heather Ammel

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that the undersigned has this date served the foregoing **DECLARATION OF HEATHER AMMEL** upon the persons listed below via email addressed as follows:

Steven B. Epstein, Esq.
*Attorney for Defendant Kyrsten Sinema*
301 Fayetteville Street
Suite 1900
Post Office Box 1801 (27602-1801)
Raleigh, North Carolina 27601
Telephone: (919) 783-2846
Facsimile: (919) 783-1075
sepstein@poynerspruill.com

This, the 17th day of April 2026.

VAN CAMP, MEACHAM & NEWMAN, PLLC
*Attorneys for Plaintiff*

By: */s/ Thomas M. Van Camp*
Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

EXHIBIT A



08:00
LTE
K S
8h
K S
+1 602-904-9665
Member of R2R, Bottlerock, and 3 additional groups
Yesterday
I miss you 21:57
Putting my hand on your heart 21:58
I'll see you soon 21:58
Today
Are you having an affair with my husband
Now
Message

EXHIBIT
B


KS
Yesterday
ble, and
ns ba...
8/19/24
7/22/24
hap...
/17/24
Thu, Jun 20 at 12:02 PM
Noah Kahan: We'll All Be Here Forever Tour
verified-ticket.com
Thu, Jul 18 at 1:32 PM
KS's location expired
KS started sharing location with you.
Mon, Jul 29 at 6:13 PM
KS's location expired
Tue, Aug 6 at 9:31 AM
1787 enter
Today 12:38 AM
I cannot sleep, I am miserable, and I want at least one of my pens back. You have them both. Pls give me one back now.
iMessage

EXHIBIT
C


3:45
3
MA
Matt
Oct 26, 2024 at 12:38 PM
That was fun!
The best ❤️
Text Message • SMS

3:45

MA

Matt



I can see you on the left



Oct 26, 2024 at 3:15 PM

Did you make it home okay?

Just got to the car 😘

Oct 26, 2024 at 4:19 PM

Text Message • SMS


3:46
3
MA
Matt
Oct 27, 2024 at 1:51 PM
I miss you. Thanks for going to Sturgill with me. Let's make more time to have fun together 💜
I miss you too!
Could Toes ands Bubs come to AZ 12/6-9? It'll be Josh flys to rdu to get them and meets me. Or I'll fly back and pick them up.
I think so but let me see what th cheer schedule is. It's supposed to be available really soon. When do you need to know by
Maybe tomorrow
There's a meeting with a grenade and rocket company and a country concert for Isla
Cool. What concert?
Luke Grimes?
Sounds familiar
Text Message • SMS

3:46

3

MA

Matt

That was little dude that called

It didn't ring. Does he still want to talk?

I love you! Text me when you arrive

I love you too

Oct 27, 2024 at 9:30 PM



Text Message • SMS

PLAINTIFF'S EXHIBIT 3

EXHIBIT A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:26-cv-00038-DAB-JEP

| | |
|---|---|
| HEATHER AMMEL, Plaintiff, v. KYRSTEN SINEMA, Defendant. | |

**DECLARATION OF KYRSTEN SINEMA**

I, KYRSTEN SINEMA, declare and state as follows:

1. I am over the age of eighteen and am competent to make this declaration. I have personal knowledge of all facts described below.

2. I reside in Arizona. I have never resided in North Carolina, own no property in North Carolina, do not conduct business in North Carolina, and have no contractual relationships with North Carolina business entities or residents.

3. I represented the State of Arizona in the U.S. House of Representatives from 2013 to 2019 and in the U.S. Senate from 2019 until 2025. During my time as a Senator, I had approximately 70 people working for me and/or my campaign who worked out of several different offices and/or remotely. I traveled frequently by airplane, in most cases more than twice per week. It was very difficult for me to keep up with my own schedule and whereabouts and, with the one exception of an aide who traveled with me, I was unable to and did not attempt to keep track of whereabouts of the other members of my staff or consultants at any given time.

4. Due to numerous threats made against me as a Senator, in 2021, my Senate campaign and political action committee ("PAC") engaged a security company to provide

security details at my public events. The first company engaged was Toa Group, LLC ("Toa Group"), which typically dispatched at least three security guards to attend my public events. Toa Group is based in Phoenix, Arizona and has no connection to North Carolina.

5. As of October 2023, due to leadership changes at Toa Group, my campaign engaged Kinsaker Security Group, LLC ("Kinsaker") to provide security details at my public events. Again, Kinsaker typically dispatched at least three security guards to attend my public events. Kinsaker is based in Phoenix, Arizona and has no connection to North Carolina.

6. The security details dispatched to my events by Toa Group and Kinsaker included at least the following three positions:

a. "Body," meaning the person who stood by or walked near me at all times I was in public;

b. "Driver," meaning the person who stayed with or in the vehicle used to transport me to ensure swift departure in case of emergency;

c. "Advance," meaning the person who came to each public event in advance to ensure it was safe prior to my arrival. Upon my arrival, the advance person would depart, often to the next public event on my schedule. I was never alone with the advance member of my security detail.

7. As a Senator, I was trained to communicate using the Signal Messenger LLC ("Signal") messaging app for communications related to my public service or governmental activities. Encrypted Signal messages disappear shortly after they are sent to the recipient and cannot thereafter be retrieved on the device of either the sender or the recipient; they also cannot be retrieved by Signal or phone service providers. I routinely used the Signal messaging app

during the time period I was a Senator, including to communicate with all security guards dispatched to my events by Toa Group and Kinsaker.

8. During the entire time Toa Group and Kinsaker provided security for me, I entered the State of North Carolina one time, a campaign-related event in Charlotte on February 6, 2023. I flew into Charlotte with a staffer, arriving at 2:00 pm. I was accompanied by a staffer and two additional security members to an office building in Charlotte, then went straight back to the airport at the conclusion of the event. The staffer and I departed from the Charlotte airport at 6:00 pm. I was in North Carolina for approximately four hours. I did not return to North Carolina thereafter until May 2025.

9. I became aware of Matthew Ammel in 2022 after he began providing security services to me and my campaign through Toa Group and later Kinsaker. Initially, I did not know where he resided, but at some point in the fall of 2023 received his telephone number in order to maintain contact with him related to his role on security details for me—as I did with all members of my security details. I became aware at that point that the area code of Mr. Ammel's telephone number was "913," which I knew to be a Kansas area code.

10. Mr. Ammel was on numerous security details for me from 2022 through 2024, initially for Toa Group, as of October 2023 for Kinsaker, and as of June 2024, also as a paid employee of the Senate; most of his security detail work for me occurred in the Western United States, Texas, New York, Chicago, and Washington, DC. At some point I learned he was working simultaneously for Ridgeline Defense, LLC ("Ridgeline"), a firearms training facility in New Hampshire, and for Staccato 2011, LLC ("Staccato"), a firearms manufacturer based in Texas. Between his work for Ridgeline and Staccato, I was aware he traveled very frequently throughout the country and needed to coordinate his travel for me and my campaign with his

travel for Ridgeline and Staccato. I was unaware of Mr. Ammel's physical whereabouts on a day-to-day basis—due to my hectic work schedule and his extensive travels—other than the occasions he was part of a security detail assigned for my protection and was either en route to my location, physically present in my location, or departing my location.

11. I did not learn that Mr. Ammel resided in North Carolina, and lived there with his wife and children, until approximately December 2023. He introduced me to his wife that month in Las Vegas, Nevada, following a U2 concert I acquired tickets for them to attend. Though I knew from that point forward that Mr. Ammel resided in North Carolina, I also knew that he was traveling outside of North Carolina for Ridgeline, Staccato, and/or me and my campaign the vast majority of each month. I never had personal knowledge of him being physically present in North Carolina at any time I initiated or had communications with Mr. Ammel prior to November 2024.

12. Between the commencement of his security detail work for me and my campaign in 2022 and October 2024, Mr. Ammel and I engaged in communications through three means: (1) telephone; (2) email; and (3) Signal messages. We did not engage in any communications via SMS (text) messages during that time period. The only phone I ever used to communicate with him was my personal cellphone.

13. I have carefully reviewed the records of my cellphone and email communications with Mr. Ammel and used those records to ascertain where I was and where he was when such communications occurred. I can produce those records upon request, but am not attaching them hereto because they are voluminous and are private records that would require some form of protection both from the public court file and from further dissemination.

14. Based upon my review of those records, none of my telephone or email communications with Mr. Ammel between early 2023 and November 1, 2024 occurred while he was physically present in North Carolina. Stated another way, Mr. Ammel was physically outside the State of North Carolina at the time I directed 100% of my telephone and email communications to him during such time period. Furthermore, virtually all such telephone and email communications I directed to him during such time related solely to the security services he provided to me and my campaign.

15. Below I detail all of my telephone and email communications with Mr. Ammel during the relevant time period, and I address the Signal messages Plaintiff alleges in her Complaint I sent to Mr. Ammel at times she alleges I knew he was physically located in North Carolina.

16. On September 23, 2023, at 11:47 am, I called Mr. Ammel from Sonoma County, CA to let him know that I and my two friends were ready to depart our hotel for a local winery. Mr. Ammel was providing security that weekend while I cycled with a friend and his wife. Mr. Ammel was in Sonoma County, CA at the time of the call. The call lasted 1 minute.

17. On September 24, 2023, at 7:28 pm, I called Mr. Ammel from Sonoma County, CA to let him know that my two friends and I were ready to depart to dinner. Mr. Ammel was in Sonoma County, CA at the time of the call. The call lasted 1 minute.

18. On October 26, 2023, at 8:00 am, I forwarded an email to Mr. Ammel. It was the registration confirmation of the Canyonlands Ultra marathon taking place in St. George, UT. The email contained no other communication. My research has confirmed that Mr. Ammel was in St. George, UT when I sent this email.

19. I have no recollection of any Signal messages I sent to Mr. Ammel in January 2024, as is alleged in paragraph 27 of Plaintiff's Complaint. If I did send him Signal messages in that month: (1) for the reasons described above, at the time, I had no knowledge as to where Mr. Ammel was physically located; and (2) any such communications would have related solely to the security services he was providing to me and my campaign, and were not of a romantic or intimate nature. To the extent Plaintiff alleges that such messages "exceeded the bounds of a normal working relationship and were of romantic and lascivious natures," that allegation is false.

20. In paragraph 28 of her Complaint, Plaintiff alleges that I sent Mr. Ammel messages that included a picture of me "wrapped in a towel" and that I offered to help him work through his mental health challenges and suggested for him to bring MDMA drugs on a work trip so I could "guide him through a psychedelic experience." First, I never sent Mr. Ammel any messages that included a picture of me wrapped in a towel and have no recollection of any message of the type Plaintiff alleges. Second, whatever messages and/or photo I sent to Mr. Ammel that pertain in any way to Plaintiff's allegations in paragraph 28 of her Complaint were (1) not of a romantic or intimate nature and (2) for the reasons described above, at the time, I had no knowledge as to where Mr. Ammel was physically located.

21. On March 2, 2024, at 2:41 pm, I called Mr. Ammel from Phoenix, AZ to let him know that my staff and I were ready to depart to the Innings Festival. Mr. Ammel was one of three security personnel assigned to me that afternoon, and was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

22. Plaintiff alleges in paragraph 29 of her Complaint that I messaged Mr. Ammel during the State of the Union address, which occurred on March 7, 2024. As is apparent from

paragraph 29, (1) such communication was not of a romantic or intimate nature; and (2) for the reasons described above, at the time, I had no knowledge as to where Mr. Ammel was physically located.

23. Plaintiff alleges in paragraph 30 of her Complaint that Mr. Ammel messaged me while at a baseball game during a work trip for Staccato in Pennsylvania that he was going to start a "fuck the troops" chant and that I responded I would "fuck the hot ones." As is apparent from paragraph 30, this communication (1) was not of a romantic or intimate nature and (2) occurred while Mr. Ammel was in Pennsylvania.

24. Plaintiff alleges in paragraph 31 of her Complaint that Mr. Ammel and I messaged each other about having sex missionary style with the lights on and that I stated "Boring!" Though I don't have a specific recollection of such message, it would have occurred at the same time as those referenced in paragraph 30 of Plaintiff's Complaint and related to the same subject matter—about American troops, not about me and Mr. Ammel. This communication (1) was not of a romantic or intimate nature and (2) occurred while Mr. Ammel was in Pennsylvania.

25. On April 6, 2024, at 5:41 pm, I called Mr. Ammel from Washington, DC to coordinate walking me and my friends to dinner. Mr. Ammel was in Washington, DC at the time of the call. The call lasted 2 minutes.

26. On April 7, 2024, at 6:50, 6:51 and 6:53 am, I called Mr. Ammel from Washington, DC three times as my friends and I were navigating our way to our destination. Mr. Ammel was in Washington, DC at the time of the call. Each call lasted 1 minute.

27. On May 25, 2024, at 2:32 pm, I called Mr. Ammel from Sonoma, CA to let him know that my flight had arrived and my friends and I would walk out of the airport terminal soon. Mr. Ammel was in Sonoma, CA at the time of the call. The call lasted 1 minute.

28. At the end of May 2024, my relationship with Mr. Ammel became romantic and intimate. On May 27, 2024, while Mr. Ammel was on a security detail for me Sonoma, CA, we were physically intimate for the first time. Thereafter, we were physically intimate in mid-June in New York City, NY, in mid-July in Washington, DC, in late-August in Aspen, CO, in late-September in Washington, DC, and in early-October in Phoenix, AZ.

29. On June 21, 2024, at 1:40 pm, I called Mr. Ammel from Los Angeles, CA to let him know that a staffer and I had completed our run to the beach and to locate him and my other friend, who was with him. Mr. Ammel was in Los Angeles, CA at the time of the call. The first call did not go through, so I called again. Each call lasted 1 minute.

30. On June 22, 2023, at 7:09 pm, I forwarded an email to Mr. Ammel. It was the receipt for his hotel room, which he needed to submit to his superiors for reimbursement. The email contained no other communication. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time I sent this email.

31. Plaintiff alleges in paragraph 40 of her Complaint that I sent Mr. Ammel a message in June 2024 expressing that I kept waking up during my sleep and reaching over for his arms to hold me. I can confirm that on or about June 22, 2024, I sent four Signal messages to Mr. Ammel. I was in Scottsdale, AZ when I sent those messages. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time I sent those messages. Those messages were as follows:

a. "I hope your day was ok";

b. "Thinking of you";

c. "I am with you"; and

d. "I keep waking up during my sleep and reaching over for your arms to hold me."

32. I was able to reconstruct the foregoing Signal messages from a screenshot Plaintiff made of them—presumably from Mr. Ammel's phone—and thereafter texted to herself. Plaintiff produced her entire text stream with Mr. Ammel in their domestic litigation and the screenshot containing these Signal messages appears on page 79 of the text stream. The messages before and after that screenshot confirm that Mr. Ammel was with his family, including Plaintiff, in Leavenworth, KS when these Signal messages were sent.

33. On June 24, 2024, at 3:02 pm, I forwarded an email to Mr. Ammel. It was the receipt for his hotel room, which he needed to submit to his superiors for reimbursement. The email contained no other communication. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time he received the email.

34. On July 4, 2024 at 2:31 pm, I called Mr. Ammel from Tokyo, Japan. I had just climbed Mount Fuji with a staffer and called Mr. Ammel to discuss an upcoming Grand Canyon hike with a group of hikers. My research has confirmed that Mr. Ammel was in Leavenworth, KS at the time of the call. The call lasted 19 minutes.

35. On July 11, 2024, at 9:42 pm, I called Mr. Ammel from Idaho to further discuss the Grand Canyon hike. Mr. Ammel called me back at 9:46 pm and we talked for 23 minutes. My research has confirmed that Mr. Ammel was in Washington, DC at the time of the call.

36. On July 20, 2024, at 8:14 am, I called Mr. Ammel from Phoenix, AZ to coordinate my departure at the airport. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

37. On August 8, 2024, at 12:19 pm, I forwarded an email to Mr. Ammel. It was the receipt for his hotel room, which he needed to submit to his superiors for reimbursement. The

email contained no other communication. My research has confirmed that Mr. Ammel was in New York City, NY when I sent this email.

38. On September 3, 2024, at 9:04 pm, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a dinner I was having with a friend. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

39. On September 4, 2024, at 2:47 pm, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a meeting. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

40. On September 7, 2024, at 1:12 pm, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a meeting. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 1 minute.

41. On September 19, 2024, at 2:46 pm, I called Mr. Ammel from New York City, NY, to coordinate my departure from a hotel I was staying at with friends. Mr. Ammel was in New York City, NY at the time of the call. The call lasted 1 minute.

42. Mr. Ammel was on security details for me in Arizona all but two nights from October 1, 2024 until October 11, 2024. That included the three-day trip to the Grand Canyon from October 7-9.

43. On October 1, at 5:40 pm, I started a staff call on my conference line while I was in Phoenix, AZ. At 5:42 pm, I called Mr. Ammel to merge him into the staff conference line for the staff meeting, as he had not dialed into the call. Mr. Ammel was in Phoenix, AZ at the time of the call. The meeting lasted 30 minutes; Mr. Ammel was merged through my line for 28 minutes.

44. On October 7, at 11:33 am, I called Mr. Ammel from Phoenix, AZ to coordinate my departure from a meeting. Mr. Ammel was in Phoenix, AZ at the time of the call. The call lasted 2 minutes.

45. On October 8, 2024, at 3:06 pm, I called Mr. Ammel from the Grand Canyon. Mr. Ammel was at the Grand Canyon at the time of the call. The call did not go through, and is listed in my phone records as lasting 1 minute.

46. On October 8, 2024, at 10:22 pm, I called Mr. Ammel from the Grand Canyon to coordinate leaving the restaurant and returning the group of hikers to our cabins. Mr. Ammel was at the Grand Canyon at the time of the call. The call lasted 2 minutes.

47. Mr. Ammel returned with me and our group of hikers to Phoenix, AZ on October 10, 2024. He left Phoenix the following day.

48. I traveled from Phoenix to Montana on October 10—while Mr. Ammel was still in Phoenix—and then left Montana on October 11 to travel to Paris, a trip that lasted from October 12-16. I then flew from Paris to Salt Lake City, UT, arriving on October 17. I was in Utah until the evening of October 18 and boarded a flight bound for Miami, FL just before midnight on October 18. I met Mr. Ammel, his wife, and children in Miami on October 19. They had come to Miami as my guests to see the Taylor Swift concert that evening. I was together with Mr. Ammel and his family October 19 and 20 before flying back to Phoenix on October 21.

49. In paragraph 44 of her Complaint, Plaintiff alleges that Mr. Ammel was in Moore County, NC in October 2024 when I messaged him, "I miss you. Putting my hand on your heart. I'll see you soon." She further alleges that she responded to my message by stating, "Are you having an affair with my husband? You took a married man away from his family." The Complaint does not allege the specific timing of this message exchange.

50. I recall sending Mr. Ammel a Signal message similar to the one described in foregoing paragraph—and also remember receiving Plaintiff's response about taking "a married man away from his family." The earliest that message exchange occurred would have been at the end of my trip to Paris—on or about October 16—which is why I closed my message to Mr. Ammel, "See you soon." Because I had acquired the Taylor Swift tickets for Mr. Ammel and his family, I knew they would be in Miami on or about October 19—three days following the end of my Paris trip. It is also possible that I sent that Signal message even closer to the time we would all be together in Miami, which would have been while I was in Utah on October 17 or 18. Thus, my very best memory is that I sent the Signal message described in the foregoing paragraph somewhere between October 16 and October 18, 2024.

51. At the time I sent the message to Mr. Ammel described in the foregoing paragraph, due to my extensive travels—which included both Paris and Utah—and my knowledge that Mr. Ammel traveled for work frequently and was rarely in North Carolina, I did not know where he was physically located. Specifically, I did not know he was with in North Carolina when that message was sent—and/or that he was in the proximity of Plaintiff—until I received her responsive message. In any event, at the time I sent that message, it was very clear to me that Mr. Ammel's marriage with Plaintiff was over and that he had found a new apartment he planned to move into imminently.

52. On October 22, 2024, at 4:40 pm, I called Mr. Ammel from Las Vegas, NV to find him as we were leaving the conference center. Mr. Ammel was in Las Vegas at the time of the call. Mr. Ammel did not answer the call; it is listed on my phone records as 1 minute. I called again at 4:41 pm and Mr. Ammel answered as he was walking towards the rest of the group inside the conference center. The call lasted 2 minutes.

53. Mr. Ammel was physically with me from October 26 until November 1, 2024, first in Phoenix, AZ and then in the Middle East.

54. I did not, as Plaintiff alleges in paragraph 53 of her Complaint, solicit Mr. Ammel "by using telephonic and internet communications of lascivious natures" while "Plaintiff and Mr. Ammel were domiciled and present in North Carolina[.]"

55. It is untrue, as Plaintiff alleges in paragraph 55 of her Complaint, that "[m]any of the communications" referenced in her Complaint "occurred while Mr. Ammel was in the marital residence in Moore County, North Carolina with Plaintiff and the Children."

56. It is untrue, as Plaintiff alleges in paragraph 56 of her Complaint, that I "had actual knowledge that Mr. Ammel was physically located and present in North Carolina with Plaintiff and the Children at the time [I] sent the messages to Mr. Ammel and the messages were received by Mr. Ammel."

57. It is untrue, as Plaintiff alleges in paragraph 57 of her Complaint, that I had "repeated telephone calls and repeatedly sent messages to Mr. Ammel knowing he was located in North Carolina with Plaintiff and the Children."

58. It is untrue, as Plaintiff alleges in paragraph 58 of her Complaint, that I "could have and should have known that through eliciting communication—texts and phone calls—with Mr. Ammel, [I] was establishing a connection with the State of North Carolina."

59. The opposite of Plaintiff's allegations is true. I had no knowledge at the time I initiated any communications with Mr. Ammel that he was located in North Carolina at the time. Indeed, my research has confirmed that Mr. Ammel was located outside of North Carolina when virtually all of the communications addressed in this declaration occurred.

60. I declare under the penalty of perjury and the laws of the United States that the foregoing is true and accurate.

This the 7th day of March, 2026.

KYRSTEN SINEMA

PLAINTIFF'S EXHIBIT 4

EXHIBIT B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:26-cv-00038-DAB-JEP

HEATHER AMMEL,

Plaintiff,

v.

KYRSTEN SINEMA,

Defendant.

**DECLARATION OF MATTHEW JOSEPH AMMEL**

I, MATTHEW JOSEPH AMMEL, declare and state as follows:

1. I am over the age of eighteen and am competent to make this declaration. I have personal knowledge of all facts described below.

2. Plaintiff and I were married on October 23, 2010. Our marital relationship ended in October 2024.

3. I was in the United States Army until my official retirement in 2022. Plaintiff and I were living in Moore County, North Carolina at the time with our three children.

4. In 2022, I began working as an independent contractor for four different companies: as a firearms instructor for Ridgeline Defense, LLC ("Ridgeline"), a firearms training facility in New Hampshire; as a firearms instructor for Staccato 2011, LLC ("Staccato"), a firearms manufacturer based in Texas; as a maritime operations instructor for Consolidated Analysis Centers, Inc. ("CACI") in Tunisia, North Africa; and as a private security guard for Toa Group, LLC ("Toa Group"), a security services company based in Arizona. As part of my work for Toa Group, I was a member of security details for Defendant. During 2022, my travel for these four companies was extensive—throughout the United States and, for CACI, in Tunisia. In

addition, during the summer, I traveled with my wife and children by car across the country to visit our extended family members in Kansas for approximately two weeks. Thus, I was rarely in North Carolina during 2022, on average only a few days per month.

5. I continued working for Ridgeline, Staccato, and Toa Group in 2023. My travel for these three companies throughout the United States was extensive. I also traveled to Mexico for medical treatment. In addition, during the summer, I traveled with my wife and children by car across the country to visit our extended family members in Kansas for approximately two weeks. Thus, I was rarely in North Carolina during 2023, on average only a few days per month.

6. In October 2023, I ceased working as a private security guard for Toa Group and began working as a private security guard for Kinsaker Security Group, LLC ("Kinsaker"), a security services company based in Arizona. I worked for Kinsaker as an independent contractor. As part of my work for Kinsaker, I was a member of security details for Defendant. As a private security guard affiliated with Kinsaker, my travels across the United States actually increased from the work I had been doing for Toa Group.

7. During the first half of 2024, I continued working as an independent contractor for Ridgeline and Staccato and was providing firearms training across the country. I also continued working as a private security guard for Kinsaker, providing security services across the country.

8. In June 2024, I was hired by the United States Senate as a W2 employee to provide security services on governmental trips, both across the country and throughout the world. Once I began that W2 employment, I stopped working for Ridgeline and for Staccato, but continued my work providing security services for Kinsaker across the country. My work for both the United States Senate and Kinsaker in 2024 included being a member of security details

for Defendant. My travels outside of North Carolina were even more extensive in 2024 than they had been in 2022 and 2023 and kept me away from North Carolina during most of the year.

9. During the summer of 2024, my wife, children, and I once again drove to Kansas to visit our extended family members there and eventually drove to Oregon as well. We left North Carolina on June 12 and did not return until July 6. On June 14, while my wife and children were in Kansas, I departed to provide security services for Defendant in New York, Arizona, and Los Angeles. I returned to Kansas City at about 12:20 a.m. on June 22. Plaintiff picked me up from the airport we drove to my in-laws' residence in Leavenworth together. I remained with Plaintiff and my family until we returned to North Carolina on July 6.

10. I provided security services for Defendant in Phoenix, AZ from October 1-3, 2024.

11. A true and accurate copy of text message exchanges between myself and Plaintiff—excerpted for brevity—is attached hereto as Exhibit 1. My texts are shaded in gray and Plaintiff's are shaded in blue.

12. On October 3, as I was flying to North Carolina from Phoenix, I texted Plaintiff the following message: "Do I need to get a hotel tonight?" Plaintiff responded as follows:

> At this point all I care about is protecting my children and preventing as much as possible any more emotional harm you're inflicting on them because of your selfish decisions. You are being manipulative asking about the hotel when you know damn well you told the kids you would be home today and they're expecting to see you. You've requested to separate many times. It's your decision to leave. That being said, ONLY BECAUSE it's my daughter's 13th birthday tomorrow, and in no way do I want her to associate this with her birthday, you can stay at the house until Sunday when you leave for your next trip. But thereafter, you need to get a hotel or apartment. Don't ask me again. That's my answer.

Ex. 1, p. 336.

13. I stayed at the marital residence in North Carolina for the next three nights, October 3, 4, and 5. During that time, I slept downstairs in the spare bedroom, a floor below the master bedroom. I then departed for Phoenix, AZ on October 6 for a work trip that involved providing security for a group of hikers in the Grand Canyon, including Defendant.

14. That same day, October 6, Plaintiff texted me the following message: "I know you've got a busy week ahead but if you have a few spare minutes this puts it really well. About how to do a structured separation. I love you and hope you have a good week." Ex. 1, p. 343. As of that date, as is indicated in Plaintiff's text, we had already decided we were going to separate and were working on the logistics of our separation.

15. The work trip I began on October 6, 2024 lasted until October 11. Before I departed Phoenix on Friday morning October 11, I received text messages from Plaintiff as follows:

> Please make sure to have a hotel arranged from Saturday to Friday. I will be in class Wednesday and Thursday this week. That is your opportunity to come finish the office project. When I am home, you can't be. You can come pick up the kids for school. There are games Monday and Wednesday this week where you can meet us. I highly suggest you use this week to find an apartment and therapist. You need help, Matt. You are destroying every relationship you have with your poor choices. When we tell the kids on Saturday, I will not take the fall for your choices. These are consequences for the choices you've made, and you haven't made choices that protect your marriage or your family.
>
> You have repeatedly told me you want a divorce. I won't allow you to continue to hurt me or the kids.

Ex. 1, p. 352.

16. Following my receipt of Plaintiff's October 3 and October 11 text messages, I began making arrangements to live separate and apart from her. I visited the apartment community Tylers Ridge at Sand Hills Apartments in Southern Pines, NC ("Tylers Ridge") on

Monday, October 14 and toured one of their apartments. I learned that they could have an apartment ready for me to move into before the end of October. I informed Plaintiff later that day that I had found an apartment and would be moving into it as soon as it was ready. As of that discussion, we had a very clear, mutual understanding that our marriage was over and that I would be moving out of the marital residence and into an apartment at Tylers Ridge as soon as possible.

17. I stayed at the marital residence in North Carolina October 12 through October 18. During that time, I slept in the spare bedroom downstairs, a floor below the master bedroom. Plaintiff and I had no physical contact of any kind during that time period.

18. On Tuesday, October 15, 2024, I received an email from Tylers Ridge following up on my visit there the prior day. A true and accurate copy of that email is attached hereto as Exhibit 2.

19. Plaintiff and I had an appointment with her therapist at 2:00 p.m. on October 17, 2024. At that appointment, we discussed the fact that we were in the process of separating and that I had found an apartment at Tylers Ridge that I planned to move into shortly.

20. From October 19-21, I traveled to Miami, FL with Plaintiff and our three children to see a Taylor Swift concert, an event that had been planned for several months. For the two nights we were in Miami, we had separate hotel rooms. I had one room with our son and Plaintiff had another room with our daughters. Plaintiff kept forgetting my room number and had to text me to have me remind her. *See* Ex. 1, p. 375. I did not have any physical contact of any kind with Plaintiff during our entire trip to Miami. We went together on this trip despite being in the process of separating because we did not want to disappoint our children.

21. On October 21, I left Miami for a work trip in Phoenix, AZ and Las Vegas, NV and returned to North Carolina on October 23. I provided security services to Defendant on that trip. I stayed in the martial residence the evenings of October 23 and 24. During that time, I slept in the spare bedroom downstairs, a floor below the master bedroom. Plaintiff and I had no physical contact of any kind during that time period.

22. I submitted my lease application to Tylers Ridge on Thursday, October 24. True and accurate copies of emails I received from Tylers Ridge acknowledging receipt of my lease application materials are attached hereto as Exhibit 3.

23. I am aware that Plaintiff has alleged in paragraph 46 of her complaint in this action that shortly after I returned from my October 21-23 work trip to Phoenix and Las Vegas, I "insisted" that Plaintiff and I "go together on an anniversary trip to Nashville, Tennessee." That allegation is false. I have reviewed my text message history with Plaintiff in order to reconstruct how that trip to Nashville actually came about.

24. Plaintiff and I had been wanting to see a concert by country artist Sturgill Simpson. Plaintiff searched online for tickets in early August 2024 and informed me she could not find affordable tickets. *See* Ex. 1, p. 165. That September, we made tentative plans to see his concert in Greensboro, but I had to back out due to my extensive travels. *See* Ex. 1, p. 293. At that time, Plaintiff and I discovered he was scheduled to perform in Nashville on October 25 as well as in Georgia about the same time. *See* Ex. 1, p. 294. Plaintiff suggested that we go to Nashville for a couple of nights and have her mother watch the kids. *See* Ex. 1, pp. 294-95. I told her that should work. At no point did we discuss anything about our anniversary. We actually made no plans for our anniversary other than me taking my son to his baseball game. *See* Ex. 1, p. 313.

25. I booked our flights to Nashville to see the Sturgill Simpson concert on September 23. Ex. 1, pp. 325-27. That was ten days before Plaintiff instructed me to find another place to live. Following her second directive for me to find another place to live on October 11, she texted me, "Are we going on our sturgill date[?]" I responded, "Yes I would like to." Ex. 1, p. 359. In view of the fact that we were in the midst of separating, this trip—which ended up being just one night—was nothing more than a way for us to see an artist we both love. We discussed in advance that the trip would be a nice way of saying "goodbye" to our marriage and all the years we had together. There was nothing romantic about this trip whatsoever. By then, our marriage had been over for weeks for all intents and purposes.

26. We flew to Nashville the morning of the concert, did some sightseeing, and went to the concert that evening at the Bridgestone Arena. Though we did stay in the same hotel room, I slept on the couch. We had no physical contact of any kind during our entire time in Nashville. The next morning, Saturday, October 26, Plaintiff boarded a flight for RDU and I boarded a flight for Phoenix, AZ. Our physical separation—along with my intent to permanently separate from Plaintiff—began at that moment. We never again spent an evening together.

27. At no point during the October 25-26 trip to Nashville did Plaintiff and I discuss the notion of continuing our marriage. The marriage effectively ended when Plaintiff instructed me to move out of the marital residence in early October.

28. I began a seven-day work trip on Saturday, October 26 that included time in Phoenix, AZ and in the Middle East. My rental application at Tylers Ridge was approved that same morning, October 26, and I paid my $200.00 security deposit that day. True and accurate copies of emails I received from Tylers Ridge confirming the approval of my lease application and the payment of my security deposit are attached hereto as Exhibit 4.

29. I returned to North Carolina on Friday, November 1 and moved into my new apartment at Tylers Ridge that day. I did not return to the marital residence again other than to see my children, perform handiwork, or to retrieve my belongings.

30. I declare under the penalty of perjury and the laws of the United States that the foregoing is true and accurate.

This the 3 day of March, 2026.

MATTHEW JOSEPH AMMEL

8/5/24, 6:15 PM
iPhone (87) (19132403852)

Oct 22

8/5/24, 6:16 PM
iPhone (87) (19132403852)

We can hold off on sturgill for a little bit

8/5/24, 6:16 PM
iPhone (87) (19132403852)

That was just the cheapest I've seen so far for his tix

8/5/24, 6:16 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I really want to go. It's just going to be really busy around then.

8/5/24, 6:17 PM
iPhone (87) (19132403852)

Yeah, let's play it by ear 👍

8/5/24, 6:17 PM
iPhone (87) (19132403852)

Did you see scout had half siblings

8/5/24, 6:18 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah. I want one…I just don't know

8/5/24, 6:18 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I really do want to breed scout and get his little dude

8/5/24, 6:19 PM
iPhone (87) (19132403852)

Yeah, I feel the same. I might go look at the puppies when I'm in Kansas with the girls. If I do, I'll ask the breeder if maybe we can arrange things

8/5/24, 6:19 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah that's a good idea

EXHIBIT 1

9/19/24, 11:49 AM (Viewed 9/19/24, 11:56 AM)
Matthew Ammel (matthew.ammel@hotmail.com)




Done

9/19/24, 11:56 AM
iPhone (87) (melansonh@yahoo.com)

Thank you 🙏

9/19/24, 12:03 PM (Viewed 9/19/24, 12:04 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Of course! I'm glad they moved it. That fucking flight better not be gay

9/19/24, 12:06 PM (Viewed 9/19/24, 12:15 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

I'm not going to be able to go to sturgill in Greensboro. We got invited to a MAPS event in Vegas. I'll catch the red eye home and be there for our anny. Can I get us tickets someplace else?

9/19/24, 12:15 PM
iPhone (87) (melansonh@yahoo.com)

Ah bummer. We'll talk about it when you get home

9/19/24, 12:16 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Could you go to GA on the 24th?

9/19/24, 12:16 PM (Delivered 9/19/24, 12:17 PM)
iPhone (87) (melansonh@yahoo.com)

Yeah possibly let me talk to my mom

9/19/24, 12:17 PM
iPhone (87) (melansonh@yahoo.com)

Is there a Nashville date too?

9/19/24, 12:17 PM (Viewed 9/19/24, 12:20 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

25th

9/19/24, 12:20 PM
iPhone (87) (melansonh@yahoo.com)

Let me talk to my mom. Are you going Miami to Vegas

9/19/24, 12:21 PM (Viewed 9/19/24, 12:22 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

Mia-phx-las

9/19/24, 12:22 PM
iPhone (87) (melansonh@yahoo.com)

😩 dang

9/19/24, 1:39 PM
iPhone (87) (melansonh@yahoo.com)

So that Georgia show is only five hours away on thursday. Or we go to Nashville for a couple nights?

9/19/24, 1:57 PM
iPhone (87) (melansonh@yahoo.com)
Message was edited 9/19/24, 1:57 PM

My mom is going to verify with work that she be here to watch the kids. It sounds doable. She also said she has time off right before we fly to Miami if we want her to come early and watch

scout. That just means she would be in town for a solid week, if you're ok w that.

**9/19/24, 3:01 PM (Viewed 9/19/24, 3:02 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Yeah that should work

**9/19/24, 3:07 PM**
iPhone (87) (melansonh@yahoo.com)

Ok, we can talk more about it in person tomorrow

**9/19/24, 3:15 PM (Viewed 9/19/24, 3:16 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

I'm about to ride the dc metro…if you don't hear back from me

**9/19/24, 3:16 PM**
iPhone (87) (melansonh@yahoo.com)

Haha I'm so confused on where you are. Are you going to new York?

**9/19/24, 3:16 PM**
iPhone (87) (melansonh@yahoo.com)

Bubba is back inside from playing if you want to call

Sunday. We can do pizza and cake, and breakfast. Shane, Joey, and Bodhi

**9/22/24, 12:59 PM**

iPhone (87) (melansonh@yahoo.com)

Maybe we can set up the projector for them to watch a movie on the porch

**9/22/24, 1:12 PM**

Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

**9/22/24, 1:23 PM**

iPhone (87) (melansonh@yahoo.com)

You'll be able to take bubba man to his game on our anniversary at 6? I'll be getting my mom from the airport at 5:30 and come straight to the game.

**9/22/24, 1:23 PM**

Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

**9/22/24, 1:23 PM**

iPhone (87) (melansonh@yahoo.com)

Cool. Can you book our hotel?

**9/22/24, 1:27 PM**

Matthew Ammel (matthew.ammel@hotmail.com)

Can you send me a picture of your Credit card

**9/22/24, 1:28 PM**

iPhone (87) (melansonh@yahoo.com)

Your new card is here. Would you rather I activate it and send to a picture?

**9/22/24, 1:28 PM**

Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

9/23/24, 5:11 PM
iPhone (87) (melansonh@yahoo.com)

Are the kids and I sitting by each other on that flight out

9/23/24, 5:12 PM
Matthew Ammel (matthew.ammel@hotmail.com)

The flight took off before I could change it. Kyrsten has to go vote then she's going to call concierge and change them.

9/23/24, 5:13 PM
iPhone (87) (melansonh@yahoo.com)

Tell her thank you 🙏 thank goodness I looked for that Nashville flight or it would've gone unnoticed

9/23/24, 5:13 PM
Matthew Ammel (matthew.ammel@hotmail.com)

Yes thank you!

9/23/24, 5:13 PM
Matthew Ammel (matthew.ammel@hotmail.com)

I don't know how I fucked that up

9/23/24, 5:13 PM
iPhone (87) (melansonh@yahoo.com)

You have a lot going on. Its okay

9/23/24, 5:14 PM
iPhone (87) (melansonh@yahoo.com)

Do you want to book those Nashville flights I sent you?

9/23/24, 5:17 PM (Viewed 9/23/24, 5:21 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

What's your AADVANTAGE #

**9/23/24, 5:21 PM**
iPhone (87) (melansonh@yahoo.com)




**9/23/24, 5:22 PM**
iPhone (87) (melansonh@yahoo.com)

BF720A6

9/23/24, 5:34 PM

Matthew Ammel (matthew.ammel@hotmail.com)



18:34

Your trip is booked    Home

$617.92

Your trip to Nashville, TN

Record Locator KJTKPI

Trip name RDU/BNA

DEPART

RDU to BNA

Fri Oct 25 2024

RETURN

BNA to RDU

Sat Oct 26 2024

Passengers

Ticket number 0012178521817

Status Ticketed

Ticket number [redacted]

9/23/24, 5:35 PM

iPhone (87) (melansonh@yahoo.com)

Those dates are right 😁 yeah! I can't wait

9/23/24, 5:45 PM

iPhone (87) (melansonh@yahoo.com)

Cooper just got a legit home run

9/23/24, 5:45 PM (Viewed 9/23/24, 5:46 PM)

Matthew Ammel (matthew.ammel@hotmail.com)

Dang

9/23/24, 5:50 PM

iPhone (87) (melansonh@yahoo.com)

He's going to be pumped to talk to you tonight

**9/30/24, 1:28 PM (Viewed 9/30/24, 1:32 PM)**

Matthew Ammel (matthew.ammel@hotmail.com)

Yeah

**9/30/24, 5:44 PM (Delivered 9/30/24, 7:50 PM)**

iPhone (87) (melansonh@yahoo.com)

Cooper just told me he wishes you were home. I think you need to do some serious soul searching. Really evaluate the decisions you're making. The consequences are going to be devastating.

**10/3/24, 12:12 PM (Viewed 10/3/24, 12:46 PM)**

Matthew Ammel (matthew.ammel@hotmail.com)

Do I need to get a hotel tonight?

**10/3/24, 1:28 PM**

iPhone (87) (melansonh@yahoo.com)

At this point all I care about is protecting my children and preventing as much as possible any more emotional harm you're inflicting on them because of your selfish decisions. You are being manipulative asking about the hotel when you know damn well you told the kids you would be home today and they're expecting to see you. You've requested to separate many times. It is your decision to leave. That being said, ONLY BECAUSE it's my daughter's 13th birthday tomorrow, and in no way do I want her to associate this with her birthday, you can stay at the house until Sunday when you leave for your next trip. But thereafter, you need to get a hotel or apartment. Don't ask me again. That's my answer.

10/6/24, 7:15 PM
iPhone (87) (melansonh@yahoo.com)

I know you've got a busy week ahead but if you have a few spare minutes this puts it really well. About how to do a structured separation. I love you and I hope you have a good week.

10/7/24, 10:09 AM
iPhone (87) (melansonh@yahoo.com)

The therapist can see us Thursday the 17th at 2

10/7/24, 10:40 AM (Viewed 10/7/24, 10:44 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Loved "I know you've got a busy week ahead but if you hav…"

10/7/24, 10:40 AM (Viewed 10/7/24, 10:44 AM)
Matthew Ammel (matthew.ammel@hotmail.com)

Liked "The therapist can see us Thursday the 17th at 2"

10/7/24, 12:31 PM
iPhone (87) (melansonh@yahoo.com)

I got our taxes situated if you get a second to call I can run you through it

10/7/24, 1:26 PM (Viewed 10/7/24, 1:52 PM)
Matthew Ammel (matthew.ammel@hotmail.com)

I have to do this clearance thing. I will call before we leave.

10/7/24, 1:52 PM
iPhone (87) (melansonh@yahoo.com)

Liked "I have to do this clearance thing. I will call bef…"

10/7/24, 3:07 PM
iPhone (87) (melansonh@yahoo.com)

Are you finished with the clearance

**10/10/24, 7:05 PM**
iPhone (87) (melansonh@yahoo.com)

It doesn't really look like you're working very hard. You could sit around at HER house but not contact your kids until I said something.

**10/10/24, 7:05 PM**
iPhone (87) (melansonh@yahoo.com)

Don't ever call them from her house again.

**10/10/24, 8:50 PM (Viewed 10/10/24, 8:52 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

What year was Regina?

**10/10/24, 8:52 PM**
iPhone (87) (melansonh@yahoo.com)

2016

**10/10/24, 9:02 PM (Viewed 10/11/24, 5:10 AM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Thanks

**10/11/24, 7:43 AM**
iPhone (87) (melansonh@yahoo.com)

Please make sure to have a hotel arranged from Saturday to Friday. I will be in class Wednesday and Thursday this week. That is your opportunity to come finish the office project. When I am home, you can't be. You can come to pick up the kids for school. There are games Monday and Wednesday this week where you can meet us. I highly suggest you use this week to find an apartment and therapist. You need help, Matt. You are destroying every relationship you have with your poor choices. When we tell the kids on Saturday, I will not take the fall for your choices. These are consequences for the choices you've made, and you haven't made choices that protect your marriage or your family.

**10/11/24, 7:45 AM**
iPhone (87) (melansonh@yahoo.com)

You have repeatedly told me you want a divorce. I won't allow you to continue to hurt me or the kids.

**10/11/24, 1:38 PM**
iPhone (87) (melansonh@yahoo.com)

Is there hope

**10/11/24, 5:32 PM**
iPhone (87) (melansonh@yahoo.com)

Are we going on our sturgill date

**10/11/24, 5:32 PM (Viewed 10/11/24, 5:33 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)
Message is a reply to thread: "Are we going on our sturgill date"

Yes I would like to

**10/11/24, 5:33 PM**
iPhone (87) (melansonh@yahoo.com)

😊

**10/11/24, 5:34 PM**
iPhone (87) (melansonh@yahoo.com)




**10/11/24, 8:59 PM (Delivered 10/11/24, 9:13 PM)**
iPhone (87) (melansonh@yahoo.com)



**10/20/24, 10:02 AM**
iPhone (87) (melansonh@yahoo.com)



REDACTED

**10/20/24, 11:02 AM**
iPhone (87) (melansonh@yahoo.com)

What's your room number again?

**10/20/24, 11:16 AM (Viewed 10/20/24, 12:35 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

1424

**10/20/24, 1:25 PM (Viewed 10/20/24, 2:36 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Where are you guys?

**10/20/24, 3:03 PM**
iPhone (87) (melansonh@yahoo.com)

Wanna come down so coop can get dressed? His jeans are down here

**10/20/24, 3:04 PM (Viewed 10/20/24, 3:09 PM)**
Matthew Ammel (matthew.ammel@hotmail.com)

Coming

**10/20/24, 3:09 PM**
iPhone (87) (melansonh@yahoo.com)

That's what she said

**10/20/24, 10:49 PM**
iPhone (87) (melansonh@yahoo.com)

🆘

**10/20/24, 10:50 PM**
iPhone (87) (melansonh@yahoo.com)

I had like ten glasses of Dom

**From:** Tylers Ridge at Sand Hills <Leasing_Office-tylersridge@knck.io>
**Date:** October 15, 2024 at 10:15:17 MST
**To:** m.ammel3222@gmail.com
**Subject: Your rental inquiry at Tylers Ridge at Sand Hills**
**Reply-To:** Tylers Ridge at Sand Hills <chats-GOKK46TC-1729011482-prospect-1055603280@knck.io>

Good afternoon, Matt!
***Thank you for your interest in Tyler's Ridge at Sandhills!***
We are excited to welcome you to our Tyler's Ridge family! We are conveniently located in beautiful Southern Pines, North Carolina - nestled between countless world-renowned golf destinations, the Moore County Airport, premier shopping destinations, Sandhills Community College, the Moore County Reservoir Park, and much, much more!

You will love our spacious 1, 2, and 3-bedroom apartment floorplans! Take an online virtual tour, browse our amazing amenities, explore our photo gallery, view current availability, and complete an application with us - all on our community website!
*Your Tyler's Ridge at Sandhills luxury apartment is just a few clicks away - just follow these quick steps:*
1. Click the link below to be directed to our property website.
www.TylersRidgeApartments.com
2. Click "Apply Now"
3. Select your desired floorplan, apartment unit, and move-in date!
4. Complete all application information requested for all lease holders.
**Payment of $75.00 application fee, per applicant is required for application to be fully committed.*
****All units highlighted below - Move In Special.. Apply Now and Move In by 09.30.2024 and receive 1st FULL MONTH FREE RENT on all 12-15 Month Leases!***

**1-Bedroom 1-Bathroom**

- **3105-M / $1,395 / Available *NOW* / 3rd Floor**
- **1109-M / $1,450 / Available *NOW* / 1st Floor**
- **5211-M / $1,430 / Available *NOW* / 2nd Floor**
- **5111-M / $1,450 / Available *NOW* / 1st Floor**
- **2207-M / $1,445 / Available *NOW* / 2nd Floor / Wooded View**
- 6207-M / $1,445 / Available *NOW* / 2nd Floor / Wooded View
- 6305-M / $1,430 / Available *NOW* / 3rd Floor
- 4204-M / $1,430 / Available *NOW* / 2nd Floor
- 5307-M / $1,430 / Available 11.09.2024 / 3rd Floor
- 2205-M / $1,430 / Available 12.06.2024 / 2nd Floor

**2-Bedroom 2-Bathroom**

- **2213-M / $1,595 / Available *NOW* / 2nd Floor**
- **1313-M / $1,595 / Available *NOW* / 3rd Floor**
- **4200-M / $1,650 / Available *NOW* / 2nd Floor**
- **1101-M / $1,670 / Available *NOW* / 1st Floor**
- **5201-M / $1,650 / Available *NOW* / 2nd Floor**
- **4312-M / $1,650 / Available *NOW* / 2nd Floor**
- **3313-M / $1,650 / Available *NOW* / 2nd Floor / Wooded View**
- 1203-M / $1,665 / Available *NOW* / 2nd Floor / Wooded View
- 1210-T / $1,665 / Available *NOW* / 3rd Floor
- 5315-M / $1,650 / Available *NOW* / 3rd Floor
- 3315- M / $1,650 / Available 10.17.2024 / 3rd Floor
- 2215-M / $1,665 / Available 10.24.2024 / 2nd Floor / Wooded View
- 1215-M / $1,665 / Available 11.26.2024 / 2nd Floor / Wooded View

**3-Bedroom 2-Bathroom**

- 7200-M / $1,880 / Available *NOW* / 2nd Floor

**All rental quotes listed reflect a monthly price for a 12-month lease term; 6-11-month lease terms available with additional monthly fee.*
Our incredible on-site amenities and luxurious apartments provide residents with a superior apartment living experience like nowhere else, right here in Southern Pines!

All of our 1, 2, & 3-Bedroom apartment floorplans include:
• Full Size Energy Washer and Dryer installed in all units
• Beautiful Granite Countertops
• Spacious Walk-In Closets
• Ceiling Fans
• Private Patio/Balcony

We are eager to share our beautiful community and superior apartment living experience with you and your family!
Please feel free to contact our office any time by phone, or e-mail at tylersridge@druckerandfalk.com. Our team is always here to help with any questions you may have! We hope to see you soon!
Have a wonderful day!

Best Wishes,
Lindsey Suitt

**Lindsey Suitt**
Tylers Ridge at Sand Hills
500 Moonseed Lane Carthage NC 28327
http://www.tylersridgeapartments.com

Rather text? Reply to (910) 543-8663, or opt-in here.

EXHIBIT
2

**From:** Tylers Ridge at Sand Hills Phase I <no-reply@rentcafe.com>
**Date:** October 24, 2024 at 12:59:27 MST
**To:** m.ammel3222@gmail.com
**Subject: User Registration Confirmation**
**Reply-To:** tylersridge@druckerandfalk.com




Dear Matthew,

Thank you for registering on Online Lease Execution! Your account has been successfully created

Username: M.ammel3222@gmail.com

To better help you find a place to live, we've forwarded your information to the following property:

Tylers Ridge at Sand Hills Phase I
500 Moonseed Lane
Carthage, NC 28327

Your credentials will be valid on all RENTCafe powered web sites

EXHIBIT
3

**From:** Tylers Ridge at Sand Hills Phase I <no-reply@rentcafe.com>
**Date:** October 24, 2024 at 13:01:51 MST
**To:** m.ammel3222@gmail.com
**Subject:** **ID Successfully Verified**
**Reply-To:** tylersridge@druckerandfalk.com

DF MULTIFAMILY
BY DRUCKER•FALK




Apartment Living Designed for YOU

Dear Matthew,

Congratulations! Your ID has been successfully verified. You can now log in and continue your online leasing application

Continue My Application

DF MULTIFAMILY
BY DRUCKER•FALK

© Copyright © 2018 Drucker & Falk LLC. All Rights Reserved. All rights reserved.

THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify the sender and permanently delete it from your computer and destroy any printout thereof.

**From:** Tylers Ridge at Sand Hills Phase I <no-reply@rentcafe.com>
**Date:** October 24, 2024 at 13:16:14 MST
**To:** m.ammel3222@gmail.com
**Subject: Debit Card Added**
**Reply-To:** tylersridge@druckerandfalk.com

DF MULTIFAMILY
BY DRUCKER+FALK




Apartment Living Designed for YOU

Dear Matthew,

This email confirms your addition of a new debit card to your profile. To review the account information, please log in to your Guest account at
https://tylersridgeapartments.securecafe.com/onlineleasing/tylers-ridge-at-sand-hills/guestlogin.aspx

Please keep this email for your personal records.

Your account security is important to us. If you find that any of the above is inaccurate or you did not authorize this account addition, please contact us immediately.

DF MULTIFAMILY
BY DRUCKER+FALK

© Copyright © 2018 Drucker & Falk LLC. All Rights Reserved. All rights reserved.

*THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify the sender and permanently delete it from your computer and destroy any printout thereof.*

clicking here
clicking here

**From:** Tylers Ridge <tylersridge@druckerandfalk.com>
**Date:** October 26, 2024 at 08:25:23 MST
**To:** m.ammel3222@gmail.com
**Subject: ACTION REQUIRED - Security Deposit Payment Information**

**Hello Matthew,**

***You have been approved for an apartment with us with a security deposit of $200.00***

- **Please log-on to your online portal NO LATER THAN 5:00pm on MONDAY 10/28/2024 , with the username and email address created at the time of your application through the Applicant Portal (CLICK HERE), to make your security deposit payment.** Use the drop-down menu, to select the *Application Charges* tab. There, you will see the posted security deposit fee, and directions for making your payment.

- **If your $200.00 Security Deposit is not paid in the time frame indicated above, your application with Tyler's Ridge will be transferred to our Waiting List** for a future available apartment, and the unit you are currently assigned to will be placed back on our website for rent.

**YOUR IMMEDIATE ACTION IS NEEDED.** If you have any questions or concerns, please do not hesitate to reach out to our office. Thank you for choosing to call Tyler's Ridge home, and please feel free to contact our office at any time with any further questions or inquiries.

Best Wishes,

Ali

EXHIBIT 4

**From:** Tylers Ridge at Sand Hills Phase I <no-reply@rentcafe.com>
**Date:** October 26, 2024 at 12:52:20 MST
**To:** m.ammel3222@gmail.com
**Subject: Your Rental Application - Additional Payment Confirmation**
**Reply-To:** tylersridge@druckerandfalk.com




Dear Matthew,

Thank you for the payment on your application to Tylers Ridge at Sand Hills Phase I.

This email confirms that we have received the following payment.Please save this email for your personal records

**PAYMENT INFORMATION**
Payment confirmation number: 795447
Payment Date : 10/26/2024
Payment Amount : $200.00

To view or edit your online application account, click the link below and select the Guest Login tab.
https://www.dfapartments.com/apartments/nc/carthage/tylers-ridge-at-sand-hills-phase-i/index.aspx

In the meantime, if you have any questions about the application process, please contact us at (855) 894-5946

**PROPERTY:**
Tylers Ridge at Sand Hills Phase I
500 Moonseed Lane
Carthage,NC 28327
tylersridge@druckerandfalk.com

DF

DF MULTIFAMILY

BY DRUCKER+FALK

© Copyright © 2018 Drucker & Falk LLC. All Rights Reserved. All rights reserved.

*THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify the sender and permanently delete it from your computer and destroy any printout thereof.*

[illegible]

[illegible]

[illegible] clicking here [illegible] clicking here

PLAINTIFF'S EXHIBIT 5



IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
MOORE COUNTY, NORTH CAROLINA
25CV000606-620

HEATHER LYNNE AMMEL,
Plaintiff;

vs.

MATTHEW JOSEPH AMMEL,
Defendant.

DEPOSITION

OF

MATTHEW JOSEPH AMMEL

At Pinehurst, North Carolina
August 12, 2025
At 11:22 A.M. to 3:01 P.M.
August 13, 2025
At 10:38 A.M. to 11:51 A.M.

Reported by: Cynthia J. Dotson

COBB COURT REPORTING
6331 NC 27E
COATS, NORTH CAROLINA 27521

ORIGINAL

919 894-7249

A P P E A R A N C E S

FOR THE PLAINTIFF: Ms. Whitney S.P. Foushee
Van Camp, Meacham & Newman
P.O. Box 1389
Pinehurst, NC 28370

FOR THE DEFENDANT: Mr. Brent Tanner
Parker Bryan Britt
Tanner & Jenkins
133 Fayetteville St.
Suite 500
Raleigh, NC 27602

ALSO PRESENT: Ms. Heather Ammel

I N D E X

| | Page |
|---|---|
| Direct Examination by Ms. Foushee . . . . . . . . . | 5 |
| Certificate of Notary Public/Reporter. . . . . . . . | 139 |

S T I P U L A T I O N S

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record:

(1) That the deposition of Matthew Joseph Ammel may be taken on August 12, 2025, at the offices of Van Camp, Meacham & Newman, 2 Regional Circle, Pinehurst, North Carolina, before Cynthia J. Dotson, Notary Public/Reporter.

(2) That this examination shall be taken for the purpose of discovery, or for use as evidence in the above-entitled action, or for both purposes.

(3) That this deposition is deemed opened and all formalities and requirements with respect to opening the same, expressly including notice of the opening of this deposition, are hereby waived, and this deposition shall have the same effect as if all formalities in respect to opening the same had been complied with in detail.

(4) The North Carolina Rules of Civil Procedure shall control the taking of said deposition and the use thereof in court.

(5) Objections to questions and motions to strike answers need not be made during the taking of this deposition, but may be made for the first time during the progress of the trial of this case, or any pretrial hearing held before any superior court judge or magistrate for the purpose of ruling thereon, or at any other hearing of said

case at which said deposition might be used, except that an objection as to the form of a question must be made at the time such question is asked or objection is waived as to the form of the question.

(6) That the witness hereby waives the right to read and sign this deposition.

(7) That the sealed original transcript of this deposition shall be mailed first-class postage or hand delivered to the party taking the deposition for preservation and delivery to the court, if and when necessary.

WHEREUPON,

Matthew Joseph Ammel,

Having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MS. FOUSHEE:

Q Please state your name.

**A Matthew Ammel.**

Q Okay. Have you ever been deposed before?

**A I have not.**

Q All right. So I want to go over a few ground rules. First and foremost, this nice lady here is going to record everything and type it up. So as I ask you questions, it's very important that you verbalize your answer, don't nod your head, so that she has a clear record of what your response was.

**A Of course.**

Q Okay. Secondly it's important that we not talk over each other, so if you'll let me finish my question, I will do my best to let you finish your answer. Understood?

**A Okay.**

Q Do you understand that you're under oath here today?

**A I do.**

Q And you understand that means you have to tell the truth?

**A** **I do.**

Q The whole truth? And so by example, I always use the same one. If I ask you what you had for breakfast and you had orange juice, cereal and toast, you understand that just responding with two of those and not three is an incomplete answer?

**A** **I do.**

Q Is there any reason you wouldn't be able to tell the truth here today?

**A** **No.**

Q Are you on any medication currently?

**A** **Just my regular medications.**

Q What would that be?

**A** **I am on Armour Thyroid. I am on HCG. And I am on testosterone.**

Q All right. At any time you need to take a break, you are welcome to take a break. You just have to finish the question or answering the question that I just asked. Understood?

**A** **Certainly.**

Q If you ever need to talk to your attorney, you certainly can walk outside. Again you just have to finish answering the question that's asked. Understood?

**A** **Certainly.**

Q All right. Where do you reside?
**A I reside at 310 Parrish Lane.**
Q How long have you lived there?
**A I have lived there since May 21st, I believe.**
Q Of this year?
**A Correct.**
Q And do you rent that home?
**A I do.**
Q Is anyone else on the lease?
**A No, there's not.**
Q How much is the monthly rent?
**A It's twenty-eight hundred a month.**
Q And how long is the lease?
**A Twelve months.**
Q How many bedrooms is it?
**A Four bedrooms.**
Q Do you rent it through a company or an individual that you know?
**A No, it's through a real estate company, Southern Pines.**
Q Where were you residing before you were at 310?
**A I was at -- I forgot my address. It was 5305 Moonseed Lane.**
Q Okay. And did you rent that residence?
**A I did.**

Q Okay. Was it just month to month?
**A It was a six-month lease and I rented it for an additional month.**
Q And how much was the rent each month on that residence?
**A I believe it was fourteen hundred.**
Q How many bedrooms?
**A Just one.**
Q Why did you change from 5305 to the 310 residence?
**A Because I have three children, so they could fit.**
Q Why the change, though? I mean, you had three children when you were renting the 5305, right?
**A It was all I could afford at the time.**
Q Okay. Where are you currently employed?
**A I'm currently employed at Arizona State University and by Sinema for Arizona.**
Q By --
**A Sinema for Arizona.**
Q Okay. How long have you worked for that company?
**A I have worked for that company since January 3rd.**
Q And what do you do for that company?
**A I am a consultant.**
Q And what do you consult on?
**A I consult on psychedelic policy and regenerative farming and domestic defense issues for the U.S.**

government.

Q Do you have -- other than -- so you're employed by Arizona State?

**A Correct.**

Q Okay. And what's the ties with Sinema for Arizona then? I'm confused. You said you're employed by both?

**A I am.**

Q Okay. So when you said you consult, is that to Arizona State or is that for --

**A No, that's for Sinema for Arizona.**

Q And are you a salaried employee?

**A I am.**

Q What's your salary?

**A Fifty thousand.**

Q And you've worked for them since January 3rd?

**A Correct.**

Q Have you had any changes in your income?

**A I have.**

Q What were those changes?

**A Due to the temporary agreement, my limited access to my children prevented me from traveling. So my -- I missed some important meetings and my company reduced my salary.**

Q What was your salary?

**A It was two hundred and fifty thousand.**
Q So they reduced your salary by two hundred thousand dollars?
**A It went down to a hundred and thirty and then the opportunity -- no, I apologize. And then the opportunity presented itself at Arizona State University, so I took it, and so they dropped me down to part-time of fifty thousand.**
Q You're going to have to flesh that out for me. Arizona State, you started working for them when?
**A July 1st.**
Q Okay. And that is completely new employment?
**A Correct.**
Q And how much do they pay you?
**A Fifty thousand.**
Q And you're paid directly from Arizona State?
**A Correct.**
Q And you do what for Arizona State?
**A I work in the future securities initiatives.**
Q And who is -- who do you report to or who's your boss?
**A I report to -- just a minute. I report to Daniel Rothenberg and Peter Bergen.**
Q What are their titles?
**A I believe they're the directors of the future securities initiatives.**

Q And how did you find this job?

A **Through contacts in my previous employment.**

Q Which is who?

A **The U.S. Senate and the Department of Defense.**

Q Which individuals?

A **I'm sorry?**

Q You said the U.S. Senate. Which individuals referred you to Peter and I think you said -- well, how did you -- you said you were referred by U.S. Senators, right, or Senate, U.S. Senate?

A **That's correct. I worked for a U.S. Senator that represents Arizona.**

Q Okay.

A **And so we had pretty good contact with Arizona State University.**

Q Okay.

A **And while I was still in the Senate, we began working on projects through Arizona State University. And they offered me a job.**

Q Okay. So out of the blue, who offered -- this Peter individual offered you a job?

A **I think Adam Deguire --**

Q Okay.

A **-- is the one who offered me the job. And I report to Peter and Daniel.**

Q Okay. And when did Adam reach out to you?

**A This has been the talk since January, actually even since last year, like around July, but in January the talk became more specific on where I would work at ASU.**

Q And what is your obligations? Do you have to go in person, remote? What are your hours?

**A I have a pretty flexible schedule where the projects that we're working on, it kind of depends on the context that we're making to build a program.**

Q Okay. So you don't have a schedule?

**A I do not, no.**

Q Do you have a minimum number of hours you have to work?

**A I do not.**

Q Do you have to be anywhere in person or is it all remote?

**A No, I do have to be there in person occasionally.**

Q Okay. So you started the job a month and a half ago, is that right?

**A Roughly, yes.**

Q How often have you had to travel for that job?

**A In a month and a half?**

Q Since you started.

**A I've had three in person engagements and one, two Zoom**

meetings.

Q Okay. And how long -- or where did you have to travel for in person engagements?

**A Twice to Arizona and once to California.**

Q How long were those trips?

**A Two days each, day and a half in California.**

Q And how do you keep track of your schedule and travel, through a calendar?

**A Through a calendar, and then our company has two schedulers as well.**

Q Is it a Outlook calendar, Google calendar?

**A Google.**

Q So that's your employment with Arizona State, who pays you directly?

**A Correct.**

Q And that is fifty grand annually?

**A Correct.**

Q Are you subject to any bonuses, incentives?

**A Not at this time, no. I get -- that's not true. I get health care and then my children and myself will get free tuition.**

Q As long as you're working for them or --

**A No, for life.**

Q Okay. Do you have an employment contract with them?

**A I do.**

Q So that's your employment with ASU, and then you said you have a second source of income?
A **Correct, with SFA, Sinema for Arizona.**
Q SFA. And that you consult?
A **I do.**
Q And how much do they pay you?
A **Currently fifty thousand.**
Q How long have you worked for them?
A **Since January 3rd.**
Q What were you previously paid by them?
A **It went down to one thirty in June, I believe. And then it -- prior to that it was two fifty from January 3rd through April.**
Q Did you have an employment contract with SFA?
A **I believe I do, yes.**
Q Okay. And who do you report to at SFA?
A **Michelle Davidson and Daniel Winkler.**
Q What are their titles?
A **Daniel is the chief of staff and Michelle is -- I'm not sure what her current title is now.**
**She is the executive director of university affairs at Arizona State University.**
Q And can you describe what SFA is?
A **I believe it was the campaign -- I'm not sure what type of business it is, but it's the campaign funding**

for a U.S. Senate campaign.
Q But they're your employer, correct?
A Correct.
Q And you don't know what they do?
A I don't know the inner functionings of the business, no. I'm a consultant for them.
Q Okay. So you started working for them January 3rd and you were paid two hundred and fifty thousand dollars?
A Through April. That's correct.
Q Through April. Okay.
A April or May. Let's see. It changed on May 15th.
Q What do you mean, that changed?
A My salary changed from two fifty to one thirty.
Q And why is that?
A Because I missed a few meetings and times that I had to travel because of the custody arrangements.
Q So those meetings, and they were on weekends when you had the kids, is that what you're saying?
A No, it's because of my limited access to my children. It was times when there was like baseball games or gymnastics practice and I wasn't going to miss the rare opportunities I had to see my kids.
Q Okay. So did you then -- so you skipped the meetings?
A Yes. I've missed meetings.
Q Okay. When were those meetings?

A Friday, May the 16th was the day I was supposed to onboard at ASU, and I had custody that weekend so I did not make it.

There was a event in Mexico I was supposed to attend from May 5th to May 9th. I was not able to attend that.

Q What was that event?

A It was a meeting to -- it was a observation of a treatment facility.

Q Okay. What other meetings did you miss that changed your income?

A The ASU one was the primary one that caused the pay change. And then I missed a meeting in Washington, D.C., due to custody mediation on Thursday, May 29th. There was a meeting in California that I missed on June 13th.

Q What was that for?

A Consulting.

Q For who?

A For AI.

Q Is that everything?

A Do you need -- do you need the company names?

Q Yes.

A Palantir and Chat GPT.

Q Did you reschedule any of these meetings or you just

missed them?

A No, I just missed them. The ASU onboarding was rescheduled.

Q What was the onboarding for?

A For employment.

Q And you had an employment contract for the company as of January 3rd?

A With Sinema for Arizona, not with ASU.

Q Okay. SFA. Okay. And who made the decision to reduce your income?

A Michelle Davidson.

Q Did you receive disciplinary letters?

A Just a letter stating the reason why and the reduction in rate. We had spoken about it previously.

Q And what did she say?

A That I was missing too much stuff. She was understanding due to the divorce, but due to the lack of flexibility in travel, it made sense.

Q What is the corporate structure of SFA? Who's the boss?

A Michelle Davidson is the boss.

Q And how big is the company?

A I believe there's seven of us.

Q And so is your current income one thirty from SFA?

A From SFA it's fifty thousand.

Q And when was it reduced from one thirty to fifty?
A On July 15th after I started the job with ASU.
Q Why would that impact your income?
A Because it was never a permanent job. The plan was always to replace it with a permanent income.
It's a pot of money that's left over from campaigning and we're spending it till it's gone, and then no one will work for the company anymore.
Q When you were offered two hundred and fifty thousand on January 3rd, was that for a specific term?
A I don't remember what the contract was, but I can look. It might be something I'm going to have to bring back later.
That's something I'm going to have to bring back for you later. I don't have it.
Q Okay. Outside of ASU and SFA, do you have any other sources of income?
A I do not.
Q Do you receive disability each month?
A I do.
Q How much is that?
A It is -- I receive four thousand five hundred and forty-nine dollars and sixty-nine cents in disability. And I receive two thousand two hundred and forty-five dollars in combat-related service-connected pay.

Q Okay. When did you retire, presumably Army?
A **Correct. I retired from the United States Army.**
Q When was that?
A **August 11th, 2022.**
Q What was your rank?
A **Sergeant First Class.**
Q After how many years?
A **Seventeen and a half.**
Q What's your VA rating?
A **A hundred percent.**
Q What are your disabilities?
A **They're pretty extensive to list. Let's see. I don't have my medical records with me.**
Q Okay. Do you have a diagnosis of TBI?
A **I do.**
Q Do you know what percentage that is?
A **I believe it's fifty percent.**
Q Do you have a diagnosis of PTSD?
A **I do.**
Q Do you know what that percentage is?
A **I believe fifty percent.**
Q Any other mental health disabilities?
A **I do not.**
Q Depression?
A **I do not.**

Q Is it your position that you are not physically capable of earning an income or working?
A **I'm sorry?**
Q Do you have any physical limitations on your ability to work?
A **I do, yes.**
Q What are they?
A **A career in the United States Army Special Forces has left me with many injuries and health conditions.**
Q Okay. Well, what are they and how do they impact your ability to work?
A **I have debilitating ulcerative colitis.**
Q Okay.
A **It developed after I received the anthrax vaccine in 2009. When it flares up, it causes me to shit my pants thirty to forty times a day.**
**It causes severe migratory arthritis, which targets my knees and my hips, my fingers and my jaw joints. It caused uveitis in my eyes, which led to a degradation of my eyes and near blindness for a while.**
**I broke my upper back when I was twenty years old in Iraq, defending my country. But it never healed properly and now I have severe degenerative disk disease.**
Q And how does that limit your ability to get around and

do things?
A Oh, I don't have feeling in my hands.
Q Okay. And what treatment do you get for GI issues?
A I started receiving a prescription for Marinol from the United States Army in -- it was roughly January of 2022. It gave me the best relief for my symptoms that I've had in my adult life.
Q Do you still take that medication?
A I do.
Q Who prescribes it?
A A doctor in Arizona.
Q What's that person's name?
A I'll get back to you on that one.
Q Where are they located? You said Arizona?
A Yes. Cave Creek, Arizona.
Q And what's the facility's name?
A It's a chiropractic office.
THE WITNESS: Can we take a break so I can step out and use the bathroom?
(FIFTEEN-MINUTE RECESS)
Q So you said you see a chiropractor at -- is it Cove Creek?
A Cave Creek.
Q Cave Creek. And --
A It is Healthy Images. And it is a physician assistant

**I see named Cara Riek.**

Q Okay. Do you see that Cave Creek for any other treatments?

**A Yes. I have had quite a bit of treatment there.**

Q Okay. For what?

**A So asking me about my health conditions and disability is a HIPAA violation and I don't have to disclose my symptoms and conditions to you.**

Q Okay. So maybe you guys take a minute, because we can get a judge on the phone. I have every right to ask you about your health conditions.

**A No, you don't.**

MR. TANNER: And I think we would feel comfortable having something in place that just says that outside the litigation, it wouldn't be disseminated to a third party.

MS. FOUSHEE: Sure.

MR. TANNER: Obviously --

THE WITNESS: You've just gotten away with it up to this point, Whitney.

MS. FOUSHEE: I misunderstood when you got your law degree. Do you want to have a chat with him or should we get a judge on the phone for you to be ordered for you to answer this information?

THE WITNESS: I would gladly do so.

MS. FOUSHEE: Okay. Where do you want to have a chat?

MR. TANNER: Do you want to have a discussion about it?

THE WITNESS: Sure.

MS. FOUSHEE: And maybe some case law that says custody trumps HIPAA. I'm happy to provide him with that as well.

(TWO-MINUTE RECESS)

Q Would you like to answer the question?

**A Can you state it again for me, please?**

Q Sure. I was asking you about any other providers that you've seen at Cove Creek.

**A I've received various treatment for symptoms of operator's syndrome there.**

Q Okay. What type of treatment have you received?

**A Various different types of treatment.**

Q You don't remember?

**A I received chiropractic treatment and injections. I've received chiropractic therapy.**

Q Okay. Anything else?

**A No, that's it for that provider.**

Q That would be it. Okay. Now, during the break, did you reach out to anybody? The break we just took?

**A Yes, I did.**

Q Who was that?
**A Kyrsten Sinema.**
Q Okay. And what did she say?
**A I couldn't remember the name of the physician's assistant. She reminded me what it is.**
Q Okay. And what is your relationship with her?
**A She's my former employer and we are now currently dating.**
Q Okay. When did you start dating?
**A In January this year.**
Q Okay. When did you first meet Kyrsten? Kyrsten?
**A Kyrsten.**
Q Kyrsten.
**A I think it was April of 2022.**
Q And you said she's your former employer?
**A Correct.**
Q What did you do for her?
**A Defense policy.**
Q And that was starting in April of '22?
**A No, in April of '22 I was on the security detail through June 6th of 2024, when I moved over to the defense policy side.**
Q What were you paid from April of '22 until June of '24?
**A I was a 1099 employee at a few different companies.**

Q Explain that to me. You worked for her security?
A I worked a few different jobs for the first year and a half that I was out of the Army.
Q Okay. What were they?
A I worked for a company called Ridgeline Defense from roughly the same time period, I think May of 2022 through summertime of '24, around the same time that I started in the Senate.
Q What did you do for Ridgeline?
A I was an instructor.
Q What type?
A Shooting and driving and breaching.
Q All right. So you said Ridgeline, and you worked for a few other companies. Which other ones?
A I worked for Staccato 2011.
Q What did you do there?
A I was a firearms instructor.
Q Okay. Where else?
A I briefly worked for CACI.
Q What did you do for CACI?
A I was a maritime operations instructor in Tunisia.
Q Was Ridgeline a local job? Did you work locally?
A No, it's in northern New Hampshire.
Q Have you looked for employment in North Carolina?
A Yes, I have.

Q Where?
A I came very close to joining the Raleigh Fire Department. Applied to the Southern Pines Fire Department, the Southern Pines Police Department, the Pinehurst Police Department, the Asheville Fire Department.
Q Are any of these applications recent?
A I recently submitted a application for a volunteer Southern Pines firefighting position.
Q Any other recent efforts to have local employment?
A No, I have not.
Q You mentioned earlier that you've been diagnosed with TBI and PTSD.
A Correct.
Q Any other mental health diagnosis?
A Yes. I was diagnosed with depression as well.
Q When was that diagnosis?
A I believe it was in -- I was in a nine-week traumatic brain injury rehabilitation program run by the VA in Richmond, Virginia. It was when I was there. I think that was April and May of '21.
Q Okay.
A May and June maybe. No, April and May.
Q Any other mental health diagnoses?
A No.

Q Do you take any medication for any of your mental health diagnoses?

**A No, I do not.**

Q Okay.

**A I have received treatment for my mental health conditions but I do not take daily medication for them.**

Q What treatments have you taken?

**A Like I had stated, I've been through a nine-week traumatic brain injury rehabilitation program. I was part of a study through UC-Davis in Dallas on traumatic brain injury. I have been to rehabilitation for a chemical dependence on opiates.**

Q When was that?

**A That was January -- December and January 2016 to '17.**

Q When was the -- where was the nine-week TBI program?

**A Richmond, Virginia.**

Q What facility?

**A The VA Hospital.**

Q Okay.

**A I think it's McGuire.**

Q Okay. And your treatment in '16-'17, where was that?

**A FirstHealth Behavioral Health.**

Q How long was that program?

**A Three or four weeks.**

Q In-patient?

**A No.**

Q And you said it was for chemical dependency?

**A Correct.**

Q Anything else?

**A No.**

Q What were you dependent upon?

**A Opiate painkillers.**

Q Were you prescribed those opiates?

**A I was.**

Q Which ones?

**A I was prescribed a wide variety of opiates from various physicians over the years.**

Q Okay. And you became addicted?

**A Correct.**

Q Was there an alcohol addiction as well?

**A Yes.**

Q Any other addictions that you were treated for?

**A No.**

Q Did you also attend Warrior's Heart?

**A Yes, I did.**

Q When was that?

**A That was in May of 2022.**

Q What was that for?

**A That was under pressure.**

Q Someone forced you to go?
A **Yes.**
Q Who?
A **Heather.**
Q Okay. How long were you in the program?
A **About a week.**
Q What was the recommended stay?
A **I don't remember.**
Q When you say under pressure, why did you feel pressured to go?
A **I hadn't had access to my kids in a few weeks.**
Q In 2022?
A **Correct.**
Q What happened? Tell me.
A **I had come off of -- I think I was on nine different medications, and I kind of foolishly came off of them all at once and had withdrawal symptoms from coming off that many medications at the same time.**
**And it was believed to be that I was drinking excessively and taking drugs, which was little to no fact over the issue, and that it was a -- withdrawal symptoms from many different kind of medications.**
Q What medications were you on?
A **I was on various medications for my symptoms of operator's syndrome.**

Q Do you remember what those are?
A It's various medications that they regularly prescribe for operator's syndrome.
Q Do you remember what they are?
A I was on amphetamines. I was on five different ulcerative colitis medications. I was on three different medications for migraines.
Q Were you drinking at the time?
A I was not.
Q Do you drink now?
A Occasionally I do.
Q And you've previously been diagnosed with an addiction to alcohol?
A Previously, yes.
Q Okay. When was the last time you drank?
A I had two beers this weekend with my kids at the beach at dinner.
Q Were you diagnosed with anything at Warrior's Heart?
A Traumatic brain injury.
Q What do you do to treat your TBI?
A I have been through treatment with Ibogaine twice, Most recently I went through a new form of TMS called SAINT.
I have done hyperbaric oxygen therapy. I have taken various medications recommended by traumatic

brain injury experts.

Q What are the side effects of your TBI?

A **They're pretty standard side effects of traumatic brain injury and operator's syndrome.**

Q Can you explain those to me? What you personally endure.

A **Endocrine dysfunction, sleep disturbance, obstructive sleep apnea, chronic joint and back pain, orthopedic problems and headaches, depression, anger, worry, rumination, stress reactivity, marital, family, community dysfunction, problems with sexual health and intimacy, being on guard or hypervigilant, memory, concentration and cognitive impairments, vestibular and vision impairments, and transition -- and challenges of the transition from military to civilian life, and common existential issues. You want me to read that again?**

Q What cognitive issues do you go through? Describe those to me.

A **I -- prior to receiving traumatic brain injury treatments, I had pretty severe short-term memory loss.**

Q Okay. Any current symptoms?

A **I still struggle with my memory sometimes.**

Q And you said you've gone through a few treatments.

You said you've been through two sessions of Ibogaine?
A **Correct.**
Q When were those?
A **The first one was in May of 2023. And the most recent one was in March of this year.**
Q Okay. And what triggered those treatments?
A **An overwhelming amount of stress.**
Q Where did you go to be treated?
A **I went to Ambio Life Sciences in Tijuana, Mexico.**
Q And how long were you there?
A **It's a five-day stay with a one overnight, San Diego.**
Q And what is treatment?
A **You receive a medicine that heals your brain.**
Q Okay. That medicine being what?
A **Ibogaine.**
Q Okay. And that is a -- what do you know about Ibogaine?
A **I know quite a bit about Ibogaine.**
Q Tell me about it.
A **It comes from the bush of the Iboga plant which grows in West Africa, Gabon and Cameroon. It is currently a Schedule 1 narcotic under the FDA.**
**It has shown profound success in treating various mental health problems and neurodegenerative problems as well. And it is currently under a few different**

research programs in the United States and under heavy review by the FDA right now.

Q Okay. But as we sit here, in the United States it is not a lawful substance, correct?

A **I went to Mexico.**

Q Okay. But you would agree it's not lawful here?

A **I haven't taken it in the United States, Whitney.**

Q Okay.

A **Mexico's a different country.**

Q You said you had some TMS procedure?

A **I did.**

Q What is that?

A **Transmagnetic stimulation is where you use a magnet to restimulate dead cell brain growth in the brain.**

Q Where did you get that treatment?

A **In LaJolla, California.**

Q What facility?

A **Kaizen Brain Center.**

Q And you said you've taken other medications?

A **Various supplements which is supposed to restimulate brain growth.**

Q Who is your treating physician currently?

A **Jesse Greer in Scottsdale, Arizona.**

Q What facility is Jesse at?

A **They are called Preamble.**

Q Pre --
A **Amble.**
Q Okay. Do you see a counselor or therapist?
A **I do.**
Q Who is that?
A **It is Zach Embree.**
Q And where is that person located?
A **I believe he lives in Vancouver and we meet remotely.**
Q When did you start with Zach?
A **In March of this year.**
Q Okay. Do you have any local physicians?
A **I do not, no.**
Q Did you historically see a Justin Ball?
A **Very briefly.**
Q When did you see him?
A **Around the time of the separation, so probably October or November of last year.**
Q Why did you stop?
A **I didn't like him as a therapist.**
Q Did he make any diagnoses?
A **No. I don't believe so.**
Q Did you recently have to go to the hospital on a work trip?
A **I did.**
Q When was that?

A That was while I was receiving a SAINT treatment, so it wasn't really -- I guess it is kind of a work trip. That would have been -- I spent the night of Wednesday to Thursday night at the ER in LaJolla.
Q What for?
A I -- I passed out and the doctors that were treating me there recommended that I go to the ER.
Q Where were you when you passed out?
A You have a little waiting room when you're in between the treatment sessions.
Q What treatment sessions?
A The SAINT treatment.
Q I'm sorry?
A This was while I was doing TMS.
Q Okay.
A SAINT treatments.
Q And at the ER, were you diagnosed with any issues?
A Atrial fibrillation.
Q Okay. In March of this year, did you make statements of -- about self harm?
A I had reassured my son that everything was okay.
Q What did you tell him?
A That I had previously thought of hurting myself but that everything was okay and that everything was going to be okay.

Q Had you in fact had thoughts of self harm?
A **I had not, no.**
Q Okay. Did you tell your wife that you had actually attempted to take your own life?
A **I did not, no.**
Q Okay. Have you in the past had these suicidal thoughts?
A **I have not, no.**
Q Have you told any professionals that you've had such thoughts?
A **I've never had suicidal thoughts.**
Q Do you consume marijuana, THC, CBD, any of those?
A **I do now through my Marinol prescription, yes.**
Q Okay. When did you get prescribed that?
A **I believe it started last month.**
Q Before that did you use marijuana?
A **Yes.**
Q Do you continue to use marijuana?
A **No, I have a prescription for it now.**
Q But prior to having a prescription, you did use marijuana?
A **Yes. I would purchase it in states where it's legal. I purchased the legally -- federally legal version.**
Q Okay. But you would consume it in North Carolina?
A **Occasionally, yes.**

Q Gummies, smoke?
**A Usually gummies and vape.**
Q Okay. Other than marijuana, any other illegal substances consumed?
**A No.**
Q Any other prescriptions not prescribed to you?
**A No.**
Q You may have already said this but who prescribed you your Marinol?
**A It is a physician assistant named Cara Riek.**
Q Okay.
**A Prior to that it was the pain management department at Womack Army Hospital.**
Q Do you still receive services from Womack?
**A I do not, no.**
Q New Year's Eve, did you have an altercation with your brother?
**A That is hearsay and not relevant for this.**
Q What happened on New Year's Eve with your brother?
**A That's hearsay, not relevant for this.**
Q What happened with your brother on New Year's Eve?
**A That's hearsay and not relevant for this conversation. There's no one in this room that has --**
Q I'm asking you --
**A -- personal knowledge of that, what happened between**

**me and my little brother.**

Q But I'm asking you what happened on New Year's Eve. You have personal knowledge of it. You were there, right?

A **And it's not relevant to this conversation.**

Q Did you assault your brother?

A **That's not relevant to this conversation.**

Q Do you want to take a minute?

MR. TANNER: Talk about it briefly?

THE WITNESS: Uh-huh.

(FIVE-MINUTE RECESS)

Q Did you get in an altercation with your brother on New Year's?

A **Yes. My younger brother and I got into a disagreement on New Year's.**

Q Okay. Did you get into a physical fight?

A **No.**

Q No. Did he suffer any injuries from that evening that led him to be at a hospital?

A **He went to the hospital that evening.**

Q Okay. So is it your testimony that your brother did not have broken ribs that evening?

A **No. He was highly intoxicated and fell and he had a broken collarbone, not ribs.**

Q Okay. So that evening the two of you did not get into

any type of fight is your testimony?
A No, we got into a disagreement.
Q Okay. You never put your hands on him?
A No.
Q Okay. And he fell and broke his collarbone is your testimony?
A He was heavily intoxicated.
Q Were you too?
A No, I was not.
Q How much did you have to drink that night?
A I had a quarter of a beer.
Q Where did you go drinking?
A It was a little bar in Leavenworth, Kansas.
Q What was it called?
A I believe it's Fat -- yeah, it's Fathead's Irish Pub.
Q Okay. Are you and your brother on good terms now?
A I don't communicate much with my brother Jordan right now, no.
Q Okay. Did firearms come out that evening?
A No.
Q Did you play Russian roulette with him?
A No.
Q Was anybody else in the home?
A No.
Q Have you received any DMT treatment or consumed any

DMT?

A **Yes, at both Ibogaine treatments. They finish with a round of DMT.**

Q Okay. Any outside of those two treatments?

A **Yes. I received it in a therapy session in May of 2024.**

Q With which provider?

A **It's with a provider outside of the United States.**

Q Where?

THE WITNESS: Can I talk to you outside?

MR. TANNER: Sure.

(ONE-MINUTE RECESS)

Q Would you like to finish your answer?

A **I don't recall the name or location of the provider but you can ask Heather because she saw the same provider and received the same treatment.**

Q You don't remember what state you were in?

A **I don't recall.**

Q Don't even remember a country?

A **I don't recall, no.**

Q Okay. But you remember it was in May of '24?

A **I do.**

Q Okay. Other than your Marinol, what other medications are you on currently?

A **I take Armour Thyroid.**

Q What is that for?
A Hypothyroidism.
Q Okay. What else?
A And then I am on various hormones for symptoms of operator's syndrome.
Q And you said steroids? Steroids?
A I am on testosterone replacement therapy.
Q What is the prescription?
A It currently is an injectable testosterone, and HCG twice a week.
Q And who prescribes that?
A The Transcend Foundation. I don't know the PA's name.
Q Where are they located?
A They are in Michigan.
Q Why do you see a provider in Michigan?
A It's a foundation that provides treatment for former special operators that are suffering from the hormone dysfunction that comes with operator's syndrome.
Q Any other medications?
A No, that is it.
Q Okay. You have health insurance through which employer? Is it through --
A I still currently have -- it's a health care program you get after you work for the Senate and it is switching over to Arizona State University right now.

**Then I also have TRICARE.**
Q Did you remove your wife from your insurance policy?
A **I did.**
Q Why?
THE WITNESS: Can we step outside?
MR. TANNER: Sure.
MS. FOUSHEE: We're violating all the rules. You're supposed to answer the question. I mean, I'm not -- I've been pretty loose, but --
MR. TANNER: Let me talk to him real quick and we'll talk about it.
THE WITNESS: So have I, Whitney.
(DISCUSSION OFF RECORD)
A **Ready now, Whitney.**
Q All right.
A **I removed her from my TRICARE because it was in the written agreement that you wrote.**
Q It says in there you can remove her from your health insurance?
A **It says I'm required to cover the children.**
Q Okay. So it says -- it does not say remove her from your health insurance, does it?
A **It doesn't say I have to cover her.**
Q Okay. But --
A **You wrote the agreement.**

Q I did.
A **And then forced me into signing it.**
Q Let's talk about -- well, no. I'll --
A **I would --**
Q -- get to the coercion.
A **I would love to.**
Q Okay. So tell me this. How much extra did it cost you to continue to provide her health insurance?
A **It doesn't matter. You wrote the agreement, Whitney.**
Q I'm going to ask you again. How much extra did it cost you to continue to provide her with health insurance?
A **Whitney, I was following the rule that you outlined --**
Q How much, sir?
A **-- in the temporary agreement that we signed.**
Q How much, sir?
A **I don't know, Whitney. I was following your temporary agreement and the rules that you outlined in it.**
Q So is your answer you don't know how much --
A **Whitney --**
Q -- extra?
A **I don't know how much, because you wrote the temporary agreement. It said that I had to cover my children under health insurance. It did not mention Heather so I removed her from my health insurance.**

Q Okay.
**A That was your decision.**
Q Did you provide her with notice that you were removing her from your health insurance?
**A You didn't say in the temporary agreement that I had to provide her notice, Whitney. You said I didn't have to cover her.**
Q So is that a yes or a no, sir?
**A Whitney, it was not in the temporary agreement that you wrote.**
MS. FOUSHEE: Brent, we can be here all day if he's going to play these games. I just want my answer.
**A I want to get to the good games, Whitney.**
MR. TANNER: All right. Just a yes or no, if you gave her notice or not.
**A I did not give her notice because it was not in the temporary order agreement that you wrote.**
Q Did you report that she had other insurance coverage to your insurance provider?
**A I don't know the status of her insurance.**
Q But did you tell the insurance company that she had alternative insurance coverage?
**A I don't recall.**
Q What did you tell the company when you had her

removed?
A I don't recall. It was an online thing.
Q Okay. Where do you bank?
A I have a USAA account that Heather will not relinquish control over. And I have a US Bank account. And then I have a First Bank account for an LLC that I have.
Q Is that all your bank accounts?
A USAA uses a off bank for the IRA. It's Victory Capital.
Q Other than your IRA, do you have any other retirement accounts?
A I do not, no.
Q Do you currently contribute to retirement?
A I briefly was contributing to a TSP when I was a Senate employee.
Q Do you still have a TSP?
A Yes. I believe whatever money I contributed is still there.
Q Where -- which bank account, USAA, US or First Bank, is your primary checking account?
A Bank of America.
Q Bank of America?
A Oh, I did not mean to say US Bank. I do not have a US Bank account. My primary account is my Bank of America account.

Q Okay. And is that where all your income is deposited?
**A It is, yes.**
Q To include both jobs, your VA and your CRSC?
**A Yes.**
Q What credit cards do you use?
**A I use a -- my First Bank credit card and then when I'm traveling for work, I have a work card that I use.**
Q And who's that with?
**A It's a US Airways business account.**
Q Have you purchased a vehicle since you've been separated?
**A I have not.**
Q How often do you go to Arizona?
**A It's been about two times a month, I would say, in the past few months.**
Q For about how long?
**A It depends.**
Q Where do you stay when you go?
**A I stay at my girlfriend's house now.**
Q And where is that?
**A In Scottsdale.**
Q What vehicle do you drive when you're there?
**A I drive my company vehicle when I'm there.**
Q What company pays for a vehicle?
**A I believe that's Sinema for Arizona.**

Q And so when you're not there, who's using that vehicle?
**A Various other employees will use it.**
Q Have you put any cost towards that vehicle?
**A I have not, no. It's a company vehicle.**
Q Do you get per diem when you travel?
**A Not since I became a salary -- no, I do. No, not since I became a salaried employee.**
Q When did you become a salaried employee?
**A In January of this year.**
Q You said you're a consultant?
**A That's correct.**
Q For which company?
**A Sinema for Arizona.**
Q What do you consult on?
**A Various policies for the US government.**
Q Like what?
**A Psychedelic policy. Defense policy.**
Q What else?
**A Regenerative farming.**
Q What is your expertise in regenerative farming?
**A Years of studying it.**
Q Where?
**A Self study.**
Q The internet?

A Yeah, internet, books. I hold a arboriculture certification through Alamance Community College. I worked in the tree industry for two years.
Q When was that?
A Starting with my SkillBridge internship in 2021.
Q Okay. And what's your expertise in psychedelic policy?
A I guess personal experience and then various research and connections that I've made over the years.
Q With the two treatments? When you say personal experience, what are you referring to?
A Years of research, and yes, the two treatments that I went through myself. And then lots of time spent with the biggest subject matter experts on Ibogaine in the world.
Q When was the last time you paid support to your wife?
A It was -- it was June 15th.
Q So you haven't provided any support, we're approaching, in two months, is that correct?
A Three paychecks.
Q Why have you not?
A Because I had a change in salary, which you and her were both aware of, when I signed the temporary agreement.
And I paid her the entire -- entirety of my

**salary in May and June, and I didn't have any income.**
Q Okay. So is it your position you haven't received any money for July?
A **Now I -- yes, I paid myself for July. I gave her my entire month's salary for June and so I gave myself July, and then this month I will give her half of my paycheck.**
Q So you don't think you should have to pay child support per the order?
A **Since separating on November 1st, I've paid a hundred and twenty-seven thousand dollars to Heather.**
Q Okay. So you signed an agreement that said you would pay her X amount, correct?
A **I mean, I was told I wouldn't see my children till September if I didn't sign the agreement, but yes.**
Q Is it your position you can't afford to pay her?
A **No, in June I could not afford to pay her because she received my -- or in July I could not, because she received my entire salary in June.**
Q So you didn't have the money, is that your testimony?
A **No, I overpaid her from November 1st through most recently, and I'm contesting the temporary agreement that I signed.**
Q So you did have the money to pay her in July?
A **I needed the income, yes.**

Q So did you have money in your bank account?
A **Yes, there was some money in my bank account.**
Q Okay. But you didn't give it to her?
A **I gave her a hundred and twenty-seven thousand dollars from November. It's eight months. I gave her a hundred and twenty-seven thousand dollars.**
Q And during that period of time, you weren't under an order to do that, were you?
A **No, I was trying to have a cordial divorce until you got involved and have provided horrible, horrible legal advice.**
Q Hmm. Can you -- what legal advice is so bad that I've given your wife?
A **You lied to a judge to get a temporary custody.**
Q Oh, what did I lie to the judge about?
A **About me being suicidal and my drug use.**
Q Okay. So you --
A **I have never purchased drugs in Mexico.**
Q Okay.
A **I've never been suicidal.**
Q You just told your son that you were having suicidal thoughts?
A **I said previously. I --**
Q Why --
A **-- was pretty low. Yeah.**

Q Why would you tell your son that you were having suicidal thoughts if you hadn't?

**A I was countering a narrative that Heather was creating that I was suicidal.**

Q Okay. How else did I lie to a judge?

**A That is a big one right there.**

Q Okay. Anything else?

**A I would have to review the ex parte order, but there was quite a few egregious lies in it.**

Q Okay. And how were you coerced into signing that temporary agreement?

**A My former attorney told me that I wouldn't see my kids until September if I didn't sign it.**

Q Is that it?

**A Yeah.**

Q Okay.

**A It was a government-sanctioned hostage program.**

Q What does that mean?

**A You lied to a judge to get an ex parte order to extract wealth from me.**

Q Uh-huh.

**A That's theft.**

Q Okay. In the last month, where have you traveled?

**A In the past month I have traveled to -- in the past thirty days I have traveled to Kansas City on a**

**personal trip. I have traveled to Phoenix for a surgery. I traveled to San Diego for a work trip in San Luis Obispo.**

**Then I traveled to San Diego for a medical treatment. Then I traveled to Washington, D.C., for work, and then to Phoenix for a personal trip.**

Q What was your Phoenix surgery?

**A A double vasectomy.**

Q Do you or have you had a diagnosis for MS?

**A I have, yes.**

Q Have had? Do you currently have a diagnosis?

**A No, I had a diagnosis for MS.**

Q Okay. But you don't currently?

**A No, they disproved the lesions were MS by a spinal fluid pressure test.**

Q Okay.

**A About three months later, four months later.**

Q What was your personal trip for Kansas City, to Kansas City for?

**A To pick up my kids for the one week that I got with all three children and for the two weeks that I got with two kids.**

Q Okay. How would you say the kids are doing right now? What's their current state?

**A I think that they have been through a very strategic**

**psychological campaign and they are very confused about what is going on.**

Q Well, let's break it down. How is your relationship with your oldest, Clara?

A **It's confusing as it is with a thirteen-year-old daughter while you're going through a divorce.**

Q Would you say that your relationship with her is strained?

A **Yeah, I'd say a divorce puts challenges on a parent and his child.**

Q Well, how would you say Clara is doing?

A **She's a tough kid and she's hanging in there, but she receives a lot of wildly exaggerated truths and a lot of misinformation from Heather.**

Q Okay.

A **So I have to spend a lot of my time countering narratives that are either boldly untrue or have been very exaggerated.**

Q Tell me how you've counteracted those narratives.

A **By telling them the truth, and sometimes the truth is difficult on a relationship.**

Q So what truths have you told them?

A **Everything about whatever false narrative Heather has created. There's been quite a few.**

Q Tell me what they are.

A My relationship with Kyrsten, what I do for a living, my drug use, my mental health, my physical health.

Q So what is your understanding of what she told the kids about your mental health?

A She has painted a picture that I'm some kind of like drug-crazed, psychotic, crazy combat veteran guy.

And yes, serving in combat does leave your mind, especially when you separate from the military, is a difficulty process, something that a lot of guys struggle with. And that has made the past few years difficult, honestly probably a big part of the reason why we're divorcing.

Q And what did you tell the kids?

A I told the kids the truth about, you know, my mental health and my physical health and some of the things I struggle with, yeah.

Q What did you tell them?

A I've had lots of conversations with my children about this.

Q Okay. Well, you testified that you're trying to counteract what she's allegedly told the kids by telling them the truth. And I'm asking you what you told your kids to counteract what you think she said.

A You want me to recall every conversation I've had with my children about narratives that Heather has created?

Q Generally speaking, what do you tell the kids about your drug use?

**A That I have used medicines that are not currently legal through the American -- through the FDA, outside of the country, to heal severe traumatic brain injury.**

Q Okay. And what did you tell them about your relationship with your girlfriend?

**A That she was previously my employer and that in our -- we became friends, and then in January became -- we started dating.**

Q Has she met the children?

**A She has.**

Q When?

**A She met Clara in -- it was summertime of '24.**

Q What about your other two children?

**A She met Cooper in December of '24. And then she met Isla in January of '25. No, October. Excuse me. October of '24.**

Q Is that the only contact the children have had with her?

**A That is, yes.**

Q Have they Facetimed?

**A Yeah, sometimes my son is in the room when I Facetime her.**

Q Is it your intent to introduce her -- well,

reintroduce the children to her again?
A Yes.
Q And we've been dating for eight months now, is that correct?
A Yeah, about eight months now.
Q Has she traveled to North Carolina?
A To see me?
Q Uh-huh.
A She's traveled once to North Carolina to see me.
Q When was that?
A That was in May of this year.
Q And how long was she here?
A Two days.
Q Is it your intent to live with her in the near future?
A It -- in the near future, I signed a twelve-months lease in North Carolina. I plan to reside in North Carolina.
Q Indefinitely you're going to stay in North Carolina?
A I will stay in North Carolina through my twelve-month lease.
Q Is it your intent to move to Arizona after that?
A Yes.
Q Going back to the kids' current state, would you agree they're doing well academically?
A I would, yes.

Q What about behaviorally?
**A Yeah, I think they're good kids.**
Q Okay. So you said they're struggling with the divorce, is that true? I don't want to --
**A Yeah, divorce is really hard.**
Q How is your parenting time going when the kids are in your care?
**A It's great with my son. It's challenging with my two daughters right now.**
Q What makes it challenging? What makes you say it's challenging?
**A Because challenging misinformation with truth is difficult, and they're twelve and thirteen-year-old girls, which just makes it all that much harder.**
Q It's your position you should have fifty-fifty custody?
**A It is.**
Q What concerns, if any, do you have about the kids being in Heather's care?
**A The campaign of misinformation that they receive.**
Q Anything else?
**A The fact that she is violating the temporary agreement that we signed by leaving them in the sole custody of her parents during her custody time.**
Q So you -- is it your position that the children

shouldn't have time with their grandparents?
A In the case of sole custody, it should fall to me if she is going to spend their summer vacation time away from them.
Q Have they historically spent time with the grandparents during the summer?
A I historically saw them more than six days in six weeks in previous summers.
Q Do you have any concerns about the children being in her father's care?
A I do, yes.
Q What? What are your concerns?
A He's an alcoholic and a marijuana user and has a previous history of cocaine use.
Q What makes you say he has previous cocaine use?
A He told me that when he was an officer in the United States Army, him and Heather's mom would go to Lake Tahoe and they would ski and gamble and do cocaine and drink.
Q How long ago was that?
A It was probably thirty years ago, forty years ago.
Q Have you left your kids alone with him since?
A Outside of my control, yes.
Q And you said he's previously an alcoholic?
A He's currently an alcoholic.

Q Currently. What makes you say that?
A **Consuming more than two drinks a day is my definition of an alcoholic.**
Q Okay. So if your medical records say that you consume more than two drinks a day, is that -- that's a fair assessment to apply to everybody?
A **Yeah, I mean, I'd say if you're drinking more than two drinks every single day, you're probably an alcoholic, yeah.**
Q And you previously had alcohol abuse?
A **Yeah, I previously had alcohol issues.**
Q Okay. So the kids shouldn't be around him because of alleged alcohol abuse?
A **He has an active addiction. I do not suffer from alcoholism.**
Q And you said he uses marijuana?
A **He does.**
Q Okay. So you have an issue with marijuana?
A **I have an issue with double standards.**
Q So do you have an issue with marijuana?
A **No, I don't.**
Q Do you think you should be caring for the kids while you're high?
A **I don't.**
Q Have you?

A In dual care of both myself and Heather when we were still married, yes. Heather has consumed marijuana in the presence of the children as well.
Q Any other concerns about Heather as a mother?
A It's the lengths that she's willing to go to try and extract money out of me and blame me for her personal issues and problems instead of moving on and seeking a healthier way to spend her time.
Q What would you say her personal issues and problems are?
A I mean, she has diagnosed mental health conditions that have been untreated.
Q What are those?
A OCD.
Q Okay.
A Depression.
Q Anything else?
A No, those are the two diagnosed ones, I believe.
Q Have you asked the children to take pictures while they're in mom's home, in Heather's home?
A What do you mean, pictures?
Q Have you asked the kids to gather evidence while they're either in her home or at granddad's house?
A Yes. I asked them to get a picture of her father's whiskey bottle.

Q Which child did you ask?
A I believe all three were in the car.
Q How did that conversation go?
A My daughters got angry about hearing the truth about their father-in-law.
Q What did you tell the kids about their grandfather?
A His history of -- extensive history of substance abuse.
Q What did you tell them?
A That he's an alcoholic, that he's also a daily cannabis user and has a history of cocaine use.
Q Okay. Why did you feel the need to tell your children that about their grandfather?
A Because the narrative has been created that I'm some kind of drug-crazed psychotic person when the actuality is that I was over-prescribed opiates by Army doctors, like I've never put anything in my mouth for heroin, Whitney.
I was picking them up from, you know, like Clark Clinic on Fort Bragg. Eventually, yes, I probably sourced some opiates from outside of prescribers, but it was due to over-prescription.
It's a pretty common problem. I'm not sure if you're aware of the opiate epidemic in this country. Bunch of lawyers have made lots of money off of the

opiate epidemic.
Q Do you --
A That's your profession.
Q Did you speak badly about Heather to the children?
A I've never spoken badly about Heather to the children, no.
Q Okay. So if the girls are saying that you bad-mouthed their mom, they're not telling the truth?
A I think that they have a confusion about what the truth is, and the truth is difficult to hear sometimes. And there has been a very, very strong campaign to paint me as some kind of horrible, evil person when this divorce was -- both the divorce and separation were Heather's idea. And she has been telling people for over two years now that she wanted to divorce me.
She created the plan for separation. This -- and then all of a sudden because I had a conversation with Heather to ask her to stop harassing me, you guys were able to spin this little story that I'm a suicidal, drug-crazed person, when in all actuality, Whitney, I'm a great father and a great citizen of this country. I am not a slimy, greasy divorce lawyer.
Q Who did she tell two years ago that she wanted a divorce?

A She told her friend Carmen back in May of '21 when I went to Warrior's Heart. That was when she started telling people about the divorce.
Specifically I'm recalling an incident. I took Heather on a work trip when I was still on the security detail to a concert in Las Vegas, and she told my current girlfriend, who was my employer at the time. She had taken drugs with her best friend, she had taken MDMA, and she told her best friends that she wanted to divorce me.
Q Which concert was this?
A It was a U2 concert.
Q And you were at the concert?
A Yes.
Q Would you agree that your relationship with your girlfriend was inappropriate prior to January?
Well, strike that. Before you were separated from Heather?
A We had become close friends and she was like a confidante, but no, I would not say our relationship was inappropriate.
Q Did you have feelings for her at that time?
A No.
Q When did you first become physical, intimate with your girlfriend?

A In January of this year.

Q Did you ever share a room with her prior to January of this year?

A I don't believe so, no.

Q Did you share any romantic feelings with her prior to January of this year?

A No, just we were close friends.

Q Okay. Did she share any romantic feelings to you prior to January?

A I mean, the entire time I've known her, she's been flirty with me.

Q Did you two kiss before January of this year?

A No, we did not.

Q No physical intimate interaction before January?

A No, I don't believe so. Not that I recall.

Q Never stayed in the same room together prior to January?

A We have stayed in like separate room hotel rooms or Air B&B's before.

Q Okay.

A But that's been the entire time that I worked for her as well.

Q Was it ever just the two of you?

A In November -- no, let's -- we had a trip to Riyadh where we shared a multi-bedroom in November.

Q Going back to your relationship with the girls, is it your position that they would want to spend half of their time with you?

A I think the next few months are going to be a challenge based upon the misinformation and the narrative that's been created in my daughters' eyes about myself.

And yes, I'm sure Heather has told you that the girls have told her after she coached them what to say that they do not want fifty-fifty custody with me.

But the fact that Heather would go to that length, even make splitting the children up an option, I think shows the immaturity and like borderline like evil, morally reprehensible action that you guys have taken in the past few months.

Q Okay. So even though the girls don't want to go, you think they should be forced to?

A That's not what I said. I said that yes, the next few months are going to be a challenge that you have created, Whitney, with your ex parte order that you gained under misconduct, possibly criminal activity.

Yes, you have made this process much harder, Whitney. Thank you. Thank you for doing that to my daughters, Whitney. You are a wonderful person.

Q Thank you. Okay.

A When I grow up, I want to be a parasite.
Q Would you agree that you've punched holes in the marital house?
A I have never punched a hole in the marital house, no.
Q No. You haven't become -- you haven't thrown things -- well, strike that. Have you thrown things at Heather?
A I have never thrown anything at Heather, no.
Q And it's -- you've never put a hole in the house?
A I damaged a door frame in 2016 when I was still struggling with opiate addiction. It was actually the peak of my opiate addition.
Following that incident, I went forward at work and sought help from my chain of command, who did not enroll me in ASAP because I wasn't like a piece of shit drug user. I had a chemical dependency to a medication that was prescribed to me by Army doctors, and they were able to help get me off of the chemical dependency that I had to opiates due to severe spinal injuries that I suffered during my time in combat, Whitney.
Q So if Heather put in her complaint that you break -- you broke and destroyed furniture, is it your position that that is true or not true?
A I damaged a table. It was a little cheap outdoor

table that was rotted that I had made.
Q Is that it?
A I think I bent a -- like an iron yard chair.
Q When was that?
A It probably would have been like winter or spring of '24.
Q Okay. What was going on that you bent a arm -- metal armchair?
A There were a couple serious incidents of Heather physically abusing me, starting in January of 2024. She hit me between the bridge of my nose and my phone. And if you want to look, you can see the little scar right here that I didn't get medical treatment for so it healed poorly.
And then two weeks after that, I could tell that she was going to hit me again, and so I curled up into a ball on the kitchen floor, and she held me down and punched me in the back of the head three times.
And she'd become incredibly, incredibly aggressive where -- to the point that she would -- like minor disagreements would set her into these states of rage and agitation where it was like she was out of control of her aggression, and she would chase me around the house and try and hit me and grab me by the arms and dig her fingernails into me and

physically back me into corners.
And I was terrified, and to -- sometimes to get her away from me, in periods of the times where -- my brain from my time spent in combat and my time training for combat is so severely damaged that sometimes too much stress overwhelms me to the point that I have a hard time thinking.
And prior to receiving brain treatments, like to get her away when she was being like physically aggressive with me, it would be to get loud and angry so she would back off, and then to run away.
So I mean, there was probably ten or fifteen incidences prior to me moving out last year where she was physically like chasing me through the yard or down the street as I tried to drive away to get away from her as she was trying to hit me.
Q And your response was to become -- you said yell back at her?
A Yeah, be big and scary and then to create distance and then get away.
Q Okay. Defense was to become big and scary?
A To be loud and to create space so that I could run away to avoid a physical confrontation with her, yes. That's exactly what I did, Whitney.
Q Did you ever call law enforcement?

A No, Whitney. I'm a six foot three, two hundred and thirty-pound ex-Green Beret. It would be quite embarrassing to have the police show up at my house with my blood running down my face and all over my first floor on the way to the bathroom because I was the victim of domestic violence. That's embarrassing for a man to come forward and say.
Q Would you agree that you have cursed and called Heather bad names?
A Yes, I have sworn at Heather before.
Q Including in her complaint, you called her a nasty cunt, would you agree with that?
A Yes. Cunt is a word that most Americans don't regularly use. Due to my career in the Airborne Infantry and the Army Special Forces, I deployed to combat multiple times with both the British para regiment and the British Special Air Service, Austri unit or the Australian T commando unit. These militaries use that word quite heavily, so you become desensitized to it.
Q Okay.
A One of the wildest times I ever heard someone say it was in 2007. We just teamed up, three dudes from the other side of the Euphrates River. It was two of us onboarders and then there was two British para guys,

and there was a sniper up on the roof. They're in placing an IED to fucking whack these dudes. And one of the Brits goes -- yells out loud and goes "Cunt," and it was the funniest fucking thing I have ever heard.

Q So do you think it's funny that you call your wife a cunt?

A No, I think that when she would aggressively attack me in the state where my brain was struggling to handle the situation, part of being loud and scary would be to say mean swear words, yes, Whitney.

Q Okay. Have you done that in front of the kids?

A She has provoked many yelling matches in front of the kids, and yes, the kids have probably heard me responding to her aggression by being loud and scary so I could create space and get away.

Q In Heather's complaint she said that you sought treatment at Warrior's Heart, which you agree to -- you said that's accurate, right?

A Yes, I went there for a brief period of time.

Q And that you withdrew from that treatment against medical advice, is that accurate?

A No, I'm friends with the co-owner of Warrior's Heart. He's a retired sergeant major named Tom Spooner. Served in Delta Force for a long time. He started

Warrior's Heart. And one of my former coworkers, Teddy Lanier, is on the board of directors at Warrior's Heart as well.

And so I was getting pressured to go to rehab when I was telling people it wasn't a drug problem. Warrior's Heart sounded like a good option because I had a very, very good relationship with the people that run it.

And I went down there and realized that I wasn't struggling with addiction problems. I had been going through withdrawals from some pretty serious medications, some pretty high doses, with a severely damaged brain.

And it was with Tom Spooner's agreement and the medical staff's agreement that what I needed was traumatic brain injury treatment and not substance abuse treatment.

Q Okay. So they would say that you didn't -- you left that program not needing treatment?

A I don't know what they think, but what I sought was treatment for my traumatic brain injury, which was what I was struggling with.

And I'd been on a cocktail of medications prescribed by the Army to keep me functioning while I was still in the Army, and I decided to come off of

those because it's -- I don't know if you heard this, but Adderall is really, really bad for your mental state. And the military at the end of your career pumps you full of it, 'cause you can just kind of push through the last few years where your brain is just fucking mush and you can't fucking think anymore, and the only thing you know how to do is just like love your kids and be a good dad, and like make sure the young kids don't die in fucking combat, and you just want to keep doing the fucking job but it's so fucking hard, and so you just get on all these different fucking medications, and like your fucking mind just melts, and when you hit the fucking end of the fucking road, and you realize that all that shit that you're on is really fucking bad for you and you stop taking them, like it's a alarming fucking experience.

And yeah, it was terrifying. I don't know if divorce lawyers ever experience something like that at the end of their career.

Have you heard of divorce lawyers going through, you know, a big dip like that when they end a, you know, job where they had purpose and reason, and just extract other people's wealth?

Q So when you left, was it against their advice at Warrior's Heart?

A It was in complete agreement with the advice that I needed, which was from the co-owner, Tom Spooner, and my friend, Teddy Lanier. I am not sure what the medical staff will say I needed while I was there.
I mean, there is -- part of the job that I do now is the pharmaceutical industry is pretty heavily corrupted, and rehab programs a lot of the time, they'll keep people in the program to make money off of them whether they need the program or not. So I don't know what the medical staff would say, Whitney.
Q How many times is it your contention that Heather's become physically abusive towards you?
A There were the two serious incidents that I spoke about, and I'd say there's probably ten to fifteen incidences in late '23 through me moving out in October of '24, and then a few attempted aggressive incidences after that.
Q With the most recent being when?
A I was trying to leave the house the night that Heather got that recording of me saying that I'm suicidal, and she was holding onto the door handle of my car as me and my son were trying to drive away. So I'd say that's the most recent aggressive incident. So that would have been in March.
Q How flexible is your travel schedule?

A Due to the temporary agreement that you wrote, it's been very difficult to get efficient work trips in. I've seen my children so few times since March that when there's like a baseball game or a gymnastics practice or a band concert or jiu jitsu practice or something that, you know, with a realistic non-evil schedule, I would be able to miss, you know, the weekly baseball game, but because of the agreement that you wrote, I am not going to miss the few opportunities that I have to see my children.

And so what happens is I wind up having to take these short like two or three-day cross-country trips and then bounce back in for this process, and for the few times that I get to see my kids outside of the six days in six weeks and then the one week with all three of them during their summer vacation, and then two weeks with the two of them.

Q So do you get to pick your travel schedule, yes or no?

A In between my custody, yes, I can. In between my custody and opportunities to see my children, I'm able to be flexible with my travel.

Q Okay. And your testimony is that you missed work stuff to watch baseball games during the week?

A Yes.

Q Okay.

A Yeah. Yeah, I'm not going to miss the rare opportunities that I get to see my children, Whitney. That's insane.

Do you think I'm happy seeing them six days in six weeks or for a one-week trip with all three and then two weeks with both of them? Does that sound like healthy -- healthy to you or do you not care 'cause you're just making money?

Q But if you had the kids more, you would still have to travel, correct?

A Yes, but I wouldn't -- if I have the kids for one week and then Heather has the kids for the following week, if there's a baseball game the week that I have them, I'm going to take my son to his baseball game. If my daughter wants to go to jiu jitsu practice, I will take her to jiu jitsu practice that week. My other daughter has cheerleading or gymnastics or whatever, I will take them that week. The next week I could then travel for work.

And because I had the week with my children, which is, you know, like a fair way to treat children, because any other way to treat children that love their dad would be, you know, insane and evil, the following week, and I would miss the baseball game and the jiu jitsu practice and the cheerleading because I

had the week with them, because you know, that's like the humane way to treat another human being.

Q So you can pick when you work?

A With the current -- with the temporary agreement that you wrote, Whitney, I cannot pick when I travel, no.

Q Okay. But if it was to change and you got more time, you can pick?

A I could travel the week that I wouldn't have custody with my children, yes, Whitney.

Q So you can pick when you travel?

A Given the current schedule that we have, that you wrote, I cannot pick when I travel, Whitney.

Q Okay. Just to be clear, you signed that agreement?

A Yes, under coercion that I would not see my children until September.

Q After Judge Bibey said are you under any influence and you said no?

A No, we are not here to talk about Judge Bibey's behavior that day.

Q Your answer to his question was "No, I'm not under any influence," was it not? I mean, it's recorded. We can --

A I'm currently requesting the recording myself, Whitney. I have -- was terrified at the thought of not getting to see my children till September and so I

**agreed to the ransom note, yes. That's right, you know it is. You took my kids' ransom to steal money. It's evil.**
Q In your motion to review, you alleged that Heather has illegally and inappropriately accessed your online portal. What makes you say that she did that?
**A Yes, she has accessed my military and VA accounts through a laptop of mine that is at the house still.**
Q And when is it your position she accessed that information?
**A It was -- I filed a police report. She used my email to log into her Yahoo account on May 4th of 2025. And she used that to get onto my milConnect account.**
Q What makes you say that?
**A Because there is access to that account on the day that she used my email to reset the password for it.**
Q And in your motion it said that government agencies confirmed that she was the one who likely accessed it?
**A Yes. I called the support staff at milConnect to confirm that someone that was not me attempted to log on that day.**
Q And what is it your position she was able to access?
**A My entire VA education and disability program and all the stuff that you can access through the milConnect website.**

Q You said that you're going to pay Heather in August, right?
**A Yes.**
Q How much?
**A I'll probably seek the advice of my counsel on how much I should pay.**
Q Okay. And you understand you're under a court order to pay the eight grand?
**A I understand that I was coerced into signing a temporary agreement that was awarded under perjury and that it was such a poorly written temporary agreement that there are all kinds of discrepancies in there.**
**I told my previous attorney below me that my salary was going to change the date that he forced me into signing it, and I signed it anyway because I was terrified of not seeing my children until September because that would be a -- going that long without seeing my children is a terrifying idea. I used to do it for a living. I don't like doing it anymore.**
Q In your motion you said that you changed your employment due to the custodial schedule. Did you make that decision?
**A Work and I agreed that I cannot continue the full-time travel schedule that I was on due to the custody arrangement and the divorce proceedings, and so it was**

agreement between myself and work.
Q Who at your work?
A **My employer, Michelle Davidson.**
Q And what is your girlfriend's position at this place of employment?
A **I guess she would be the CEO of SFA.**
Q So you're employed by your girlfriend?
A **We're both employed at SFA. She was the former principal of the business, yes.**
Q You said that your position at SFA is based on -- wait, S -- SFA is based on campaign funds and that'll run out, did I understand that correctly?
A **Correct.**
Q So that's just a temporary job?
A **It is.**
Q What's your plan for long-term employment?
A **I mean, I have ASU, so figure out if I can start spending some more time there and get a salary increase.**
**The projects that we're working on are picking up steam pretty quick, so it should be okay.**
Q Do you think it would be difficult to find a local job making more than fifty grand a month?
A **I don't want to get a local job.**
Q Why not?

A Because a big part of what guys struggle with when they get out of the military is finding purpose and reason. I was stationed on Fort Bragg for almost seventeen years of my life and deployed eight times out of there and drove to work every day and trained and prepared for combat.

And the idea of driving onto Fort Bragg is like a -- go work in the fucking basement of USSSA soccer and go sit on the range and be a fat old guy yelling at the young studs, I think, would be -- would be really difficult for my mental health.

And that was kind of the -- a big part of the reason that Heather and I are divorced is I -- this was like the one thing that I told her getting out of the military, is that I wasn't going to drive onto fucking Fort Bragg and get stuck behind like a group of guys coming home from the fucking range or whatever, and that I would have done -- laid out probably ten serious career paths that would have resulted in me finding a fulfilling job and she disagreed to all of those. And so that is the reason why we are divorcing.

Q What's the reason?

A Her unwillingness to allow me to pursue a job that provides me purpose and meaning following my military

career. I think that's a pretty justifiable reason to end a what had become toxic marriage.

She could have taken a job for four months and I would have been a Pinehurst police officer, but she refused to do that. She could have taken a job for four months and I would have been a Raleigh firefighter and drove to Raleigh two days a week.

I could have deployed as a contractor for multiple different three-letter agencies for sixty to ninety days a year and made an exorbitant amount of money, but she disagreed to that. And so we are in the position that we are in, and she has still not sought employment.

Q She disagreed with you contracting?

A Uh-huh. No, she preferred the job that I had that led to the eventual relationship that I had. It was her preferred job. It was relatively low travel and a pretty decent daily rate.

Q And which job is this?

A That was when I was a security detail member. And then she encouraged the US Senate job as well because the work there is really, really important, saving a lot of people.

Q You opened up a business, Matthew -- your name, LLC?

A Uh-huh.

Q Why?
A Because I was a 1099 employee for multiple companies like we talked about earlier, and I'm not super financially smart, but I know it's good to route 1099 money through an LLC.
And then in addition to that, throughout our -- Heather and I had already decided that we were going to separate, but throughout our marriage Heather controlled the accounts.
And I guess the nice way to say it would be our views on finances are very different, and she spent -- would keep the amount of money in our accounts very, very low, and so I couldn't afford to separate.
And so leading up to the separation, I was able to leave some money in my business accounts that I then transferred to my new account when she wouldn't relinquish control over my USAA account that I've had since I left high school early at eighteen years old and got at Fort Benning, Georgia.
Q Where are you incorporated?
A North Carolina.
Q You said you had how many deployments during the marriage?
A Seven.
Q Any vacations this summer? Have you traveled for

vacation?
A I took the kids to go visit my little brother and his family in Idaho. I don't think -- this past weekend me and the kids went down to the beach. I don't think I've taken a personal vacation.
I don't think I've taken a vacation, personal one. Oh, no, we're -- no, I've not taken a personal vacation.
Q In one of your motions you allege that Heather's opened your mail. What do you contend she's opened? What has she opened?
A Heather opened every single piece of documentation that was delivered to 18 Cayman Court after I moved out that was from First Bank, the VA, TRICARE. What's the -- DFAS, the Army's pay system where I get my CRSC from.
I was getting a bunch of HIPAA mail from the FAA 'cause I was applying for a pilot's license and she opened every single piece of those.
Q You were applying for your pilot's license?
A Last year prior to when you guys went and lied to Judge Bibey and got the ex parte order and everything got crazy, yes, I was thinking about starting my pilot's license on the side.
Q Okay. So since the separation, what mail do you

contend she's opened?

A She opened hundreds of pieces of -- every single piece of mail from First Bank, from Pinehurst Health Clinic, from TRICARE, from the Foreign Veterans Affairs, from USAA that was titled to me and not her.

I would estimate it was hundreds of letters. I think I have four in my possession right now.

Q What -- when have you been to Pinehurst Health Clinic?

A I don't know, a few years ago.

Q And they're sending you mail now?

A Yeah.

Q How do you know she received your mail and opened it?

A Because she would hand me a bundle when we would do the child hand-off, and any piece that she thought had some kind of intel in it, she opened.

So I would receive a bundle of like thirty or forty letters at a time and usually about like half to three quarters had been opened, which is a federal offense.

Q Who is your support network locally?

A I've got a few really, really good buddies here.

Q So you're tied up, kids need something. Who do you call?

A I'd probably call my buddy Lance Webb or John Drew.

Q What's -- Lance who?

A Lance Webb.

Q Okay. And who's the other one?

A John Drew.

Q Do they have children?

A They do.

Q Are they close with your kids?

A They are.

Q And they live locally?

A They do. Lance is in the same neighborhood as the 18 Cayman Court house, so very close proximity.

Q During one of your custodial times, the girls left your house and went to Heather's. Do you recall that?

A I do.

Q What is your understanding of what took place that day?

A Yeah, I went -- they went to -- Heather told them to come home and they went over there without -- I thought that they were going over to see their friend and they went to the other house.

Q Other than asking the kids to take pictures of alcohol bottles at granddad's, have you instructed them to do anything else to -- during Heather's custodial time?

A I have not, no. Just to stay in touch as much as they can.

MS. FOUSHEE: Let's take a break.

(THIRTY-NINE MINUTE RECESS)

Q Have you previously been in any states of psychosis?

A **No, I have not.**

Q Never?

A **No. I've never been diagnosed with psychosis.**

Q Have you ever complained of being in a state of psychosis?

A **No. What you're obviously alleging to is the time that I came off of all those medications, which we have previously spoken about.**

**Heather through like deep medical research on Instagram figured out that what was affecting me was psychosis. So I don't think it is a -- any credible medical evaluation. I've never been diagnosed with psychosis.**

Q And you've never reported feeling that you've been in a state of psychosis?

A **No.**

Q Okay. When did you know that your income was going to decrease?

A **I had spoken to my boss, Michelle. I believe in February we talked about it for the first time.**

Q Okay. And how did that discussion go?

A **That because of the pending divorce procedures, I wasn't going to be able to travel as much as was**

**required as a full-time employee.**

Q Okay. And so you said "I'm not going to be traveling as much," and she said what?

A **That they were going to lower my salary.**

Q And so you knew as of February that your salary was going to be reduced?

A **Yes. I knew it was in discussion.**

Q Okay.

A **I believe I knew for sure in March.**

Q Okay. And did you know how much?

A **I don't think I knew that until -- that was like mid-March. I don't know the exact day. I believe it was in mid-March.**

Q What does -- I understand you have to travel twice, three times a month out of state. What does a typical day look like? Are you on Zoom calls, what do you do for work?

A **When I'm traveling or when I'm local?**

Q When you're local.

A **Yeah, usually on a workday when I'm local, I'll have two or three Zoom calls.**

Q How do you and your girlfriend communicate? Is it via text?

A **Yeah, either text or Facetime.**

Q Okay. Not Signal or WhatsApp?

A Primarily text or Signal, yes.
Q Are those messages still in place or have they been deleted?
A Yeah, I believe that most of them are still in place.
Q Okay. Have you ever lied to Heather about being with your girlfriend?
A Can you please --
Q Do you recall a time where you told Heather that you were hiking alone but you were really with your girlfriend?
A Yes. We did a training hike together, preparing for an incredibly challenging nineteen-mile hike that we did about a month later.
And yes, I was not honest with Heather about whether I was hiking alone or not.
Q Why would you lie to her about Kyrsten being present for that?
A I mean, I think it's fairly obvious that it would cause some kind of suspicion that I was hanging out with my former boss and friend. And our marriage at that point was ending and I didn't -- I didn't want to make it worse.
Q Okay. And you would agree that before you were separated from one another, that Kyrsten had sent you messages saying she missed you, cares about you?

A Yes. Heather committed a felony when she took a screen shot of a flirty Signal message from Kyrsten sometime last summer and sent it to herself. And that text message was used as evidence under perjury.
Q Okay. And it would include, you would agree, that Kyrsten sent you a message saying "I keep waking up during my sleep and reaching over for your arms to hold me"?
A That sounds like a flirty text message to me, Whitney.
Q And is that because the two of you have held each other leading up to that point?
A She had expressed to me that she was interested in me and was flirtatious. That is it.
Q But it's your position that you never embraced?
A We certainly hugged.
Q Never slept in the same bed before January of this year?
A No, we had not.
Q Do you think those messages are inappropriate to send to a married man?
A I mean, yeah, it's probably inappropriate to send to a married man. But you have to remember, these messages came after Heather voluntarily took MDMA with her friends in December of 2023 and had told her best friends then, the first time meeting them, that she

wanted to divorce me. And so I mean, I don't think that was probably a very smart move on Heather's part if --

Q Did you tell Kyrsten to not communicate with you that type -- that way, that it was inappropriate?

A Yes. I mean, for the large part of the time that I was employed by her is I, you know, avoided her flirtiness, I guess. I don't know.

Q And she continued to do it anyways?

A No, she was pretty professional about it.

Q How did you confront her about the flirtiness?

A I do not recall exactly how it came up.

Q Do you recall when you confronted her about it?

A Probably last summer.

Q And was it in person or via message?

A No, I'm sure it was an in person conversation.

Q How would you describe your time with the children leading up to this lawsuit? How much time were you spending with the children from when you moved out to the emergency order?

A It was challenging up through May for me to get lots of time with all three kids. I spent quite a bit of time with my son, like we discussed earlier.

I had a one-bedroom apartment and he had no problem sleeping on an air mattress on the floor. But

I obviously wasn't going to subject my thirteen and twelve-year-old daughter to sleeping on air mattresses in my one-bedroom apartment.

But I mean, I was still doing school pick-ups and drop-offs and evening activities, and I mean, back then I was still spending quite a bit of time at the 18 Cayman Court house under Heather's request. And so I'd say it was pretty good, yeah.

Q How often would you see the kids?

A Fifty percent of the month.

Q What is your proposed schedule? How -- what time would you like with the kids? What's the schedule?

A Fifty-fifty.

Q On what schedule?

A I mean, I think a week on, week off would be the -- a fixed schedule that makes the most sense.

Ideally I would have a flexible schedule and could predict ninety days out when I would like to have custody and when Heather could have custody.

That would give me far more freedom for work stuff, but I would still ensure it would be at least fifty-fifty.

Q So you think the kids' schedule and Heather's custodial schedule should be based around your work schedule?

A Heather has not been employed and she has not sought employment. I am the -- currently supporting both households. And I -- for the work that I am doing, it would be helpful to have a flexible travel schedule, yes.
Q Would you say during the marriage Heather was a good mother to the kids?
A Yes, I think Heather is an excellent mother.
Q Would you say that you hate Heather?
A No, I would not say that I hate Heather. Her behavior in our separation specifically from March has been hurtful, and in all honesty I feel bad for her. I think that she has made me the target for her rage and her unwillingness to deal with her own personal problems.
And both the separation and the divorce were her idea. And she saw an opportunity to get even more than the substantial amount of money that I was giving to her and she took it, and that has made things quite difficult.
Q How much do you contend you can afford to pay in support to Heather and the kids?
A I mean, I think roughly around three thousand dollars a month would be a realistic child support and alimony payment that I could probably afford.

Q And that would leave you with how much?
A **That would leave me with roughly about the same amount.**
Q Do you not consider your disability and -- your VA and your CRSC as income?
A **No, my understanding is that disability and the combat-related service-connected component of it are not divisible as --**
Q Okay. So when you say you would have three thousand, really you would have nine thousand and she and the kids would have three thousand?
A **No, I would have roughly about the same amount in my salary and then I would have my disability and my CRSC.**
Q Okay. So you don't pay bills with that money?
A **I pay for medical bills and supplementation for the injuries and health conditions that I incurred in combat, which is what that money's intended for.**
Q Okay. So what out of pocket expenses do you pay for your treatments?
A **I have a recommendation to pay -- there's a certain regime of supplements I'm supposed to take and those are not covered by health insurance. Those can be quite costly.**
Q You currently taking them?

A I am, yes.
Q Okay. So what is not covered by insurance that you're taking?
A I don't have my list with me. I can get it for you another time.
Q So how much out of pocket do you pay, approximately?
A I would have to look it up. I don't know.
Q But it would be reflected in your bank account that you're paying for these things?
A Yes. It would be disbursed on my bank account on the various supplements that I'm paying for.
Q Who do you get your supplements from?
A Pure Encapsulations, Amazon. Various locations depending on what it is.
Q What was the first one?
A Pure Encapsulations is generally regarded as the cleanest supplements.
Q Okay. And when you say supplements, we're talking vitamins?
A Yes. We're talking various vitamins and natural supplements.
Q And that costs thousands of dollars?
A Yes.
Q Have you always taken them?
A I mean, I've always taken some. My current therapist

recommended a big part of the regime that I'm on and then I've had a few other experts give me advice on what I should be taking.

Q Okay. So we weren't taking these vitamins prior to separation? Am I understanding that correctly?

A I mean, I've always taken some amount of supplementation, yes. It has increased through guidance from doctors.

Q And you said earlier that it's your intent to move to Arizona next summer, is that right?

A I never stated that my intent is to move to Arizona next summer.

I would like to move to Arizona at some point. My primary concern is fifty-fifty custody with my children. We will figure out that further in the rest of these divorce proceedings.

Q Are you foreseeing a further reduction in your income?

A I don't believe so, no. Not under current foreseen circumstances.

Q Do you go into an office in Arizona or where do you go in Arizona for work? Is there an office space?

A The part of the company rents office space through one of the hotels, so that is often where we'll hold our meetings if it is us hosting them.

If it's not there, it's various locations around

**the country and Arizona.**

Q Okay. Where does the -- your work truck, where is it stored?

**A Usually either at the chief of staff's house or at my girlfriend's house.**

MS. FOUSHEE: That's probably good for today. Go down another rabbit hole, but it'll take another bit. Want to pause for today and resume tomorrow? What time?

(DISCUSSION OFF RECORD)

(WHEREUPON THE DEPOSITION ADJOURNED AT 3:01 P.M. AND RESUMED AUGUST 13, 2025, AT 10:38 A.M.)

DIRECT EXAMINATION CONTINUED BY MS. FOUSHEE:

Q Sir, correct me if I'm wrong, but yesterday you testified that you took a trip in the spring of this year to Mexico for an Ibogaine session, is that correct?

**A It is correct.**

Q Did you describe that as an emergency session to Heather?

**A Yes. I was struggling with many different things in both my personal and professional life, and was feeling overwhelmed and sought professional help, and the recommendation that I got was to go get a touch-up with my friends at Ambio.**

Q Okay. What's a -- what's a touch-up mean?
A Specifically special operators, over thirteen hundred have been treated with Ibogaine at Ambio. Many go through yearly treatments.
And so it had been two years since I had had a treatment, so it was recommended I go get another one.
Q Okay. So -- but it was not originally planned, it was based on your current state, is that correct?
A Yes. The success and like the place that I found myself in my professional life is overwhelming to me.
My plan getting out of the Army was to climb trees with a chainsaw, and now I go to meetings with the Secretary of Defense and the Vice President, and their assistants take notes when I talk. It's not a -- I didn't see this one in the tea leaves. And it's quite overwhelming.
Q Okay. And you said it was a struggle. You said you were dealing with struggles?
A Yes. I have post-traumatic stress disorder and traumatic brain injury. A side effect of a severely damaged brain is to fall into bouts of mild depression.
Q And at that time, were you depressed and struggling with symptoms from your PTSD?
A I was struggling with symptoms from my traumatic brain

injury, yes.
Q And what were those symptoms in March?
A Panic attacks, anxiety, mild depression.
Q Okay. And what is your plan for ongoing treatment?
A I'm in multiple forms of ongoing treatment, Whitney, as we discussed yesterday.
Q As far as Ibogaine goes.
A When I feel the time's right to go through another session, I'll go through another session of Ibogaine.
Q Okay. And you have to travel out of the country for that?
A By that time we should have research programs going on in the United States.
I don't know if you saw the New York Times article that came out yesterday. We're working with former Texas Governor Rick Perry. There was a big article in the New York Times with him and my friend Brian Hubbard, and my girlfriend, Kyrsten Sinema, were mentioned in it. I actually have a meeting with a reporter next week.
So this isn't some like sketchy illegal activity that you are trying to paint it out to be, Whitney. This is I go to meetings with the director of the FDA, Dr. Makary, about this. I've met with Dr. Oz about this. I have met with Deputy Jim O'Neill four times

about this.

Q So is it your position that it's not an illegal substance in the States?

A **It is currently not under -- not approved for research. That is correct.**

Q Okay. So it is illegal to consume it here?

A **I have never consumed Ibogaine in the United States, Whitney. I've mentioned that.**

Q What relationships outside of your current girlfriend have you been in since January of '24?

A **Relationships?**

Q Yes. Romantic, sexual.

A **I have been in no relationships.**

Q No other ones? Do you recall telling Heather that you had a romantic interest in a Julianna Mercer?

A **She is an amazing woman and very beautiful.**

Q Okay. So you did admit having an interest in that individual?

A **Heather was provoking a fight and I was saying things to make her angry. She's fixated on Kyrsten Sinema being the reason that our marriage ended when she knows that is certainly not the case. She is just the woman that I happened to begin dating at the end of our marriage, after our separation.**

**To think that there weren't other women that I**

was potentially interested in as I became a separated man is kind of ridiculous.
Q Okay. How often do you see Kyrsten?
A It depends on our work schedule and our personal schedule.
Q So in the last two months, how often were you able to see her?
A In person?
Q Yes.
A I would estimate eight days a month.
Q Okay. Have you had conversation with your girls about them meeting Kyrsten again?
A So Heather had sent me a threatening text message saying that if I did not discuss my relationship with Kyrsten with the kids, that she was going to do it.
And so I -- it was obviously a very hard conversation because I was countering a false narrative that has been created. And I did exactly what she said and I had the conversation with my daughters about exactly my -- the woman that she met that was my former boss, is now my girlfriend, and I explained how that has happened.
Q What did you say?
A That the woman that I used to work for had -- at some point along the way we became friends, and then after

your mom and I separated, we began dating.
Q How did the girls react?
A As understandably traumatized as a preteen and teenage daughter would to hearing something that is wildly different than what they had been told up to that point.
Q What do you mean, wildly different from what they had been told?
A Like I said earlier, the narrative has been created that Kyrsten Sinema is the reason that Heather's and I marriage has ended. And as we discussed, Heather's been telling people since 2021 that she wanted to divorce me. This isn't some new thing that popped up on the horizon when I started working for Kyrsten Sinema.
We got married very young, had kids very young. I deployed seven times. We had a incredibly stressful marriage and life.
We both come from parents that did not have great marriages, so neither one of us witnessed a good marriage growing up. Heather's parents I think signed divorce papers within twelve months of this, at least of our separation beginning.
So it's not like this is some fixated issue because I am this evil, drug-crazed, awful husband

that I have been fabricated out to be.

Q Did you tell the girls over your summer visit that Kyrsten was going to drive them after a flight delay?

A Yeah. So in the two weeks that you guys gave me in the temporary agreement to spend with my kids during their summer vacation, the first week of that, I took my kids to go visit my little brother in Idaho. The return flight from Idaho was -- had critical timing because our oldest daughter had to be at band camp by four p.m. on Sunday.

There was severe weather all over Colorado, so our flight -- connecting flight out of Denver International was redirected to Grand Rapids, Colorado. My girlfriend happened to be flying on a separate trip, was also supposed to connect through Denver just randomly and was redirected to -- forgetting, I forget, another small Colorado airport about forty-five minutes away.

In my seventeen and a half years in training in the special forces, I've traveled all around the world, all around the States, and when severe weather or some type of contingency can prevent your plans from following through, you develop contingency plans in case your original plan fails.

So in the event that we were going to spend an

unknown amount of time in severe weather in the Grand Rapids airport in Colorado, my daughter would miss her band camp that she was very much looking forward to.

Me being a -- not an expert at a lot of things, as you mentioned yesterday, Whitney, but I have been traveling the world and living out of my backpack and a duffel bag since I was nineteen years old.

So making a plan to rent a vehicle when we were forty-five minutes from each other to drive to an airport that is open three hundred and sixty-five days out of the year and is one of the most reliable airports in the country and has two direct connecting flights to RDU at five a.m. and at three-thirty-three p.m. every single day -- I know this because I travel.

Q Maybe I should ask the question again, 'cause I think you didn't understand. Did you tell the girls that she was going to drive them?

A Yes. I told my daughters that we had a contingency plan to ensure that my daughter Clara would make it to band camp in time, that if the severe weather that was being predicted by the National Weather Service and by the airlines became -- persisted and my daughter was going to miss band camp, I made plans to ensure that that didn't happen.

Q Okay. And how did --

A I would call that good parenting, Whitney.
Q How did the girls react?
A Well, there is a narrative that has been created that Kyrsten Sinema is some kind of evil woman when it -- clearly she has been trusted with the secrets at the top level of our national government and is a licensed clinical social worker and a lawyer herself. She's a quite credible woman.
Q So how did the girls react?
A They were upset.
Q How so? What did they say?
A I don't remember what they said, Whitney.
Q But they didn't want to go with her, right?
A They were told that they didn't want to go with her, yes.
Q But they told you they didn't want to go with her, right?
A No, they never told me that.
Q What did they say?
A Whitney, I don't remember what they said.
Q Okay. You just remember what they didn't say, is that --
A I -- Whitney, I love my twelve and thirteen-year-old daughters like nothing else in this world. They're my absolute princesses.

They are these perfect, beautiful, angelic creatures that I adore and love with every part of my fucking heart. But they are twelve and thirteen-year-old girls. Involving them in travel plans doesn't make much sense. I don't know if you would agree with that.

Yes, my twelve and thirteen-year-old daughters have done some traveling, but that -- like they usually -- they haven't drove the car like across the country or they've never like purchased an airplane ticket or like gone through TSA by themselves, or I -- Whitney, is a thirteen-year-old child qualified to make travel plans to get from Grand Rapids, Colorado, to Greensboro, North Carolina, for band camp? Is a thirteen-year-old of the facilities to make those decisions?

Q Okay. So as you described your princesses, do you think their voice should matter on when they want to spend time with each parent?

A I think that Heather is going down a slippery slope, that she needs to be very careful. This vengeful plan to turn my daughters against me as being this -- this awful creature is a very strange messaging to give to your own daughters, is "I started dating and fell in love and married and procreated three times with a

**monster." That is a strange thing to teach your daughters.**

Q So yes, their voice matters, or no?

A **Whitney, I will say that in the event of ensuring that my thirteen-year-old daughter makes it to band camp, something that she had been looking forward to for a long time, that I -- no, I will override their emotions for practical planning.**

Q Okay. I'm not -- and maybe I will rephrase.

In a custodial schedule, moving forward, do you think your children's voice should be heard and considered?

A **I think the fact that you and Heather are making this an option is evil and disgusting. Do you think a nine-year-old boy's voice should be heard in this matter?**

Q So you --

A **Whitney, do you --**

Q -- don't or you do?

A **Whitney, do you think a nine-year-old boy's voice --**

Q I get to ask the questions, you get to answer. So I'm going to ask you again.

A **Shall we depose Cooper? Shall we see who he wants to spend more time with? Is that something you really want to do? Do you think that I'm evil enough to take**

my son from his mother?
Q So you think their voice does matter?
A In matters of making rational decisions, no, I'm not going to include my thirteen and twelve-year-old daughters' emotional responses to a narrative that has been created by Heather into the effect when it includes their safety.
Q Okay. So their voice does not matter?
A When it comes to matters of their safety over their emotions, no, Whitney, I will override.
Q Okay. And it's impossible for their experiences with you to have actually impacted their preferences, is that your position?
A Yes. A narrative has been created, Whitney, that every experience with me is going to be a miserable experience because I am an evil, disgusting man.
And when I can separate my daughters from this area specifically, I've found that they are their wonderful selves again. It's when they get back into the sphere of knowing that if they don't obey Heather's orders, they will receive this vengeful wrath that I am now receiving.
My daughter Isla has Heather saved in her phone as the drill sergeant. And I know that that's kind of a funny joke, but I think that should be indicative of

like the level of like emotional abuse that Heather's willing to go to create a narrative that I am a monster.

Q Have you told Cooper that he should be home schooled?

A Cooper has asked me if he could be home schooled. I don't think that it is a terrible idea.

The public school system is a waste of my children's time. All three of my children are off the charts, unbelievably intelligent. And they spend their time in the North Carolina public school systems reviewing for like the three standardized tests that they take quarterly.

There are many, many programs out there for gifted children like my children are, where they could have a part-time in school schedule, they could have a part-time home school schedule, and they could travel the world and country with me, and I could teach my children the skills that I've learned over my twenty-year career of working for the government.

Q What's your level of education?

A I have a -- what is essentially a fake associate's degree that I used Quizlet to cheat on, 'cause the Army made it a silly requirement that you had to have an associate's degree to get promoted to master sergeant around the same time that we lost both wars.

And then I also hold a certificate in arboriculture from the Alamance Community College.

And Whitney, I can see what you're getting at is the fact that I do not hold formal education, as you as a divorce lawyer do, Whitney. I got a different education myself.

When I was twenty years old, me and my friends took a -- it's kind of like a backpacking trip acrose the birthplace of civilization.

I know you probably won't have read the Bible, but the Garden of Eden is the land in between the Euphrates and the Tigris River. And so I became intimately familiar with an ancient, unbelievable culture in the birthplace of civilization, the ancient Mesopotamian empire.

I got a -- you know, what could be considered a bachelor's level study in Sunni and Shia Islam. From there I --

Q So do you practice Islam? Do you -- are you a religious --

A What? Whitney, are you fucking serious?

Q What's your religion, sir?

A I am a Christian.

Q Okay.

A What?

Q So what --

A **We got to pause.**

MR. TANNER: You need a break?

MS. AMMEL: I think he needs a break.

THE WITNESS: Are you accusing me of being -- of converting to Islam?

MS. FOUSHEE: You may need a break.

(EIGHT-MINUTE RECESS)

Q Have you looked into home schooling programs?

A **All the -- Whitney, we have to go back and touch on this last part before we move on. I, for the record, want to state that accusing me of having converted to Islam is one of the most comical things I've ever heard in my life.**

**On my second deployment to Afghanistan, following in the footsteps of Alexander the Great to the graveyard of empires, we used to spend like four or five nights at a time at a Afghan national police checkpoint.**

**And obviously the guys that have been there tell you what the -- like the eight to twelve-year-old boy, the reason why he hangs around with the Afghan police and with the Afghan commandos.**

**And it's such a vile, disgusting thing that is so far outside of the mind of what a fucking American man**

would fucking comprehend of using a little boy as a fucking object for sex, that you block it from your mind until you're sitting on fucking guard duty one night and listen to it. You sit there and listen to -- for a fucking hour to a fucking ten-year-old boy get butt fucked.

No, Whitney, I have not converted to fucking Islam.

Q So what home school programs have you looked into?

A I've looked into many different private school and home school programs for my son.

Q Okay. Which ones?

A There is a zero percent chance that Heather is going to agree to any school changes right now until we are further into the divorce proceedings, so it is not worth addressing at this time.

Q So can you name any here today?

A Whitney, are we going to come to an agreement on the future education of our children during this deposition?

Q So is the answer you don't know any?

A The answer is when Heather and I come to agreement that the Moore County school system is wasting our children's time and there are better opportunities for our children out there, we will do some research,

hopefully together, and come up with a better plan for our children's future.
Q Have you looked at private schools?
A I have done some research into many different private schools, yes, Whitney.
Q Okay. Which ones?
A Many different private schools, Whitney.
Q Can you name any here today?
A Whitney, there is no -- there is as much sense of accusing me of having joined fucking ISIS as there is of us coming up with an education plan for our children's future when we are sitting here in this deposition right now.
This -- I'm not a lawyer, but this is not the part of the divorce where this is discussed.
Q So the question, sir, wasn't have you and Heather talked about where your children should go. I'm asking you what private schools you want your children to go to.
A Heather and I cannot come upon an agreement on where we are going to live moving forward in the future, so it doesn't make any sense to do significant research into exactly which program we would get our children into.
Q Can you name any, sir?

A The Agoge school system is a incredible school system for children like mine.

Q Where is that?

A It's based out of Austin, Texas, but it is spreading around the country rapidly.

Q And what makes you say that's a good fit for your kids?

A It's a school founded by a former Green Beret that thinks the way I think and teaches children in a way that makes them prepared to be productive citizens in the future and not cubicle workers.

Q How do you spell that? I'm not familiar with it.

A I think it's A-g-o-g-e.

Q Okay. And you think that would be appropriate for all three of your children?

A I think that is one of the many options that are out there that could be an appropriate fit for our children that is vastly superior to the education they are getting through the Moore County school system, yes.

Q Okay. Any local schools, private schools?

A No, there are no local schools in Moore County that I would want to get my children into.

Q And do you know the cost associated with this school in Austin?

A No, I have not done extensive research into it, Whitney. I've been busy dealing with getting through this divorce.
Q Did you have a discussion with your son about home school?
A My son has expressed extensive interest in home schooling. His best friend and our next door neighbors, the two kids that my children play with daily, have always been home schooled.
And they are wonderful, bright, creative young kids that get to spend a lot more time playing outside while still learning just as much as my children do and not spending their time reviewing for standardized tests.
Q So what did you tell your son about home schooling, if anything?
A I said that if he's interested in that, that I will talk to his mom in the future and that we will come up with a plan to see if that is feasible.
Q Around the time of the emergency order, your son missed some school days while he was at your home, correct?
A Correct.
Q Why?
A Well, Whitney, as you can imagine, Heather went to

extensive lengths to create a narrative that I was a drug-crazed, suicidal maniac that was going to take my children and flee the country to Mexico where I purchase and consume drugs regularly, I believe it is written. And that is a lot of hard misinformation for a very rational, smart boy to understand. And there was also a narrative created that he was not going to get to see me anymore.

And so in the times where Heather would allow me to see my son when we had no custody agreement, when it was clear that he wanted to spend time with me and to sleep in my apartment and things like that, he sometimes in the morning at the school drop-off line, you are correct, Whitney, he would not want to get out of the car because he would want to spend time with his dad.

Q And did you think spending time with dad was more important than going to school?

A Whitney, my son is so fucking smart, it's insane. Like off the charts insane.

I think he could miss a semester of Moore County public school and he could come in and he could sit on their little apps and do the reviews for their standardized tests and he would test two or three grade levels higher in reading, writing and

arithmetic, and my son would be just fine without the Moore County schools.

Q Okay. So you don't think he should go to school in Moore County? You don't think it's important that he attend school while he's enrolled in school? Is that true?

A Whitney, you are trying to lawyer talk and change what I am saying. What I am saying is at the time where you and Heather created absolute turmoil in my household, my son was so traumatized and fearful that he would not get to see his dad anymore that you are right, he would not get out of my car in the school drop-off line.

I guess I could have thrown him over my shoulders as he kicked and screamed and I could have drug him into his classroom and duct taped him to the fucking chair.

I'm not sure -- I don't know your parenting style, Whitney, but when you have a son who's refusing to get out of your car in the school drop-off line, I would pull into the parking lot and spend thirty minutes saying, "Hey, buddy, you have to go to school. I know you don't want to but you have to do this."

And when you have a crying nine-year-old who just wants to spend time with his dad because his mom and

an evil witch have created a narrative that he was going to kill himself or steal him and flee to Timbuktu or whatever, yes, yes, my son was rightfully traumatized by the two of your behavior.

And yes, there were a few days that my son missed school. Guess what. He still passed the third grade, Whitney. Do you want to see his test scores?

Q And what about --

A **Whitney, would you like to see my son's tests scores after missing three days of school because he wanted to spend time with his dad, who he was not being allowed to see? Do you want me to bring in my son's test scores to see if that had any effect on his education?**

Q What about tardies? Do you not think it's -- are there often times where your son --

A **Whitney --**

Q Do I have to go over the rules? I ask the questions, you respond. You let me finish, I will let you finish. I've been very kind in letting you rant and rant and rant --

A **As Salam. As Salam. As Salam.**

Q What are you doing there?

A **I'm praying to Islam, Whitney.**

Q Okay.

A I joined ISIS after seventeen and a half years in the special forces.
Q Okay.
A After watching my best friend try and snap an Al Qaeda sniper's neck with his bare hands and then having the guy's wife pick a newborn baby off the floor and throw it across the room at me.
Q Are you on any impairing substances this morning?
A Whitney, the only thing that impaired me is the thought that a seventeen and a half year veteran of the 82nd Airborne Division and the Third Special Forces Group would convert to Islam. It's so insane.
Q So what medication did you take this morning, or any other substances?
A I took my Armour Thyroid, as I take every morning prior to eating breakfast.
Q Anything else?
A I have had approximately four cups of coffee.

MS. FOUSHEE: Okay. I need to step out. I'll be right back.

(FIVE-MINUTE RECESS)

THE WITNESS: Sorry, I was submitting a security clearance to the White House. I hope they don't find out about my Islam.

Q So would you agree, sir, that there were times that

instead of getting your son to school on time, that you would take him to breakfast or hang out with him?

A **There are times when my son refused to go to the school to the point that I was not going to traumatize him by forcing him, yes, Whitney.**

Q Okay. So do you not have the ability to force your son to do something he doesn't want to do?

A **No, Whitney, I'm not going to force my nine-year-old son into his school kicking and screaming because he wants to spend time with me because his mom won't allow him to.**

Q Okay. You stated yesterday that it is your position that you want fifty-fifty custody of the children, correct, sir?

A **Yes. I'm going to get fifty-fifty custody of my children, Whitney.**

Q What do you mean, you're going to?

A **I'm going to get fifty-fifty custody of my children. This isn't a want, and any other thing would be ridiculous and absurd and predicated upon some lie that you and Heather fabricated.**

Q So what happens if the judge --

A **And perjured, the judge that you just mentioned, to not allow me to have fifty-fifty custody from the get go.**

Q So what are you going to do if the judge decides that you don't get fifty-fifty?

A I think that judicial oversight is a big problem here in Moore County, and if judges in this county are allowing criminal activity to be committed in their courtrooms, then I think need to be brought down upon it.

Q What do you -- what makes you say that?

A During the ex parte return custody hearing that you and my former attorney, Ronnie Scott, planned, where you coordinated to have Ron Scott show up two hours and forty-five minutes late, wearing a fake hospital bracelet while visually under the influence of cocaine, and Judge Steve Bibey allowed it to happen, and a lie was created that I would not be allowed to have access to my children until September unless I signed the -- what is going to be proven as illegal and criminal temporary custody order, yes, there needs to be some judiciary oversight of what's going on here.

Q So it's your testimony that I coordinated with Attorney Scott on all this?

A He admitted to it on a phone call with me. I have it on recording.

Q Oh, what did he say?

A That you and him created --

MR. TANNER: On that, just put out there, I would invoke the issue of privilege, so you would be disseminating privileged information. Do you want to talk about that?

THE WITNESS: Yeah.

(ONE-MINUTE RECESS)

MS. FOUSHEE: Are we invoking privilege?

MR. TANNER: I think after conferring with my client, he is happy to talk about that discussion.

MS. FOUSHEE: Okay. Sure.

Q So what did Mr. Scott say to you about --

A **That you and him planned the temporary custody order the night prior. He did not make me aware in any way that he had come up with a plan for you or with you. He did not notify me that he was going to be intentionally late.**

**I have FOIA requested the courtroom footage. He was clearly wearing a fake hospital bracelet. That is easily provable. He was clearly -- clearly visually under the influence of cocaine. For Steve Bibey to claim that he upholds the law while there is a lawyer that is geeking out on cocaine in his chambers is astonishing.**

**And to pretend like this hasn't been going on in**

this county and that you guys all clearly don't play the little Moore County lawyer parasite game is very clear. You guys were all turning around and whispering to each other and snickering and laughing at me.

It was very obvious that a plan had been created prior to me entering the courtroom that day, Whitney. I'm not a dummy. I know that you had mentioned my lack of formal education, but I'm still here after getting through some pretty crazy stuff, so --

Q Did you get the video footage?

A I'm working on it right now, Whitney. Government is slow.

Q Okay. You said he was wearing a fake hospital bracelet. What makes you say it's fake?

A There was no personal information listed on the bracelet. The point of the bracelet is so that the hospital knows who they have inside of the hospital. There was also not a QR code on it.

Q Okay.

A I've spent lots of time in hospitals, given my health conditions and physical injuries. I know what a hospital bracelet looks like.

Q And what makes you say he was -- and I don't want to misquote you, but on some type of impairing substance?

I think you referenced cocaine.
A He was clearly on cocaine or some type of high dose amphetamine.
I am not a law enforcement officer but I have spent enough time around -- as you have lovingly accused me of being a drug user and I've spent lots of time around law enforcement and I can make a professional opinion that Ron Scott was under the influence of some type of narcotic during our return ex parte order.
Q Okay. Have you reported him in any way?
A Just State Bar complaint.
Q And what is your -- you somehow blame Judge Bibey on this?
A I mean, what you guys did is criminal and immoral.
Q What is Bibey's involvement in this criminal activity?
A If he is allowing something like this to proceed, then he is a -- not doing his job. And that is the problem with our country is that there are people in positions of authority that have gotten used to being able to operate in a certain way.
And there is a little game being played here in Moore County, home of U.S. Army Special Operations, where Whitney Foushee and Laura Creed and Ron Scott and all the different attorneys have this play that

they run where they go "Look, look, the guy that used to hunt human beings for a living is crazy."

And it is more than likely an ADA violation to target special operators either currently employed by the U.S. Army or former on grounds of mental health and injuries sustained in combat both to their emotional stability and their physical brain health and their physical health.

Q Okay. And so what was Bibey's involvement in this criminal activity?

A He watched a lawyer stand ten feet in front of him after showing up two hours and forty-five minutes later with a clear plan that was colluded ahead of time, called him back to his chambers.

It would be complete speculation to wonder what they talked about or wonder if any money changed hands or if anyone rounded third base, but clearly Steve Bibey is not innocent in this little game that the lawyers here have been playing.

Q What do you mean?

A I mean, this is small town socialism. You are extracting my wealth, my combat-related service-connected disability that I earned serving my country, predicated upon perjury that you committed in front of Steve Bibey, which he allowed, to extract my wealth

from me, an exorbitant amount of wealth, a hundred and twenty-seven thousand dollars in eight months, completely predicated upon a lie.
Q Okay. And so it's your opinion that Judge Bibey is in this collusion?
A It is my opinion that there needs to be judicial oversight in Moore County. I am not -- as you have mentioned, Whitney, I am not an expert, but I know when something does not smell right.
Q Okay. Have you reported Judge Bibey?
A I'm working on it, Whitney. I got a meeting in D.C. about it.
Q Okay. And it's your intent to report him to someone in D.C.?
A Figure out who does judicial oversight in a broken government system. You are correct, Whitney. I will figure this out.
Q Okay. So what's this meeting in D.C.? When is it and who's it with?
A Whitney, I'm not at privy to discuss who I meet with as the course of my job until after the meetings have happened.
Q Okay. When is the meeting?
A Whitney, I have a meeting in Washington, D.C., at the end of this week.

Q Okay. And that's about judicial oversight?
A **It's about many different things that I'm working on that is wrong with our country, Whitney.**
Q Okay. Once you, according to you, you will -- you will obtain fifty-fifty custody, will you have an increase in your income?
A **I do not know what my work will look like until after I get through this divorce. This is my priority is getting fifty-fifty custody of my children.**
Q Okay.
A **I am fortunate that work has kept me on board. They have been flexible with the schedule.**
Q And once you -- if and once you have this fifty-fifty custody, how would you coordinate your travel?
A **Whitney, you and Heather have made any coordinating at all throughout this entire process extremely difficult. I in no way made coordinating a challenge at all.**
**I believe most divorced couples nowadays, there are parenting apps that you use to schedule pick-up times and drop-offs and school pick-ups and all the different things.**
**And I'm sure when we get to that point of the divorce, the four of us should come up with a plan for moving forward. But Heather has made no attempt to**

communicate cordially or to engage in any kind of constructive plan for moving forward with the separation and divorce that she agreed to. She has devoted her full time, based upon your guidance, to figuring out how to extract money from me and not make a plan for the future.
Q Are you able to have a consistent schedule?
A I am able to have whatever schedule gives me fifty-fifty custody of my children, Whitney.
Q So you are able to control your schedule?
A I am going to ensure that I have fifty-fifty custody of my children, Whitney.
Q You said you would prefer for at least your son to be home schooled. Who would be doing the home school?
A I'm certainly qualified to home school. I guess I'm not, Whitney. I only have a associate's degree.
But I will figure out a -- there are many good programs. I've got many friends and neighbors and -- that are involved in lots of good programs.
One of the things that we're working on at ASU is we're using AI to figure out a better way to teach children. And so through that, they could probably find some pretty good resources.
But yeah, I -- as I stated, my goal right now is to get through this divorce and to have fifty-fifty

custody of my children.

The plan moving forward, when Heather wants to be more cordial and sit down and come up with a constructive plan for the future, we will talk about it then.

Q Are you opposed to Heather home schooling the kids?

A I would not be opposed to Heather home schooling the kids, no.

Q But it's not your assumption that she would be responsible for that?

A No, I think we could come up with a excellent split schedule of home school and I could probably find some type of gifted program for my children that they would be enrolled in while also doing home school activities.

Q It was your testimony, and correct me if I'm wrong, that Heather was the one that insisted on the divorce. Is that correct?

A That is correct, yes.

Q And would you agree that in past times you have threatened divorce?

A I'm sure that there are times when we have been fighting and I have threatened divorce in the past. I have never consistently threatened divorce. Heather has been consistently threatening divorce since the

Warrior's Heart incident that we talked about earlier.
That has been a consistent theme, and minor arguments about like whether or not I want to drive her to the grocery store would turn into "I want to fucking divorce you."
And so I think the message has been pretty clear for many years that Heather was -- was no longer interested in me as a husband, and that was her decision as well.
Q And at the time of the separation, did you want to maintain the relationship?
A I agreed with her plan that separation seemed like the only appropriate answer for the point we were at in our relationship where nothing else was working.
Q When you told her, assuming that you admit that you told her in June of '24 that you wanted a divorce, after that time, did you change your mind?
A I'm confused by the question. Can you restate it?
Q Did you tell Heather in June of '24 that you wanted a divorce?
A I do not recall whether or not I told Heather in June of '24 whether or not I wanted to divorce and whether or not I was agreeing to her saying that she wanted a divorce.
Q Do you recall telling Heather last year that you were

going to take your life by throwing yourself over the Grand Canyon?

A I do not recall that at all.

Q Do you remember having any statements about the Grand Canyon and going over the ledge?

A I do not recall that at all, Whitney.

Q Do you recall taking a walk and saying it would -- it would have been a nice night to kill yourself?

A I do not recall that, Whitney.

Q Have you ever made such or similar statements to Heather about taking your own life?

A Whitney, I've never been suicidal and I've never made statements of suicidality.

Q Do you recall stealing prescription medication or taking prescription medication from third parties that weren't prescribed to you?

A Absolutely. Addiction runs a horrible course, especially opiate addiction, the way it controls your mind and literally controls your decision making process and completely blocks your judgment, leads you to make some terrible decisions.

And yes, throughout my struggle with pain pills from 2010 through 2016, there's plenty of other medicine cabinets that I've dug through. I think that's a common theme amongst people that are addicted

to pain pills. It happens with the guys at work as my shit would come up missing as well.

I don't think that this is a uncommon problem amongst people that are addicted to pain meds, nor do I think a person being addicted to pain meds is some individual problem that only Matthew Ammel seems to have. I think that's a problem that affects close to like -- like a hundred and twenty million Americans or something.

And yes, I struggled with it for many years and that is a big part of the reason why I have -- a big part of what I'm doing right now is Ibogaine has proven eighty-three percent effectiveness against opiate addiction compared to other treatment options with like suboxone, which are around twenty-seven percent, or methadone, which are around thirty-two percent, and are really just another opiate. They are not getting a person off of opiates. You're just getting them onto an opiate made by Pfizer or Johnson & Johnson.

So I'd say yes, I fully understand the depths of depravity that opiate addiction will lead a person to. I am not sure where you're going with this.

Q Okay. And did you also take Fentanyl lollipops around that time frame too?

A I took plenty of Fentanyl lollipops out of my medic's narc boxes.

**Yes, that is a problem that persists on every team in the special forces. It is a constant problem that every medic faces because opiate addiction is a problem that is common amongst special forces operators.**

**Same thing happens with the guys' personal prescriptions of amphetamines too, as many came up missing or progress on to more serious addictions to non-prescription amphetamines.**

Q You testified earlier about a concert that Heather went to. Did you also use MDMA at that concert?

A **I did not.**

Q Have you at concerts with your girlfriend?

A **I have taken MDMA one time and it was in a therapeutic setting at a location that I do not remember and with a provider whose name I forget.**

Q Have you consumed marijuana with your girlfriend?

A **Yes, I have.**

Q Okay. Any other substances with your girlfriend?

A **No, I have not.**

Q Psilo -- psil --

MS. AMMEL: Psilocybin.

Q That one.

A I have not consumed psilocybin --
Q Never?
A -- with my girlfriend. No.
Q Have you ever consumed it?
A Yes, I have consumed psilocybin.
Q When?
A In 2008. We got home from this crazy fifteen-month adventure in which I allegedly had converted to Islam and not -- didn't cause a mass destruction to Islam at a very -- at a very young age.
Then we came home from deployment and one night we were pretty hammered. One of the guys pulled out some mushrooms and we ate some mushrooms and watched the trees grow and the fire get big and it was wild.
And it was like a really good maturing moment 'cause I was pretty reckless with my life up to that point, and I had like a horrible trip that night about waking up in the -- like I thought I was in the ICU with third degree burns all over my body. And after that I was much more responsible and took much less risk with my -- with my body.
Q When was the last time you used mushrooms?
A I don't recall.
Q Do you recall locking Heather out of the marital home?
A I remember a time when Heather was in such a fit of

rage and I was in so much fear for -- that I was going to be physically abused that the only logical thing my brain could think of in a moment of panic was to lock the door so I could run out of the other side of the house. Yes, I'm one hundred percent sure that has happened.

Q Okay. That you -- that you locked just the front door, not the other doors?

A I -- we don't live like in the -- like the Arctic Circle. Like I've never like abandoned her like in the wild. But when she's been trying to physically abuse me, I have locked the door and then run out of the other side of the house so that I wasn't physically abused. Like she didn't go long without like food and water or shelter or anything.

I don't -- what -- I think that seems like a pretty rational response to someone trying to be physically assaulted and preventing that from happening. What would you do in that situation, Whitney?

Q So yes, you locked her out of the house?

A Yes, Whitney, to protect myself from a physical assault, I probably locked her out of the house on an occasion.

Q Are you engaged?

A I am not engaged, no.
Q Have the two of you discussed getting married?
A No, we have not.
Q Have you discussed living together?
A We haven't seriously discussed living together, no.
Q Have there been discussions of you relocating to her in Arizona?
A We have already discussed extensively that yes, it makes sense with my professional opportunities and both my personal interest that I would like to move to Arizona at some point. I think that that makes sense. We have no ties here in North Carolina.
I think it's a -- almost like a trauma farming thing where special operators get out and then they stay in this town and it's very unhealthy for their mental health to have one foot into what was a very -- into their old life.
I think that's a big part of the problem why we're seeing so many of the -- like the really high quality guys are just kind of wasting away, getting drunk at McDonald's or whatever every night.
Q So how is living here impacting you?
A I -- it's not that I don't still have connections to this community here and don't still have some professional connections to this community. But the

work that I'm doing now, I don't need to be located at the home of U.S. Army Special Operations anymore.

It doesn't make sense for me to be here, over an hour from a major airport, which impacts my professional life greatly. I've spent more time in the past two and a half years driving up Highway 1 than I care for.

Q So if the kids are living here, does your staying here going to impact your mental health or well being?

A Whitney, I'm going to have fifty-fifty custody of my children. That is the greatest thing that could affect my mental health and well being. Where I am with those children, we will figure out at a later time in these divorce proceedings.

You and Heather have made no attempt to make this process cordial or professional, and I think that we're going to get to the point that the court is going to have to order us on how this is going to proceed, because we're at the point that you are accusing me of being an Islamic terrorist on record. That's a strange thing, strange -- strange reach.

Q So if the court maintains the current schedule, would you still stay in Moore County?

A If the court maintains this current schedule?

Q Yes, sir.

A If the court maintains this current schedule, then I am obviously going to see my kids at every opportunity that I can, given the ridiculous temporary agreement that we were forced into signing.

If that stands, I obviously will have much more work to do in the bigger picture of the issue behind this divorce then.

Q So you would or would not stay in Moore County?

A I mean, if -- my full-time job will be getting judicial oversight if I -- if this temporary custody agreement stands.

Q What does judicial oversight mean to you? What do you think that -- what does that mean?

A I think that an unfortunate part of what happened, what has happened with our government is you have these little tiny fiefdoms that are created.

And I don't think that Steve Bibey is probably a bad person. I know that he's a veteran himself and was a law enforcement officer.

But when someone's power goes unchecked for too long, they become authoritarian. And if you were to take a simple cell phone video of the way Steve Bibey addresses the people that are going to him and treating him respectfully and asking them questions as they are going through what is a unbelievably

confusing and like emotionally traumatizing experience, and for him to talk to them like they are his subjects is indicative of a broken government.

And when that happens is you have to bring authority down on top of them to say, yes, you've gotten away with this for too long. Here is a slap on the wrist, stop it. This is small town socialism. You are extracting the wealth of patriots to pay for parasites, to pay for Ron Scott's cocaine and Whitney's new broom.

MS. FOUSHEE: That's a lovely note to end on. Let me take a break and see if I want to ask anything else.

(DISCUSSION OFF RECORD)

(THEREUPON THE WITNESS WAS DISMISSED.)

State of North Carolina
Wake County

CERTIFICATE

I, Cynthia J. Dotson, Notary Public/Reporter, do hereby certify that Matthew Joseph Ammel was duly sworn by me prior to the taking of the foregoing deposition: And that said deposition was taken by me and that the foregoing 138 pages constitute a true and accurate transcript of the testimony of the witness.

I do further certify that I am not of counsel for or in the employment of either of the parties to this action, nor am I interested in the results of this action.

In witness whereof, I have hereunto subscribed my name this 27th day of August, 2025.

Cynthia J. Dotson
Certificate No. 19972120061

PLAINTIFF'S EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO. 1:26-cv-00038

| | | |
|---|---|---|
| **HEATHER AMMEL,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **NOTICE OF DEPOSITION OF MATTHEW AMMEL** |
| **KYRSTEN SINEMA,** | ) | |
| **Defendant.** | ) | |

To: Mr. Matthew Ammel
Camp San Luis Obispo
Post Operations Building 738
10 Sonoma Avenue
San Luis Obispo, CA 93405

**PLEASE TAKE NOTICE** that the undersigned counsel for Plaintiff, will, pursuant to Rule 30 of the Federal Rules of Civil Procedure, take your oral examination beginning at **12:00 p.m. EDT (9:00 a.m. PDT) on July 28, 2026,** via Zoom, for the purposes of discovery or for use in evidence, or for any other lawful purpose. The deposition will continue day to day until completed and will be taken before an officer authorized to administer oaths and to take such depositions by the laws of North Carolina, will be recorded by audio and stenographic means, and may be videotaped. You are required by this notice to be present for your deposition.

This, the 16th day of July 2026.

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

By: Mary Catherine Coltrane

Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that the undersigned has this date served the foregoing **NOTICE OF DEPOSITION OF MATTHEW AMMEL** upon the persons listed below via e-mail addressed as follows:

POYNER & SPRUILL
*Attorneys for Defendant Kyrsten Sinema*
Steven B. Epstein, Esq.
Abigail R. Jenkins, Esq.
301 Fayetteville Street, Suite 1900
Post Office Box 1801 (27602-1801)
Raleigh, North Carolina 27601
Telephone: (919) 783-2846
Facsimile: (919) 783-1075
sepstein@poynerspruill.com
ajenkins@poynerspruill.com

PARKER BRIAN FAMILY LAW
Brent Tanner, Esq.
104 N McNeill Street
Carthage, North Carolina 28327
brent.tanner@parkerbryanfamilylaw.com

Mr. Matthew Ammel
Camp San Luis Obispo
Post Operations Building 738
10 Sonoma Avenue
San Luis Obispo, CA 93405

This, the 16th day of July 2026.

**VAN CAMP, MEACHAM & NEWMAN, PLLC**
*Attorneys for Plaintiff*

By: Mary Catherine Coltrane

Thomas M. Van Camp, N.C. State Bar No. 16872
Mary Catherine Coltrane, N.C. State Bar No. 60820
Post Office Box 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com
marycatherine@vancamplaw.com

# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | | |
|---|---|---|
| HEATHER AMMEL<br>*Plaintiff*<br>v.<br>KYRSTEN SINEMA<br>*Defendant* | ) | Civil Action No. 1:26-cv-00038 |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: MATTHEW AMMEL
Camp San Luis Obispo, 10 Sonoma Avenue, San Luis Obispo, CA 93405

*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: via ZOOM | Date and Time: 07/28/2026 12:00 pm (EDT) |
|---|---|

The deposition will be recorded by this method: The deposition will be taken before an officer authorized to administer oath

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

SEE EXHIBIT A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 07/16/2026

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk* | *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiff , who issues or requests this subpoena, are:

Thomas M. Van Camp, Esq. Van Camp, Meacham & Newman, PLLC. P.O. Box 1389, Pinehurst, North Carolina 28374

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 1:26-cv-00038

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________________
on *(date)* ______________ .

❐ I served the subpoena by delivering a copy to the named individual as follows: ______________
__________________________________________________________________________
__________________________________________ on *(date)* ______________ ; or

❐ I returned the subpoena unexecuted because: ______________________________________
__________________________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT A**

1. Please produce all communications between you and Kyrsten Sinema from 1 April 2022 through 1 November 2024, including but not limited to correspondence, emails, text (SMS) messages, Signal messages, audio or video recordings, voicemails, and encrypted messages.

2. Please produce all documents in your custody, control, or possession which constitute, evidence, relate, or make reference to complete copies of your telephone records, including but not limited to the following numbers: 913-240-4005, 202-981-2041, and 602-890-3368, indicating the location of every call made and received and every text (SMS) message sent and received by and between you and Kyrsten Sinema from 1 April 2022 to 1 November 2024, or make reference to any and all travel by you and Kyrsten Sinema to any State within the United States during the period 1 April 2022 to 1 November 2024, including but not limited to credit card statements, receipts, hotel reservation confirmations, rental contracts for accommodations or car rentals, airfare charges or airline tickets, or other similar documents.

PLAINTIFF'S EXHIBIT 7




AMMEL 1st POD 629/630




AMMEL 1st POD 630/630

PLAINTIFF'S EXHIBIT 8

**CONFIDENTIAL**

Confirmation code: **WGWCIJ**

## Monday, September 30, 2024

**RDU**
Raleigh-Durham
**2:45 PM**

**AA 468**

**CLT**
Charlotte
**3:55 PM**

Seat: **13C**
Class: **Economy (G)**
Meals:

**CLT**
Charlotte
**4:55 PM**

**AA 540**

**PHX**
Phoenix
**6:21 PM**

Seat: **24C**
Class: **Economy (G)**
Meals: **Food for purchase**

## Thursday, October 3, 2024

**PHX**
Phoenix
**6:22 AM**

**AA 1158**

**CLT**
Charlotte
**1:31 PM**

Seat: **11E**
Class: **Economy (G)**
Meals: **Food for purchase**

**CLT**
Charlotte
**2:37 PM**

**AA 1665**

**RDU**
Raleigh-Durham
**3:31 PM**

Seat: **14C**
Class: **Economy (G)**
Meals:

**Manage your trip**

# Your purchase

**Matthew Ammel - AAdvantage® #: U50******

| | |
|---|---|
| New ticket (0012176641332)<br>[$594.18 + Taxes & carrier-imposed fees $93.76] | $687.94 |
| Main Cabin Extra (CLT-PHX)<br>Document #: (0010610235134)<br>[$65.15 + Taxes & carrier-imposed fees $4.89] | $70.04 |
| Main Cabin Extra (PHX-CLT)<br>Document #: (0010610235134)<br>[$42.57 + Taxes & carrier-imposed fees $3.19] | $45.76 |
| **Total cost** | **$803.74** |

# Your payment

| | |
|---|---|
| MasterCard (ending 3630 ) | $803.74 |
| Total paid | **$803.74** |

## Bag information

Bag fees apply at each Check-in location. Additional allowances and/or discounts may apply. For information regarding American Airlines checked baggage policies, please visit: Bag and optional fees

If your flight is operated by a partner airline, see the other airline's website for carry-on and checked bag policies.

Carry-on bags (American Airlines)

| | |
|---|---|
| **Personal item** | A small purse, briefcase, laptop bag, or similar item that must fit under the seat in front of you. |
| **Carry-on** | Maximum dimensions must not to exceed: 22" long x 14" wide x 9" tall (56 x 35 x 23 cm). |

Book a hotel »

Buy trip insurance »

Book a car »

Vacations »




Contact us
Privacy policy

**Download the American app**

Download on the App Store | GET IT ON Google Play

© 2024 American Airlines, Inc. All Rights Reserved.

You have up to 24 hours from the time of ticket purchase to receive a full refund if you booked at least 2 days before departure. Once canceled, your refund will be processed automatically.

If you have purchased a NON-REFUNDABLE fare, the itinerary must be canceled before the ticketed departure time of the first unused coupon or the ticket has NO VALUE. If the fare allows changes, a fee may be assessed for changes and restrictions may apply.

Some American Airlines check-in counters do not accept cash as a form of payment. For more information, visit our Airport Information page.




Some everyday products, like e-cigarettes and aerosol spray starch, can be dangerous when transported on the aircraft in carry-on and/or checked baggage. Changes in temperature or pressure can cause some items to leak, generate toxic fumes or start a fire. Carriage of prohibited items may result in fines or in certain cases imprisonment. Please ensure there are no forbidden hazardous materials in your baggage like

Some Lithium batteries (e.g. spares in checked baggage, batteries over a certain size), Explosives / Fireworks, Strike anywhere matches/ Lighter fluid, Compressed gases / Aerosols Oxygen bottles/ Liquid oxygen. Flammable liquids, Pesticides/ Poison, Corrosive material.

There are special exceptions for small quantities (up to 70 ounces total) of medicinal and toilet articles carried in your luggage, spare lithium batteries for most consumer electronic devices in carry-on baggage, and certain

smoking materials carried on your person.

Certain items are required to be carried with you onboard the aircraft. For example, spare lithium batteries for portable electronic devices, cigarette lighters and e-cigarettes must be removed from checked or gate-checked baggage and carried onboard the aircraft. However, e-cigarettes may not be used on-board the aircraft.

Traveling with medical oxygen, liquid oxygen, mobility aids and other assistive devices may require airline pre-approval or be restricted from carriage entirely. Passengers requiring these items should contact the airline operator for information on use of such devices.

NOTICE OF INCORPORATED TERMS OF CONTRACT

Air Transportation, whether it is domestic or international (including domestic portions of international journeys), is subject to the individual terms of the transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage. Other carriers on which you may be ticketed may have different conditions of carriage. International air transportation, including the carrier's liability, may also be governed by applicable tariffs on file with the U.S. and other governments and by the Warsaw Convention, as amended, or by the Montreal Convention. Incorporated terms may include, but are not restricted to: 1. Rules and limits on liability for personal injury or death, 2. Rules and limits on liability for baggage, including fragile or perishable goods, and availability of excess valuation charges, 3. Claim restrictions, including time periods in which passengers must file a claim or bring an action against the air carrier, 4. Rights on the air carrier to change terms of the contract, 5 Rules on reconfirmation of reservations, check-in times and refusal to carry, 6. Rights of the air carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of alternate air carriers or aircraft and rerouting.

You can obtain additional information on items 1 through 6 above at any U.S. location where the transporting air carrier's tickets are sold. You have the right to inspect the full text of each transporting air carrier's terms at its airport and city ticket offices. You also have the right, upon request, to receive (free of charge) the full text of the applicable terms incorporated by reference from each of the transporting air carriers. Information on ordering the full text of each air carrier's terms is available at any U.S. location where the air carrier's tickets are sold or you can click on the Conditions of Carriage link below.

Air transportation on American Airlines and the American Eagle carriers® is subject to American's **conditions of carriage.**

For more on Canada passenger protection regulations visit **aa.com/CanadaPassengers**.

Please do not reply to this email address as it is not monitored. This email was sent to m.ammel3222@gmail.com.

NOTICE: This email and any information, files or attachments are for the exclusive and confidential use of the intended recipient. This message contains confidential and proprietary information of American Airlines (such as customer and business data) that may not be read, searched, distributed or otherwise used by anyone other than the intended recipient. If you are not an intended recipient, do not read, distribute, or take action in reliance upon this message. Do you think you received this email by mistake? If so, please forward this email to us with an explanation.

For all other questions about bookings or upcoming trips, visit our contact page. Contact American >

**one**world is a registered trademark of **one**world Alliance, LLC.

**CONFIDENTIAL**

Confirmation code: **FALQSD**

**Sunday, October 6, 2024**

| | |
|---|---|
| **RDU**<br>Raleigh-Durham<br>**4:21 PM** | **AA 2704** |
| **CLT**<br>Charlotte<br>**5:30 PM** | Seat: **14D**<br>Class: **Economy (G)**<br>Meals: |
| **CLT**<br>Charlotte<br>**6:02 PM** | **AA 809** |
| **PHX**<br>Phoenix<br>**7:25 PM** | Seat: **11B**<br>Class: **Economy (G)**<br>Meals: **Food for purchase** |

**Thursday, October 10, 2024**

| | |
|---|---|
| **PHX**<br>Phoenix<br>**5:00 AM** | **AA 392** |
| **CLT**<br>Charlotte<br>**12:02 PM** | Seat: **11B**<br>Class: **Economy (S)**<br>Meals: **Food for purchase** |
| **CLT**<br>Charlotte<br>**1:13 PM** | **AA 1897** |
| **RDU**<br>Raleigh-Durham<br>**2:14 PM** | Seat: **14C**<br>Class: **Economy (S)**<br>Meals: |

**Manage your trip**

# Your purchase

**Matthew Ammel - AAdvantage® #: U50******

| | |
|---|---|
| New ticket (0012176645257)<br>[$563.49 + Taxes & carrier-imposed fees $91.46] | $654.95 |
| Main Cabin Extra (CLT-PHX)<br>Document #: (0010610235907)<br>[$65.15 + Taxes & carrier-imposed fees $4.89] | $70.04 |
| Main Cabin Extra (PHX-CLT)<br>Document #: (0010610235907)<br>[$35.48 + Taxes & carrier-imposed fees $2.66] | $38.14 |
| **Total cost** | **$763.13** |

# Your payment

| | |
|---|---|
| MasterCard (ending 3630 ) | $763.13 |
| Total paid | **$763.13** |

## Bag information

**Checked Bag (Airport)**

| | |
|---|---|
| 1st bag | No charge |
| 2nd bag | $45.00 |

**Checked Bag (Online*)**

| | |
|---|---|
| 1st bag | No charge |
| 2nd bag | $45.00 |

Maximum dimensions: 62 inches or 158 centimeters calculated as (length + width + height)
Maximum weight: 50 pounds or 23 kilograms
Bag fees apply at each Check-in location. Additional allowances and/or discounts may apply. For information regarding American Airlines checked baggage policies, please visit: Bag and optional fees

If your flight is operated by a partner airline, see the other airline's website for carry-on and checked bag policies.

*Online payment available beginning 24 hours (and up to 4 hours) before departure.

Carry-on bags (American Airlines)

**Personal item** A small purse, briefcase, laptop bag, or similar item that

must fit under the seat in front of you.

| | |
|---|---|
| **Carry-on** | Maximum dimensions must not to exceed: 22" long x 14" wide x 9" tall (56 x 35 x 23 cm). |

Book a hotel »

Book a car »

Buy trip insurance »

Vacations »




Contact us
Privacy policy

**Download the American app**

Download on the App Store

GET IT ON Google Play

© 2024 American Airlines, Inc. All Rights Reserved.

You have up to 24 hours from the time of ticket purchase to receive a full refund if you booked at least 2 days before departure. Once canceled, your refund will be processed automatically.

If you have purchased a NON-REFUNDABLE fare, the itinerary must be canceled before the ticketed departure time of the first unused coupon or the ticket has NO VALUE. If the fare allows changes, a fee may be assessed for changes and restrictions may apply.

Some American Airlines check-in counters do not accept cash as a form of payment. For more information, visit our Airport Information page.

Lithium Batteries Explosives Radioactive Corrosives

Some everyday products, like e-cigarettes and aerosol spray starch, can be dangerous when transported on the aircraft in carry-on and/or checked baggage. Changes in temperature or pressure can cause some items to leak, generate toxic fumes or start a fire. Carriage of prohibited items may result in fines or in certain cases imprisonment. Please ensure there are no forbidden hazardous materials in your baggage like:

Some Lithium batteries (e.g. spares in checked baggage, batteries over a certain size), Explosives / Fireworks, Strike anywhere matches/ Lighter fluid, Compressed gases / Aerosols Oxygen bottles/ Liquid oxygen, Flammable liquids, Pesticides/ Poison, Corrosive material.

There are special exceptions for small quantities (up to 70 ounces total) of medicinal and toilet articles carried in your luggage, spare lithium batteries for most consumer electronic devices in carry-on baggage, and certain smoking materials carried on your person.

Certain items are required to be carried with you onboard the aircraft. For example, spare lithium batteries for portable electronic devices, cigarette lighters and e-cigarettes must be removed from checked or gate-checked baggage and carried onboard the aircraft. However, e-cigarettes may not be used on-board the aircraft.

Traveling with medical oxygen, liquid oxygen, mobility aids and other assistive devices may require airline pre-approval or be restricted from carriage entirely. Passengers requiring these items should contact the airline operator for information on use of such devices.

NOTICE OF INCORPORATED TERMS OF CONTRACT

Air Transportation, whether it is domestic or international (including domestic portions of international journeys), is subject to the individual terms of the transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage. Other carriers on which you may be ticketed may have different conditions of carriage. International air transportation, including the carrier's liability, may also be governed by applicable tariffs on file with the U.S. and other governments and by the Warsaw Convention, as amended, or by the Montreal Convention. Incorporated terms may include, but are not restricted to: 1. Rules and limits on liability for personal injury or death, 2. Rules and limits on liability for baggage, including fragile or perishable goods, and availability of excess valuation charges, 3. Claim restrictions, including time periods in which passengers must file a claim or bring an action against the air carrier, 4. Rights on the air carrier to change terms of the contract, 5. Rules on reconfirmation of reservations, check-in times and refusal to carry, 6. Rights of the air carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of alternate air carriers or aircraft and rerouting.

You can obtain additional information on items 1 through 6 above at any U.S. location where the transporting air carrier's tickets are sold. You have the right to inspect the full text of each transporting air carrier's terms at its airport and city ticket offices. You also have the right, upon request, to receive (free of charge) the full text of the applicable terms incorporated by reference from each of the transporting air carriers. Information on ordering the full text of each air carrier's terms is available at any U.S. location where the air carrier's tickets are sold or you can click on the Conditions of Carriage link below.

Air transportation on American Airlines and the American Eagle carriers® is subject to American's conditions of carriage.

For more on Canada passenger protection regulations visit aa.com/CanadaPassengers.

Please do not reply to this email address as it is not monitored. This email was sent to m.ammel3222@gmail.com.

NOTICE: This email and any information, files or attachments are for the exclusive and confidential use of the intended recipient. This message contains confidential and proprietary information of American Airlines (such as customer and business data) that may not be read, searched, distributed or otherwise used by anyone other than the intended recipient. If you are not an intended recipient, do not read, distribute, or take action in reliance upon this message. Do you think you received this email by mistake? If so, please forward this email to us with an explanation.

For all other questions about bookings or upcoming trips, visit our contact page. Contact American >

**one**world is a registered trademark of **one**world Alliance, LLC.

PLAINTIFF'S EXHIBIT 9




02:41
KS
8h
Yesterday
I hope your day was ok 20:54
Thinking of you 20:54
I really miss you. 22:38
I am with you 22:59
Today
I keep waking up during my sleep and reaching over for your arms to hold me. 01:18
You deleted this message.
19m
New Messages
What did you write and delete 1m
I am here 1m
Message


KS
Thu, Jun 20 at 12:02 PM
Noah Kahan: We'll All Be Here Forever Tour
verified-ticket.com
Thu, Jul 18 at 1:32 PM
KS's location expired
KS started sharing location with you.
Mon, Jul 29 at 6:13 PM
KS's location expired
Tue, Aug 6 at 9:31 AM
1787 enter
Today 12:38 AM
I cannot sleep, I am miserable, and I want at least one of my pens back. You have them both. Pls give me one back now.
iMessage
8/19/24
7/22/24


08:00
LTE
K S
8h
K S
+1 602-904-9665
Member of R2R, Bottlerock, and 3 additional groups
Yesterday
I miss you 21:57
Putting my hand on your heart 21:58
I'll see you soon 21:58
Today
Are you having an affair with my husband
Now
Message