IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| HEATHER AMMEL,<br><br>Plaintiff,<br>v.<br><br>KYRSTEN SINEMA,<br><br>Defendant. | 1:26-CV-38 |

**ORDER**

Plaintiff Heather Ammel, a North Carolina resident, filed this action alleging alienation of affection and punitive damages in Moore County Superior Court. *See Complaint*, D.E. 2 (Jan. 13, 2026). Defendant Kyrsten Sinema, an Arizona resident, filed a notice of removal to this Court. *See Notice of Removal*, D.E. 1 (Jan. 13, 2026). Ms. Sinema moved to dismiss the action for lack of personal jurisdiction. *See Motion to Dismiss for Lack of Jurisdiction*, D.E. 14 (Mar. 12, 2026). Considering the relevant standards, this Court allowed limited discovery solely on the issue of personal jurisdiction and held an evidentiary hearing on August 19, 2026. *See Order*, D.E. 20 (May 7, 2026). Based on the pleadings, jurisdictional evidence, and evidentiary hearing, this Court denies the motion to dismiss.

**FACTUAL BACKGROUND**[1]

Ms. Ammel married Matthew Ammel in 2010. *Plaintiff's Supplemental Brief on Personal Jurisdiction, Exhibit 3 – Deposition of Mr. Ammel*,[2] p. 17, D.E. 37-3

[1] This description of the facts reflects the Court's factual findings under the preponderance of the evidence standard discussed below. In making this determination, the Court did make credibility determinations, some of which are discussed further below. These credibility determinations and factual findings are made only for the purposes of determining personal jurisdiction.

[2] Ms. Sinema and Ms. Ammel both attach the depositions of Ms. Sinema, Ms. Ammel, and Mr. Ammel to their supplemental briefs. Because Ms. Ammel filed the complete depositions rather than excerpts, the Court cites to the depositions filed by Ms. Ammel.

(Aug. 12, 2026). From 2014 through November 2024, they resided in Whispering Pines, North Carolina, with their three children. *Id*. at 17, 71.

Mr. Ammel met Ms. Sinema in August 2022, following his retirement from the military. *Id*. at 19–20. At that time, Ms. Sinema was serving as a United States Senator for the State of Arizona. *Plaintiff's Supplemental Brief on Personal Jurisdiction, Exhibit 2 – Deposition of Ms. Sinema*, pp. 11–17, D.E. 37-2 (Aug. 12, 2026). During her tenure in the Senate, Ms. Sinema maintained residences in both Arizona and Washington, DC. *Id*. Ms. Sinema left the Senate and is currently a professor at Arizona State University and an attorney with Hogan Lovells Cadwalader in Washington, DC. *Id*. at 18.

In April 2022, Mr. Ammel was hired by TOA Group as a security guard. *Deposition of Mr. Ammel*, p. 20, D.E. 37-3. At the time, TOA Group provided security services for Ms. Sinema. *Id*. In October 2023, following a falling out between Ms. Sinema and TOA Group, Mr. Ammel began working for Kinsaker Security Group, which assumed responsibility for providing security services to Ms. Sinema. *Id*. at 20, 97. In 2023, Mr. Ammel also worked as an independent contractor for Ridgeline Defense and Staccato 2011, providing firearms training. *Id*. at 97–98. In June 2024, Mr. Ammel became a W-2 employee of the United States Senate, where he worked for Ms. Sinema, while continuing to work for Kinsaker Security Group. *Id*. at 98. Thus, although Mr. Ammel worked for different employers during this period, from August 2022 through November 2024, he was a member of Ms. Sinema's security team. In that capacity, he was "responsible for all movement and security of both Kyrsten and her staff during campaign events and fundraising events." *Id*. at 21.

Ms. Sinema and Mr. Ammel took their first trip alone together, traveling to Napa Valley, California, in the fall of 2023. *Id.* at 22; *Plaintiff's Supplemental Brief on Personal Jurisdiction, Exhibit 1 – Deposition of Ms. Ammel*, pp. 28–29, D.E. 37-1 (Aug. 12, 2026). Around the same time, Mr. Ammel traveled with Ms. Sinema to Colorado as part of her security detail. *Deposition of Ms. Ammel*, p. 29, D.E. 37-1.

In December 2023, Ms. Sinema met Ms. Ammel for the first time when Mr. Ammel brought his wife to Las Vegas, Nevada, for a U2 concert with Ms. Sinema. *Deposition of Ms. Sinema*, pp. 75, 124–125, D.E. 37-2. Around that time, Ms. Sinema learned that Mr. Ammel lived in North Carolina with his wife and three children. *Id.* at 70. Ms. Sinema testified that she believed Mr. Ammel told her he resided in North Carolina in the winter of 2023. *Id.*

Ms. Sinema and Mr. Ammel began texting through Signal in December 2023. *Deposition of Mr. Ammel*, pp. 24–25, D.E. 37-3. Signal allows users to set messages

to automatically delete after a specified period. *Id*. at 28–29. Both Ms. Sinema and Mr. Ammel set their Signal accounts to delete messages after eight hours. *Id*.; *Deposition of Ms. Sinema*, pp. 91–92, D.E. 37-2. According to Mr. Ammel, Ms. Sinema began sending him Signal messages while he was in North Carolina in 2024. *Deposition of Mr. Ammel*, pp. 23–25, D.E. 37-3. Ms. Ammel read seven of those messages by picking up Mr. Ammel's phone off the kitchen counter of their North Carolina home:

> 1. In January 2024, Ms. Sinema sent Mr. Ammel a message about helping him with his mental health.
>
> 2. In Spring 2024, Ms. Sinema sent Mr. Ammel a picture of her bare back wrapped in a towel with bruising from cupping.
>
> 3. In Spring 2024, Ms. Sinema sent Mr. Ammel a message about only wanting to be intimidating to her opponents, not people she likes.
>
> 4. In Spring 2024, Ms. Sinema sent Mr. Ammel a message asking him to bring MDMA on a work trip so she could guide him through a psychedelic experience.
>
> 5. In Spring 2024, Ms. Sinema sent Mr. Ammel a message asking him to watch a Netflix documentary on MDMA.
>
> 6. Mr. Ammel sent Ms. Sinema a message about "having sex missionary style with the lights on," to which Ms. Sinema responded, "Boring!" Ms. Ammel does not allege a date for this message.
>
> 7. In Spring 2024, Ms. Sinema sent Mr. Ammel a message stating that she was on her way to see Depeche Mode.

*Defendant's Supplemental Brief on Personal Jurisdiction, Exhibit A – Plaintiff's Responses to Defendant's Interrogatories*, pp. 8–11, D.E. 39-1 (Aug. 12, 2026). On March 7, 2024, Ms. Ammel witnessed Mr. Ammel messaging Ms. Sinema while they were in their North Carolina home, asking why she was not attending the State of the Union address, and she responded that she did not need to listen to an old man talk about legislation she wrote. *Deposition of Mr. Ammel*, p. 35, D.E. 37-3; *Deposition of Ms. Ammel*, pp. 24–25, D.E. 37-1.

According to Mr. Ammel and Ms. Sinema, they first had sexual intercourse at an Airbnb in Napa, California, on May 27, 2024. *Deposition of Ms. Sinema*, pp. 35–37, D.E. 37-2. Their physical relationship continued throughout the summer of 2024, including sexual encounters in mid-June 2024 in New York City, mid-July 2024 in Washington, D.C., and late August 2024 in Aspen, Colorado. *Id*. at 56–62.

Because of the nature of Signal messages, the record contains evidence of only one message that Ms. Sinema sent to Mr. Ammel during the summer of 2024:




*Deposition of Ms. Ammel*, pp. 339–340, D.E. 37-1. Ms. Ammel was on vacation in Kansas with Mr. Ammel when he received the above message. *Id*. at 58–59.

Mr. Ammel and Ms. Sinema spent the night together and had sex on October 2, 2024, at Ms. Sinema's home in Phoenix. *Deposition of Ms. Sinema,* pp. 61–63, D.E. 37-2. Ms. Sinema testified that she knew that Mr. Ammel was scheduled to fly out of Phoenix early the following day; however, she testified that she did not know that he was going to North Carolina for his daughter's birthday. Based on flight records, on October 3, 2024, Mr. Ammel departed Phoenix at approximately 6:22 a.m. and arrived in North Carolina around 3:31 p.m. *Id.* at 353. Ms. Sinema sent the following message to Mr. Ammel at 9:57 p.m. on October 3, 2024, while he was in North Carolina:



*Id.* at 78–81, 365. Ms. Ammel opened the message from Ms. Sinema and responded in the early hours of October 4, 2024, "Are you having an affair with my husband[.]" *Id.* Ms. Sinema did not respond. *Id*.

Throughout 2024, Mr. and Ms. Ammel's marital relationship was strained, at least in part because of Mr. Ammel's relationship with Ms. Sinema. *See, e.g., Plaintiff's Supplemental Brief on Personal Jurisdiction, Exhibit 4 – Text Messages between Mr. Ammel and Ms. Ammel*, D.E. 37-4 (Aug. 12, 2026) ("I need to say this over text. She's insidious. Yes, she might care about you and want to help you, but it's to her own gain. This is a woman who is willing to break up a family. Why do you want to align yourself with someone who doesn't respect your marriage and family? She's a home wrecker. She knows you're vulnerable, and has taken advantage of that. And I get why you feel comforted by her. But underlying that is more darkness. She has you in her web now. I'm telling you if our marriage ends, and you continue this emotional affair (if not physical at this point) the girls will never forgive you. That is not a threat either. It's just what will happen. And I don't want to see them damaged in that way. Please do not throw away our family that I love SO much for someone as selfish as she is. I love you more than anything. I don't ever want to lose you. I'm going to do everything in my [*sic*] power to fix my shit so we can have a happy marriage. I need to know that you are willing too."). Their text messages reflect periods of conflict and reconciliation. *Id*. Nevertheless, October 25-26, 2024, Mr. and Ms. Ammel took an anniversary trip together that included sexual intimacy and was followed by text messages in which they expressed their love for one another. *Declaration of Heather Ammel, Exhibit C – Text Messages*, D.E. 18-3 (April 17, 2026).[3] During this time, Ms. Sinema was around Ms. Ammel and the Ammel children. Ms. Sinema attended a concert with one of the Ammel children and gave them a tour of the Capitol in July 2024.

[3] Mr. Ammel testified that this trip was not an anniversary trip and that they did not have sex on this trip. *Deposition of Mr. Ammel*, pp. 63–64, D.E. 37-3. But this Court finds Ms. Ammel's account more credible. *See Deposition of Ms. Ammel*, pp. 148-152, D.E. 37-1. First, the text messages following the trip are warm and include "I love you" messages by both Mr. and Ms. Ammel. *See Text Messages*, D.E. 18-3. Second, Mr. Ammel admitted lying under oath in his custodial deposition on key points, including his sexual relationship with Ms. Sinema. *Deposition of Mr. Ammel*, pp. 111–112, D.E. 37-3. His depositions contain multiple statements that conflict with his previous deposition and Ms. Sinema's deposition. *See e.g. id.* at 24–27, 47–49, 53–54, 56. Mr. Ammel did not testify at the hearing and does not have a record of telling the truth in this matter. Therefore, the Court finds Ms. Ammel more credible than Mr. Ammel.

*Plaintiff's Discovery Responses*, p. 14, D.E. 39-1. Ms. Ammel and the Ammel children also attended a Taylor Swift concert with Ms. Sinema in mid-October 2024. *Deposition of Ms. Ammel*, pp. 146–47, D.E. 37-1.

Mr. and Ms. Ammel ultimately separated on November 1, 2024. *See Complaint*, p. 8, D.E. 2.[4]

## LEGAL STANDARD

"The plaintiff's burden in establishing jurisdiction varies according to the posture of a case and the evidence that has been presented to the court." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). If the court considers personal jurisdiction based on the pleadings, the plaintiff only needs to make a *prima facie* showing. *Id*. But because a plaintiff must establish personal jurisdiction at every stage, including ultimately "by a preponderance of the evidence," the Fourth Circuit has said that "the better course is for the district court to follow a procedure that allows it to dispose of the motion as a preliminary matter." *Id*. Therefore, since this Court allowed discovery on personal jurisdiction and an evidentiary hearing, Ms. Ammel must establish personal jurisdiction by a preponderance of the evidence. *Id*.

"The burden of showing something by a preponderance of the evidence, the most common standard in the civil law, simply requires the trier of fact to believe

[4] Ms. Sinema argues that any facts after the separation are irrelevant. *Defendant's Supplemental Brief*, pp. 18–19, D.E. 39; *Defendant's Memorandum on Motion to Dismiss*, p. 19, D.E. 15 (March 12, 2026). Ms. Ammel argues that these later facts can provide context and corroboration for earlier periods of the relationship. *Plaintiff's Supplemental Brief*, p. 13, D.E. 37; *see Beavers v. McMican*, 385 N.C. 629, 629 (2024) ("[E]vidence of post-separation conduct may be used to corroborate pre-separation conduct, so long as the evidence of pre-separation conduct gives rise to more than mere conjecture."). Here, to the extent Ms. Sinema suggests her relationship with Mr. Ammel was a fleeting sex-only relationship, later conduct undermines this claim. That conduct includes: (1) Mr. Ammel and Ms. Sinema are still in a romantic relationship and stay with each other 4-6 days each month, *Deposition of Ms. Sinema*, pp. 10, 21–22, D.E. 37-2; (2) Ms. Sinema called Mr. Ammel on November 1, 2024 and talked for 48 minutes, *Id*. at 50; (3) Ms. Sinema was with Mr. Ammel in North Carolina in May, August, and September 2025, *Id*. at 50–51, *Plaintiff's Discovery Responses*, p. 16, D.E. 39-1; and (4) Ms. Sinema bonded Mr. Ammel out of jail in November 2025, *Plaintiff's Discovery Responses*, pp. 16–17, D.E. 39-1, *Deposition of Mr. Ammel*, p. 12, D.E. 37-3. In any event, given its findings below, this Court does not need to rely on this post-separation conduct.

that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 622 (1993) (internal quotation marks and citations omitted).

**ANALYSIS**

In North Carolina, "whether a nonresident defendant is subject to personal jurisdiction in this State's courts involves a two-step analysis." *Schaeffer v. SingleCare Holdings, LLC*, 384 N.C. 102, 106 (2023) (quoting *State ex rel. Stein v. E. I. du Pont de Nemours & Co.*, 382 N.C. 549, 556 (2022)). The first step is whether North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4, authorizes jurisdiction. *Schaeffer*, 384 N.C. at 106. However, the North Carolina Supreme Court has determined that the long-arm statute "make[s] available to the North Carolina courts the full jurisdictional powers permissible under federal due process." *Id.* (quoting *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676 (1977)). Therefore, the second step is "whether the Fourteenth Amendment's Due Process Clause permits a state court to exercise jurisdiction over a defendant." *Schaeffer*, 384 N.C. at 106 (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021)).

Two types of personal jurisdiction exist: specific and general. *Ford Motor Co.,* 592 U.S. at 358. General jurisdiction exists "when a defendant is essentially at home in the State." *Id*. (internal quotation marks and citations omitted). Conversely, specific jurisdiction exists when a defendant has "purposefully availed" themselves "of the privilege of conducting activities within the forum State." *Id*. at 359 (internal quotation marks and citations omitted). Here, Ms. Ammel does not argue that general jurisdiction exists, only that this Court has specific personal jurisdiction over Ms. Sinema.

A court may exercise specific jurisdiction when "the defendant has purposefully directed [its] activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotations and citations omitted). In determining whether specific jurisdiction exists, courts generally consider a three prong due process inquiry: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir.

2016) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 712 (4th Cir. 2002)).

A. Purposeful Availment

The first prong of the due process inquiry is whether "the defendant has purposefully directed [her] activities at residents of the forum." *Burger King Corp.*, 471 U.S. at 472 (internal quotations and citations omitted). "The purposeful-availment test is flexible, and [the] analysis proceeds on a case-by-case basis." *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co*., 682 F.3d 292, 302 (4th Cir. 2012). If a defendant has directed her intentional tortious conduct toward the forum state, courts may assess this prong through the "effects" test. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 398 n.7 (4th Cir. 2003); *Calder v. Jones*, 465 U.S. 783, 789 (1984); *Khashoggi v. NSO Group Techs. Ltd*., 138 F.4th 152, 160 (4th Cir. 2025). Under this test, the plaintiff must show "that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Carefirst*, 334 F.3d at 398 n.7.

*1. Intentional Tort*

Ms. Ammel alleges that Ms. Sinema has committed the intentional tort of alienation of affection. To establish an alienation of affection claim, a party must show: "(1) there was a marriage with love and affection existing between the husband and wife; (2) that love and affection was alienated; and (3) the malicious acts of the defendant produced the loss of that love and affection." *Fish v. Stetina*, 297 N.C. App. 733, 739, *review dismissed, cert. denied*, 915 S.E.2d 168 (2025) (internal quotations and citations omitted). A malicious act "include[s] any intentional conduct that would probably affect the marital relationship." *Id*. at 746 (internal citation and quotation marks omitted). However, in cases in which the defendant has engaged in sexual intercourse with the plaintiff's spouse, malice is conclusively presumed. *Id*. at 739 (internal citation and quotation marks omitted).

The evidence demonstrates that although the relationship between Mr. and Ms. Ammel was turbulent in 2024, there was still genuine love and affection between them, as reflected in their text messages. *See Text Messages between Mr. Ammel and Ms. Ammel*, D.E. 37-4. In October 2024, Mr. and Ms. Ammel took an anniversary trip that included intimacy and was followed by text messages in which they expressed their love for one another. *See Text Messages*, D.E. 18-3. The evidence also shows that love and affection was alienated by Mr. Ammel's relationship with

Ms. Sinema; *see Text Messages between Mr. Ammel and Ms. Ammel*, D.E. 37-4; *Deposition of Ms. Ammel*, pp. 96–98, D.E. 37-1; and since their relationship included a sexual relationship, malice is conclusively presumed. *See Fish,* 297 N.C. App. at 739.

*2. Focal Point of Harm*

The second factor is where the harm was felt. Ms. Ammel felt the harm in North Carolina, since her marital residence was there and there was no evidence that she traveled substantially outside of North Carolina.

*3. Focal Point of Tortious Activity*

The third factor is whether the "defendant expressly aimed [her] tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Carefirst*, 334 F.3d at 398 n.7. In *Calder*, the Supreme Court held that California could exercise personal jurisdiction over Florida-based reporters who wrote an allegedly libelous article about a California actress. 465 U.S. at 788–90. The Court reasoned that California was the "focal point" of both the story and the harm because the reporters knew the actress lived and worked there and would therefore suffer the effects of the alleged defamation there. *Id*.

Here, Ms. Ammel testified that she saw nine Signal messages from Ms. Sinema on Mr. Ammel's phone while he was in North Carolina. Ms. Sinema testified that she did not recall sending any of those messages, except the October 3rd message.

The Court finds Ms. Ammel credible in describing the existence of and context of the messages. Ms. Ammel's testimony has been generally consistent and supported by corroborating evidence. In addition, Ms. Ammel has acknowledged facts that hurt her case. In contrast, Ms. Sinema's testimony on several key matters has not been credible, with portions of her declaration contradicted by her testimony at the evidentiary hearing. *Motion to Dismiss for Lack of Personal Jurisdiction, Exhibit A – Declaration of Kyrsten Sinema*, ¶¶ 50–51, D.E. 14-1 (March 12, 2026). The Court also finds Ms. Sinema's testimony that her relationship with Mr. Ammel involved only sex, that she did not flirt with him, and that she would not have sent messages when he was not with her to be implausible.

Contrary to these claims, the texts that were preserved show an emotional connection between Mr. Ammel and Ms. Sinema. *See Deposition of Ms. Ammel*, pp. 339–340, 342, D.E. 37-1. Those messages, coupled with Ms. Sinema's connection with Mr. Ammel's children and their continuing relationship, make it unlikely that Ms. Sinema's testimony about her relationship with Mr. Ammel was true. The Court

also finds it implausible that Mr. Ammel, a married man and mere security guard to Ms. Sinema, would have kissed his boss, a United States Senator, with no prior flirting or invitation.

Ms. Sinema argues that Ms. Ammel cannot prove that seven of these messages were sent to Mr. Ammel while he was in North Carolina. The Court accepts Ms. Ammel's testimony that she found the messages on Mr. Ammel's phone at her home. However, she acknowledged that she did not know when the messages were sent.

Both Ms. Sinema and Mr. Ammel had their phones set to delete messages eight hours after they were read. *Deposition of Mr. Ammel*, pp. 24–25, D.E. 37-3; *Deposition of Ms. Sinema*, pp. 91–92, D.E. 37-2. Ms. Sinema did not provide any evidence that Mr. Ammel regularly waited a long time to read her messages. Therefore, the Court infers that Mr. Ammel usually read Ms. Sinema's messages soon after she sent them since she was his boss, and they were beginning an intimate relationship. Because Ms. Ammel saw the messages in North Carolina within eight hours of the time they were first read, the Court finds it reasonable to conclude that the messages were sent while Mr. Ammel was in North Carolina.

Ms. Sinema argues that such an inference is not appropriate since Mr. Ammel was often traveling. Although both parties, for different reasons, seek to portray Mr. Ammel as a man who was rarely home, the phone records tell a different story. Those records show that Mr. Ammel was in North Carolina more than 60% of the time between November 1, 2023, and November 1, 2024. *See Defendant's Supplemental Brief on Personal Jurisdiction, Exhibit C – Supplemental Declaration of Mr. Ammel*, D.E. 39-3 (August 12, 2026). Therefore, the Court finds that Ms. Ammel has shown, by a preponderance of the evidence, that Mr. Ammel was in North Carolina when the messages were sent.

Ms. Sinema next claims that she did not know Mr. Ammel's location when she sent the messages and therefore did not expressly aim her conduct at North Carolina. The evidence, however, does not support that contention. Ms. Sinema admitted that she knew Mr. Ammel was married and lived in North Carolina with his wife and children during the relevant period. *Deposition of Ms. Sinema*, p. 70, D.E. 37-2. Moreover, during the relevant period, Mr. Ammel worked as security for Ms. Sinema. The text messages also convey a personal and emotional relationship that makes it more likely that Ms. Sinema would know where Mr. Ammel was. Therefore, it is reasonable to conclude that Ms. Sinema knew where Mr. Ammel was at the time the messages were sent. And even if she did not know exactly, she certainly knew he was not with her or her staff and therefore likely to be at home in North Carolina.

The October 3, 2024, "hand over your heart" message is in a different category because there is no dispute that Mr. Ammel was in North Carolina when it was sent. Nonetheless, Ms. Sinema still claims that she did not *know* where Mr. Ammel was when she sent it. Ms. Sinema testified that she and Mr. Ammel had sexual intercourse on the night of October 2, 2024, after which he spent the night at her house. She further testified that she knew Mr. Ammel planned to leave early the following morning to catch a flight, but she did not know that he was going to North Carolina for his daughter's birthday. However, by that time, Ms. Sinema had been in a romantic relationship with Mr. Ammel for more than four months. *Id*. 36–37. Their relationship had likely been personal and emotional for even longer. And Ms. Sinema had a relationship with Mr. Ammel's children. For example, in July 2024, she attended a concert with one of his children and gave them a tour of the Capitol. *Plaintiff's Discovery Responses*, p. 14, D.E. 39-1. She also attended a Taylor Swift concert with the children in mid-October, just a few weeks after the text at issue was sent. *Deposition of Ms. Ammel*, pp. 146–147, D.E. 37-1. Against that backdrop, the Court finds it implausible that Mr. Ammel would have left Ms. Sinema before 6:22 a.m. to catch a flight without telling her that he was returning to North Carolina for his daughter's birthday.

Thus, as in *Calder*, North Carolina was the "focal point" of the alleged tortious conduct. Ms. Sinema knew that Mr. Ammel was married, lived in North Carolina, and had children there. The evidence further supports the conclusion that she knew Mr. Ammel generally returned to North Carolina when he was not with her and that the alleged conduct would cause harm to Ms. Ammel in North Carolina, where she and her children lived.

Therefore, despite testimony to the contrary, the evidence demonstrates that Ms. Sinema purposefully availed herself of the privilege of conducting activities in North Carolina by sending nine messages to Mr. Sinema, a married man, while he was in North Carolina. These messages, considered together, show Ms. Sinema building and furthering a romantic relationship with Mr. Ammel—invading the marriage not just while he was away on trips with her but while he was home with his family in North Carolina.

B. <u>Claims Arising Out of Activities Directed at the State</u>

The second prong is whether the claims arise out of or relate to defendant's contacts with the forum. *See Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 138 (4th Cir. 2020); *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017). "[T]here must be 'an affiliation between the forum

and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Bristol-Myers Squibb Co.*, 582 U.S. at 262 (internal citation and quotation marks omitted). Therefore, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id*. (internal citation and quotation marks omitted).

As discussed above, a claim for alienation of affection requires a plaintiff to prove: "(1) there was a marriage with love and affection existing between the husband and wife; (2) that love and affection was alienated; and (3) the malicious acts of the defendant produced the loss of that love and affection." *Fish* 297 N.C. App. at 739 (internal citation omitted).

Here, Ms. Sinema's contacts with North Carolina consist of nine text messages she sent to Mr. Ammel while he was in North Carolina. *See Plaintiff's Discovery Responses*, pp. 9–11, D.E. 39-1. Some of those messages, standing alone, constitute acts that contributed to the loss of love and affection between Mr. and Ms. Ammel. Viewed collectively, the messages do more: they develop and further the intimate relationship between Mr. Ammel and Ms. Sinema that allegedly produced the loss of love and affection between Mr. and Ms. Ammel. Because Ms. Sinema sent these messages to Mr. Ammel while he was physically present in North Carolina, the messages bear a direct connection to the conduct underlying Ms. Ammel's alienation of affection claim. Accordingly, the claim arises out of or relates to Ms. Sinema's contacts with North Carolina.

C. Constitutionally Reasonable

Lastly, courts consider "[the] contacts . . . in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 U.S. at 476 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). Those factors include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Id*. at 477 (internal quotation marks and citations omitted).

North Carolina's interest in adjudicating this dispute weighs strongly in favor of exercising personal jurisdiction. In *Malecek v. Williams*, the North Carolina Court of Appeals explained that North Carolina has an interest in "seek[ing] to deter and remedy the harmful effects that result from acts that cause people to break their marriage vows, inflict personal injury on others, and damage the institution of

marriage." 255 N.C. App. 300, 306 (2017). By contrast, Ms. Sinema has not presented evidence that litigating this matter in North Carolina would impose a significant burden. Although Ms. Sinema resides in Arizona, she testified that she works in Washington, D.C., which is a 90-minute flight or a 5-hour drive from Winston-Salem, North Carolina. Furthermore, Ms. Sinema is an experienced traveler. If she can live in Arizona and work in Washington, D.C., it seems unlikely that a lawsuit in North Carolina would impose a burden.

Therefore, North Carolina's substantial interest in adjudicating the dispute, coupled with the absence of any demonstrated burden on Ms. Sinema, supports the conclusion that the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.

Accordingly, because Ms. Ammel has made a showing of personal jurisdiction by a preponderance of the evidence, the motion to dismiss is denied.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Ms. Sinema's motion to dismiss for lack of personal jurisdiction. D.E. 14. Because the Court is denying the motion to dismiss, the motion to compel related to jurisdictional discovery, D.E. 30, is DENIED as MOOT.

This the 4th day of September, 2026.

*/s/ David A. Bragdon*
United States District Judge